FILED
OCT 27 2006
CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

*'Ilio'Ulaokalani Coalition v. Rumsfeld*, No. 05-15915

BEA, Circuit Judge, dissenting from the order:

I respectfully dissent from the panel's order regarding plaintiffs-appellants' Emergency Motion Under Circuit Rule 27-3(a) For Interim Injunctive Relief Pending Decision Regarding Permanent Injunction.

A.  *The panel's order is overbroad; it violates Circuit Rule 27-3.*

As a threshold matter, the order reaches too far because the motion's Circuit Rule 27-3 Certificate of Counsel claims irreparable damage only with respect of burial grounds and cultural sites. Mtn at i–iv. Even if an injunction were warranted, it should touch only upon grubbing, grading, other ground disturbance, and construction or other activities which require the excavation of ground that contains burial grounds and cultural sites. *See* Ninth Circuit Rule 27-3(a)(3)(ii) (counsel's certificate shall set forth the "[f]acts showing the existence and nature of the claimed emergency"); *see also infra* part D (concluding injunction agreed on in Joint Stipulation is not binding in this court). Since no irreparable damage to such burial grounds and cultural sites is threatened by land acquisition, project design, or contract award, the majority's order simply over-reaches our authority under our Circuit Rules. Those rules require we decide only those issues invoked by Counsel's Certificate purportedly justifying emergency action. *See id.*

B.  *The district court has already denied similar motions for injunction and made findings of fact that the balance of hardships favors the Army, and these findings should control on the present motion.*

Even as to the questions of grubbing, grading, other ground disturbance, and activities which require excavation, I oppose the issuance of the temporary injunction. Similar motions for preliminary injunction were denied by the district court November 5, 2004, and May 19, 2005. Another similar motion for injunction was denied by this court May 27, 2005. Nothing has changed since those denials as to the claimed irreparable harm to plaintiffs-appellants. The burial and cultural sites were there in 2004–05. But more importantly, nothing has changed from the irreparable harm found by the district court to be threatened to the Army and the Nation. The global War on Terror existed then and it hasn't abated now.

On the other hand, the considerations which the district court found on November 5, 2004 regarding the irreparable damage to be suffered by the Army and the Nation also remain the same: "Delaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." November 5, 2004 Order at 17–18. It is axiomatic this court owes deference to the district court's fact finding of

irreparable injury to the Army and the Nation. Further, there is not one word in the plaintiffs-appellants' proof submitted with the application for this emergency injunction which in the slightest meets, much less rebuts, the finding of the district court that irreparable injury is threatened the defendant-appellants by the issuance of an injunction staying plans for transformation of the 2nd Brigade to Stryker status. Plainly stated, we have not the slightest basis for determining the district court's finding that an injunction would cause irreparable injury to the national security of the United States is an abuse of discretion. The majority does not cite any evidence to reverse the district court's finding of irreparable damage to the Nation should the injunction issue.

What has changed since then is this court's decision of October 5, 2006, which determined the district court had erred in finding the defendants had complied with the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* ("NEPA"). That decision found that failure to *consider* alternative sites for transforming the 2nd Brigade was a procedural failure committed during the administrative process. Rather than reverse the district court's judgement, this court chose to remand the case to the district court with instructions that further administrative proceedings regarding the Army's Site-Specific Environmental Impact Statement (Site-Specific "EIS") be held, during which the defendants

should comply with the procedural steps required by this court, namely, *consider* alternative locations.

That determination of this court does not require the defendants to *choose* alternate locations for transforming the 2nd Brigade. Such substantive directions to the defendants would, of course, be beyond the power of this court under NEPA. The October 5, 2006 decision of this court merely prescribes additional procedures with which the Army must comply to satisfy NEPA; it does not alter the balance of hardships between the parties regarding whether an injunction should issue.

C.   *Plaintiffs-appellants attempts to show irreparable harm are faulty and fail.*

Further, the plaintiffs-appellants' evidentiary showing as to irreparable damage to burial sites and cultural sites is simply inadequate. The declarations of plaintiffs' archeologists and Cultural Monitor show that all of Hawaii is subject to Native Hawaiian burials. The location of such burials can be in the mountains, the plains, or the sea shores. Tengan Dec. ¶ 3. The Native Hawaiian custom is to keep the sites of the burials secret to prevent burial site defilement by enemies of the family doing the burial. *Id.* at ¶ 7. Indeed, Mr. Quitevis, a Cultural Monitor and a member of a Native Hawaiian family which he declares has inhabited the very area in question (Schofield Barracks BAX) from "time immemorial,"

Quitevis Dec. ¶ 1, fails to locate either a single place in that area where burials occurred, or a place where burials did *not* occur, so to guide the Army in building in a manner to avoid defilement of Native Hawaiian burial sites. *See id.* This silence as to the burial locations may be in keeping with the Native Hawaiian custom of secrecy. On the other hand, it may be due to Quitevis's lack of knowledge of where his ancestors "iwi" are buried. The fact is that a majority of Native Hawaiians cannot locate the bones ("iwi") of their ancestors. Abad Dec. ¶ 8. Indeed, there is no evidence presented that Native Hawaiians buried their ancestors' bones in areas they inhabited or hid them elsewhere on the islands of the State.

