**FILED**

*'Ilio'Ulaokalani Coalition v. Rumsfeld*, No. 05-15915

OCT 05 2006

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

BEA, Circuit Judge, dissenting:

This case questions whether a court can second-guess the Army when it decides that modernizing its brigade units as quickly as possible, while maintaining combat readiness, can be done only "in place," i.e., at each brigade's present base location. In the name of environmental "concerns,"[1] the majority would require the Army to consider what it has already reasonably rejected: whether it should consider moving Army units around the country for the new training—regardless it would cause delay in modernizing, lack of combat-readiness and entail prohibitive costs—because of possible environmental impacts training "in place" could cause.

I respectfully dissent. The purpose and need of the Army's overall transformation is to modernize its brigade units as quickly and efficiently as possible, while maintaining combat readiness. To further that purpose and need, the Army reasonably decided such transformation would proceed "in place." Not

---

[1] I place the word in quotes because it may have acquired a special meaning in the context of environmental litigation. Where other litigants have "objections," environmental groups seem to have "concerns." This may imply the "concerned" possess a greater commitment, sensitivity and objectivity. Nonetheless, for our purposes, to have effect in litigation, "concerns," like objections, must be voiced and justified, or be lost by doctrines of waiver and exhaustion of administrative remedies.

1

EXHIBIT "C"

only have plaintiffs failed to raise any challenge to the Army's purpose and need

of quick transformation while maintaining combat readiness, they have also failed

to challenge "in place" transformation as arbitrary and capricious.  I would find

that plaintiffs have failed to argue their only tenable ground for relief: that the

Army improperly ruled out relocation of brigades as an alternative to "in place"

transformation.  But in fact, the decision by the Army to transform units "in place"

was reasonable and is entitled to deference.

    To add insult to injury, the majority would allow plaintiffs to be the vehicle

for this second guessing even though the plaintiffs raised no objections or

"concerns" on the issue of alternate locations for transformation in the agency

proceedings which preceded this action.  In so doing, the majority aims to

strengthen NEPA compliance by cutting out the legs of the administrative process

on which it stands; it accomplishes this result by misapplying and retooling

precedent.  I would affirm the district court, which held the plaintiffs failed to

raise their "concerns" through the prescribed administrative process and should

therefore not be granted relief when they arrive at the federal courts.

    Finally, the majority substitutes its own judgment for the Army's as to

whether there exists a reasonable alternative to "in place" transformation.  The

Army did not have to consider relocation of the 2nd Brigade in Hawaii because it

had already determined transformation of all its brigades including the 2nd

Brigade would be "in place." The Army did have to consider reasonable

alternatives to full transformation in Hawaii, including a no-action alternative, and

the Army did so. The Army adequately considered environmental impacts to

Hawaii by alternatives consistent with the purpose and need of the project.

I

A

In 1999, the Secretary of the Army and Chief of Staff of the Army

articulated a vision of transformation of *all* Army brigade units into what the

Army thought would be a more effective and dominant force, responsive to what it

saw as new and different strategic threats to the nation. In 2000, the Army

published notices of its intended transformation in the Federal Register and in

USA TODAY. The Federal Register notice informed the public the Army intended

to prepare a Programmatic Environmental Impact Statement (PEIS)[2]; the USA

TODAY notice announced the Army was seeking public input for the PEIS. The

---

[2] Consistent with the PEIS's statement of purpose and need, the Federal Register notice informed readers: "The Army will implement transformation as rapidly as possible, while continually maintaining the warfighting readiness of its operational forces . . . ." 65 Fed. Reg. 78476 (Dec. 15, 2000). It also noted "all aspects" of the Army would undergo transformation. *Id.*

3

initial draft of the PEIS was completed in 2001.[3]  The Army then published notices

the draft PEIS was available to the public for the asking.  These notices were again

published in the Federal Register and in USA TODAY.  Those notices announced a

public comment period during which members of the public could submit

comments that would be considered before the final PEIS issued.

Given this series of published notices, it is clear the Army met its notice

obligations under the National Environmental Policy Act of 1969, 42 U.S.C.

§ 4321 et seq. (NEPA).  40 C.F.R. § 1506.6(b)(2) provides that for each "action

with effects of national concern notice shall include publication in the Federal

Register and notice by mail to national organizations reasonably expected to be

interested in the matter . . . ."  The Army transformation program was national in

scope; no program is more "national" in scope that the transformation of the whole

Army, located over all the states and in foreign countries.  Plaintiffs are clearly not

a "national organization" reasonably expected to be interested in the national

transformation, nor do they claim to be.  As such, the Army correctly chose to and

---

[3] The draft PEIS informed readers: "For the foreseeable future, the Army
would expect to conduct its transformation of existing operating forces 'in-place.'
Relocation of units would not be anticipated."  Draft Programmatic Environmental
Impact Statement (Oct. 2001), at 4-3, AR 0003714.  It also informed readers that
"[t]he Army has tentatively identified three additional brigades . . . for sequenced
transformation [including] the 2nd Brigade, 25th Infantry Division (Light),
Schofield Barracks, Hawaii."  Id. at 2-9, AR 0003597.

did comply with Council on Environmental Quality (CEQ)[4] and Army regulations. It published in the Federal Register (as required) and in USA TODAY (as unrequired outreach) and it did not mail to plaintiffs since they are not a national organization, a point they concede. The notice was adequate. Indeed, the majority cannot bring itself to find otherwise. Although vigorously urged by plaintiffs to reverse on this ground, it does not overrule the district court's denial of summary judgment to the plaintiffs for inadequacy of the notice. *Maj. Op.* at 17.[5]

B

Plaintiffs do not challenge—even on appeal—the most important determination by the Army in this case: "in place" transformation of all brigade units. The Army discussed and analyzed the impacts of its overall transformation in the PEIS. The PEIS stated the purpose and need of overall Army transformation was to modernize the Army's units "in the most timely and efficient manner possible and without compromising readiness and

---

[4] The CEQ sits within the Executive Office of the President and is composed of three members appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. 42 U.S.C. § 4342.

