DAVID L. HENKIN          #6876
ISAAC H. MORIWAKE        #7141
EARTHJUSTICE
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: dhenkin@earthjustice.org

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| 'ĪLIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NĀ 'IMI PONO, a Hawai'i unincorporated association; and KĪPUKA, a Hawai'i unincorporated association,<br><br>      Plaintiffs,<br><br>    v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; FRANCIS J. HARVEY, Secretary of the United States Department of the Army; C.R. CHURCHILL, D.A. HEENAN, RICHARD W. GUSHMAN II, and RONALD J. ZLATROPER, Trustees Under the Will and of The Estate of James Campbell, Deceased; and JOHN B. RAY, WARREN H. HARUKI, and TIMOTHY E. JOHNS, Trustees of the Parker Land Trust,<br><br>      Defendants. | Civil No. 04-00502 DAE BMK<br><br>SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF; CERTIFICATE OF SERVICE |

# EXHIBIT B

SECOND AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs ʻĪlioʻulaokalani Coalition, Nā ʻImi Pono, and Kīpuka complain of
defendants as follows:

INTRODUCTION

1.    This action seeks an order compelling compliance by the Secretary of
Defense and the Secretary of the United States Department of the Army
(hereinafter referred to collectively as "defendants") with the National
Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 et seq., prior to
carrying out any activities related to the transformation of the 2nd Brigade, 25th
Infantry Division (Light) to a Stryker Brigade Combat Team ("SBCT") in Hawaiʻi.

2.    Defendants know that transformation of the 2nd Brigade in Hawaiʻi
poses significant threats to the cultural and biological treasures found on Oʻahu
and Hawaiʻi Island, yet defendants have refused to consider any alternate locations
for transformation in the environmental impact statements prepared for this project.
Allowing defendants to proceed with transformation in Hawaiʻi without a legally
adequate alternatives analysis would violate NEPA's fundamental purpose:  to
"insure that environmental information is available to public officials and citizens
before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b)
(emphasis added).

2

3.     Moreover, in preparing their Programmatic Environmental Impact

Statement for Army Transformation ("PEIS"), on which defendants rely to justify

the decision to pursue transformation in Hawaiʻi, defendants failed to satisfy their

mandatory duty to "involve the public," including, but not limited to, failures (a) to

provide adequate notice of their intent to station an SBCT in Hawaiʻi or of their

intent to base their stationing decision solely on the analysis in the PEIS, (b) to

provide notice to potentially interested national or community organizations, (c) to

publish notice in local newspapers, other local media or newsletters that may be

expected to reach potentially interested persons, (d) to mail notice to owners or

occupants of nearby or affected property, (e) to post notice on and off site in the

area where the action is to be located, and (f) affirmatively to solicit comments on

the draft PEIS from those persons or organizations who may be interested or

affected. Id. § 1506.6(a); see also id. §§ 1501.7(a)(1), 1503.1(a)(4), 1506.6(b); 32

C.F.R., subpt. G (1999); 32 C.F.R., subpt. G and app. D (2002).  Defendants also

violated their duty to seek input from affected state and local agencies, including

but not limited to agencies authorized to develop and enforce environmental

standards, and from state and local elected and appointed officials. See 32 C.F.R.,

subpt. G (1999); 32 C.F.R., subpt. G and app. D (2002); 40 C.F.R. §§ 1501.7(a)(1),

1502.19(a), 1503.1(a)(2).  Defendants' failure to comply with NEPA's mandate to

"[e]ncourage and facilitate public involvement in decisions which affect the quality

3

of the human environment" renders the PEIS legally inadequate to support their decision to station an SBCT in Hawai'i. 40 C.F.R. § 1500.2(d)

## JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction over the claims for relief in this action pursuant to 5 U.S.C. §§ 701-706 (actions under the Administrative Procedure Act ("APA")); 28 U.S.C. § 1331 (actions arising under the laws of the United States); 28 U.S.C. § 1361 (actions to compel an officer of the United States to perform his duty); and 28 U.S.C. §§ 2201-02 (power to issue declaratory judgments in cases of actual controversy).

5.    Venue lies properly in this judicial district by virtue of 28 U.S.C. § 1391(e) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and plaintiffs 'Īlio'ulaokalani Coalition, Nā 'Imi Pono, and Kīpuka reside here.

