DAVID L. HENKIN          #6876
ISAAC H. MORIWAKE        #7141
EARTHJUSTICE
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: dhenkin@earthjustice.org

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| 'ĪLIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NĀ 'IMI PONO, a Hawai'i unincorporated association; and KĪPUKA, a Hawai'i unincorporated association,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army,<br><br>Defendants. | Civil No. 04-00502 DAE BMK<br><br>PLAINTIFFS' MEMORANDUM RE: INTERIM INJUNCTION; CERTIFICATE OF COMPLIANCE; DECLARATION OF KĒHAUNANI CACHOLA ABAD; DECLARATION OF LEIMAILE QUITEVIS; DECLARATION OF TY P. KAWIKA TENGAN; DECLARATION OF DAVID L. HENKIN; EXHIBITS "1"-"36;" CERTIFICATE OF SERVICE<br><br>Hearing:<br><br>Date:  November 20, 2006<br>Time: 9:45 a.m.<br>Judge: Hon. David A. Ezra |

## PLAINTIFFS' MEMORANDUM RE: INTERIM INJUNCTION

# TABLE OF CONTENTS

<u>Page</u>

I.    INTRODUCTION .....................................................................1

II.   BACKGROUND ......................................................................2

    A.    District Court Proceedings ...........................................2

    B.    Proceedings On Appeal ................................................3

    C.    Proceedings On Remand ...............................................5

III.  STANDARD FOR INJUNCTION ...............................................5

IV.   BROAD INJUNCTIVE RELIEF IS NECESSARY TO PREVENT
    IRREPARABLE HARM TO CULTURAL RESOURCES,
    ENDANGERED SPECIES AND NATIVE ECOSYSTEMS ....................6

    A.    Harm to Cultural Resources ..........................................9

    B.    Harm To Endangered Species And Native Ecosystems .................14

V.    A BROAD INJUNCTION IS VITAL TO PREVENT STRYKER
    CONVERSION IN HAWAI‘I FROM GAINING IRREVERISBLE
    MOMENTUM ........................................................................18

VI.   ONLY LIMITED STRYKER-RELATED ACTIVITIES SHOULD
    BE ALLOWED PENDING COMPLIANCE WITH NEPA ....................20

VII.  NO UNUSUAL CIRCUMSTANCES WEIGH AGAINST
    GRANTING THE REQUESTED INJUNCTIVE RELIEF ......................27

VIII. THE PUBLIC INTEREST FAVORS ISSUANCE OF A BROAD
    INJUNCTION ........................................................................34

# TABLE OF AUTHORITIES

Page

## PUBLISHED FEDERAL CASES

American Motorcyclist Ass'n v. Watt,
    714 F.2d 962 (9th Cir. 1983) .......................................................................5, 27

Amoco Prod. Co. v. Village of Gambell,
    480 U.S. 531 (1987)..........................................................................................6

Blue Ocean Preservation Soc'y v. Watkins,
    767 F. Supp. 1518 (D. Haw. 1991)...................................................................6

Bonnichsen v. United States,
    367 F.3d 864 (9th Cir. 2004) .........................................................................34

Burbank Anti-Noise Group v. Goldschmidt,
    623 F.2d 115 (9th Cir. 1980) .........................................................................24

Coalition for Canyon Preservation v. Bowers,
    632 F.2d 774 (9th Cir. 1980) .........................................................................28

Conner v. Burford,
    848 F.2d 1441 (9th Cir. 1988) .......................................................................20

Desert Citizens Against Pollution v. Bisson,
    231 F.3d 1172 (9th Cir. 2000) .......................................................................24

Environmental Defense Fund v. Andrus,
    596 F.2d 848 (9th Cir. 1979) .........................................................................19

Forest Conservation Council v. U.S. Forest Service,
    66 F.3d 1489 (9th Cir. 1995) ....................................................................23, 27

Fund for Animals v. Espy,
    814 F. Supp. 142 (D.D.C. 1993)....................................................................35

Page

**PUBLISHED FEDERAL CASES (cont.)**

High Sierra Hikers Ass'n v. Blackwell,
    390 F.3d 630 (9th Cir. 2004) ............................................................5, 7, 8, 35

ʻĪlioʻulaokalani Coalition v. Rumsfeld,
    464 F.3d 1083 (9th Cir. 2006) ....................................................1, 4, 7, 21, 31

Johnson v. U.S. Dep't of Ag.,
    734 F.2d 774 (11th Cir. 1984) ...........................................................................34

Jones v. SEC,
    298 U.S. 1 (1936)................................................................................................24

Lands Council v. Powell,
    395 F.3d 1019 (9th Cir. 2005) ....................................................................1, 21

Mālama Mākua v. Rumsfeld,
    163 F. Supp. 2d 1202 (D. Haw. 2001)...................................27, 28, 31, 33, 35

National Audubon Soc'y v. Department of Navy,
    422 F.3d 174 (4th Cir. 2005) ....................................................................21, 24

National Forest Preservation Group v. Butz,
    485 F.2d 408 (9th Cir. 1973) ...........................................................................24

National Parks & Conservation Ass'n v. Babbitt,
    241 F.3d 722 (9th Cir. 2001) ...........................................................2, 6, 7, 18

National Wildlife Fed'n v. Espy,
    45 F.3d 1337 (9th Cir. 1995) ....................................................................23, 24

People of Enewetak v. Laird,
    353 F. Supp. 811 (D. Haw. 1973)......................................................................21

Seattle Audubon Society v. Evans,
    771 F. Supp. 1081 (W.D. Wash.) .....................................................................35

Page

**PUBLISHED FEDERAL CASES (cont.)**

Shoen v. Shoen,
    5 F.3d 1289 (9th Cir. 1993) ...........................................................................5

Sierra Club v. Marsh,
    872 F.2d 497 (1st Cir. 1989)........................................................7, 18, 19, 20

Sierra Club v. Norton,
    207 F. Supp. 2d 1310 (S.D. Ala. 2002) ........................................................17

Stand Together Against Neighborhood Decay, Inc. v. Board of Estimate,
    690 F. Supp. 1192 (E.D.N.Y. 1988) ...........................................................24

Stop H-3 Association v. Volpe,
    353 F. Supp. 14 (D. Haw. 1972)............................................................23, 28

Tennessee Valley Authority v. Hill,
    437 U.S. 153 (1978).......................................................................................34

The Wilderness Society v. Tyrrel,
    701 F. Supp. 1473 (E.D. Cal. 1988) ............................................................28

Thomas v. Peterson,
    753 F.2d 754 (9th Cir. 1985) ..........................................................................6

United States v. Oakland Cannabis Buyers' Cooperative,
    532 U.S. 483 (2001)........................................................................................6

Washington County v. U.S. Dep't of the Navy,
    357 F. Supp. 2d 861 (E.D.N.C. 2005) .........................................................21

Wisconsin v. Weinberger,
    745 F.2d 412 (7th Cir. 1984) ........................................................................27

Page

**UNPUBLISHED FEDERAL CASES**

United States v. 1,402 Acres,
    No. 05-15858 (9th Cir. Oct. 5, 2006) ..........................................................24


**FEDERAL STATUTES**

16 U.S.C. § 470(b)(4)...................................................................................34


**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 1500.1(b) ..............................................................................1, 21


**PUBLISHED HAWAI'I CASES**

Public Access Shoreline Hawaii v. Hawai'i County Planning Comm'n,
    79 Haw. 425, 908 P.2d 1246 (1995).................................................26

**HAWAI'I CONSTITUTION**

Haw. Const. art. XII, § 7 ..........................................................................26


**HAWAI'I STATUTES**

Haw. Rev. Stat. § 1-1 ...............................................................................26

Haw. Rev. Stat. § 7-1 ...............................................................................26

I.    INTRODUCTION

In granting its temporary injunction, the Ninth Circuit emphasized "the Army has violated [the National Environmental Policy Act ("NEPA")] and must come into compliance before proceeding with its plan to transform the 2nd Brigade into a Stryker unit at its Hawaii base."  Exh. 1: 10/27/06 Addendum to Order at 1-2.  Broad injunctive relief is necessary to achieve NEPA's fundamental purpose: to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b) (emphasis added).  Especially here, where the Army's violation was failure to "consider[] alternatives that include transformation of the 2nd Brigade outside of Hawaii," ʻĪlioʻulaokalani Coalition v. Rumsfeld, 464 F.3d 1083, 1098 (9th Cir. 2006), allowing the Army to make Stryker conversion in Hawaiʻi a *fait accompli*, before it evaluates stationing alternatives "that might be pursued with less environmental harm," would subvert Congress's intent in adopting NEPA and render the mandated alternatives analysis on remand a sham.  Lands Council v. Powell, 395 F.3d 1019, 1027 (9th Cir. 2005).

