IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| 'ĪLIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NĀ 'IMI PONO, a Hawai'i unincorporated association; and KĪPUKA, a Hawai'i unincorporated association,<br><br>    Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army,<br><br>    Defendants. | Civil No. 04-00502 DAE BMK<br><br>DECLARATION OF KĒHAUNANI CACHOLA ABAD, PH.D. |

DECLARATION OF KĒHAUNANI CACHOLA ABAD, PH.D.

I, KĒHAUNANI CACHOLA ABAD, declare that if called as a witness in this action I could testify of my own personal knowledge as follows:

1. I received a Masters and Ph.D. in Anthropology from the University of Hawai'i at Mānoa, specializing in archaeology and traditional Hawaiian culture. My studies, research, and work over the years have focused on Hawaiian tradition and culture. I taught Hawaiian Studies at Kamehameha Schools for twelve years. I have published numerous manuscripts and have researched and prepared dozens of reports and studies and countless presentations on Hawaiian ethnohistory, archaeology, and anthropology. I have conducted research for Hui Mālama I Nā Kūpuna O Hawai'i Nei ("Hui Mālama"), a Hawaiian organization recognized by Congress in statutes such as the National Historic Preservation Act ("NHPA") and Native American Graves Protection and Repatriation Act ("NAGPRA") to have expertise in Hawaiian cultural matters, particularly burial issues. I continue to assist Hui Mālama as a researcher and writer. I have also conducted research for other Hawaiian organizations, including the Kaho'olawe Island Conveyance Commission, Hawai'i Lā'ieikawai Association, and Kamehameha Schools. I have been appointed to various positions in organizations involved in Hawaiian history and culture, including the Board of Trustees of the Hawaiian Historical Society, the O'ahu Island Burial Council, and the Technical Advisory Committee of the Kaho'olawe Island Reserve Commission.

2.  I have reviewed the Army's Final Environmental Impact Statement ("EIS") for Army Stryker conversion in Hawai'i, the Programmatic Agreement ("PA") the Army prepared pursuant to the NHPA, and various archaeological reports and documents the Army generated in connection with the EIS and PA. Based on my background and experience, I believe the EIS fails to grasp fully the significance of the cultural harms of Stryker conversion. The EIS admits that these harms will be significant, even with mitigation. Nonetheless, as further discussed below, the EIS still takes an overly generous view of the Army's proposed mitigation measures. Throughout the EIS, these measures mostly involve following consultation procedures under the PA and other provisions. Such measures do nothing to repair the ultimate cultural injury suffered by Hawaiians when burials are disturbed or *wahi kūpuna* (ancestral places) are damaged or destroyed.

**Relating to Burials**

*Significance of burials in Hawaiian culture*

3.  Traditional Hawaiian cultural burial practices are rooted in the Hawaiian cultural understanding that the *mana* (spiritual energy) of deceased individuals would remain in their *iwi* (bones) upon passing. For this and other reasons, *iwi* are considered highly *kapu* (sacred, restricted). A related belief is that

3

the *iwi* of an individual are a continued manifestation of the individual, requiring care and protection, just as someone living does.

4.     The proper handing of these *iwi* required that close family members *kanu* (plant, bury) *iwi* in secret burial places and protect them from any disturbance. In time, *iwi* return to the land and imbue the burial place and the surrounding area with the *mana* of those individuals buried there. To the descendants of the individuals buried in a given area, those areas are *kulāiwi* (ancestral lands to which family members of the deceased are considered quite literally connected) that are energized and nourished by the very essence of their ancestors. To ensure that such an intended final stage of a Hawaiian life cycle is completed, loved ones exercise extreme care to protect burials from any intrusion.

5.     Disturbing a burial site and the *iwi* interred there is an act of intense disrespect to the deceased individual, his/her *'ohana* (extended family), and to all Hawaiians who continue to hold these traditional beliefs. Handling the *iwi*, displacing them, physically damaging them, or even exposing the *iwi* to sunlight and the eyes of others inflicts grievous cultural harm.

