IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| 'ĪLIO'ULAOKALANI COALITION, a ) Hawai'i nonprofit corporation; NĀ 'IMI ) PONO, a Hawai'i unincorporated ) association; and KĪPUKA, a Hawai'i ) unincorporated association, ) )              Plaintiffs, ) )     v. ) ) DONALD H. RUMSFELD, Secretary of) Defense; and FRANCIS J. HARVEY, ) Secretary of the United States ) Department of the Army, ) )            Defendants. ) ) | Civil No. 04-00502 DAE BMK DECLARATION OF A. LEIMAILE QUITEVIS |

DECLARATION OF A. LEIMAILE QUITEVIS

I, A. LEIMAILE QUITEVIS, declare that if called as a witness in this action I could testify of my own personal knowledge as follows:

1.    My name is Leimaile Quitevis.  I previously submitted testimony to the United States Court of Appeals for the Ninth Circuit in support of the plaintiff Hawaiian Groups' request for an injunction.  I reiterate that testimony and provide additional testimony in this declaration.

## BACKGROUND AND QUALIFICATIONS

2.    I am a woman of Kanaka Maoli (Native Hawaiian) ancestry.  I was born and raised on the island of Oʻahu.  My ʻohana (extended family) has lived in the area traditionally known as Līhuʻe since time immemorial.  This area encompasses much of the land the U.S. Army would use and adversely impact in converting the 2nd Brigade to a Stryker Brigade Combat Team, including the land in and around the Schofield Barracks Military Reservation.  My ʻohana and I have continuing, direct ancestral and cultural connections to this ʻāina (land) and the many cultural treasures it contains.

3.    I am a member of the Wahiawā Hawaiian Civic Club and of Kahunānā (families of the land), which is one of the Native Hawaiian organizations that has taken the lead in consulting with the Army regarding the cultural impacts of the Army's Stryker plans.  I consider it my kuleana

2

(privilege/responsibility) to serve as one of Na Alakaʻi ame na Kiaʻi o Kahunānā (the leading guardians of the families of the land). Based on my membership in the Wahiawā Hawaiian Civic Club and Kahunānā, the recommendations from the Native Hawaiian community, and my recognized cultural connections to the lands in the Līhuʻe area affected by the Army's Stryker activities, the Army has retained me as a "Cultural Monitor" under the Programmatic Agreement ("PA") it developed to comply with its legal obligations under the National Historic Preservation Act ("NHPA").

4.    The PA incorporates the participation of Cultural Monitors as an essential part of its required procedures. In written testimony before this Court and the Ninth Circuit, the Army's Cultural Resources Manager has acknowledged that such participation is "invaluable due to [the Cultural Monitors'] knowledge of properties that have traditional religious and cultural importance." The PA requires Cultural Monitors to demonstrate "cultural affiliation with the affected project area," "familiarity with the affected and anticipated cultural properties in the project area," and "sensitivity and the ability to represent and communicate with the [Army] on behalf of Native Hawaiians." Stipulation III.E.2. In retaining me as a Cultural Monitor, the Army has recognized I possess these qualifications.

3

I have served as a Cultural Monitor from 2004 to the present, as part of a team of several Cultural Monitors.

5.      Through my role as Cultural Monitor working with the Army on a daily basis and my participation in broader consultations between the Army and Native Hawaiian groups, I am intimately familiar with matters relating to the cultural impacts of the Army's Stryker plans. I have reviewed and am thoroughly versed with the documents relating to these matters, including the PA, the relevant parts of the Army's Environmental Impact Statement ("EIS"), various reports and surveys submitted by the Army's contract archaeologists, as well as the arguments and testimony the Army has submitted in this case to this Court and the Ninth Circuit. In sum, I know not only what the Army has stated formal documents and public statements, but also how it has operated in practice, "on the ground."

