IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| 'ĪLIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NĀ 'IMI PONO, a Hawai'i unincorporated association; and KĪPUKA, a Hawai'i unincorporated association,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army,<br><br>Defendants. | Civil No. 04-00502 DAE BMK<br><br>DECLARATION OF TY P. KAWIKA TENGAN, PH.D. |

DECLARATION OF TY P. KAWIKA TENGAN, PH.D.

I, TY P. KAWIKA TENGAN, declare that if called as a witness in this action I could testify of my own personal knowledge as follows:

1. I received a B.A. in Anthropology modified with Native American Studies from Dartmouth College, and a Masters and Ph.D. in Anthropology from the University of Hawai'i at Mānoa. I am currently an Assistant Professor in the Departments of Ethnic Studies and Anthropology of the University of Hawai'i at Mānoa. My background and experience focus on Hawaiian cultural issues, particularly traditional and cultural practices surrounding ancient burials. I am a member of Hui Mālama I Nā Kūpuna O Hawai'i Nei ("Hui Mālama"), a Native Hawaiian organization specifically identified under federal statutes, including the National Historic Preservation Act ("NHPA"), the Native American Graves Protection and Repatriation Act ("NAGPRA"), and the statute establishing the Smithsonian Institution's National Museum of the American Indian, as having expertise in Hawaiian culture, particularly burials. See 16 U.S.C. § 470w(18); 25 U.S.C. § 3001(6); 20 U.S.C. § 80q-11(b)(1). I have published manuscripts and conducted presentations on Hawaiian burials and have participated in numerous repatriations for Hui Mālama and as a former cultural specialist for the Bishop Museum. I previously submitted a declaration to the United States Court of Appeals for the Ninth Circuit in connection with plaintiffs' request for an injunction and reiterate that testimony in this declaration.

2. **The Army's cultural impact analysis:** I have reviewed the Final Environmental Impact Statement ("EIS") prepared by the Army covering its plans to convert, in Hawai`i, the 2nd Brigade, 25th Infantry Division (Light) to a Stryker Brigade. The Army admits in its EIS that transformation will cause overall a wide range of significant impacts to cultural resources such as Hawaiian burials and cultural sites. These impacts include, but are not limited to, damage or destruction from range and facility and road and trail construction (which involves ground softening, grubbing, grading, subsurface excavations, and moving heavy construction equipment) and training activities (which includes off-road vehicle maneuvers, live fire, subsurface excavations related to training, disposal of unexploded ordnance, and vandalism, accidental damage, and other harm from increased traffic).

3. Notwithstanding the Army's admissions, its analysis consistently understates the gravity of the impacts to cultural resources in at least two ways. First, particularly in its discussions of individual transformation activities at specific locations, the Army tends to minimize the likelihood of damage or destruction to cultural sites by stating that it "could" occur. Based on my experience, including that with Hui Mālama, it is not only possible or likely, but all but inevitable, that the Army, in developing and using such areas of traditional Native Hawaiian activity, will encounter and destroy Hawaiian burial sites and

2

cultural sites. Oral traditions and archaeological evidence attest to the occurrence of burials located near and sometimes under dwelling sites.[1] Moreover, because traditional habitation, economic, religious, and other activities extended over the landscape and into the sea, the Hawai'i State Historic Preservation Division has maintained that "unmarked native Hawaiian burial sites can be encountered almost anywhere, from the highest mountains to the shoreline . . . and from the most remote regions to the most developed areas in the State."[2] Hui Mālama has already taken part in reburials of bones uncovered in regions the Army intends to develop, such as Kahuku and Pōhakuloa. As the transformation proceeds, it is not a matter of *if* but *when* burial and cultural sites will be desecrated.

4. Second, the Army suggests that the impacts are somehow less than significant because of various mitigation measures it proposes to implement. The Army repeatedly refers to legal protocols for consultation under the NHPA and

---

[1] Bowen, R.N. (1961). *Disposal of the Dead*, Master's Thesis in Anthropology, Honolulu: University of Hawaii at Manoa, 76-78. Buck, P. (1957). "Section XIII: Death and Burial," *Arts and Crafts of Hawaii*, Bernice Pauahi Bishop Museum Special Publication 45, Honolulu: BPBM, 570-575. Lebo, S. and Savulis, E-R. (2001). "Last Will, Hiding Pits, Hiding Caves: Incorporating Hawaiian Funerary Practices into Archaeological Repatriation Efforts," *Human Remains: Conservation, Retrieval, and Analysis,* Proceedings of a Conference Held in Williamsburg, VA, Nov 7-11, 1999, BAR International Series 934, 70-72.