Albeit rank hearsay, witness Tegan claims "[t]he above testimonies reveal that the living descendants today suffer spiritually, physically, culturally, and emotionally each time a burial or cultural site is desecrated." Tegan Dec. ¶ 11. "Years after the destruction of the Kukuiokāne Heiau in 1990 during the construction of the H-3 Freeway, Hawaiians still suffer deep despair and pain." *Id.* at ¶ 15. But one cannot improve for proof of utter lack of concrete damages, to say nothing of irreparable damage, to cultural resources, than Quitevis's own declaration: "Without prior identification and evaluation of all cultural resources, the full extent of harm to cultural resources is unknown, and likely can never be

5

known." Quitevis Dec. ¶ 12.

However, one look at the development of Hawaii in the past, and the development taking place at the present, belies the extravagant claim that Native Hawaiian burial sites permeate the whole of the State and that excavation anywhere will cause the threatened defilement of such sites and that great emotional and spiritual damage to Native Hawaiians. If it were such as claimed by the Groups, the Native Hawaiian population of the State would present with symptoms of at least clinical depression, rather than the vibrant community it is. The elected representatives of these Native Hawaiians would surely prohibit the grant of any building permits for building foundations, streets, or underground utility installations for fear of defilement of Native Hawaiian burial sites. Clearly, the academics' declarations are subject to severe credibility criticism just on the basis of common sense.

Further, the declarations submitted by plaintiff are rife with hearsay and statements unfounded in personal knowledge. For example, the Abad declaration states: "Reports . . . reveal ongoing, widespread noncompliance by the Army with the letter and spirit of the [Programmatic Agreement]." Abad Dec. ¶ 22. Yet there is no foundational evidence that Abad wrote these "reports"; the reports were not even attached, eliminating the possibility they be self-authenticating and perhaps

6

official records not subject to hearsay objections. Quitevis's declaration does not explain who "we" are when he states that "we have found," Quitevis Dec. ¶ 7, that initial Army surveys ignored cultural artifacts. It strips the credibility from the initial personal knowledge statement and is, at best, vague and ambiguous: did he find, or did some other person or persons with whom he might think he is associated, find that the Army did as stated? That problem recurs in describing new sites which "we have increased" to "191 and counting," *id.* at ¶ 8. This "we" also discovered a bulldozer's activity, *id.* at ¶ 13, p. 9, and "we" found "that there are numerous undocumented sites . . ." *Id.* at ¶ 18. Next, the facts related are unacceptably vague: "*Some* of them [sites] lie within the supposed footprint of construction . . ."; "*Elsewhere,* a streambed was filled and culvert installed . . . *Id.* at ¶¶ 8; 13, p.10 (emphasis added).

Finally, plaintiffs-appellants' motion is rife with half-truths and misleading citations to the record. The Army's EISs do not establish "irreparable" harm as plaintiffs-appellants assert; rather, those documents speak of "significant" harms that can be lessened through mitigation measures. Plaintiffs-appellants' Counsel's certificate claims the army's mitigation measures "would do nothing to eliminate the irreparable cultural harm," but cites as authority only the Site-Specific EIS, which contains no such admission or assertion. Mtn. at iv. Additionally, a careful

reading of the record reveals that the "historic buildings" that are alleged to be threatened in the SBCT transformation are mainly Nike Missile buildings and other Cold War relics. *See* AR-S 51525.

D.   *The Joint Stipulation is not binding in this court.*

The majority's order granting temporary injunction mirrors the November 22, 2004 Joint Stipulation entered into by the Army and the plaintiffs-appellants in the district court. However, this Stipulation is of no bearing in this court, any more than its provisions regarding discovery would be controlling or relevant in this court. The plaintiffs-appellants argue that the term "Court" should be interpreted according to its plain, ordinary and accepted use. Mtn. at 9. Apparently, the majority's order has bought the argument that "Court" can apply to this court. However, the plain, ordinary meaning of "Court" here is the district court. The Bluebook recognizes the significance of capitalizing "Court" in a motion:

> In addition to capitalizing "Court" when naming any court in full or when referring to the U.S. Supreme Court, also capitalize "Court" in a court document *when referring to the court that will be receiving that document.*

THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION (Columbia Law Review Ass'n et al. eds., 18th ed. 2005) at 21 (emphasis added). Here, the district court is "the" single "court" that "receiv[ed]" the Stipulation. This court "received" the

8

Stipulation in the sense that it was submitted as an exhibit in the present motion, but the Bluebook does not say "courts," it says "court."