[5] Albeit not without a "tsk-tsk" footnote counseling the Army it was not "wise" in its notification. *Maj Op.* at 17 n.4. This merely serves to emphasize the Army *did* comply with legal requirements; it just didn't do so in a way that pleases those in the judiciary who would be its editors.

5

responsiveness." Final Programmatic Environmental Impact Statement (Feb. 2002), at 1-2, AR 0003865. To that end, the PEIS determined that "the Army would expect to conduct its transformation of existing operating forces 'in place.' Relocation of units would not be anticipated." *Id.* at 4-3, AR 0004000. Plaintiffs do not quarrel with any of this; rather, they aim to have the court create a requirement that the Army analyze alternate locations for training each brigade notwithstanding the Army's reasoned and unchallenged decision to transform units "in place." Once the decision to transform all brigade units "in place" was made, the Army was not obligated to consider stationing alternatives; those alternatives were by definition unreasonable and irrelevant. The fact the PEIS identifies the 2nd Brigade as an Interim Force brigade does not change this conclusion. Every unit in the Army is either in the Initial (first), Interim (second), or Objective (third) Phase. All eventually will transform from traditional brigades to Stryker brigades. Whether the 2nd Brigade was selected in the PEIS or later in a different document, the fact remains that because all Army units will be transformed "in place" to ensure timely transformation and readiness, stationing alternatives need not be considered.

The plaintiffs *could* have challenged the Army's "in place" decision which ruled out alternative relocations of the units. However, the challenge would have

6

had to prove the Army's decision was "arbitrary and capricious," for that is the correct standard of review. *See* 5 U.S.C. § 706; *Lands Council v. Powell*, 395 F.3d 1019, 1026 n.5 (9th Cir. 2005) (arbitrary and capricious standard applies to claims of inadequate analysis under NEPA). They did not so challenge; they do not even now. This is the principal reason why this appeal is without merit. Plaintiffs' argument that the Army had to consider relocation of the 2nd Brigade ignores (and fails to challenge) the elephant in the living room: *the Army had already determined that to achieve its purpose and need, transformation of all units, including the 2nd Brigade in Hawaii, would be accomplished "in place."*

## C

### 1

Even if plaintiffs had properly challenged the Army's "in place" transformation of all Army units, I would find the Army's exercise of judgment in choosing it was not arbitrary and capricious. Like any other federal agency, the Army must comply with NEPA; it is not exempt just because it guards our national security. And, as with other federal agencies, NEPA does not mandate environmentalist groups to tell the Army how to do its job. What NEPA tells the Army is what procedures it must follow to analyze environmental issues. *See Powell*, 395 F.3d at 1026–27. That is, NEPA mandates how the Army should go

7

about deciding these issues; not what it should decide as to any of them. Finally, the procedures must be reasonable in the circumstances, or within the purpose and need of the agency's project. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1067 (9th Cir. 1998) ("When the purpose [of a project] is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." (quoting *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986)) (emphasis omitted)). Given the sequence of strategic decisions by the Army, its decision to transform units "in place" was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

Suppose the Army wanted to set up an artillery firing range (purpose) at one of several locations. All else being equal, the Army should consider at which location the shells will do the least damage to the flora and fauna. It does not make much difference to the Army where the shells fall (need). But if what is proposed is to deny the enemy San Francisco Bay (purpose) by fortifying the high ground bordering it, with cannon that can shoot down to rake the enemy ships that may be in the Bay, the Army is not made to consider the alternative of placing the cannon on the flat, all to save some trees that grow on the hills' rim. Nor can the Army be made to spare the trees if they get in the way of moving the cannon

quickly. The Army would require shoot down capability and movement in its cannon (need).

When the Army spells out its purpose and need for a project, this court can review its decision not to consider alternative locations less harmful to the environment only when the suggested alternatives are reasonable, given the purpose and need of the Army's project. That review is limited to the question whether the Army acted arbitrarily and capriciously—that is, unreasonably—in failing to consider the alternatives. 5 U.S.C. § 706; *Powell*, 395 F.3d 1019, 1026 n.5. Here, "in place" transformation was not unreasonable in view of the purpose and need of the Army's transformation: relocation was ruled out as a reasonable possibility because the Army's purpose and need to transform its units to Stryker Brigades must be done as quickly as possible while maintaining combat-readiness. This case is like the location of the cannon on the hill, not the selection of the artillery range.

2

As noted, the decision to transform "in place" was within the Army's stated purpose and need of upgrading its units quickly while maintaining readiness. The Army has stated *all* Army units will undergo transformation within the next thirty years. The consideration of alternate locations for transformation would require

9

taking into account all the places to which each of the brigades could be transferred for training. Conceivably, the Army could consider relocating each brigade to another base. But, it would be fatuous to consider relocating units merely for the exercise of relocating them. That would simply be a bureaucratic game of "musical chairs."