## PARTIES

A.    Plaintiffs

6.    Plaintiff 'Īlio'ulaokalani Coalition is a Hawai'i non-profit corporation, whose members consist of kūpuna (elders), their 'ohana (families), loea (cultural experts), kumu hula (master teachers of Hawaiian dance), halau hula (Hawaiian

4

dance schools), artists, craftspeople, fishers, farmers, students, environmentalists, and others who make Hawai'i their home. 'Īlio'ulaokalani's mission is to preserve and protect Native Hawaiians' traditional way of life and ancestral rights and the integrity of Hawai'i's cultural environment. 'Īlio'ulaokalani's purpose is to link and apply traditional Hawaiian cultural principles, practices and skills to effect educational, social, environmental and economic change for the betterment and advancement of Native Hawaiians and the community at large.

7.    'Īlio'ulaokalani's members reside, work and recreate on all islands in the Hawaiian archipelago. It is "Īlio'ulaokalani's kuleana (responsibility) to advocate for the protection of all of those lands that our people access in the process of exercising their cultural practices and gathering rights, including lands that would be adversely affected by transformation in Hawai'i of the 2nd Brigade of the 25th Infantry Division (Light).

8.    Plaintiff Nā 'Imi Pono is a Hawai'i unincorporated association whose members are Native Hawaiian cultural practitioners.  Nā 'Imi Pono and its members are committed to the protection, preservation, and perpetuation of Native Hawaiian culture, traditional and customary practices, cultural sites and resources. Nā 'Imi Pono's goals include the protection, restoration, and ultimate return of lands in Hawai'i currently under control of the U.S. Army, in a condition that is appropriate to allow for Hawaiian traditional and customary uses.

9.     Nā ʻImi Pono and its members are actively working to protect and restore Hawaiian cultural sites on all islands in the State of Hawaiʻi, including on lands under defendants' control that would be affected by transformation-related activities. Its members have participated in the construction of ahu (altars) at Mākua, Kahanahāiki and Koʻiahi Valleys on Mākua Military Reservation, ʻIolani Palace, Kahoʻolawe, and the State Capitol. Its members have conducted repatriation and reburial of ʻiwi kupuna (ancestral bones) throughout the State of Hawaiʻi, including on lands under defendants' control that would be affected by transformation.

10.    Plaintiff Kīpuka is a Hawaiʻi unincorporated association whose members are young Native Hawaiians. Kīpuka's mission is to preserve and perpetuate Hawaiian culture through mālama ʻāina, fighting for Native Hawaiian access rights, and educating and involving the public, especially the youth, in these issues.

11.    Members of the plaintiff organizations possess direct lineal and cultural ties to lands currently under defendants' control or proposed for acquisition that would be adversely affected by transformation-related activities, including, but not limited to, Kawaihāpai (Dillingham Military Reservation) and Waiʻanae Uka (Schofield Barracks Military Reservation).

12.    To carry out traditional and customary practices including, but not limited to, caring for family grave sites and gathering resources such as lau kī (ti

6

plant), lama and lā'au lapa'au (medicinal plants), and otherwise perpetuate the Hawaiian culture, plaintiffs and their respective members use and depend on the cultural sites, areas of traditional importance and native ecosystems in areas that defendants propose to acquire to carry out the transformation of the 2nd Brigade of the 25th Infantry Division (Light). Moreover, plaintiffs and their respective members intend to use lands currently under defendants' control for such purposes, as soon as those lands are returned to the people of Hawai'i or access is otherwise secured.

13.    Plaintiffs and their respective members conduct cultural training and education programs to assist with the perpetuation, understanding, and protection of Native Hawaiian cultural sites and traditional and customary practices, including those sites and practices found on lands slated for transformation.

14.    As Native Hawaiians, plaintiffs' members recognize that all things in nature have mana (spiritual power). Plaintiffs and their respective members have, and accept, the kuleana to protect the native ecosystems – and the species that rely upon them – threatened by construction and operational activities associated with defendants' proposed transformation of the 2nd Brigade. Plaintiffs' members' spiritual well-being is derived from their relationship with the natural world and from fulfilling their kuleana.

15.    Because of the significant impact on Hawaiian cultural sites, traditional and customary practices, and native ecosystems associated with

7

defendants' proposed  transformation of the 2nd Brigade into a Stryker Brigade in

Hawai'i, plaintiffs and their members have actively participated in all stages of the

NEPA process for transformation of the 2nd Brigade.  At both the scoping phase

and in comments on the draft environmental impact statement, plaintiffs and their

members urged defendants to consider alternatives to transformation in Hawai'i,

including, but not limited to, carrying out transformation of the 2nd Brigade to an

SBCT at locations outside the State of Hawai'i.