As plaintiffs (hereinafter, "the Hawaiian Groups") explain below, the Court should enjoin all Stryker-related activities in Hawaiʻi, other than mandated cultural surveys and use, with appropriate safeguards, of the Schofield Barracks Tactical Vehicle Facility Wash ("TVFW") and Qualification Training Range 1 ("QTR1").  See Part VI, infra.  It should also set aside the Army's acquisitions of more than

25,000 acres of formerly private land on Oʻahu and Hawaiʻi Island.  As the Ninth

Circuit held in <u>National Parks & Conservation Ass'n v. Babbitt</u>, 241 F.3d 722 (9th

Cir. 2001) ("<u>NPCA</u>"), "[w]here an [environmental impact statement ("EIS")] is

required, allowing a potentially environmentally damaging project to proceed prior

to its preparation runs contrary to the very purpose of the statute."  <u>Id.</u> at 837.


II.    BACKGROUND

    C.    <u>District Court Proceedings.</u>

On August 17, 2004, the Hawaiian Groups filed a complaint in this Court,

challenging the Army's failure to consider stationing locations outside Hawaiʻi

before deciding to convert 2nd Brigade into a Stryker brigade in Hawaiʻi.  Clerk's

Record ("C.R.") 1.

On October 12, 2004, the Court entered the parties' stipulated agreement

that, pending a ruling on preliminary injunction, the Army would refrain from

various activities related to the 2nd Brigade's conversion, including construction of

Stryker facilities, Stryker training, and land acquisitions.  C.R. 6.  On November 5,

2004, the Court denied the Hawaiian Groups' motion for preliminary injunction.

C.R. 15.

On November 22, 2004, the Court entered the parties' stipulated agreement

to resolve disputes over discovery the Hawaiian Groups had sought regarding this

case's remedy phase.  C.R. 23: 11/22/04 Stipulated Order at 3, ¶ 7.  The Stipulated

Order bifurcated resolution of the merits of the Hawaiian Groups' NEPA challenge from "the determination of the appropriate remedy should the Court find a NEPA violation."  Id. ¶ 1.  The parties further agreed:

> If the Court finds that defendants violated NEPA, defendants shall refrain from implementing, executing or proceeding with the following activities associated with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to an SBCT in Hawaiʻi: grading, grubbing, other ground disturbance, construction, land acquisition, project design, geotechnical testing, unexploded ordnance clearance, contract award, and SBCT-specific training … .

Id. ¶ 4.  The stipulated injunction was to remain in effect until a ruling "on whether a permanent injunction should issue and, if so, its scope."  Id. ¶ 4.

On April 25, 2005, the Court entered an order denying the Hawaiian Groups' motion for summary judgment and granting the Army's cross-motion for summary judgment.  C.R. 65.  Judgment in the Army's favor was entered on April 29, 2005.  C.R. 66.

D.    Proceedings On Appeal.

The Hawaiian Groups appealed on May 3, 2005.  C.R. 67.  On May 9, 2005, the Hawaiian Groups filed in this Court a motion for injunction pending appeal, which the Court denied on May 19, 2005.  C.R. 70.  The Ninth Circuit denied the Hawaiian Groups' motion for injunction pending appeal on May 27, 2005, but expedited the hearing of the appeal, which took place on December 6, 2005.

On October 5, 2006, the Ninth Circuit held "[t]he Army violated NEPA by not considering alternatives that include transformation of the 2nd Brigade outside of Hawaii." ʻĪlioʻulaokalani Coalition, 464 F.3d at 1098.  The court remanded "to require [the Army] to prepare a supplemental [site-specific EIS ("SEIS")] to consider all reasonable alternatives, most notably the potential for transforming the 2nd Brigade outside of Hawaii." Id. at 1087.

Despite the Ninth Circuit's decision, the Army continued to press forward with Stryker activities in Hawaiʻi, prompting the Hawaiian Groups to file an emergency motion for temporary injunction.[1]  The court granted the motion on October 27, 2006, specifying its injunction would remain in effect "until the district court has entered an interim injunction … pending Defendants-Appellees' compliance with [NEPA]."  Exh. 2: 10/27/06 Order at 2-3.  The Ninth Circuit instructed that, on remand, this Court must undertake "a fact-intensive inquiry" to "balanc[e] the parties' equities." Id. at 3.  It specified this Court "should consider, among other factors, which of the Stryker Brigade Combat Team transformation-related activities in Hawaii are time-critical and which activities can proceed without causing irreparable environmental and cultural harm." Id.

---

[1] The court's holding the Army violated NEPA triggered the Stipulated Order's prohibition on Stryker activities in Hawaiʻi pending discovery, briefing, and a ruling regarding injunctive relief pending compliance with NEPA. Addendum at 6-7; see also Stipulated Order ¶ 6.

E.      Proceedings On Remand.

On November 6, 2006, this Court held a status conference to establish a

schedule for resolving issues related to injunctive relief on remand.  After denying

the Hawaiian Groups' request for expedited discovery, the Court set the hearing on

the scope of injunctive relief for November 20, 2006.[2]

III.    STANDARD FOR INJUNCTION

As the Ninth Circuit recently explained:

> The traditional bases for injunctive relief are irreparable injury and
> inadequacy of legal remedies.  In issuing an injunction, the court must
> balance the equities between the parties and give due regard to the
> public interest.

High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 641-42 (9th Cir. 2004)

(citing Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987)).

"While an injunction does not automatically issue upon a finding that an

agency violated NEPA, 'the presence of strong NEPA claims gives rise to more

liberal standards for granting an injunction.'"  Id. at 642 (quoting American

Motorcyclist Ass'n v. Watt, 714 F.2d 962, 965 (9th Cir. 1983)).  Moreover, since

"[e]nvironmental injury, by its nature, can seldom be adequately remedied by

money damages and is often permanent or at least of long duration, i.e.,

---

[2] The Hawaiian Groups respectfully object to the denial of remedy-related
discovery, which has prevented them from fully briefing the appropriate scope of
injunctive relief.  As the Ninth Circuit emphasized in Shoen v. Shoen, 5 F.3d 1289
(9th Cir. 1993), "wide access to relevant facts serves the integrity and fairness of
the judicial process by promoting the search for the truth."  Id. at 1292.

irreparable," if such injury is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment."  Amoco Prod. Co., 480 U.S. at 545; see also Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985) (irreparable damage presumed from violation of NEPA procedures).

Where, as here, an EIS is required, the Ninth Circuit has stressed that "allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purpose of the statutory requirement." NPCA, 241 F.3d at 737; see also Blue Ocean Preservation Soc'y v. Watkins, 767 F. Supp. 1518, 1528 (D. Haw. 1991) ("The policies embodied in NEPA will tolerate nothing short of an absolute bar on further federal participation … in the Project until NEPA is complied with").  "Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute."  United States v. Oakland Cannabis Buyers' Cooperative, 532 U.S. 483, 497 (2001).


IV.   BROAD INJUNCTIVE RELIEF IS NECESSARY TO PREVENT IRREPARABLE HARM TO CULTURAL RESOURCES, ENDANGERED SPECIES AND NATIVE ECOSYSTEMS

The Ninth Circuit has already held the Hawaiian Groups "have shown irreparable harm."  The court stressed:

> "[I]n the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." …
> Thus, the very fact that the Army failed to consider reasonable alternatives has caused irreparable harm.