### *Identification of burials*

6.     Under traditional Hawaiian practice, burial locations were unmarked and highly guarded by *'ohana* members – a secret privy only to those within an *'ohana*. Burial locations were often chosen because they would be difficult to

4

detect by individuals passing through an area or even by those who might have sought to degrade a family by harming their burial sites. Hence, they are difficult for archaeological field crews to detect today.

7. Following the introduction of Western diseases, the Hawaiian population experienced a catastrophic collapse, with entire families dying from the waves of epidemics that arrived. In many cases, this prevented individuals from passing on in normal ways such highly guarded information as family burial locations. Overlapping in time with the era of population decimation were large-scale land tenure changes (occurring in mid-1800s) that ultimately displaced a vast majority of Hawaiians from their *kulāiwi*, further impairing their ability to care for family burials and to share these locations with the youth of their families.

8. As a result of these circumstances and other factors, a majority of Hawaiians today are not able to identify the specific burial locations of their ancestors, especially for those ancestors who would have lived prior to the 1800s. Thus, although many contemporary Hawaiians can trace their ancestry to the project areas affected by Stryker transformation, it is highly likely that numerous burials within the project areas would not have been identified either through inquiring within the Hawaiian community or through archaeological survey methods.

### *Imminent Harms to Burials and Hawaiians*

9.  It is also highly likely that unidentified burials will be encountered inadvertently via the many ground-disturbing activities anticipated in the planned transformation. The EIS acknowledges the presence of burials in many of the affected areas, and it is certain that additional undiscovered burials exist in the areas that the Army proposes to develop. Burials encountered in such projects are nearly always Hawaiian, as few others who later came to Hawai'i were buried in unmarked graves as Hawaiians were. The Army's ground-disturbing activities will intrude upon burials, thereby breaking and crushing bones, disarticulating burials, co-mingling remains from multiple individuals buried in a single location, damaging burial goods that were placed with the deceased, and destroying the natural or man-made interment contexts in which the bones were meant to remain at rest. Monitoring will not avoid this damage, as the Army monitoring plans make clear that only *after* excavation will any monitors "inspect . . . for cultural features or materials" and "collect datable samples and significant cultural material."

10. Given the history described above, Hawaiians take a protective stance toward all Hawaiian burials, acting as *'ohana* who would do the same. Hawaiians feel a particular need to exert their *kuleana* (right and responsibility) to care for

6

Hawaiian burials when such burials are in areas that they know to be their *kulāiwi* – that is, where such buried individuals have a high likelihood of being *'ohana*.

11.  The EIS and PA indicate a high likelihood that burials will be discovered during the Stryker transformation.  Apart from the severe cultural harm inflicted by such disturbances, it would be of utmost importance for Hawaiians that the burials be returned as best as possible to their state prior to disturbance, and that the Army avoid the burials in its future activities.  The EIS and PA, however, grant the Army complete discretion as to whether the burials will remain in place or be removed.  The EIS cites the notification and consultation requirements of Section 3 of NAGPRA, a provision dealing with the disposition of remains found during projects on federal land.  Under this procedure and the Inadvertent Discovery Plan attached to the PA, when burials are disturbed, the Army will conduct an examination of the unearthed remains and then notify the Hawaiian community regarding the Army's proposed disposition.  In other words, the Army contemplates that any consultation with Hawaiians would occur only *after* the Army has decided what it wants to do with the burials and would thus focus on how the burials are excavated and relocated, not whether they should remain at rest, in place.

12.  Any measures that the Army might establish to prevent further harms to burials inadvertently discovered after the initial intrusion, or any measures the

7

Army might take to assist with the reburial of the remains and funerary objects, would neither negate nor significantly alleviate the severe harms of the initial burial intrusion and the additional harms resulting from the examination of the burial and its removal. Such disregard for the sanctity of the burial would be considered by Hawaiians as acts of extreme disrespect and desecration to the individuals removed and to living Hawaiians, especially those who trace their lineage to these areas.

13. If Hawaiians are unable to protect the burials of their ancestors, or the burials of those for whom they have now taken responsibility, the cultural harms would be significant. These would include Hawaiians suffering profound emotional and spiritual strain, living with a foreboding sense that those who were buried and disturbed are now in a state of great unrest, that the intended full life journey of the disturbed individuals was not completed, that potential harms will result to the living due to the unrest of the disturbed, and that the natural flow of what is right and proper has been severely disrupted. This cultural harm is real and tangible for many Hawaiians, yet is absent from the Army's analysis.