SIGNIFICANCE OF THE PA'S REQUIREMENTS

6.      The Army entered into the PA in 2004 with the Hawai'i State Historic Preservation Office ("SHPO") and the Advisory Council on Historic Preservation ("ACHP"); the state Office of Hawaiian Affairs ("OHA") was a "concurring party," signing "with reservations." The PA purports to "set forth processes . . . for the identification, evaluation, treatment, and management of historic properties[,] . . . including properties of traditional religious and cultural importance to Native

4

Hawaiian organizations, families and individuals," as the NHPA requires. The Army also relied on the PA in the Environmental Impact Statement ("EIS") it prepared under the National Environmental Policy Act ("NEPA"). In the EIS, the Army admitted that conversion of the 2nd Brigade into a Stryker brigade in Hawai'i would have significant cultural impacts, but claimed that compliance with the PA would mitigate those impacts somewhat (though impacts would remain significant). The Army repeatedly cited the PA as the primary – and in many instances, the only – "mitigation" of the pervasive cultural impacts of its Stryker activities.

7.    Some of the PA's notable requirements include:

- The Army "will <u>complete identification and evaluation</u> of historic properties <u>prior to</u> implementation of [Stryker] undertakings." Stipulation IV.A.2 (emphasis added).

- The Army "will <u>consult</u> with . . . Native Hawaiian organizations, families and individuals to solicit their assistance and advice in <u>identifying</u> properties of traditional religious and cultural importance within the proposed projects' <u>APEs ["areas of potential effect"]</u> . . . ." Stipulation III.B (emphasis added).

- "Consultation with Native Hawaiians concerning the identification of sites of traditional religious and cultural importance is recognition of their expertise in these areas." Stipulation II.A.1 (emphasis added).

- "When an undertaking may affect properties of traditional religious and cultural importance to Native Hawaiians, the [Army] will afford Native Hawaiian organizations, families and individuals the opportunity to participate as consulting parties in identification and evaluation of properties, and assessment and treatment of effects." Stipulation III.D (emphasis added).

- The Army "will insure that all excavations conducted as part of construction projects associated with the conversion of the 2nd Brigade of the 25th ID (L), especially those in areas of high archaeological sensitivity, are monitored by an archaeologist and a Cultural Monitor in accordance with Stipulation III.D." Stipulation V.A.1 (emphasis added).

- The Army "will work with" Cultural Monitors, providing "timely notification of all site-specific projects and access for the participation of a Cultural Monitor." The Cultural Monitor "will act as an independent observer." Stipulation III.E.

6

8.     Stipulation IV of the PA establishes an extensive, multi-step process to fulfill its purported function of "identification, evaluation, assessment, and treatment of historic properties." The steps of this process are:

(1)    "Phase I inventory," in which the Army must "[c]onsult with Native Hawaiian organizations, families and individuals" and "identify properties or potentially eligible properties within the APEs of all the [Stryker] project areas." Stipulation IV.B (emphasis added).

(2)    "Phase II inventory," in which the Army conducts "[e]valuations of [s]ignificance," the results of which "will form the basis for the Army to determine the eligibility of these properties for listing on the National Register of Historic Places." Stipulation IV.C.

(3)    "Determinations of Eligibility," in which the Army notifies SHPO of its eligibility determinations, including "a description of the respective APE," and the SHPO has due opportunity to challenge the determinations. Stipulation IV.D.

(4)    "Procedures for assessing effect," in which the Army "assesses effects of all undertakings on historic properties and properties of traditional religious and cultural importance," and SHPO has a due opportunity to challenge the assessments. Stipulation IV.E.

7

9.    After the completion of all these steps, the PA provides that the Army "will modify the project or activity to avoid the adverse affect wherever possible and practical as determined by the [Army]." Stipulation IV.E(5). When adverse effects cannot be avoided, the Army will "implement mitigation measures," including: "data recovery"; collection of "information related to the property" and consultation on the "scope and disposition of the materials"; and "site protection measures," which "may be developed and implemented" and "might include establishing buffer zones." Stipulation IV.E(7).