[2] "Nā Iwi Kūpuna: The Bones of Our Ancestors." (2003). Website companion to video, Honolulu: State of Hawaii, Department of Land and Natural Resources, Historic Preservation Division, available at: http://www.hawaii.gov/dlnr/hpd/naiwikupuna.htm

3

NAGPRA and most frequently cites "data recovery" (i.e., documenting a site before destruction) as proposed mitigation. As explained in further detail below, such reasoning reflects a fundamental misunderstanding of Hawaiian culture. Traditional and modern Hawaiian culture deems disturbance of burials and destruction of cultural sites as a cultural harm of first magnitude. Once burials are disturbed, no subsequent accommodations such as consultation or reinterment will undo the cultural injury. Likewise, mere "data recovery" does nothing to diminish the loss of cultural sites to the living Hawaiian culture; once a cultural site is gone, it is lost forever to present and future generations of Hawaiians.

5. **People, land, and gods:** The relationship between people, land, and gods serves as the basis for understanding all aspects of Hawaiian culture and society. The gods Wākea (sky father) and Papahānaumoku (earth mother) begat the islands and a daughter named Hoʻohōkūkalani. Wākea mated with Hoʻohōkūkalani who gave birth to a stillborn child they named Hāloanakalaukapalili. From the place where the fetus was buried grew the first kalo (taro) plant, which is the staple of the Hawaiian diet. The second child of Wākea and Hoʻohōkūkalani was a boy who they named Hāloa after the firstborn, and he became a ruling chief and the ancestor of all the living Hawaiians today. This tradition establishes the familial relationship between people, land, and gods. Moreover, because humans are the junior siblings, we carry a responsibility to care

4

for the elder siblings (land) and parents (gods) who in turn protect and provide for us.[3] These obligations are fundamental to Hawaiian and Polynesian family systems more generally.[4]

6. **Importance of burials:** The practices and beliefs surrounding burials provide the living with one of the most powerful and important means of maintaining the proper relations between people, land, and gods, thus ensuring the well-being of families and society as a whole. The Hawaiian term "kanu" means "to bury" and "to plant," a double meaning most appropriately captured in the burial/planting of Hāloanakalaukapalili, who became the first kalo (taro), the sustenance and elder sibling of the Hawaiian people. The burial of iwi (bones) results in the physical growth of plants and the spiritual growth of "mana" – energy and life derived from the gods. The living descendents feed off the foods of the land and are nourished spiritually by the knowledge that the iwi are well cared for and in their rightful place.[5] So central is this cultural relationship to the sense of

---

[3] Kameʻeleihiwa, L. (1992). *Native Land and Foreign Desires: Pehea Lā E Pono Ai?* Honolulu, Bishop Museum Press, 23-33.

[4] Handy, E.S.C. and Pukui, M.K. (1972), *The Polynesian Family System in Ka-ʻu, Hawaiʻi*, Rutland, Vermont, Charles E. Tuttle Company.

[5] Ayau, E.H. (1995). "Rooted in Native Soil: The Native American Graves Protection and Repatriation Act," *Special Report of Federal Archaeology*, Fall/Winter, 24-27.

Hawaiian self that one of the terms used to identify indigenous Hawaiians is 'Ōiwi, which literally means "of the bone."

7.    Hawaiians of old understood well the importance of protecting and caring for iwi (bones). Each family carried a responsibility to give the deceased a proper burial in which the iwi were buried with ceremony, and treasured possessions that would be needed in the spiritual realm were also laid to rest with the iwi. Burials were conducted in secrecy, for enemies who sought to either defile or appropriate a deceased person's mana (spiritual power) would seek out his/her bones. The bones were the last repository for a person's mana, and any desecration or misuse of the iwi would insult the spirit and humiliate the living.[6] Noted 19th century historian Samuel M. Kamakau related numerous stories of chiefs whose bones were made into fishhooks or arrows for shooting rats by their enemies. These actions succeeded not only in diminishing the mana of the iwi, but also in "heaping reproach on the descendents of those thus treated."[7] Thus the tranquility of a person's spirit and the wellbeing of the family depended on the level of protection given to the iwi. These beliefs remain central to Hawaiian cultural practice today.