The plaintiffs-appellants argue the Stipulation should be construed as a whole. Mtn at 9. Construed as a whole, however, the Stipulation allows the Army to avoid discovery requests it faced in district court by agreeing to refrain from transformation activities if the same court found a NEPA violation. The Stipulation states:

> The parties have negotiated and executed this Joint Stipulation in good faith in order to minimize litigation on whether discovery is appropriate in this action and to avoid the need to file a motion to quash the deposition notices served upon Mr. Bechtel and Mr. Swan.

November 22, 2004 Stipulation at ¶ 7. Once an appeal was taken, "the Court" (*i.e.*, the district court) had made its determination that no NEPA violation was present. The discovery requests referred to in the Stipulation then were moot. The agreement then ceased to have practical effect, for it simply was not the case that "the Court finds that defendants violated NEPA." *Id.* at ¶ 4. Contrary to plaintiffs-appellants' position, there is nothing "absurd" about interpreting the Stipulation to apply only in the district court. What is "absurd" is plaintiffs-appellants' claim that under this interpretation, "the parties would never reach 'issues related to remedy.'" The paragraph cited by plaintiffs-appellants in this

9

vein states:

> Resolution of the merits of plaintiffs' NEPA challenge is bifurcated from the determination of the appropriate remedy should the Court find a NEPA violation. The parties' cross-motions for summary judgment . . . shall focus solely on whether defendants violated NEPA, leaving issues related to remedy to a later date, should the Court find a NEPA violation.

November 22, 2004 Stipulation at ¶ 1. This purpose of this paragraph is to eliminate "issues related to remedy" from the parties' motions, which motions were the basis of this appeal. The parties will reach issues related to remedy, if at all, in the district court on remand, but that has nothing to do with whether a Stipulation agreed on before appeal should be deemed binding in this court.

On appeal, the parties could have entered into a similar stipulation providing for the Army to cease transformation activity. They did not. Given that they did not, the Army should not be held to have agreed to cease transformation activity if a panel of this court—or any other court, for that matter—were, at some point in this litigation, to find the Army had violated NEPA. The Army agreed to the Stipulation to avoid specific discovery requests in the district court, and we should not interpret the Stipulation any differently.

E.   *The lesson we were taught a week ago by the Supreme Court.*

Perhaps most importantly, the majority's order seems oblivious to the harsh lesson taught us a week ago when the Supreme Court filed its decision in *Purcell*

10

*v. Gonzalez*, 549 U.S. ___ (October 20, 2006) (per curiam).

*1. The importance of District Court findings of fact and conclusions of law*

"These findings were important because resolution of legal questions in the Court of Appeals required evaluation of underlying factual issues." *Purcell*, Slip. Op. at 2.

Here we have District Court findings of fact and conclusions of law—but they support only a denial, not a grant of a temporary injunction. *See* Orders of November 5, 2004 and May 19, 2005.

The majority's order quite ignores such district court findings. It does not even attempt to invalidate them as abuses of discretion, or by changed conditions, if any.

"It was still necessary, as a procedural matter, for the Court of Appeals to give deference to the discretion of the District Court. We find no indication that it did so, and we conclude this was error." *Purcell*, Slip Op. at 4.

The majority's order, regrettably, does just that.

*2. The importance of offering an explanation or justification for the order of the Court of Appeals.*

The Supreme Court chastised our court in *Purcell* for issuing a two-judge order enjoining a state election in Arizona without analysis, citation of authority,

11

or other explanation.

"The Court of Appeals offered no explanation or justification for its order." *Id.* at 3.

The majority's order, regrettably, does just that. It is a diktat. It faithfully follows plaintiffs-appellants' requested injunction, without a word of explanation or justification.

> The Supreme Court pointed out why a reasoned explanation is necessary: [T]he Court of Appeals was required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures . . . . Furthermore, it might have given some weight to the possibility that the nonprevailing parties would want to seek en banc review. In the Ninth Circuit that procedure, involving the voting by all active judges and an en banc hearing by a court of 15, can consume further valuable time.

*Id.* at 4.

The majority's order, as it stands, will leave the Supreme Court in the same position it was in in the *Purcell* case. "[Without] any factual findings or indeed any reasoning of its own the Court of Appeals left this Court in the position of evaluating the Court of Appeals' bare order in light of the District Court's ultimate findings." *Id.* at 5.

The majority's order appears directly to contravene the Court's instruction in *Purcell*.

12

For all these reasons, I respectfully dissent.