If consideration is to be given to alternate locations for training, there must be some Army bases where the training can take place with less danger of environmental harm than there is to other bases. Indeed, there may be a base so bereft of flora, fauna and archeological troves that little harm could be done there by 20-ton Stryker vehicles, no matter how sophisticated the investigative techniques used by environmental groups such as plaintiffs. Call such a location Camp X. The majority would have each of the Site-Specific Environmental Impact Statements (SEISs) for each of the brigades "consider" relocation to Camp X. If to "consider" is to be anything more than a doff of the hat to environmental groups, any reasonable administrator will actually be obligated to decide that each brigade should be transformed at Base X. The result is that each of the seventy brigade-sized units would be transformed, one at a time, at Camp X. Equipping and transforming a Stryker Brigade Combat Team takes two years, plus an additional period to reach Final Operational Capability. Suppose the total time to

achieve transformation of a brigade is two and a half years: that computes to 175

years to achieve the overall transformation the Army needs done in thirty.  In 175

years, perhaps even the Stryker will be surpassed by technology and be considered

as effective a military artifact as is now the rowboat used to ferry General

Washington to Trenton.

Ah, but the 175 years would be cut to thirty, if six such Camp Xs were

designated. But, how would one maintain combat-readiness for the six itinerant

brigades which, like the soul of the Flying Dutchman, would have to move each

2.5 years to the bases of the brigades being sent to the six Camp Xs, and never

reach their original homes until the end of the program?  Charged with the

"purpose and need" of transforming quickly and maintaining combat-readiness,

can we say it was "arbitrary and capricious" for the Army to determine that each

brigade should transform "in place," that is, at its own home base?  The Army

chose to foreclose a more circuitous route to transformation in the PEIS, and its

decision is entitled to deference.  Preparing an EIS "necessarily calls for judgment,

and that judgment is the agency's."  *Westlands Water Dist. v. United States Dept.*

*of the Interior*, 376 F.3d 853, 866 (9th Cir. 2004) (internal quotation marks

omitted).

This is not to deny that the Army *may* relocate forces during its

11

transformation.  The Army decided to relocate the 2nd Armored Cavalry Regiment from Fort Polk, Louisiana, to Fort Lewis, Washington, so that a Brigade Combat Team could be created at Fort Polk.  How can this lawful exercise of agency power translate into a requirement that the Army must consider relocation of all units or relocation of the 2nd Brigade?  A particular relocation would have to conform to applicable requirements, including perhaps NEPA requirements, but those are not at issue here.  The decision to relocate a particular regiment has no bearing on NEPA requirements involving the Army's overall transformation.  The relocation of one regiment does not render relocation of other regiments reasonable or feasible, particularly where the Army has cited the strategic importance of the Pacific Rim.  Nor do individual relocations estop the Army from stating that large-scale relocation is outside the scope of the transformation process.

## II

From the adequacy of the notice, *see supra* Part IA, one must conclude that because the plaintiffs had notice that Army units—including the 2nd Brigade—would be transformed "in place" and yet failed to take the opportunity to comment, complain or voice any "concerns," plaintiffs should be barred from bringing the present action.  This section concludes that plaintiffs waived any

challenges to Army transformation in Hawaii when they failed to comment on the

Army's EISs, which did not contain any errors that were "so obvious" that

plaintiffs' failure to comment can be excused.

A

Anyone who had written to the Army or navigated to the Army webpage as

provided in the 2001 notices would have received a copy of the draft PEIS.

Anyone who had then read the draft PEIS would have learned the Army intended

to transform all its forces "in place." Someone reading the draft PEIS would have

seen something else: the 2nd Brigade in Hawaii had been tentatively selected to

participate in the Interim Phase of the transformation, which meant it would

transform itself earlier than the other 60-odd Army brigades. After an agency

makes an EIS available, the Environmental Protection Agency publishes a Notice

of Availability that begins a period during which the agency must accept

comments from the public regarding the EIS. 40 C.F.R. § 1506.10. Here,

plaintiffs had at least 45 days during which they could make their comments or

complaints, or voice their "concerns," about the 2nd Brigade's transformation in

Hawaii as opposed to other locations, which plaintiffs imagined to be reasonable

alternative locations. If plaintiffs wanted to argue that the Army had not given

sufficient consideration to the relocation of units during transformation, they were

13

told by the notices where and when they could challenge the Army's judgment that

the most rapid transformation possible, while maintaining combat-readiness,

requires the transformation and its training "in place," i.e., at each brigade's home

base.

The Administrative Procedure Act requires plaintiffs to exhaust remedies

before bringing suit in federal court. 5 U.S.C. § 704. "The purpose of the

exhaustion doctrine is to allow the administrative agency in question to exercise

its expertise over the subject matter and to permit the agency an opportunity to

correct any mistakes that may have occurred during the proceeding, thus avoiding

unnecessary or premature judicial intervention into the administrative process."

*Daly-Murphy v. Winston*, 820 F.2d 1470, 1476 (9th Cir. 1987) (internal quotation

marks omitted) (district court did not abuse its discretion in requiring Veterans

Administration (VA) hospital doctor to raise wrongful suspension claims through

the VA's prescribed peer review and other administrative procedures because

procedures were not inadequate, inefficacious, futile, harmful, or void, and injury

was not irreparable because suspension was with pay); *see also McCarthy v.*

*Madigan*, 503 U.S. 140, 145 (1992) ("[T]he exhaustion doctrine recognizes the

notion, grounded in deference to Congress' delegation of authority to coordinate

branches of Government, that agencies, not the courts, ought to have primary

14

responsibility for the programs that Congress has charged them to administer. . . . The exhaustion doctrine also acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."); *Ruviwat v. Smith*, 701 F.2d 844, 845 (9th Cir. 1983) ("[T]he requirement of exhaustion of remedies will aid judicial review by allowing the appropriate development of a factual record in an expert forum; conserve the court's time because of the possibility that the relief applied for may be granted at the administrative level; and allow the administrative agency an opportunity to correct errors occurring in the course of administrative proceedings."); *cf. I.N.S. v. Orlando Ventura*, 537 U.S. 12, 17 (2002) ("The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides.").