16.    Plaintiffs and their respective members intend to continue their efforts

to protect and restore all lands currently under defendants' control, as well as the

additional lands proposed for expansion of military activities in connection with

transformation of the 2nd Brigade into a Styrker Brigade and, whenever possible, to

increase and expand their use of those lands.  The above-described religious,

cultural, environmental, traditional and customary, and educational interests of

plaintiffs and their respective members, have been, are being, and, unless the relief

prayed herein is granted, will continue to be adversely affected and irreparably

injured by the refusal of defendants to comply with NEPA, as is more fully set

forth below.  The individual interests of plaintiffs' members as well as their

organizational interests are thus directly and adversely affected by defendants'

unlawful actions.

B.    Defendants

17.    Defendant Donald H. Rumsfeld is the Secretary of Defense, and is sued herein in his official capacity. He has the ultimate responsibility to ensure that the Army's actions conform to the requirements of our nation's environmental laws, including NEPA. If ordered by the Court, Secretary Rumsfeld has the authority and ability to remedy the harm inflicted by defendants' actions.

18.    Defendant Francis J. Harvey is the Secretary of the United States Department of the Army, and is sued herein in his official capacity. He has the responsibility to ensure that the Army's actions conform to the requirements of our nation's environmental laws, including NEPA. If ordered by the Court, Secretary Harvey has the authority and ability to remedy the harm inflicted by defendants' actions.

19.    Plaintiffs are informed and believe and on the basis thereof allege that defendants C.R. Churchill, D.A. Heenan, Richard W. Gushman II, and Ronald J. Zlatroper (collectively, "The James Campbell Estate") are the duly appointed, qualified and acting trustees under the Will and of the Estate of James Campbell, deceased, and they are sued herein in that capacity. Plaintiffs are further informed and believe and on the basis thereof allege that, on or about September 24, 2004, The James Campbell Estate entered into the Stipulated Judgment As To Just Compensation And Order For Withdrawal Of Funds On Deposit in United States of America v. 1402.000 Acres of Land, et al., Civ. No. 04-00574 SOM-BMK (D.

Haw.), which finalized the Army's condemnation of approximately 1,400 acres of land on the island of Oʻahu in connection with its planned transformation of the 2nd Brigade to an SBCT in Hawaiʻi. Defendant The James Campbell Estate is named as a defendant herein pursuant to Federal Rule of Civil Procedure 19(a).

20.     Plaintiffs are informed and believe and on the basis thereof allege that defendants John B. Ray, Warren H. Haruki, and Timothy E. Johns (collectively, "The Parker Land Trust") are the duly appointed, qualified and acting trustees under that certain unrecorded land trust agreement for the Parker Land Trust dated September 13, 2002, as amended, and they are sued herein in that capacity. Plaintiffs are further informed and believe and on the basis thereof allege that, on or about June 9, 2006, The Parker Land Trust sold approximately 24,000 acres of land on the island of Hawaiʻi known as the Keamuku parcel (TMK 3-6-7-001-003) to the Army in connection with the Army's planned transformation of the 2nd Brigade to an SBCT in Hawaiʻi. Defendant The Parker Land Trust is named as a defendant herein pursuant to Federal Rule of Civil Procedure 19(a).

## STATUTORY FRAMEWORK:
## THE NATIONAL ENVIRONMENTAL POLICY ACT

21.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its fundamental purpose is to ensure that the environmental impacts of federal agency actions are scrutinized before such actions are carried out and environmental damage occurs.

10

A.    Obligation to Prepare Environmental Impact Statements

22.    NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major federal actions" subject to NEPA include "new and continuing activities" with "effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. The "human environment" includes "the natural and physical environment and the relationship of people with that environment." Id. § 1508.14. Effects that must be considered in an EIS include ecological, aesthetic, historic, cultural, economic, social, and health effects, whether direct, indirect, or cumulative. Id. §§ 1508.8, 1508.25.

23.    "The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government." Id. § 1502.1. An EIS must "provide full and fair discussion of significant environmental impacts and [must] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." Id.