Addendum at 3 (quoting <u>High Sierra Hikers Ass'n</u>, 390 F.3d at 642).  As then-

Circuit Judge Breyer explained in <u>Sierra Club v. Marsh</u>, 872 F.2d 497 (1st Cir.

1989), "the harm at stake is a harm to the <u>environment</u>," which:

> consists of the added <u>risk</u> to the environment that takes place when
> governmental decisionmakers make up their minds without having
> before them an analysis (with prior public comment) of the likely
> effects of their decision upon the environment.  NEPA's object is to
> minimize that risk, the risk of uninformed choice, a risk that arises in
> part from a practical fact that bureaucratic decisionmakers (when the
> law permits) are less likely to tear down a nearly completed project
> than a barely started project.

<u>Id.</u> at 500-01; <u>see also</u> <u>NPCA</u>, 241 F.3d at 737 n.18.  The harm from allowing the

Army to continue Stryker-related activities in Hawai'i is particularly significant,

since the Ninth Circuit faulted the Army for failing to consider "transformation of

the 2nd Brigade outside of Hawaii" where Stryker conversion "could happen at

potentially lower cost to the environment."  <u>'Īlio'ulaokalani Coalition</u>, 464 F.3d at

1098.  An objective alternatives analysis on remand therefore may lead to the

conclusion that no Stryker activities – and, thus, no impacts – should occur in

Hawai'i.  <u>See</u> <u>id.</u> at 1100 ("Nothing in the record distinguishes Hawaii from Alaska

or Washington" in fulfilling Army's purpose and need).

        In addition, as detailed below, the Ninth Circuit determined the Hawaiian

Groups "have clearly shown that environmental and cultural injury are <u>sufficiently</u>

<u>likely</u>," and, thus, "the balance of harms will usually favor the issuance of an

injunction to protect the environment."  Addendum at 4 (quoting <u>High Sierra</u>

7

Hikers Ass'n, 390 F.3d at 642).  As the Ninth Circuit found, the Army's own analysis "describe[es] hundreds of federally listed species and other endemic plants and animals, cultural and archaeological sites, burials, ecosystems, and thousands of acres of habitat that will be destroyed, lost, or irreparably damaged as a result of Stryker activities" in Hawai'i.  Addendum at 5; see also Exh. 3: AR-S 51232.[3]  The Army has conceded Stryker activities threaten hundreds of Native Hawaiian cultural sites, including *heiau* (Hawaiian temples), *ahu* (altars), burials and petroglyphs, and would cut off Native Hawaiian access to sites for traditional or religious purposes.  See, e.g., AR-S 51524-28, 51744-57, 51913-19, 52056-67, 52273-96.[4]  The Army also acknowledges that carrying out Stryker projects in Hawai'i would destroy endemic plants and animals protected under the Endangered Species Act ("ESA") and degrade the habitat on which these species rely for their continued survival and eventual recovery.  See, e.g., AR-S 51516-19, 51703-04, 51712-27, 52020-21, 52029-43, 52224-25, 52237-56.  As the Army has acknowledged in private, "[b]ecause these are islands, cultural and biological resources are scarce, valuable, and impacts are magnified."  AR-S 2198.

---

[3] References to the administrative records for the SEIS and Programmatic EIS are abbreviated "AR-S" and "AR-P," respectively, followed by citation to the record's consecutive, Bates-stamped page numbers.

[4] To aid readability, Exhibit "4" provides copies of various maps from the SEIS in their original color.

A.    <u>Harm to Cultural Resources.</u>

Unless enjoined, the Army will resume construction at the Schofield

Barracks Urban Assault Course Training Facility ("UACTF") and Qualification

Training Range 2 ("QTR2") in the adjacent South Range Acquisition Area

("SRAA").  Exh. 5: 10/22/06 Kawasaki Dec. ¶ 6.  It will also break ground on the

Schofield Battle Area Complex ("BAX"), Combined Arms Collective Training

Facility ("CACTF") and TVWF at Kahuku Training Area, the Pōhakuloa Training

Area ("PTA") BAX, PTA TVWF, and an extensive network of training roads on

Oʻahu and Hawaiʻi Island.  <u>Id.</u> ¶¶ 6-7, 9; <u>see also</u> AR-S 51320-21.  These projects

are all located in "archaeological sensitivity areas," AR-S 51753, 52061, 52064,

52282, which include cultural resources that are "critical for future studies into

ancient Hawaiian history and culture and to the sense of cultural identity for

modern Hawaiians."  AR-S 61069; <u>see, e.g.</u>, AR-S 27981-82, 66023.

In its SEIS, the Army acknowledged:

> Facility and range construction involves grubbing vegetation, grading
> site surfaces, excavating subsurface, and moving heavy construction
> equipment.  All of these activities, particularly excavation, could
> result in direct damage to or destruction of archeological resources.

AR-S 51755; <u>see also</u> AR-S 51526, 52293.[5]  The Army conceded that "[i]mpacts

---

[5] At PTA, "[c]ultural resources within lava tubes" – such as Native Hawaiian
religious sites and burials – "would be particularly subject to damage as a result of
ground softening prior to construction of the [PTA] BAX."  AR-S 52293; <u>see, e.g.</u>,
AR-S 52274-75, 52277, 52283, 61019, 66152.  "Ground softening" is a

on archaeological resources from range and facility construction" will be "[s]ignificant," AR-S 51755, 52292, and "[p]otential impacts related to construction of training facilities could include destroying or damaging [Areas of Traditional Importance], including shrines, archaeological sites, burials, or elements of Native Hawaiian cultural landscapes." AR-S 51527; see also Abad Dec. ¶¶ 2-23; Quitevis Dec. ¶¶ 10-20, 25; Tengan Dec. ¶¶ 3-4, 10-15. It further confirmed that construction at the Schofield BAX and UACTF "could result in destruction or damage, or restrict access to previously unknown properties of traditional importance to Native Hawaiians," causing additional "significant" impacts. AR-S 51755-56. Similarly significant impacts are associated with resuming construction at the Multiple Deployment Facility ("MDF") at Wheeler Army Airfield, which threatens Mauna'ula, a "famous landmark and [Native Hawaiian] place of worship." Quitevis Dec. ¶ 27.

Proposed Stryker training likewise threatens irreparable harm to cultural resources. The SEIS acknowledges that "[t]raining activities on PTA and the [West PTA Acquisition Area ("WPAA")] under the Proposed Action would result in … possible impacts on archaeological sites." AR-S 52293. Such impacts would result from live-fire training that "could damage surface or subsurface resources from direct impacts of munitions or explosions." Id. In addition, "[a]ctivities such

---

euphemism for "using a D-10 bulldozer [to] drive back and forth over areas on the ranges to crush lava, large rocks, and hard soil." AR-S 51320.

as ordnance removal, construction of field fortifications or defensive positions, and off-road vehicular movement could cause site destruction or damage directly or indirectly." AR-S 52293-94. Mounted Stryker maneuver exercises would place cultural sites "at significant risk of damage," AR-S 52294, particularly in the WPAA and SRAA, and proposed training "could limit Native Hawaiian access to and use of [cultural] sites on these parcels for traditional or religious purposes." AR-S 51527; see also AR-S 51753 (showing archaeologically sensitive areas in SRAA), 51756 (converting SRAA to military training "might result in inadvertent physical damage or destruction of [cultural] sites"), 52285 (showing archaeologically sensitive areas in WPAA), 52294 (military training in WPAA "would limit access to the property" and "may also damage or destroy any unrecorded sites").

While the Army previously has claimed it will mitigate damage to cultural sites and address "accidental discovery of archaeological sites, human remains, or cultural items," the mitigations envisioned – data recovery (i.e., recording what will be destroyed) and reburial – would do nothing to eliminate the irreparable cultural harm. AR-S 51756. Cultural expert University of Hawai'i Professor Ty Tengan explains:

> Traditional and modern Hawaiian culture deems disturbance of burials
> and destruction of cultural sites as a cultural harm of first magnitude.
> Once burials are disturbed, no subsequent accommodations such as
> consultation or reinterment will undo the cultural injury. Likewise,
> mere "data recovery" does nothing to diminish the loss of cultural

sites to the living Hawaiian culture; once a cultural site is gone, it is
lost forever to present and future generations of Hawaiians.