**Relating to Archaeological Sites and Properties of Traditional Religious and Cultural Significance**

*Significance*

14. As an initial matter, the EIS and PA draw an artificial distinction between "archaeological sites" and "properties of traditional religious and cultural importance to Hawaiians" that does not conform with Hawaiian cultural perspectives. Rather than being distinct categories, the two overlap considerably. A majority of the historic properties referred to as "archaeological sites" were created by Hawaiians of times past as integrated living, working, and planting areas. Part and parcel of such sites are areas such as burial and religious places, *i.e.*, what the PA refers to as "properties of traditional religious and cultural importance to Hawaiians." As a whole, such sites comprise a Hawaiian category of *wahi kūpuna*, or ancestral places including habitations, agricultural sites, work areas, burials, and religious sites – all of which would hold cultural significance to Hawaiians.

15. *Wahi kūpuna* are directly linked to the environments in which they are situated. The purposes of *wahi kūpuna* were linked to the environment, as with a *heiau* (religious site) being located in an environment where the deity related to the *heiau* was thought to reside, a lithic (stone) work area being situated immediately adjacent to a quarry source for adze material, or agricultural features being created

9

with the particular understandings of the types of agricultural products that could be grown in an area and the techniques used to maximize the agricultural productivity of that area. Even the exact placement of *wahi kūpuna* within an environment was highly purposeful. In ancient times, *kāhuna kuhikuhipuʻuone* (masters, experts in the placement of structures within an environment) would offer their expertise regarding the best locations and orientations of structures to one another, to the landscape, and to the elements of nature. The cultural significance of *wahi kūpuna* stems directly from the relationship of these sites to their surrounding context.

16. *Wahi kūpuna* of all types hold particular cultural significance to Hawaiians because they remain part of their original contexts and because they are tangible and accessible direct connections to earlier generations of Hawaiians. Unlike portable ancestral objects that are now in museums, in glass cases, and away from their original cultural contexts, *wahi kūpuna* continue to exist in their original contexts relative to one another and the natural environment and are directly accessible (i.e., there are no glass cases separating Hawaiians from the *wahi kūpuna*). Hence, interacting with *wahi kūpuna* affords Hawaiians a highly valued experience of directly connecting with the lives of their ancestors in the

10

same contexts as their ancestors. In short, *wahi kūpuna* are not archaeological artifacts, but rather supporting elements of a living culture.

### *Identification and significance assessments of wahi kūpuna*

17. The EIS recognizes the need for more surveys and identification of *wahi kūpuna* and the ample potential for unknown sites. In documents relating to construction of the Battle Area Complex ("BAX") at Schofield Barracks, the Army has observed that, because the affected areas were "once a thriving region of traditional Hawaiian settlement and ceremony supported by extensive areas of wetland and dryland agriculture," "it is anticipated that Hawaiian sites associated with habitation, ceremonial activities, and agriculture will be identified" in those areas. As the Army acknowledges, cultural resources in such areas of traditional activity include not only visible sites on the surface, but also subsurface remains, including burials. The Army has admitted making "numerous discoveries of artifacts and sites" during pre-construction activities and has described one subsurface feature ("Site 6696") that it disturbed during ordnance demolition, which it believes contains further subsurface material.

18. In addition to undiscovered sites, the EIS also acknowledges throughout that the Army has yet to conduct evaluations of the cultural significance of the known *wahi kūpuna*. Indeed, the EIS routinely cites as

11

"mitigation" the Army's intention to identify and evaluate any cultural resources in the affected area under the process set forth in the PA. Apart from the incomplete and backwards nature of such analysis, the existence of the PA process is not a valid basis for downplaying the impacts to cultural resources. First, as discussed above, the PA process (as well as the numerous archaeological studies generated by the Army for the PA and the EIS) rests on a limited concept of "properties of traditional religious and cultural importance" to Hawaiians. The assumption underlying the PA is that sites are significant only if they involve burials or religious features, or where the Army's consultations with a limited set of Hawaiians yield what the Army considers important information. Again, the Hawaiian concept of significance is not limited to certain categories of sites. Also, although the history of massive physical and cultural dislocation has led to the loss of much of the specific information about the history and use of many *wahi kūpuna*, this does not diminish the significance of these sites to Hawaiians. To the contrary, for the reasons stated above, Hawaiians continue to view these sites as integral parts of their culture because of the connection they provide Hawaiians with the *'āina* (land) and their ancestors.