## VIOLATIONS OF THE PA AND HARM TO CULTURAL RESOURCES

10.    Since work on the Army's Stryker projects began, the Army has repeatedly failed to comply with the PA. The Cultural Monitors have not been alone in objecting to these violations; both signatories to the PA, ACHP and SHPO, as well as the concurring party OHA, have sent letters with concerns similar to ours. In particular, the Army has consistently failed to identify, evaluate, and provide site protection plans for all cultural resources, in consultation with Native Hawaiian representatives, before proceeding with destructive activities. The Army has also constantly impeded the Cultural Monitors from performing their independent observer function under the PA. As explained in further detail below, these violations of the PA have resulted in numerous specific incidents of

8

Army activities harming and imperiling cultural resources. They also threaten further imminent harm should the Army be permitted to proceed with even more destructive activities in the near future. These violations expose as empty promises the Army's claims that it will avoid harm to cultural resources and interests by following the PA.

11.    The problems begin with the Army's widespread failure to account for all the cultural resources in the areas affected by Stryker activities. For example, in the area of Qualification Training Range 1 ("QTR1") and the Battle Area Complex at Schofield Barracks ("BAX"), which are among the Army's initial Stryker projects, the Cultural Monitors have found, via the limited inspection opportunities the Army has given us, that the initial surveys conducted by Army contractors ignored or simply overlooked a huge number of wahi pana (cultural sites) and mea Hawai'i (cultural artifacts). These additional sites number in the dozens, if not hundreds.

12.    For example, whereas the initial surveys the Army contractors conducted over several years identified 66 sites in the BAX, in just fifteen days of surveys in October 2006, the Cultural Monitors, accompanied by the Army's archaeologist, have increased the number to 230 and counting, with roughly 30 to 40 percent of the known additional sites still left to be identified. The 230 figure

takes into account that many features may compose a single complex; if every single feature were counted, the figure would be much larger. In addition, the Cultural Monitors have found about 200 cultural artifacts beyond the 100 or so that the initial surveys found; these include artifacts such as koʻi (adzes), kalama kukui (lamps), ʻulu maika (stones for ceremonial games), and hammer, sinker, scraping, and polishing stones.

13.     The newly discovered cultural resources are located not only in areas the Army neglected to survey, but also in areas the Army claimed to have surveyed. Some of them lie within areas the Army claims are construction footprints. Many lie in the immediate vicinity of the construction footprints and areas where the Army plans to locate targets. All fall within the "area of potential effect" of the BAX, where the Army expects harm from Stryker training will occur.

14.     The newly discovered sites span the entire gamut of site categories. They include platforms that likely were part of habitations, enclosures which were part of houses or heiau (places of worship), as well as several extensive wetland and dryland agricultural complexes that still have many features intact. They also include numerous features bearing the unmistakable characteristics of Native

Hawaiian burials. One area contained as many as 50 burial mounds that the Army previously failed to identify.

15.    The newly discovered sites are notable not only in their number, but also in their cultural significance. For example, the Cultural Monitors, with guidance from knowledgeable kūpuna (elders), identified the famous Hale'au'au Heiau, a culturally significant site. The Army's archaeologists had assumed the heiau was located in another area and had previously been destroyed. The heiau, comprising a large complex of sites, was readily identifiable once properly located, and is situated in an area the Army supposedly surveyed before, close to several targets the Army constructed. Other culturally important sites, including Kukuiolono, an extensive lo'i (taro patch) complex, and the famous heiau of Kalena and Kūmakali'i, are also known to be in the area, included among the features the Army has failed to identify.

16.    This abundance of sites, far beyond what the Army previously identified, conforms with the common understanding – shared by the Army – of these areas as places of intensive traditional activity. The high concentrations of cultural material, including extremely sensitive burials, in such areas make it unavoidable that ground-disturbing activities by the Army will indiscriminately damage and destroy cultural resources and desecrate burials.