---

[6] Pukui, M.K. *et al.* (1972). *Nānā i ke Kumu: Look to the Source*, Honolulu, Hui Hānai, 107-109.

[7] Kamakau, S.M. (1992). *Ruling Chiefs of Hawai'i*, Revised ed., Honolulu, Kamehameha Schools Press, 217.

8. A related, enduring belief at the core of Hawaiian cultural practice is that deified ancestors become ʻaumākua, or family guardians. The ʻaumākua are associated with specific families and specific places, especially those where family residence on the land extends so far back that these sites have become "kulāiwi" – native homeland, literally "the bone plains" where the iwi are planted. In Hawaiian culture, the ʻaumākua provide for and protect the living, while the descendants in turn care for and feed the ancestors in order to maintain the balance and unity of the family. The responsibility to care for the iwi is the same as the responsibility to maintain harmony between the living, the dead, and the land.

9. The major gods are also ʻaumākua (family guardians) as they are the source from which all people and lands come.[8] During the chiefdom era, the tranquility of society depended upon care that the chief gave to the gods and the ʻaumākua. This was evidenced by the condition of the burial sites throughout the land. When there was peace in the land, the people were properly buried; when rulers were treacherous and derelict of spiritual duty, the bones were dug up and exposed to the sun.[9]

---

[8] Kamakau, S.M. (1964). *Ka Poʻe Kahiko: The People of Old*, Honolulu, Bishop Museum Press, 28.

[9] Kamakau, S.M., *ibid.*, 38.

7

10.  **Protecting burial sites:**  The most recent movement within the Hawaiian community to protect burial sites began in 1989 when a mass desecration of burials took place on the island of Maui at the construction site of the Ritz Carlton Kapalua.  At the site, Dr. Davianna McGregor, Professor of Ethnic Studies at the University of Hawai'i at Mānoa, stated, "Wherever it happens . . . we have to stop the issuing of permits that allow the desecration of ourselves as Native Hawaiians."[10]  Ipō Nihipali, a member of the group that became Hui Mālama, cried as she spoke, "I cannot see our people, our ancestors, being dug up like this.  How?! Can you see your grandparents and your family being dug up?"[11]  These same sentiments have continued to emerge each time a burial has been unearthed.  At a recent symposium, associate professor of political science and renowned Hawaiian scholar Dr. Noenoe Silva spoke on the recent disturbance of burials through the construction of a highway on Hawai'i Island.  She drew upon many of the themes outlined above when denouncing the efforts to push the construction project through.  She also spoke about the numerous cultural sites located by these burials, such as the battleground of Kuamo'o where the keepers of the old religion made their last stand against King Kamehameha II who abolished the old ritual

---

[10] *Na Wai e Ho'ola i na Iwi? Who Will Save the Bones?* (1989). Documentary film, Honolulu, Nā Maka o ka 'Āina.

[11] *Ibid.*

8

system of separate eating. Dr. Silva explained that these sites were part of a larger "storied landscape," and that once they were gone, we would have lost irretrievable parts of our history and culture. Moreover, we would be saddled with the knowledge that the bones of the ancestors had been desecrated once again, and we would be forced to live with the shame and humiliation.[12]

11. The above testimonies reveal that the living descendants today suffer spiritually, physically, culturally, and emotionally each time a burial or cultural site is desecrated. The life of the Hawaiian culture depends upon the preservation of these sites, for it is these sites and the practices of caring for them that allow the ʻŌiwi (indigenous Hawaiians) to maintain the proper balance of people, gods and land. To expose the burials is to desecrate them, and to destroy the sites and the bones therein is the ultimate form of humiliation for the living. Mere reinterment of the iwi once they are uncovered does not suffice to remedy the cultural harm suffered from their disturbance and removal.