The Supreme Court held in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519 (1978), that the exhaustion requirement applies to claims under NEPA. There, a group called Saginaw commented on a draft EIS written by the Atomic Energy Commission (AEC) for

construction of two nuclear power plants, raising 119 environmental contentions,
seventeen of which the D.C. Circuit interpreted as assertions the EIS was fatally
defective for failure to examine "energy conservation" as an alternative to a
nuclear power plant. *Id.* at 531–32; *Aeschliman v. U.S. Nuclear Regulatory
Comm'n*, 547 F.2d 622, 625 (D.C. Cir. 1976). The AEC revised the EIS and
conducted further hearings at which Saginaw declined to participate. *Vermont
Yankee*, 435 U.S. at 532. The AEC's Licensing Board granted a permit for
construction of the plants and its Appeal Board affirmed. *Id.* at 533. After the
CEQ promulgated new regulations requiring EISs to consider "energy
conservation" alternatives, Saginaw moved to have the AEC clarify its ruling and
reopen proceedings on the power plants. *Id.* The Commission declined, noting it
had been willing to take evidence on Saginaw's contentions but that Saginaw had
failed to present any and had shown "total disregard of even those minimal
procedural formalities necessary to give the Board some idea of exactly what was
at issue." *Id.* at 533–34. The Commission noted that it had a responsibility to
conform to the CEQ's new regulations, but that "the Board must have some
workable procedural rules" and that "intervenors also have their responsibilities.
They must state clear and reasonably specific energy conservation contentions in a
timely fashion. Beyond that, they have a burden of coming forward with some

16

affirmative showing if they wish to have these novel contentions explored further." *Id.* at 534. Saginaw then challenged the grant of the construction permit by filing a lawsuit in the D.C. Circuit, and the court remanded for further proceedings, holding that because Saginaw had identified "in a general way" the measures it wanted considered, the agency should not have rejected energy conservation alternatives without inquiry or explanation, and doing so was arbitrary and capricious. *Aeschliman*, 547 F.2d at 629–30. The court also criticized the AEC's practice of refusing to entertain comments that did not meet a "threshold test" of substantiality as imposing a "heavy substantive burden[]" on intervenors. *Id.* at 626–27 & n.11.

The Supreme Court reversed. *Vermont Yankee*, 435 U.S. at 558. The Court first noted that "energy conservation" was then a concept of recent vintage, and given its open-ended and evolving nature, the Licensing Board's decision to grant the construction permit was within the proper bounds of its statutory authority. *Id.* at 552–53. The Court then approved the AEC's "threshold test," and held that while the agency must comply with NEPA, "it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Id.* at 553. The Court reasoned that "administrative proceedings should not be a game or a

17

forum to engage in unjustified obstructionism" and that "[c]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern." *Id.* at 553–54 (internal quotation mark omitted). The Court held that to characterize the AEC's actions as arbitrary and capricious would "deprive those words of any meaning." *Id.* at 554. It emphasized the limited role of reviewing courts that it opined the D.C. Circuit had "forgotten":

> [T]he role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review. Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.

Id. at 555 (internal quotation mark omitted).

Just as *Vermont Yankee*'s intervenors should have raised objections material enough to suggest real issues of "energy conservation" as an alternative to the proposed nuclear plants, plaintiffs here should have shown real world alternatives to the Army's twin requirements of maximum speed in transformation while maintaining combat-readiness, or that the application of these twin requirements, which resulted in the decision to transform "in place" for all brigades, was "arbitrary and capricious." *Powell*, 395 F.3d 1019, 1026 n.5. This plaintiffs have

18

never done.  Nor did they raise issues regarding suitable alternate locations in the event that attacks on the purpose and need, as expressed in the twin requirements, were successful.

In *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), the Supreme Court unanimously reaffirmed its view that, under NEPA, would-be intervenors must participate meaningfully in agency proceedings or waive their challenges to agency decisionmaking.  There, the Federal Motor Carrier Safety Administration (FMCSA) had promulgated rules allowing Mexican trucks to operate in the United States and issued an Environmental Assessment (EA) that stated the proposed rules would have no significant impact on the environment; the agency therefore did not prepare a full EIS.  *Id.* at 762.  Unions and environmental groups made comments in response to the EA but had not suggested in those comments that the agency consider claimed environmentally superior alternatives to the proposed rules.  *Id.* at 764–65.  The agency issued the rules, and the unions and groups filed petitions with this court arguing the rules were in violation of NEPA.  *Id.* at 762.  This court remanded for preparation of a full EIS on the ground that the agency had failed to give adequate consideration to the overall environmental impact of its rules allowing the trucks to operate.  *Id.* at 762–63.  Reversing, the Supreme Court held that the unions' and groups'

19

argument that the agency had to consider alternatives to its proposed rules were

challenges not properly before the court. *Id.* at 764. The Court noted the unions

and groups had neither "identified in their comments any rulemaking alternatives"

other than those evaluated by the FMCSA in its environmental assessment (EA),

nor "urged FMCSA to consider alternatives." *Id.* The Court held the unions' and

groups' claims to be waived:

> Because respondents did not raise these particular objections to the EA,
> FMCSA was not given the opportunity to examine any proposed
> alternatives to determine if they were reasonably available. Respondents
> have therefore forfeited any objection to the EA on the ground that it failed
> adequately to discuss potential alternatives to the proposed action.