24.    An EIS must discuss, among other things:  the environmental impact of the proposed federal action, any adverse and unavoidable environmental effects,

11

any alternatives to the proposed action, and any irreversible and irretrievable commitment of resources involved in the proposed action. 42 U.S.C. § 4332(2)(C).

25.    The alternatives section "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14. In this section, agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives," devoting "substantial treatment to each alternative considered in detail . . . so that reviewers may evaluate their comparative merits." Id. § 1502.14 (a), (b). The core purpose of the alternatives analysis is to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." Id. § 1502.14.

26.    EISs must "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." 40 C.F.R. § 1502.2(g); see also id. § 1502.5; 32 C.F.R. pt. 651, app. E, § (a)(4).

B.    Tiering

27.    NEPA's implementing regulations define "tiering" as "the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general

12

discussions and concentrating solely on the issues specific to the statement subsequently prepared."  40 C.F.R. § 1508.28.

28.     NEPA's regulations encourage agencies "to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." Id. § 1502.20.

C.     Procedures for Preparing Environmental Impact Statements

29.     Preparing an EIS provides important opportunities for public involvement in federal agencies' decision-making process.  After publishing in the Federal Register a Notice Of Intent ("NOI") to prepare an EIS, an agency normally must invite the public to participate in "scoping," which is "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action."  Id. § 1501.7.

30.     The agency then prepares a draft EIS in accordance with the scope decided upon in the public scoping process and circulates the draft EIS for public review.  Id. §§ 1502.9(a), 1502.19.  The agency must seek public comments on the draft EIS, "affirmatively soliciting comments from those persons or organizations who may be interested or affected."  Id. § 1503.1(a)(4).

31.    The agency must "assess and consider comments [on the draft EIS] both individually and collectively" and respond to these comments in the final EIS. Id. § 1503.4(a); see also id. § 1502.9(b).  "Possible responses are to":

(1)    Modify alternatives including the proposed action.

(2)    Develop and evaluate alternatives not previously given serious consideration by the agency.

(3)    Supplement, improve, or modify its analysis.

(4)    Make factual corrections.

(5)    Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position . . . .

Id. § 1503.4(a).

32.    The agency must file the final EIS with the Environmental Protection Agency, which then publishes in the Federal Register a notice of filing.  Id. §§ 1506.9, 1506.10(a).  The agency must wait at least thirty days after publication of this notice before making a decision on the proposed action.  Id. § 1506.10(b)(2).

33.    At the time of its decision, the agency prepares a concise, public record of decision ("ROD").  Among other things, the ROD describes and explains the basis for the agency's ultimate decision, discusses all alternatives considered, and states whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why.  Id. § 1505.2.

14

34.     Until an agency issues a ROD, it cannot take any action concerning the proposal that would:

(1)     Have an adverse environmental impact; or

(2)     Limit the choice of reasonable alternatives.

Id. § 1506.1(a).

### D.     Obligation to Involve Public and State and Local Governments in Preparation of Environmental Impact Statements

35.     To ensure environmentally informed decision-making, both the Council of Economic Quality's NEPA regulations, which are binding on defendants, and defendants' own NEPA regulations provide specific, mandatory procedures for involving the public and state and local governments in EIS preparation.  Among other things, these regulations require defendants (a) to seek input from affected state and local agencies, including but not limited to agencies authorized to develop and enforce environmental standards, and from state and local elected and appointed officials, (b) to provide notice to potentially interested national or community organizations, (c) to publish notice in local newspapers, other local media, or newsletters that may be expected to reach potentially interested persons, (d) to mail notice to owners or occupants of nearby or affected property, (e) to post notice on and off site in the area where the action is to be located, and (f) affirmatively to solicit comments on draft

15

EIS's from those persons or organizations who may be interested or affected.  See, e.g., 32 C.F.R. § 651.32 (1999); id. subpt. G; 32 C.F.R. § 651.45 (2002); id. subpt. G and app. D; 40 C.F.R. §§ 1501.7(a)(1), 1502.19(a), 1503.1(a)(2), 1503.1(a)(4), 1506.6.

36.    NEPA's implementing regulations also require defendants, at each stage of the EIS process, to provide adequate notice to inform the public and state and local governments regarding the nature of the activities that defendants propose to carry out and on which they seek input.  See, e.g., 32 C.F.R. §§ 651.14(d), 651.32 (1999); 32 C.F.R. §§ 651.22, 651.45 (2002); 40 C.F.R. §§ 1501.7, 1506.6, 1508.22.