Tengan Dec. ¶ 4; <u>see also</u> <u>id.</u> ¶ 6-15; Abad Dec. ¶¶ 2-23. As the Army has stated

succinctly: "If we can't avoid the site, it can be lost forever." AR-S 2198.

Notably, the Army's SEIS factored in all possible mitigation measures (<u>e.g.</u>,

modifying training facility design, archaeological and cultural monitoring,

provisions for inadvertent discovery of cultural resources and burials), and still

concluded these measures would not "mitigate the severity of the impacts" from

range and facility construction or training "to less than significant levels." AR-S

51526; <u>see also</u> AR-S 51755-57, 52292-94. No amount of repackaging by the

Army of its mitigation measures can change that ultimate conclusion. The Army

may well have the goal of avoiding impacts "to the full extent practicable," but the

reality is that allowing Stryker activities to proceed inevitably will result in

irreparable damage or destruction to cultural resources, both those currently known

and those that will become known only after a bulldozer plows into them. AR-S

51756. Indeed, such damage has already occurred. <u>See, e.g.,</u> Quitevis Dec. ¶ 18;

Exh. 6: 10/5/06 Office of Hawaiian Affairs ("OHA") Letter at 10-17.

The Ninth Circuit emphasized the significance of these cultural harms,

"deplor[ing] the … denigration of Plaintiffs' claim that native Hawaiians 'suffer

spiritually, physically, culturally, and emotionally each time a burial or cultural site

is desecrated.'" Addendum at 4-5 (citation omitted). Moreover, the court stressed

the irreparable nature of these harms, noting, "[i]f the Army digs up Native Hawaiian ancestors' bones, there is nothing that can be done to reverse that harm." Id. at 5.

The serious impacts to cultural resources described above assume the Army fully implements all mitigation measures. AR-S 51526. In practice, however, the Army has not lived up to its commitments under the Programmatic Agreement ("PA") it signed pursuant to the National Historic Preservation Act ("NHPA"). See Addendum at 4 ("the Army's mitigation measures have serious limitations"); see generally OHA Letter; Exh. 7: 10/25/06 OHA Amicus Brief. The Army has failed to "complete identification and evaluation of historic properties prior to implementation of [Stryker] undertakings," making it impossible to establish meaningful site protection plans. AR-S 53073; see also Quitevis Dec. ¶¶ 10-30; OHA Letter at 17-21. The Army has also severely restricted the activities of cultural monitors charged with ensuring proper treatment of traditional religious and other cultural properties, preventing them from exercising meaningful oversight of construction and unexploded ordnance ("UXO") removal activities in culturally sensitive areas. See AR-S 53072-73; Quitevis Dec. ¶¶ 10-23, 26-30; cf. Exh. 8: 10/22/06 Lucking Dec. ¶ 7 (stressing cultural monitors' importance).

Due to the Army's failures to implement required mitigations, numerous cultural sites have already been destroyed during UXO removal and construction at Stryker facilities, including features associated with Haleʻauʻau Heiau, a Hawaiian

temple recently re-discovered in the Schofield BAX, which were likely bulldozed by an unmonitored UXO clearance team.  See OHA Letter at 10-16; Quitevis Dec. ¶ 18; Exh. 9: 10/25/06 Markell Dec. ¶ 6.  The lack of adequate site identification and protection plans also leaves sites at Schofield's recently completed QTR1 at risk of destruction from live-fire practice.   See OHA Letter at 16-17; Quitevis Dec. ¶¶ 23-24.[6]  The Army's repeated violations of the PA have prompted protests from the PA's signatory and concurring parties, with Hawai'i's State Historic Preservation Office ("SHPO") threatening to seek the PA's termination, belying the Army's claims there is no cause for concern about impacts to irreplaceable cultural resources.  See Exh. 10: 10/4/06 SHPO Letter; Exh. 11: 7/25/06 Advisory Council on Historic Preservation ("ACHP") Letter; OHA Letter; OHA Amicus.

B.     Harm To Endangered Species And Native Ecosystems.

Unless enjoined, Stryker projects will also destroy endangered species and unique native ecosystems.  For example, the U.S. Fish and Wildlife Service ("USFWS") has concluded that building the PTA BAX "will result in the complete loss of several occurrences of listed plants and roosting habitat for the

---

[6] The Army has compounded the threat by using MK19 grenade launchers – a weapon system the SEIS neither disclosed nor analyzed for use at QTR1 – whose rapid-fire projectiles can pierce half-inch thick steel plates and threaten to inflict considerable damage to cultural resources.  Quitevis Dec. ¶ 24; see also AR-S 51563.  Notably, cultural monitors have recently found MK19 projectiles in culturally sensitive areas, including burial sites, confirming the threats to unprotected cultural resources at QTR1.  Quitevis Dec. ¶ 24.

[endangered] Hawaiian hoary bat," causing "a permanent loss of species and habitat."  AR-S 24196.   The sub-alpine tropical dryland ecosystem threatened with destruction at PTA is considered "one of the rarest on the planet."  AR-S 24097.

Stryker training poses additional, serious threats to endangered species and native ecosystems.  The Army admits such training would cause "habitat disturbance, deterrence of wildlife use, spread of nonnative species, increase in the probability of fire and direct take of listed wildlife, and destruction of listed plants."  AR-S 51518; see also AR-S 51516-17.  Ominously, the Army has warned "it would only take one wildland fire to significantly damage biological resources."  AR-S 2198.  The USFWS concurs in this assessment.  See AR-S 24197, 24261-62, 24264, 24266-67, 24462-63, 24474.

With respect to training-related fires, the USFWS noted in its biological opinion:

> The increase in the use of direct gunnery and mortar ammunition [for Stryker training] may increase the potential for ammunition to land outside of the current fire break road due to velocity and charge. Therefore, additional use of these weapons particularly Stryker-mounted systems under SBCT may increase the number of rounds that land outside of the fire break road, increasing the risk of fire in the areas where endangered plant species occur ... .

AR-S 24474; see also AR-S 24197, 24463.  The Army has acknowledged, "[f]ire in native vegetation almost invariably damages the ecosystem, in part because every fire burning in native vegetation destroys habitat for threatened and endangered species."  Exh. 12: 4/03 Programmatic Biological Assessment for

15

Oʻahu at 49 (emphasis added); see also id. at 52 (fires from military training increase spread of alien weeds). The USFWS has explained the nature and severity of this threat:

> Few native Hawaiian plants and animals are adapted to wildfires … . Consequently, most native plants and animals perish during fires with little subsequent recovery. Once a fire sweeps through native habitat it allows for the intrusion of non-native invasive plants and prohibits the regeneration of native plants. Each successive fire that reaches native forest stands reduces habitat for listed species, affects the moisture and canopy of the forest boundary, and increases the number of alien plants in areas of native vegetation. Invasive plant encroachment increase[s] after a major disturbance event such as a fire and this threat would have a significant effect on any threatened or endangered plant species not destroyed by the fire.

AR-S 24462.

In its biological opinions, the USFWS emphasized that, because of the nature of Stryker training, "[t]he potential for a wildland fire can never be totally eliminated," even with full implementation of the Army's fire management plans, a fact the Army has acknowledged in its more candid moments. AR-S 24474; see also AR-S 24197, 24463; Exh. 13: 4/03 Programmatic Biological Assessment for Hawaiʻi Island at 138 (fire vulnerability "cannot be mitigated to a lower level because of the highly fire prone nature of the live-fire weapons").[7] Notably, the Army's SEIS identified the biological resources at risk from Stryker conversion based primarily on the potential for training-related fires. AR-S 51703, 52020,

---

[7] The Army's planned training with the Stryker Mobile Gun System is precisely the type of "direct gunnery fire" the USFWS identified as increasing fire threats. AR-S 24474; see also Exh. 14: 10/21/06 Borne Dec. ¶ 4.