### *Imminent harms to wahi kūpuna and Hawaiians*

19.     Second, the PA gives the Army ultimate discretion in determining whether any project will affect *wahi kūpuna* (ancestral places), and whether a project will go forward unmodified, despite the acknowledged adverse effects. After the Army decides to proceed with their project, the only mitigation that the EIS repeatedly falls back on is "data recovery." In other words, the *wahi kūpuna* are recorded before destruction. In the case of *wahi kūpuna* that the PA describes as "archaeological sites," recordation would focus on their physical descriptions: their type of construction, morphological features, orientation, and possibly related cultural material that might be excavated from a small sample of the subsurface area of a site – that is, data that archaeologists deem important solely for archaeological purposes. In the case of *wahi kūpuna* that the PA describes as possessing "traditional religious and cultural importance" to Hawaiians, information from oral history interviews and archival research would also be recorded. As with burials, the Inadvertent Discovery Plan describes any consultation over such sites as involving only decisions of the "scope and disposition of the [recorded] materials."

20.     As one example of "data recovery," the Army's Site Protection Plan for the Schofield BAX and Qualification Training Range 1 ("QTR1"), also at

13

Schofield, recommends that "archaeological testing and sampling occur at [the site of an ancient *imu* (earthen oven)] – when permissible – in order to collect information before it loses all significance [from] future military activity." It also provides generally that "[i]f subsurface archaeological features or remains are encountered, they will be recorded with accurate GPS positions, mapped in profile and/or plan, and sampled."

21.  Far from mitigating the harm, such data recovery ends the culturally meaningful aspects about these *wahi kūpuna* (ancestral places). It eliminates the physical relationship of *wahi kūpuna* to their environments, including other sites, natural features on the landscape, and elements of nature. It also severs the ability of Hawaiians to make direct connections with the tangible creations of their ancestors within the contexts that their ancestors created them – to interact with something created by those who came before them, to literally walk along the same paths once traveled by their ancestors. Sterile descriptions of *wahi kūpuna* recorded on paper do nothing to lessen such losses.

22.  Similarly, the Site Protection Plan identifies a petroglyph feature located in the QTR1 construction footprint that "is broken in a few places, and has been impacted by live-fire activities." The document recommends the Army "remove and relocate" it. Again, such *wahi kūpuna* (ancestral places) are

14

inseparable from the complex geographic context in which they are situated; removing them from this context all but eliminates their cultural meaning and value.

23. Finally, apart from its inherent limitations, the PA obviously can provide none of benefits the Army claims it will if the Army fails to follow it. I have reviewed the testimony of Cultural Monitor Leimaile Quitevis presented in this case and have been aware of the long-standing objections to the Army's noncompliance with the PA raised by the Cultural Monitors and as others such as the Office of Hawaiian Affairs and State Historic Preservation Office of the State of Hawai'i, both of whom signed the PA. These reveal serious problems with the Army's treatment of cultural resources and confirm the deficiencies of the PA process in both concept and practice. Without identifying, evaluating, and providing site protection plans for all potential cultural resources in the affected areas, the Army renders meaningless precisely what it relied upon in its EIS as a principal "mitigation" of the anticipated cultural harms of its activities. Particularly in such areas of acknowledged traditional activity, the lack of thorough, prior examination of potential cultural resources makes it all but inevitable that the Army's ground-disturbing activities will inadvertently destroy *wahi kūpuna*. Any knowledge of such destruction after it occurs is of course

meaningless; the loss of a previously undiscovered *wahi kūpuna* is in all respects irretrievable.

I declare under penalty of perjury that I have read the foregoing declaration and know the contents thereof to be true of my own knowledge.

Dated at Honolulu, Hawai'i, November 14, 2006.

*Kēhaunani Cachola Abad*
KĒHAUNANI CACHOLA ABAD, PH.D.