11

17.    The Army has compounded the threats to cultural resources by consistently blocking any attempts to follow up on what the Army's initial surveys missed. The Army has severely restricted opportunities for further identification and evaluation of cultural sites, or even for monitoring the Army's ground-disturbing activities in the absence of such information. In response to the Cultural Monitor's objections, the Army has resorted to various excuses, such as insisting that the surveys were over, and that sites outside the planned construction footprints can be surveyed at some unspecified future date. In the meantime, the Army has conducted extensive ground-disturbing work with heavy equipment, including excavation, trenching, and bulldozing, as well as live-fire training, both inside and outside what the Army claims to be the construction footprints, including in areas that the Army has never surveyed for cultural resources. Numerous known incidents of damage to cultural resources have already occurred, but these only begin to hint at the full extent of harm that has been and will be caused by the Army's willful neglect.

18.    The following gives some examples of known violations of the PA and harm to cultural resources. These examples reveal fundamental problems in the Army's treatment of cultural resources, the full impacts of which undoubtedly extend far beyond the known incidents.

12

- Beginning in late October 2005, the Army contractor began extensive trenching with a backhoe in the BAX. The contract called for the excavation of thousands of linear feet of trenches, with each trench measuring about two feet deep, six feet wide, and several meters long. Such excavation occurred without the required identification and evaluation of cultural resources. The Army allowed Cultural Monitors only brief opportunities of a couple minutes each to inspect the excavations after-the-fact, at which point damage to cultural resources would be difficult to detect and, in any event, irreparable.

- The Army has severely limited our ability to observe ground-disturbing activities, claming it involved "UXO clearance" and not "construction." Since June 2006, however, such "UXO clearance" has expanded from conventional methods of inspection, manual excavation, and removal or demolition, to the use of heavy equipment such as backhoes, excavators, and bulldozers for whole range of activities that can only be called construction. These include: cutting, grading, and excavating course and service roads and target footings; constructing road swales; excavating trenches; and general grading and compacting. Such construction activities have occurred without

13

prior identification and evaluation of cultural resources, and without any cultural monitoring, in violation of the PA's express requirements.

- In June 2006, the Army contractor stated it would only cut grass to allow placement of survey points, but ended up indiscriminately bulldozing a wide area in the BAX, both inside and outside the construction footprint. Most of this area had not been surveyed for cultural resources. These activities displaced, toppled, and damaged numerous objects and structures, including petroglyphs and sites bearing the unmistakable characteristics of burials. In addition, the bulldozing also dug up and exposed skeletal remains, which the Army decided to rebury in place. Despite the Army's conjecture that these remains, which were thoroughly crushed, belonged to an animal, the true nature of the remains has never been conclusively documented, to my knowledge.

- In July 2006, the Army imposed further limitations on cultural monitoring, allowing Cultural Monitors only three brief opportunities – each lasting mere minutes – to inspect work occurring during the entire 8- to 12-hour work day. During this time, the Cultural Monitors

discovered that a UXO-clearance team had bulldozed across a buffer zone the Army itself had established to protect the newly discovered Hale'au'au Heiau. The red barrier fence was toppled and boulders and cobbles were shoved into the buffer zone. Notably, the buffer included only the presently identified features of the larger heiau complex. This complex extends right up to, and probably into, the construction footprint. It is extremely likely that the bulldozing affected unidentified surface and subsurface features, thereby forever marring the cultural landscape of the heiau complex. This wanton intrusion into the heiau complex also violated the site's mana (spiritual power), which is a deep cultural and spiritual insult for Native Hawaiians. In addition, the Army intends to construct several target areas in the vicinity of the Hale'au'au Heiau, putting the sites in the line of fire. Excavation of the footings for these targets used heavy equipment and unearthed and destroyed several large boulders that were likely part of the larger heiau complex.