12. There is no way of mitigating this harm. The harm done to the Hawaiian people through the despoiling of burials and other cultural sites is above repair, and it will have long-term consequences that our own descendants will have to endure. It is the responsibility of the living to protect the dead in order for the

---

[12] Silva, N. (2004) Presentation at "Symposium on Practical Pluralism," Honolulu, William S. Richardson School of Law, University of Hawaiʻi at Mānoa, April 16-17.

future generations to live in pono – balance and unity. This cannot occur when burial sites and the kulāiwi (ancestral lands) they are in, lands which contain generations upon generations of families planted back into the soil, are destroyed. The only certainty is the humiliation and reproach such destruction will heap upon the Hawaiian culture and people.

13.     **Stewardship of TCPs and ATIs:** In line with its reverent views of burials, traditional and contemporary Hawaiian culture affords utmost care and respect to cultural sites, including traditional cultural properties ("TCP") and areas of traditional importance ("ATI"). The book *Pana Oʻahu: Sacred Stones, Sacred Land*[13] provides some of the clearest statements on, and vivid images of, important cultural sites and their relationships to ʻŌiwi (indigenous Hawaiians) today. In her foreword to the book, preeminent expert on Hawaiian land tenure and now Emerita Professor of Ethnic Studies at the University of Hawaiʻi, Mānoa, Marion Kelly notes that within a Hawaiian worldview, the responsibility of the ʻŌiwi is to take care of all that the gods have created for the welfare of the people. The sacred cultural sites serve as the connection between the people and the gods.[14] At the level of the chiefs, the most conspicuous of these sites are the monumental heiau

---

[13] Becket, J. and Singer, J., eds. (1999). *Pana Oʻahu: Sacred Stones, Sacred Lands.* Contributions by Cachola-Abad, K., Ho, J.M., and Makanani, K., Honolulu, University of Hawaiʻi Press.

[14] Kelly, M. (1999). "Foreword," in *ibid*, viii.

(places of worship) that took the form of temples. For commoners, the sites for the continued worship and care of ʻaumākua (family guardians) include family shrines, stones, and men's houses which are often harder to recognize than the more elaborate sites of the chiefs.[15] This raises a serious problem for archaeological surveys, especially those conducted by archaeologists not raised within the host culture.

14.  **Protecting cultural sites:** The issue of place returns us to the interconnection between people, land, and gods. Heiau, and indeed all sites, are located not "in isolation but partly in response to topography, weather, seasons, and many other factors."[16] These sites, therefore, are key nodes in the relationship between people, land, and ancestors and gods. Becket and Singer state that the linkages embodied in these sites connect us "not only to the builders of *heiau* [or other sites] but to the places their builders intended them to mark:  the *ʻāina* [land] itself."[17] Mikilani Ho writes that cultural sites are "more than remnants of a distant past; they are enduring reminders of Hawaiian identity, a rich heritage left by *kūpuna* [ancestors]. Preservation of precontact sites assures future generations of

---

[15] Becket, J. and Singer, J. (1999). "Preface" in Becket and Singer, eds., *op cit.*, xiv.

[16] Becket and Singer, *op cit.*, xiv.

[17] *Ibid.*, xiv.

Hawaiians the tangible presence of their own histories."[18] Hawaiian historian Kāwika Makanani asserts that when people desecrate cultural sites, "the damage is irreversible. . . . They erase information about the place . . . and ultimately the people"[19]

15.  In sum, in Hawaiian culture, sites are inextricably linked to location and geography, and their continued existence in their original state and location is key to the perpetuation of the living culture.  This compels that cultural sites be protected and highlights the grievous and irreparable harm caused by their permanent damage or destruction.  This also explains why, contrary to the Army's portrayal, "data recovery" before bulldozing is useless as a mitigation measure. Years after the destruction of the Kukuiokāne Heiau in 1990 during the construction of the H-3 Freeway, Hawaiians still suffer deep despair and pain.[20] The destruction wrought by the Army's transformation activities will cause similar enduring harm.

---

[18] Ho, J.M. (1999). In Becket and Singer, eds., *op cit.*, xxix.

[19] Makanani, K. (1999) in Becket and Singer, eds., *op cit.*, xxvii.

[20] Kelly, M. (1999) in Becket and Singer, eds., *op cit.*, ix; Cachola-Abad, (1999) in Becket and Singer, eds., *op cit.*, xxiii.

I declare under penalty of perjury that I have read the foregoing declaration and know the contents thereof to be true of my own knowledge.

Dated at Honolulu, Hawai'i, November 12, 2006.

_____
TY P. KAWIKA TENGAN