*Id.*

Just as the unions and environmental groups failed to suggest cleaner air

alternatives to the FMCSA, plaintiffs have failed to suggest lesser environmental

impacts could result from a consideration of alternate, rather than "in place," sites

for troop transformation.

With respect, the majority's attempts to distinguish *Public Citizen* and

*Vermont Yankee* fall short and are contrary to the well-established purpose of the

requirement of exhaustion of remedies. The majority argues that those cases do

not control because there the plaintiff organization submitted inadequate

comments or failed to follow up on submitted comments. The majority would

limit *Vermont Yankee* to those cases in which a plaintiff group submits some comments, yet not apply its rule when a plaintiff group furnishes no comments at all. This makes no sense at all. It would provide an incentive for challenging groups to "hide the ball" in agency proceedings, lest some tepid and ambiguous comments be held to fall within *Vermont Yankee*'s bar. If aspiring intervenors fear *some* participation in agency proceedings will bar them from asserting additional comments in future judicial proceedings, such groups might prefer simply to lie in the weeds, eschew agency proceedings, and later take their suggestions directly to the federal courts, as authorized by today's majority decision. "[E]xhaustion principles apply with special force when frequent and deliberate flouting of administrative processes could weaken an agency's effectiveness by encouraging disregard of its procedures." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) (internal quotation marks omitted). If cryptic and obscure comments cause administrative proceedings to devolve into "a game or a forum to engage in unjustified obstructionism," *Vermont Yankee*, 435 U.S. at 553, plaintiffs' skipping the administrative process altogether threatens to turn agency proceedings into something resembling a meaningless charade. *See Public Citizen*, 541 U.S. at 764 (holding the purpose of the *Vermont Yankee* rule is to "allow the agency to give the issue meaningful consideration"). Here, had the plaintiff groups properly

21

presented the claims they *now* make, the Army could have exercised its

responsibility and authority to research and analyze the plaintiffs' claims.[6]  This

procedure would have either mooted the present dispute or provided a stronger

record on which the federal courts could decide the issue, rather than having to

remand for a supplemental EIS, as the majority does.  Interposing federal judges as

referees in the administrative process carries significant risks of extending judicial

influence where it is not warranted.  "While agencies are not directly accountable

to the people, the Chief Executive is, and it is entirely appropriate for this political

branch of the Government to make . . . policy choices."  *Chevron U.S.A., Inc. v.*

*Natural Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984).

　　　Despite the majority's insistence to the contrary, *Kunaknana v. Clark*, 742

F.2d 1145 (9th Cir. 1984), does not require a different result here.  There, two

Eskimos who led a subsistence lifestyle in the North Slope region of Alaska sued

under the Alaska National Interest Lands Conservation Act (ANILCA) to

challenge oil and gas leases granted by the Bureau of Land Management.  *Id.* at

1147.  The court affirmed the district court's denial of the plaintiffs' claims on the

ground the agency had complied with the procedural requirements of ANILCA.

---

[6] Conceivably, it could have shown the plaintiffs their only viable claim was
to attack the Army's finding that because of its purpose and need, transformation
"in place" was required.

Before doing so, however, the court held the Eskimos' claims were properly

before the court. The court observed that "[t]he purpose of the ANILCA was to

protect those North Slope natives who, like appellants, lead a subsistence

lifestyle." *Id.* at 1148; *see also* 16 U.S.C. § 3101(c) (Congressional statement of

purpose of ANILCA). The court excused the Eskimos' failure to participate

meaningfully in the administrative process and entertained the merits of the

Eskimos' claims. *Kunaknana*, 742 F.2d at 1148. The majority is correct that the

court refused to adopt a "broad rule which would require participation in agency

proceedings as a condition precedent to seeking judicial review of an agency

decision." *Id.* *Kunaknana*, however, is distinguishable as a non-NEPA case

involving another statute the purpose of which was to protect a specifically named

class of Eskimos who sued under that statute. It is not authority for the

interpretation of a statute (NEPA) not involved in the case and which targets no

specific class of protected plaintiffs.

 *Kunaknana* is a case involving "exceptional circumstances" within the

meaning of *Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991) (per

curiam). In *Havasupai Tribe*, the Forest Service approved a plan of operations for

a uranium mine and plaintiffs sued, claiming the agency's EIS contained

inadequate consideration of the impact on groundwater of a planned mine. *Id.* at

23

33. The district court affirmed the Forest Service, holding the agency had adequately considered the issues the plaintiffs were raising. *Id.* at 34. This court affirmed, and held that the district court could have refused to reach the merits of the plaintiffs' claim the EIS was inadequate due to the plaintiffs' failure to raise this challenge before the agency. *Id.* We held that "[a]bsent *exceptional circumstances,* such belatedly raised issues may not form a basis for reversal of an agency decision." *Id.* at 34 (emphasis added). Although the majority is correct that in *Havasupai Tribe,* the plaintiffs' comments were solicited, *see Maj. Op.* at 15–16, nothing in *Havasupai Tribe* equates exceptional circumstances with the *lack* of being personally solicited. *See id.* Here, the concededly adequate notices did solicit plaintiffs'—and everybody else's—input. Seen in this light, *Kunaknana* is a case that fits into *Havasupai Tribe*'s exception for cases that present "exceptional circumstances." In *Kunaknana,* the exceptional circumstances that justified the court's carving out an exception to the *Vermont Yankee* rule was to effectuate Congress's special protection for Eskimos in ANILCA, a reason that is totally inapplicable here, even by analogy. *See Kunaknana,* 742 F.2d at 1151. Plaintiffs have not identified any exceptional circumstances warranting their excusal from *Vermont Yankee*'s requirement, a requirement recently affirmed by the Court in *Public Citizen.*