## BACKGROUND FACTS

A.    Programmatic EIS for Army Transformation.

37.    On October 12, 1999, the Secretary of the Army and the Chief of Staff of the Army articulated a vision to position the Army to meet the demands of the 21st century: "Soldiers on Point for the Nation . . . Persuasive in Peace, Invincible in War."  This "Army Vision" provides for an Objective Force that has the characteristics of being more responsive, deployable, agile, versatile, lethal, survivable, and sustainable than today's Army.

38.    On December 15, 2000, pursuant to NEPA, the Department of the Army published in the Federal Register a Notice of Intent to prepare a PEIS for

implementation of the Army Transformation Campaign Plan and inviting public comment on scoping. In addition, defendants published notice regarding scoping in one national newspaper, USA Today.

39. During the scoping process, defendants did not invite the participation of elected or appointed state or local officials, affected state or local agencies, including but not limited to agencies authorized to develop and enforce environmental standards, or other interested persons (including those who might not be in accord with the action on environmental grounds). They did not mail notice to national organizations reasonably expected to be interested in the matter or to owners or occupants of nearby or affected property. Nor did defendants publish notice in local newspapers, other local media, or newsletters that may be expected to reach potentially interested persons in Hawai'i or in the other locations under consideration for transformation. Moreover, defendants did not otherwise provide notice to potentially interested community organizations, nor did they post notice on and off site in the areas where transformation activities are to be located.

40. Even had defendants adequately apprised the public of the opportunity to participate in scoping, neither plaintiffs nor anyone else in Hawai'i would have had reason to believe that it was the appropriate forum to raise concerns regarding site-specific impacts in Hawai'i or the need to consider alternate locations for transformation. The scoping notices provided only vague descriptions of the

Army's proposed transformation and made no mention of Hawai'i, or any other specific location, where the Army proposed to carry out transformation.

41.    On October 18, 2001, the Army published in the Federal Register notice that the draft PEIS was available for public review and comment. In addition, defendants published notice regarding the draft PEIS's availability in one national newspaper, USA Today.

42.    As part of the draft PEIS process, defendants neither requested the comments of appropriate state and local agencies that are authorized to develop and enforce environmental standards nor circulated the draft PEIS to such agencies. Defendants did not affirmatively solicit comments from those persons or organizations who may be interested or affected. Nor did defendants seek input from elected or appointed state or local officials, mail notice to national organizations reasonably expected to be interested in the matter or to owners or occupants of nearby or affected property, or publish notice in local newspapers, other local media or newsletters that may be expected to reach potentially interested persons in Hawai'i or in the other locations under consideration for transformation. Defendants did not otherwise provide notice to potentially interested community organizations, nor did they post notice on and off site in the areas where transformation activities are to be located.

43.    Like the scoping notices, the notices regarding the draft PEIS's availability provided only a vague description of the Army's proposed

18

transformation and made no mention of Hawai'i, or any other specific location, where the Army proposed to carry out transformation.

44.     Even had defendants adequately apprised the public of the opportunity to review and comment on the draft PEIS, neither plaintiffs nor anyone else in Hawai'i would have had reason to believe that it was the time to raise concerns regarding site-specific impacts or alternatives. Neither the notices of availability nor the draft PEIS provided notice of defendants' intent to base their decision whether to station an SBCT in Hawai'i solely on the analysis in the PEIS.

45.     The draft PEIS identified the Army's proposed action as a "multiyear, phased, and synchronized program of transformation" to achieve the Army Vision. The Army proposed to conduct, over a thirty-year period, a series of transformation activities during an Initial Phase, an Interim Capability Phase, and an Objective Force Phase. The proposed transformation "would affect most, if not all, aspects of the Army's doctrine, training, leader development, organizations, installations, material, and soldiers."

46.     The draft PEIS stated that the purpose and need for this fundamental overhaul was "to enable the Army to achieve the force characteristics articulated in the Army Vision in the most timely and efficient manner possible and without compromising readiness and responsiveness."

47.    Based on the Army's determination that it needed to change to meet new national security requirements, the draft PEIS examined in detail only two alternatives: the proposed action and a "no action" alternative.