16

52224.  Dozens of federally listed species and dozens more "sensitive" species are located within these "Regions of Influence."  AR-S 51714-19, 52030-35, 52239-44.  Undeniably, endangered species and their habitat will burn, regardless of the measures the Army implements, should Stryker conversion proceed.

Off-road maneuver activity by Strykers would cause additional damage, destroying "native habitat for listed plants and bats" at PTA and the recently acquired WPAA, which "creates population and habitat fragmentation, essentially diminishing ranges of species and genetic transfer among individuals of a species." AR-S 24195.  The USFWS has emphasized that the loss of habitat and endangered species from Stryker maneuver training "is considered important."  AR-S 24196.

Even after factoring in all possible mitigations, the Army's SEIS concluded "[t]he overall impact of project actions on sensitive (listed) species and their sensitive habitat (including federally designated critical habitat) is still considered significant" and is "not mitigable to less than significant."  AR-S 51518 (emphasis added).  The USFWS has agreed, noting the Army's minimization measures "will only partially offset the negative effects of military training and wildfire on bats." AR-S 24261.  After factoring in all habitat protection measures, the USFWS concluded Stryker activities would cause a net loss of nearly 30,000 acres of bat habitat.  AR-S 24262; see also Sierra Club v. Norton, 207 F. Supp. 2d 1310, 1340 (S.D. Ala. 2002) ("The threatened harm, destruction of optimal habitat of an endangered species, is clearly irreparable").  Overall, the USFWS "anticipates that

17

take of Hawaiian hoary bats will occur in the form of direct take resulting in the death or injury of individual bats, harm due to significant loss of potential available treeland roosting habitat, and harassment by noise and ground disturbance." AR-S 24266; see also AR-S 24267.


V.    A BROAD INJUNCTION IS VITAL TO PREVENT STRYKER
      CONVERSION IN HAWAI'I FROM GAINING IRREVERISBLE
      MOMENTUM

In Sierra Club v. Marsh, Justice Breyer wrote:

> NEPA is not designed to prevent all possible harm to the
> environment; it foresees that decisionmakers may choose to inflict
> such harm, for perfectly good reasons. Rather, NEPA is designed to
> influence the decisionmaking process; its aim is to make government
> officials notice environmental considerations and take them into
> account. Thus, when a decision to which NEPA obligations attach is
> made without the informed environmental consideration that NEPA
> requires, the harm that NEPA intends to prevent has been suffered.

872 F. 2d at 500 (quoting Commonwealth of Massachusetts v. Watt, 716 F.2d 946, 952 (1st Cir. 1983); emphasis in Marsh); see also NPCA, 241 F.3d at 737 n.18. He continued:

> [T]o set aside the agency's action at a later date will not necessarily
> undo the harm. The agency as well as private parties may well have
> become committed to the previously chosen course of action, and new
> information – a new EIS – may bring about a new decision, but it is
> that much less likely to bring about a different one. It is far easier to
> influence an initial choice than to change a mind already made up.

Marsh, 872 F.2d at 500 (quoting Watt, 716 F.2d at 952; emphasis in Watt).

Justice Breyer's observations are on the money in this case, where the Army has already spent nearly $110 million on Stryker-related construction and land acquisition and, unless enjoined, plans to spend over $180 million more on projects in the pipeline.  See Kawasaki Dec. ¶¶ 3, 6-9.  This represents nearly half the total project budget of $627.5 million.  AR-S 1454.

Allowing such massive expenditures before the Army complies with NEPA would forge:

> link[s] in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues.  Once large bureaucracies are committed to a course of action, it is difficult to change that course – even if new, or more thorough, NEPA statements are prepared and the agency is told to "redecide."

Marsh, 872 F.2d at 500 (quoting Watt, 716 F.2d at 952-53).  As the Ninth Circuit warned in Environmental Defense Fund v. Andrus, 596 F.2d 848 (9th Cir. 1979):

> [D]elay in preparing an EIS may make all parties less flexible.  After major investment of both time and money, it is likely that more environmental harm will be tolerated.

Id. at 853 (citing Lathan v. Volpe, 455 F.2d 1111, 1121 (9th Cir. 1971)).

In addition, absent an injunction, the Army expects to complete several Stryker training facilities in the coming months and to be well underway on others, further adding to the project's momentum.  See Kawasaki Dec. ¶¶ 6-7.  Since the Army is "less likely to tear down a nearly completed project than a barely started project," allowing activities in furtherance of transformation to continue would cause significant "harm to the environment," consisting of "the added risk to the

environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." Marsh, 872 F.2d at 500-01. Thus, in addition to the significant, irreparable harm to cultural and biological resources that would occur while the Army complies with NEPA, the Court should weigh in the balance the increased likelihood the Army will ultimately proceed with Stryker conversion in Hawaiʻi, inflicting the significant, unavoidable impacts to cultural resources, native ecosystems, endangered species, air quality, recreation, noise levels, and soils described in the SEIS, regardless of whether alternate locations exist where the Army could achieve its goals with less environmental damage. See AR-S 51232. Such a result would contravene NEPA's basic purpose: "to apprise decision-makers of the disruptive environmental effects that may flow from their decisions at a time when they 'retain[] a maximum range of options.'" Conner v. Burford, 848 F.2d 1441, 1446 (9th Cir. 1988).

## VI.    ONLY LIMITED STRYKER-RELATED ACTIVITIES SHOULD BE ALLOWED PENDING COMPLIANCE WITH NEPA

The foregoing discussion makes clear that allowing the Army to proceed with Stryker conversion in Hawaiʻi threatens irreparable injury. As the Ninth Circuit concluded in granting temporary injunctive relief, once the cultural and biological treasures at risk from Stryker-related activities are destroyed, they are

gone forever.  Addendum at 5; see also AR-S 2198.  Permitting this irreparable

harm to occur before the Army has satisfied its duty to consider "alternative

location[s] where transformation of the 2nd Brigade could happen at potentially

lower cost to the environment" would contravene NEPA's basic purpose.

'Ilio'ulaokalani Coalition, 464 F.3d at 1098; see also Lands Council, 395 F.3d at

1027 (NEPA's purpose "to permit informed public comment on proposed action

and any choices or alternatives that might be pursued with less environmental

harm"); 40 C.F.R. § 1500.1(b).

　　　Accordingly, the Hawaiian Groups respectfully ask this Court to issue a

broad injunction prohibiting nearly all Stryker-related activities in Hawai'i pending

the Army's full compliance with NEPA.  See Washington County v. U.S. Dep't of

the Navy, 357 F. Supp. 2d 861, 878 (E.D.N.C. 2005) (enjoining Navy "from taking

any further activity associated with the planning, development, or construction" of

aircraft landing training field pending NEPA compliance);[8] People of Enewetak v.

Laird, 353 F. Supp. 811, 820-21 (D. Haw. 1973) (enjoining all aspects of simulated

---

[8] Even though, on appeal, the Fourth Circuit accepted the Navy's claim the
proposed facility was necessary for military readiness, it still modified the scope of
the injunction only slightly, allowing only activities that would "not include cutting
even a single blade of grass" to proceed pending compliance with NEPA.  National
Audubon Soc'y v. Department of Navy, 422 F.3d 174, 206 (4th Cir. 2005).
Notably, the court allowed these narrowly constrained activities only because it
was convinced they would "neither harm the environment nor limit the options
available to the Navy – nor cause any other form of irreparable harm."  Id. at 204;
see also id. at 206 (permitted activities will not turn Navy's "ultimate decision
about where to place the [landing field] into a foregone conclusion").

nuclear blast). Because of the threats posed to irreplaceable cultural sites, endangered species and native ecosystems, the injunction should prohibit all grading, grubbing, other ground disturbance, construction, UXO clearance, geotechnical testing, and Stryker-specific training.[9] With respect to training, the Army should be permitted to use only the types of weapons and quantities of ammunition employed prior to the commencement of Stryker conversion, due to the increased "risk of fire in the areas where endangered plant species occur" associated with proposed changes in live-fire training. AR-S 24474.[10]

In addition, to prevent Stryker conversion in Hawai'i from gaining irreversible momentum pending compliance with NEPA, the injunction should prohibit all future contract award, project design, and land acquisition. While the Army cannot recoup the over $61 million already spent on Stryker construction projects in Hawai'i, it should not be allowed further to commit financially to the

---

[9] "Stryker-specific training" is defined as training specifically intended to familiarize soldiers with the Stryker vehicle, other than in a classroom or computer simulation setting. Under the requested injunction, the Army could still train and qualify soldiers on and with weapons systems not mounted on Stryker vehicles.