- On numerous occasions since work on Stryker projects began, the Army used bulldozers to extend, realign, and significantly widen roads in QTR1 and the BAX to accommodate Stryker vehicles,

without any prior cultural documentation or concurrent monitoring.
The Army expanded and extended an old jeep road that runs through
an area in the BAX known to contain many undocumented sites, and
near what was later identified as probable burial sites. Elsewhere in
the BAX, the Army extended a large, unnamed road into new areas,
which included filling a streambed and installing a culvert in areas
known to contain cultural sites. The Army constructed at least two
other roads in the BAX without any surveying or monitoring. In
QTR1, the Army began constructing a fuel break road outside a pre-
approved alignment and, if not fortuitously stopped by Cultural
Monitors, would have bulldozed through unsurveyed areas without
any documentation or protection of cultural resources. Elsewhere in
QTR1, the Army built another road to a distant target area without any
prior surveys.

- In June to September 2005, the Army prevented the Cultural Monitors
from monitoring ground disturbing activities at the Combined Arms
Collective Training Facility in Kahuku, including work with a
bulldozer and trenching with an excavator and backhoe. Later
inspections revealed the activities scraped and gouged the stone

surfaces of what appears to be a platform for a heiau. The Cultural Monitors, along with families with lineal ties to the area, an expert Hawaiian archaeologist, and the Army contractor's field archaeologist, found at least 19 sites inside and around the planned construction footprint that they all agreed were Native Hawaiian cultural sites, which the Army's previous surveys missed. These sites included ahu (altars) and potential heiau (places of worship) complexes and burials. The Army claims to have revised their construction plans to avoid these newly discovered sites, but have not given the Cultural Monitors any opportunity to inspect the area affected by the current plans. This raises serious concerns because the Army contractor's own archaeologist, based on surveys conducted with the Cultural Monitors, has found the Kahuku range to be "chock full" of undocumented sites. Moreover, the Army has refused to designate the newly discovered sites as eligible for protection under the NHPA, which leaves them exposed to damage and destruction from any future Army activities, including live-fire training.

19.    If allowed to proceed, Stryker activities threaten even greater, imminent harm to cultural resources. The Army has established a clear pattern:

not only has it given little or no opportunity for the Cultural Monitors to perform their required, "invaluable" function, but even when the Cultural Monitors identify threats to previously and newly discovered cultural resources, the Army insists on pushing forward with its Stryker activities anyway. The Army consistently subordinates its legal obligations and supposed commitment to protecting cultural resources to whatever timetable it deems necessary and convenient for its Stryker activities.

20.    Just last month, in October 2006, even after the Ninth Circuit ordered the Army to comply with NEPA, the Army insisted on proceeding with its Stryker activities, including beginning full-scale construction activities at the BAX on November 1, 2006. Only the Ninth Circuit's injunction is stopping the Army from immediately going forward with its BAX project. Yet, the Army is nowhere close to completing the identification and evaluation of the cultural resources in the area, let alone developing site protection plans or examining how it may need to revise its plans to avoid harm to these resources (which the Army has claimed is its "chief mitigation" instead of "data recovery"). The Army's insistence on proceeding without such analysis blatantly violates the PA's requirement that the Army "complete identification and evaluation of historic properties prior to implementation of [Stryker] undertakings."

21.    As discussed above, during the last couple of years, the Cultural Monitors have become aware of many cultural resources in Stryker project areas that the Army failed to identify in its initial surveys. For a long time, however, the Army refused to allow the Cultural Monitors to examine these additional cultural resources. Only after months of objections and the fiasco of bulldozing into the landscape of Hale'au'au Heiau did the Army allow the Cultural Monitors a few days in August 2006 to conduct a preliminary assessment of the BAX. This assessment confirmed the existence of large numbers of undocumented sites, as well as damage that had already occurred, as described above. The Cultural Monitors then requested an opportunity to identify and evaluate these sites, as the PA requires. The Army was unwilling to give us anything more than one month, October 2006. Conflicts with other activities such as live-fire training further limited us to only 15 actual days of field work.