*Northwest Environmental Defense Center v. Bonneville Power Administration*, 117 F.3d 1520 (9th Cir. 1997), does not weaken this conclusion. First, as the majority acknowledges, that case's discussion of waiver involved the Northwest Power Act, not NEPA.[7]  *See Maj. Op.* at 17.  Second, even if *Bonneville Power* controlled, the plaintiffs' failure to participate should not be excused.  The plaintiffs' claim that the Army should have considered relocation of the 2nd Brigade as a *reasonable* alternative in its EISs is a "specific factual contention regarding the substantive content of an EIS," therefore requiring timely participation, and not a "procedural violation" under which a plaintiff's failure to participate in the administrative process might be excused.  *Bonneville Power*, 117 F.3d at 1535.  After all, what is more a "specific factual contention" than whether something is "reasonable"?  Juries are called upon daily to determine whether defendants acted with "reasonable care."  Plaintiffs had notice that the Army had decided to transform "in place" and that such determination included the 2nd Brigade.  Whether the purpose and need of the project made consideration of alternate locations "reasonable" was a preliminary factual issue that had to be

---

[7] Far from stating NEPA and the Northwest Power Act were "analogous" statutes, the *Bonneville Power* court noted that "[i]n contrast" to the NEPA cases *Vermont Yankee* and *Havasupai Tribe*, the facts in *Bonneville Power* entailed "an alleged procedural violation of a statute that governs the public comment process," namely the Northwest Power Act. *Id.* at 1535.

determined before the procedural duty to consider the alternate sites was triggered. The plaintiffs had to alert the Army that the Army's determination that no alternate locations for transformation were "reasonable" in view of the Army's purpose and need was a determination that had to be examined. As I noted at the beginning of this dissent, even *now* the plaintiffs do not make that claim, the only claim that is conceivably viable: that the purpose and need of the Army transformation (the "twin requirements" mentioned *supra*) are "arbitrary and capricious" or that the Army's decision that such purpose and need require "all units" to transform "in place" is "arbitrary and capricious."

B

The opinion further holds, I think in error, that the Army's EIS contained flaws that were "so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *See Maj. Op.* at 17–18 (quoting *Public Citizen*, 541 U.S. at 765). The Supreme Court penned this language, clearly dicta, in *Public Citizen*. In doing so, it found that this "so obvious" exception did not apply on the facts of that case. *Id.* at 765. It should not apply here, either.

The majority cites dissidence among the Army's staff as evidence of the proposition that errors in the EIS were "so obvious" that plaintiffs were not

26

required to raise objections during agency proceedings. If anything, internal

dissidence shows there was healthy debate and discussion within the Army over

whether alternatives such as relocation of units undergoing transformation could

be considered reasonable in view of the purposes and needs of the program

which—we must remember always, and from the first notice of the draft

PEIS—required transformation "in place" of each and all of the Army's brigades.

In any event, dissidence among agency members does not fit the mold of *Public*

*Citizen*'s exception for obvious errors.[8] Rather, here, as in *Public Citizen*,

plaintiffs "fail to identify any evidence" that shows relocation of the 2nd Brigade

for either temporary training or permanent transformation to any particular

location would advance environmental goals. *Id.*; *see also Angoon*, 803 F.2d at

1022 (9th Cir. 1986) (where plaintiff organization had not offered a "specific,

detailed counterproposal" demonstrating environmental benefits, the

consequences of its proposal were merely "remote and speculative"). In *Public*

---

[8] I find puzzling the majority's reliance on *Friends of Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000), to interpret *Public Citizen*. That case dealt with whether an EIS contained flaws that rendered the EIS inadequate, not whether those flaws were also so obvious that, in addition to rendering the EIS inadequate, the flaws dispensed with the requirement that the commentator identify the flaws during agency proceedings to preserve the flaws as error in later court proceedings. *See id.* at 558–59. The issue of waiver was never in that case because the public commentator had raised the objection or "concern" at the proper time. *See id.* at 555.

*Citizen*, the Court held that "removing older, more polluting trucks through more effective enforcement of motor carrier safety standards" would not obviously have a positive environmental impact because "respondents fail to identify any evidence that shows that any effect from these possible actions would be significant, or even noticeable, for air-quality purposes." *Id.* at 765.

Likewise, plaintiffs here fail to identify any evidence that shows relocation of the 2nd Brigade would have significant, or even noticeable, environmental benefits. In that sense, I agree with the majority that "nothing in the record distinguishes Hawaii from Alaska or Washington." *Maj. Op.* at 37.[9] The record, including the SEIS, details the environmental impacts that transformation would have on Hawaii. Yet the record is silent regarding alternative transformation sites that should have been obvious to the Army. It is not the Army's obligation to guess what stationing locations plaintiff organizations would prefer to Hawaii; it was the *organizations'* responsibility to suggest relocation and alternative siting locations during the administrative process and clearly to state why those alternate locations decreased any claimed environmental impacts. *See Public Citizen*, 541 U.S. at 764–65; *see also Angoon*, 803 F.2d at 1022. It is the *Army's* job to

_____

[9] But see *infra* pp. 30–32 for rejection of this comparison when it used geographical locations.

evaluate *reasonable* alternatives within the stated purpose and need, but as appears in the next Part, relocation of the 2nd Brigade was not a *reasonable* alternative the Army had to evaluate. But even if relocation were a "reasonable alternative," it is not "so obvious" as to exempt it from being raised at the administrative level so properly to exhaust what is now plaintiffs' claim.