48.    As proposed, transformation of the Army would occur in three major phases. The Initial Phase, already underway at the time the draft PEIS was issued and now completed, involved transformation of two units stationed at Fort Lewis in Washington State – the 1st Brigade of the 25th Infantry Division (Light) and the 3rd Brigade of the 2nd Infantry Division – to Initial Brigade Combat Teams, an infantry unit using the wheeled, armored Stryker vehicle to transport soldiers to areas of conflict. The purpose of the Initial Phase was to validate an organizational and operational model for the new brigade combat teams, which the draft PEIS referred to as "Interim Brigade Combat Teams" and defendants now call "Stryker Brigade Combat Teams."

49.    In the second phase of Army transformation, or "Interim Capability Phase," the Army would field five to eight SBCTs, including the two brigades at Fort Lewis transformed during the Initial Phase.

50.    The third phase of Army transformation is the "Objective Capability Phase," whose major goal is to transform the SBCTs and the remaining Army forces into the Objective Force itself. The Objective Force would be equipped with an as-yet undefined "Future Combat System" and would be trained to achieve the capabilities set forth in the Army Vision.

20

51.    The draft PEIS stressed:

The scope of this PEIS is necessarily broad.  Its breadth is
commensurate with the lengthy planning horizon and diverse array of
actions associated with transformation.  It is being initiated early in a
30-year process of change.  Future combat systems have not yet been
developed.  Knowledge of specific activities and related time frames
and locations is imprecise.

52.    The draft PEIS noted that the Army was still "studying the

exact number and sequence in which brigades, higher echelons, and other

Army elements would transform."  It stated:

The Army soon plans to identify certain brigades to be included in the
Interim Force.  The installations at which these brigades would live
and train are the locations where the potential environmental effects of
transformation would first arise.  Identifying environmental and
socioeconomic parameters at those installations most likely to be
involved in early transformation activities that have a potential for
adverse effects will enable the Army to include these considerations in
performing detailed planning, as well as in making decisions that best
support both environmental stewardship and transformation objectives
while meeting national security requirements.

53.    While the draft PEIS "tentatively identified" the 2nd Brigade of the

25th Infantry Division (Light) as one of four Army units to be transformed as part

of the Interim Force, it stressed that the PEIS was not the appropriate forum to

address where transformation-related actions would occur.  Instead, the draft PEIS

instructed that such decisions would be made based on subsequent, site-specific

NEPA analyses.

54.    Consistent with its broad scope, the draft PEIS analyzed the

potential environmental and socioeconomic impacts of transforming the

entire Army at the programmatic level; it did not present any site-specific

analysis of the impacts associated with transforming the 2nd Brigade to an

SBCT in Hawai'i. Similarly, the draft PEIS did not evaluate alternatives to

transformation of the 2nd Brigade in Hawai'i. Rather, the draft PEIS noted:

> In implementing the proposed action over the next three decades, the
> Army would make many other decisions that would enable or
> foreclose alternatives that might be applicable to subsequent
> decisions. As the Army prepares for these decisions on
> transformation, actions and activities will be evaluated as to their
> potential for affecting the environment and additional impact analyses
> will be completed where appropriate. Some of those analyses would
> be tiered from this PEIS.

55.    On March 8, 2002, the Army published in the Federal Register notice

that the final PEIS was available for public review and comment.

56.    As part of the final PEIS process, defendants neither requested the

comments of appropriate state and local agencies that are authorized to develop

and enforce environmental standards nor circulated the final PEIS to such

agencies. Defendants did not seek input from elected or appointed state or local

officials, mail notice to national organizations reasonably expected to be interested

in the matter or to owners or occupants of nearby or affected property, or publish

notice in local newspapers, other local media, or newsletters that may be expected

to reach potentially interested persons in Hawai'i or in the other locations under

consideration for transformation. Defendants did not otherwise provide notice to

potentially interested community organizations, nor did they post notice on and off site in the areas where transformation activities are to be located.

57.    Like the notices for scoping and the draft PEIS, the notice of the final PEIS's availability provided only a vague description of the Army's proposed transformation and made no mention of Hawai'i or any other specific location where the Army proposed to carry out transformation.

58.    Even had defendants adequately apprised the public of the opportunity to review and comment on the final PEIS, neither plaintiffs nor anyone else in Hawai'i would have had reason to believe that it was the time to raise concerns regarding site-specific impacts or alternatives. Neither the notice of availability nor the final PEIS provided notice of defendants' intent to base their decision whether to station an SBCT in Hawai'i solely on the analysis in the PEIS.