[10] Unless enjoined, the combined ammunition use of the Stryker brigade with a current force brigade would increase 25% over levels with two infantry brigades, meaning that the Stryker brigade's ammunition use is 50% more than an infantry brigade's. AR-S 51326. The addition of 120mm mortars and the more than doubling of the number of mortar rounds are of particular concern since "[t]he increase in the use of … mortar ammunition" threatens endangered species and native ecosystems outside firebreaks "due to velocity and charge." Id.; AR-S 24474; see also Exh. 15: J-Fire, Multiservice Procedures for the Joint Application of Firepower at 11 (Nov. 1997) (120mm mortars' range double 60mm mortars').

project before considering more environmentally friendly – and cheaper – options elsewhere.  See Kawasaki Dec. ¶ 3; see also id. ¶ 7 (Army plans to award contracts for projects worth over $75 million); Exh. 16: David Wickert, New brigade could arrive soon, The News Tribune, July 24, 2004 (Fort Lewis "has demonstrated its proficiency at Stryker conversions" and "has the training facilities and space for soldiers").  As this Court noted in Stop H-3 Ass'n v. Volpe, 353 F. Supp. 14 (D. Haw. 1972), "halting of the continued expenditure of money" is critical to ensuring impartial review under NEPA.  Id. at 17.

While the funds already spent on construction projects may be unrecoverable, this Court can, and should, set aside the two major Stryker-related land acquisitions that occurred during this case's pendency: the condemnation of the 1,400-acre SRAA from the Campbell Estate for $15.9 million and the purchase of the 24,000-acre WPAA from Parker ranch for $31.5 million.  Kawasaki Dec. ¶ 8; Exh. 17: WPAA Deed at 2.[11]  It is well-established that, in NEPA cases, courts have the equitable discretion to set aside land transactions that occur "after a defendant has been notified of the pendency of a suit seeking an injunction against

---

[11] Now that this case has reached the remedy phase, the Hawaiian Groups have sought to join the landowners as necessary parties pursuant to Federal Rule of Civil Procedure 19(a).  See Forest Conservation Council v. U.S. Forest Service, 66 F.3d 1489, 1499 & n.11 (9th Cir. 1995) (in NEPA cases, non-federal parties have interest only in "portion of the proceedings addressing the injunctive relief sought by plaintiffs").  The Hawaiian Groups respectfully ask the Court to defer a decision on this aspect of injunctive relief to a future hearing following the landowners' joinder, so they can make their views known.  See National Wildlife Fed'n v. Espy, 45 F.3d 1337, 1344 (9th Cir. 1995) ("NWF").

him, even though a temporary injunction has not been granted." National Forest Preservation Group v. Butz, 485 F.2d 408, 411 (9th Cir. 1973) (quoting Jones v. SEC, 298 U.S. 1, 17 (1936)); see also NWF, 45 F.3d at 1342 (district court authorized "to void a property transaction and order a transfer of title where necessary"); Burbank Anti-Noise Group v. Goldschmidt, 623 F.2d 115, 116 (9th Cir. 1980), cert. denied, 450 U.S. 965 (1981) (if NEPA violated, court can order transfer of title to original owner).[12]   The court's equitable power extends to transactions in which the government has taken title to land, including condemnations.  See, e.g., Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172, 1175, 1187-88 (9th Cir. 2000) (setting aside federal agency's acquisition of 2,642 acres); Stand Together Against Neighborhood Decay, Inc. v. Board of Estimate, 690 F. Supp. 1192, 1200 (E.D.N.Y. 1988) (in condemnation case, "title ... can be returned whence it came by order of the Court"); cf. National Audubon Soc'y, 422 F.3d at 202-07 (injunction against Navy's condemnation of land from unwilling sellers).[13]

---

[12] The Hawaiian Groups' complaint put the Army on notice of their claim that, prior to compliance with NEPA, any land acquisition for Stryker conversion in Hawai'i was illegal.  Complaint at 20.  The Hawaiian Groups also informed the Campbell Estate and Parker Ranch of this claim.  See, e.g., Exh. 18: 8/19/04 Letter to Campbell Estate; Exh. 19: 8/20/04 Letter to Parker Ranch; Exh. 20: 5/4/05 Letter to Parker Ranch.  Thus, "granting the relief would not defeat the expectations of innocent parties."  NWF, 45 F.3d at 1343.

[13] In the SRAA condemnation case, the Ninth Circuit did not, as the Army now claims, preclude this Court from setting aside the condemnation.  The issue in that case was whether the Army's NEPA violation deprived it of congressional

Setting aside the land transactions is necessary to avoid irreversible momentum for the Stryker project in Hawai'i. Project Manager Lawrence Kawasaki's candid statement that "[t]he $46,200,000 the Army invested in land acquisitions to date will not be very useful unless the Army is allowed to construct and/or train on them" abundantly illustrates the need to undo the transactions to ensure the Army's analysis of stationing alternatives on remand is objective and meaningful. Kawasaki Dec. ¶ 3.

Promptly restoring the WPAA and SRAA to private ownership is also necessary because, as the Ninth Circuit found, land acquisition "harm[s] cultural resources." Addendum at 8. The Army's acquisition of these properties cut off Native Hawaiians' rights of access to carry out traditional and customary practices,

---

authorization to condemn, not whether this Court, exercising its equitable discretion, could set aside the condemnation in fashioning relief for the NEPA violation. Exh. 21: <u>United States v. 1,402 Acres</u>, No. 05-15858, slip op. at 2 (9th Cir. Oct. 5, 2006). Significantly, the Army argued to the Ninth Circuit that "[a] court's ability to fashion an equitable remedy in a direct NEPA challenge to an agency action … may include the ability to enjoin … any condemnation of land to be undertaken as part of that action." Exh. 22: Army Br. at 17. As the Army explained:

> [C]ondemnation of land as part of a larger project may in certain instances limit the range of reasonable alternatives or constitute a commitment of resources towards the underlying project that would prejudice a subsequent NEPA analysis of the project. … Thus, the question in a NEPA lawsuit, once a violation of NEPA has been found, is whether any part of the project – <u>including condemnation</u> – will prejudice the agency's environmental analysis in further violation of NEPA … .

<u>Id.</u> at 17-18 (emphasis added).

rights protected under Hawaiʻi's constitution and statutes.  See Exh. 23: SRAA Title Report at 4, 6, 10; WPAA Deed at 10; see also Haw. Const. art. XII, § 7; Haw. Rev. Stat. §§ 1-1, 7-1; Public Access Shoreline Hawaii v. Hawaiʻi County Planning Comm'n, 79 Haw. 425, 437-51, 908 P.2d 1246, 1258-72 (1995).  Unless title is returned to private ownership, Native Hawaiians will continue to suffer significant harm from interference with cultural access.  AR-S 51525, 51527.

The Hawaiian Groups do not seek an injunction against all Stryker-related activities.  The Court should allow the Army to conduct the cultural surveys required under the PA to identify and evaluate historic properties, as well as any UXO clearance necessary to perform the surveys.  See AR-S 53073-75.  While such surveys arguably advance project design, they also would provide valuable information about the cultural resources threatened by the Army's proposed undertakings.  Securing this information is important to allow an informed choice among the stationing options for the Stryker brigade, furthering NEPA's purposes. To ensure cultural resources are adequately protected from irreparable harm during the aforementioned surveys and associated UXO clearance, the Court should allow the Army to carry them out only upon the filing of written, monthly certification from all parties to the PA – ACHP, SHPO, and OHA – that the Army is acting in compliance with the PA.