22.    These 15 days were grossly insufficient to allow compliance with the PA. The Army took years to document 66 sites, yet somehow expected us to document scores or hundreds more in half a month. The Cultural Monitors had no alternative but to record only GPS coordinates for the sites, and ultimately were able to cover only about 60 to 70 percent of the total undocumented sites. There was no time whatsoever to evaluate or develop site protection plans for any of the

19

sites. Yet, had the Ninth Circuit not issued its injunction, the Army would have already begun construction. Particularly in such an area rich with cultural resources, the Army's failure to comply with the PA greatly heightens the risk of irreparable harm. Identification of sites only informs us of what we stand to lose; it does nothing to avoid or mitigate actual losses.

23.    Similarly, when the Ninth Circuit issued its injunction, the Army was conducting live-fire training at QTR1, even though it has failed to complete the required identification, evaluation and protection of the affected cultural sites. To date, the Army has surveyed only part of QTR1, yet the Cultural Monitors have discovered numerous undocumented sites throughout the impact area where ordnance is expected to land. When we previously objected to these omissions, the Army claimed that the sites fell outside of the construction footprint. But in August 2006, while construction was still ongoing, the Army started live-fire training. The majority of the cultural sites threatened by the training are not even identified, and those that are identified are not protected under any site protection plan.

24.    Moreover, the Army's training includes use of MK19 grenade launchers, which increases the threats to cultural sites. The Army's EIS did not mention or analyze the use of such weapons at QTR1, but rather contemplated only

pistol, rifle, shotgun and machine gun fire in that area. The MK19's rapid-fire, high-velocity projectiles can inflict considerable damage to cultural resources. I have seen steel target plates about a quarter- to half-inch thick severely dented or completely punctured by the blue 40mm practice rounds and have no doubt that these rounds can break or shatter the stone components of sacred cultural sites and highly sensitive burial mounds. In inspections immediately following training exercises, the Cultural Monitors have found the 40mm blue practice rounds in Hale'au'au Gulch, where many undocumented sites are located, including burial mounds. One site containing burial mounds is located between two QTR1 targets, and the Cultural Monitors have documented 40mm practice rounds that landed in the site. These rounds were not present in prior inspections, so there is no doubt that they were fired during the recent training.

25.    In sum, given the Army's widespread failures to comply with its obligations under the PA and promises in the EIS to identify, evaluate, and protect cultural resources, there is no question that the Army's insistence on pushing ahead with its Stryker projects threatens imminent harm to cultural resources in these areas, and that the full scope and severity of such harm will be devastating.

26.    Notably, the Army has not taken advantage of the Ninth Circuit's injunction to remedy its violations of the PA. The Ninth Circuit issued its

injunction on October 27, 2006. On November 1, the Army contractor terminated the Cultural Monitors' employment. The Army justified this action by claiming that no work could be done on Stryker projects, although the surveying work the Cultural Monitors were conducting to fulfill the Army's obligations under the PA was not among the specific activities the injunction prohibited. Having failed to continue required surveys, if and when the Army resumes its Stryker plans, it will be in no better position to avoid irreparable harm to cultural resources than before.

### RESPONSES TO THE ARMY'S EXCUSES

27.    In its arguments to the Ninth Circuit, the Army repeated its now-familiar claim that only cultural sites that are exactly within the immediate "footprint" of construction are threatened and merit concern. The Army has used this argument to limit our ongoing follow-up investigations of the host of undocumented resources the Army's initial surveys missed inside, just outside, and in the immediate vicinity of this footprint. The Army is now using the argument to justify proceeding with Stryker projects without documenting and mitigating harm to these resources as the PA requires. This argument misses the point for several reasons. First, the Army has cited a laundry list of projects where it claims no indications of extant cultural resources were found in the construction footprint. The Cultural Monitors have had no opportunity to inspect many of these projects, including the Tactical Vehicle Wash, Range Control Facility, Training Support