III

The Army also met its obligation in the SEIS to consider reasonable alternatives to the proposed action of transforming the 2nd Brigade in Hawaii. The Army's SEIS states its purpose as: "to assist in bringing the Army's Interim Force to operational capability and to provide realistic field training in Hawai'i." Final Site-Specific Environmental Impact Statement, Transformation of the 2nd Brigade, 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii (May 2004) ("Final SEIS"), at 1-4, AR 0051275. The need is stated as: "to provide the nation with capabilities that meet current and evolving national defense requirements." *Id.* The Army's statement of purpose and need is reasonable. Under this purpose and need, the SEIS analyzed a number of alternatives to full transformation in Hawaii, which alternatives would have had substantially similar environmental impacts to relocation of the 2nd Brigade, as plaintiffs urge should have been considered. These alternatives include training

29

the 2nd Brigade on the mainland, and a no-action alternative, under which the 2nd Brigade would not be transformed into a Stryker brigade.

A

"Courts have afforded agencies considerable discretion to define the purpose and need of a project." *Westlands Water Dist.*, 376 F.3d at 866 (internal quotation marks omitted). The SEIS states its purpose is to assist in making the Interim Force operational and to provide realistic field training in Hawaii. These purposes follow directly and respectively from the PEIS's lawful decisions that the 2nd Brigade would transform as part of the Interim Force[10] and that transformation of brigades would be "in place." The SEIS's statement of need adds that the 2nd Brigade was chosen because the Pacific Rim is a critical area of interest for the United States, because Hawaii provides terrain and conditions most likely to be encountered by troops in the Pacific Rim, and because a team stationed in Hawaii may readily be deployed from airbases and seaports of suitable size. I find nothing

_____

[10] To the extent plaintiffs argue the decision to transform the 2nd Brigade as part of the Interim Force, rather than later, lacked sufficient analysis of reasonable alternatives, I disagree. All brigades will be transformed, and some brigade has to be in the Interim Force, just as two brigades were in the Initial Phase. Nothing in the record shows the exercises of Stryker vehicles or other transformation activities will be different in different phases.

unreasonable in the SEIS's statement of purpose and need.[11]

The majority quarrels with the SEIS's statement of reasons why Hawaii was selected for transformation, *see Maj. Op.* at 36–40, but we should defer to the Army's judgment in matters such as deployment and training terrain and conditions, which are fact-bound and technical matters and, therefore, within the Army's discretion. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989) (agency is entitled to deference when a dispute centers on fact-bound matters within the agency's expertise). Moreover, the majority's contentions are unpersuasive. The majority rejects the SEIS's statement that maintaining a presence in the Pacific Rim justified stationing a Stryker Brigade Combat Team (SBCT) in Hawaii, by astonishingly concluding "[n]othing in the record distinguishes Hawaii from Alaska or Washington." *Maj. Op.* at 37. In fact, the record shows that deployment times from Hawaii to areas in South Asia are shorter than deployment times from Washington. U.S. Army Headquarters, Stryker Brigade Combat Team Primer (Aug. 12, 2003) at 5, AR 0006213. Additionally, deployment times from Hawaii to the South Pacific are shorter than

---

[11] Nor, as I explain below, do I agree with the majority that the decision to transform in Hawaii was settled prior to creation of the SEIS. *Maj. Op.* at 28. The SEIS considered a range of alternatives, including a no-action alternative that would have abandoned the plan to transform the 2nd Brigade in Hawaii.

31

deployment times from Washington and, by a small margin, Alaska as well. *Id.*

The majority also contends the SEIS does not support its own statement of need

because the Kawailoa Training Area (KLOA) on Oahu cannot support Stryker

vehicles except on Drum Road. This argument is easily dispatched under our

deferential standard of review, for there is nothing unreasonable about the Army

wanting to have Stryker vehicle exercises on Drum Road coordinated with troop

exercises in the nearby mountainous jungle setting in the KLOA. An agency's

decisions cannot be nullified under NEPA "simply because the court is unhappy

with the result reached." *Vermont Yankee*, 435 U.S. at 558.

B

The SEIS explored the possibility of maneuver live-fire and nonlive-fire

training on the continental U.S. instead of Hawaii, which casts significant doubt

on the plaintiffs' claim that the Army separately needed to consider relocation of

the 2nd Brigade. An agency is not required to undertake a "separate analysis of

alternatives which are not significantly distinguishable from alternatives actually

considered, or which have substantially similar consequences." *Westlands Water

Dist.*, 376 F.3d at 868 (citing *N. Plains Res. Council v. Lujan*, 874 F.2d 661, 666

(9th Cir.1989) (holding that, because an exchange of fee coal interests had

substantially similar consequences to coal leasing, NEPA did not require separate

32

analysis of the exchange)).  Here, the crucial factor is that the *environmental*

*impacts* of relocating the 2nd Brigade would have been substantially similar to the

mainland training alternative and the no-action alternative.  The mainland training

alternative would have provided for the 2nd Brigade and its weapons and materiel

to be transported to one of the three other SBCT sites, located in Alaska,

Washington, and Louisiana, for training.  Under this option, the Army would not

need to acquire a 23,000 acre plot of land and build battle area complexes and

other facilities in Hawaii.  The record is clear that moving live-fire training to the

mainland and not engaging in construction would lessen the "most significant"

environmental impacts on Hawaii of transformation.[12]  Final SEIS at 4-69–4-72,

AR 0051516–0051519.  This option was rejected as unfeasible and impractical

due to the cost and inefficiency of moving the soldiers and equipment to and from

Hawaii, and the strain it would place on the mainland sites.  *Id.* at 2-52, AR

0051337.  NEPA does not mandate any substantive outcome in particular.  *See*

*Powell*, 395 F.3d at 1026–27.  Although ultimately unnecessary, because of its

determination to transform all units "in place," the Army's consideration of

---

[12] This is not to say that mainland training or even relocation would have
environmental benefits.  As developed *supra* in Part IIB of this dissent, the
plaintiffs fail to identify evidence showing that relocation or selection of a
different brigade for transformation would have obvious environmental benefits.

training outside of Hawaii shows it evaluated an option with substantially similar consequences as full relocation.