59.    The final PEIS's discussion of the Army's proposal and methodology for making decisions regarding future transformation-related activities is identical to the discussion set forth in the draft PEIS, described in paragraphs 43 through 52, supra.

60.    On April 11, 2002, the Army signed a ROD for the PEIS indicating its decision to proceed with "its preferred alternative, implementation of a multiyear, phased, and synchronized program of transformation" of the entire Army.

23

61.     In the PEIS ROD, the Army confirmed the selection of the 2nd

Brigade of the 25th Infantry Division (Light) as one of four additional

brigades to be converted to SBCTs.

62.     The PEIS ROD affirmed that "[a]ctions at these installations to

implement Army Transformation, including conversion of each of these four

units to [SBCT] status, shall be subject to appropriate evaluation of potential

environmental effects in accordance with the National Environmental Policy

Act."

63.     On July 2, 2002, defendants published in the Federal Register

notice of the PEIS ROD's availability.  The notice provided only a vague

description of the Army's proposed transformation and made no mention of

Hawai'i or any other specific location where the Army proposed to carry out

transformation.  Moreover, the notice did not provided notice of defendants'

intent to base their decision whether to station an SBCT in Hawai'i solely on

the analysis in the PEIS.  Rather, the notice stated:

> Project- and site-specific proposals for transformation actions and
> activities will be appropriately evaluated for their potential
> environmental effects.  Future planning for and initiating actions to
> accomplish transformation shall be subject to appropriate evaluation
> pursuant to the National Environmental Policy Act and other
> requirements.

B.    EIS for Transformation of the 2nd Brigade in Hawai'i.

64.    From April 8 to June 15, 2002, the Army held open a public scoping period on its proposal to transform the 2nd Brigade to an SBCT in Hawai'i. During the scoping period, numerous citizens concerned about the significant potential impacts associated with transformation in Hawai'i urged the Army to consider alternatives that would involve relocating the 2nd Brigade to various installations in the continental United States to undergo transformation there. Suggested alternatives included, but were not limited to, moving the 2nd Brigade to Fort Lewis, Washington, where it would join the 25th Infantry Division's 1st Brigade. The commenters noted that the 1st Brigade, which the Army had moved to Fort Lewis from Hawai'i in 1995 as part of an Army-wide reorganization, was already in the process of transforming to an SBCT as part of the Interim Force.

65.    In October 2003, the Army announced the availability for public review of the draft EIS ("DEIS") for transformation of the 2nd Brigade.

66.    In the DEIS, the Army considered only three alternatives in detail:  (1) the Army's preferred alternative of transforming the 2nd Brigade to an SBCT in Hawai'i, with associated facility construction and acquisition of approximately 24,400 acres of new military training land; (2) a "reduced land acquisition" alternative, identical to the preferred alternative except for the location of one training range and the reduction of new land acquisition by approximately 1,300 acres (to approximately 23,100 acres); and the "no action" alternative.

25

67.    The DEIS identified seven major Army installations in the western United States devoted to training U.S. Army forces command units, including three installations – U.S. Army, Alaska; Fort Lewis; and Fort Polk – already undergoing transformation to receive SBCTs. The DEIS completely failed, however, to mention, much less consider, the alternative the public repeatedly urged in the scoping period: relocating the 2nd Brigade to the continental United States to undergo transformation there.

68.    During the comment period on the DEIS, the public repeatedly criticized the Army's refusal to consider relocating the 2nd Brigade to undergo transformation at locations other than Hawai'i and urged the Army to analyze such alternatives in either a revised DEIS or the final EIS ("FEIS").

69.    The Army issued the FEIS for transformation of the 2nd Brigade in May 2004.

70.    The FEIS considered only three alternatives in detail: (1) the preferred alternative, (2) the "reduced land acquisition" alternative, and (3) the "no action" alternative. The FEIS acknowledged that proceeding with the preferred alternative would have significant, unavoidable impacts to cultural resources, native ecosystems, endangered species, air quality, recreation, noise levels, and soils.

71.    Like the DEIS, the FEIS failed completely to consider any alternative involving relocating the 2nd Brigade to the continental United States to undergo transformation there.

72.    On July 7, 2004, the Army issued its ROD for the FEIS, deciding to proceed with its preferred alternative of transforming the 2nd Brigade to an SBCT in Hawai'i.