In addition, the Hawaiian Groups do not object to the Army's use of the Schofield TVWF, whose construction was completed while this case was on

26

appeal, as the money has already been spent and construction-related damage done. Finally, the Hawaiian Groups do not object to the Army's use of QTR1, whose construction is also complete, for non-Stryker-specific training, provided (1) all parties to the PA first certify to this Court in writing that the Army has complied fully with its obligations under the PA to identify and evaluate cultural resources that might be damaged by live-fire training and has finalized and implemented the necessary mitigations, see AR-S 53073-77, and (2) live-fire training is limited to only the weapons and ammunition analyzed in the SEIS (e.g., no use of MK19 grenade launchers). See AR-S 51563.

## VII.    NO UNUSUAL CIRCUMSTANCES WEIGH AGAINST GRANTING THE REQUESTED INJUNCTIVE RELIEF

"[T]here is no national defense exception to NEPA." Mālama Mākua v. Rumsfeld, 163 F. Supp. 2d 1202, 1222 (D. Haw. 2001) (quoting Wisconsin v. Weinberger, 745 F.2d 412, 425 (7th Cir. 1984)). Thus, the normal injunction standard for NEPA cases applies, and the Army bears the burden of "present[ing] evidence . . . that 'unusual circumstances' weigh against the injunction sought." Forest Conservation Council, 66 F.3d at 1496; see also American Motorcyclist Ass'n, 714 F.2d at 966 (finding "unusual circumstances" where "strong environmental considerations militated" against injunction). In arguments to the Ninth Circuit, the Army identified a limited set of Stryker-related activities the injunction of which allegedly would cause harm by delaying the 2nd Brigade's

27

Stryker conversion beyond November 2007.  Exh. 24: Army Opp'n at 14-15.[14]

Since even the Army concedes that enjoining the remaining Stryker activities

(including all but a handful of construction projects on Oʻahu) would not cause

irreparable harm, there is no basis for this Court to allow them to proceed.  See

Addendum at 3 ("the Army has itself conceded that most of its activities are not

critical to national security").[15]

    With respect to the other activities, the Ninth Circuit found the Army failed

to "provide[] convincing reasons why even the 'critical' activities are 'critical.'"

Addendum at 3.  The court noted the Army has:

> claimed previously that certain of its Stryker transformation-related
> activities must proceed on-schedule, and yet "[t]he Army fails to
> explain why th[e] half-year delay [in construction of the Schofield

---

[14] The allegedly "critical" activities are: new equipment fielding, new
equipment training, soldier and unit level training, and five construction projects:
QTR1, the Motor Pool in the SRAA, the UACTF, the Schofield TVWF, and the
MDF.  Id. at 15.  As discussed above, construction of both QTR1 and the Schofield
TVWF is already complete, and the Hawaiian Groups do not object to the Army's
use of these facilities, with appropriate safeguards in place.

[15] While the Army claimed it would incur financial penalties from putting
construction projects on hold and its contractors might not make as much profit, it
did not assert such economic loss constitutes irreparable harm.  See Mālama
Mākua, 163 F. Supp. 2d at 1221 (financial harm not "unusual circumstance"
justifying refusal to enjoin NEPA violations); The Wilderness Society v. Tyrrel,
701 F. Supp. 1473, 1491 (E.D. Cal. 1988), rev'd on other grounds, 918 F.2d 813
(9th Cir. 1990) ("Government's economic loss cannot be considered compelling if
it is to be gained in contravention of federal law"); Stop H-3 Ass'n, 353 F. Supp. at
18 ("substantial monetary loss … is not sufficient basis for either forbearing to
issue the injunction or for staying it;" "prospective monetary damage is not
irreparable injury"); see also Coalition for Canyon Preservation v. Bowers, 632
F.2d 774,780 (9th Cir. 1980) (Kennedy, J.) ("increase in costs due to delay" not
prejudicial since "NEPA by its very nature contemplates such delay").

> BAX] – which allegedly posed such dire ramifications – did not, when
> it came to pass, have any adverse consequences. Instead, the Army
> simply … assert[s] once again that Stryker conversion must be
> completed on schedule (the newly minted one, that is) or else."

Addendum at 6 (alterations in original; citation omitted).[16] Unless the Army can

satisfy its burden to present credible evidence – not just more rhetoric – regarding

why alleged national security needs outweigh established threats to Hawai'i's

cultural and biological treasures, these destructive Stryker activities should be

enjoined.[17]

---

[16] In opposing injunction pending appeal, the Army had told the Ninth
Circuit that any postponement of the 2nd Brigade's conversion beyond May 2007
would:

> immediately disrupt the Army's transformation efforts, significantly
> degrade the Army's ability to provide effective and ready forces to
> meet strategic commitments, including on-going operations in Iraq,
> and reduce the Army's strategic posture to deter conflict and respond
> to crisis situations in the Pacific area of responsibility, including the
> Republic of Korea.

Exh. 25: 5/24/05 Lovelace Dec. ¶ 1; see also id. ¶¶ 6-9. Despite the absence of any
injunction, the Army unilaterally allowed the completion date for the 2nd Brigade's
conversion to slip by half a year, until November 2007. See Exh. 26: 10/23/06
Lovelace Dec. ¶ 7. Rather than explain to the Ninth Circuit why the half-year
delay did not, as predicted, result in any harm, the Army simply cut-and-pasted
from earlier declarations, claiming that failure to keep to the new schedule would
have the same allegedly dire consequences. See id. ¶ 1.

[17] Notably, the crisis the Army alleges is based on temporary restrictions on
one of the Army's seventy brigades. The rest of the Army's activities would be
completely unaffected. As discussed below, even this single brigade would be free
to pursue Stryker conversion elsewhere or, alternatively, to train in Hawai'i as an
infantry brigade, as the other Hawai'i-based brigade has, without Stryker facilities.

For example, while the Army asserts it must train with the Stryker Mobile Gun System ("MGS") at PTA, the fact is this weapon just rolled off the assembly line.  See Borne Dec. ¶ 4.  No Stryker brigade deployed to date has ever used this weapon, and, thus, the Army cannot credibly claim it is integral to converting the 2nd Brigade.  See Exh. 27: Michael Gilbert, New Stryker boasts plenty of firepower, The News Tribune, Sept. 17, 2006.  Particularly since the USFWS has identified the MGS as precisely the type of "direct gunnery fire" that threatens endangered species with destruction, the Court should prohibit its use in Hawai'i pending NEPA compliance.  AR-S 24474; see also Gilbert, supra (noting challenge of "firing [105mm cannon] accurately off a bouncy wheeled platform").

The Army similarly must prove why the three remaining construction projects are vital to national security, not merely convenient.  The Army currently has over 160 Stryker vehicles in Hawai'i.  Borne Dec. ¶ 4.  Presumably, it is parking and maintaining them somewhere and, thus, does not truly need the SRAA Motor Pool.  Likewise, even without the UACTF, the Army successfully trained the 25th Infantry's 3rd Brigade for deployment to Iraq this summer, undercutting the claim the new facility is critical for training.  See Exh. 28: William Cole, 5,000 leaving for war games, Honolulu Advertiser, Apr. 23, 2006.  As for the MDF, the Army has not demonstrated why the existing, interim facility is so inadequate as to justify proceeding with Stryker conversion in Hawai'i prior to full compliance with NEPA.

More generally, the Army's claim that activities in Hawai'i are "critical" fails to come to terms with the fact that entry of a narrowly tailored injunction focused on activities here would not preclude completing the 2nd Brigade's conversion to a Stryker brigade.[18]  The Army now has at its disposal all the facilities necessary to train Stryker units in two locations, both of which support deployment to the Pacific Rim:  Fort Lewis and Alaska.  'Īlio'ulaokalani Coalition, 464 F.3d at 1100.  The current, year-long deployment of one of Fort Lewis' Stryker brigades means the 2nd Brigade could temporarily relocate to Washington State and carry out any needed Stryker training there.  See Exh. 30: 11/7/05 Dep't of Defense Press Release; Exh. 31: Sean Cockerham, Fort Lewis Strykers could head for Baghdad, The News Tribune, July 27, 2006.