22

Facility, and Motorpool Complex, so there is no telling what the Army may have missed there, as it did in other areas such as the BAX and the Combined Arms Collective Training Facility in Kahuku, where we found undocumented sites both inside and outside the footprint. As for the projects on the list we have been able to survey, we have found numerous undocumented cultural resources directly next to the footprint, in the immediate vicinity of construction sites and target areas, and within the area of impact where the Army expects harm to occur. This includes: QTR1, the impact area of which is filled with undocumented cultural resources, including numerous burials, sizable wall and platform complexes, stone structures, and agricultural systems; QTR 2, the impact area of which encompasses a documented platform housing a burial, as well as undocumented cultural resources such as apparent burial mounds, auwai (irrigation ditches), and wall and platform structures; the Multiple Deployment Facility ("MDF"), which borders on the famous landmark and place of worship Mauna'una (which has been jeopardized by construction at the MDF), as well as unsurveyed areas that could very well contain additional sites; and the Urban Assault Course ("UAC"), which overlaps in part with the BAX and abuts large unsurveyed areas where at least one undocumented site is known to exist.

28.    Second, as the Army itself recognized in conducting its initial surveys within and in the vicinity of the construction footprints, construction-related

impacts are not limited to narrowly defined construction sites, but also include transportation to and from, and activities around and beyond, these sites. The numerous incidents to date of harm to cultural resources outside the footprint, including the Hale'au'au Heiau incident, confirm this. Whether by design or accident, construction-related impacts outside the immediate construction footprint are inevitable.

29.    Third, the Army recognizes that the harms of Stryker projects extend far beyond the mere construction footprint, to the areas threatened by Stryker training. But despite our repeated objections, the Army has not indicated when, if ever, it will comply with the PA and complete the identification and evaluation of all cultural resources so that the Army can implement its supposed "chief mitigation" of "avoidance of sites in design, construction and training." The Army would have us believe that, after they complete construction, they will take the time to follow the PA requirements, then freely redesign and reconstruct the projects to implement its "chief mitigation." The Army's suggestion that it can and will completely overhaul the projects whenever any subsequent investigations reveal in detail the numerous cultural resources in the impact area, and will hold off on any potentially destructive activities in the meantime, is simply not credible. It is also contrary to the Army's actual practice, as the Army demonstrated at QTR1, where, even before completion of construction, and absent the required

documentation, consultation, and site protection plans covering all the cultural resources in the area of impact where the Army expects harm to occur, the Army began live-fire training activities. This backwards and illegal "build first, investigate later (if ever)" approach all but assures cultural harm.

30. The Army has also routinely claimed it has been "effective in protecting known sites," and it "is not aware of any sites that were damaged." The Army is apparently comfortable saying this because it does not know exactly what it damaged when, for example, it disturbed petroglyphs and burials and bulldozed into the Hale'au'au Heiau landscape. The whole point is that the Army is supposed to do the required documentation and consultation beforehand, so that it can actually "know" and be "aware" of what it may be destroying. Without the required information, the Army can only assert – often contrary to established fact – that no harm occurred.

31. Finally, I feel compelled to respond to the Army's claims it will lose millions of dollars if the Stryker projects are delayed at all. The cultural resources imperiled by Stryker conversion have existed for hundreds of years, and, but for the Army's shortsighted focus on building here and now in Hawai'i, would exist for hundreds more. I cannot express in words, much less in dollar figures, how valuable it is for Native Hawaiians not only to hear about these sacred cultural sites

in stories and songs, but also to experience them on the ground and in person as enduring elements of our living culture. The loss of these cultural resources to present and future generations of Native Hawaiians is permanent, and the resulting harm to Native Hawaiian culture and identity is incalculable.

I declare under penalty of perjury that I have read the foregoing declaration and know the contents thereof to be true of my own knowledge.

Dated at Honolulu, Hawai'i, November 14, 2006.

A. LEIMAILE QUITEVIS

26