The Army could have decided not to transform the 2nd Brigade in Hawaii by selecting the no-action alternative, which also would have had substantially similar environmental consequences as full relocation. The majority is correct that the SEIS considered the no-action alternative, but it is incorrect that this alternative would have "involved transformation of the 2nd Brigade in Hawaii on Oahu." *Maj. Op.* at 24. Selection of the no-action alternative would have caused the 2nd Brigade *not* to be transformed into a Stryker brigade. The SEIS stated the no-action alternative would not meet the purpose and need for transforming the 2nd Brigade, and in the SEIS Record of Decision, the Army determined that moving forward with transformation in Hawaii "reflect[ed] a proper balance among competing factors, most notably statutory mission imperatives, environmental impacts, technical considerations, and all practicable means that will avoid or minimize environmental harm." Record of Decision, Transformation of the 2nd Brigade, 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii (July 2004), at 1, AR 0048483. This was entirely lawful, and the fact the SEIS stated its purpose was to provide realistic field training *in Hawaii* does not change this conclusion. We have held before that an agency "[does] not

34

act unreasonably in rejecting [a] no-action alternative on the ground that it would not meet the purpose and need of the proposed project." *Morrison*, 153 F.3d at 1067. "[W]hen the purpose [of a project] is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." *Id.* (quoting *Angoon*, 803 F.2d at 1021). Under the no-action alternative, the Army would continue to train in Hawaii as it currently does, and the resulting impacts would be "less than significant" because the brigade would not transform into a Stryker brigade. Because this option had substantially similar environmental consequences as full relocation, the Army did not also separately have to consider relocation of the 2nd Brigade.[13]

Complete restationing of the 2nd Brigade out of Hawaii would, of course, have had consequences that none of the options discussed heretofore would, namely, the 2nd Brigade would not continue to operate in Hawaii, either as an SBCT *or otherwise.* To the extent relocation of the 2nd Brigade is urged as a reasonable alternative on this basis, it is completely outside the scope of Army

_____

[13] The SEIS also explored transformation of a different brigade at another location—yet another option with substantially similar consequences as full relocation. The Army determined this was not a viable alternative: "[B]ecause the Pacific Rim is a critical area of interest for the United States," stationing an SBCT in Hawaii "allows the President to rapidly respond to events in an area of increasing importance to national security." Final SEIS at 2-47, AR 0051332.

transformation, and the Army did not have to consider it. *See Westlands Water*

*Dist.*, 376 F.3d at 866; *see also id.* at 871 ("[I]t would turn NEPA on its head to

interpret the statute to require that [an agency] conduct in-depth analyses

of . . . alternatives that are inconsistent with the [agency's] policy objectives."

(alterations in original) (quoting *Kootenai Tribe v. Veneman*, 313 F.3d 1094, 1122

(9th Cir. 2002))).[14]

The Army's consideration of these alternatives establishes that the Army

looked at reasonable alternatives to transformation in Hawaii, given the

conclusion that the Army could determine that transformation of all units would be

"in place." Once the constraint[15] of "in place" transformation was decided

upon—quite properly—in the PEIS, the SEIS could consider as its only

---

[14] I am also puzzled as to why the majority orders the preparation of a supplemental EIS. As this case is an appeal from a grant of summary judgment, the proper remedy would be to reverse the grant of summary judgment and remand to the district court. Additionally, if the majority mean to reverse the denial of the plaintiffs' motion for summary judgment, it should say so and remand for entry of judgment in plaintiffs' favor, permanently enjoining the project. The Army can always commence a new Notice-PEIS-SEIS proceeding rather than take its chances on the truncated proceeding devised by the remand.

[15] A constraint quite accurately recognized by an Army attorney and indeed felicitously reproduced throughout the Majority Opinion. *See Maj. Op.* at pp. 11, 30 n.5, and 34 (noting the Army's purpose and need statements were "crafted so tightly that we may be restricting ourselves"). "Restricting ourselves" from *what*? From considering alternate locations for transformation because of the "in place" determination, of course.

alternatives not transforming in Hawaii at all, or taking various measures to mitigate the impact of transformation, such as a reduced land usage or through conducting training elsewhere. The SEIS did both. Not transforming the 2nd Brigade was rejected in favor of transformation, which the Army decided better balanced environmental impacts with mission imperatives and the need to maintain the ability to respond quickly to events in the Pacific Rim. Mitigation through mainland training would have meant less environmental impact to Hawaii, but the plan was rejected as unfeasible and impractical due to the significant transportation requirements entailed. NEPA requires no more. *See Vermont Yankee*, 435 U.S. at 558 ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.").

*     *     *

The majority opinion places the Army in an awkward position as it aims to modernize all its units. As future brigades within the Ninth Circuit's jurisdiction are directed by Army Headquarters to transform to SBCTs, must the Army analyze relocation of each brigade for a nationwide project that was deemed from the start to entail only "in place" transformation? If so, on what legal basis? The majority opinion does not supply an answer to these important questions. Because the Army's decision to transform units "in place" was not arbitrary and capricious,

37

because the plaintiffs waived their challenges to the Army's SEIS, and because the

Army's SEIS evaluated alternatives to full transformation in Hawaii, I would

affirm the judgment of the district court.