## FIRST CLAIM FOR RELIEF

### (Failure to Consider All Reasonable Alternatives And/Or Analyze Site-Specific Impacts)

73.    Plaintiffs reallege, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

74.    Defendants have failed to prepare a legally adequate EIS for the transformation of the 2nd Brigade to a Stryker Brigade Combat Team.  Both the PEIS and the FEIS fail to consider all reasonable alternatives to transforming the 2nd Brigade in Hawai'i, including, but not limited to, alternatives involving relocating the brigade to the continental United States to undergo transformation there.  In addition, the PEIS fails to analyze any site-specific impacts associated with transforming the 2nd Brigade in Hawai'i.

75.    Defendants' decision to go forward with transformation of the 2nd Brigade in Hawai'i in the absence of a comprehensive and adequate EIS that considers all reasonable alternatives and/or analyzes all site-specific impacts

27

violates NEPA, 42 U.S.C. § 4332, NEPA's implementing regulations, and the
Administrative Procedure Act, 5 U.S.C. §§ 701-706.

### SECOND CLAIM FOR RELIEF

(Failure to Involve Public and State and Local Governments in PEIS Preparation)

76.    Plaintiffs reallege, as if fully set forth herein, each and every
allegation in the preceding paragraphs of this Complaint.

77.    Defendants failed to comply with mandatory procedures for involving
the public and state and local governments in preparation of the PEIS.

78.    Defendants' decision to go forward with transformation of the 2nd
Brigade in Hawai'i based on a procedurally defective PEIS violates NEPA, 42
U.S.C. § 4332, NEPA's implementing regulations, and the Administrative
Procedure Act, 5 U.S.C. §§ 701-706.

### THIRD CLAIM FOR RELIEF

(Failure to Provide Adequate Notice of Action Proposed in PEIS)

79.    Plaintiffs reallege, as if fully set forth herein, each and every
allegation in the preceding paragraphs of this Complaint.

80.    In preparing the PEIS, defendants failed to provide adequate notice to
inform the public and state and local governments regarding the nature of the
activities that defendants proposed to carry out and on which they sought input.  In
particular, at various stages of the proceedings, defendants failed to provide notice

28

of their intent to transform the 2nd Brigade to an SBCT in Hawai'i or of their intent to base their stationing decision solely on the analysis in the PEIS.

81.    Defendants' decision to go forward with transformation of the 2nd Brigade in Hawai'i based on a procedurally defective PEIS violates NEPA, 42 U.S.C. § 4332, NEPA's implementing regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief as follows:

1.    For a declaratory judgment that defendants have violated and are violating the National Environmental Policy Act by proceeding with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawai'i in the absence of a comprehensive and adequate EIS that considers all reasonable alternatives and/or analyzes all site-specific impacts.

2.    For a declaratory judgment that defendants have violated and are violating the National Environmental Policy Act by proceeding with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawai'i based on a procedurally defective programmatic EIS.

3.     For appropriate preliminary and permanent injunctive relief to ensure that defendants fully comply with NEPA, its implementing regulations, and the APA and to avoid irreparable harm to plaintiffs and Hawai'i's environment until such compliance occurs, including, but not limited to, enjoining defendants from proceeding with any land acquisition, contract awards, grading, grubbing, construction, training, or any other activity associated with, and setting aside defendants' acquisitions of interests in land in connection with, the proposed transformation in Hawai'i of the 2nd Brigade of the 25th Infantry Division (Light), at least for the duration of defendants' noncompliance.

4.     For the Court to retain continuing jurisdiction to review defendants' compliance with all judgments and orders entered herein.

5.     For such additional judicial determinations and orders as may be necessary to effectuate the foregoing.

6.     For an award of plaintiffs' costs of litigation, including reasonable attorneys' fees; and

7.     For such other and further relief as the Court may deem just and proper to effectuate a complete resolution of the legal disputes between plaintiffs and defendants.

\\

\\

\\

DATED:    Honolulu, Hawaiʻi, _____ _____, 2006.

EARTHJUSTICE
223 South King Street, Suite 400
Honolulu, Hawaiʻi 96813


By:    _____ _____
DAVID L. HENKIN
Attorneys for Plaintiffs

ʻĪlioʻulaokalani Coalition, et al. v. Rumsfeld, et al., Civil No. 04-00502 DAE BMK
(D. Haw.); SECOND AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

31