The Army's renewed claim Fort Lewis has no room for a third Stryker brigade is no more credible than its identical assertion in the SEIS, which was immediately followed by the 2nd Cavalry's transfer to undergo Stryker conversion there.  See AR-S 51336; Exh. 32: AR-P 9561, 9608.  The recent move by the 2nd Cavalry, now a Stryker unit, to Germany, together with the current deployment of

---

[18]  Alternatively, the Army could continue to train the 2nd Brigade in the same manner it has trained for years, as an infantry unit.  The brigade would be no less or differently prepared to carry out its mission than when the 3rd Brigade deployed to Iraq this summer, or when the 2nd Brigade successfully deployed in 2004, confirming it can continue to carry out its national defense mission effectively.  See Exh. 29: Gregg K. Kakesako, Army honors war-weathered division, Honolulu Star-Bulletin, May 4, 2005.  Issuing the requested injunction would not "significantly impair the ability of the Army to defend the nation." Mālama Mākua, 163 F. Supp. 2d at 1221.

another Stryker brigade, opens up training opportunities at Fort Lewis.  Exh. 33:

9/18/06 Army Press Release.  The Army's litigation position that temporarily

relocating the 2nd Brigade to Fort Lewis is out of the question cannot be squared

with the notifications it is providing to its soldiers that they may soon be headed

there for Stryker training.  See Exh. 34: William Cole, Were Strykers fast tracked?,

Honolulu Advertiser (Nov. 6, 2006).[19]

Even if Fort Lewis alone cannot satisfy all the 2nd Brigade's training needs,

the Army has other resources at its disposal.  The Army recently acknowledged the

2nd Brigade will extend its time at the National Training Center ("NTC") in

California to accomplish additional pre-deployment training.  See Exh. 34.

Moreover, Lt. General John Brown, the Army's commander in the Pacific, has

stated that, whatever happens in this case, the Army will "ensure our Soldiers are

trained to standard prior to sending them into combat."  Exh. 35: U.S. Army

Garrison Hawaii Public Affairs, 2nd SBCT halts its Stryker training, Hawai'i Army

Weekly at A-1 (Nov. 3, 2006); see also Exh. 36: Bednarek Deposition at 165:5-15

(emphasizing "flexibility of [Army's] system to provide [deploying] formations

what they need" "to get soldiers trained and ready to deploy").  The existence of

alternate Stryker training facilities outside Hawai'i precludes a finding of

---

[19] Notably, the Hawaiian Groups do not suggest the Army should fly the 2nd
Brigade to Fort Lewis every time it needs to train, the absurd "alternative" from the
SEIS.  AR-S 51334-36.  Rather, the Army could restation the brigade temporarily,
avoiding excessive use of transport capacity and lost training days.

irreparable harm from entry of the requested injunction. Mālama Mākua, 163 F. Supp. 2d at 1221.[20]

Finally, even if the Army could satisfy its heavy burden of establishing the balance of harms favors allowing one or more of the allegedly "critical" activities to proceed, the Court still should carefully tailor its injunction to provide maximum protection for Hawai'i's irreplaceable cultural sites and endangered species. For example, construction of, or training at, the UACTF – or any other Stryker-related facility – should not be allowed unless and until all parties to the PA provide written confirmation to the Court that the Army is in full compliance with the PA's requirements for identifying, evaluating and protecting cultural sites.[21] Moreover, because off-road maneuvers with Stryker vehicles threaten to crush burials, destroy cultural sites, and degrade native ecosystems, any authorized "driver training" or other maneuver exercises should be restricted to pre-existing paved roads and other paved surfaces. Furthermore, even should the Court find some Stryker-specific live-fire training in Hawai'i is warranted, to minimize impacts, only the types of weapons and quantities of ammunition employed prior to the commencement of

---

[20] While relocating the 2nd Brigade to train elsewhere may cause regrettable inconvenience, such harm pales in comparison to the irreparable injury to cultural and biological treasures from proceeding with Stryker activities in Hawai'i. See id. (rejecting alleged harm to morale).

[21] As discussed above, even with full implementation of all mitigations, impacts on irreplaceable cultural resources and endangered species would still be significant. AR-S 51517, 51525, 51725, 51755, 52040, 52252, 52292.

Stryker conversion should be allowed, with no maneuver live-fire.  See supra

footnote 10 & accompanying text; Borne Dec. ¶ 6(a) (Strykers using QTR1 would

be stationary), 6(c) (use of UACTF "limited to dismounted individual or small unit

li[v]e fire drills").

## VIII.  THE PUBLIC INTEREST FAVORS ISSUANCE OF A BROAD INJUNCTION

The public's strong interest in protecting the cultural and biological

resources threatened with destruction should Stryker activities in Hawai'i resume

is reflected in numerous federal statutes.  See Johnson v. U.S. Dep't of Ag., 734

F.2d 774, 788 (11th Cir. 1984) ("Congressional intent and statutory purpose can be

taken as a statement of public interest").  In enacting the NHPA, Congress declared

that preserving our nation's "irreplaceable heritage is in the public interest so that

its vital legacy of cultural, educational, aesthetic, inspirational, economic, and

energy benefits will be maintained and enriched for future generations of

Americans."  16 U.S.C. § 470(b)(4).  The Native American Graves Protection and

Repatriation Act affirms the importance of sparing Native Hawaiians "the

indignity and resentment that would be aroused by the despoiling of their

ancestors' graves."  Bonnichsen v. United States, 367 F.3d 864, 876 (9th Cir.

2004).  The ESA's legislative history "reveals a conscious decision by Congress to

give endangered species priority over the 'primary missions' of federal agencies."

Tennessee Valley Authority v. Hill, 437 U.S. 153, 185 (1978).

Issuing a broad injunction would advance the public's "significant interest in the protection of endangered species, cultural resources, Native Hawaiian rights, and the environment ... ." Mālama Mākua, 163 F. Supp. 2d at 1222. Moreover, ensuring the Army complies with NEPA before proceeding with Stryker conversion "invokes a public interest of the highest order: the interest in having government officials act in accordance with the law." Seattle Audubon Society v. Evans, 771 F. Supp. 1081, 1096 (W.D. Wash.), aff'd, 952 F.2d 297 (9th Cir. 1991); see also Fund for Animals v. Espy, 814 F. Supp. 142, 152 (D.D.C. 1993). Without broad injunctive relief, the public's interest in ensuring protection of Hawai'i's unique cultural and biological resources and in holding the Army accountable for its legal violations would be irreparably harmed. Accordingly, the public interest favors granting the Hawaiian Groups' request for the injunction described in Part VI, supra. See High Sierra Hikers, 390 F.3d at 643.

DATED:   Honolulu, Hawai'i, November 14, 2006.

EARTHJUSTICE
David L. Henkin
Isaac H. Moriwake
223 South King Street, Suite 400
Honolulu, Hawai'i 96813

By:   /s/ David L. Henkin
DAVID L. HENKIN
ISAAC H. MORIWAKE
Attorneys for Plaintiffs

35

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| ʻĪLIOʻULAOKALANI COALITION, a Hawaiʻi nonprofit corporation; NĀ ʻIMI PONO, a Hawaiʻi unincorporated association; and KĪPUKA, a Hawaiʻi unincorporated association,<br><br>        Plaintiffs,<br><br>   v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army,<br><br>        Defendants. | CIVIL NO. 04-00502 DAE BMK<br><br>CERTIFICATE OF COMPLIANCE |

CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.5(e), I certify that the foregoing brief is set in a proportionally spaced 14-point font (Hawaiian version of Times New Roman) and contains 9,000 words, exclusive of the caption and signature block. I have relied upon Microsoft Word to determine the word count.

DATED: Honolulu, Hawaiʻi, November 14, 2006.

/s/ David L. Henkin
DAVID L. HENKIN
Attorney for Plaintiffs