EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
HARRY YEE      (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General
BARRY A. WEINER
JAMES D. GETTE
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0469
Facsimile:  (202) 305-0274
Email: Barry.Weiner@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| ILIO'ULAOKALANI COALITION, a Hawaii, nonprofit corporation; NA'IMI PONO, a Hawaii unincorporated association; and KIPUKA, a Hawaii unincorporated association, | CIVIL NO.04-00502 DAE BMK |
| | FEDERAL DEFENDANTS' MEMORANDUM ON THE SCOPE OF INTERIM INJUNCTIVE RELIEF IN ACCORDANCE WITH THE NINTH CIRCUIT'S REMAND |
| Plaintiffs, | |
| v. | |
| DONALD H. RUMSFELD, Secretary of United States Department of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army, | Hearing: |
| | Date:   November 20, 2006 |
| | Time:   9:45 a.m. |
| Defendants. | Judge:  Hon. David A. Ezra |

TABLE OF CONTENTS

TABLE OF AUTHORITIES

FEDERAL DEFENDANTS' MEMORANDUM ON THE SCOPE OF INTERIM
<u>INJUNCTIVE RELIEF IN ACCORDANCE WITH THE NINTH CIRCUIT'S REMAND</u>

<u>DECLARATION OF THOMAS HELPER; EXHIBITS "A" AND "B"</u>

<u>DECLARATION OF RONALD L. BORNE</u>

<u>DECLARATION OF LAURIE LUCKING; ATTACHMENTS "1" TO "31"</u>

<u>DECLARATION OF MAJOR GENERAL WILLIAM H. BRANDENBURG</u>

<u>DECLARATION OF COLONEL STEFAN J. BANACH</u>

<u>DECLARATION OF COLONEL ROBERT B. BROWN</u>

<u>DECLARATION OF MICHELLE MANSKER</u>

<u>DECLARATION OF MAJOR GENERAL DANA T. ATKINS</u>

<u>DECLARATION OF JAMES J. LOVELACE</u>

<u>DECLARATION OF LIEUTENANT GENERAL JOHN M. BROWN III</u>

<u>CERTIFICATE OF SERVICE</u>

Federal Defendants, Donald H. Rumsfeld, Secretary of the United States Department of Defense; and Francis J. Harvey, Secretary of the United States Department of the Army, ("U.S. Army" or "Army"), by and through undersigned counsel, file this Emergency Motion for Decision on the Scope of Interim Injunctive Relief in Accordance with the Ninth Circuit's Remand.  For the reasons set forth below, the Army respectfully requests the Court to lift the temporary injunction entered in this action by the United States Court of Appeals for the Ninth Circuit, and replace it with a more limited interim injunction that allows the Army to proceed with critical transformation and training activities for the 2nd Brigade of the 25th Infantry Division (Light) as a Stryker Brigade Combat Team in Hawaii pending further proceedings in this Court to address what permanent injunction, if any, is warranted pending compliance with the National Environmental Policy Act ("NEPA").

## I.    INTRODUCTION

This action was remanded to this Court by the Ninth Circuit in an Order entered on October 27, 2006, issued a few weeks after the Ninth Circuit's Opinion concluding that the U.S. Army had violated the National Environmental Policy Act ("NEPA") by failing to consider locations outside of Hawaii for transforming the 2nd Brigade to a Stryker Brigade Combat Team.  See Opinion entered October 5, 2006 at 41 (2-1).  In its October 27th Order, as described in more detail below, the Ninth Circuit issued a limited remand to this Court for the sole purpose of determining on an expedited basis the appropriate scope of "interim injunctive relief" pending a decision by this Court on the scope of a permanent injunction.  Order of October 27, 2006, at 2-3 and Addendum to Order at 9 (2-1).  Since this matter is very time-sensitive, a fact recognized by the Ninth Circuit in directing

that the matter be resolved "expeditiously," Order at 3, the Army requests the Court to consider the scope of interim injunctive relief at its earliest opportunity.

The Ninth Circuit's October 27th Order responds to an emergency motion filed by Plaintiffs in the Ninth Circuit seeking "interim injunctive relief" pending a decision by this Court on the scope of permanent relief pursuant to the Ninth Circuit's Opinion on the merits. The Ninth Circuit did not grant the Plaintiffs the relief they sought, but instead issued a "temporary injunction" and "remanded to the district court to enter and determine the scope of an interim injunction." Addendum at 9.

The temporary injunction prohibits the Army "from implementing, executing, or proceeding with the following activities associated with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii: grading, grubbing, other ground disturbance, construction, land acquisition, project design, geotechnical testing, unexploded ordinance clearance, contract award, and Stryker Brigade Combat Team-specific training pending entry of an injunction by the district court." Order of Oct. 27 at 1-2. The Ninth Circuit imposed this temporary injunction "until the district court has entered an interim injunction" and accordingly remanded to this Court "for the purpose of determining the appropriate scope of an interim injunction . . . ." Id. at 2. In response to a dissent to the Order filed by Judge Bea, the Court of Appeals issued an Addendum to its Order that clarified that it had not issued the interim injunction requested by Plaintiffs but instead had "entered a temporary injunction pending the district court's expeditious resolution of the interim injunction." Addendum at 9.

3

As the Ninth Circuit acknowledged, it did not "[p]roperly balanc[e] the parties' equities" in entering the temporary injunction, a function the Ninth Circuit determined should be performed instead by this Court.  Order at 3 ("Properly balancing the parties' equities requires a fact-intensive inquiry best undertaken by the district court").  Further, responding to the U.S. Army's objection that an interim injunction would harm national security, the Ninth Circuit acknowledged that "this matter is very time-sensitive," and it consequently ordered "the district court [to] proceed expeditiously" to adjudicate the interim injunction.  Id. (emphasis added).  Finally, in the Addendum to its Order, the Ninth Circuit took pains to clarify the temporal limitations of the temporary injunction and its directions to this Court:

> Reading the dissent, one would think that we have issued a permanent injunction.  We have not.  We have not even issued an interim injunction pending a ruling on a permanent injunction, which is what the Plaintiffs ask for.  Rather, we have entered a temporary injunction pending the district court's expeditious resolution of the interim injunction.  We have acknowledged that properly balancing the parties' equities is a fact-intensive inquiry best undertaken by the district court, and we have remanded to the district court to enter and determine the scope of an interim injunction.

Addendum at 9.

As set forth below, the Ninth Circuit's temporary injunction is impairing the ability of the 2nd Brigade to accomplish its military mission with a minimum of American combat related casualties, a paramount national interest.  The temporary injunction should be lifted immediately because the harm to the U.S. Army, and to the public interest, from continuation of the injunction grossly outweighs the negligible risk of harm to the Plaintiffs' interests

from lifting it.[1]

Further, the interim injunction contemplated by the Ninth Circuit should be narrowly tailored to allow certain critical elements of the 2d Brigade transformation and training to proceed pending further proceedings concerning a potential permanent injunction pending NEPA compliance. In its October 27 remand Order, the Ninth Circuit directed the district court to consider "which Stryker Brigade Combat Team transformation-related activities in Hawaii are time critical and which activities can proceed without causing irreparable environmental and cultural harm." Id. at 3.

The Army has identified five (5) of the twenty-eight (28) Stryker related projects and one minor modification to an existing training range (6 projects in total) that are the most time-sensitive and critical to proceed in order to ensure that the 2nd Brigade of the 25th Infantry Division Light ("2nd Brigade") can properly transform into a Stryker Brigade Combat Team ("SBCT")and be ready for deployment by November 2007. The continuation of Stryker training and these six critical transformation related activities will permit the 2nd Brigade to properly transform and be available to defend our nation with the most effective military technology and weapons systems in a manner that does not cause irreparable harm to cultural sites or natural resources.

This Court previously held that the harm Plaintiffs alleged to cultural and natural resources was speculative and could not justify issuance of injunctive relief. See Court's November 5, 2004 Order at 15-16. That same conclusion is even more appropriate today. There

---

[1] The U.S. Army will await issuance of the mandate before seeking a hearing before this Court to address what permanent injunction, if any, is warranted pending compliance with NEPA.

are no endangered or threatened species in the six critical project areas.  See Declaration of Michelle Mansker at ¶4.  Furthermore, the significant measures the Army has undertaken to protect cultural resources have proven to be effective in protecting cultural resources during the transformation process.  See Declaration of Dr. Laurie Lucking "Lucking Dec")at ¶¶4-10, and attachment 1 to Lucking Dec at ¶¶7, 12-19.  Plaintiffs' claim that some unknown burial site might be impacted in the future is nothing more than pure speculation, and does not demonstrate irreparable harm as is needed to substantiate an injunction on the equipping and training of the 2nd Brigade and the six critical Stryker-related projects and training.

As this Court previously recognized, the harm to the Army and its effort on the Global War on Terrorism from an injunction are both "demonstrative and severe."  See Court's November 5, 2004 Order at 17.  There is no question that "delaying or disrupting the conversion of the 2nd Brigade to a SBCT 5 will significantly impact the sequence of the Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism."  Id. at 15, 18.  Above all, to enjoin the transformation of the 2nd Brigade would result in soldiers that are not properly trained on the most effective and protective defense systems, thereby compromising the safety and effectiveness of these soldiers in combat.

The high likelihood of harm to the U.S. Army, and to the public interest, from continuation of the temporary injunction would grossly outweigh the negligible risk of harm to the Plaintiffs' interests from lifting it.  Consequently, the temporary injunction should be lifted and it should be replaced by a more narrowly tailored interim injunction pending further proceedings in this Court to address what

permanent injunction, if any, is warranted pending NEPA compliance. The severe and demonstrative impact to our soldiers and our Nation from the temporary injunction must be avoided by allowing a limited number of projects and training to go forward immediately because they are necessary to accomplish the transformation of the 2nd Brigade and can be implemented in a manner that reduces to a discountable level the risk of harm to cultural and natural resources.  Consequently, the Army requests the Court to narrowly tailor the interim injunction so that it allows the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, and the following six transformation related projects:

    (1)   Completion of the Qualification Training Range One ("QTR1");
    (2)   Completion of 2/25 SBCT Motor Park and Maintenance Area ("SBCT Motor Pool");
    (3)   Completion of the Urban Assault Course ("UAC");
    (4)   Completion of the Tactical Vehicle Wash Facility ("TVWF");
    (5)   Completion of the Multiple Deployment Facility ("MDF"); and
    (6)   Minor modification to existing training range 11T on the Pohakuloa Training Area ("PTA").

## II.  FACTUAL BACKGROUND

To avoid needless repetition and inconvenience to the Court, Federal Defendants hereby incorporate by reference the Factual Background sections previously presented to the Court in their Cross-Motion for Summary Judgment dated February 4, 2005, and in their opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004.  See Federal Defendants' Memorandum in support of their Cross-Motion for Summary Judgment dated February 4, 2005 at 4-16 and Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004 at 1-10. This briefing provides the Court with the factual background underlying the Army's decision and need to transform the 2nd Brigade to a SBCT.  The critical information needed to resolve the scope of

an interim injunction and determine "which Stryker Brigade Combat
Team transformation-related activities in Hawaii are time critical
and which activities can proceed without causing irreparable
environmental and cultural harm" is contained in this memorandum and
the following declarations:

    (1)   Declaration of Ronald L. Borne ("Borne Dec.") dated
           November 13, 2006;

    (2)   Declaration of Laurie Lucking ("Lucking Dec.") dated
           November 13, 2006 with Attachment 1, Declaration of Laurie
           Lucking dated October 22, 2006 and Attachments 2-31
           (photographs and maps of critical project areas);

    (3)   Declaration of William H. Brandenburg ("Brandenburg Dec.")
           dated November 13, 2006;

    (4)   Declaration of Stefan J. Banach ("Banach Dec.") dated
           November 8, 2006;

    (5)   Declaration of Robert B. Brown ("Brown Dec.") dated
           November 7, 2006;

    (6)   Declaration of Michelle Mansker ("Mansker Dec.") dated
           November 11, 2006;

    (7)   Declaration of Dana T. Atkins ("Atkins Dec.") dated
           November 7, 2006;

    (8)   Declaration of James J. Lovelace ("Lovelace Dec.") dated
           November 10, 2006; and

    (9)   Declaration of John M. Brown III ("Brown III Dec.") dated
           November 9, 2006.

These declarations identify the critical transformation projects
that are needed to transform the 2nd Brigade and ensure that it is
properly trained and available for deployment in a timely manner.
These declarations further confirm that the Army has undertaken
significant protective measures to ensure that Stryker-related
training and construction of these critical projects can be completed
in a manner that is protective of cultural sites and natural
resources.  Finally, these declarations explain why these projects
and Stryker-related training are time-sensitive and critical to our
Nation's defense and ensuring that our soldiers are properly trained
with the most effective and technologically advanced military defense
equipment.

In addition, the course of events that led up to the 2d

Brigade's current posture of being 12 months into an approximately two year training cycle is particularly important when considering the appropriate scope of interim injunctive relief.  On August 17, 2004, Plaintiffs filed a complaint in the Hawaii district court alleging that the Army violated NEPA by failing to consider reasonable alternatives, including relocation to the continental United States. On November 5, 2004, this Court denied Plaintiffs' motion for a preliminary injunction.  Even then, before transformation of the 2d Brigade was in full swing, the Court realized that national security concerns were "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." See Court's November 5, 2004 Order at 17-18.

On April 25, 2005, this Court granted the United States' motion for summary judgment.  The Court entered final judgment on April 29, 2005 and denied Plaintiffs' motion for an injunction pending appeal on May 19, 2005. The Plaintiffs then moved for an injunction pending appeal in the Ninth Circuit, which similarly denied the injunction. On October 5, 2006, the Ninth Circuit reversed the district court and remanded for the Army to prepare a Supplemental Environmental Impact Statement ("SEIS") examining the alternative of relocation of the 2d Brigade to a facility outside of Hawaii.

Between the denial of the first motion for preliminary injunction in this case and the Ninth Circuit's October 5, 2006, decision, the Army proceeded with transforming the 2d Brigade. As a result, the 2d Brigade is 12 months into the transformation process.

It has completed 60% of its training and almost 70% of its new equipment fielding. Brandenburg Dec. at ¶4. The 2d Brigade is scheduled to become a fully manned, trained, and equipped Stryker Brigade Combat Team (SBCT), ready for deployment, by November 2007. The 2d Brigade can no longer simply train as a light-infantry brigade, and therefore any delay in Stryker training will result in a combat ineffective unit. Thus, "to stop transformation now, even for a matter of weeks, would deny the 2d Brigade Commander the power and ability to complete transformation and training to fulfill his assigned operational missions." Lovelace Dec. at ¶8. The Army cannot afford to delay the transformation and readiness of a single brigade, including the 2nd Brigade.  Lovelace Dec. at ¶3. "If 2nd Brigade is not available to deploy when required as SBCT 5, then every other brigade in the Army would have to deploy sooner. This accelerated deployment would further reduce unit training time, significantly increase the risk of American casualties, and decrease unit mission effectiveness in combat-for every brigade in the Army." Id.  The national security concerns that the district court found compelling in November of 2004 thus carry even more weight two years later and one full year into transforming the 2d Brigade.

Knowing that the 2nd Brigade cannot go back to an ineffective light infantry brigade and must continue with transformation, the Army has carefully considered the 28 Stryker-related projects and identified the most time-sensitive and critical to our national security and the safety and effectiveness of our soldiers.  As reflected in the administrative record and accompanying declarations, the Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to cultural and natural resources from continued training and completion of these six

specific projects.  This Court previously recognized the lengths to which the Army had gone to ensure that cultural and natural resources are protected during the transformation process, see Court's November 5, 2004 Order at 15-16, and nothing has occurred during the appeal process that would alter that previous determination.

For the reasons discussed below and in the accompanying declarations, it is requested that the temporary injunction be lifted and that the interim injunction that replaces it allow the Army to proceed with the six specific Stryker related projects and provision of the requisite equipment and training in order to ensure that the 2nd Brigade is properly trained and available for deployment as a SBCT by November 2007.

## III. STANDARD FOR ISSUANCE OF AN INJUNCTION

Violations of environmental statutes do not mandate issuance of an injunction.  "NEPA creates no exception to the traditional principles that govern injunctive remedies." National Audubon Society v. Department of Navy, 422 F.3d 174, 201 (4th Cir. 2005).  Thus, to qualify for injunctive relief, the moving party must first show it will suffer some tangible irreparable injury absent an injunction. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982); Amoco Production Company v. Village of Gambell, 480 U.S. 531, 542 (1987). There is no presumption of irreparable injury in environmental cases. Romero-Barcelo, 456 U.S. at 312; Amoco Production Co., 480 U.S. at 542; see also Forest Conservation Council v. U.S. Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995).

Further, where there are violations of environmental statutes, the court must balance the competing claims of injury and consider the effect on each party of granting or withholding the requested relief. <u>Amoco Production Company v. Village of Gambell</u>, 480 U.S. 531, 542 (1987); <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982). The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances. <u>Id</u>. The relative hardship to the parties is controlling. <u>Benda v. Grand Lodge of Int'l Ass'n of Machinists</u>, 584 F.2d 308, 314, 315 (9th Cir. 1978). When a federal court considers the propriety of injunctive relief, it must balance the equities of the case, considering the potential harms of granting or denying relief to each party, in an effort to "mould each decree to the necessities of the particular case." <u>Romero-Barcelo</u>, 456 U.S. at 312 (1982). The Court must also determine whether the balance of public interests is served by the requested injunction. <u>Caribbean Marine Services v. Baldridge</u>, 844 F.2d 668, 674 (9th Cir. 1988).

**IV.   ARGUMENT**

While the Army remains committed to complying fully with NEPA,[2] equipment fielding, training activities and certain limited

---

[2]The Army has already taken initial actions to prepare the Supplemental EIS ordered by the Ninth Circuit. Brown III Dec. at ¶9.

12

construction activities that will directly facilitate the necessary training of the 2nd Brigade simply cannot be halted at this late date without doing irreparable harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security.  In accordance with the Ninth Circuit's remand, the Army has identified six Stryker-related projects that are time-sensitive and critical to ensure the transformation of the 2nd Brigade to a SBCT.  These construction projects as well as the associated Stryker-related training will not irreparably harm cultural or natural resources.  Mansker Dec. at ¶4, Lucking Dec. at ¶¶4-10, Attachment 1 to Lucking Dec. at ¶¶7, 12-19. The Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to environmental and cultural resources from these actions and will continue to do so as it proceeds with training the 2nd Brigade. Id.  The analysis this Court previously conducted on the impacts to the Army and this Nation's security that would result from an injunction is even more relevant today than it was in November 2004.  This Court earlier found that the national security concerns implicated from preventing transformation are "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and

13

reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." <u>See</u> Court's November 5, 2004 Order at 17. The same conclusion should be reached here when considering interim injunctive relief because the harm to the Army and this nation's defense is highly likely and severe, while the harm claimed by the Plaintiffs is speculative in nature and unlikely due to the lack of cultural and natural resources in the six critical project areas and the extensive mitigation measures undertaken as part of the transformation process.

### A. THE ARMY AND THE PUBLIC INTEREST WILL BE IRREPARABLY HARMED BY THE ISSUANCE OF A BLANKET INJUNCTION ON ALL STRYKER-RELATED PROJECTS AND TRAINING

The Army has carefully crafted a solution that permits equipment fielding, training, and a limited number of Stryker-related construction projects to proceed while incorporating the protective measures outlined in the administrative record and accompanying declarations that will reduce any likelihood of harm to cultural and natural resources to a negligible level. As discussed below, unlike the potential for irreparable harm to cultural and natural resources, which is remote, the likelihood of severe harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security is high and, thus, the balance of harms tips decidedly in favor of the Army and the issuance of an interim injunction that permits transformation of

14

the 2ⁿᵈ Brigade to a SBCT.

> **1.** ***The irreparable harm that will be suffered by the Army and its soldiers from an injunction that prohibits the transformation of the 2ⁿᵈ Brigade is demonstrative and severe***

There are currently four operational SBCTs. When the 2d Brigade is finished with its transformation, it will be the fifth. At the time the Army announced its plans to begin transforming into a future force, its object was to create a "more responsive deployable, agile, versatile, lethal, survivable, and sustainable" Army. ARP[3] 9656. Combat evidence demonstrates that the Army has done just that with the operational SBCTs.

The primary component of an SBCT is the Stryker vehicle. As Colonel (COL) Robert B. Brown, who commanded the 1st Brigade, 25th Infantry Division, Stryker Brigade Combat Team in Iraq, explains: "Having spent a year in combat fighting from a Stryker vehicle, I can emphatically state that it is my vehicle of choice for combat operations in today's environment." Brown Dec. at ¶5. In short, the Stryker vehicle saves soldiers' lives. As Brigade Commander, COL

---

[3] In this memorandum, Federal Defendants refer to documents from the Programmatic Environmental Impact Statement in the Administrative Record as "ARP" and document from the Site-Specific Environmental Impact Statement as "ARS" followed by the pertinent bates number for the referenced document. The administrative record documents cited herein are attached to the Declaration of Thomas Helper, which has been filed simultaneously with this memorandum.

Brown obtained personal knowledge of the survival capabilities
provided by the Stryker vehicle in the form of approximately 137
Rocket Propelled Grenades (RPGs) and approximately 50 Suicide Vehicle
Born Improvised Explosive Devices striking direct hits to Stryker
vehicles under his command. Id. None of the RPGs penetrated a
Stryker vehicle due to its protection and speed. Id. The brigade
nevertheless ultimately lost 33 of its soldiers in combat. According
to COL Brown, the Stryker vehicle was "essential to saving lives" and
"the losses would have been significantly higher if we had not been
able to fight configured as a [SBCT] or use the Stryker vehicle
during our training and deployment." Id.

Colonel Brown is not alone in that assessment. Given its
performance in Iraq, the Army recognizes the importance of the SBCTs
and the Stryker vehicle to its mission. General George Casey, the
military commander of the Multi-National Force Iraq, requires SBCTs
and employs them in vital missions, recently assigning an SBCT to
"the priority mission to increase security in Baghdad and reduce the
level of sectarian violence and terror attack." Lovelace Dec. at ¶9.
In addition, General Casey "continues to submit formal requests for
forces to include [SBCTs] to Joint Forces Command as part of the
ongoing and continuous requirements in his theater of operations" and
he "will not accept a light infantry brigade as a substitute for the

16

SBCT requirement in Iraq." Id.  The SBCTs are vital, as "[n]o other unit provides the same capabilities urgently needed in Iraq."  Id. Congress also recognizes the SBCTs vital importance, as it has directed the Army to submit plans to field a seventh SBCT and appropriated additional funds for that purpose.

To provide the commanders in the field with another SBCT as soon as possible, the Army has scheduled the 2d Brigade to complete transformation into the fifth SBCT by November 2007 and then be available to deploy. Id. at ¶7. The training involved in creating a SBCT is an intensive process that takes approximately two years. SBCTs "are configured to fight differently than previous brigades . . . [which] requires more extensive training and preparation in the initial stages of the fielding." Brown Dec. at ¶3. To become the agile and adaptive soldier that SBCTs demand requires "extensive training in a variety of areas, such as leadership, adaptability, creative thinking, the use of digital information and advanced marksmanship techniques." Id.

The 2d Brigade is currently in month 12 of that almost two-year long process, and because it "no longer exists as a light infantry brigade" there is no turning back the clock. Bradenburg Dec. at ¶4; Banach Dec. at ¶6-7. Its weapons, vehicles, and communications are those required for a SBCT, and its soldiers have skills tailored to

17

those required for a SBCT. Id. at ¶8. Thousands of pieces of new Stryker Brigade equipment have been issued and hundreds of pieces of old equipment have been turned in. Brown III Dec. at ¶5; Banach Dec. at ¶6. But the 2d Brigade cannot perform its vital function as an SBCT if it cannot complete its training and new equipment fielding as such. An SBCT is "enormously complex" and "unlike any other organization we have had in the history of our Army." Banach Dec. at ¶10. That creates "a significant learning curve" before soldiers can become combat ready. Id. Any delay makes the curve that much steeper, and will ultimately result in a "combat ineffective unit." Banach Dec. at ¶1.

Delaying the training and new equipment fielding involved in transforming the 2d Brigade into a SBCT will therefore ultimately deny the commanders in the field adequate combat and deterrent forces by interrupting tightly integrated transformation and deployment schedules. For example, Major General Dana T. Atkins, the Director of Operations, United States Pacific Command, states that disrupting the transformation of the 2d Brigade "would immediately and unacceptably undermine the ability . . . to deter conflict and respond to crisis situations throughout the Asia-Pacific region." Atkins Dec. at ¶1. It will affect not only the Army's combat and deterrent missions, but also its humanitarian mission in responding to the "frequent and

18

severe natural disasters, including super-typhoons, earthquakes,
tsunamis, volcanic eruptions, and mudslides" in the Pacific Command's
Area of Responsibility. Id. at ¶4. In addition, the 2d Brigade is
"the only active brigade combat team assigned . . . in the Pacific
that is not deployed to the Middle East. As such, it provides company
and platoon sized contingency ready forces for PACOM responses to
homeland security threats and provides units to participate in
Theater Security Cooperation training and exercises with allied and
neighboring armies." Brown III Dec. at ¶4.  No other Pacific Command
"force provides the firepower, mobility, situational awareness, and
information processing capabilities resident in a [SBCT]." Atkins
Dec. at ¶6.

It is therefore critical that the 2d Brigade transform as
planned to meet Pacific Command "mission requirements and response
timeliness and to enhance the strategic flexibility of the United
States within the theater." Id.  Disrupting training at this point
would "cause immense harm to the US Army Pacific's capability to
execute our mission to provide combat ready forces to the United
States Pacific Command" and "add extreme difficulty to the brigade's
already complex task of achieving combat readiness." Brown III Dec.
at ¶8. Delaying the transformation of 2nd Brigade now, 12 months into
transformation, will have an even greater domino effect than when

19

this Court heard Plaintiffs' first motion for an injunction pending appeal, weakening the Army's strategic posture to deter threats in the Pacific Region, breaking a transformation sequence that was carefully synchronized with projected requirements for combat operations in Iraq and Afghanistan, and disrupting the reallocation of resources to other units that are undergoing transformation. Brown III at ¶1,6.

In addition to disrupting the Army's overall ability to respond to threats around the world by throwing off a tightly integrated transformation and deployment schedule, any delay in training will also have a profound and direct impact on the soldiers of the 2d Brigade when they are deployed: *less training equals more casualties upon deployment.* Banach Dec. at ¶2. COL Stefan Banach, Commander of the 2d Brigade, understands the need for continuity in training plans. He led a U.S. Army Ranger combat parachute assault into Afghanistan on October 19, 2001, "as the spearhead for the Global War on Terrorism." Id. Those Rangers "were the best trained and most well led Soldiers in our Army" and "were fully resourced and . . . had full continuity in all aspects of our combat preparedness," yet this country "still lost five great Rangers and over thirty more Rangers were severely wounded." Id. In Colonel Banach's informed opinion, "any disruption of our current training plan will get many

more of our Soldiers killed and wounded in combat than if we were
able to maintain continuity in our current training and
transformation plan to a fully combat ready [SBCT]." Id.; Bradenburg
Dec. at ¶3. In other words, interrupting the training of the 2d
Brigade as an SBCT "will have second and third order effects that
will be measured in the blood of our Soldiers."[4] Id.

When weighed against the speculative environmental harms
Plaintiffs have alleged, the disruption to the Army's mission and the
harm to its soldiers and their families that an injunction would
cause weigh heavily in favor of granting interim injunctive relief
that would permit the Army to transform the 2nd Brigade into a SBCT.

> **2.    The Army has identified six specific projects
> in addition to training that are needed to
> prepare the 2d Brigade for combat deployment
> as a SBCT and are highly unlikely to cause
> environmental or cultural harm.**

Ronald L. Borne, the Director of Transformation for the 2d
Brigade, has set forth the essential requirements that the Army must
have to successfully complete the 2d Brigade's training as an SBCT
before November 2007. Borne Dec. at ¶¶4-6.  To enjoin those
activities will severely harm the Army. Thus, the Army submits that
any interim injunction should permit the following activities, which

---

[4]Small detachments of 2d Brigade soldiers are already in
combat in the Philippines and Iraq. Banach ¶ 9.

are critical to ensuring that the 2nd Brigade is properly transformed

into a SBCT and prepared for deployment and combat in hostile

environments:

• New Equipment Fielding and New Equipment Training

• Soldier and Unit Level Training

• Construction and use of the five critical projects out of the 28

   studied in the EIS, and modification to an existing training

   range. These projects represent a fraction of the overall

   Stryker-related construction. They are:

   1. QTR1 at Schofield Barracks
   2. SBCT Motor Pool at Schofield Barracks
   3. Urban Assault Course at Schofield Barracks
   4. Tactical Vehicle Wash Facility at Schofield Barracks East
      Range (an environmental protection measure)
   5. Multiple Deployment Facility at Wheeler Army Airfield,
      Hawaii
   6. Minor modification to existing range 11T
   All of the Army's 28 construction projects in association with

the transformation are important[5], but these six are absolutely

---

[5] Plaintiffs have suggested that the delay in constructing
the Schofield BAX demonstrates that none of the Stryker-related
projects should be considered critical because this was one of
the 28 projects that Army previously claimed were necessary to
transform. This criticism is misplaced. The Army maintains that
all 28 projects are needed to establish facilities to transform,
maintain and sustain a Stryker brigade in the long term, but for
the limited duration of an interim injunction, the Army has
identified the six most critical projects that will permit the
2nd Brigade to transform in a timely manner and be ready for
deployment by November 2007. Borne Dec. at ¶8. The fact that
the Schofield BAX was delayed does not undermine the credibility
of the Army's assessment of what is needed for timely
transformation of the 2nd Brigade. As Ronald Borne explained in

critical to ensuring that the 2nd Brigade is transformed into a SBCT and ready for deployment in November 2007. Borne Dec. at ¶6; Banach Dec. at ¶¶6,8; Brandenburg Dec. at ¶¶ 7, 10-12.[6] Of these critical projects, two projects - QTR1 and Tactical Vehicle Wash Facility - are already completed. Borne Dec. at ¶6  The three remaining projects are being built over existing facilities and are close to 50% complete, thereby minimizing any environmental impact.  Borne Dec. at ¶6. The final project is a minor modification to an existing range 11T, which involves re-grading roads, improving berms, and moving certain targets, all with no adverse environmental impacts.  Id. at ¶4.   The Army has identified six critical projects that will have minimal impact to the environment, but must proceed in order to transform the 2nd Brigade to a SBCT.  Without these projects and training, the harm to the Army, its soldiers, and its effectiveness on the battlefield is inevitable.

The reasons these projects were deemed critical to the

_____

his declaration, the project was delayed due to the unexpected discovery of a significant amount of unexploded ordnance (UXO) that took much longer than expected to clear, thus causing a delay in construction.  Id.  The Army should not be faulted for ensuring the safety of its soldiers, construction staff, and the general public.

[6]The reasons why these specific projects and Stryker-related training are critical to the transformation of the 2nd Brigade is discussed in detail in the declarations of Ronald Borne, Colonel Banach, and Major General William H. Brandenburg.

transformation of the 2nd Brigade are described in detail in Declaration of Ronald L. Borne. Mr. Borne explains the critical nature of ensuring that QTR1 at Schofield Barracks is available for training. Borne Dec. at ¶6(b)(I). This is a multi-purpose small arms and machine gun range that was built over the former site of other ranges and is designed to accommodate all individual and crew-served pistol, rifle, and machine gun qualification requirements. Id. This project is now complete and the weapons being used are not unique to a Stryker vehicle and will be in use regardless of the scope of any injunction issued in this case. Id. Furthermore, all ammunition used on this range is for training purposes and is not explosive in nature, thereby minimizing any alleged harm. Id. The QTR1 range is a critical facility for training the 2nd Brigade because without it, there is no range in Hawaii for a Stryker unit to become proficient with the weapons and communication systems associated with the Stryker vehicle. Id.

The second critical project for the transformation of the 2nd Brigade is the SBCT Motor Pool at Schofield Barracks. Borne Dec. at ¶6(b)(ii). The SBCT Motor Pool is designed to provide a facility to park, store, and perform the requisite maintenance and repair on the more than 1,000 Stryker vehicles, trailers and wheel mounted systems that are assigned to a SBCT. Id. Without this facility, there is no

24

place on Oahu to store, maintain, and repair these vehicles and they would be left in fields, parking lots, and other open space areas. Id. This would create significant security issues and also increase the risk of environmental harm due to maintenance and fueling mishaps. Id.

The third critical project for the transformation of the 2nd Brigade is the Urban Assault Course ("UAC") at Schofield Barracks, which is more than 50% constructed. Id. at ¶6(b)(iii). The UAC is designed to provide a facility capable of training a SBCT unit on urban terrain combat, which is needed in hostile environments such as Baghdad, Iraq. Id. The UAC is a multi-purpose small arms and machine gun range designed to accommodate all urban area fire training requirements. Id. This training facility will be used by a SBCT in a similar manner to all other units in Hawaii, and will be limited to dismounted individual or small unit live fire training. Id. The UAC project is critical because without it, SBCT training units will not be able to satisfy current urban operation doctrine and training standards and, thus, will not be properly trained to engage the enemy in an urban environment such as exists in Iraq and Afghanistan. Id. This inability to complete urban warfare training will likely translate into higher casualties for the 2nd Brigade. Id.

25

The fourth critical project for transformation of the 2nd Brigade is the Tactical Vehicle Wash Facility at the Schofield Barracks East Range.  Borne Dec. at ¶6(b)(iv).  This facility was built to provide a facility for the 2nd Brigade and other units to remove soil, debris and alien seeds from vehicles, trailers and wheel mounted systems that are used in the East Range and the vicinity of Schofield Barracks.  Id.  This project is an environmental protective measure that permits the Army to prevent the spread of alien invasive species of weeds and other biological pests between the unique ecosystems constituting the Army training areas, as required by a U.S. Fish and Wildlife Biological Opinion.  Id.  The Tactical Vehicle Wash Facility was built over a former warehouse site and serves a significant and important role in ensuring invasive species, seeds, and pests are not transported throughout the facility.  Id.  This facility is now complete and in use by the 2nd Brigade and other military units in Hawaii to protect the environment. Id.  This facility is critical to enable the 2nd Brigade to conduct vehicle operations necessary to transform while minimizing any harm to the environment.  Id.

The final critical project for the transformation of the 2nd Brigade is the Multiple Deployment Facility ("MDF") at Wheeler Army

26

Airfield in Hawaii.  Borne Dec. at 6(b)(v).  This facility is

currently under construction and is being built over the Army's

former deployment  holding site, which cannot accommodate a SBCT.

The MDF is designed to allow units to pack, weigh, balance, and

inspect vehicles prior to transport by air or to a seaport for

debarkation.  Id.  Accurate weighing and center-of-gravity

determinations are crucial for safely loading aircraft and boats and

ensuring safety during transit.  Id.  Furthermore, the 2nd Brigade

once transformed to a SBCT must have the capacity to deploy within 96

hours notice and must have the flexibility to  deploy under various

load specifications.  Id.  This facility is critical to achieving

such a deployment capability.  Id.

      In addition to these five construction projects, receiving and

training on the new equipment associated with Stryker vehicles,

including the new communications systems and new or upgraded weapons

systems, is essential to ensuring that these soldiers are properly

prepared to operate as a SBCT.  Borne Dec. at ¶¶4, 5.  This training

will occur on existing roads, trails and ranges on Schofield Barracks

or Pohakuloa Training Area ("PTA").  Id.  The weaponry associated with

the Stryker vehicle is similar to the weapons that have been used or

are currently in use at training facilities in Hawaii, and only non-

27

explosive ammunition will be used during training.  Id.; see Borne

Dec. at ¶¶4-5 for a more detailed description of the Stryker-related

training that is needed to transform the 2nd Brigade to a SBCT.[7]

Therefore, the Stryker-related training is not likely to cause any

additional impacts to cultural or natural resources.  The Stryker-

related training is consistent with military training that will occur

on similar weapons systems even if an injunction is issued.

The Army considers all Stryker-related projects to be important

and necessary to complete the transformation process, but it has

identified six of these projects that are absolutely critical to

ensuring that the 2nd Brigade can transform into a SBCT and properly

trained on the new communications and weapons systems before this

unit deploys in November 2007.  This transformation is critical to

this Nation's security interests and, as discussed below, it will be

---

[7] The 2nd Brigade also will be using a Mobile Gun System, which employs a 105 millimeter (mm) gun. During training exercises, non-explosive training ammunition will be used.  Borne Dec. at ¶4.  The range upon which this training will occur, Range 11T, is currently a helicopter gunnery, machine gun, and anti-tank missile range.  Id.  In the past, this range was used by Model M60 tanks that were equipped with the same type of weapon systems as the Mobile Gun Systems, a 105 mm gun. Minor modifications that will not impact the environment, including improving roads and berms, and installing new targets will be made to accommodate this training.  Borne Dec. at ¶4.  This training is critical to ensuring our soldiers are properly trained on the weapons systems they will use as a SBCT. Furthermore, any alleged damage from use of the MGS will be minimal because the Army will not be using explosive ammunition. Id.

done in a manner that is protective of the environment and will not result in an appreciable risk of harm to cultural or natural resources.  As such, it is requested that the Court narrowly tailor an interim injunction to permit these critical projects to proceed along with the Stryker-related training discussed above.[8]

> **3.    *There are no viable alternatives to finishing the training of the 2d Brigade as a SBCT at a location outside Hawaii and maintaining this unit as a light infantry brigade is improvident.***

Plaintiffs have suggested an alternative to transforming the 2nd Brigade in Hawaii that would involve transporting the entire unit to another location either in the contiguous United States or Alaska. In the alternative, Plaintiffs have suggested that the 2nd Brigade simply continue to train and operate as a light infantry brigade. Either suggestion is not a viable alternative, and would result in significant harm to the Army and the public interest.

First, there is no feasible alternative for the 2d Brigade to finish its training as an SBCT outside Hawaii while staying on

---

[8]The Army can complete these critical construction projects and train the 2d Brigade for combat deployment while still maintaining the ability to take an objective look at whether to ultimately station the 2d Brigade in Hawaii, in compliance with NEPA and this Court's order. As Borne states in his declaration, these projects can be and are used by other Army units on Hawaii, Borne Dec. at ¶¶1,7, and thus their existence does not preclude the Army from restationing the 2d Brigade. See, infra, discussion under Point Heading IV(A)(4).

schedule to meet mission requirements. There is simply "no brigade-size excess capacity for Army housing, training areas and installation facilities available in the United States." Lovelace Dec. at ¶12; Brandenburg Dec. at ¶15. SBCT 3 will return to Alaska before the 2nd Brigade could complete its training; facilities in Alaska cannot accommodate that overlap. Lovelace Dec. at ¶10. There would be similar overlap with the impending activation of SBCT 7 at Fort Lewis in Washington. Id. Training at another location would also require transporting all personnel, equipment, and vehicles to that installation by air, which would require 80% of the Air Force's transport capacity and would consume 40 out of 270 available training days. AR 51334-36. Given the extensive transportation delays, and the years in advance in which the Army plans these actions, the 2d Brigade would not be able to meet its November 2007 availability date if training was to be completed outside Hawaii. Lovelace Dec. at ¶13.

In addition to the logistical problems of moving the 2d Brigade to complete its training, moving the 2d Brigade out of Hawaii would also "reduce the Army's posture to deter conflict and meet treaty obligations in the Pacific region including the Republic of Korea." Lovelace Dec. at ¶8. By remaining in Hawaii, the 2d Brigade is "strategically positioned to deploy to the four critical areas

identified in the National Defense Strategy: Northeast Asia, the East Asian littoral, Southwest Asia, and the Middle East." Id.  Thus, Admiral William J. Fallon, the combatant commander of the United States Pacific Command, "requires 2d Brigade to transform in Hawaii on time to meet mission requirements assigned by the Secretary of Defense." Id.

Finally, if soldiers were trained in Alaska or at Fort Lewis, their families would have to be left behind in Hawaii, because housing in Alaska and Fort Lewis is already occupied.  "This would require the soldiers and families of the 2nd Brigade, who have already endured a year-long deployment in Iraq . . . to endure additional months of separation during transformation" that would immediately be followed by another year-long deployment in Iraq. Lovelace Dec. at ¶12. It is not just a matter of convenience for those families, or for the Army.  Unexpected separation preceding a year-long deployment "adversely affect command authority, good order and discipline by creating morale and family problems that will undermine individual soldier's mental discipline and erode unit effectiveness." Id.; Brown III Dec. at ¶6. Separation creates distraction, and "distracted soldiers imperil themselves and others." Lovelace Dec. at ¶10.

31

In past motions, Plaintiffs have suggested that the 2nd Brigade would be as effective as a SBCT if it continued to operate as a light infantry brigade. The Army, however, has the expertise to determine what is in the nation's best interest as far as national defense is concerned, and it has determined that training as a light infantry brigade is both impractical and unwise. The 2d Brigade simply is not a light infantry brigade anymore and the Army does not operate light infantry units.  Brandenburg Dec. at ¶4; Banach Dec. at ¶6. "It has different and improved capabilities that are now part of a fully integrated set of state of the art systems that provides our Nation with a new and overwhelming combat capability." Banach Dec. at ¶7. The new weapons systems and technology require each unit to transform and be trained on more advanced equipment and technology that is designed to provide a more effective and safer combat unit.  As detailed in Colonel Banach's declaration not only would it be impossible to go back to being a light infantry brigade, "to do so at this point would be illogical given the existing enhanced weapons accuracy, communications capability and protection for our soldiers that we can achieve now with our Strykers." Id.

It is also vital to train the 2d Brigade as an SBCT because "if events in the world require 2d Brigade to deploy tomorrow, or

whenever, it will do so with all available Strykers." Id.  The soldiers must train on the equipment they will take into battle. And they must do so "everyday in order to fight effectively when . . . deployed to combat." Id.  The bottom line is this: "There is no going back to legacy procedures and or previous less capable unit designs." Id.  The 2d Brigade no longer exists as a light infantry brigade, the equipment has changed, the training has changed, and the new system provides the Army with more effective capabilities while also providing for greater protection of our soldiers.

It is clear that 2nd Brigade's transformation is critical to national security, and should not be enjoined.  The brigade needs its equipment and specific facilities to ensure that it can properly transform to a SBCT.  National security and foreign policy considerations such as those implicated here are sufficient to find that any injunction should allow transformation of the 2nd Brigade, even in the face of a NEPA violation.  See Committee for Nuclear Responsibility Inc. et al., v. Seaborg, 463 F.2d 796, 798 (D.C. Cir 1971).

In contrast to Plaintiffs' impractical proposals, the Army has carefully crafted a solution that permits the Army to proceed with equipment fielding, training and a limited number of construction

projects that will not cause a significant risk of harm to natural or cultural resources.  Two of these projects are already completed and the remaining three projects, other than the minor modification of Range 11T, are close to 50 percent complete.  As for the Stryker-related training, the Army has already completed close to 70 percent of the requisite training to transform the 2nd Brigade to a SBCT. Rather than transport the 2nd Brigade to another location outside Hawaii as Plaintiffs have suggested, the only viable alternative to ensure that the 2nd Brigade is transformed and available for deployment in November 2007 is to permit the transformation of this unit in Hawaii under the limited conditions set forth above.

> **4.  The Army should be permitted to proceed with the critical SBCT projects because each has independent utility and their completion will not restrict the Army's ability to analyze reasonable alternatives in a SEIS.**

Not only would a broad interim injunction be inequitable, for the reasons discussed above, it would also be unnecessary to preserve a meaningful NEPA process.  Federal Defendants anticipate that Plaintiffs may argue that the completion of the five critical projects and modification of Range 11T at PTA would undermine the Army's ability to meaningfully analyze reasonable alternatives in a supplemental NEPA analysis.  To the extent Plaintiffs make this

argument, it is without merit.

Courts have held that action on a project may proceed, notwithstanding a NEPA violation, where such action would neither "have an adverse environmental impact" nor "limit the choice of reasonable alternatives" within the meaning of 40 C.F.R. § 1506.1(a). For example, in North Carolina v. City of Virginia Beach, 951 F.2d 596, 598 (4th Cir. 1991), the Fourth Circuit reversed a district court's refusal to modify its injunction which prohibited the City of Virginia Beach from undertaking steps to build an 85-mile pipeline from Lake Gaston to satisfy the City' s potable water needs.  The project required a FERC permit, and FERC had neither issued its permit nor conducted its NEPA review.  Id. at 600.  In reversing, the court of appeals recognized that action on a project should not go forward pending NEPA compliance to the extent doing so would so influence the agency s ultimate decision on the project as to effectively limit the choice of reasonable alternatives available to the federal decisionmakers in the NEPA process.  Id. at 601-02.  The court ruled, however, that the injunction should have been narrowly tailored to allow the limited construction that the City wanted to do because such work would not "unduly influence" FERC's consideration of alternatives.  Id. at 602; see also South Carolina Dept. of

<u>Wildlife & Marine Resources v. Marsh</u>, 866 F.2d 97, 99-101 (4th Cir.
1989) (holding that action need not be enjoined pending NEPA
compliance notwithstanding the plaintiff's contention that allowing
the action to proceed would prejudice the federal agency's
consideration of alternatives in the NEPA process).  The court's
conclusion is consistent with the Council on Environmental Quality's
("CEQ") regulations which provide that until an agency completes the
NEPA process and issues a ROD, it is only prohibited from taking
action concerning a proposal that would have an adverse environmental
impact or limit the choice of reasonable alternatives.  40 C.F.R. §
1506.1(a).

In this case, work on these critical projects and training will
not impact whether the Army decides where and how to complete the
transformation process.  Borne Dec. at ¶7.  While these projects are
vital to the 2nd Brigade's training and transformation, none are
unique to the Stryker transformation process and can be used by other
military units in Hawaii even if transformation is enjoined.  <u>Id</u>. at
¶¶6,7.  As explained by Ronald Borne, Director of Transformation for
the U.S. Army Garrison Hawaii, "[t]hese projects will also be used by
other military units stationed in Hawaii. Because these projects can,
and will, support activities unrelated to Stryker transformation,

36

their completion and/or use will not affect the ultimate decision on where 2/25 will be permanently stationed." Id. at ¶1. For example, construction on QTR1, a multi-purpose, small arms and machine gun range, and the Tactical Vehicle Wash Facility, a facility used to minimize the spread of invasive plant species and biological pests, has been completed and these facilities are in use by other Army units in Hawaii. Id. at ¶6. Thus, as Ronald Borne states in his declaration, the critical projects have independent utility and their existence does not preclude the Army from taking an objective look at whether to ultimately station the 2d Brigade in Hawaii, after compliance with NEPA under the Ninth Circuit's order. Id. at ¶¶1,6-8. Under such a scenario, and in accordance with the case law cited above, the Court should permit the Army to proceed with the limited number of projects that are needed to transform the 2nd Brigade.

The same result is reached with respect to the other prong of the CEQ regulation, which prohibits a federal agency from taking action that would have an adverse environmental impact pending NEPA compliance. See 40 C.F.R. § 1506.1(a)(1). In South Carolina Dept. of Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 100-01 (4th Cir. 1989), the district court granted plaintiffs motion for a preliminary injunction to prevent the Army Corps of Engineers from installing

pumped storage facilities prior to completion of an environmental impact statement that adequately considered the environmental impacts of operating the pumps.  The Fourth Circuit recognized that injunctive relief must be "tailored to restrain no more than what is reasonably required to accomplish its ends and no "broader than necessary to protect against the environmental risk." Id. at 100 (internal quotation marks and citations omitted).  Noting that "[t]he Corps ha[d] already spent a majority of the funds allocated for the project, and [that] Plaintiffs conceded at oral argument that installation alone of the already purchased pumped storage generators will cause no environmental damage," the Court of Appeals concluded that "restraining the installation of the generators is not reasonably required to protect the environment" and "vacate[d] that part of the injunction which prohibits the Corps from installing the pumped storage generators at the Dam." Id. at 100.

     As more fully set forth in section IV.A.2, above, and section IV.B, below, the critical projects and training the Army seeks to complete pending further proceedings on a permanent injunction present negligible risk of significant harm to cultural or environmental resources.  Accordingly, it is not necessary to enjoin these activities to promote NEPA's purposes.

38

In the end, there is no danger of these limited construction projects and the related Stryker training rendering the NEPA compliance "an empty exercise," as Plaintiffs fear or, in the parlance of NEPA, "limit[ing] the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(2).  These projects are complete or close to completion, they have independent utility, and their future use is not conditioned on completion of the transformation process. Inasmuch as their use does not preclude the Army from giving meaningful consideration to other reasonable alternatives in an SEIS, these critical projects and related training should be allowed to proceed. See National Audubon Society, 422 F.3d at 201 ("[A] NEPA injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.' Violation of NEPA is not always cause to enjoin all agency activity while the agency completes the required environmental analysis.") (citation omitted).

**B.    PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF THE COURT ISSUES A LIMITED INJUNCTION PERMITTING TRANSFORMATION OF THE 2ND BRIGADE**

As this Court previously recognized in denying Plaintiffs' prior requests for injunctive relief, Plaintiffs' claims are speculative in nature and the Army has gone to great lengths to ensure that impacts to cultural sites and natural resources are either eliminated or

mitigated.  See Court's Order dated November 5, 2004 at 15-16.
Today, Plaintiffs' assertions of harm fare worse than they did two
years ago.

The administrative record demonstrates that the Army took the
requisite hard look at the environmental impacts associated with the
transformation process in its programmatic and site-specific EISs.
See ARP 009656-666; ARS 0010308-329; 0024083-86; 0024260-73; 0024294-
98; 0024616-24; 0051514-522; 0051523-529; 0051703-736; 0051737-759;
0052224-666; and 0052267-298.  The Army specifically analyzed the
potential impacts associated with transformation and concluded, as
did the Fish and Wildlife Service in its Biological Opinion, that the
significant measures undertaken ensure that any risk to cultural and
natural resources is minimized.  See ARS 0024083-86; 0024260-73;
0024294-98; 0024616-24.

Plaintiffs in this action have never questioned the Army's NEPA
analysis on potential impacts nor have they claimed that this
analysis violates NEPA.  In fact, neither the district court nor the
Ninth Circuit identified any defects in the Army's impacts analysis.
The analysis contained in the Army's NEPA documents on impacts to
cultural and natural resources has not been invalidated and fully
complies with the statutory requirements under NEPA.

40

Plaintiffs cannot demonstrate that they are likely to suffer irreparable harm from the limited activities the Army here seeks leave to pursue.  First, there are no endangered or threatened species in the critical project areas.  See Mansker Dec. at ¶4. Second, the Army has undertaken significant measures to protect cultural resources and, to date, these measures have proven to be effective in protecting cultural resources during the transformation process.  See Lucking Dec. at ¶¶2-11, Attachment 1 to Lucking Dec. at ¶¶7, 12-19.  With respect to cultural resources, there are none in four of the five project areas and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1. Lucking Dec. at ¶¶4-10. As for the modification to Range 11T, this project has not begun and the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences.  Id.  In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade.  Finally, Plaintiffs have raised concerns about the cultural site identified as Mauna'una, but, as Dr. Lucking explains, this site is located on a bluff and not within 200 yards of any of the critical

41

project areas. Lucking Dec. at ¶8.

Since Plaintiffs cannot demonstrate that cultural sites or natural resources are likely to be irreparably harmed by the completion of the six designated projects and Stryker-related training, the Court should fashion an injunction that permits these projects and training to continue in order to ensure that the 2nd Brigade is properly transformed and ready for deployment by November 2007.

### 1. *Plaintiffs cannot demonstrate irreparable harm to cultural resources*

Plaintiffs have argued that the transformation of the 2nd Brigade will cause irreparable injury to unknown cultural resources. But, as this Court has previously recognized, Plaintiffs' claims of irreparable harm are too speculative and overlook the Army's knowledge of cultural resources in construction areas and the extensive steps it has taken to avoid and mitigate impacts to cultural areas. Lucking Dec. at ¶¶ 2-10, Attachment 1 to Lucking Dec. at ¶¶2, 7-16, 19; see also Court's Order dated November 5, 2004 at 15-16.

Dr. Laurie Lucking, the Army Cultural Resources Manager, explains in her declaration that the Army acknowledged in the SEIS that transforming the 2nd Brigade might have significant impacts on

cultural resources because it realized that destroying even one cultural site would be significant to Native Hawaiians. Attachment 1 to Lucking Dec. at ¶4. In addition, Areas of Traditional Importance, which may not be protected under the National Historic Preservation Act, may be impacted. Id. at ¶4. When it published the SEIS, project designs had not progressed far enough to determine cultural impacts with certainty, and the Army cannot guarantee that no cultural sites will be impacted. However, the Army's goal is to prevent impacts, and its efforts to date have proven successful. Id. at ¶¶13,14.

Dr. Lucking explains in detail the Army's ongoing surveying and monitoring of project sites.[9] Most of the areas surveyed to date have revealed no cultural sites. Id. at ¶11. In the few instances when the Army has discovered cultural sites, it has altered the projects to avoid those sites entirely. Id. at ¶¶13, 14. To date, there is no indication that unexploded ordnance clearance or pre-construction environmental and geotechnical testing have damaged any cultural resources. Id. at ¶¶11,16. Archeological and cultural

-----

[9]Many of the measures Dr. Lucking describes are included in the Programmatic Agreement the Army entered into with the Advisory Council on Historic Preservation, the Hawaii State Preservation Office, and the Office of Hawaiian Affairs to meet its obligations under the National Historic Preservation Act. Lucking Decl. ¶3.

monitoring will continue throughout the construction process to ensure that any cultural resources that may be discovered are properly protected.  Id. at ¶7.

Plaintiffs' selective criticism of the Army's mitigation measures in past briefing has failed to acknowledge the full scope of those efforts. Before the Army ever gets to the point of "data recovery" or "reburial," it will survey construction areas, flag eligible archaeological sites for avoidance, and design projects to avoid impacting those sites wherever possible.  ARS 52067; Attachment 1 to Lucking Dec. at ¶¶10,13,14.  Plaintiffs have argued that data recovery alone is insufficient to protect cultural resources. However, data recovery is not the only method of mitigation, as Plaintiffs would lead the Court to believe; in fact, it is the last line of defense. Id. Following Plaintiffs' logic, no earth-moving would be permitted in Hawaii since any such activity could lead to accidental discovery of archaeological sites, human remains, or cultural items. See also Judge Bea's dissent in Ninth Circuit's October 27, 2006 Order.  The Army is making every effort as it goes forward to avoid harming cultural resources by consulting with Native Hawaiian organizations, families and individuals, surveying project areas, amending project designs to avoid cultural sites, using lineal

44

descendants from project areas as cultural monitors to identify and suggest protection for sites, and using archaeologists and cultural monitors to oversee all earthmoving activities. Id. at ¶¶2,5-11,13-14.

In the past, Plaintiffs have misstated the record when they've suggested that construction of several projects will occur in "archaeological sensitivity areas." The SEIS identifies all archaeological sites at each sub-installation of which the Army was then aware. See, e.g., ARS 52056-65. However, the SEIS explains that individual project areas within those sub-installations "will be designed to avoid all eligible and unevaluated archaeological sites, to the full extent practicable." ARS 52067. The Army has consistently redesigned projects to avoid cultural sites, Attachment 1 to Lucking Dec. at ¶¶ 2,10,13,14, and will continue to do so.

The Army developed a Cultural Monitoring Program, which enlists the assistance of persons who are knowledgeable about Native Hawaiian activities, to insure maximum protection for cultural sites and artifacts. Id. at ¶7. Currently, the Program includes 30 cultural monitors, all of whom are Native Hawaiians, who are permitted to go anywhere in the project area that is accessible to contractors and archaeologists. Id. Information reported by the monitors is given

45

to the archaeologists and the Army, as well as to interested members of the community for additional comment.  Id. at ¶8.  Dr. Lucking describes the other efforts the Army has undertaken, successfully, to avoid disturbing cultural resources in the project areas. Plaintiffs have complained that cultural monitors have been prevented from exercising meaningful oversight, but any restrictions have been safety related. Id. at ¶15.  Moreover, these complaints do not involve projects that are among the six critical projects that the Army wishes to continue during the interim injunction.  For example, due to the large amounts of unexploded ordnance at the Schofield BAX (not one of the six critical projects), the monitors initially were required to remain 200 feet away from all intrusive activities. Id. That was increased to 650 feet when chemical weapons were discovered on site. Id. Once earth disturbing activities were completed, however, the monitors were allowed down-range to examine those areas. Id. These restrictions, which were only in place at the Schofield Barracks BAX, were lifted several months ago after consultation with the cultural monitors, who, as a result, became part of the Schofield BAX UXO clearance team.

Any claim that construction will lead inevitably to the disinterment and destruction of Native Hawaiian burials is likewise

46

speculative and ignores the mitigation measures the Army has employed to ensure that such harm will not occur.  Attachment 1 to Lucking Dec. at ¶¶10,19.  The Army has taken every precaution to avoid effects on Native Hawaiian burials, including extensive surveying and, as noted above, hiring cultural monitors who are lineal descendants of people native to the various project areas and who are also knowledgeable about burial areas.  Id. at ¶¶7, 15,19.  When the Army identified possible burial sites at the South Range Acquisition Area, it marked the area "off-limits," and will do the same if it identifies other burial sites in the future.  Id. at ¶19.  The success of these measures is reflected in the identification and protection of possible burial sites at the South Range Acquisition Area (not one of the six critical projects) in July 2003.  Id. If additional burial areas are identified, similar precautions will be undertaken to protect them.  Id.  Thus, other than mere speculation, Plaintiffs cannot demonstrate that harm to Native Hawaiian burials is inevitable and irreparable.

With respect to the six critical projects, the extensive mitigation measures outlined above have worked with the two completed projects and are working effectively with the three projects that are currently under construction.  Lucking Dec. at 4-10; Attachment 1 to

47

Lucking Dec. at ¶7.  In fact, the Army's mitigation measures have revealed that there have been no cultural resources and historic properties identified in four of the five critical project areas, and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.  For example, in QTR1, which is an existing military range that is in use by non-Stryker units, a cultural site was identified and mitigation measures were undertaken to protect this site.  Id. at 9.  To date, this site has not been harmed.  Id.  As for the minor modification to Range 11T, this project has not begun, but the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences.  Id.

In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade.  Furthermore, there is a cultural site known as Mauna'una that Plaintiffs have identified as an area of concerns.  As Dr. Lucking explains, the Army is well aware of this site and has confirmed that it is more than 200 yards from any critical project area. Lucking Dec. at ¶8.  Mauna'una is located on a eroding slope and rather than harm this resource, the Army is

48

stockpiling soil from the Multiple Deployment Facility with hope that this soil can be used to stabilize the erosion around this site. Id. Based on the foregoing and as explained in Dr. Lucking's declaration, Plaintiffs cannot establish that there is a likelihood of harm to cultural resources from the completion of the six critical Stryker projects and related training.

Finally, Plaintiffs have complained that the use of the MK-19 grenade launcher is likely to cause irreparable harm to cultural resources. But as Dr. Lucking explains in her declaration, the Army does not use, and does not intend to use, high explosive rounds for training with the MK-19. Instead, the MK-19 "weapons are using practice munitions that do not have a high explosive charge." Attachment 1 to Lucking Dec. at ¶17. Those practice rounds do not pose a threat of irreparable harm to cultural resources. Id.

As this Court has already recognized, the Army has undertaken extensive measures to ensure that cultural sites and ATIs are identified and protected to fullest extent practicable. See Court's Order dated November 5, 2004 at 15. Given these protective measures as outlined above, it is not surprising that there is no evidence that cultural resources have been irreparably harmed. Attachment 1 to Lucking Dec. at ¶¶7, 12-19.  Nor is it likely that this will occur.

49

Therefore, Plaintiffs cannot demonstrate irreparable harm to cultural resources and the Court should issue an interim injunction that permits the Army to proceed with the five critical Stryker projects and Stryker training.  See Cummings v. Connell, 316 F.3d 886, 897 (9th Cir. 2003) (where there was no "cognizable danger" demonstrated by plaintiffs, the court could not grant injunctive relief).[10]

### 2.    Plaintiffs cannot demonstrate irreparable harm to natural resources

Plaintiffs cannot demonstrate that there will be  irreparable

---

[10]In the past, Plaintiffs have erroneously asserted that the Army conceded its actions will irreparably harm cultural and natural resources.  Plaintiffs' assertion, and much of their irreparable harm argument, has been based on the Army's site-specific EIS.  However, Plaintiffs' reliance on the Army's SEIS to carry their burden is misplaced.  The EIS's characterization of the likelihood of impacts as "significant" reflects the Army's solicitude for Plaintiffs' cultural interests; the Army recognizes that the loss of even one cultural site would be significant.  However, Plaintiffs overlook that the EIS predicts the impacts that might result from the proposed action as a whole, not, as is the issue here, from a limited subset of critical Stryker projects and training.  The SEIS does not indicate that harm is likely or severe as a result of the critical Stryker projects and training at issue here.  To the contrary, as this Court earlier recognized, the Army developed extensive measures to avoid and mitigate any impacts to these resources.  See Court's November 5, 2004 Opinion at 15-16.  In fact, four of the project areas have no known cultural resources and protective measures have proven successful in identifying and protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.  The same protective measures will be undertaken before the modification of Range 11T.  Thus, in light of the historic success of the Army's protective measures, it is even more apparent today than it was when the Court earlier ruled that significant harm to cultural and natural resources from the critical projects and training is not likely.

harm to natural resources in the critical project areas or as a result of Stryker-related training. First, there are no endangered or threatened species in the six critical project areas.  Mansker Dec. at ¶¶4, 17.  In fact, the only site within the current or planned construction projects that contains listed species or its habitat is at the PTA BAX. Id.  This, however, is not one of the  critical projects. Borne Dec. at ¶4-6. Thus, there is no current activity with respect to the six critical projects or training that impacts a listed species or its habitat, nor will there be, and even for the PTA BAX (not one of the six critical projects), the Army will build a 21,000 acre fenced area to exclude non-native ungulates. Mansker Dec. at ¶4. The conservation measures employed at the site will "result in a net benefit to the species in the long run." Id. at ¶7.

Second, the Fish and Wildlife Service issued two biological opinions concluding that the 2d Brigade transformation is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy critical habitat.  ARS 24264, 24616. This Court defers to the "special expertise of the FWS" in making such determinations.  See Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 523 (9th Cir. 1998); see also Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1456 (9th

Cir. 1992).  The Service's scientific judgment refutes Plaintiffs'
allegation that the Army will irreparably harm listed species absent
an injunction.  Significantly, Plaintiffs have not challenged these
biological opinions under the Endangered Species Act.

The Biological Opinions outline the actions the Army has taken
to protect critical habitat and listed species in the project area.
ARS 24264-73, 24616-24.  With these protective measures in place, the
Fish and Wildlife Service concluded that the proposed action is not
likely to jeopardize the continued existence of any species or
adversely modify critical habitat.  ARS 24264, 24616.  With regard to
the Hawaiian hoary bat, the Service concluded that "adverse impacts .
. . will be minimized and offset by fencing, ungulate removal, and
wildfire threat abatement."  ARS 24261.  Monitoring of bat habitat
will enable the agencies to assess the effectiveness of and adjust
these mitigation measures, as well as "provide valuable scientific
data that would contribute to the recovery of the Hawaiian hoary
bat."  ARS 24263.  The Army will also construct fence units, remove
ungulates, and plant listed plant species to increase their
distribution and abundance, and will take appropriate action to
protect palila habitat.  ARS 24264-65.  The Fish and Wildlife Service
concluded that minimization and mitigation measures would offset

adverse impacts to palila habitat.  ARS 24247.

Natural Resource Manager Michelle Mansker described in her declaration the Army's extensive efforts to protect listed species and their habitat.  Among other things, the Army has implemented an Integrated Wildfire Management Plan ("IWFMP") to reduce the frequency, size, and severity of any fire.  Mansker Dec. at ¶6.  The IWFMP includes a Fire Danger Rating System that restricts specific activities during high-risk periods and standard operating procedures for each installation that outline responsibilities, fire prevention measures, staffing levels, and requisite equipment needed, including helicopter support during all live fire training.  Id.  The Fish and Wildlife Service noted the significance of the IWFMP in protecting critical habitats and species in its no-jeopardy determination.  Id.; ARS 24265. Plaintiffs have not demonstrated that the proposed transformation, and most particularly the six critical construction projects, will irreparably harm the Hawaiian hoary bat or any other species or habitat in the proposed transformation area.

In the end, Plaintiffs simply cannot that demonstrate that there will be irreparable harm to natural resources in the six critical project areas or as a result of Stryker-related training.  There are no listed species found near or within any of the critical

construction projects.  Mansker Dec. at ¶4. Moreover, the Army has undertaken significant protective measures to ensure protection of natural resources during any training, including mitigation pursuant to the Wildfire Management Plan, and Integrated Natural Resources Management Plan. Id. at ¶7.  Such measures have proven successful and were relied on by the U.S. Fish and Wildlife Service in issuing its biological opinion that Stryker training and related construction will not jeopardize threatened or endangered species.  Id. at ¶7-8.

Based on the foregoing and the no-jeopardy determination of the Fish and Wildlife Service, Plaintiffs cannot demonstrate that any of the proposed critical construction projects or related training will irreparably harm any species or habitat in the proposed transformation area.

### C.   THE BALANCE OF HARMS TIPS DECIDEDLY IN THE ARMY'S FAVOR

In considering the propriety of issuing an injunction, the court must balance the relative harm each party may sustain. Caribbean Marine Services v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  In the instant case, the immediate and significant harm to the safety of American soldiers and our country's national security far outweighs the speculative claims of possible harm to cultural and natural resources alleged by Plaintiffs.  The scale tips even more decidedly

in the Army's favor when the Court considers the narrow tailoring requested by the Army for the interim injunction.

Given the limited relief sought by the Army, Plaintiff simply cannot show any likelihood of harm, let alone a level of harm that outweighs the substantial harm faced by American soldiers and the Army.  First, there are no cultural resources in four of the critical project areas sought by the Army, and, in the fifth, QTR1, the mitigation measures undertaken have proven successful in protecting the identified cultural resources. Lucking Dec. at ¶¶4-11; see also Attachment 1 to Lucking Dec. at ¶¶7, 9-12.  These same successful mitigation measures will be undertaken before work begins on the minor modification to existing training range 11T.  Id. Second, as for natural resources, there are no threatened or endangered species in the critical project areas, and mitigation measures, as concluded by the Fish and Wildlife Service in its Biological Opinions, have effectively protected species in other areas throughout the Army installation.  Mansker Dec. at ¶4.

In contrast to Plaintiffs' speculative assertions of irreparable harm, the harm to our soldiers and to national security that would result from issuance of an injunction prohibiting the six critical projects and Stryker training would be severe.  See State of

Wisconsin v. Weinberger, 745 F.2d 412, 428 (7th Cir. 1984) ("the district court abused its discretion by failing to consider the degree to which the NEPA interest would, in fact, be served by an injunction, the efficacy of other forms of relief, and the harm to national defense interests that would result").  SBCTs provide improved battle command capabilities and defense systems that increase our soldiers effectiveness in combat and protect them to a much greater extent than current military defense systems.  Brown Dec. at ¶5.  According to Colonel Brown who has first hand experience in Iraq, the Stryker vehicle was "essential to saving lives" and "the losses would have been significantly higher if we had not been able to fight configured as a [SBCT] or use the Stryker vehicle during our training and deployment."  Id.

In addition, delaying or disrupting the conversion of the 2nd Brigade to a SBCT will significantly impact the sequence of Army transformation, reduce the number of highly effective SBCT units in the field of battle, and reduce the overall effectiveness of Army forces fighting the Global War on Terrorism.  See Court's November 5, 2004 Order at 17-18.

The Army has carefully crafted a solution that does not involve all 28 Stryker related projects, but rather requires five critical

projects and a minor modification to one existing range to be completed immediately to ensure the transformation is completed and the 2nd Brigade is ready to deploy in November 2007.  These projects, with the exception to the minor modification to Range 11T, are either completed or more than 50% complete, and the related Stryker training is nearly 70% complete. To enjoin the transformation at this time would result in creating an ineffective brigade that has not been transformed and cannot be deployed.  Borne Dec. at ¶8.

The balance of harms in this matter clearly tips in favor of permitting the Army to proceed with the transformation of the 2nd Brigade, thereby, protecting our soldiers, improving our combat ability, and serving this Nation's security interests.  The Supreme Court recently reiterated that the role of the judiciary in reviewing military decisions is constrained.  "Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them."  Hamdi v. Rumsfeld, 124 S.Ct. 2633, 2647 (2004) (citing Department of the Navy v. Egan, 484 U.S. 518, 530 (1988).

As the facts in this memorandum demonstrate, and as this Court previously recognized, enjoining the 2nd Brigade from transforming to

a SBCT would result in real and significant harm to the Army, its soldiers, and the war on terror.  See Court's November 5, 2004 Order at 17-18.  Therefore, the Army requests that the Court not disrupt the Army's efforts to provide the best support possible to soldiers in combat and the best security possible to our nation when the record shows that the Army has effectively implemented efforts to eliminate or minimize harm to cultural and natural resources.

**D.  AN INJUNCTION PREVENTING THE TRANSFORMATION OF THE 2ND BRIGADE TO A SBCT WOULD BE CONTRARY TO THE PUBLIC INTEREST**

As the Ninth Circuit has said, the trial court "must always consider whether the public interest would be advanced or impaired by issuance of an injunction in any action in which the public interest is affected."  Carribean Marine Services Co., Inc. v. Baldridge, 844 F.2d 668, 674 (citations omitted).  Indeed, if the public interest weighs strongly against an injunction, the relief must be denied "even though irreparable injury may otherwise result to plaintiff. . . ."  Weinberger v. Romero-Barcelo, et al., 456 U.S. 305, 312 (citing Yakus v. United States, 321 U.S. 414, 440 (1944)).

The Army vigorously denies that Plaintiffs would suffer any harm absent an injunction in this case, let alone immediate and irreparable harm.  But, even if such harm were likely, the public

interest would dictate that no injunction issue in this case. Clearly, the defense of the United States is one of, if not the, most important of public interests.  Moreover, it is unquestionable that preparing our soldiers by providing them with the most advanced training and supplying them with the most advanced equipment serves not only the individual soldier's best interest, but the best interest of the public as well.  Put simply, where an injunction would harm the military's ability to provide for the national defense, it "would have a large negative effect on public interest." Water Keeper Alliance v. Department of Defense, 152 F.Supp.2d 155, 163 (D.P.R. 2001).

The overwhelming weight of the evidence before the Court demonstrates that enjoining the transformation of the 2nd Brigade will harm national security.  First, delay in transforming the 2nd Brigade will result in faster deployment of other Army units to combat operations in Iraq and elsewhere.  Such "accelerated deployment would further reduce unit training time, significantly increase the risk of American casualties and decrease unit mission effectiveness in combat . . . ."  Lovelace Dec. at ¶ 8.

Second, transformation delay would substantially interfere with the Army's ability to meet its obligation to protect the United

States' interests in the Pacific region.  As the "only active brigade combat team" in the Pacific that is not currently deployed, the ability of the unit to react expeditiously and provide the advanced capabilities attendant to a SBCT, would "cause immense harm to the US Army Pacific's capability to execute our mission. . . ."  Brown III Dec. at ¶ 8.

Finally, delay in the training of the soldiers of the 2nd Brigade will diminish the ability of our soldiers to carry out there mission of protecting the United States.  "Less training equals more casualties upon deployment."  Banach Dec. at ¶ 2.  Obviously greater numbers of casualties is not in the public interest and will not advance the Army's mission of protecting the public interest.  As Judge Mollway has stated "there is no heavier weight to balance than the loss of human life."  <u>Malama Makua v. Rumsfeld</u>, 2006 U.S. Dist LEXIS 3962, *33 (D.Hawaii February 2, 2006).

**V.    CONCLUSION**

For the foregoing reasons, Federal Defendants request that the Court issue an order on interim injunction relief permitting the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, a minor modification to existing training Range 11T, and the following five transformation related construction

projects in order to properly transform the 2nd Brigade and protect our national security interests:

1.   QTR1 at Schofield Barracks
2.   SBCT Motor Pool at Schofield Barracks
3.   Urban Assault Course at Schofield Barracks
4.   Tactical Vehicle Wash Facility at Schofield Barracks East Range (an environmental protection measure)
5.   Multiple Deployment Facility at Wheeler Army Airfield, Hawaii.

Respectfully submitted this 14th day of November 2006,

> EDWARD H. KUBO, JR. (2499)
> United States Attorney
> District of Hawai`I
> /s/ Thomas Helper
> _____
>
> HARRY YEE      (3790)
> THOMAS HELPER  (5676)
> Assistant United States Attorney
> Room 6-100, PJKK Federal Building
> 300 Ala Moana Boulevard
> Honolulu, Hawai`I  96850
> Telephone: (808) 541-2850
> Facsimile: (808) 541-3752
> Email: harry.yee@usdoj.gov
>
> SUE ELLEN WOODRIDGE
> Assistant Attorney General
>
> BARRY A.  WEINER
> JAMES D. GETTE
> Trial Attorneys
> General Litigation Section
> Environment & Natural Resources
> Division
> U.S. Department of Justice
> P.O. Box 663
> Washington, D.C.  20044-0663
> Email: Barry.Weiner@usdoj.gov

```
                                    Telephone:     202-305-0469
                                    Fax:        202-305-0274

Of Counsel:
Robert M. Lewis
Senior Trial Attorney
Army Environmental Law Division
901 North Stuart Street, Suite 400
Arlington, VA 22203
Telephone:  (703) 696-1567
Facsimile:   (703) 696-2940
```

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

Served Electronically through CM/ECF:

David L. Henkin        dhenkin@earthjustice.org

Isaac H. Moriwake      imoriwake@earthjustice.org

Attorneys for Plaintiffs

DATED:  November 14, 2006, at Honolulu, Hawaii.


/s/ Jan Yoneda
_____

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
HARRY YEE     (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General
BARRY A. WEINER
JAMES D. GETTE
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0469
Facsimile:  (202) 305-0274
Email: Barry.Weiner@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

——————————————————————————————
                                    )CIVIL NO.04-00502 DAE BMK
ILIO‘ULAOKALANI COALITION,          )
a Hawaii, nonprofit corporation;    )FEDERAL DEFENDANTS'
NA‘IMI PONO, a Hawaii               )MEMORANDUM ON THE SCOPE OF
unincorporated association; and     )INTERIM INJUNCTIVE RELIEF
KIPUKA, a Hawaii unincorporated     )IN ACCORDANCE WITH THE
association,                        )NINTH CIRCUIT'S REMAND
                                    )
              Plaintiffs,           )
                                    )
      v.                            )
                                    )
DONALD H. RUMSFELD, Secretary of    )
United States Department of         ) Hearing:
Defense; and FRANCIS J. HARVEY,     )
Secretary of the United States      ) Date:  November 20, 2006
Department of the Army,             ) Time:  9:45 a.m.
                                    ) Judge: Hon. David A. Ezra
              Defendants.           )
——————————————————————————————

TABLE OF CONTENTS

TABLE OF AUTHORITIES

FEDERAL DEFENDANTS' MEMORANDUM ON THE SCOPE OF INTERIM INJUNCTIVE RELIEF IN ACCORDANCE WITH THE NINTH CIRCUIT'S REMAND

DECLARATION OF THOMAS HELPER; EXHIBITS "A" AND "B"

DECLARATION OF RONALD L. BORNE

DECLARATION OF LAURIE LUCKING; ATTACHMENTS "1" TO "31"

DECLARATION OF MAJOR GENERAL WILLIAM H. BRANDENBURG

DECLARATION OF COLONEL STEFAN J. BANACH

DECLARATION OF COLONEL ROBERT B. BROWN

DECLARATION OF MICHELLE MANSKER

DECLARATION OF MAJOR GENERAL DANA T. ATKINS

DECLARATION OF JAMES J. LOVELACE

DECLARATION OF LIEUTENANT GENERAL JOHN M. BROWN III

CERTIFICATE OF SERVICE

Federal Defendants, Donald H. Rumsfeld, Secretary of the United States Department of Defense; and Francis J. Harvey, Secretary of the United States Department of the Army, ("U.S. Army" or "Army"), by and through undersigned counsel, file this Emergency Motion for Decision on the Scope of Interim Injunctive Relief in Accordance with the Ninth Circuit's Remand.  For the reasons set forth below, the Army respectfully requests the Court to lift the temporary injunction entered in this action by the United States Court of Appeals for the Ninth Circuit, and replace it with a more limited interim injunction that allows the Army to proceed with critical transformation and training activities for the 2nd Brigade of the 25th Infantry Division (Light) as a Stryker Brigade Combat Team in Hawaii pending further proceedings in this Court to address what permanent injunction, if any, is warranted pending compliance with the National Environmental Policy Act ("NEPA").

## I.    INTRODUCTION

This action was remanded to this Court by the Ninth Circuit in an Order entered on October 27, 2006, issued a few weeks after the Ninth Circuit's Opinion concluding that the U.S. Army had violated the National Environmental Policy Act ("NEPA") by failing to consider locations outside of Hawaii for transforming the 2nd Brigade to a Stryker Brigade Combat Team.  See Opinion entered October 5, 2006 at 41 (2-1).  In its October 27th Order, as described in more detail below, the Ninth Circuit issued a limited remand to this Court for the sole purpose of determining on an expedited basis the appropriate scope of "interim injunctive relief" pending a decision by this Court on the scope of a permanent injunction.  Order of October 27, 2006, at 2-3 and Addendum to Order at 9 (2-1).  Since this matter is very time-sensitive, a fact recognized by the Ninth Circuit in directing

2

that the matter be resolved "expeditiously," Order at 3, the Army requests the Court to consider the scope of interim injunctive relief at its earliest opportunity.

The Ninth Circuit's October 27th Order responds to an emergency motion filed by Plaintiffs in the Ninth Circuit seeking "interim injunctive relief" pending a decision by this Court on the scope of permanent relief pursuant to the Ninth Circuit's Opinion on the merits. The Ninth Circuit did not grant the Plaintiffs the relief they sought, but instead issued a "temporary injunction" and "remanded to the district court to enter and determine the scope of an interim injunction." Addendum at 9.

The temporary injunction prohibits the Army "from implementing, executing, or proceeding with the following activities associated with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii: grading, grubbing, other ground disturbance, construction, land acquisition, project design, geotechnical testing, unexploded ordinance clearance, contract award, and Stryker Brigade Combat Team-specific training pending entry of an injunction by the district court." Order of Oct. 27 at 1-2. The Ninth Circuit imposed this temporary injunction "until the district court has entered an interim injunction" and accordingly remanded to this Court "for the purpose of determining the appropriate scope of an interim injunction . . . ." Id. at 2. In response to a dissent to the Order filed by Judge Bea, the Court of Appeals issued an Addendum to its Order that clarified that it had not issued the interim injunction requested by Plaintiffs but instead had "entered a temporary injunction pending the district court's expeditious resolution of the interim injunction." Addendum at 9.

3

As the Ninth Circuit acknowledged, it did not "[p]roperly balanc[e] the parties' equities" in entering the temporary injunction, a function the Ninth Circuit determined should be performed instead by this Court.  Order at 3 ("Properly balancing the parties' equities requires a fact-intensive inquiry best undertaken by the district court").  Further, responding to the U.S. Army's objection that an interim injunction would harm national security, the Ninth Circuit acknowledged that "this matter is very time-sensitive," and it consequently ordered "the district court [to] proceed expeditiously" to adjudicate the interim injunction.  Id. (emphasis added).  Finally, in the Addendum to its Order, the Ninth Circuit took pains to clarify the temporal limitations of the temporary injunction and its directions to this Court:

> Reading the dissent, one would think that we have issued a permanent injunction. We have not.  We have not even issued an interim injunction pending a ruling on a permanent injunction, which is what the Plaintiffs ask for.  Rather, we have entered a temporary injunction pending the district court's expeditious resolution of the interim injunction.  We have acknowledged that properly balancing the parties' equities is a fact-intensive inquiry best undertaken by the district court, and we have remanded to the district court to enter and determine the scope of an interim injunction.

Addendum at 9.

As set forth below, the Ninth Circuit's temporary injunction is impairing the ability of the 2nd Brigade to accomplish its military mission with a minimum of American combat related casualties, a paramount national interest.  The temporary injunction should be lifted immediately because the harm to the U.S. Army, and to the public interest, from continuation of the injunction grossly outweighs the negligible risk of harm to the Plaintiffs' interests

from lifting it.[1]

Further, the interim injunction contemplated by the Ninth Circuit should be narrowly tailored to allow certain critical elements of the 2d Brigade transformation and training to proceed pending further proceedings concerning a potential permanent injunction pending NEPA compliance. In its October 27 remand Order, the Ninth Circuit directed the district court to consider "which Stryker Brigade Combat Team transformation-related activities in Hawaii are time critical and which activities can proceed without causing irreparable environmental and cultural harm." Id. at 3.

The Army has identified five (5) of the twenty-eight (28) Stryker related projects and one minor modification to an existing training range (6 projects in total) that are the most time-sensitive and critical to proceed in order to ensure that the 2nd Brigade of the 25th Infantry Division Light ("2nd Brigade") can properly transform into a Stryker Brigade Combat Team ("SBCT")and be ready for deployment by November 2007. The continuation of Stryker training and these six critical transformation related activities will permit the 2nd Brigade to properly transform and be available to defend our nation with the most effective military technology and weapons systems in a manner that does not cause irreparable harm to cultural sites or natural resources.

This Court previously held that the harm Plaintiffs alleged to cultural and natural resources was speculative and could not justify issuance of injunctive relief. See Court's November 5, 2004 Order at 15-16. That same conclusion is even more appropriate today. There

_____

[1] The U.S. Army will await issuance of the mandate before seeking a hearing before this Court to address what permanent injunction, if any, is warranted pending compliance with NEPA.

are no endangered or threatened species in the six critical project areas.  See Declaration of Michelle Mansker at ¶4.  Furthermore, the significant measures the Army has undertaken to protect cultural resources have proven to be effective in protecting cultural resources during the transformation process.  See Declaration of Dr. Laurie Lucking "Lucking Dec")at ¶¶4-10, and attachment 1 to Lucking Dec at ¶¶7, 12-19.  Plaintiffs' claim that some unknown burial site might be impacted in the future is nothing more than pure speculation, and does not demonstrate irreparable harm as is needed to substantiate an injunction on the equipping and training of the 2nd Brigade and the six critical Stryker-related projects and training.

As this Court previously recognized, the harm to the Army and its effort on the Global War on Terrorism from an injunction are both "demonstrative and severe."  See Court's November 5, 2004 Order at 17.  There is no question that "delaying or disrupting the conversion of the 2nd Brigade to a SBCT 5 will significantly impact the sequence of the Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism."  Id. at 15, 18.  Above all, to enjoin the transformation of the 2nd Brigade would result in soldiers that are not properly trained on the most effective and protective defense systems, thereby compromising the safety and effectiveness of these soldiers in combat.

The high likelihood of harm to the U.S. Army, and to the public interest, from continuation of the temporary injunction would grossly outweigh the negligible risk of harm to the Plaintiffs' interests from lifting it.  Consequently, the temporary injunction should be lifted and it should be replaced by a more narrowly tailored interim injunction pending further proceedings in this Court to address what

permanent injunction, if any, is warranted pending NEPA compliance. The severe and demonstrative impact to our soldiers and our Nation from the temporary injunction must be avoided by allowing a limited number of projects and training to go forward immediately because they are necessary to accomplish the transformation of the 2nd Brigade and can be implemented in a manner that reduces to a discountable level the risk of harm to cultural and natural resources.  Consequently, the Army requests the Court to narrowly tailor the interim injunction so that it allows the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, and the following six transformation related projects:

(1) Completion of the Qualification Training Range One ("QTR1");
(2) Completion of 2/25 SBCT Motor Park and Maintenance Area ("SBCT Motor Pool");
(3) Completion of the Urban Assault Course ("UAC");
(4) Completion of the Tactical Vehicle Wash Facility ("TVWF");
(5) Completion of the Multiple Deployment Facility ("MDF"); and
(6) Minor modification to existing training range 11T on the Pohakuloa Training Area ("PTA").

## II.  FACTUAL BACKGROUND

To avoid needless repetition and inconvenience to the Court, Federal Defendants hereby incorporate by reference the Factual Background sections previously presented to the Court in their Cross-Motion for Summary Judgment dated February 4, 2005, and in their opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004.  See Federal Defendants' Memorandum in support of their Cross-Motion for Summary Judgment dated February 4, 2005 at 4-16 and Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004 at 1-10. This briefing provides the Court with the factual background underlying the Army's decision and need to transform the 2nd Brigade to a SBCT.  The critical information needed to resolve the scope of

an interim injunction and determine "which Stryker Brigade Combat Team transformation-related activities in Hawaii are time critical and which activities can proceed without causing irreparable environmental and cultural harm" is contained in this memorandum and the following declarations:

(1)  Declaration of Ronald L. Borne ("Borne Dec.") dated November 13, 2006;

(2)  Declaration of Laurie Lucking ("Lucking Dec.") dated November 13, 2006 with Attachment 1, Declaration of Laurie Lucking dated October 22, 2006 and Attachments 2-31 (photographs and maps of critical project areas);

(3)  Declaration of William H. Brandenburg ("Brandenburg Dec.") dated November 13, 2006;

(4)  Declaration of Stefan J. Banach ("Banach Dec.") dated November 8, 2006;

(5)  Declaration of Robert B. Brown ("Brown Dec.") dated November 7, 2006;

(6)  Declaration of Michelle Mansker ("Mansker Dec.") dated November 11, 2006;

(7)  Declaration of Dana T. Atkins ("Atkins Dec.") dated November 7, 2006;

(8)  Declaration of James J. Lovelace ("Lovelace Dec.") dated November 10, 2006; and

(9)  Declaration of John M. Brown III ("Brown III Dec.") dated November 9, 2006.

These declarations identify the critical transformation projects that are needed to transform the 2nd Brigade and ensure that it is properly trained and available for deployment in a timely manner. These declarations further confirm that the Army has undertaken significant protective measures to ensure that Stryker-related training and construction of these critical projects can be completed in a manner that is protective of cultural sites and natural resources.  Finally, these declarations explain why these projects and Stryker-related training are time-sensitive and critical to our Nation's defense and ensuring that our soldiers are properly trained with the most effective and technologically advanced military defense equipment.

In addition, the course of events that led up to the 2d

8

Brigade's current posture of being 12 months into an approximately two year training cycle is particularly important when considering the appropriate scope of interim injunctive relief.  On August 17, 2004, Plaintiffs filed a complaint in the Hawaii district court alleging that the Army violated NEPA by failing to consider reasonable alternatives, including relocation to the continental United States. On November 5, 2004, this Court denied Plaintiffs' motion for a preliminary injunction.  Even then, before transformation of the 2d Brigade was in full swing, the Court realized that national security concerns were "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." See Court's November 5, 2004 Order at 17-18.

On April 25, 2005, this Court granted the United States' motion for summary judgment.  The Court entered final judgment on April 29, 2005 and denied Plaintiffs' motion for an injunction pending appeal on May 19, 2005. The Plaintiffs then moved for an injunction pending appeal in the Ninth Circuit, which similarly denied the injunction. On October 5, 2006, the Ninth Circuit reversed the district court and remanded for the Army to prepare a Supplemental Environmental Impact Statement ("SEIS") examining the alternative of relocation of the 2d Brigade to a facility outside of Hawaii.

Between the denial of the first motion for preliminary injunction in this case and the Ninth Circuit's October 5, 2006, decision, the Army proceeded with transforming the 2d Brigade. As a result, the 2d Brigade is 12 months into the transformation process.

It has completed 60% of its training and almost 70% of its new equipment fielding. Brandenburg Dec. at ¶4. The 2d Brigade is scheduled to become a fully manned, trained, and equipped Stryker Brigade Combat Team (SBCT), ready for deployment, by November 2007. The 2d Brigade can no longer simply train as a light-infantry brigade, and therefore any delay in Stryker training will result in a combat ineffective unit. Thus, "to stop transformation now, even for a matter of weeks, would deny the 2d Brigade Commander the power and ability to complete transformation and training to fulfill his assigned operational missions." Lovelace Dec. at ¶8. The Army cannot afford to delay the transformation and readiness of a single brigade, including the 2nd Brigade. Lovelace Dec. at ¶3. "If 2nd Brigade is not available to deploy when required as SBCT 5, then every other brigade in the Army would have to deploy sooner. This accelerated deployment would further reduce unit training time, significantly increase the risk of American casualties, and decrease unit mission effectiveness in combat-for every brigade in the Army." Id. The national security concerns that the district court found compelling in November of 2004 thus carry even more weight two years later and one full year into transforming the 2d Brigade.

Knowing that the 2nd Brigade cannot go back to an ineffective light infantry brigade and must continue with transformation, the Army has carefully considered the 28 Stryker-related projects and identified the most time-sensitive and critical to our national security and the safety and effectiveness of our soldiers. As reflected in the administrative record and accompanying declarations, the Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to cultural and natural resources from continued training and completion of these six

specific projects.  This Court previously recognized the lengths to which the Army had gone to ensure that cultural and natural resources are protected during the transformation process, see Court's November 5, 2004 Order at 15-16, and nothing has occurred during the appeal process that would alter that previous determination.

For the reasons discussed below and in the accompanying declarations, it is requested that the temporary injunction be lifted and that the interim injunction that replaces it allow the Army to proceed with the six specific Stryker related projects and provision of the requisite equipment and training in order to ensure that the 2nd Brigade is properly trained and available for deployment as a SBCT by November 2007.

## III. STANDARD FOR ISSUANCE OF AN INJUNCTION

Violations of environmental statutes do not mandate issuance of an injunction.  "NEPA creates no exception to the traditional principles that govern injunctive remedies." National Audubon Society v. Department of Navy, 422 F.3d 174, 201 (4th Cir. 2005).  Thus, to qualify for injunctive relief, the moving party must first show it will suffer some tangible irreparable injury absent an injunction.  See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982); Amoco Production Company v. Village of Gambell, 480 U.S. 531, 542 (1987).  There is no presumption of irreparable injury in environmental cases.  Romero-Barcelo, 456 U.S. at 312; Amoco Production Co., 480 U.S. at 542; see also Forest Conservation Council v. U.S. Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995).

11

Further, where there are violations of environmental statutes, the court must balance the competing claims of injury and consider the effect on each party of granting or withholding the requested relief. <u>Amoco Production Company v. Village of Gambell</u>, 480 U.S. 531, 542 (1987); <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982). The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances. <u>Id</u>. The relative hardship to the parties is controlling. <u>Benda v. Grand Lodge of Int'l Ass'n of Machinists</u>, 584 F.2d 308, 314, 315 (9th Cir. 1978). When a federal court considers the propriety of injunctive relief, it must balance the equities of the case, considering the potential harms of granting or denying relief to each party, in an effort to "mould each decree to the necessities of the particular case." <u>Romero-Barcelo</u>, 456 U.S. at 312 (1982). The Court must also determine whether the balance of public interests is served by the requested injunction. <u>Caribbean Marine Services v. Baldridge</u>, 844 F.2d 668, 674 (9th Cir. 1988).

**IV.  ARGUMENT**

While the Army remains committed to complying fully with NEPA,[2] equipment fielding, training activities and certain limited

---

[2]The Army has already taken initial actions to prepare the Supplemental EIS ordered by the Ninth Circuit. Brown III Dec. at ¶9.

12

construction activities that will directly facilitate the necessary training of the 2nd Brigade simply cannot be halted at this late date without doing irreparable harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security.  In accordance with the Ninth Circuit's remand, the Army has identified six Stryker-related projects that are time-sensitive and critical to ensure the transformation of the 2nd Brigade to a SBCT.  These construction projects as well as the associated Stryker-related training will not irreparably harm cultural or natural resources.  Mansker Dec. at ¶4, Lucking Dec. at ¶¶4-10, Attachment 1 to Lucking Dec. at ¶¶7, 12-19. The Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to environmental and cultural resources from these actions and will continue to do so as it proceeds with training the 2nd Brigade. Id.  The analysis this Court previously conducted on the impacts to the Army and this Nation's security that would result from an injunction is even more relevant today than it was in November 2004.  This Court earlier found that the national security concerns implicated from preventing transformation are "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and

13

reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." <u>See</u> Court's November 5, 2004 Order at 17. The same conclusion should be reached here when considering interim injunctive relief because the harm to the Army and this nation's defense is highly likely and severe, while the harm claimed by the Plaintiffs is speculative in nature and unlikely due to the lack of cultural and natural resources in the six critical project areas and the extensive mitigation measures undertaken as part of the transformation process.

   **A.   THE ARMY AND THE PUBLIC INTEREST WILL BE IRREPARABLY
         HARMED BY THE ISSUANCE OF A BLANKET INJUNCTION ON
         ALL STRYKER-RELATED PROJECTS AND TRAINING**

   The Army has carefully crafted a solution that permits equipment fielding, training, and a limited number of Stryker-related construction projects to proceed while incorporating the protective measures outlined in the administrative record and accompanying declarations that will reduce any likelihood of harm to cultural and natural resources to a negligible level. As discussed below, unlike the potential for irreparable harm to cultural and natural resources, which is remote, the likelihood of severe harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security is high and, thus, the balance of harms tips decidedly in favor of the Army and the issuance of an interim injunction that permits transformation of

14

the 2nd Brigade to a SBCT.

>    **1.    *The irreparable harm that will be suffered
>    by the Army and its soldiers from an injunction
>    that prohibits the transformation of the
>    2nd Brigade is demonstrative and severe***

There are currently four operational SBCTs. When the 2d Brigade is finished with its transformation, it will be the fifth. At the time the Army announced its plans to begin transforming into a future force, its object was to create a "more responsive deployable, agile, versatile, lethal, survivable, and sustainable" Army. ARP[3] 9656. Combat evidence demonstrates that the Army has done just that with the operational SBCTs.

The primary component of an SBCT is the Stryker vehicle. As Colonel (COL) Robert B. Brown, who commanded the 1st Brigade, 25th Infantry Division, Stryker Brigade Combat Team in Iraq, explains: "Having spent a year in combat fighting from a Stryker vehicle, I can emphatically state that it is my vehicle of choice for combat operations in today's environment." Brown Dec. at ¶5. In short, the Stryker vehicle saves soldiers' lives. As Brigade Commander, COL

_____

[3] In this memorandum, Federal Defendants refer to documents from the Programmatic Environmental Impact Statement in the Administrative Record as "ARP" and document from the Site-Specific Environmental Impact Statement as "ARS" followed by the pertinent bates number for the referenced document. The administrative record documents cited herein are attached to the Declaration of Thomas Helper, which has been filed simultaneously with this memorandum.

Brown obtained personal knowledge of the survival capabilities provided by the Stryker vehicle in the form of approximately 137 Rocket Propelled Grenades (RPGs) and approximately 50 Suicide Vehicle Born Improvised Explosive Devices striking direct hits to Stryker vehicles under his command.  Id.  None of the RPGs penetrated a Stryker vehicle due to its protection and speed.  Id.  The brigade nevertheless ultimately lost 33 of its soldiers in combat.  According to COL Brown, the Stryker vehicle was "essential to saving lives" and "the losses would have been significantly higher if we had not been able to fight configured as a [SBCT] or use the Stryker vehicle during our training and deployment." Id.

Colonel Brown is not alone in that assessment. Given its performance in Iraq, the Army recognizes the importance of the SBCTs and the Stryker vehicle to its mission. General George Casey, the military commander of the Multi-National Force Iraq, requires SBCTs and employs them in vital missions, recently assigning an SBCT to "the priority mission to increase security in Baghdad and reduce the level of sectarian violence and terror attack." Lovelace Dec. at ¶9. In addition, General Casey "continues to submit formal requests for forces to include [SBCTs] to Joint Forces Command as part of the ongoing and continuous requirements in his theater of operations" and he "will not accept a light infantry brigade as a substitute for the

16

SBCT requirement in Iraq." Id.  The SBCTs are vital, as "[n]o other unit provides the same capabilities urgently needed in Iraq."  Id. Congress also recognizes the SBCTs vital importance, as it has directed the Army to submit plans to field a seventh SBCT and appropriated additional funds for that purpose.

To provide the commanders in the field with another SBCT as soon as possible, the Army has scheduled the 2d Brigade to complete transformation into the fifth SBCT by November 2007 and then be available to deploy. Id. at ¶7. The training involved in creating a SBCT is an intensive process that takes approximately two years. SBCTs "are configured to fight differently than previous brigades . . . [which] requires more extensive training and preparation in the initial stages of the fielding." Brown Dec. at ¶3. To become the agile and adaptive soldier that SBCTs demand requires "extensive training in a variety of areas, such as leadership, adaptability, creative thinking, the use of digital information and advanced marksmanship techniques." Id.

The 2d Brigade is currently in month 12 of that almost two-year long process, and because it "no longer exists as a light infantry brigade" there is no turning back the clock. Bradenburg Dec. at ¶4; Banach Dec. at ¶6-7. Its weapons, vehicles, and communications are those required for a SBCT, and its soldiers have skills tailored to

17

those required for a SBCT. Id. at ¶8. Thousands of pieces of new Stryker Brigade equipment have been issued and hundreds of pieces of old equipment have been turned in. Brown III Dec. at ¶5; Banach Dec. at ¶6. But the 2d Brigade cannot perform its vital function as an SBCT if it cannot complete its training and new equipment fielding as such. An SBCT is "enormously complex" and "unlike any other organization we have had in the history of our Army." Banach Dec. at ¶10. That creates "a significant learning curve" before soldiers can become combat ready. Id. Any delay makes the curve that much steeper, and will ultimately result in a "combat ineffective unit." Banach Dec. at ¶1.

Delaying the training and new equipment fielding involved in transforming the 2d Brigade into a SBCT will therefore ultimately deny the commanders in the field adequate combat and deterrent forces by interrupting tightly integrated transformation and deployment schedules. For example, Major General Dana T. Atkins, the Director of Operations, United States Pacific Command, states that disrupting the transformation of the 2d Brigade "would immediately and unacceptably undermine the ability . . . to deter conflict and respond to crisis situations throughout the Asia-Pacific region." Atkins Dec. at ¶1. It will affect not only the Army's combat and deterrent missions, but also its humanitarian mission in responding to the "frequent and

severe natural disasters, including super-typhoons, earthquakes, tsunamis, volcanic eruptions, and mudslides" in the Pacific Command's Area of Responsibility. Id. at ¶4. In addition, the 2d Brigade is "the only active brigade combat team assigned . . . in the Pacific that is not deployed to the Middle East. As such, it provides company and platoon sized contingency ready forces for PACOM responses to homeland security threats and provides units to participate in Theater Security Cooperation training and exercises with allied and neighboring armies." Brown III Dec. at ¶4. No other Pacific Command "force provides the firepower, mobility, situational awareness, and information processing capabilities resident in a [SBCT]." Atkins Dec. at ¶6.

It is therefore critical that the 2d Brigade transform as planned to meet Pacific Command "mission requirements and response timeliness and to enhance the strategic flexibility of the United States within the theater." Id. Disrupting training at this point would "cause immense harm to the US Army Pacific's capability to execute our mission to provide combat ready forces to the United States Pacific Command" and "add extreme difficulty to the brigade's already complex task of achieving combat readiness." Brown III Dec. at ¶8. Delaying the transformation of 2nd Brigade now, 12 months into transformation, will have an even greater domino effect than when

19

this Court heard Plaintiffs' first motion for an injunction pending appeal, weakening the Army's strategic posture to deter threats in the Pacific Region, breaking a transformation sequence that was carefully synchronized with projected requirements for combat operations in Iraq and Afghanistan, and disrupting the reallocation of resources to other units that are undergoing transformation. Brown III at ¶1,6.

In addition to disrupting the Army's overall ability to respond to threats around the world by throwing off a tightly integrated transformation and deployment schedule, any delay in training will also have a profound and direct impact on the soldiers of the 2d Brigade when they are deployed: *less training equals more casualties upon deployment.* Banach Dec. at ¶2. COL Stefan Banach, Commander of the 2d Brigade, understands the need for continuity in training plans. He led a U.S. Army Ranger combat parachute assault into Afghanistan on October 19, 2001, "as the spearhead for the Global War on Terrorism." Id. Those Rangers "were the best trained and most well led Soldiers in our Army" and "were fully resourced and . . . had full continuity in all aspects of our combat preparedness," yet this country "still lost five great Rangers and over thirty more Rangers were severely wounded." Id. In Colonel Banach's informed opinion, "any disruption of our current training plan will get many

more of our Soldiers killed and wounded in combat than if we were able to maintain continuity in our current training and transformation plan to a fully combat ready [SBCT]."  Id.; Bradenburg Dec. at ¶3. In other words, interrupting the training of the 2d Brigade as an SBCT "will have second and third order effects that will be measured in the blood of our Soldiers."[4] Id.

When weighed against the speculative environmental harms Plaintiffs have alleged, the disruption to the Army's mission and the harm to its soldiers and their families that an injunction would cause weigh heavily in favor of granting interim injunctive relief that would permit the Army to transform the 2nd Brigade into a SBCT.

> **2. The Army has identified six specific projects in addition to training that are needed to prepare the 2d Brigade for combat deployment as a SBCT and are highly unlikely to cause environmental or cultural harm.**

Ronald L. Borne, the Director of Transformation for the 2d Brigade, has set forth the essential requirements that the Army must have to successfully complete the 2d Brigade's training as an SBCT before November 2007. Borne Dec. at ¶¶4-6.  To enjoin those activities will severely harm the Army. Thus, the Army submits that any interim injunction should permit the following activities, which

---

[4]Small detachments of 2d Brigade soldiers are already in combat in the Philippines and Iraq. Banach ¶ 9.

are critical to ensuring that the 2nd Brigade is properly transformed into a SBCT and prepared for deployment and combat in hostile environments:

• New Equipment Fielding and New Equipment Training

• Soldier and Unit Level Training

• Construction and use of the five critical projects out of the 28 studied in the EIS, and modification to an existing training range. These projects represent a fraction of the overall Stryker-related construction. They are:

1. QTR1 at Schofield Barracks
2. SBCT Motor Pool at Schofield Barracks
3. Urban Assault Course at Schofield Barracks
4. Tactical Vehicle Wash Facility at Schofield Barracks East Range (an environmental protection measure)
5. Multiple Deployment Facility at Wheeler Army Airfield, Hawaii
6. Minor modification to existing range 11T

All of the Army's 28 construction projects in association with the transformation are important[5], but these six are absolutely

---

[5] Plaintiffs have suggested that the delay in constructing the Schofield BAX demonstrates that none of the Stryker-related projects should be considered critical because this was one of the 28 projects that Army previously claimed were necessary to transform. This criticism is misplaced. The Army maintains that all 28 projects are needed to establish facilities to transform, maintain and sustain a Stryker brigade in the long term, but for the limited duration of an interim injunction, the Army has identified the six most critical projects that will permit the 2nd Brigade to transform in a timely manner and be ready for deployment by November 2007. Borne Dec. at ¶8. The fact that the Schofield BAX was delayed does not undermine the credibility of the Army's assessment of what is needed for timely transformation of the 2nd Brigade. As Ronald Borne explained in

critical to ensuring that the 2nd Brigade is transformed into a SBCT and ready for deployment in November 2007. Borne Dec. at ¶6; Banach Dec. at ¶¶6,8; Brandenburg Dec. at ¶¶ 7, 10-12.[6]  Of these critical projects, two projects - QTR1 and Tactical Vehicle Wash Facility - are already completed. Borne Dec. at ¶6  The three remaining projects are being built over existing facilities and are close to 50% complete, thereby minimizing any environmental impact.  Borne Dec. at ¶6. The final project is a minor modification to an existing range 11T, which involves re-grading roads, improving berms, and moving certain targets, all with no adverse environmental impacts.  Id. at ¶4.   The Army has identified six critical projects that will have minimal impact to the environment, but must proceed in order to transform the 2nd Brigade to a SBCT.  Without these projects and training, the harm to the Army, its soldiers, and its effectiveness on the battlefield is inevitable.

The reasons these projects were deemed critical to the

_____

his declaration, the project was delayed due to the unexpected discovery of a significant amount of unexploded ordnance (UXO) that took much longer than expected to clear, thus causing a delay in construction.  Id.  The Army should not be faulted for ensuring the safety of its soldiers, construction staff, and the general public.

[6]The reasons why these specific projects and Stryker-related training are critical to the transformation of the 2nd Brigade is discussed in detail in the declarations of Ronald Borne, Colonel Banach, and Major General William H. Brandenburg.

transformation of the 2nd Brigade are described in detail in Declaration of Ronald L. Borne.  Mr. Borne explains the critical nature of ensuring that QTR1 at Schofield Barracks is available for training. Borne Dec. at ¶6(b)(I).  This is a multi-purpose small arms and machine gun range that was built over the former site of other ranges and is designed to accommodate all individual and crew-served pistol, rifle, and machine gun qualification requirements.  Id.  This project is now complete and the weapons being used are not unique to a Stryker vehicle and will be in use regardless of the scope of any injunction issued in this case. Id. Furthermore, all ammunition used on this range is for training purposes and is not explosive in nature, thereby minimizing any alleged harm.  Id.  The QTR1 range is a critical facility for training the 2nd Brigade because without it, there is no range in Hawaii for a Stryker unit to become proficient with the weapons and communication systems associated with the Stryker vehicle.  Id.

The second critical project for the transformation of the 2nd Brigade is the SBCT Motor Pool at Schofield Barracks.  Borne Dec. at ¶6(b)(ii).  The SBCT Motor Pool is designed to provide a facility to park, store, and perform the requisite maintenance and repair on the more than 1,000 Stryker vehicles, trailers and wheel mounted systems that are assigned to a SBCT.  Id.  Without this facility, there is no

place on Oahu to store, maintain, and repair these vehicles and they would be left in fields, parking lots, and other open space areas. Id. This would create significant security issues and also increase the risk of environmental harm due to maintenance and fueling mishaps. Id.

The third critical project for the transformation of the 2nd Brigade is the Urban Assault Course ("UAC") at Schofield Barracks, which is more than 50% constructed. Id. at ¶6(b)(iii). The UAC is designed to provide a facility capable of training a SBCT unit on urban terrain combat, which is needed in hostile environments such as Baghdad, Iraq. Id. The UAC is a multi-purpose small arms and machine gun range designed to accommodate all urban area fire training requirements. Id. This training facility will be used by a SBCT in a similar manner to all other units in Hawaii, and will be limited to dismounted individual or small unit live fire training. Id. The UAC project is critical because without it, SBCT training units will not be able to satisfy current urban operation doctrine and training standards and, thus, will not be properly trained to engage the enemy in an urban environment such as exists in Iraq and Afghanistan. Id. This inability to complete urban warfare training will likely translate into higher casualties for the 2nd Brigade. Id.

25

The fourth critical project for transformation of the 2nd Brigade is the Tactical Vehicle Wash Facility at the Schofield Barracks East Range.  Borne Dec. at ¶6(b)(iv).  This facility was built to provide a facility for the 2nd Brigade and other units to remove soil, debris and alien seeds from vehicles, trailers and wheel mounted systems that are used in the East Range and the vicinity of Schofield Barracks.  Id.  This project is an environmental protective measure that permits the Army to prevent the spread of alien invasive species of weeds and other biological pests between the unique ecosystems constituting the Army training areas, as required by a U.S. Fish and Wildlife Biological Opinion.  Id.  The Tactical Vehicle Wash Facility was built over a former warehouse site and serves a significant and important role in ensuring invasive species, seeds, and pests are not transported throughout the facility.  Id.  This facility is now complete and in use by the 2nd Brigade and other military units in Hawaii to protect the environment. Id.  This facility is critical to enable the 2nd Brigade to conduct vehicle operations necessary to transform while minimizing any harm to the environment.  Id.

The final critical project for the transformation of the 2nd Brigade is the Multiple Deployment Facility ("MDF") at Wheeler Army

26

Airfield in Hawaii.  Borne Dec. at 6(b)(v).  This facility is
currently under construction and is being built over the Army's
former deployment  holding site, which cannot accommodate a SBCT.
The MDF is designed to allow units to pack, weigh, balance, and
inspect vehicles prior to transport by air or to a seaport for
debarkation.  Id.  Accurate weighing and center-of-gravity
determinations are crucial for safely loading aircraft and boats and
ensuring safety during transit.  Id.  Furthermore, the 2nd Brigade
once transformed to a SBCT must have the capacity to deploy within 96
hours notice and must have the flexibility to  deploy under various
load specifications.  Id.  This facility is critical to achieving
such a deployment capability.  Id.

    In addition to these five construction projects, receiving and
training on the new equipment associated with Stryker vehicles,
including the new communications systems and new or upgraded weapons
systems, is essential to ensuring that these soldiers are properly
prepared to operate as a SBCT.  Borne Dec. at ¶¶4, 5.  This training
will occur on existing roads, trails and ranges on Schofield Barracks
or Pohakuloa Training Area ("PTA").  Id.  The weaponry associated with
the Stryker vehicle is similar to the weapons that have been used or
are currently in use at training facilities in Hawaii, and only non-

27

explosive ammunition will be used during training.  Id.; see Borne Dec. at ¶¶4-5 for a more detailed description of the Stryker-related training that is needed to transform the 2nd Brigade to a SBCT.[7] Therefore, the Stryker-related training is not likely to cause any additional impacts to cultural or natural resources.  The Stryker-related training is consistent with military training that will occur on similar weapons systems even if an injunction is issued.

The Army considers all Stryker-related projects to be important and necessary to complete the transformation process, but it has identified six of these projects that are absolutely critical to ensuring that the 2nd Brigade can transform into a SBCT and properly trained on the new communications and weapons systems before this unit deploys in November 2007.  This transformation is critical to this Nation's security interests and, as discussed below, it will be

---

[7] The 2nd Brigade also will be using a Mobile Gun System, which employs a 105 millimeter (mm) gun. During training exercises, non-explosive training ammunition will be used.  Borne Dec. at ¶4.  The range upon which this training will occur, Range 11T, is currently a helicopter gunnery, machine gun, and anti-tank missile range.  Id.  In the past, this range was used by Model M60 tanks that were equipped with the same type of weapon systems as the Mobile Gun Systems, a 105 mm gun. Minor modifications that will not impact the environment, including improving roads and berms, and installing new targets will be made to accommodate this training.  Borne Dec. at ¶4.  This training is critical to ensuring our soldiers are properly trained on the weapons systems they will use as a SBCT. Furthermore, any alleged damage from use of the MGS will be minimal because the Army will not be using explosive ammunition. Id.

28

done in a manner that is protective of the environment and will not result in an appreciable risk of harm to cultural or natural resources.  As such, it is requested that the Court narrowly tailor an interim injunction to permit these critical projects to proceed along with the Stryker-related training discussed above.[8]

> **3.    *There are no viable alternatives to finishing the training of the 2d Brigade as a SBCT at a location outside Hawaii and maintaining this unit as a light infantry brigade is improvident.***

Plaintiffs have suggested an alternative to transforming the 2nd Brigade in Hawaii that would involve transporting the entire unit to another location either in the contiguous United States or Alaska. In the alternative, Plaintiffs have suggested that the 2nd Brigade simply continue to train and operate as a light infantry brigade. Either suggestion is not a viable alternative, and would result in significant harm to the Army and the public interest.

First, there is no feasible alternative for the 2d Brigade to finish its training as an SBCT outside Hawaii while staying on

_____

[8]The Army can complete these critical construction projects and train the 2d Brigade for combat deployment while still maintaining the ability to take an objective look at whether to ultimately station the 2d Brigade in Hawaii, in compliance with NEPA and this Court's order. As Borne states in his declaration, these projects can be and are used by other Army units on Hawaii, Borne Dec. at ¶¶1,7, and thus their existence does not preclude the Army from restationing the 2d Brigade. See, infra, discussion under Point Heading IV(A)(4).

29

schedule to meet mission requirements. There is simply "no brigade-size excess capacity for Army housing, training areas and installation facilities available in the United States." Lovelace Dec. at ¶12; Brandenburg Dec. at ¶15. SBCT 3 will return to Alaska before the 2nd Brigade could complete its training; facilities in Alaska cannot accommodate that overlap. Lovelace Dec. at ¶10. There would be similar overlap with the impending activation of SBCT 7 at Fort Lewis in Washington. Id. Training at another location would also require transporting all personnel, equipment, and vehicles to that installation by air, which would require 80% of the Air Force's transport capacity and would consume 40 out of 270 available training days. AR 51334-36. Given the extensive transportation delays, and the years in advance in which the Army plans these actions, the 2d Brigade would not be able to meet its November 2007 availability date if training was to be completed outside Hawaii. Lovelace Dec. at ¶13.

In addition to the logistical problems of moving the 2d Brigade to complete its training, moving the 2d Brigade out of Hawaii would also "reduce the Army's posture to deter conflict and meet treaty obligations in the Pacific region including the Republic of Korea." Lovelace Dec. at ¶8. By remaining in Hawaii, the 2d Brigade is "strategically positioned to deploy to the four critical areas

identified in the National Defense Strategy: Northeast Asia, the East Asian littoral, Southwest Asia, and the Middle East." Id.  Thus, Admiral William J. Fallon, the combatant commander of the United States Pacific Command, "requires 2d Brigade to transform in Hawaii on time to meet mission requirements assigned by the Secretary of Defense." Id.

Finally, if soldiers were trained in Alaska or at Fort Lewis, their families would have to be left behind in Hawaii, because housing in Alaska and Fort Lewis is already occupied.  "This would require the soldiers and families of the 2nd Brigade, who have already endured a year-long deployment in Iraq . . . to endure additional months of separation during transformation" that would immediately be followed by another year-long deployment in Iraq. Lovelace Dec. at ¶12. It is not just a matter of convenience for those families, or for the Army.  Unexpected separation preceding a year-long deployment "adversely affect command authority, good order and discipline by creating morale and family problems that will undermine individual soldier's mental discipline and erode unit effectiveness." Id.; Brown III Dec. at ¶6. Separation creates distraction, and "distracted soldiers imperil themselves and others." Lovelace Dec. at ¶10.

31

In past motions, Plaintiffs have suggested that the 2nd Brigade would be as effective as a SBCT if it continued to operate as a light infantry brigade. The Army, however, has the expertise to determine what is in the nation's best interest as far as national defense is concerned, and it has determined that training as a light infantry brigade is both impractical and unwise. The 2d Brigade simply is not a light infantry brigade anymore and the Army does not operate light infantry units.  Brandenburg Dec. at ¶4; Banach Dec. at ¶6. "It has different and improved capabilities that are now part of a fully integrated set of state of the art systems that provides our Nation with a new and overwhelming combat capability." Banach Dec. at ¶7. The new weapons systems and technology require each unit to transform and be trained on more advanced equipment and technology that is designed to provide a more effective and safer combat unit.  As detailed in Colonel Banach's declaration not only would it be impossible to go back to being a light infantry brigade, "to do so at this point would be illogical given the existing enhanced weapons accuracy, communications capability and protection for our soldiers that we can achieve now with our Strykers." Id.

It is also vital to train the 2d Brigade as an SBCT because "if events in the world require 2d Brigade to deploy tomorrow, or

whenever, it will do so with all available Strykers." Id.  The soldiers must train on the equipment they will take into battle. And they must do so "everyday in order to fight effectively when . . . deployed to combat."  Id.  The bottom line is this: "There is no going back to legacy procedures and or previous less capable unit designs." Id.  The 2d Brigade no longer exists as a light infantry brigade, the equipment has changed, the training has changed, and the new system provides the Army with more effective capabilities while also providing for greater protection of our soldiers.

It is clear that 2nd Brigade's transformation is critical to national security, and should not be enjoined.  The brigade needs its equipment and specific facilities to ensure that it can properly transform to a SBCT.  National security and foreign policy considerations such as those implicated here are sufficient to find that any injunction should allow transformation of the 2nd Brigade, even in the face of a NEPA violation.  See Committee for Nuclear Responsibility Inc. et al., v. Seaborg, 463 F.2d 796, 798 (D.C. Cir 1971).

In contrast to Plaintiffs' impractical proposals, the Army has carefully crafted a solution that permits the Army to proceed with equipment fielding, training and a limited number of construction

projects that will not cause a significant risk of harm to natural or cultural resources.  Two of these projects are already completed and the remaining three projects, other than the minor modification of Range 11T, are close to 50 percent complete.  As for the Stryker-related training, the Army has already completed close to 70 percent of the requisite training to transform the 2nd Brigade to a SBCT. Rather than transport the 2nd Brigade to another location outside Hawaii as Plaintiffs have suggested, the only viable alternative to ensure that the 2nd Brigade is transformed and available for deployment in November 2007 is to permit the transformation of this unit in Hawaii under the limited conditions set forth above.

**4.    The Army should be permitted to proceed with the critical SBCT projects because each has independent utility and their completion will not restrict the Army's ability to analyze reasonable alternatives in a SEIS.**

Not only would a broad interim injunction be inequitable, for the reasons discussed above, it would also be unnecessary to preserve a meaningful NEPA process.  Federal Defendants anticipate that Plaintiffs may argue that the completion of the five critical projects and modification of Range 11T at PTA would undermine the Army's ability to meaningfully analyze reasonable alternatives in a supplemental NEPA analysis.  To the extent Plaintiffs make this

34

argument, it is without merit.

Courts have held that action on a project may proceed, notwithstanding a NEPA violation, where such action would neither "have an adverse environmental impact" nor "limit the choice of reasonable alternatives" within the meaning of 40 C.F.R. § 1506.1(a). For example, in <u>North Carolina v. City of Virginia Beach</u>, 951 F.2d 596, 598 (4th Cir. 1991), the Fourth Circuit reversed a district court's refusal to modify its injunction which prohibited the City of Virginia Beach from undertaking steps to build an 85-mile pipeline from Lake Gaston to satisfy the City' s potable water needs.  The project required a FERC permit, and FERC had neither issued its permit nor conducted its NEPA review.  <u>Id</u>. at 600.  In reversing, the court of appeals recognized that action on a project should not go forward pending NEPA compliance to the extent doing so would so influence the agency s ultimate decision on the project as to effectively limit the choice of reasonable alternatives available to the federal decisionmakers in the NEPA process.  <u>Id</u>. at 601-02.  The court ruled, however, that the injunction should have been narrowly tailored to allow the limited construction that the City wanted to do because such work would not "unduly influence" FERC's consideration of alternatives.  <u>Id</u>. at 602; <u>see also</u> <u>South Carolina Dept. of</u>

Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 99-101 (4th Cir.
1989) (holding that action need not be enjoined pending NEPA
compliance notwithstanding the plaintiff's contention that allowing
the action to proceed would prejudice the federal agency's
consideration of alternatives in the NEPA process).  The court's
conclusion is consistent with the Council on Environmental Quality's
("CEQ") regulations which provide that until an agency completes the
NEPA process and issues a ROD, it is only prohibited from taking
action concerning a proposal that would have an adverse environmental
impact or limit the choice of reasonable alternatives.  40 C.F.R. §
1506.1(a).

     In this case, work on these critical projects and training will
not impact whether the Army decides where and how to complete the
transformation process.  Borne Dec. at ¶7.  While these projects are
vital to the 2nd Brigade's training and transformation, none are
unique to the Stryker transformation process and can be used by other
military units in Hawaii even if transformation is enjoined.  Id. at
¶¶6,7.  As explained by Ronald Borne, Director of Transformation for
the U.S. Army Garrison Hawaii, "[t]hese projects will also be used by
other military units stationed in Hawaii. Because these projects can,
and will, support activities unrelated to Stryker transformation,

their completion and/or use will not affect the ultimate decision on where 2/25 will be permanently stationed." Id. at ¶1. For example, construction on QTR1, a multi-purpose, small arms and machine gun range, and the Tactical Vehicle Wash Facility, a facility used to minimize the spread of invasive plant species and biological pests, has been completed and these facilities are in use by other Army units in Hawaii. Id. at ¶6. Thus, as Ronald Borne states in his declaration, the critical projects have independent utility and their existence does not preclude the Army from taking an objective look at whether to ultimately station the 2d Brigade in Hawaii, after compliance with NEPA under the Ninth Circuit's order. Id. at ¶¶1,6-8. Under such a scenario, and in accordance with the case law cited above, the Court should permit the Army to proceed with the limited number of projects that are needed to transform the 2nd Brigade.

The same result is reached with respect to the other prong of the CEQ regulation, which prohibits a federal agency from taking action that would have an adverse environmental impact pending NEPA compliance. See 40 C.F.R. § 1506.1(a)(1). In South Carolina Dept. of Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 100-01 (4th Cir. 1989), the district court granted plaintiffs motion for a preliminary injunction to prevent the Army Corps of Engineers from installing

pumped storage facilities prior to completion of an environmental
impact statement that adequately considered the environmental impacts
of operating the pumps.  The Fourth Circuit recognized that
injunctive relief must be "tailored to restrain no more than what is
reasonably required to accomplish its ends and no "broader than
necessary to protect against the environmental risk." Id. at 100
(internal quotation marks and citations omitted).  Noting that "[t]he
Corps ha[d] already spent a majority of the funds allocated for the
project, and [that] Plaintiffs conceded at oral argument that
installation alone of the already purchased pumped storage generators
will cause no environmental damage," the Court of Appeals concluded
that "restraining the installation of the generators is not
reasonably required to protect the environment" and "vacate[d] that
part of the injunction which prohibits the Corps from installing the
pumped storage generators at the Dam." Id. at 100.

As more fully set forth in section IV.A.2, above, and section
IV.B, below, the critical projects and training the Army seeks to
complete pending further proceedings on a permanent injunction
present negligible risk of significant harm to cultural or
environmental resources.  Accordingly, it is not necessary to enjoin
these activities to promote NEPA's purposes.

38

In the end, there is no danger of these limited construction projects and the related Stryker training rendering the NEPA compliance "an empty exercise," as Plaintiffs fear or, in the parlance of NEPA, "limit[ing] the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(2). These projects are complete or close to completion, they have independent utility, and their future use is not conditioned on completion of the transformation process. Inasmuch as their use does not preclude the Army from giving meaningful consideration to other reasonable alternatives in an SEIS, these critical projects and related training should be allowed to proceed. See National Audubon Society, 422 F.3d at 201 ("[A] NEPA injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.' Violation of NEPA is not always cause to enjoin all agency activity while the agency completes the required environmental analysis.") (citation omitted).

**B. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF THE COURT ISSUES A LIMITED INJUNCTION PERMITTING TRANSFORMATION OF THE 2ND BRIGADE**

As this Court previously recognized in denying Plaintiffs' prior requests for injunctive relief, Plaintiffs' claims are speculative in nature and the Army has gone to great lengths to ensure that impacts to cultural sites and natural resources are either eliminated or

mitigated.  See Court's Order dated November 5, 2004 at 15-16.
Today, Plaintiffs' assertions of harm fare worse than they did two
years ago.

The administrative record demonstrates that the Army took the
requisite hard look at the environmental impacts associated with the
transformation process in its programmatic and site-specific EISs.
See ARP 009656-666; ARS 0010308-329; 0024083-86; 0024260-73; 0024294-
98; 0024616-24; 0051514-522; 0051523-529; 0051703-736; 0051737-759;
0052224-666; and 0052267-298.  The Army specifically analyzed the
potential impacts associated with transformation and concluded, as
did the Fish and Wildlife Service in its Biological Opinion, that the
significant measures undertaken ensure that any risk to cultural and
natural resources is minimized.  See ARS 0024083-86; 0024260-73;
0024294-98; 0024616-24.

Plaintiffs in this action have never questioned the Army's NEPA
analysis on potential impacts nor have they claimed that this
analysis violates NEPA.  In fact, neither the district court nor the
Ninth Circuit identified any defects in the Army's impacts analysis.
The analysis contained in the Army's NEPA documents on impacts to
cultural and natural resources has not been invalidated and fully
complies with the statutory requirements under NEPA.

40

Plaintiffs cannot demonstrate that they are likely to suffer irreparable harm from the limited activities the Army here seeks leave to pursue. First, there are no endangered or threatened species in the critical project areas. <u>See</u> Mansker Dec. at ¶4. Second, the Army has undertaken significant measures to protect cultural resources and, to date, these measures have proven to be effective in protecting cultural resources during the transformation process. <u>See</u> Lucking Dec. at ¶¶2-11, Attachment 1 to Lucking Dec. at ¶¶7, 12-19. With respect to cultural resources, there are none in four of the five project areas and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1. Lucking Dec. at ¶¶4-10. As for the modification to Range 11T, this project has not begun and the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences. <u>Id</u>. In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade. Finally, Plaintiffs have raised concerns about the cultural site identified as Mauna'una, but, as Dr. Lucking explains, this site is located on a bluff and not within 200 yards of any of the critical

41

project areas. Lucking Dec. at ¶8.

Since Plaintiffs cannot demonstrate that cultural sites or natural resources are likely to be irreparably harmed by the completion of the six designated projects and Stryker-related training, the Court should fashion an injunction that permits these projects and training to continue in order to ensure that the 2nd Brigade is properly transformed and ready for deployment by November 2007.

### 1. *Plaintiffs cannot demonstrate irreparable harm to cultural resources*

Plaintiffs have argued that the transformation of the 2nd Brigade will cause irreparable injury to unknown cultural resources. But, as this Court has previously recognized, Plaintiffs' claims of irreparable harm are too speculative and overlook the Army's knowledge of cultural resources in construction areas and the extensive steps it has taken to avoid and mitigate impacts to cultural areas. Lucking Dec. at ¶¶ 2-10, Attachment 1 to Lucking Dec. at ¶¶2, 7-16, 19; see also Court's Order dated November 5, 2004 at 15-16.

Dr. Laurie Lucking, the Army Cultural Resources Manager, explains in her declaration that the Army acknowledged in the SEIS that transforming the 2nd Brigade might have significant impacts on

42

cultural resources because it realized that destroying even one cultural site would be significant to Native Hawaiians. Attachment 1 to Lucking Dec. at ¶4. In addition, Areas of Traditional Importance, which may not be protected under the National Historic Preservation Act, may be impacted. Id. at ¶4. When it published the SEIS, project designs had not progressed far enough to determine cultural impacts with certainty, and the Army cannot guarantee that no cultural sites will be impacted. However, the Army's goal is to prevent impacts, and its efforts to date have proven successful. Id. at ¶¶13,14.

Dr. Lucking explains in detail the Army's ongoing surveying and monitoring of project sites.[9] Most of the areas surveyed to date have revealed no cultural sites. Id. at ¶11. In the few instances when the Army has discovered cultural sites, it has altered the projects to avoid those sites entirely. Id. at ¶¶13, 14. To date, there is no indication that unexploded ordnance clearance or pre-construction environmental and geotechnical testing have damaged any cultural resources. Id. at ¶¶11,16. Archeological and cultural

---

[9]Many of the measures Dr. Lucking describes are included in the Programmatic Agreement the Army entered into with the Advisory Council on Historic Preservation, the Hawaii State Preservation Office, and the Office of Hawaiian Affairs to meet its obligations under the National Historic Preservation Act. Lucking Decl. ¶3.

43

monitoring will continue throughout the construction process to ensure that any cultural resources that may be discovered are properly protected.  Id. at ¶7.

Plaintiffs' selective criticism of the Army's mitigation measures in past briefing has failed to acknowledge the full scope of those efforts. Before the Army ever gets to the point of "data recovery" or "reburial," it will survey construction areas, flag eligible archaeological sites for avoidance, and design projects to avoid impacting those sites wherever possible.  ARS 52067; Attachment 1 to Lucking Dec. at ¶¶10,13,14.  Plaintiffs have argued that data recovery alone is insufficient to protect cultural resources. However, data recovery is not the only method of mitigation, as Plaintiffs would lead the Court to believe; in fact, it is the last line of defense. Id. Following Plaintiffs' logic, no earth-moving would be permitted in Hawaii since any such activity could lead to accidental discovery of archaeological sites, human remains, or cultural items. See also Judge Bea's dissent in Ninth Circuit's October 27, 2006 Order.  The Army is making every effort as it goes forward to avoid harming cultural resources by consulting with Native Hawaiian organizations, families and individuals, surveying project areas, amending project designs to avoid cultural sites, using lineal

44

descendants from project areas as cultural monitors to identify and
suggest protection for sites, and using archaeologists and cultural
monitors to oversee all earthmoving activities.  Id. at ¶¶2,5-11,13-
14.

In the past, Plaintiffs have misstated the record when they've
suggested that construction of several projects will occur in
"archaeological sensitivity areas."  The SEIS identifies all
archaeological sites at each sub-installation of which the Army was
then aware.  See, e.g., ARS 52056-65.  However, the SEIS explains
that individual project areas within those sub-installations "will be
designed to avoid all eligible and unevaluated archaeological sites,
to the full extent practicable."  ARS 52067. The Army has
consistently redesigned projects to avoid cultural sites, Attachment
1 to Lucking Dec. at ¶¶ 2,10,13,14, and will continue to do so.

The Army developed a Cultural Monitoring Program, which enlists
the assistance of persons who are knowledgeable about Native Hawaiian
activities, to insure maximum protection for cultural sites and
artifacts.  Id. at ¶7.  Currently, the Program includes 30 cultural
monitors, all of whom are Native Hawaiians, who are permitted to go
anywhere in the project area that is accessible to contractors and
archaeologists.  Id.  Information reported by the monitors is given

to the archaeologists and the Army, as well as to interested members of the community for additional comment. Id. at ¶8. Dr. Lucking describes the other efforts the Army has undertaken, successfully, to avoid disturbing cultural resources in the project areas. Plaintiffs have complained that cultural monitors have been prevented from exercising meaningful oversight, but any restrictions have been safety related. Id. at ¶15. Moreover, these complaints do not involve projects that are among the six critical projects that the Army wishes to continue during the interim injunction. For example, due to the large amounts of unexploded ordnance at the Schofield BAX (not one of the six critical projects), the monitors initially were required to remain 200 feet away from all intrusive activities. Id. That was increased to 650 feet when chemical weapons were discovered on site. Id. Once earth disturbing activities were completed, however, the monitors were allowed down-range to examine those areas. Id. These restrictions, which were only in place at the Schofield Barracks BAX, were lifted several months ago after consultation with the cultural monitors, who, as a result, became part of the Schofield BAX UXO clearance team.

Any claim that construction will lead inevitably to the disinterment and destruction of Native Hawaiian burials is likewise

speculative and ignores the mitigation measures the Army has employed to ensure that such harm will not occur.  Attachment 1 to Lucking Dec. at ¶¶10,19.  The Army has taken every precaution to avoid effects on Native Hawaiian burials, including extensive surveying and, as noted above, hiring cultural monitors who are lineal descendants of people native to the various project areas and who are also knowledgeable about burial areas.  Id. at ¶¶7, 15,19.  When the Army identified possible burial sites at the South Range Acquisition Area, it marked the area "off-limits," and will do the same if it identifies other burial sites in the future.  Id. at ¶19.  The success of these measures is reflected in the identification and protection of possible burial sites at the South Range Acquisition Area (not one of the six critical projects) in July 2003.  Id. If additional burial areas are identified, similar precautions will be undertaken to protect them.  Id.  Thus, other than mere speculation, Plaintiffs cannot demonstrate that harm to Native Hawaiian burials is inevitable and irreparable.

With respect to the six critical projects, the extensive mitigation measures outlined above have worked with the two completed projects and are working effectively with the three projects that are currently under construction.  Lucking Dec. at 4-10; Attachment 1 to

47

Lucking Dec. at ¶7.  In fact, the Army's mitigation measures have
revealed that there have been no cultural resources and historic
properties identified in four of the five critical project areas, and
mitigation measures have proven successful in identifying and
protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.  For
example, in QTR1, which is an existing military range that is in use
by non-Stryker units, a cultural site was identified and mitigation
measures were undertaken to protect this site.  Id. at 9.  To date,
this site has not been harmed.  Id.  As for the minor modification to
Range 11T, this project has not begun, but the mitigation measures,
including cultural resource surveys, that have proven successful
elsewhere will be undertaken before this project commences.  Id.

In past briefing, Plaintiffs have raised concerns about
construction at the Schofield Battle Area Complex, but this is not
one of the critical projects identified by the Army as needed for
transformation of the 2nd Brigade.  Furthermore, there is a cultural
site known as Mauna'una that Plaintiffs have identified as an area of
concerns.  As Dr. Lucking explains, the Army is well aware of this
site and has confirmed that it is more than 200 yards from any
critical project area. Lucking Dec. at ¶8.  Mauna'una is located on a
eroding slope and rather than harm this resource, the Army is

48

stockpiling soil from the Multiple Deployment Facility with hope that this soil can be used to stabilize the erosion around this site. Id. Based on the foregoing and as explained in Dr. Lucking's declaration, Plaintiffs cannot establish that there is a likelihood of harm to cultural resources from the completion of the six critical Stryker projects and related training.

Finally, Plaintiffs have complained that the use of the MK-19 grenade launcher is likely to cause irreparable harm to cultural resources. But as Dr. Lucking explains in her declaration, the Army does not use, and does not intend to use, high explosive rounds for training with the MK-19. Instead, the MK-19 "weapons are using practice munitions that do not have a high explosive charge." Attachment 1 to Lucking Dec. at ¶17. Those practice rounds do not pose a threat of irreparable harm to cultural resources. Id.

As this Court has already recognized, the Army has undertaken extensive measures to ensure that cultural sites and ATIs are identified and protected to fullest extent practicable. See Court's Order dated November 5, 2004 at 15. Given these protective measures as outlined above, it is not surprising that there is no evidence that cultural resources have been irreparably harmed. Attachment 1 to Lucking Dec. at ¶¶7, 12-19. Nor is it likely that this will occur.

49

Therefore, Plaintiffs cannot demonstrate irreparable harm to cultural resources and the Court should issue an interim injunction that permits the Army to proceed with the five critical Stryker projects and Stryker training.  See Cummings v. Connell, 316 F.3d 886, 897 (9th Cir. 2003) (where there was no "cognizable danger" demonstrated by plaintiffs, the court could not grant injunctive relief).[10]

### 2. Plaintiffs cannot demonstrate irreparable harm to natural resources

Plaintiffs cannot demonstrate that there will be  irreparable

---

[10]In the past, Plaintiffs have erroneously asserted that the Army conceded its actions will irreparably harm cultural and natural resources.  Plaintiffs' assertion, and much of their irreparable harm argument, has been based on the Army's site-specific EIS.  However, Plaintiffs' reliance on the Army's SEIS to carry their burden is misplaced.  The EIS's characterization of the likelihood of impacts as "significant" reflects the Army's solicitude for Plaintiffs' cultural interests; the Army recognizes that the loss of even one cultural site would be significant.  However, Plaintiffs overlook that the EIS predicts the impacts that might result from the proposed action as a whole, not, as is the issue here, from a limited subset of critical Stryker projects and training.  The SEIS does not indicate that harm is likely or severe as a result of the critical Stryker projects and training at issue here.  To the contrary, as this Court earlier recognized, the Army developed extensive measures to avoid and mitigate any impacts to these resources.  See Court's November 5, 2004 Opinion at 15-16.  In fact, four of the project areas have no known cultural resources and protective measures have proven successful in identifying and protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.  The same protective measures will be undertaken before the modification of Range 11T.  Thus, in light of the historic success of the Army's protective measures, it is even more apparent today than it was when the Court earlier ruled that significant harm to cultural and natural resources from the critical projects and training is not likely.

harm to natural resources in the critical project areas or as a result of Stryker-related training. First, there are no endangered or threatened species in the six critical project areas. Mansker Dec. at ¶¶4, 17. In fact, the only site within the current or planned construction projects that contains listed species or its habitat is at the PTA BAX. Id. This, however, is not one of the critical projects. Borne Dec. at ¶4-6. Thus, there is no current activity with respect to the six critical projects or training that impacts a listed species or its habitat, nor will there be, and even for the PTA BAX (not one of the six critical projects), the Army will build a 21,000 acre fenced area to exclude non-native ungulates. Mansker Dec. at ¶4. The conservation measures employed at the site will "result in a net benefit to the species in the long run." Id. at ¶7.

Second, the Fish and Wildlife Service issued two biological opinions concluding that the 2d Brigade transformation is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy critical habitat. ARS 24264, 24616. This Court defers to the "special expertise of the FWS" in making such determinations. See Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 523 (9th Cir. 1998); see also Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1456 (9th

Cir. 1992).  The Service's scientific judgment refutes Plaintiffs'
allegation that the Army will irreparably harm listed species absent
an injunction.  Significantly, Plaintiffs have not challenged these
biological opinions under the Endangered Species Act.

The Biological Opinions outline the actions the Army has taken
to protect critical habitat and listed species in the project area.
ARS 24264-73, 24616-24.  With these protective measures in place, the
Fish and Wildlife Service concluded that the proposed action is not
likely to jeopardize the continued existence of any species or
adversely modify critical habitat.  ARS 24264, 24616.  With regard to
the Hawaiian hoary bat, the Service concluded that "adverse impacts .
. . will be minimized and offset by fencing, ungulate removal, and
wildfire threat abatement."  ARS 24261.  Monitoring of bat habitat
will enable the agencies to assess the effectiveness of and adjust
these mitigation measures, as well as "provide valuable scientific
data that would contribute to the recovery of the Hawaiian hoary
bat."  ARS 24263.  The Army will also construct fence units, remove
ungulates, and plant listed plant species to increase their
distribution and abundance, and will take appropriate action to
protect palila habitat.  ARS 24264-65.  The Fish and Wildlife Service
concluded that minimization and mitigation measures would offset

adverse impacts to palila habitat.  ARS 24247.

Natural Resource Manager Michelle Mansker described in her
declaration the Army's extensive efforts to protect listed species
and their habitat.  Among other things, the Army has implemented an
Integrated Wildfire Management Plan ("IWFMP") to reduce the
frequency, size, and severity of any fire.  Mansker Dec. at ¶6.  The
IWFMP includes a Fire Danger Rating System that restricts specific
activities during high-risk periods and standard operating procedures
for each installation that outline responsibilities, fire prevention
measures, staffing levels, and requisite equipment needed, including
helicopter support during all live fire training.  Id.  The Fish and
Wildlife Service noted the significance of the IWFMP in protecting
critical habitats and species in its no-jeopardy determination.  Id.;
ARS 24265. Plaintiffs have not demonstrated that the proposed
transformation, and most particularly the six critical construction
projects, will irreparably harm the Hawaiian hoary bat or any other
species or habitat in the proposed transformation area.

In the end, Plaintiffs simply cannot that demonstrate that there
will be irreparable harm to natural resources in the six critical
project areas or as a result of Stryker-related training.  There are
no listed species found near or within any of the critical

construction projects. Mansker Dec. at ¶4. Moreover, the Army has undertaken significant protective measures to ensure protection of natural resources during any training, including mitigation pursuant to the Wildfire Management Plan, and Integrated Natural Resources Management Plan. Id. at ¶7. Such measures have proven successful and were relied on by the U.S. Fish and Wildlife Service in issuing its biological opinion that Stryker training and related construction will not jeopardize threatened or endangered species. Id. at ¶7-8.

Based on the foregoing and the no-jeopardy determination of the Fish and Wildlife Service, Plaintiffs cannot demonstrate that any of the proposed critical construction projects or related training will irreparably harm any species or habitat in the proposed transformation area.

### C. THE BALANCE OF HARMS TIPS DECIDEDLY IN THE ARMY'S FAVOR

In considering the propriety of issuing an injunction, the court must balance the relative harm each party may sustain. Caribbean Marine Services v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988). In the instant case, the immediate and significant harm to the safety of American soldiers and our country's national security far outweighs the speculative claims of possible harm to cultural and natural resources alleged by Plaintiffs. The scale tips even more decidedly

in the Army's favor when the Court considers the narrow tailoring requested by the Army for the interim injunction.

Given the limited relief sought by the Army, Plaintiff simply cannot show any likelihood of harm, let alone a level of harm that outweighs the substantial harm faced by American soldiers and the Army. First, there are no cultural resources in four of the critical project areas sought by the Army, and, in the fifth, QTR1, the mitigation measures undertaken have proven successful in protecting the identified cultural resources. Lucking Dec. at ¶¶4-11; see also Attachment 1 to Lucking Dec. at ¶¶7, 9-12. These same successful mitigation measures will be undertaken before work begins on the minor modification to existing training range 11T. Id. Second, as for natural resources, there are no threatened or endangered species in the critical project areas, and mitigation measures, as concluded by the Fish and Wildlife Service in its Biological Opinions, have effectively protected species in other areas throughout the Army installation. Mansker Dec. at ¶4.

In contrast to Plaintiffs' speculative assertions of irreparable harm, the harm to our soldiers and to national security that would result from issuance of an injunction prohibiting the six critical projects and Stryker training would be severe. See State of

55

Wisconsin v. Weinberger, 745 F.2d 412, 428 (7th Cir. 1984) ("the district court abused its discretion by failing to consider the degree to which the NEPA interest would, in fact, be served by an injunction, the efficacy of other forms of relief, and the harm to national defense interests that would result").  SBCTs provide improved battle command capabilities and defense systems that increase our soldiers effectiveness in combat and protect them to a much greater extent than current military defense systems.  Brown Dec. at ¶5.  According to Colonel Brown who has first hand experience in Iraq, the Stryker vehicle was "essential to saving lives" and "the losses would have been significantly higher if we had not been able to fight configured as a [SBCT] or use the Stryker vehicle during our training and deployment."  Id.

In addition, delaying or disrupting the conversion of the 2nd Brigade to a SBCT will significantly impact the sequence of Army transformation, reduce the number of highly effective SBCT units in the field of battle, and reduce the overall effectiveness of Army forces fighting the Global War on Terrorism.  See Court's November 5, 2004 Order at 17-18.

The Army has carefully crafted a solution that does not involve all 28 Stryker related projects, but rather requires five critical

56

projects and a minor modification to one existing range to be completed immediately to ensure the transformation is completed and the 2nd Brigade is ready to deploy in November 2007. These projects, with the exception to the minor modification to Range 11T, are either completed or more than 50% complete, and the related Stryker training is nearly 70% complete. To enjoin the transformation at this time would result in creating an ineffective brigade that has not been transformed and cannot be deployed. Borne Dec. at ¶8.

The balance of harms in this matter clearly tips in favor of permitting the Army to proceed with the transformation of the 2nd Brigade, thereby, protecting our soldiers, improving our combat ability, and serving this Nation's security interests. The Supreme Court recently reiterated that the role of the judiciary in reviewing military decisions is constrained. "Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." Hamdi v. Rumsfeld, 124 S.Ct. 2633, 2647 (2004) (citing Department of the Navy v. Egan, 484 U.S. 518, 530 (1988).

As the facts in this memorandum demonstrate, and as this Court previously recognized, enjoining the 2nd Brigade from transforming to

57

a SBCT would result in real and significant harm to the Army, its soldiers, and the war on terror.  <u>See</u> Court's November 5, 2004 Order at 17-18.  Therefore, the Army requests that the Court not disrupt the Army's efforts to provide the best support possible to soldiers in combat and the best security possible to our nation when the record shows that the Army has effectively implemented efforts to eliminate or minimize harm to cultural and natural resources.

**D.    AN INJUNCTION PREVENTING THE TRANSFORMATION OF THE 2ND BRIGADE TO A SBCT WOULD BE CONTRARY TO THE PUBLIC INTEREST**

As the Ninth Circuit has said, the trial court "must always consider whether the public interest would be advanced or impaired by issuance of an injunction in any action in which the public interest is affected."  <u>Carribean Marine Services Co., Inc. v. Baldridge</u>, 844 F.2d 668, 674 (citations omitted).  Indeed, if the public interest weighs strongly against an injunction, the relief must be denied "even though irreparable injury may otherwise result to plaintiff. . . ."  <u>Weinberger v. Romero-Barcelo, et al.</u>, 456 U.S. 305, 312 (*citing* <u>Yakus v. United States</u>, 321 U.S. 414, 440 (1944)).

The Army vigorously denies that Plaintiffs would suffer any harm absent an injunction in this case, let alone immediate and irreparable harm.  But, even if such harm were likely, the public

58

interest would dictate that no injunction issue in this case. Clearly, the defense of the United States is one of, if not the, most important of public interests.  Moreover, it is unquestionable that preparing our soldiers by providing them with the most advanced training and supplying them with the most advanced equipment serves not only the individual soldier's best interest, but the best interest of the public as well.  Put simply, where an injunction would harm the military's ability to provide for the national defense, it "would have a large negative effect on public interest." Water Keeper Alliance v. Department of Defense, 152 F.Supp.2d 155, 163 (D.P.R. 2001).

The overwhelming weight of the evidence before the Court demonstrates that enjoining the transformation of the 2nd Brigade will harm national security.  First, delay in transforming the 2nd Brigade will result in faster deployment of other Army units to combat operations in Iraq and elsewhere.  Such "accelerated deployment would further reduce unit training time, significantly increase the risk of American casualties and decrease unit mission effectiveness in combat . . . ."  Lovelace Dec. at ¶ 8.

Second, transformation delay would substantially interfere with the Army's ability to meet its obligation to protect the United

States' interests in the Pacific region.  As the "only active brigade combat team" in the Pacific that is not currently deployed, the ability of the unit to react expeditiously and provide the advanced capabilities attendant to a SBCT, would "cause immense harm to the US Army Pacific's capability to execute our mission. . . ."  Brown III Dec. at ¶ 8.

Finally, delay in the training of the soldiers of the 2nd Brigade will diminish the ability of our soldiers to carry out there mission of protecting the United States.  "Less training equals more casualties upon deployment."  Banach Dec. at ¶ 2.  Obviously greater numbers of casualties is not in the public interest and will not advance the Army's mission of protecting the public interest.  As Judge Mollway has stated "there is no heavier weight to balance than the loss of human life."  <u>Malama Makua v. Rumsfeld</u>, 2006 U.S. Dist LEXIS 3962, *33 (D.Hawaii February 2, 2006).

**V.    CONCLUSION**

For the foregoing reasons, Federal Defendants request that the Court issue an order on interim injunction relief permitting the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, a minor modification to existing training Range 11T, and the following five transformation related construction

60

projects in order to properly transform the 2nd Brigade and protect our national security interests:

1.  QTR1 at Schofield Barracks
2.  SBCT Motor Pool at Schofield Barracks
3.  Urban Assault Course at Schofield Barracks
4.  Tactical Vehicle Wash Facility at Schofield Barracks East Range (an environmental protection measure)
5.  Multiple Deployment Facility at Wheeler Army Airfield, Hawaii.

Respectfully submitted this 14th day of November 2006,

> EDWARD H. KUBO, JR. (2499)
> United States Attorney
> District of Hawai`I
> /s/ Thomas Helper
> _____
>
> HARRY YEE      (3790)
> THOMAS HELPER  (5676)
> Assistant United States Attorney
> Room 6-100, PJKK Federal Building
> 300 Ala Moana Boulevard
> Honolulu, Hawai`I  96850
> Telephone: (808) 541-2850
> Facsimile: (808) 541-3752
> Email: harry.yee@usdoj.gov
>
> SUE ELLEN WOODRIDGE
> Assistant Attorney General
>
> BARRY A.  WEINER
> JAMES D. GETTE
> Trial Attorneys
> General Litigation Section
> Environment & Natural Resources Division
> U.S. Department of Justice
> P.O. Box 663
> Washington, D.C.  20044-0663
> Email: Barry.Weiner@usdoj.gov

```
                              Telephone:      202-305-0469
                              Fax:        202-305-0274

Of Counsel:
Robert M. Lewis
Senior Trial Attorney
Army Environmental Law Division
901 North Stuart Street, Suite 400
Arlington, VA 22203
Telephone:  (703) 696-1567
Facsimile:   (703) 696-2940
```

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

Served Electronically through CM/ECF:

David L. Henkin        dhenkin@earthjustice.org

Isaac H. Moriwake      imoriwake@earthjustice.org

        Attorneys for Plaintiffs

DATED:  November 14, 2006, at Honolulu, Hawaii.


                    /s/ Jan Yoneda
                    _____

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
HARRY YEE      (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General
BARRY A. WEINER
JAMES D. GETTE
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0469
Facsimile:  (202) 305-0274
Email: Barry.Weiner@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

―――――――――――――――――――――――――

| | |
|---|---|
| ILIO'ULAOKALANI COALITION, a Hawaii, nonprofit corporation; NA'IMI PONO, a Hawaii unincorporated association; and KIPUKA, a Hawaii unincorporated association, | )CIVIL NO.04-00502 DAE BMK )<br>)FEDERAL DEFENDANTS' )MEMORANDUM ON THE SCOPE OF )INTERIM INJUNCTIVE RELIEF )IN ACCORDANCE WITH THE )NINTH CIRCUIT'S REMAND ) |
| Plaintiffs, | ) |
| v. | )<br>) |
| DONALD H. RUMSFELD, Secretary of United States Department of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army, | )<br>) Hearing:<br>)<br>) Date:   November 20, 2006<br>) Time:   9:45 a.m. |
| Defendants. | ) Judge:  Hon. David A. Ezra<br>) |

―――――――――――――――――――――――――

TABLE OF CONTENTS

TABLE OF AUTHORITIES

FEDERAL DEFENDANTS' MEMORANDUM ON THE SCOPE OF INTERIM
INJUNCTIVE RELIEF IN ACCORDANCE WITH THE NINTH CIRCUIT'S REMAND

DECLARATION OF THOMAS HELPER; EXHIBITS "A" AND "B"

DECLARATION OF RONALD L. BORNE

DECLARATION OF LAURIE LUCKING; ATTACHMENTS "1" TO "31"

DECLARATION OF MAJOR GENERAL WILLIAM H. BRANDENBURG

DECLARATION OF COLONEL STEFAN J. BANACH

DECLARATION OF COLONEL ROBERT B. BROWN

DECLARATION OF MICHELLE MANSKER

DECLARATION OF MAJOR GENERAL DANA T. ATKINS

DECLARATION OF JAMES J. LOVELACE

DECLARATION OF LIEUTENANT GENERAL JOHN M. BROWN III

CERTIFICATE OF SERVICE

Federal Defendants, Donald H. Rumsfeld, Secretary of the United States Department of Defense; and Francis J. Harvey, Secretary of the United States Department of the Army, ("U.S. Army" or "Army"), by and through undersigned counsel, file this Emergency Motion for Decision on the Scope of Interim Injunctive Relief in Accordance with the Ninth Circuit's Remand.  For the reasons set forth below, the Army respectfully requests the Court to lift the temporary injunction entered in this action by the United States Court of Appeals for the Ninth Circuit, and replace it with a more limited interim injunction that allows the Army to proceed with critical transformation and training activities for the 2nd Brigade of the 25th Infantry Division (Light) as a Stryker Brigade Combat Team in Hawaii pending further proceedings in this Court to address what permanent injunction, if any, is warranted pending compliance with the National Environmental Policy Act ("NEPA").

## I.    INTRODUCTION

This action was remanded to this Court by the Ninth Circuit in an Order entered on October 27, 2006, issued a few weeks after the Ninth Circuit's Opinion concluding that the U.S. Army had violated the National Environmental Policy Act ("NEPA") by failing to consider locations outside of Hawaii for transforming the 2nd Brigade to a Stryker Brigade Combat Team.  See Opinion entered October 5, 2006 at 41 (2-1).  In its October 27th Order, as described in more detail below, the Ninth Circuit issued a limited remand to this Court for the sole purpose of determining on an expedited basis the appropriate scope of "interim injunctive relief" pending a decision by this Court on the scope of a permanent injunction.  Order of October 27, 2006, at 2-3 and Addendum to Order at 9 (2-1).  Since this matter is very time-sensitive, a fact recognized by the Ninth Circuit in directing

that the matter be resolved "expeditiously," Order at 3, the Army requests the Court to consider the scope of interim injunctive relief at its earliest opportunity.

The Ninth Circuit's October 27th Order responds to an emergency motion filed by Plaintiffs in the Ninth Circuit seeking "interim injunctive relief" pending a decision by this Court on the scope of permanent relief pursuant to the Ninth Circuit's Opinion on the merits. The Ninth Circuit did not grant the Plaintiffs the relief they sought, but instead issued a "temporary injunction" and "remanded to the district court to enter and determine the scope of an interim injunction." Addendum at 9.

The temporary injunction prohibits the Army "from implementing, executing, or proceeding with the following activities associated with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii: grading, grubbing, other ground disturbance, construction, land acquisition, project design, geotechnical testing, unexploded ordinance clearance, contract award, and Stryker Brigade Combat Team-specific training pending entry of an injunction by the district court." Order of Oct. 27 at 1-2. The Ninth Circuit imposed this temporary injunction "until the district court has entered an interim injunction" and accordingly remanded to this Court "for the purpose of determining the appropriate scope of an interim injunction . . . ." Id. at 2. In response to a dissent to the Order filed by Judge Bea, the Court of Appeals issued an Addendum to its Order that clarified that it had not issued the interim injunction requested by Plaintiffs but instead had "entered a temporary injunction pending the district court's expeditious resolution of the interim injunction." Addendum at 9.

3

As the Ninth Circuit acknowledged, it did not "[p]roperly balanc[e] the parties' equities" in entering the temporary injunction, a function the Ninth Circuit determined should be performed instead by this Court. Order at 3 ("Properly balancing the parties' equities requires a fact-intensive inquiry best undertaken by the district court"). Further, responding to the U.S. Army's objection that an interim injunction would harm national security, the Ninth Circuit acknowledged that "this matter is very time-sensitive," and it consequently ordered "the district court [to] proceed expeditiously" to adjudicate the interim injunction. Id. (emphasis added). Finally, in the Addendum to its Order, the Ninth Circuit took pains to clarify the temporal limitations of the temporary injunction and its directions to this Court:

> Reading the dissent, one would think that we have issued a permanent injunction. We have not. We have not even issued an interim injunction pending a ruling on a permanent injunction, which is what the Plaintiffs ask for. Rather, we have entered a temporary injunction pending the district court's expeditious resolution of the interim injunction. We have acknowledged that properly balancing the parties' equities is a fact-intensive inquiry best undertaken by the district court, and we have remanded to the district court to enter and determine the scope of an interim injunction.

Addendum at 9.

As set forth below, the Ninth Circuit's temporary injunction is impairing the ability of the 2nd Brigade to accomplish its military mission with a minimum of American combat related casualties, a paramount national interest. The temporary injunction should be lifted immediately because the harm to the U.S. Army, and to the public interest, from continuation of the injunction grossly outweighs the negligible risk of harm to the Plaintiffs' interests

4

from lifting it.[1]

Further, the interim injunction contemplated by the Ninth Circuit should be narrowly tailored to allow certain critical elements of the 2d Brigade transformation and training to proceed pending further proceedings concerning a potential permanent injunction pending NEPA compliance.  In its October 27 remand Order, the Ninth Circuit directed the district court to consider "which Stryker Brigade Combat Team transformation-related activities in Hawaii are time critical and which activities can proceed without causing irreparable environmental and cultural harm."  Id. at 3.

The Army has identified five (5) of the twenty-eight (28) Stryker related projects and one minor modification to an existing training range (6 projects in total) that are the most time-sensitive and critical to proceed in order to ensure that the 2nd Brigade of the 25th Infantry Division Light ("2nd Brigade") can properly transform into a Stryker Brigade Combat Team ("SBCT")and be ready for deployment by November 2007.  The continuation of Stryker training and these six critical transformation related activities will permit the 2nd Brigade to properly transform and be available to defend our nation with the most effective military technology and weapons systems in a manner that does not cause irreparable harm to cultural sites or natural resources.

This Court previously held that the harm Plaintiffs alleged to cultural and natural resources was speculative and could not justify issuance of injunctive relief.  See Court's November 5, 2004 Order at 15-16.  That same conclusion is even more appropriate today.  There

---

[1] The U.S. Army will await issuance of the mandate before seeking a hearing before this Court to address what permanent injunction, if any, is warranted pending compliance with NEPA.

are no endangered or threatened species in the six critical project areas.  See Declaration of Michelle Mansker at ¶4.  Furthermore, the significant measures the Army has undertaken to protect cultural resources have proven to be effective in protecting cultural resources during the transformation process.  See Declaration of Dr. Laurie Lucking "Lucking Dec")at ¶¶4-10, and attachment 1 to Lucking Dec at ¶¶7, 12-19.  Plaintiffs' claim that some unknown burial site might be impacted in the future is nothing more than pure speculation, and does not demonstrate irreparable harm as is needed to substantiate an injunction on the equipping and training of the 2nd Brigade and the six critical Stryker-related projects and training.

As this Court previously recognized, the harm to the Army and its effort on the Global War on Terrorism from an injunction are both "demonstrative and severe."  See Court's November 5, 2004 Order at 17.  There is no question that "delaying or disrupting the conversion of the 2nd Brigade to a SBCT 5 will significantly impact the sequence of the Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism."  Id. at 15, 18.  Above all, to enjoin the transformation of the 2nd Brigade would result in soldiers that are not properly trained on the most effective and protective defense systems, thereby compromising the safety and effectiveness of these soldiers in combat.

The high likelihood of harm to the U.S. Army, and to the public interest, from continuation of the temporary injunction would grossly outweigh the negligible risk of harm to the Plaintiffs' interests from lifting it.  Consequently, the temporary injunction should be lifted and it should be replaced by a more narrowly tailored interim injunction pending further proceedings in this Court to address what

permanent injunction, if any, is warranted pending NEPA compliance. The severe and demonstrative impact to our soldiers and our Nation from the temporary injunction must be avoided by allowing a limited number of projects and training to go forward immediately because they are necessary to accomplish the transformation of the 2nd Brigade and can be implemented in a manner that reduces to a discountable level the risk of harm to cultural and natural resources. Consequently, the Army requests the Court to narrowly tailor the interim injunction so that it allows the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, and the following six transformation related projects:

  (1)  Completion of the Qualification Training Range One ("QTR1");
  (2)  Completion of 2/25 SBCT Motor Park and Maintenance Area ("SBCT Motor Pool");
  (3)  Completion of the Urban Assault Course ("UAC");
  (4)  Completion of the Tactical Vehicle Wash Facility ("TVWF");
  (5)  Completion of the Multiple Deployment Facility ("MDF"); and
  (6)  Minor modification to existing training range 11T on the Pohakuloa Training Area ("PTA").

## II.  FACTUAL BACKGROUND

       To avoid needless repetition and inconvenience to the Court, Federal Defendants hereby incorporate by reference the Factual Background sections previously presented to the Court in their Cross-Motion for Summary Judgment dated February 4, 2005, and in their opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004. <u>See</u> Federal Defendants' Memorandum in support of their Cross-Motion for Summary Judgment dated February 4, 2005 at 4-16 and Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004 at 1-10. This briefing provides the Court with the factual background underlying the Army's decision and need to transform the 2nd Brigade to a SBCT. The critical information needed to resolve the scope of

7

an interim injunction and determine "which Stryker Brigade Combat
Team transformation-related activities in Hawaii are time critical
and which activities can proceed without causing irreparable
environmental and cultural harm" is contained in this memorandum and
the following declarations:

    (1)  Declaration of Ronald L. Borne ("Borne Dec.") dated
         November 13, 2006;

    (2)  Declaration of Laurie Lucking ("Lucking Dec.") dated
         November 13, 2006 with Attachment 1, Declaration of Laurie
         Lucking dated October 22, 2006 and Attachments 2-31
         (photographs and maps of critical project areas);

    (3)  Declaration of William H. Brandenburg ("Brandenburg Dec.")
         dated November 13, 2006;

    (4)  Declaration of Stefan J. Banach ("Banach Dec.") dated
         November 8, 2006;

    (5)  Declaration of Robert B. Brown ("Brown Dec.") dated
         November 7, 2006;

    (6)  Declaration of Michelle Mansker ("Mansker Dec.") dated
         November 11, 2006;

    (7)  Declaration of Dana T. Atkins ("Atkins Dec.") dated
         November 7, 2006;

    (8)  Declaration of James J. Lovelace ("Lovelace Dec.") dated
         November 10, 2006; and

    (9)  Declaration of John M. Brown III ("Brown III Dec.") dated
         November 9, 2006.

These declarations identify the critical transformation projects
that are needed to transform the 2nd Brigade and ensure that it is
properly trained and available for deployment in a timely manner.
These declarations further confirm that the Army has undertaken
significant protective measures to ensure that Stryker-related
training and construction of these critical projects can be completed
in a manner that is protective of cultural sites and natural
resources.  Finally, these declarations explain why these projects
and Stryker-related training are time-sensitive and critical to our
Nation's defense and ensuring that our soldiers are properly trained
with the most effective and technologically advanced military defense
equipment.

    In addition, the course of events that led up to the 2d

Brigade's current posture of being 12 months into an approximately two year training cycle is particularly important when considering the appropriate scope of interim injunctive relief.  On August 17, 2004, Plaintiffs filed a complaint in the Hawaii district court alleging that the Army violated NEPA by failing to consider reasonable alternatives, including relocation to the continental United States. On November 5, 2004, this Court denied Plaintiffs' motion for a preliminary injunction.  Even then, before transformation of the 2d Brigade was in full swing, the Court realized that national security concerns were "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." See Court's November 5, 2004 Order at 17-18.

On April 25, 2005, this Court granted the United States' motion for summary judgment.  The Court entered final judgment on April 29, 2005 and denied Plaintiffs' motion for an injunction pending appeal on May 19, 2005. The Plaintiffs then moved for an injunction pending appeal in the Ninth Circuit, which similarly denied the injunction. On October 5, 2006, the Ninth Circuit reversed the district court and remanded for the Army to prepare a Supplemental Environmental Impact Statement ("SEIS") examining the alternative of relocation of the 2d Brigade to a facility outside of Hawaii.

Between the denial of the first motion for preliminary injunction in this case and the Ninth Circuit's October 5, 2006, decision, the Army proceeded with transforming the 2d Brigade. As a result, the 2d Brigade is 12 months into the transformation process.

It has completed 60% of its training and almost 70% of its new equipment fielding. Brandenburg Dec. at ¶4. The 2d Brigade is scheduled to become a fully manned, trained, and equipped Stryker Brigade Combat Team (SBCT), ready for deployment, by November 2007. The 2d Brigade can no longer simply train as a light-infantry brigade, and therefore any delay in Stryker training will result in a combat ineffective unit. Thus, "to stop transformation now, even for a matter of weeks, would deny the 2d Brigade Commander the power and ability to complete transformation and training to fulfill his assigned operational missions." Lovelace Dec. at ¶8. The Army cannot afford to delay the transformation and readiness of a single brigade, including the 2nd Brigade.  Lovelace Dec. at ¶3. "If 2nd Brigade is not available to deploy when required as SBCT 5, then every other brigade in the Army would have to deploy sooner. This accelerated deployment would further reduce unit training time, significantly increase the risk of American casualties, and decrease unit mission effectiveness in combat-for every brigade in the Army." Id.  The national security concerns that the district court found compelling in November of 2004 thus carry even more weight two years later and one full year into transforming the 2d Brigade.

Knowing that the 2nd Brigade cannot go back to an ineffective light infantry brigade and must continue with transformation, the Army has carefully considered the 28 Stryker-related projects and identified the most time-sensitive and critical to our national security and the safety and effectiveness of our soldiers.  As reflected in the administrative record and accompanying declarations, the Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to cultural and natural resources from continued training and completion of these six

specific projects.  This Court previously recognized the lengths to which the Army had gone to ensure that cultural and natural resources are protected during the transformation process, see Court's November 5, 2004 Order at 15-16, and nothing has occurred during the appeal process that would alter that previous determination.

For the reasons discussed below and in the accompanying declarations, it is requested that the temporary injunction be lifted and that the interim injunction that replaces it allow the Army to proceed with the six specific Stryker related projects and provision of the requisite equipment and training in order to ensure that the 2nd Brigade is properly trained and available for deployment as a SBCT by November 2007.

## III. STANDARD FOR ISSUANCE OF AN INJUNCTION

Violations of environmental statutes do not mandate issuance of an injunction.  "NEPA creates no exception to the traditional principles that govern injunctive remedies." National Audubon Society v. Department of Navy, 422 F.3d 174, 201 (4th Cir. 2005).  Thus, to qualify for injunctive relief, the moving party must first show it will suffer some tangible irreparable injury absent an injunction. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982); Amoco Production Company v. Village of Gambell, 480 U.S. 531, 542 (1987). There is no presumption of irreparable injury in environmental cases. Romero-Barcelo, 456 U.S. at 312; Amoco Production Co., 480 U.S. at 542; see also Forest Conservation Council v. U.S. Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995).

Further, where there are violations of environmental statutes, the court must balance the competing claims of injury and consider the effect on each party of granting or withholding the requested relief. <u>Amoco Production Company v. Village of Gambell</u>, 480 U.S. 531, 542 (1987); <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982). The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances. <u>Id</u>. The relative hardship to the parties is controlling. <u>Benda v. Grand Lodge of Int'l Ass'n of Machinists</u>, 584 F.2d 308, 314, 315 (9th Cir. 1978). When a federal court considers the propriety of injunctive relief, it must balance the equities of the case, considering the potential harms of granting or denying relief to each party, in an effort to "mould each decree to the necessities of the particular case." <u>Romero-Barcelo</u>, 456 U.S. at 312 (1982). The Court must also determine whether the balance of public interests is served by the requested injunction. <u>Caribbean Marine Services v. Baldridge</u>, 844 F.2d 668, 674 (9th Cir. 1988).

## IV. ARGUMENT

While the Army remains committed to complying fully with NEPA,[2] equipment fielding, training activities and certain limited

---

[2]The Army has already taken initial actions to prepare the Supplemental EIS ordered by the Ninth Circuit. Brown III Dec. at ¶9.

12

construction activities that will directly facilitate the necessary training of the 2nd Brigade simply cannot be halted at this late date without doing irreparable harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security. In accordance with the Ninth Circuit's remand, the Army has identified six Stryker-related projects that are time-sensitive and critical to ensure the transformation of the 2nd Brigade to a SBCT. These construction projects as well as the associated Stryker-related training will not irreparably harm cultural or natural resources. Mansker Dec. at ¶4, Lucking Dec. at ¶¶4-10, Attachment 1 to Lucking Dec. at ¶¶7, 12-19. The Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to environmental and cultural resources from these actions and will continue to do so as it proceeds with training the 2nd Brigade. Id. The analysis this Court previously conducted on the impacts to the Army and this Nation's security that would result from an injunction is even more relevant today than it was in November 2004. This Court earlier found that the national security concerns implicated from preventing transformation are "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and

13

reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." <u>See</u> Court's November 5, 2004 Order at 17. The same conclusion should be reached here when considering interim injunctive relief because the harm to the Army and this nation's defense is highly likely and severe, while the harm claimed by the Plaintiffs is speculative in nature and unlikely due to the lack of cultural and natural resources in the six critical project areas and the extensive mitigation measures undertaken as part of the transformation process.

     **A. THE ARMY AND THE PUBLIC INTEREST WILL BE IRREPARABLY HARMED BY THE ISSUANCE OF A BLANKET INJUNCTION ON ALL STRYKER-RELATED PROJECTS AND TRAINING**

The Army has carefully crafted a solution that permits equipment fielding, training, and a limited number of Stryker-related construction projects to proceed while incorporating the protective measures outlined in the administrative record and accompanying declarations that will reduce any likelihood of harm to cultural and natural resources to a negligible level. As discussed below, unlike the potential for irreparable harm to cultural and natural resources, which is remote, the likelihood of severe harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security is high and, thus, the balance of harms tips decidedly in favor of the Army and the issuance of an interim injunction that permits transformation of

14

the 2nd Brigade to a SBCT.

>    **1.    The irreparable harm that will be suffered
>         by the Army and its soldiers from an injunction
>         that prohibits the transformation of the
>         2nd Brigade is demonstrative and severe**

There are currently four operational SBCTs. When the 2d Brigade is finished with its transformation, it will be the fifth. At the time the Army announced its plans to begin transforming into a future force, its object was to create a "more responsive deployable, agile, versatile, lethal, survivable, and sustainable" Army. ARP[3] 9656. Combat evidence demonstrates that the Army has done just that with the operational SBCTs.

The primary component of an SBCT is the Stryker vehicle.  As Colonel (COL) Robert B. Brown, who commanded the 1st Brigade, 25th Infantry Division, Stryker Brigade Combat Team in Iraq, explains: "Having spent a year in combat fighting from a Stryker vehicle, I can emphatically state that it is my vehicle of choice for combat operations in today's environment."  Brown Dec. at ¶5. In short, the Stryker vehicle saves soldiers' lives.  As Brigade Commander, COL

---

[3] In this memorandum, Federal Defendants refer to documents from the Programmatic Environmental Impact Statement in the Administrative Record as "ARP" and document from the Site-Specific Environmental Impact Statement as "ARS" followed by the pertinent bates number for the referenced document.  The administrative record documents cited herein are attached to the Declaration of Thomas Helper, which has been filed simultaneously with this memorandum.

Brown obtained personal knowledge of the survival capabilities provided by the Stryker vehicle in the form of approximately 137 Rocket Propelled Grenades (RPGs) and approximately 50 Suicide Vehicle Born Improvised Explosive Devices striking direct hits to Stryker vehicles under his command. Id. None of the RPGs penetrated a Stryker vehicle due to its protection and speed. Id. The brigade nevertheless ultimately lost 33 of its soldiers in combat. According to COL Brown, the Stryker vehicle was "essential to saving lives" and "the losses would have been significantly higher if we had not been able to fight configured as a [SBCT] or use the Stryker vehicle during our training and deployment." Id.

Colonel Brown is not alone in that assessment. Given its performance in Iraq, the Army recognizes the importance of the SBCTs and the Stryker vehicle to its mission. General George Casey, the military commander of the Multi-National Force Iraq, requires SBCTs and employs them in vital missions, recently assigning an SBCT to "the priority mission to increase security in Baghdad and reduce the level of sectarian violence and terror attack." Lovelace Dec. at ¶9. In addition, General Casey "continues to submit formal requests for forces to include [SBCTs] to Joint Forces Command as part of the ongoing and continuous requirements in his theater of operations" and he "will not accept a light infantry brigade as a substitute for the

16

SBCT requirement in Iraq." Id.  The SBCTs are vital, as "[n]o other unit provides the same capabilities urgently needed in Iraq."  Id. Congress also recognizes the SBCTs vital importance, as it has directed the Army to submit plans to field a seventh SBCT and appropriated additional funds for that purpose.

To provide the commanders in the field with another SBCT as soon as possible, the Army has scheduled the 2d Brigade to complete transformation into the fifth SBCT by November 2007 and then be available to deploy. Id. at ¶7. The training involved in creating a SBCT is an intensive process that takes approximately two years. SBCTs "are configured to fight differently than previous brigades . . . [which] requires more extensive training and preparation in the initial stages of the fielding." Brown Dec. at ¶3. To become the agile and adaptive soldier that SBCTs demand requires "extensive training in a variety of areas, such as leadership, adaptability, creative thinking, the use of digital information and advanced marksmanship techniques." Id.

The 2d Brigade is currently in month 12 of that almost two-year long process, and because it "no longer exists as a light infantry brigade" there is no turning back the clock. Bradenburg Dec. at ¶4; Banach Dec. at ¶6-7. Its weapons, vehicles, and communications are those required for a SBCT, and its soldiers have skills tailored to

those required for a SBCT. Id. at ¶8. Thousands of pieces of new
Stryker Brigade equipment have been issued and hundreds of pieces of
old equipment have been turned in. Brown III Dec. at ¶5; Banach Dec.
at ¶6. But the 2d Brigade cannot perform its vital function as an
SBCT if it cannot complete its training and new equipment fielding as
such.  An SBCT is "enormously complex" and "unlike any other
organization we have had in the history of our Army." Banach Dec. at
¶10.  That creates "a significant learning curve" before soldiers can
become combat ready.  Id.  Any delay makes the curve that much
steeper, and will ultimately result in a "combat ineffective unit."
Banach Dec. at ¶1.

Delaying the training and new equipment fielding involved in
transforming the 2d Brigade into a SBCT will therefore ultimately
deny the commanders in the field adequate combat and deterrent forces
by interrupting tightly integrated transformation and deployment
schedules. For example, Major General Dana T. Atkins, the Director of
Operations, United States Pacific Command, states that disrupting the
transformation of the 2d Brigade "would immediately and unacceptably
undermine the ability . . . to deter conflict and respond to crisis
situations throughout the Asia-Pacific region." Atkins Dec. at ¶1.
It will affect not only the Army's combat and deterrent missions, but
also its humanitarian mission in responding to the "frequent and

18

severe natural disasters, including super-typhoons, earthquakes,
tsunamis, volcanic eruptions, and mudslides" in the Pacific Command's
Area of Responsibility. Id. at ¶4. In addition, the 2d Brigade is
"the only active brigade combat team assigned . . . in the Pacific
that is not deployed to the Middle East. As such, it provides company
and platoon sized contingency ready forces for PACOM responses to
homeland security threats and provides units to participate in
Theater Security Cooperation training and exercises with allied and
neighboring armies." Brown III Dec. at ¶4.  No other Pacific Command
"force provides the firepower, mobility, situational awareness, and
information processing capabilities resident in a [SBCT]." Atkins
Dec. at ¶6.

It is therefore critical that the 2d Brigade transform as
planned to meet Pacific Command "mission requirements and response
timeliness and to enhance the strategic flexibility of the United
States within the theater." Id.  Disrupting training at this point
would "cause immense harm to the US Army Pacific's capability to
execute our mission to provide combat ready forces to the United
States Pacific Command" and "add extreme difficulty to the brigade's
already complex task of achieving combat readiness." Brown III Dec.
at ¶8. Delaying the transformation of 2nd Brigade now, 12 months into
transformation, will have an even greater domino effect than when

19

this Court heard Plaintiffs' first motion for an injunction pending appeal, weakening the Army's strategic posture to deter threats in the Pacific Region, breaking a transformation sequence that was carefully synchronized with projected requirements for combat operations in Iraq and Afghanistan, and disrupting the reallocation of resources to other units that are undergoing transformation. Brown III at ¶1,6.

In addition to disrupting the Army's overall ability to respond to threats around the world by throwing off a tightly integrated transformation and deployment schedule, any delay in training will also have a profound and direct impact on the soldiers of the 2d Brigade when they are deployed: *less training equals more casualties upon deployment.* Banach Dec. at ¶2. COL Stefan Banach, Commander of the 2d Brigade, understands the need for continuity in training plans. He led a U.S. Army Ranger combat parachute assault into Afghanistan on October 19, 2001, "as the spearhead for the Global War on Terrorism." Id. Those Rangers "were the best trained and most well led Soldiers in our Army" and "were fully resourced and . . . had full continuity in all aspects of our combat preparedness," yet this country "still lost five great Rangers and over thirty more Rangers were severely wounded." Id. In Colonel Banach's informed opinion, "any disruption of our current training plan will get many

more of our Soldiers killed and wounded in combat than if we were
able to maintain continuity in our current training and
transformation plan to a fully combat ready [SBCT]."  Id.; Bradenburg
Dec. at ¶3. In other words, interrupting the training of the 2d
Brigade as an SBCT "will have second and third order effects that
will be measured in the blood of our Soldiers."[4] Id.

When weighed against the speculative environmental harms
Plaintiffs have alleged, the disruption to the Army's mission and the
harm to its soldiers and their families that an injunction would
cause weigh heavily in favor of granting interim injunctive relief
that would permit the Army to transform the 2nd Brigade into a SBCT.

> **2.    *The Army has identified six specific projects
>         in addition to training that are needed to
>         prepare the 2d Brigade for combat deployment
>         as a SBCT and are highly unlikely to cause
>         environmental or cultural harm.***

Ronald L. Borne, the Director of Transformation for the 2d
Brigade, has set forth the essential requirements that the Army must
have to successfully complete the 2d Brigade's training as an SBCT
before November 2007. Borne Dec. at ¶¶4-6.  To enjoin those
activities will severely harm the Army. Thus, the Army submits that
any interim injunction should permit the following activities, which

---

[4]Small detachments of 2d Brigade soldiers are already in
combat in the Philippines and Iraq. Banach ¶ 9.

21

are critical to ensuring that the 2nd Brigade is properly transformed
into a SBCT and prepared for deployment and combat in hostile
environments:

•   New Equipment Fielding and New Equipment Training

•   Soldier and Unit Level Training

•   Construction and use of the five critical projects out of the 28
    studied in the EIS, and modification to an existing training
    range. These projects represent a fraction of the overall
    Stryker-related construction. They are:

    1.  QTR1 at Schofield Barracks
    2.  SBCT Motor Pool at Schofield Barracks
    3.  Urban Assault Course at Schofield Barracks
    4.  Tactical Vehicle Wash Facility at Schofield Barracks East
        Range (an environmental protection measure)
    5.  Multiple Deployment Facility at Wheeler Army Airfield,
        Hawaii
    6.  Minor modification to existing range 11T
    All of the Army's 28 construction projects in association with
the transformation are important[5], but these six are absolutely

_____

[5] Plaintiffs have suggested that the delay in constructing
the Schofield BAX demonstrates that none of the Stryker-related
projects should be considered critical because this was one of
the 28 projects that Army previously claimed were necessary to
transform.  This criticism is misplaced.  The Army maintains that
all 28 projects are needed to establish facilities to transform,
maintain and sustain a Stryker brigade in the long term, but for
the limited duration of an interim injunction, the Army has
identified the six most critical projects that will permit the
2nd Brigade to transform in a timely manner and be ready for
deployment by November 2007.  Borne Dec. at ¶8.  The fact that
the Schofield BAX was delayed does not undermine the credibility
of the Army's assessment of what is needed for timely
transformation of the 2nd Brigade.  As Ronald Borne explained in

22

critical to ensuring that the 2nd Brigade is transformed into a SBCT and ready for deployment in November 2007. Borne Dec. at ¶6; Banach Dec. at ¶¶6,8; Brandenburg Dec. at ¶¶ 7, 10-12.[6]  Of these critical projects, two projects - QTR1 and Tactical Vehicle Wash Facility - are already completed. Borne Dec. at ¶6  The three remaining projects are being built over existing facilities and are close to 50% complete, thereby minimizing any environmental impact.  Borne Dec. at ¶6. The final project is a minor modification to an existing range 11T, which involves re-grading roads, improving berms, and moving certain targets, all with no adverse environmental impacts.  Id. at ¶4.  The Army has identified six critical projects that will have minimal impact to the environment, but must proceed in order to transform the 2nd Brigade to a SBCT.  Without these projects and training, the harm to the Army, its soldiers, and its effectiveness on the battlefield is inevitable.

The reasons these projects were deemed critical to the

---

his declaration, the project was delayed due to the unexpected discovery of a significant amount of unexploded ordnance (UXO) that took much longer than expected to clear, thus causing a delay in construction.  Id.  The Army should not be faulted for ensuring the safety of its soldiers, construction staff, and the general public.

[6]The reasons why these specific projects and Stryker-related training are critical to the transformation of the 2nd Brigade is discussed in detail in the declarations of Ronald Borne, Colonel Banach, and Major General William H. Brandenburg.

transformation of the 2nd Brigade are described in detail in Declaration of Ronald L. Borne.  Mr. Borne explains the critical nature of ensuring that QTR1 at Schofield Barracks is available for training. Borne Dec. at ¶6(b)(I).  This is a multi-purpose small arms and machine gun range that was built over the former site of other ranges and is designed to accommodate all individual and crew-served pistol, rifle, and machine gun qualification requirements.  Id.  This project is now complete and the weapons being used are not unique to a Stryker vehicle and will be in use regardless of the scope of any injunction issued in this case. Id. Furthermore, all ammunition used on this range is for training purposes and is not explosive in nature, thereby minimizing any alleged harm.  Id.  The QTR1 range is a critical facility for training the 2nd Brigade because without it, there is no range in Hawaii for a Stryker unit to become proficient with the weapons and communication systems associated with the Stryker vehicle.  Id.

The second critical project for the transformation of the 2nd Brigade is the SBCT Motor Pool at Schofield Barracks.  Borne Dec. at ¶6(b)(ii).  The SBCT Motor Pool is designed to provide a facility to park, store, and perform the requisite maintenance and repair on the more than 1,000 Stryker vehicles, trailers and wheel mounted systems that are assigned to a SBCT.  Id.  Without this facility, there is no

24

place on Oahu to store, maintain, and repair these vehicles and they would be left in fields, parking lots, and other open space areas. Id. This would create significant security issues and also increase the risk of environmental harm due to maintenance and fueling mishaps. Id.

The third critical project for the transformation of the 2nd Brigade is the Urban Assault Course ("UAC") at Schofield Barracks, which is more than 50% constructed. Id. at ¶6(b)(iii). The UAC is designed to provide a facility capable of training a SBCT unit on urban terrain combat, which is needed in hostile environments such as Baghdad, Iraq. Id. The UAC is a multi-purpose small arms and machine gun range designed to accommodate all urban area fire training requirements. Id. This training facility will be used by a SBCT in a similar manner to all other units in Hawaii, and will be limited to dismounted individual or small unit live fire training. Id. The UAC project is critical because without it, SBCT training units will not be able to satisfy current urban operation doctrine and training standards and, thus, will not be properly trained to engage the enemy in an urban environment such as exists in Iraq and Afghanistan. Id. This inability to complete urban warfare training will likely translate into higher casualties for the 2nd Brigade. Id.

25

The fourth critical project for transformation of the 2nd Brigade is the Tactical Vehicle Wash Facility at the Schofield Barracks East Range.  Borne Dec. at ¶6(b)(iv).  This facility was built to provide a facility for the 2nd Brigade and other units to remove soil, debris and alien seeds from vehicles, trailers and wheel mounted systems that are used in the East Range and the vicinity of Schofield Barracks.  Id.  This project is an environmental protective measure that permits the Army to prevent the spread of alien invasive species of weeds and other biological pests between the unique ecosystems constituting the Army training areas, as required by a U.S. Fish and Wildlife Biological Opinion.  Id.  The Tactical Vehicle Wash Facility was built over a former warehouse site and serves a significant and important role in ensuring invasive species, seeds, and pests are not transported throughout the facility.  Id.  This facility is now complete and in use by the 2nd Brigade and other military units in Hawaii to protect the environment. Id.  This facility is critical to enable the 2nd Brigade to conduct vehicle operations necessary to transform while minimizing any harm to the environment.  Id.

The final critical project for the transformation of the 2nd Brigade is the Multiple Deployment Facility ("MDF") at Wheeler Army

26

Airfield in Hawaii.  Borne Dec. at 6(b)(v).  This facility is
currently under construction and is being built over the Army's
former deployment  holding site, which cannot accommodate a SBCT.
The MDF is designed to allow units to pack, weigh, balance, and
inspect vehicles prior to transport by air or to a seaport for
debarkation.  Id.  Accurate weighing and center-of-gravity
determinations are crucial for safely loading aircraft and boats and
ensuring safety during transit.  Id.  Furthermore, the 2nd Brigade
once transformed to a SBCT must have the capacity to deploy within 96
hours notice and must have the flexibility to  deploy under various
load specifications.  Id.  This facility is critical to achieving
such a deployment capability.  Id.

     In addition to these five construction projects, receiving and
training on the new equipment associated with Stryker vehicles,
including the new communications systems and new or upgraded weapons
systems, is essential to ensuring that these soldiers are properly
prepared to operate as a SBCT.  Borne Dec. at ¶¶4, 5.  This training
will occur on existing roads, trails and ranges on Schofield Barracks
or Pohakuloa Training Area ("PTA").  Id.  The weaponry associated with
the Stryker vehicle is similar to the weapons that have been used or
are currently in use at training facilities in Hawaii, and only non-

27

explosive ammunition will be used during training.  Id.; see Borne

Dec. at ¶¶4-5 for a more detailed description of the Stryker-related

training that is needed to transform the 2nd Brigade to a SBCT.[7]

Therefore, the Stryker-related training is not likely to cause any

additional impacts to cultural or natural resources.  The Stryker-

related training is consistent with military training that will occur

on similar weapons systems even if an injunction is issued.

The Army considers all Stryker-related projects to be important

and necessary to complete the transformation process, but it has

identified six of these projects that are absolutely critical to

ensuring that the 2nd Brigade can transform into a SBCT and properly

trained on the new communications and weapons systems before this

unit deploys in November 2007.  This transformation is critical to

this Nation's security interests and, as discussed below, it will be

---

[7] The 2nd Brigade also will be using a Mobile Gun System,
which employs a 105 millimeter (mm) gun. During training
exercises, non-explosive training ammunition will be used.  Borne
Dec. at ¶4.  The range upon which this training will occur, Range
11T, is currently a helicopter gunnery, machine gun, and anti-
tank missile range.  Id.  In the past, this range was used by
Model M60 tanks that were equipped with the same type of weapon
systems as the Mobile Gun Systems, a 105 mm gun. Minor
modifications that will not impact the environment, including
improving roads and berms, and installing new targets will be
made to accommodate this training.  Borne Dec. at ¶4.  This
training is critical to ensuring our soldiers are properly
trained on the weapons systems they will use as a SBCT.
Furthermore, any alleged damage from use of the MGS will be
minimal because the Army will not be using explosive ammunition.
Id.

done in a manner that is protective of the environment and will not result in an appreciable risk of harm to cultural or natural resources. As such, it is requested that the Court narrowly tailor an interim injunction to permit these critical projects to proceed along with the Stryker-related training discussed above.[8]

> **3.    *There are no viable alternatives to finishing the training of the 2d Brigade as a SBCT at a location outside Hawaii and maintaining this unit as a light infantry brigade is improvident.***

Plaintiffs have suggested an alternative to transforming the 2nd Brigade in Hawaii that would involve transporting the entire unit to another location either in the contiguous United States or Alaska. In the alternative, Plaintiffs have suggested that the 2nd Brigade simply continue to train and operate as a light infantry brigade. Either suggestion is not a viable alternative, and would result in significant harm to the Army and the public interest.

First, there is no feasible alternative for the 2d Brigade to finish its training as an SBCT outside Hawaii while staying on

---

[8]The Army can complete these critical construction projects and train the 2d Brigade for combat deployment while still maintaining the ability to take an objective look at whether to ultimately station the 2d Brigade in Hawaii, in compliance with NEPA and this Court's order. As Borne states in his declaration, these projects can be and are used by other Army units on Hawaii, Borne Dec. at ¶¶1,7, and thus their existence does not preclude the Army from restationing the 2d Brigade. See, infra, discussion under Point Heading IV(A)(4).

29

schedule to meet mission requirements. There is simply "no brigade-size excess capacity for Army housing, training areas and installation facilities available in the United States." Lovelace Dec. at ¶12; Brandenburg Dec. at ¶15. SBCT 3 will return to Alaska before the 2nd Brigade could complete its training; facilities in Alaska cannot accommodate that overlap. Lovelace Dec. at ¶10. There would be similar overlap with the impending activation of SBCT 7 at Fort Lewis in Washington. Id. Training at another location would also require transporting all personnel, equipment, and vehicles to that installation by air, which would require 80% of the Air Force's transport capacity and would consume 40 out of 270 available training days. AR 51334-36. Given the extensive transportation delays, and the years in advance in which the Army plans these actions, the 2d Brigade would not be able to meet its November 2007 availability date if training was to be completed outside Hawaii. Lovelace Dec. at ¶13.

In addition to the logistical problems of moving the 2d Brigade to complete its training, moving the 2d Brigade out of Hawaii would also "reduce the Army's posture to deter conflict and meet treaty obligations in the Pacific region including the Republic of Korea." Lovelace Dec. at ¶8. By remaining in Hawaii, the 2d Brigade is "strategically positioned to deploy to the four critical areas

30

identified in the National Defense Strategy: Northeast Asia, the East Asian littoral, Southwest Asia, and the Middle East." Id.  Thus, Admiral William J. Fallon, the combatant commander of the United States Pacific Command, "requires 2d Brigade to transform in Hawaii on time to meet mission requirements assigned by the Secretary of Defense." Id.

Finally, if soldiers were trained in Alaska or at Fort Lewis, their families would have to be left behind in Hawaii, because housing in Alaska and Fort Lewis is already occupied.  "This would require the soldiers and families of the 2nd Brigade, who have already endured a year-long deployment in Iraq . . . to endure additional months of separation during transformation" that would immediately be followed by another year-long deployment in Iraq. Lovelace Dec. at ¶12. It is not just a matter of convenience for those families, or for the Army.  Unexpected separation preceding a year-long deployment "adversely affect command authority, good order and discipline by creating morale and family problems that will undermine individual soldier's mental discipline and erode unit effectiveness." Id.; Brown III Dec. at ¶6. Separation creates distraction, and "distracted soldiers imperil themselves and others." Lovelace Dec. at ¶10.

31

In past motions, Plaintiffs have suggested that the 2nd Brigade would be as effective as a SBCT if it continued to operate as a light infantry brigade. The Army, however, has the expertise to determine what is in the nation's best interest as far as national defense is concerned, and it has determined that training as a light infantry brigade is both impractical and unwise. The 2d Brigade simply is not a light infantry brigade anymore and the Army does not operate light infantry units.  Brandenburg Dec. at ¶4; Banach Dec. at ¶6. "It has different and improved capabilities that are now part of a fully integrated set of state of the art systems that provides our Nation with a new and overwhelming combat capability." Banach Dec. at ¶7. The new weapons systems and technology require each unit to transform and be trained on more advanced equipment and technology that is designed to provide a more effective and safer combat unit.  As detailed in Colonel Banach's declaration not only would it be impossible to go back to being a light infantry brigade, "to do so at this point would be illogical given the existing enhanced weapons accuracy, communications capability and protection for our soldiers that we can achieve now with our Strykers." Id.

It is also vital to train the 2d Brigade as an SBCT because "if events in the world require 2d Brigade to deploy tomorrow, or

whenever, it will do so with all available Strykers." Id.  The
soldiers must train on the equipment they will take into battle. And
they must do so "everyday in order to fight effectively when . . .
deployed to combat." Id.  The bottom line is this: "There is no
going back to legacy procedures and or previous less capable unit
designs." Id.  The 2d Brigade no longer exists as a light infantry
brigade, the equipment has changed, the training has changed, and the
new system provides the Army with more effective capabilities while
also providing for greater protection of our soldiers.

It is clear that 2nd Brigade's transformation is critical to
national security, and should not be enjoined.  The brigade needs its
equipment and specific facilities to ensure that it can properly
transform to a SBCT.  National security and foreign policy
considerations such as those implicated here are sufficient to find
that any injunction should allow transformation of the 2nd Brigade,
even in the face of a NEPA violation.  See Committee for Nuclear
Responsibility Inc. et al., v. Seaborg, 463 F.2d 796, 798 (D.C. Cir
1971).

In contrast to Plaintiffs' impractical proposals, the Army has
carefully crafted a solution that permits the Army to proceed with
equipment fielding, training and a limited number of construction

33

projects that will not cause a significant risk of harm to natural or cultural resources.  Two of these projects are already completed and the remaining three projects, other than the minor modification of Range 11T, are close to 50 percent complete.  As for the Stryker-related training, the Army has already completed close to 70 percent of the requisite training to transform the 2nd Brigade to a SBCT. Rather than transport the 2nd Brigade to another location outside Hawaii as Plaintiffs have suggested, the only viable alternative to ensure that the 2nd Brigade is transformed and available for deployment in November 2007 is to permit the transformation of this unit in Hawaii under the limited conditions set forth above.

**4.    The Army should be permitted to proceed with the critical SBCT projects because each has independent utility and their completion will not restrict the Army's ability to analyze reasonable alternatives in a SEIS.**

Not only would a broad interim injunction be inequitable, for the reasons discussed above, it would also be unnecessary to preserve a meaningful NEPA process.  Federal Defendants anticipate that Plaintiffs may argue that the completion of the five critical projects and modification of Range 11T at PTA would undermine the Army's ability to meaningfully analyze reasonable alternatives in a supplemental NEPA analysis.  To the extent Plaintiffs make this

argument, it is without merit.

Courts have held that action on a project may proceed, notwithstanding a NEPA violation, where such action would neither "have an adverse environmental impact" nor "limit the choice of reasonable alternatives" within the meaning of 40 C.F.R. § 1506.1(a). For example, in <u>North Carolina v. City of Virginia Beach</u>, 951 F.2d 596, 598 (4th Cir. 1991), the Fourth Circuit reversed a district court's refusal to modify its injunction which prohibited the City of Virginia Beach from undertaking steps to build an 85-mile pipeline from Lake Gaston to satisfy the City' s potable water needs.  The project required a FERC permit, and FERC had neither issued its permit nor conducted its NEPA review.  <u>Id</u>. at 600.  In reversing, the court of appeals recognized that action on a project should not go forward pending NEPA compliance to the extent doing so would so influence the agency s ultimate decision on the project as to effectively limit the choice of reasonable alternatives available to the federal decisionmakers in the NEPA process.  <u>Id</u>. at 601-02.  The court ruled, however, that the injunction should have been narrowly tailored to allow the limited construction that the City wanted to do because such work would not "unduly influence" FERC's consideration of alternatives.  <u>Id</u>. at 602; <u>see also</u> <u>South Carolina Dept. of</u>

35

<u>Wildlife & Marine Resources v. Marsh</u>, 866 F.2d 97, 99-101 (4th Cir. 1989) (holding that action need not be enjoined pending NEPA compliance notwithstanding the plaintiff's contention that allowing the action to proceed would prejudice the federal agency's consideration of alternatives in the NEPA process).  The court's conclusion is consistent with the Council on Environmental Quality's ("CEQ") regulations which provide that until an agency completes the NEPA process and issues a ROD, it is only prohibited from taking action concerning a proposal that would have an adverse environmental impact or limit the choice of reasonable alternatives.  40 C.F.R. § 1506.1(a).

In this case, work on these critical projects and training will not impact whether the Army decides where and how to complete the transformation process.  Borne Dec. at ¶7.  While these projects are vital to the 2nd Brigade's training and transformation, none are unique to the Stryker transformation process and can be used by other military units in Hawaii even if transformation is enjoined.  <u>Id</u>. at ¶¶6,7.  As explained by Ronald Borne, Director of Transformation for the U.S. Army Garrison Hawaii, "[t]hese projects will also be used by other military units stationed in Hawaii. Because these projects can, and will, support activities unrelated to Stryker transformation,

36

their completion and/or use will not affect the ultimate decision on where 2/25 will be permanently stationed." Id. at ¶1. For example, construction on QTR1, a multi-purpose, small arms and machine gun range, and the Tactical Vehicle Wash Facility, a facility used to minimize the spread of invasive plant species and biological pests, has been completed and these facilities are in use by other Army units in Hawaii. Id. at ¶6. Thus, as Ronald Borne states in his declaration, the critical projects have independent utility and their existence does not preclude the Army from taking an objective look at whether to ultimately station the 2d Brigade in Hawaii, after compliance with NEPA under the Ninth Circuit's order. Id. at ¶¶1,6-8. Under such a scenario, and in accordance with the case law cited above, the Court should permit the Army to proceed with the limited number of projects that are needed to transform the 2nd Brigade.

The same result is reached with respect to the other prong of the CEQ regulation, which prohibits a federal agency from taking action that would have an adverse environmental impact pending NEPA compliance. See 40 C.F.R. § 1506.1(a)(1). In South Carolina Dept. of Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 100-01 (4th Cir. 1989), the district court granted plaintiffs motion for a preliminary injunction to prevent the Army Corps of Engineers from installing

37

pumped storage facilities prior to completion of an environmental impact statement that adequately considered the environmental impacts of operating the pumps.  The Fourth Circuit recognized that injunctive relief must be "tailored to restrain no more than what is reasonably required to accomplish its ends and no "broader than necessary to protect against the environmental risk." Id. at 100 (internal quotation marks and citations omitted).  Noting that "[t]he Corps ha[d] already spent a majority of the funds allocated for the project, and [that] Plaintiffs conceded at oral argument that installation alone of the already purchased pumped storage generators will cause no environmental damage," the Court of Appeals concluded that "restraining the installation of the generators is not reasonably required to protect the environment" and "vacate[d] that part of the injunction which prohibits the Corps from installing the pumped storage generators at the Dam." Id. at 100.

As more fully set forth in section IV.A.2, above, and section IV.B, below, the critical projects and training the Army seeks to complete pending further proceedings on a permanent injunction present negligible risk of significant harm to cultural or environmental resources.  Accordingly, it is not necessary to enjoin these activities to promote NEPA's purposes.

38

In the end, there is no danger of these limited construction projects and the related Stryker training rendering the NEPA compliance "an empty exercise," as Plaintiffs fear or, in the parlance of NEPA, "limit[ing] the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(2).  These projects are complete or close to completion, they have independent utility, and their future use is not conditioned on completion of the transformation process. Inasmuch as their use does not preclude the Army from giving meaningful consideration to other reasonable alternatives in an SEIS, these critical projects and related training should be allowed to proceed. See National Audubon Society, 422 F.3d at 201 ("[A] NEPA injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.' Violation of NEPA is not always cause to enjoin all agency activity while the agency completes the required environmental analysis.") (citation omitted).

**B.    PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF THE COURT ISSUES A LIMITED INJUNCTION PERMITTING TRANSFORMATION OF THE 2ND BRIGADE**

As this Court previously recognized in denying Plaintiffs' prior requests for injunctive relief, Plaintiffs' claims are speculative in nature and the Army has gone to great lengths to ensure that impacts to cultural sites and natural resources are either eliminated or

mitigated.  See Court's Order dated November 5, 2004 at 15-16.
Today, Plaintiffs' assertions of harm fare worse than they did two
years ago.

The administrative record demonstrates that the Army took the
requisite hard look at the environmental impacts associated with the
transformation process in its programmatic and site-specific EISs.
See ARP 009656-666; ARS 0010308-329; 0024083-86; 0024260-73; 0024294-
98; 0024616-24; 0051514-522; 0051523-529; 0051703-736; 0051737-759;
0052224-666; and 0052267-298.  The Army specifically analyzed the
potential impacts associated with transformation and concluded, as
did the Fish and Wildlife Service in its Biological Opinion, that the
significant measures undertaken ensure that any risk to cultural and
natural resources is minimized.  See ARS 0024083-86; 0024260-73;
0024294-98; 0024616-24.

Plaintiffs in this action have never questioned the Army's NEPA
analysis on potential impacts nor have they claimed that this
analysis violates NEPA.  In fact, neither the district court nor the
Ninth Circuit identified any defects in the Army's impacts analysis.
The analysis contained in the Army's NEPA documents on impacts to
cultural and natural resources has not been invalidated and fully
complies with the statutory requirements under NEPA.

40

Plaintiffs cannot demonstrate that they are likely to suffer irreparable harm from the limited activities the Army here seeks leave to pursue.  First, there are no endangered or threatened species in the critical project areas.  See Mansker Dec. at ¶4. Second, the Army has undertaken significant measures to protect cultural resources and, to date, these measures have proven to be effective in protecting cultural resources during the transformation process.  See Lucking Dec. at ¶¶2-11, Attachment 1 to Lucking Dec. at ¶¶7, 12-19.  With respect to cultural resources, there are none in four of the five project areas and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1. Lucking Dec. at ¶¶4-10. As for the modification to Range 11T, this project has not begun and the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences.  Id.  In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade.  Finally, Plaintiffs have raised concerns about the cultural site identified as Mauna'una, but, as Dr. Lucking explains, this site is located on a bluff and not within 200 yards of any of the critical

41

project areas. Lucking Dec. at ¶8.

Since Plaintiffs cannot demonstrate that cultural sites or
natural resources are likely to be irreparably harmed by the
completion of the six designated projects and Stryker-related
training, the Court should fashion an injunction that permits these
projects and training to continue in order to ensure that the 2nd
Brigade is properly transformed and ready for deployment by November
2007.

### 1. *Plaintiffs cannot demonstrate irreparable harm to cultural resources*

Plaintiffs have argued that the transformation of the 2nd
Brigade will cause irreparable injury to unknown cultural resources.
But, as this Court has previously recognized, Plaintiffs' claims of
irreparable harm are too speculative and overlook the Army's
knowledge of cultural resources in construction areas and the
extensive steps it has taken to avoid and mitigate impacts to
cultural areas.  Lucking Dec. at ¶¶ 2-10, Attachment 1 to Lucking
Dec. at ¶¶2, 7-16, 19; see also Court's Order dated November 5, 2004
at 15-16.

Dr. Laurie Lucking, the Army Cultural Resources Manager,
explains in her declaration that the Army acknowledged in the SEIS
that transforming the 2nd Brigade might have significant impacts on

42

cultural resources because it realized that destroying even one cultural site would be significant to Native Hawaiians. Attachment 1 to Lucking Dec. at ¶4. In addition, Areas of Traditional Importance, which may not be protected under the National Historic Preservation Act, may be impacted. Id. at ¶4. When it published the SEIS, project designs had not progressed far enough to determine cultural impacts with certainty, and the Army cannot guarantee that no cultural sites will be impacted. However, the Army's goal is to prevent impacts, and its efforts to date have proven successful. Id. at ¶¶13,14.

Dr. Lucking explains in detail the Army's ongoing surveying and monitoring of project sites.[9] Most of the areas surveyed to date have revealed no cultural sites. Id. at ¶11. In the few instances when the Army has discovered cultural sites, it has altered the projects to avoid those sites entirely. Id. at ¶¶13, 14. To date, there is no indication that unexploded ordnance clearance or pre-construction environmental and geotechnical testing have damaged any cultural resources. Id. at ¶¶11,16. Archeological and cultural

---

[9]Many of the measures Dr. Lucking describes are included in the Programmatic Agreement the Army entered into with the Advisory Council on Historic Preservation, the Hawaii State Preservation Office, and the Office of Hawaiian Affairs to meet its obligations under the National Historic Preservation Act. Lucking Decl. ¶3.

43

monitoring will continue throughout the construction process to ensure that any cultural resources that may be discovered are properly protected.  Id. at ¶7.

Plaintiffs' selective criticism of the Army's mitigation measures in past briefing has failed to acknowledge the full scope of those efforts. Before the Army ever gets to the point of "data recovery" or "reburial," it will survey construction areas, flag eligible archaeological sites for avoidance, and design projects to avoid impacting those sites wherever possible.  ARS 52067; Attachment 1 to Lucking Dec. at ¶¶10,13,14.  Plaintiffs have argued that data recovery alone is insufficient to protect cultural resources. However, data recovery is not the only method of mitigation, as Plaintiffs would lead the Court to believe; in fact, it is the last line of defense. Id. Following Plaintiffs' logic, no earth-moving would be permitted in Hawaii since any such activity could lead to accidental discovery of archaeological sites, human remains, or cultural items. See also Judge Bea's dissent in Ninth Circuit's October 27, 2006 Order.  The Army is making every effort as it goes forward to avoid harming cultural resources by consulting with Native Hawaiian organizations, families and individuals, surveying project areas, amending project designs to avoid cultural sites, using lineal

44

descendants from project areas as cultural monitors to identify and suggest protection for sites, and using archaeologists and cultural monitors to oversee all earthmoving activities.  Id. at ¶¶2,5-11,13-14.

In the past, Plaintiffs have misstated the record when they've suggested that construction of several projects will occur in "archaeological sensitivity areas."  The SEIS identifies all archaeological sites at each sub-installation of which the Army was then aware.  See, e.g., ARS 52056-65.  However, the SEIS explains that individual project areas within those sub-installations "will be designed to avoid all eligible and unevaluated archaeological sites, to the full extent practicable."  ARS 52067. The Army has consistently redesigned projects to avoid cultural sites, Attachment 1 to Lucking Dec. at ¶¶ 2,10,13,14, and will continue to do so.

The Army developed a Cultural Monitoring Program, which enlists the assistance of persons who are knowledgeable about Native Hawaiian activities, to insure maximum protection for cultural sites and artifacts.  Id. at ¶7.  Currently, the Program includes 30 cultural monitors, all of whom are Native Hawaiians, who are permitted to go anywhere in the project area that is accessible to contractors and archaeologists.  Id.  Information reported by the monitors is given

45

to the archaeologists and the Army, as well as to interested members
of the community for additional comment. Id. at ¶8. Dr. Lucking
describes the other efforts the Army has undertaken, successfully, to
avoid disturbing cultural resources in the project areas. Plaintiffs
have complained that cultural monitors have been prevented from
exercising meaningful oversight, but any restrictions have been
safety related. Id. at ¶15. Moreover, these complaints do not
involve projects that are among the six critical projects that the
Army wishes to continue during the interim injunction. For example,
due to the large amounts of unexploded ordnance at the Schofield BAX
(not one of the six critical projects), the monitors initially were
required to remain 200 feet away from all intrusive activities. Id.
That was increased to 650 feet when chemical weapons were discovered
on site. Id. Once earth disturbing activities were completed,
however, the monitors were allowed down-range to examine those areas.
Id. These restrictions, which were only in place at the Schofield
Barracks BAX, were lifted several months ago after consultation with
the cultural monitors, who, as a result, became part of the Schofield
BAX UXO clearance team.

Any claim that construction will lead inevitably to the
disinterment and destruction of Native Hawaiian burials is likewise

speculative and ignores the mitigation measures the Army has employed
to ensure that such harm will not occur.  Attachment 1 to Lucking
Dec. at ¶¶10,19.  The Army has taken every precaution to avoid
effects on Native Hawaiian burials, including extensive surveying
and, as noted above, hiring cultural monitors who are lineal
descendants of people native to the various project areas and who are
also knowledgeable about burial areas.  Id. at ¶¶7, 15,19.  When the
Army identified possible burial sites at the South Range Acquisition
Area, it marked the area "off-limits," and will do the same if it
identifies other burial sites in the future.  Id. at ¶19.  The
success of these measures is reflected in the identification and
protection of possible burial sites at the South Range Acquisition
Area (not one of the six critical projects) in July 2003.  Id. If
additional burial areas are identified, similar precautions will be
undertaken to protect them.  Id.  Thus, other than mere speculation,
Plaintiffs cannot demonstrate that harm to Native Hawaiian burials is
inevitable and irreparable.

    With respect to the six critical projects, the extensive
mitigation measures outlined above have worked with the two completed
projects and are working effectively with the three projects that are
currently under construction.  Lucking Dec. at 4-10; Attachment 1 to

47

Lucking Dec. at ¶7.  In fact, the Army's mitigation measures have revealed that there have been no cultural resources and historic properties identified in four of the five critical project areas, and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.  For example, in QTR1, which is an existing military range that is in use by non-Stryker units, a cultural site was identified and mitigation measures were undertaken to protect this site.  Id. at 9.  To date, this site has not been harmed.  Id.  As for the minor modification to Range 11T, this project has not begun, but the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences.  Id.

In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade.  Furthermore, there is a cultural site known as Mauna'una that Plaintiffs have identified as an area of concerns.  As Dr. Lucking explains, the Army is well aware of this site and has confirmed that it is more than 200 yards from any critical project area. Lucking Dec. at ¶8.  Mauna'una is located on a eroding slope and rather than harm this resource, the Army is

48

stockpiling soil from the Multiple Deployment Facility with hope that this soil can be used to stabilize the erosion around this site. Id. Based on the foregoing and as explained in Dr. Lucking's declaration, Plaintiffs cannot establish that there is a likelihood of harm to cultural resources from the completion of the six critical Stryker projects and related training.

Finally, Plaintiffs have complained that the use of the MK-19 grenade launcher is likely to cause irreparable harm to cultural resources. But as Dr. Lucking explains in her declaration, the Army does not use, and does not intend to use, high explosive rounds for training with the MK-19. Instead, the MK-19 "weapons are using practice munitions that do not have a high explosive charge." Attachment 1 to Lucking Dec. at ¶17. Those practice rounds do not pose a threat of irreparable harm to cultural resources. Id.

As this Court has already recognized, the Army has undertaken extensive measures to ensure that cultural sites and ATIs are identified and protected to fullest extent practicable. See Court's Order dated November 5, 2004 at 15. Given these protective measures as outlined above, it is not surprising that there is no evidence that cultural resources have been irreparably harmed. Attachment 1 to Lucking Dec. at ¶¶7, 12-19. Nor is it likely that this will occur.

49

Therefore, Plaintiffs cannot demonstrate irreparable harm to cultural resources and the Court should issue an interim injunction that permits the Army to proceed with the five critical Stryker projects and Stryker training.  See Cummings v. Connell, 316 F.3d 886, 897 (9th Cir. 2003) (where there was no "cognizable danger" demonstrated by plaintiffs, the court could not grant injunctive relief).[10]

### 2. Plaintiffs cannot demonstrate irreparable harm to natural resources

Plaintiffs cannot demonstrate that there will be  irreparable

---

[10]In the past, Plaintiffs have erroneously asserted that the Army conceded its actions will irreparably harm cultural and natural resources.  Plaintiffs' assertion, and much of their irreparable harm argument, has been based on the Army's site-specific EIS.  However, Plaintiffs' reliance on the Army's SEIS to carry their burden is misplaced.  The EIS's characterization of the likelihood of impacts as "significant" reflects the Army's solicitude for Plaintiffs' cultural interests; the Army recognizes that the loss of even one cultural site would be significant.  However, Plaintiffs overlook that the EIS predicts the impacts that might result from the proposed action as a whole, not, as is the issue here, from a limited subset of critical Stryker projects and training.  The SEIS does not indicate that harm is likely or severe as a result of the critical Stryker projects and training at issue here.  To the contrary, as this Court earlier recognized, the Army developed extensive measures to avoid and mitigate any impacts to these resources.  See Court's November 5, 2004 Opinion at 15-16.  In fact, four of the project areas have no known cultural resources and protective measures have proven successful in identifying and protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10. The same protective measures will be undertaken before the modification of Range 11T.  Thus, in light of the historic success of the Army's protective measures, it is even more apparent today than it was when the Court earlier ruled that significant harm to cultural and natural resources from the critical projects and training is not likely.

harm to natural resources in the critical project areas or as a result of Stryker-related training. First, there are no endangered or threatened species in the six critical project areas. Mansker Dec. at ¶¶4, 17.  In fact, the only site within the current or planned construction projects that contains listed species or its habitat is at the PTA BAX. Id.  This, however, is not one of the  critical projects. Borne Dec. at ¶4-6. Thus, there is no current activity with respect to the six critical projects or training that impacts a listed species or its habitat, nor will there be, and even for the PTA BAX (not one of the six critical projects), the Army will build a 21,000 acre fenced area to exclude non-native ungulates. Mansker Dec. at ¶4. The conservation measures employed at the site will "result in a net benefit to the species in the long run." Id. at ¶7.

    Second, the Fish and Wildlife Service issued two biological opinions concluding that the 2d Brigade transformation is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy critical habitat.  ARS 24264, 24616. This Court defers to the "special expertise of the FWS" in making such determinations.  See Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 523 (9th Cir. 1998); see also Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1456 (9th

Cir. 1992).  The Service's scientific judgment refutes Plaintiffs' allegation that the Army will irreparably harm listed species absent an injunction.  Significantly, Plaintiffs have not challenged these biological opinions under the Endangered Species Act.

The Biological Opinions outline the actions the Army has taken to protect critical habitat and listed species in the project area. ARS 24264-73, 24616-24.  With these protective measures in place, the Fish and Wildlife Service concluded that the proposed action is not likely to jeopardize the continued existence of any species or adversely modify critical habitat.  ARS 24264, 24616.  With regard to the Hawaiian hoary bat, the Service concluded that "adverse impacts . . . will be minimized and offset by fencing, ungulate removal, and wildfire threat abatement."  ARS 24261.  Monitoring of bat habitat will enable the agencies to assess the effectiveness of and adjust these mitigation measures, as well as "provide valuable scientific data that would contribute to the recovery of the Hawaiian hoary bat."  ARS 24263.  The Army will also construct fence units, remove ungulates, and plant listed plant species to increase their distribution and abundance, and will take appropriate action to protect palila habitat.  ARS 24264-65.  The Fish and Wildlife Service concluded that minimization and mitigation measures would offset

52

adverse impacts to palila habitat.  ARS 24247.

Natural Resource Manager Michelle Mansker described in her
declaration the Army's extensive efforts to protect listed species
and their habitat.  Among other things, the Army has implemented an
Integrated Wildfire Management Plan ("IWFMP") to reduce the
frequency, size, and severity of any fire.  Mansker Dec. at ¶6.  The
IWFMP includes a Fire Danger Rating System that restricts specific
activities during high-risk periods and standard operating procedures
for each installation that outline responsibilities, fire prevention
measures, staffing levels, and requisite equipment needed, including
helicopter support during all live fire training.  Id.  The Fish and
Wildlife Service noted the significance of the IWFMP in protecting
critical habitats and species in its no-jeopardy determination.  Id.;
ARS 24265. Plaintiffs have not demonstrated that the proposed
transformation, and most particularly the six critical construction
projects, will irreparably harm the Hawaiian hoary bat or any other
species or habitat in the proposed transformation area.

In the end, Plaintiffs simply cannot that demonstrate that there
will be irreparable harm to natural resources in the six critical
project areas or as a result of Stryker-related training.  There are
no listed species found near or within any of the critical

construction projects.  Mansker Dec. at ¶4. Moreover, the Army has undertaken significant protective measures to ensure protection of natural resources during any training, including mitigation pursuant to the Wildfire Management Plan, and Integrated Natural Resources Management Plan. Id. at ¶7.  Such measures have proven successful and were relied on by the U.S. Fish and Wildlife Service in issuing its biological opinion that Stryker training and related construction will not jeopardize threatened or endangered species.  Id. at ¶7-8.

Based on the foregoing and the no-jeopardy determination of the Fish and Wildlife Service, Plaintiffs cannot demonstrate that any of the proposed critical construction projects or related training will irreparably harm any species or habitat in the proposed transformation area.

### C.    THE BALANCE OF HARMS TIPS DECIDEDLY IN THE ARMY'S FAVOR

In considering the propriety of issuing an injunction, the court must balance the relative harm each party may sustain. Caribbean Marine Services v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  In the instant case, the immediate and significant harm to the safety of American soldiers and our country's national security far outweighs the speculative claims of possible harm to cultural and natural resources alleged by Plaintiffs.  The scale tips even more decidedly

in the Army's favor when the Court considers the narrow tailoring requested by the Army for the interim injunction.

Given the limited relief sought by the Army, Plaintiff simply cannot show any likelihood of harm, let alone a level of harm that outweighs the substantial harm faced by American soldiers and the Army. First, there are no cultural resources in four of the critical project areas sought by the Army, and, in the fifth, QTR1, the mitigation measures undertaken have proven successful in protecting the identified cultural resources. Lucking Dec. at ¶¶4-11; see also Attachment 1 to Lucking Dec. at ¶¶7, 9-12. These same successful mitigation measures will be undertaken before work begins on the minor modification to existing training range 11T. Id. Second, as for natural resources, there are no threatened or endangered species in the critical project areas, and mitigation measures, as concluded by the Fish and Wildlife Service in its Biological Opinions, have effectively protected species in other areas throughout the Army installation. Mansker Dec. at ¶4.

In contrast to Plaintiffs' speculative assertions of irreparable harm, the harm to our soldiers and to national security that would result from issuance of an injunction prohibiting the six critical projects and Stryker training would be severe. See State of

55

Wisconsin v. Weinberger, 745 F.2d 412, 428 (7th Cir. 1984) ("the district court abused its discretion by failing to consider the degree to which the NEPA interest would, in fact, be served by an injunction, the efficacy of other forms of relief, and the harm to national defense interests that would result").  SBCTs provide improved battle command capabilities and defense systems that increase our soldiers effectiveness in combat and protect them to a much greater extent than current military defense systems.  Brown Dec. at ¶5.  According to Colonel Brown who has first hand experience in Iraq, the Stryker vehicle was "essential to saving lives" and "the losses would have been significantly higher if we had not been able to fight configured as a [SBCT] or use the Stryker vehicle during our training and deployment."  Id.

In addition, delaying or disrupting the conversion of the 2nd Brigade to a SBCT will significantly impact the sequence of Army transformation, reduce the number of highly effective SBCT units in the field of battle, and reduce the overall effectiveness of Army forces fighting the Global War on Terrorism.  See Court's November 5, 2004 Order at 17-18.

The Army has carefully crafted a solution that does not involve all 28 Stryker related projects, but rather requires five critical

56

projects and a minor modification to one existing range to be
completed immediately to ensure the transformation is completed and
the 2nd Brigade is ready to deploy in November 2007.  These projects,
with the exception to the minor modification to Range 11T, are either
completed or more than 50% complete, and the related Stryker training
is nearly 70% complete. To enjoin the transformation at this time
would result in creating an ineffective brigade that has not been
transformed and cannot be deployed.  Borne Dec. at ¶8.

The balance of harms in this matter clearly tips in favor of
permitting the Army to proceed with the transformation of the 2nd
Brigade, thereby, protecting our soldiers, improving our combat
ability, and serving this Nation's security interests.  The Supreme
Court recently reiterated that the role of the judiciary in reviewing
military decisions is constrained.  "Without doubt, our Constitution
recognizes that core strategic matters of warmaking belong in the
hands of those who are best positioned and most politically
accountable for making them."  Hamdi v. Rumsfeld, 124 S.Ct. 2633,
2647 (2004) (citing Department of the Navy v. Egan, 484 U.S. 518, 530
(1988).

As the facts in this memorandum demonstrate, and as this Court
previously recognized, enjoining the 2nd Brigade from transforming to

a SBCT would result in real and significant harm to the Army, its soldiers, and the war on terror.  See Court's November 5, 2004 Order at 17-18.  Therefore, the Army requests that the Court not disrupt the Army's efforts to provide the best support possible to soldiers in combat and the best security possible to our nation when the record shows that the Army has effectively implemented efforts to eliminate or minimize harm to cultural and natural resources.

D.    **AN INJUNCTION PREVENTING THE TRANSFORMATION OF THE 2ND BRIGADE TO A SBCT WOULD BE CONTRARY TO THE PUBLIC INTEREST**

As the Ninth Circuit has said, the trial court "must always consider whether the public interest would be advanced or impaired by issuance of an injunction in any action in which the public interest is affected." Carribean Marine Services Co., Inc. v. Baldridge, 844 F.2d 668, 674 (citations omitted).  Indeed, if the public interest weighs strongly against an injunction, the relief must be denied "even though irreparable injury may otherwise result to plaintiff. . . ." Weinberger v. Romero-Barcelo, et al., 456 U.S. 305, 312 (citing Yakus v. United States, 321 U.S. 414, 440 (1944)).

The Army vigorously denies that Plaintiffs would suffer any harm absent an injunction in this case, let alone immediate and irreparable harm.  But, even if such harm were likely, the public

interest would dictate that no injunction issue in this case.
Clearly, the defense of the United States is one of, if not the, most
important of public interests.  Moreover, it is unquestionable that
preparing our soldiers by providing them with the most advanced
training and supplying them with the most advanced equipment serves
not only the individual soldier's best interest, but the best
interest of the public as well.  Put simply, where an injunction
would harm the military's ability to provide for the national
defense, it "would have a large negative effect on public interest."
Water Keeper Alliance v. Department of Defense, 152 F.Supp.2d 155,
163 (D.P.R. 2001).

The overwhelming weight of the evidence before the Court
demonstrates that enjoining the transformation of the 2nd Brigade
will harm national security.  First, delay in transforming the 2nd
Brigade will result in faster deployment of other Army units to
combat operations in Iraq and elsewhere.  Such "accelerated
deployment would further reduce unit training time, significantly
increase the risk of American casualties and decrease unit mission
effectiveness in combat . . . ."  Lovelace Dec. at ¶ 8.

Second, transformation delay would substantially interfere with
the Army's ability to meet its obligation to protect the United

States' interests in the Pacific region.  As the "only active brigade combat team" in the Pacific that is not currently deployed, the ability of the unit to react expeditiously and provide the advanced capabilities attendant to a SBCT, would "cause immense harm to the US Army Pacific's capability to execute our mission. . . ."  Brown III Dec. at ¶ 8.

Finally, delay in the training of the soldiers of the 2nd Brigade will diminish the ability of our soldiers to carry out there mission of protecting the United States.  "Less training equals more casualties upon deployment."  Banach Dec. at ¶ 2.   Obviously greater numbers of casualties is not in the public interest and will not advance the Army's mission of protecting the public interest.  As Judge Mollway has stated "there is no heavier weight to balance than the loss of human life."  Malama Makua v. Rumsfeld, 2006 U.S. Dist LEXIS 3962, *33 (D.Hawaii February 2, 2006).

## V.    CONCLUSION

For the foregoing reasons, Federal Defendants request that the Court issue an order on interim injunction relief permitting the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, a minor modification to existing training Range 11T, and the following five transformation related construction

projects in order to properly transform the 2nd Brigade and protect our national security interests:

1.  QTR1 at Schofield Barracks
2.  SBCT Motor Pool at Schofield Barracks
3.  Urban Assault Course at Schofield Barracks
4.  Tactical Vehicle Wash Facility at Schofield Barracks East Range (an environmental protection measure)
5.  Multiple Deployment Facility at Wheeler Army Airfield, Hawaii.

Respectfully submitted this 14th day of November 2006,

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
/s/ Thomas Helper

_____
HARRY YEE      (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General

BARRY A.  WEINER
JAMES D. GETTE
Trial Attorneys
General Litigation Section
Environment & Natural Resources
Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C.  20044-0663
Email: Barry.Weiner@usdoj.gov

```
                              Telephone:      202-305-0469
                              Fax:        202-305-0274

Of Counsel:
Robert M. Lewis
Senior Trial Attorney
Army Environmental Law Division
901 North Stuart Street, Suite 400
Arlington, VA 22203
Telephone:  (703) 696-1567
Facsimile:   (703) 696-2940
```

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

Served Electronically through CM/ECF:

David L. Henkin        dhenkin@earthjustice.org

Isaac H. Moriwake      imoriwake@earthjustice.org

Attorneys for Plaintiffs

DATED:  November 14, 2006, at Honolulu, Hawaii.


/s/ Jan Yoneda
_____

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
HARRY YEE      (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General
BARRY A. WEINER
JAMES D. GETTE
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0469
Facsimile: (202) 305-0274
Email: Barry.Weiner@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| ILIO‘ULAOKALANI COALITION, a Hawaii, nonprofit corporation; NA‘IMI PONO, a Hawaii unincorporated association; and KIPUKA, a Hawaii unincorporated association, | CIVIL NO.04-00502 DAE BMK )<br><br>)FEDERAL DEFENDANTS'<br>)MEMORANDUM ON THE SCOPE OF<br>)INTERIM INJUNCTIVE RELIEF<br>)IN ACCORDANCE WITH THE<br>)NINTH CIRCUIT'S REMAND<br>) |
|          Plaintiffs, | ) |
|    v. | ) |
| DONALD H. RUMSFELD, Secretary of United States Department of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army, | ) Hearing:<br>)<br>) Date:  November 20, 2006<br>) Time:  9:45 a.m.<br>) Judge: Hon. David A. Ezra |
|          Defendants. | ) |

TABLE OF CONTENTS

TABLE OF AUTHORITIES

FEDERAL DEFENDANTS' MEMORANDUM ON THE SCOPE OF INTERIM
INJUNCTIVE RELIEF IN ACCORDANCE WITH THE NINTH CIRCUIT'S REMAND

DECLARATION OF THOMAS HELPER; EXHIBITS "A" AND "B"

DECLARATION OF RONALD L. BORNE

DECLARATION OF LAURIE LUCKING; ATTACHMENTS "1" TO "31"

DECLARATION OF MAJOR GENERAL WILLIAM H. BRANDENBURG

DECLARATION OF COLONEL STEFAN J. BANACH

DECLARATION OF COLONEL ROBERT B. BROWN

DECLARATION OF MICHELLE MANSKER

DECLARATION OF MAJOR GENERAL DANA T. ATKINS

DECLARATION OF JAMES J. LOVELACE

DECLARATION OF LIEUTENANT GENERAL JOHN M. BROWN III

CERTIFICATE OF SERVICE

Federal Defendants, Donald H. Rumsfeld, Secretary of the United States Department of Defense; and Francis J. Harvey, Secretary of the United States Department of the Army, ("U.S. Army" or "Army"), by and through undersigned counsel, file this Emergency Motion for Decision on the Scope of Interim Injunctive Relief in Accordance with the Ninth Circuit's Remand. For the reasons set forth below, the Army respectfully requests the Court to lift the temporary injunction entered in this action by the United States Court of Appeals for the Ninth Circuit, and replace it with a more limited interim injunction that allows the Army to proceed with critical transformation and training activities for the 2nd Brigade of the 25th Infantry Division (Light) as a Stryker Brigade Combat Team in Hawaii pending further proceedings in this Court to address what permanent injunction, if any, is warranted pending compliance with the National Environmental Policy Act ("NEPA").

## I.    INTRODUCTION

This action was remanded to this Court by the Ninth Circuit in an Order entered on October 27, 2006, issued a few weeks after the Ninth Circuit's Opinion concluding that the U.S. Army had violated the National Environmental Policy Act ("NEPA") by failing to consider locations outside of Hawaii for transforming the 2nd Brigade to a Stryker Brigade Combat Team. See Opinion entered October 5, 2006 at 41 (2-1). In its October 27th Order, as described in more detail below, the Ninth Circuit issued a limited remand to this Court for the sole purpose of determining on an expedited basis the appropriate scope of "interim injunctive relief" pending a decision by this Court on the scope of a permanent injunction. Order of October 27, 2006, at 2-3 and Addendum to Order at 9 (2-1). Since this matter is very time-sensitive, a fact recognized by the Ninth Circuit in directing

2

that the matter be resolved "expeditiously," Order at 3, the Army requests the Court to consider the scope of interim injunctive relief at its earliest opportunity.

The Ninth Circuit's October 27th Order responds to an emergency motion filed by Plaintiffs in the Ninth Circuit seeking "interim injunctive relief" pending a decision by this Court on the scope of permanent relief pursuant to the Ninth Circuit's Opinion on the merits. The Ninth Circuit did not grant the Plaintiffs the relief they sought, but instead issued a "temporary injunction" and "remanded to the district court to enter and determine the scope of an interim injunction." Addendum at 9.

The temporary injunction prohibits the Army "from implementing, executing, or proceeding with the following activities associated with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii: grading, grubbing, other ground disturbance, construction, land acquisition, project design, geotechnical testing, unexploded ordinance clearance, contract award, and Stryker Brigade Combat Team-specific training pending entry of an injunction by the district court." Order of Oct. 27 at 1-2. The Ninth Circuit imposed this temporary injunction "until the district court has entered an interim injunction" and accordingly remanded to this Court "for the purpose of determining the appropriate scope of an interim injunction . . . ." Id. at 2. In response to a dissent to the Order filed by Judge Bea, the Court of Appeals issued an Addendum to its Order that clarified that it had not issued the interim injunction requested by Plaintiffs but instead had "entered a temporary injunction pending the district court's expeditious resolution of the interim injunction." Addendum at 9.

3

As the Ninth Circuit acknowledged, it did not "[p]roperly balanc[e] the parties' equities" in entering the temporary injunction, a function the Ninth Circuit determined should be performed instead by this Court.  Order at 3 ("Properly balancing the parties' equities requires a fact-intensive inquiry best undertaken by the district court").  Further, responding to the U.S. Army's objection that an interim injunction would harm national security, the Ninth Circuit acknowledged that "this matter is very time-sensitive," and it consequently ordered "the district court [to] proceed expeditiously" to adjudicate the interim injunction.  Id. (emphasis added).  Finally, in the Addendum to its Order, the Ninth Circuit took pains to clarify the temporal limitations of the temporary injunction and its directions to this Court:

> Reading the dissent, one would think that we have issued a permanent injunction. We have not.  We have not even issued an interim injunction pending a ruling on a permanent injunction, which is what the Plaintiffs ask for.  Rather, we have entered a temporary injunction pending the district court's expeditious resolution of the interim injunction.  We have acknowledged that properly balancing the parties' equities is a fact-intensive inquiry best undertaken by the district court, and we have remanded to the district court to enter and determine the scope of an interim injunction.

Addendum at 9.

As set forth below, the Ninth Circuit's temporary injunction is impairing the ability of the 2nd Brigade to accomplish its military mission with a minimum of American combat related casualties, a paramount national interest.  The temporary injunction should be lifted immediately because the harm to the U.S. Army, and to the public interest, from continuation of the injunction grossly outweighs the negligible risk of harm to the Plaintiffs' interests

4

from lifting it.[1]

Further, the interim injunction contemplated by the Ninth Circuit should be narrowly tailored to allow certain critical elements of the 2d Brigade transformation and training to proceed pending further proceedings concerning a potential permanent injunction pending NEPA compliance.  In its October 27 remand Order, the Ninth Circuit directed the district court to consider "which Stryker Brigade Combat Team transformation-related activities in Hawaii are time critical and which activities can proceed without causing irreparable environmental and cultural harm."  Id. at 3.

The Army has identified five (5) of the twenty-eight (28) Stryker related projects and one minor modification to an existing training range (6 projects in total) that are the most time-sensitive and critical to proceed in order to ensure that the 2nd Brigade of the 25th Infantry Division Light ("2nd Brigade") can properly transform into a Stryker Brigade Combat Team ("SBCT")and be ready for deployment by November 2007.  The continuation of Stryker training and these six critical transformation related activities will permit the 2nd Brigade to properly transform and be available to defend our nation with the most effective military technology and weapons systems in a manner that does not cause irreparable harm to cultural sites or natural resources.

This Court previously held that the harm Plaintiffs alleged to cultural and natural resources was speculative and could not justify issuance of injunctive relief.  See Court's November 5, 2004 Order at 15-16.  That same conclusion is even more appropriate today.  There

---

[1] The U.S. Army will await issuance of the mandate before seeking a hearing before this Court to address what permanent injunction, if any, is warranted pending compliance with NEPA.

are no endangered or threatened species in the six critical project areas.  See Declaration of Michelle Mansker at ¶4.  Furthermore, the significant measures the Army has undertaken to protect cultural resources have proven to be effective in protecting cultural resources during the transformation process.  See Declaration of Dr. Laurie Lucking "Lucking Dec")at ¶¶4-10, and attachment 1 to Lucking Dec at ¶¶7, 12-19.  Plaintiffs' claim that some unknown burial site might be impacted in the future is nothing more than pure speculation, and does not demonstrate irreparable harm as is needed to substantiate an injunction on the equipping and training of the 2nd Brigade and the six critical Stryker-related projects and training.

As this Court previously recognized, the harm to the Army and its effort on the Global War on Terrorism from an injunction are both "demonstrative and severe."  See Court's November 5, 2004 Order at 17.  There is no question that "delaying or disrupting the conversion of the 2nd Brigade to a SBCT 5 will significantly impact the sequence of the Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism."  Id. at 15, 18.  Above all, to enjoin the transformation of the 2nd Brigade would result in soldiers that are not properly trained on the most effective and protective defense systems, thereby compromising the safety and effectiveness of these soldiers in combat.

The high likelihood of harm to the U.S. Army, and to the public interest, from continuation of the temporary injunction would grossly outweigh the negligible risk of harm to the Plaintiffs' interests from lifting it.  Consequently, the temporary injunction should be lifted and it should be replaced by a more narrowly tailored interim injunction pending further proceedings in this Court to address what

permanent injunction, if any, is warranted pending NEPA compliance. The severe and demonstrative impact to our soldiers and our Nation from the temporary injunction must be avoided by allowing a limited number of projects and training to go forward immediately because they are necessary to accomplish the transformation of the 2nd Brigade and can be implemented in a manner that reduces to a discountable level the risk of harm to cultural and natural resources.  Consequently, the Army requests the Court to narrowly tailor the interim injunction so that it allows the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, and the following six transformation related projects:

> (1) Completion of the Qualification Training Range One ("QTR1");
> (2) Completion of 2/25 SBCT Motor Park and Maintenance Area ("SBCT Motor Pool");
> (3) Completion of the Urban Assault Course ("UAC");
> (4) Completion of the Tactical Vehicle Wash Facility ("TVWF");
> (5) Completion of the Multiple Deployment Facility ("MDF"); and
> (6) Minor modification to existing training range 11T on the Pohakuloa Training Area ("PTA").

## II.  FACTUAL BACKGROUND

To avoid needless repetition and inconvenience to the Court, Federal Defendants hereby incorporate by reference the Factual Background sections previously presented to the Court in their Cross-Motion for Summary Judgment dated February 4, 2005, and in their opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004.  <u>See</u> Federal Defendants' Memorandum in support of their Cross-Motion for Summary Judgment dated February 4, 2005 at 4-16 and Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004 at 1-10. This briefing provides the Court with the factual background underlying the Army's decision and need to transform the 2nd Brigade to a SBCT.  The critical information needed to resolve the scope of

7

an interim injunction and determine "which Stryker Brigade Combat
Team transformation-related activities in Hawaii are time critical
and which activities can proceed without causing irreparable
environmental and cultural harm" is contained in this memorandum and
the following declarations:

(1) Declaration of Ronald L. Borne ("Borne Dec.") dated
November 13, 2006;

(2) Declaration of Laurie Lucking ("Lucking Dec.") dated
November 13, 2006 with Attachment 1, Declaration of Laurie
Lucking dated October 22, 2006 and Attachments 2-31
(photographs and maps of critical project areas);

(3) Declaration of William H. Brandenburg ("Brandenburg Dec.")
dated November 13, 2006;

(4) Declaration of Stefan J. Banach ("Banach Dec.") dated
November 8, 2006;

(5) Declaration of Robert B. Brown ("Brown Dec.") dated
November 7, 2006;

(6) Declaration of Michelle Mansker ("Mansker Dec.") dated
November 11, 2006;

(7) Declaration of Dana T. Atkins ("Atkins Dec.") dated
November 7, 2006;

(8) Declaration of James J. Lovelace ("Lovelace Dec.") dated
November 10, 2006; and

(9) Declaration of John M. Brown III ("Brown III Dec.") dated
November 9, 2006.

These declarations identify the critical transformation projects
that are needed to transform the 2nd Brigade and ensure that it is
properly trained and available for deployment in a timely manner.
These declarations further confirm that the Army has undertaken
significant protective measures to ensure that Stryker-related
training and construction of these critical projects can be completed
in a manner that is protective of cultural sites and natural
resources.  Finally, these declarations explain why these projects
and Stryker-related training are time-sensitive and critical to our
Nation's defense and ensuring that our soldiers are properly trained
with the most effective and technologically advanced military defense
equipment.

In addition, the course of events that led up to the 2d

8

Brigade's current posture of being 12 months into an approximately
two year training cycle is particularly important when considering
the appropriate scope of interim injunctive relief.  On August 17,
2004, Plaintiffs filed a complaint in the Hawaii district court
alleging that the Army violated NEPA by failing to consider
reasonable alternatives, including relocation to the continental
United States. On November 5, 2004, this Court denied Plaintiffs'
motion for a preliminary injunction.  Even then, before
transformation of the 2d Brigade was in full swing, the Court
realized that national security concerns were "an issue of paramount
importance that tips the balance of hardships decidedly in favor of"
the Army because "[d]elaying or disrupting the conversion of the 2nd
Brigade to SBCT 5 will significantly impact the sequence of Army
transformation and reduce the overall effectiveness of Army forces
currently fighting the Global War on Terrorism." See Court's
November 5, 2004 Order at 17-18.

On April 25, 2005, this Court granted the United States' motion
for summary judgment.  The Court entered final judgment on April 29,
2005 and denied Plaintiffs' motion for an injunction pending appeal
on May 19, 2005. The Plaintiffs then moved for an injunction pending
appeal in the Ninth Circuit, which similarly denied the injunction.
On October 5, 2006, the Ninth Circuit reversed the district court and
remanded for the Army to prepare a Supplemental Environmental Impact
Statement ("SEIS") examining the alternative of relocation of the 2d
Brigade to a facility outside of Hawaii.

Between the denial of the first motion for preliminary
injunction in this case and the Ninth Circuit's October 5, 2006,
decision, the Army proceeded with transforming the 2d Brigade. As a
result, the 2d Brigade is 12 months into the transformation process.

It has completed 60% of its training and almost 70% of its new
equipment fielding. Brandenburg Dec. at ¶4. The 2d Brigade is
scheduled to become a fully manned, trained, and equipped Stryker
Brigade Combat Team (SBCT), ready for deployment, by November 2007.
The 2d Brigade can no longer simply train as a light-infantry
brigade, and therefore any delay in Stryker training will result in a
combat ineffective unit. Thus, "to stop transformation now, even for
a matter of weeks, would deny the 2d Brigade Commander the power and
ability to complete transformation and training to fulfill his
assigned operational missions." Lovelace Dec. at ¶8. The Army cannot
afford to delay the transformation and readiness of a single brigade,
including the 2nd Brigade.  Lovelace Dec. at ¶3. "If 2nd Brigade is
not available to deploy when required as SBCT 5, then every other
brigade in the Army would have to deploy sooner. This accelerated
deployment would further reduce unit training time, significantly
increase the risk of American casualties, and decrease unit mission
effectiveness in combat-for every brigade in the Army." Id.  The
national security concerns that the district court found compelling
in November of 2004 thus carry even more weight two years later and
one full year into transforming the 2d Brigade.

Knowing that the 2nd Brigade cannot go back to an ineffective
light infantry brigade and must continue with transformation, the
Army has carefully considered the 28 Stryker-related projects and
identified the most time-sensitive and critical to our national
security and the safety and effectiveness of our soldiers.  As
reflected in the administrative record and accompanying declarations,
the Army has undertaken significant protective measures to reduce to
a discountable level the risk of harm to cultural and natural
resources from continued training and completion of these six

10

specific projects.  This Court previously recognized the lengths to which the Army had gone to ensure that cultural and natural resources are protected during the transformation process, <u>see</u> Court's November 5, 2004 Order at 15-16, and nothing has occurred during the appeal process that would alter that previous determination.

For the reasons discussed below and in the accompanying declarations, it is requested that the temporary injunction be lifted and that the interim injunction that replaces it allow the Army to proceed with the six specific Stryker related projects and provision of the requisite equipment and training in order to ensure that the 2nd Brigade is properly trained and available for deployment as a SBCT by November 2007.

## III. STANDARD FOR ISSUANCE OF AN INJUNCTION

Violations of environmental statutes do not mandate issuance of an injunction.  "NEPA creates no exception to the traditional principles that govern injunctive remedies." <u>National Audubon Society v. Department of Navy</u>, 422 F.3d 174, 201 (4th Cir. 2005).  Thus, to qualify for injunctive relief, the moving party must first show it will suffer some tangible irreparable injury absent an injunction. <u>See</u> <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982); <u>Amoco Production Company v. Village of Gambell</u>, 480 U.S. 531, 542 (1987). There is no presumption of irreparable injury in environmental cases. <u>Romero-Barcelo</u>, 456 U.S. at 312; <u>Amoco Production Co.</u>, 480 U.S. at 542; <u>see</u> <u>also</u> <u>Forest Conservation Council v. U.S. Forest Service</u>, 66 F.3d 1489, 1496 (9th Cir. 1995).

11

Further, where there are violations of environmental statutes, the court must balance the competing claims of injury and consider the effect on each party of granting or withholding the requested relief. <u>Amoco Production Company v. Village of Gambell</u>, 480 U.S. 531, 542 (1987); <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982). The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances. <u>Id</u>. The relative hardship to the parties is controlling. <u>Benda v. Grand Lodge of Int'l Ass'n of Machinists</u>, 584 F.2d 308, 314, 315 (9th Cir. 1978). When a federal court considers the propriety of injunctive relief, it must balance the equities of the case, considering the potential harms of granting or denying relief to each party, in an effort to "mould each decree to the necessities of the particular case." <u>Romero-Barcelo</u>, 456 U.S. at 312 (1982). The Court must also determine whether the balance of public interests is served by the requested injunction. <u>Caribbean Marine Services v. Baldridge</u>, 844 F.2d 668, 674 (9th Cir. 1988).

**IV.   ARGUMENT**

While the Army remains committed to complying fully with NEPA,[2] equipment fielding, training activities and certain limited

---

[2]The Army has already taken initial actions to prepare the Supplemental EIS ordered by the Ninth Circuit. Brown III Dec. at ¶9.

12

construction activities that will directly facilitate the necessary training of the 2nd Brigade simply cannot be halted at this late date without doing irreparable harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security.  In accordance with the Ninth Circuit's remand, the Army has identified six Stryker-related projects that are time-sensitive and critical to ensure the transformation of the 2nd Brigade to a SBCT.  These construction projects as well as the associated Stryker-related training will not irreparably harm cultural or natural resources.  Mansker Dec. at ¶4, Lucking Dec. at ¶¶4-10, Attachment 1 to Lucking Dec. at ¶¶7, 12-19.  The Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to environmental and cultural resources from these actions and will continue to do so as it proceeds with training the 2nd Brigade. Id.  The analysis this Court previously conducted on the impacts to the Army and this Nation's security that would result from an injunction is even more relevant today than it was in November 2004.  This Court earlier found that the national security concerns implicated from preventing transformation are "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and

13

reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." <u>See</u> Court's November 5, 2004 Order at 17. The same conclusion should be reached here when considering interim injunctive relief because the harm to the Army and this nation's defense is highly likely and severe, while the harm claimed by the Plaintiffs is speculative in nature and unlikely due to the lack of cultural and natural resources in the six critical project areas and the extensive mitigation measures undertaken as part of the transformation process.

### A. THE ARMY AND THE PUBLIC INTEREST WILL BE IRREPARABLY HARMED BY THE ISSUANCE OF A BLANKET INJUNCTION ON ALL STRYKER-RELATED PROJECTS AND TRAINING

The Army has carefully crafted a solution that permits equipment fielding, training, and a limited number of Stryker-related construction projects to proceed while incorporating the protective measures outlined in the administrative record and accompanying declarations that will reduce any likelihood of harm to cultural and natural resources to a negligible level. As discussed below, unlike the potential for irreparable harm to cultural and natural resources, which is remote, the likelihood of severe harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security is high and, thus, the balance of harms tips decidedly in favor of the Army and the issuance of an interim injunction that permits transformation of

14

the 2nd Brigade to a SBCT.

> **1.    *The irreparable harm that will be suffered
> by the Army and its soldiers from an injunction
> that prohibits the transformation of the
> 2nd Brigade is demonstrative and severe***

There are currently four operational SBCTs. When the 2d Brigade is finished with its transformation, it will be the fifth.  At the time the Army announced its plans to begin transforming into a future force, its object was to create a "more responsive deployable, agile, versatile, lethal, survivable, and sustainable" Army. ARP[3] 9656. Combat evidence demonstrates that the Army has done just that with the operational SBCTs.

The primary component of an SBCT is the Stryker vehicle.  As Colonel (COL) Robert B. Brown, who commanded the 1st Brigade, 25th Infantry Division, Stryker Brigade Combat Team in Iraq, explains: "Having spent a year in combat fighting from a Stryker vehicle, I can emphatically state that it is my vehicle of choice for combat operations in today's environment."  Brown Dec. at ¶5. In short, the Stryker vehicle saves soldiers' lives.  As Brigade Commander, COL

---

[3] In this memorandum, Federal Defendants refer to documents from the Programmatic Environmental Impact Statement in the Administrative Record as "ARP" and document from the Site-Specific Environmental Impact Statement as "ARS" followed by the pertinent bates number for the referenced document.  The administrative record documents cited herein are attached to the Declaration of Thomas Helper, which has been filed simultaneously with this memorandum.

Brown obtained personal knowledge of the survival capabilities provided by the Stryker vehicle in the form of approximately 137 Rocket Propelled Grenades (RPGs) and approximately 50 Suicide Vehicle Born Improvised Explosive Devices striking direct hits to Stryker vehicles under his command. Id. None of the RPGs penetrated a Stryker vehicle due to its protection and speed. Id. The brigade nevertheless ultimately lost 33 of its soldiers in combat. According to COL Brown, the Stryker vehicle was "essential to saving lives" and "the losses would have been significantly higher if we had not been able to fight configured as a [SBCT] or use the Stryker vehicle during our training and deployment." Id.

Colonel Brown is not alone in that assessment. Given its performance in Iraq, the Army recognizes the importance of the SBCTs and the Stryker vehicle to its mission. General George Casey, the military commander of the Multi-National Force Iraq, requires SBCTs and employs them in vital missions, recently assigning an SBCT to "the priority mission to increase security in Baghdad and reduce the level of sectarian violence and terror attack." Lovelace Dec. at ¶9. In addition, General Casey "continues to submit formal requests for forces to include [SBCTs] to Joint Forces Command as part of the ongoing and continuous requirements in his theater of operations" and he "will not accept a light infantry brigade as a substitute for the

SBCT requirement in Iraq." Id.  The SBCTs are vital, as "[n]o other unit provides the same capabilities urgently needed in Iraq."  Id. Congress also recognizes the SBCTs vital importance, as it has directed the Army to submit plans to field a seventh SBCT and appropriated additional funds for that purpose.

To provide the commanders in the field with another SBCT as soon as possible, the Army has scheduled the 2d Brigade to complete transformation into the fifth SBCT by November 2007 and then be available to deploy. Id. at ¶7. The training involved in creating a SBCT is an intensive process that takes approximately two years. SBCTs "are configured to fight differently than previous brigades . . . [which] requires more extensive training and preparation in the initial stages of the fielding." Brown Dec. at ¶3. To become the agile and adaptive soldier that SBCTs demand requires "extensive training in a variety of areas, such as leadership, adaptability, creative thinking, the use of digital information and advanced marksmanship techniques." Id.

The 2d Brigade is currently in month 12 of that almost two-year long process, and because it "no longer exists as a light infantry brigade" there is no turning back the clock. Bradenburg Dec. at ¶4; Banach Dec. at ¶6-7. Its weapons, vehicles, and communications are those required for a SBCT, and its soldiers have skills tailored to

17

those required for a SBCT. Id. at ¶8. Thousands of pieces of new
Stryker Brigade equipment have been issued and hundreds of pieces of
old equipment have been turned in. Brown III Dec. at ¶5; Banach Dec.
at ¶6. But the 2d Brigade cannot perform its vital function as an
SBCT if it cannot complete its training and new equipment fielding as
such.  An SBCT is "enormously complex" and "unlike any other
organization we have had in the history of our Army." Banach Dec. at
¶10.  That creates "a significant learning curve" before soldiers can
become combat ready.  Id.  Any delay makes the curve that much
steeper, and will ultimately result in a "combat ineffective unit."
Banach Dec. at ¶1.

Delaying the training and new equipment fielding involved in
transforming the 2d Brigade into a SBCT will therefore ultimately
deny the commanders in the field adequate combat and deterrent forces
by interrupting tightly integrated transformation and deployment
schedules. For example, Major General Dana T. Atkins, the Director of
Operations, United States Pacific Command, states that disrupting the
transformation of the 2d Brigade "would immediately and unacceptably
undermine the ability . . . to deter conflict and respond to crisis
situations throughout the Asia-Pacific region." Atkins Dec. at ¶1.
It will affect not only the Army's combat and deterrent missions, but
also its humanitarian mission in responding to the "frequent and

severe natural disasters, including super-typhoons, earthquakes,
tsunamis, volcanic eruptions, and mudslides" in the Pacific Command's
Area of Responsibility. Id. at ¶4. In addition, the 2d Brigade is
"the only active brigade combat team assigned . . . in the Pacific
that is not deployed to the Middle East. As such, it provides company
and platoon sized contingency ready forces for PACOM responses to
homeland security threats and provides units to participate in
Theater Security Cooperation training and exercises with allied and
neighboring armies." Brown III Dec. at ¶4.  No other Pacific Command
"force provides the firepower, mobility, situational awareness, and
information processing capabilities resident in a [SBCT]." Atkins
Dec. at ¶6.

It is therefore critical that the 2d Brigade transform as
planned to meet Pacific Command "mission requirements and response
timeliness and to enhance the strategic flexibility of the United
States within the theater." Id.  Disrupting training at this point
would "cause immense harm to the US Army Pacific's capability to
execute our mission to provide combat ready forces to the United
States Pacific Command" and "add extreme difficulty to the brigade's
already complex task of achieving combat readiness." Brown III Dec.
at ¶8. Delaying the transformation of 2nd Brigade now, 12 months into
transformation, will have an even greater domino effect than when

19

this Court heard Plaintiffs' first motion for an injunction pending appeal, weakening the Army's strategic posture to deter threats in the Pacific Region, breaking a transformation sequence that was carefully synchronized with projected requirements for combat operations in Iraq and Afghanistan, and disrupting the reallocation of resources to other units that are undergoing transformation. Brown III at ¶1,6.

In addition to disrupting the Army's overall ability to respond to threats around the world by throwing off a tightly integrated transformation and deployment schedule, any delay in training will also have a profound and direct impact on the soldiers of the 2d Brigade when they are deployed: *less training equals more casualties upon deployment.* Banach Dec. at ¶2. COL Stefan Banach, Commander of the 2d Brigade, understands the need for continuity in training plans. He led a U.S. Army Ranger combat parachute assault into Afghanistan on October 19, 2001, "as the spearhead for the Global War on Terrorism." Id. Those Rangers "were the best trained and most well led Soldiers in our Army" and "were fully resourced and . . . had full continuity in all aspects of our combat preparedness," yet this country "still lost five great Rangers and over thirty more Rangers were severely wounded." Id. In Colonel Banach's informed opinion, "any disruption of our current training plan will get many

more of our Soldiers killed and wounded in combat than if we were able to maintain continuity in our current training and transformation plan to a fully combat ready [SBCT]."  Id.; Bradenburg Dec. at ¶3. In other words, interrupting the training of the 2d Brigade as an SBCT "will have second and third order effects that will be measured in the blood of our Soldiers."[4] Id.

When weighed against the speculative environmental harms Plaintiffs have alleged, the disruption to the Army's mission and the harm to its soldiers and their families that an injunction would cause weigh heavily in favor of granting interim injunctive relief that would permit the Army to transform the 2nd Brigade into a SBCT.

> ### 2.  The Army has identified six specific projects in addition to training that are needed to prepare the 2d Brigade for combat deployment as a SBCT and are highly unlikely to cause environmental or cultural harm.

Ronald L. Borne, the Director of Transformation for the 2d Brigade, has set forth the essential requirements that the Army must have to successfully complete the 2d Brigade's training as an SBCT before November 2007. Borne Dec. at ¶¶4-6.  To enjoin those activities will severely harm the Army. Thus, the Army submits that any interim injunction should permit the following activities, which

---

[4]Small detachments of 2d Brigade soldiers are already in combat in the Philippines and Iraq. Banach ¶ 9.

21

are critical to ensuring that the 2nd Brigade is properly transformed into a SBCT and prepared for deployment and combat in hostile environments:

- New Equipment Fielding and New Equipment Training

- Soldier and Unit Level Training

- Construction and use of the five critical projects out of the 28 studied in the EIS, and modification to an existing training range. These projects represent a fraction of the overall Stryker-related construction. They are:

  1. QTR1 at Schofield Barracks
  2. SBCT Motor Pool at Schofield Barracks
  3. Urban Assault Course at Schofield Barracks
  4. Tactical Vehicle Wash Facility at Schofield Barracks East Range (an environmental protection measure)
  5. Multiple Deployment Facility at Wheeler Army Airfield, Hawaii
  6. Minor modification to existing range 11T

  All of the Army's 28 construction projects in association with

the transformation are important[5], but these six are absolutely

---

[5] Plaintiffs have suggested that the delay in constructing the Schofield BAX demonstrates that none of the Stryker-related projects should be considered critical because this was one of the 28 projects that Army previously claimed were necessary to transform.  This criticism is misplaced.  The Army maintains that all 28 projects are needed to establish facilities to transform, maintain and sustain a Stryker brigade in the long term, but for the limited duration of an interim injunction, the Army has identified the six most critical projects that will permit the 2nd Brigade to transform in a timely manner and be ready for deployment by November 2007.  Borne Dec. at ¶8.  The fact that the Schofield BAX was delayed does not undermine the credibility of the Army's assessment of what is needed for timely transformation of the 2nd Brigade.  As Ronald Borne explained in

critical to ensuring that the 2nd Brigade is transformed into a SBCT and ready for deployment in November 2007. Borne Dec. at ¶6; Banach Dec. at ¶¶6,8; Brandenburg Dec. at ¶¶ 7, 10-12.[6] Of these critical projects, two projects - QTR1 and Tactical Vehicle Wash Facility - are already completed. Borne Dec. at ¶6 The three remaining projects are being built over existing facilities and are close to 50% complete, thereby minimizing any environmental impact. Borne Dec. at ¶6. The final project is a minor modification to an existing range 11T, which involves re-grading roads, improving berms, and moving certain targets, all with no adverse environmental impacts. Id. at ¶4. The Army has identified six critical projects that will have minimal impact to the environment, but must proceed in order to transform the 2nd Brigade to a SBCT. Without these projects and training, the harm to the Army, its soldiers, and its effectiveness on the battlefield is inevitable.

The reasons these projects were deemed critical to the

---

his declaration, the project was delayed due to the unexpected discovery of a significant amount of unexploded ordnance (UXO) that took much longer than expected to clear, thus causing a delay in construction. Id. The Army should not be faulted for ensuring the safety of its soldiers, construction staff, and the general public.

[6]The reasons why these specific projects and Stryker-related training are critical to the transformation of the 2nd Brigade is discussed in detail in the declarations of Ronald Borne, Colonel Banach, and Major General William H. Brandenburg.

transformation of the 2nd Brigade are described in detail in Declaration of Ronald L. Borne.  Mr. Borne explains the critical nature of ensuring that QTR1 at Schofield Barracks is available for training. Borne Dec. at ¶6(b)(I).  This is a multi-purpose small arms and machine gun range that was built over the former site of other ranges and is designed to accommodate all individual and crew-served pistol, rifle, and machine gun qualification requirements.  Id.  This project is now complete and the weapons being used are not unique to a Stryker vehicle and will be in use regardless of the scope of any injunction issued in this case. Id. Furthermore, all ammunition used on this range is for training purposes and is not explosive in nature, thereby minimizing any alleged harm.  Id.  The QTR1 range is a critical facility for training the 2nd Brigade because without it, there is no range in Hawaii for a Stryker unit to become proficient with the weapons and communication systems associated with the Stryker vehicle.  Id.

The second critical project for the transformation of the 2nd Brigade is the SBCT Motor Pool at Schofield Barracks.  Borne Dec. at ¶6(b)(ii).  The SBCT Motor Pool is designed to provide a facility to park, store, and perform the requisite maintenance and repair on the more than 1,000 Stryker vehicles, trailers and wheel mounted systems that are assigned to a SBCT.  Id.  Without this facility, there is no

place on Oahu to store, maintain, and repair these vehicles and they would be left in fields, parking lots, and other open space areas. Id. This would create significant security issues and also increase the risk of environmental harm due to maintenance and fueling mishaps. Id.

The third critical project for the transformation of the 2nd Brigade is the Urban Assault Course ("UAC") at Schofield Barracks, which is more than 50% constructed. Id. at ¶6(b)(iii). The UAC is designed to provide a facility capable of training a SBCT unit on urban terrain combat, which is needed in hostile environments such as Baghdad, Iraq. Id. The UAC is a multi-purpose small arms and machine gun range designed to accommodate all urban area fire training requirements. Id. This training facility will be used by a SBCT in a similar manner to all other units in Hawaii, and will be limited to dismounted individual or small unit live fire training. Id. The UAC project is critical because without it, SBCT training units will not be able to satisfy current urban operation doctrine and training standards and, thus, will not be properly trained to engage the enemy in an urban environment such as exists in Iraq and Afghanistan. Id. This inability to complete urban warfare training will likely translate into higher casualties for the 2nd Brigade. Id.

25

The fourth critical project for transformation of the 2nd Brigade is the Tactical Vehicle Wash Facility at the Schofield Barracks East Range.  Borne Dec. at ¶6(b)(iv).  This facility was built to provide a facility for the 2nd Brigade and other units to remove soil, debris and alien seeds from vehicles, trailers and wheel mounted systems that are used in the East Range and the vicinity of Schofield Barracks.  Id.  This project is an environmental protective measure that permits the Army to prevent the spread of alien invasive species of weeds and other biological pests between the unique ecosystems constituting the Army training areas, as required by a U.S. Fish and Wildlife Biological Opinion.  Id.  The Tactical Vehicle Wash Facility was built over a former warehouse site and serves a significant and important role in ensuring invasive species, seeds, and pests are not transported throughout the facility.  Id.  This facility is now complete and in use by the 2nd Brigade and other military units in Hawaii to protect the environment. Id.  This facility is critical to enable the 2nd Brigade to conduct vehicle operations necessary to transform while minimizing any harm to the environment.  Id.

The final critical project for the transformation of the 2nd Brigade is the Multiple Deployment Facility ("MDF") at Wheeler Army

Airfield in Hawaii.  Borne Dec. at 6(b)(v).  This facility is currently under construction and is being built over the Army's former deployment  holding site, which cannot accommodate a SBCT. The MDF is designed to allow units to pack, weigh, balance, and inspect vehicles prior to transport by air or to a seaport for debarkation.  Id.  Accurate weighing and center-of-gravity determinations are crucial for safely loading aircraft and boats and ensuring safety during transit.  Id.  Furthermore, the 2nd Brigade once transformed to a SBCT must have the capacity to deploy within 96 hours notice and must have the flexibility to  deploy under various load specifications.  Id.  This facility is critical to achieving such a deployment capability.  Id.

In addition to these five construction projects, receiving and training on the new equipment associated with Stryker vehicles, including the new communications systems and new or upgraded weapons systems, is essential to ensuring that these soldiers are properly prepared to operate as a SBCT.  Borne Dec. at ¶¶4, 5.  This training will occur on existing roads, trails and ranges on Schofield Barracks or Pohakuloa Training Area ("PTA").  Id.  The weaponry associated with the Stryker vehicle is similar to the weapons that have been used or are currently in use at training facilities in Hawaii, and only non-

27

explosive ammunition will be used during training.  Id.; see Borne Dec. at ¶¶4-5 for a more detailed description of the Stryker-related training that is needed to transform the 2nd Brigade to a SBCT.[7] Therefore, the Stryker-related training is not likely to cause any additional impacts to cultural or natural resources.  The Stryker-related training is consistent with military training that will occur on similar weapons systems even if an injunction is issued.

The Army considers all Stryker-related projects to be important and necessary to complete the transformation process, but it has identified six of these projects that are absolutely critical to ensuring that the 2nd Brigade can transform into a SBCT and properly trained on the new communications and weapons systems before this unit deploys in November 2007.  This transformation is critical to this Nation's security interests and, as discussed below, it will be

---

[7] The 2nd Brigade also will be using a Mobile Gun System, which employs a 105 millimeter (mm) gun. During training exercises, non-explosive training ammunition will be used.  Borne Dec. at ¶4.  The range upon which this training will occur, Range 11T, is currently a helicopter gunnery, machine gun, and anti-tank missile range.  Id.  In the past, this range was used by Model M60 tanks that were equipped with the same type of weapon systems as the Mobile Gun Systems, a 105 mm gun. Minor modifications that will not impact the environment, including improving roads and berms, and installing new targets will be made to accommodate this training.  Borne Dec. at ¶4.  This training is critical to ensuring our soldiers are properly trained on the weapons systems they will use as a SBCT. Furthermore, any alleged damage from use of the MGS will be minimal because the Army will not be using explosive ammunition. Id.

done in a manner that is protective of the environment and will not result in an appreciable risk of harm to cultural or natural resources. As such, it is requested that the Court narrowly tailor an interim injunction to permit these critical projects to proceed along with the Stryker-related training discussed above.[8]

> **3.  There are no viable alternatives to finishing the training of the 2d Brigade as a SBCT at a location outside Hawaii and maintaining this unit as a light infantry brigade is improvident.**

Plaintiffs have suggested an alternative to transforming the 2nd Brigade in Hawaii that would involve transporting the entire unit to another location either in the contiguous United States or Alaska. In the alternative, Plaintiffs have suggested that the 2nd Brigade simply continue to train and operate as a light infantry brigade. Either suggestion is not a viable alternative, and would result in significant harm to the Army and the public interest.

First, there is no feasible alternative for the 2d Brigade to finish its training as an SBCT outside Hawaii while staying on

_____

[8] The Army can complete these critical construction projects and train the 2d Brigade for combat deployment while still maintaining the ability to take an objective look at whether to ultimately station the 2d Brigade in Hawaii, in compliance with NEPA and this Court's order. As Borne states in his declaration, these projects can be and are used by other Army units on Hawaii, Borne Dec. at ¶¶1,7, and thus their existence does not preclude the Army from restationing the 2d Brigade. See, infra, discussion under Point Heading IV(A)(4).

29

schedule to meet mission requirements. There is simply "no brigade-size excess capacity for Army housing, training areas and installation facilities available in the United States." Lovelace Dec. at ¶12; Brandenburg Dec. at ¶15. SBCT 3 will return to Alaska before the 2nd Brigade could complete its training; facilities in Alaska cannot accommodate that overlap. Lovelace Dec. at ¶10. There would be similar overlap with the impending activation of SBCT 7 at Fort Lewis in Washington. Id. Training at another location would also require transporting all personnel, equipment, and vehicles to that installation by air, which would require 80% of the Air Force's transport capacity and would consume 40 out of 270 available training days. AR 51334-36. Given the extensive transportation delays, and the years in advance in which the Army plans these actions, the 2d Brigade would not be able to meet its November 2007 availability date if training was to be completed outside Hawaii. Lovelace Dec. at ¶13.

In addition to the logistical problems of moving the 2d Brigade to complete its training, moving the 2d Brigade out of Hawaii would also "reduce the Army's posture to deter conflict and meet treaty obligations in the Pacific region including the Republic of Korea." Lovelace Dec. at ¶8. By remaining in Hawaii, the 2d Brigade is "strategically positioned to deploy to the four critical areas

identified in the National Defense Strategy: Northeast Asia, the East Asian littoral, Southwest Asia, and the Middle East." Id.  Thus, Admiral William J. Fallon, the combatant commander of the United States Pacific Command, "requires 2d Brigade to transform in Hawaii on time to meet mission requirements assigned by the Secretary of Defense." Id.

Finally, if soldiers were trained in Alaska or at Fort Lewis, their families would have to be left behind in Hawaii, because housing in Alaska and Fort Lewis is already occupied.  "This would require the soldiers and families of the 2nd Brigade, who have already endured a year-long deployment in Iraq . . . to endure additional months of separation during transformation" that would immediately be followed by another year-long deployment in Iraq. Lovelace Dec. at ¶12. It is not just a matter of convenience for those families, or for the Army.  Unexpected separation preceding a year-long deployment "adversely affect command authority, good order and discipline by creating morale and family problems that will undermine individual soldier's mental discipline and erode unit effectiveness." Id.; Brown III Dec. at ¶6. Separation creates distraction, and "distracted soldiers imperil themselves and others." Lovelace Dec. at ¶10.

31

In past motions, Plaintiffs have suggested that the 2nd Brigade would be as effective as a SBCT if it continued to operate as a light infantry brigade. The Army, however, has the expertise to determine what is in the nation's best interest as far as national defense is concerned, and it has determined that training as a light infantry brigade is both impractical and unwise. The 2d Brigade simply is not a light infantry brigade anymore and the Army does not operate light infantry units. Brandenburg Dec. at ¶4; Banach Dec. at ¶6. "It has different and improved capabilities that are now part of a fully integrated set of state of the art systems that provides our Nation with a new and overwhelming combat capability." Banach Dec. at ¶7. The new weapons systems and technology require each unit to transform and be trained on more advanced equipment and technology that is designed to provide a more effective and safer combat unit.  As detailed in Colonel Banach's declaration not only would it be impossible to go back to being a light infantry brigade, "to do so at this point would be illogical given the existing enhanced weapons accuracy, communications capability and protection for our soldiers that we can achieve now with our Strykers." Id.

It is also vital to train the 2d Brigade as an SBCT because "if events in the world require 2d Brigade to deploy tomorrow, or

32

whenever, it will do so with all available Strykers." Id.  The
soldiers must train on the equipment they will take into battle. And
they must do so "everyday in order to fight effectively when . . .
deployed to combat." Id.  The bottom line is this: "There is no
going back to legacy procedures and or previous less capable unit
designs." Id.  The 2d Brigade no longer exists as a light infantry
brigade, the equipment has changed, the training has changed, and the
new system provides the Army with more effective capabilities while
also providing for greater protection of our soldiers.

It is clear that 2nd Brigade's transformation is critical to
national security, and should not be enjoined.  The brigade needs its
equipment and specific facilities to ensure that it can properly
transform to a SBCT.  National security and foreign policy
considerations such as those implicated here are sufficient to find
that any injunction should allow transformation of the 2nd Brigade,
even in the face of a NEPA violation.  See Committee for Nuclear
Responsibility Inc. et al., v. Seaborg, 463 F.2d 796, 798 (D.C. Cir
1971).

In contrast to Plaintiffs' impractical proposals, the Army has
carefully crafted a solution that permits the Army to proceed with
equipment fielding, training and a limited number of construction

projects that will not cause a significant risk of harm to natural or cultural resources.  Two of these projects are already completed and the remaining three projects, other than the minor modification of Range 11T, are close to 50 percent complete.  As for the Stryker-related training, the Army has already completed close to 70 percent of the requisite training to transform the 2nd Brigade to a SBCT. Rather than transport the 2nd Brigade to another location outside Hawaii as Plaintiffs have suggested, the only viable alternative to ensure that the 2nd Brigade is transformed and available for deployment in November 2007 is to permit the transformation of this unit in Hawaii under the limited conditions set forth above.

> **4.    The Army should be permitted to proceed with the critical SBCT projects because each has independent utility and their completion will not restrict the Army's ability to analyze reasonable alternatives in a SEIS.**

Not only would a broad interim injunction be inequitable, for the reasons discussed above, it would also be unnecessary to preserve a meaningful NEPA process.  Federal Defendants anticipate that Plaintiffs may argue that the completion of the five critical projects and modification of Range 11T at PTA would undermine the Army's ability to meaningfully analyze reasonable alternatives in a supplemental NEPA analysis.  To the extent Plaintiffs make this

argument, it is without merit.

Courts have held that action on a project may proceed, notwithstanding a NEPA violation, where such action would neither "have an adverse environmental impact" nor "limit the choice of reasonable alternatives" within the meaning of 40 C.F.R. § 1506.1(a). For example, in North Carolina v. City of Virginia Beach, 951 F.2d 596, 598 (4th Cir. 1991), the Fourth Circuit reversed a district court's refusal to modify its injunction which prohibited the City of Virginia Beach from undertaking steps to build an 85-mile pipeline from Lake Gaston to satisfy the City' s potable water needs.  The project required a FERC permit, and FERC had neither issued its permit nor conducted its NEPA review.  Id. at 600.  In reversing, the court of appeals recognized that action on a project should not go forward pending NEPA compliance to the extent doing so would so influence the agency s ultimate decision on the project as to effectively limit the choice of reasonable alternatives available to the federal decisionmakers in the NEPA process.  Id. at 601-02.  The court ruled, however, that the injunction should have been narrowly tailored to allow the limited construction that the City wanted to do because such work would not "unduly influence" FERC's consideration of alternatives.  Id. at 602; see also South Carolina Dept. of

35

Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 99-101 (4th Cir.
1989) (holding that action need not be enjoined pending NEPA
compliance notwithstanding the plaintiff's contention that allowing
the action to proceed would prejudice the federal agency's
consideration of alternatives in the NEPA process).  The court's
conclusion is consistent with the Council on Environmental Quality's
("CEQ") regulations which provide that until an agency completes the
NEPA process and issues a ROD, it is only prohibited from taking
action concerning a proposal that would have an adverse environmental
impact or limit the choice of reasonable alternatives.  40 C.F.R. §
1506.1(a).

In this case, work on these critical projects and training will
not impact whether the Army decides where and how to complete the
transformation process.  Borne Dec. at ¶7.  While these projects are
vital to the 2nd Brigade's training and transformation, none are
unique to the Stryker transformation process and can be used by other
military units in Hawaii even if transformation is enjoined.  Id. at
¶¶6,7.  As explained by Ronald Borne, Director of Transformation for
the U.S. Army Garrison Hawaii, "[t]hese projects will also be used by
other military units stationed in Hawaii. Because these projects can,
and will, support activities unrelated to Stryker transformation,

36

their completion and/or use will not affect the ultimate decision on where 2/25 will be permanently stationed." Id. at ¶1. For example, construction on QTR1, a multi-purpose, small arms and machine gun range, and the Tactical Vehicle Wash Facility, a facility used to minimize the spread of invasive plant species and biological pests, has been completed and these facilities are in use by other Army units in Hawaii. Id. at ¶6. Thus, as Ronald Borne states in his declaration, the critical projects have independent utility and their existence does not preclude the Army from taking an objective look at whether to ultimately station the 2d Brigade in Hawaii, after compliance with NEPA under the Ninth Circuit's order. Id. at ¶¶1,6-8. Under such a scenario, and in accordance with the case law cited above, the Court should permit the Army to proceed with the limited number of projects that are needed to transform the 2nd Brigade.

The same result is reached with respect to the other prong of the CEQ regulation, which prohibits a federal agency from taking action that would have an adverse environmental impact pending NEPA compliance. See 40 C.F.R. § 1506.1(a)(1). In South Carolina Dept. of Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 100-01 (4th Cir. 1989), the district court granted plaintiffs motion for a preliminary injunction to prevent the Army Corps of Engineers from installing

37

pumped storage facilities prior to completion of an environmental impact statement that adequately considered the environmental impacts of operating the pumps.  The Fourth Circuit recognized that injunctive relief must be "tailored to restrain no more than what is reasonably required to accomplish its ends and no "broader than necessary to protect against the environmental risk." Id. at 100 (internal quotation marks and citations omitted).  Noting that "[t]he Corps ha[d] already spent a majority of the funds allocated for the project, and [that] Plaintiffs conceded at oral argument that installation alone of the already purchased pumped storage generators will cause no environmental damage," the Court of Appeals concluded that "restraining the installation of the generators is not reasonably required to protect the environment" and "vacate[d] that part of the injunction which prohibits the Corps from installing the pumped storage generators at the Dam." Id. at 100.

As more fully set forth in section IV.A.2, above, and section IV.B, below, the critical projects and training the Army seeks to complete pending further proceedings on a permanent injunction present negligible risk of significant harm to cultural or environmental resources.  Accordingly, it is not necessary to enjoin these activities to promote NEPA's purposes.

38

In the end, there is no danger of these limited construction projects and the related Stryker training rendering the NEPA compliance "an empty exercise," as Plaintiffs fear or, in the parlance of NEPA, "limit[ing] the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(2).  These projects are complete or close to completion, they have independent utility, and their future use is not conditioned on completion of the transformation process. Inasmuch as their use does not preclude the Army from giving meaningful consideration to other reasonable alternatives in an SEIS, these critical projects and related training should be allowed to proceed. See National Audubon Society, 422 F.3d at 201 ("[A] NEPA injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.' Violation of NEPA is not always cause to enjoin all agency activity while the agency completes the required environmental analysis.") (citation omitted).

## B.  PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF THE COURT ISSUES A LIMITED INJUNCTION PERMITTING TRANSFORMATION OF THE 2ND BRIGADE

As this Court previously recognized in denying Plaintiffs' prior requests for injunctive relief, Plaintiffs' claims are speculative in nature and the Army has gone to great lengths to ensure that impacts to cultural sites and natural resources are either eliminated or

mitigated.  See Court's Order dated November 5, 2004 at 15-16.
Today, Plaintiffs' assertions of harm fare worse than they did two
years ago.

The administrative record demonstrates that the Army took the
requisite hard look at the environmental impacts associated with the
transformation process in its programmatic and site-specific EISs.
See ARP 009656-666; ARS 0010308-329; 0024083-86; 0024260-73; 0024294-
98; 0024616-24; 0051514-522; 0051523-529; 0051703-736; 0051737-759;
0052224-666; and 0052267-298.  The Army specifically analyzed the
potential impacts associated with transformation and concluded, as
did the Fish and Wildlife Service in its Biological Opinion, that the
significant measures undertaken ensure that any risk to cultural and
natural resources is minimized.  See ARS 0024083-86; 0024260-73;
0024294-98; 0024616-24.

Plaintiffs in this action have never questioned the Army's NEPA
analysis on potential impacts nor have they claimed that this
analysis violates NEPA.  In fact, neither the district court nor the
Ninth Circuit identified any defects in the Army's impacts analysis.
The analysis contained in the Army's NEPA documents on impacts to
cultural and natural resources has not been invalidated and fully
complies with the statutory requirements under NEPA.

40

Plaintiffs cannot demonstrate that they are likely to suffer irreparable harm from the limited activities the Army here seeks leave to pursue. First, there are no endangered or threatened species in the critical project areas. See Mansker Dec. at ¶4. Second, the Army has undertaken significant measures to protect cultural resources and, to date, these measures have proven to be effective in protecting cultural resources during the transformation process. See Lucking Dec. at ¶¶2-11, Attachment 1 to Lucking Dec. at ¶¶7, 12-19. With respect to cultural resources, there are none in four of the five project areas and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1. Lucking Dec. at ¶¶4-10. As for the modification to Range 11T, this project has not begun and the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences. Id. In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade. Finally, Plaintiffs have raised concerns about the cultural site identified as Mauna'una, but, as Dr. Lucking explains, this site is located on a bluff and not within 200 yards of any of the critical

41

project areas. Lucking Dec. at ¶8.

Since Plaintiffs cannot demonstrate that cultural sites or natural resources are likely to be irreparably harmed by the completion of the six designated projects and Stryker-related training, the Court should fashion an injunction that permits these projects and training to continue in order to ensure that the 2nd Brigade is properly transformed and ready for deployment by November 2007.

### 1. *Plaintiffs cannot demonstrate irreparable harm to cultural resources*

Plaintiffs have argued that the transformation of the 2nd Brigade will cause irreparable injury to unknown cultural resources. But, as this Court has previously recognized, Plaintiffs' claims of irreparable harm are too speculative and overlook the Army's knowledge of cultural resources in construction areas and the extensive steps it has taken to avoid and mitigate impacts to cultural areas. Lucking Dec. at ¶¶ 2-10, Attachment 1 to Lucking Dec. at ¶¶2, 7-16, 19; see also Court's Order dated November 5, 2004 at 15-16.

Dr. Laurie Lucking, the Army Cultural Resources Manager, explains in her declaration that the Army acknowledged in the SEIS that transforming the 2nd Brigade might have significant impacts on

42

cultural resources because it realized that destroying even one cultural site would be significant to Native Hawaiians. Attachment 1 to Lucking Dec. at ¶4. In addition, Areas of Traditional Importance, which may not be protected under the National Historic Preservation Act, may be impacted. Id. at ¶4. When it published the SEIS, project designs had not progressed far enough to determine cultural impacts with certainty, and the Army cannot guarantee that no cultural sites will be impacted. However, the Army's goal is to prevent impacts, and its efforts to date have proven successful. Id. at ¶¶13,14.

Dr. Lucking explains in detail the Army's ongoing surveying and monitoring of project sites.[9] Most of the areas surveyed to date have revealed no cultural sites. Id. at ¶11. In the few instances when the Army has discovered cultural sites, it has altered the projects to avoid those sites entirely. Id. at ¶¶13, 14. To date, there is no indication that unexploded ordnance clearance or pre-construction environmental and geotechnical testing have damaged any cultural resources. Id. at ¶¶11,16. Archeological and cultural

---

[9]Many of the measures Dr. Lucking describes are included in the Programmatic Agreement the Army entered into with the Advisory Council on Historic Preservation, the Hawaii State Preservation Office, and the Office of Hawaiian Affairs to meet its obligations under the National Historic Preservation Act. Lucking Decl. ¶3.

monitoring will continue throughout the construction process to ensure that any cultural resources that may be discovered are properly protected.  Id. at ¶7.

Plaintiffs' selective criticism of the Army's mitigation measures in past briefing has failed to acknowledge the full scope of those efforts. Before the Army ever gets to the point of "data recovery" or "reburial," it will survey construction areas, flag eligible archaeological sites for avoidance, and design projects to avoid impacting those sites wherever possible.  ARS 52067; Attachment 1 to Lucking Dec. at ¶¶10,13,14.  Plaintiffs have argued that data recovery alone is insufficient to protect cultural resources. However, data recovery is not the only method of mitigation, as Plaintiffs would lead the Court to believe; in fact, it is the last line of defense. Id. Following Plaintiffs' logic, no earth-moving would be permitted in Hawaii since any such activity could lead to accidental discovery of archaeological sites, human remains, or cultural items. See also Judge Bea's dissent in Ninth Circuit's October 27, 2006 Order.  The Army is making every effort as it goes forward to avoid harming cultural resources by consulting with Native Hawaiian organizations, families and individuals, surveying project areas, amending project designs to avoid cultural sites, using lineal

44

descendants from project areas as cultural monitors to identify and suggest protection for sites, and using archaeologists and cultural monitors to oversee all earthmoving activities.  Id. at ¶¶2,5-11,13-14.

In the past, Plaintiffs have misstated the record when they've suggested that construction of several projects will occur in "archaeological sensitivity areas."  The SEIS identifies all archaeological sites at each sub-installation of which the Army was then aware.  See, e.g., ARS 52056-65.  However, the SEIS explains that individual project areas within those sub-installations "will be designed to avoid all eligible and unevaluated archaeological sites, to the full extent practicable."  ARS 52067. The Army has consistently redesigned projects to avoid cultural sites, Attachment 1 to Lucking Dec. at ¶¶ 2,10,13,14, and will continue to do so.

The Army developed a Cultural Monitoring Program, which enlists the assistance of persons who are knowledgeable about Native Hawaiian activities, to insure maximum protection for cultural sites and artifacts.  Id. at ¶7.  Currently, the Program includes 30 cultural monitors, all of whom are Native Hawaiians, who are permitted to go anywhere in the project area that is accessible to contractors and archaeologists.  Id.  Information reported by the monitors is given

45

to the archaeologists and the Army, as well as to interested members
of the community for additional comment.  Id. at ¶8.  Dr. Lucking
describes the other efforts the Army has undertaken, successfully, to
avoid disturbing cultural resources in the project areas. Plaintiffs
have complained that cultural monitors have been prevented from
exercising meaningful oversight, but any restrictions have been
safety related. Id. at ¶15.  Moreover, these complaints do not
involve projects that are among the six critical projects that the
Army wishes to continue during the interim injunction.  For example,
due to the large amounts of unexploded ordnance at the Schofield BAX
(not one of the six critical projects), the monitors initially were
required to remain 200 feet away from all intrusive activities. Id.
That was increased to 650 feet when chemical weapons were discovered
on site. Id. Once earth disturbing activities were completed,
however, the monitors were allowed down-range to examine those areas.
Id. These restrictions, which were only in place at the Schofield
Barracks BAX, were lifted several months ago after consultation with
the cultural monitors, who, as a result, became part of the Schofield
BAX UXO clearance team.

    Any claim that construction will lead inevitably to the
disinterment and destruction of Native Hawaiian burials is likewise

speculative and ignores the mitigation measures the Army has employed to ensure that such harm will not occur.  Attachment 1 to Lucking Dec. at ¶¶10,19.  The Army has taken every precaution to avoid effects on Native Hawaiian burials, including extensive surveying and, as noted above, hiring cultural monitors who are lineal descendants of people native to the various project areas and who are also knowledgeable about burial areas.  Id. at ¶¶7, 15,19.  When the Army identified possible burial sites at the South Range Acquisition Area, it marked the area "off-limits," and will do the same if it identifies other burial sites in the future.  Id. at ¶19.  The success of these measures is reflected in the identification and protection of possible burial sites at the South Range Acquisition Area (not one of the six critical projects) in July 2003.  Id. If additional burial areas are identified, similar precautions will be undertaken to protect them.  Id.  Thus, other than mere speculation, Plaintiffs cannot demonstrate that harm to Native Hawaiian burials is inevitable and irreparable.

With respect to the six critical projects, the extensive mitigation measures outlined above have worked with the two completed projects and are working effectively with the three projects that are currently under construction.  Lucking Dec. at 4-10; Attachment 1 to

47

Lucking Dec. at ¶7.  In fact, the Army's mitigation measures have revealed that there have been no cultural resources and historic properties identified in four of the five critical project areas, and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.  For example, in QTR1, which is an existing military range that is in use by non-Stryker units, a cultural site was identified and mitigation measures were undertaken to protect this site.  Id. at 9.  To date, this site has not been harmed.  Id.  As for the minor modification to Range 11T, this project has not begun, but the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences.  Id.

In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade.  Furthermore, there is a cultural site known as Mauna'una that Plaintiffs have identified as an area of concerns.  As Dr. Lucking explains, the Army is well aware of this site and has confirmed that it is more than 200 yards from any critical project area. Lucking Dec. at ¶8.  Mauna'una is located on a eroding slope and rather than harm this resource, the Army is

48

stockpiling soil from the Multiple Deployment Facility with hope that this soil can be used to stabilize the erosion around this site. Id. Based on the foregoing and as explained in Dr. Lucking's declaration, Plaintiffs cannot establish that there is a likelihood of harm to cultural resources from the completion of the six critical Stryker projects and related training.

Finally, Plaintiffs have complained that the use of the MK-19 grenade launcher is likely to cause irreparable harm to cultural resources. But as Dr. Lucking explains in her declaration, the Army does not use, and does not intend to use, high explosive rounds for training with the MK-19. Instead, the MK-19 "weapons are using practice munitions that do not have a high explosive charge." Attachment 1 to Lucking Dec. at ¶17. Those practice rounds do not pose a threat of irreparable harm to cultural resources. Id.

As this Court has already recognized, the Army has undertaken extensive measures to ensure that cultural sites and ATIs are identified and protected to fullest extent practicable. See Court's Order dated November 5, 2004 at 15. Given these protective measures as outlined above, it is not surprising that there is no evidence that cultural resources have been irreparably harmed. Attachment 1 to Lucking Dec. at ¶¶7, 12-19. Nor is it likely that this will occur.

49

Therefore, Plaintiffs cannot demonstrate irreparable harm to cultural resources and the Court should issue an interim injunction that permits the Army to proceed with the five critical Stryker projects and Stryker training.  See Cummings v. Connell, 316 F.3d 886, 897 (9th Cir. 2003) (where there was no "cognizable danger" demonstrated by plaintiffs, the court could not grant injunctive relief).[10]

> **2.  Plaintiffs cannot demonstrate irreparable harm to natural resources**

Plaintiffs cannot demonstrate that there will be  irreparable

---

[10]In the past, Plaintiffs have erroneously asserted that the Army conceded its actions will irreparably harm cultural and natural resources.  Plaintiffs' assertion, and much of their irreparable harm argument, has been based on the Army's site-specific EIS.  However, Plaintiffs' reliance on the Army's SEIS to carry their burden is misplaced.  The EIS's characterization of the likelihood of impacts as "significant" reflects the Army's solicitude for Plaintiffs' cultural interests; the Army recognizes that the loss of even one cultural site would be significant.  However, Plaintiffs overlook that the EIS predicts the impacts that might result from the proposed action as a whole, not, as is the issue here, from a limited subset of critical Stryker projects and training.  The SEIS does not indicate that harm is likely or severe as a result of the critical Stryker projects and training at issue here.  To the contrary, as this Court earlier recognized, the Army developed extensive measures to avoid and mitigate any impacts to these resources.  See Court's November 5, 2004 Opinion at 15-16.  In fact, four of the project areas have no known cultural resources and protective measures have proven successful in identifying and protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.  The same protective measures will be undertaken before the modification of Range 11T.  Thus, in light of the historic success of the Army's protective measures, it is even more apparent today than it was when the Court earlier ruled that significant harm to cultural and natural resources from the critical projects and training is not likely.

harm to natural resources in the critical project areas or as a result of Stryker-related training. First, there are no endangered or threatened species in the six critical project areas. Mansker Dec. at ¶¶4, 17. In fact, the only site within the current or planned construction projects that contains listed species or its habitat is at the PTA BAX. Id. This, however, is not one of the critical projects. Borne Dec. at ¶4-6. Thus, there is no current activity with respect to the six critical projects or training that impacts a listed species or its habitat, nor will there be, and even for the PTA BAX (not one of the six critical projects), the Army will build a 21,000 acre fenced area to exclude non-native ungulates. Mansker Dec. at ¶4. The conservation measures employed at the site will "result in a net benefit to the species in the long run." Id. at ¶7.

Second, the Fish and Wildlife Service issued two biological opinions concluding that the 2d Brigade transformation is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy critical habitat. ARS 24264, 24616. This Court defers to the "special expertise of the FWS" in making such determinations. See Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 523 (9th Cir. 1998); see also Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1456 (9th

Cir. 1992).  The Service's scientific judgment refutes Plaintiffs'
allegation that the Army will irreparably harm listed species absent
an injunction.  Significantly, Plaintiffs have not challenged these
biological opinions under the Endangered Species Act.

The Biological Opinions outline the actions the Army has taken
to protect critical habitat and listed species in the project area.
ARS 24264-73, 24616-24.  With these protective measures in place, the
Fish and Wildlife Service concluded that the proposed action is not
likely to jeopardize the continued existence of any species or
adversely modify critical habitat.  ARS 24264, 24616.  With regard to
the Hawaiian hoary bat, the Service concluded that "adverse impacts .
. . will be minimized and offset by fencing, ungulate removal, and
wildfire threat abatement."  ARS 24261.  Monitoring of bat habitat
will enable the agencies to assess the effectiveness of and adjust
these mitigation measures, as well as "provide valuable scientific
data that would contribute to the recovery of the Hawaiian hoary
bat."  ARS 24263.  The Army will also construct fence units, remove
ungulates, and plant listed plant species to increase their
distribution and abundance, and will take appropriate action to
protect palila habitat.  ARS 24264-65.  The Fish and Wildlife Service
concluded that minimization and mitigation measures would offset

adverse impacts to palila habitat.  ARS 24247.

Natural Resource Manager Michelle Mansker described in her declaration the Army's extensive efforts to protect listed species and their habitat.  Among other things, the Army has implemented an Integrated Wildfire Management Plan ("IWFMP") to reduce the frequency, size, and severity of any fire.  Mansker Dec. at ¶6.  The IWFMP includes a Fire Danger Rating System that restricts specific activities during high-risk periods and standard operating procedures for each installation that outline responsibilities, fire prevention measures, staffing levels, and requisite equipment needed, including helicopter support during all live fire training.  Id.  The Fish and Wildlife Service noted the significance of the IWFMP in protecting critical habitats and species in its no-jeopardy determination.  Id.; ARS 24265. Plaintiffs have not demonstrated that the proposed transformation, and most particularly the six critical construction projects, will irreparably harm the Hawaiian hoary bat or any other species or habitat in the proposed transformation area.

In the end, Plaintiffs simply cannot that demonstrate that there will be irreparable harm to natural resources in the six critical project areas or as a result of Stryker-related training.  There are no listed species found near or within any of the critical

construction projects.  Mansker Dec. at ¶4. Moreover, the Army has undertaken significant protective measures to ensure protection of natural resources during any training, including mitigation pursuant to the Wildfire Management Plan, and Integrated Natural Resources Management Plan. Id. at ¶7.  Such measures have proven successful and were relied on by the U.S. Fish and Wildlife Service in issuing its biological opinion that Stryker training and related construction will not jeopardize threatened or endangered species.  Id. at ¶7-8.

Based on the foregoing and the no-jeopardy determination of the Fish and Wildlife Service, Plaintiffs cannot demonstrate that any of the proposed critical construction projects or related training will irreparably harm any species or habitat in the proposed transformation area.

### C.   THE BALANCE OF HARMS TIPS DECIDEDLY IN THE ARMY'S FAVOR

In considering the propriety of issuing an injunction, the court must balance the relative harm each party may sustain. Caribbean Marine Services v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  In the instant case, the immediate and significant harm to the safety of American soldiers and our country's national security far outweighs the speculative claims of possible harm to cultural and natural resources alleged by Plaintiffs.  The scale tips even more decidedly

in the Army's favor when the Court considers the narrow tailoring requested by the Army for the interim injunction.

Given the limited relief sought by the Army, Plaintiff simply cannot show any likelihood of harm, let alone a level of harm that outweighs the substantial harm faced by American soldiers and the Army. First, there are no cultural resources in four of the critical project areas sought by the Army, and, in the fifth, QTR1, the mitigation measures undertaken have proven successful in protecting the identified cultural resources. Lucking Dec. at ¶¶4-11; see also Attachment 1 to Lucking Dec. at ¶¶7, 9-12. These same successful mitigation measures will be undertaken before work begins on the minor modification to existing training range 11T. Id. Second, as for natural resources, there are no threatened or endangered species in the critical project areas, and mitigation measures, as concluded by the Fish and Wildlife Service in its Biological Opinions, have effectively protected species in other areas throughout the Army installation. Mansker Dec. at ¶4.

In contrast to Plaintiffs' speculative assertions of irreparable harm, the harm to our soldiers and to national security that would result from issuance of an injunction prohibiting the six critical projects and Stryker training would be severe. See State of

<u>Wisconsin v. Weinberger</u>, 745 F.2d 412, 428 (7th Cir. 1984) ("the district court abused its discretion by failing to consider the degree to which the NEPA interest would, in fact, be served by an injunction, the efficacy of other forms of relief, and the harm to national defense interests that would result").  SBCTs provide improved battle command capabilities and defense systems that increase our soldiers effectiveness in combat and protect them to a much greater extent than current military defense systems.  Brown Dec. at ¶5.  According to Colonel Brown who has first hand experience in Iraq, the Stryker vehicle was "essential to saving lives" and "the losses would have been significantly higher if we had not been able to fight configured as a [SBCT] or use the Stryker vehicle during our training and deployment."  <u>Id</u>.

In addition, delaying or disrupting the conversion of the 2nd Brigade to a SBCT will significantly impact the sequence of Army transformation, reduce the number of highly effective SBCT units in the field of battle, and reduce the overall effectiveness of Army forces fighting the Global War on Terrorism.  <u>See</u> Court's November 5, 2004 Order at 17-18.

The Army has carefully crafted a solution that does not involve all 28 Stryker related projects, but rather requires five critical

projects and a minor modification to one existing range to be completed immediately to ensure the transformation is completed and the 2nd Brigade is ready to deploy in November 2007.  These projects, with the exception to the minor modification to Range 11T, are either completed or more than 50% complete, and the related Stryker training is nearly 70% complete. To enjoin the transformation at this time would result in creating an ineffective brigade that has not been transformed and cannot be deployed.  Borne Dec. at ¶8.

The balance of harms in this matter clearly tips in favor of permitting the Army to proceed with the transformation of the 2nd Brigade, thereby, protecting our soldiers, improving our combat ability, and serving this Nation's security interests.  The Supreme Court recently reiterated that the role of the judiciary in reviewing military decisions is constrained.  "Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." Hamdi v. Rumsfeld, 124 S.Ct. 2633, 2647 (2004) (citing Department of the Navy v. Egan, 484 U.S. 518, 530 (1988).

As the facts in this memorandum demonstrate, and as this Court previously recognized, enjoining the 2nd Brigade from transforming to

a SBCT would result in real and significant harm to the Army, its soldiers, and the war on terror.  <u>See</u> Court's November 5, 2004 Order at 17-18.  Therefore, the Army requests that the Court not disrupt the Army's efforts to provide the best support possible to soldiers in combat and the best security possible to our nation when the record shows that the Army has effectively implemented efforts to eliminate or minimize harm to cultural and natural resources.

D.   **AN INJUNCTION PREVENTING THE TRANSFORMATION OF THE 2^ND^ BRIGADE TO A SBCT WOULD BE CONTRARY TO THE PUBLIC INTEREST**

As the Ninth Circuit has said, the trial court "must always consider whether the public interest would be advanced or impaired by issuance of an injunction in any action in which the public interest is affected."  <u>Carribean Marine Services Co., Inc. v. Baldridge</u>, 844 F.2d 668, 674 (citations omitted).  Indeed, if the public interest weighs strongly against an injunction, the relief must be denied "even though irreparable injury may otherwise result to plaintiff. . . ."  <u>Weinberger v. Romero-Barcelo, et al.</u>, 456 U.S. 305, 312 (*citing* <u>Yakus v. United States</u>, 321 U.S. 414, 440 (1944)).

The Army vigorously denies that Plaintiffs would suffer any harm absent an injunction in this case, let alone immediate and irreparable harm.  But, even if such harm were likely, the public

interest would dictate that no injunction issue in this case.
Clearly, the defense of the United States is one of, if not the, most
important of public interests.  Moreover, it is unquestionable that
preparing our soldiers by providing them with the most advanced
training and supplying them with the most advanced equipment serves
not only the individual soldier's best interest, but the best
interest of the public as well.  Put simply, where an injunction
would harm the military's ability to provide for the national
defense, it "would have a large negative effect on public interest."
Water Keeper Alliance v. Department of Defense, 152 F.Supp.2d 155,
163 (D.P.R. 2001).

The overwhelming weight of the evidence before the Court
demonstrates that enjoining the transformation of the 2nd Brigade
will harm national security.  First, delay in transforming the 2nd
Brigade will result in faster deployment of other Army units to
combat operations in Iraq and elsewhere.  Such "accelerated
deployment would further reduce unit training time, significantly
increase the risk of American casualties and decrease unit mission
effectiveness in combat . . . ."  Lovelace Dec. at ¶ 8.

Second, transformation delay would substantially interfere with
the Army's ability to meet its obligation to protect the United

59

States' interests in the Pacific region.  As the "only active brigade combat team" in the Pacific that is not currently deployed, the ability of the unit to react expeditiously and provide the advanced capabilities attendant to a SBCT, would "cause immense harm to the US Army Pacific's capability to execute our mission. . . ."  Brown III Dec. at ¶ 8.

Finally, delay in the training of the soldiers of the 2nd Brigade will diminish the ability of our soldiers to carry out there mission of protecting the United States.  "Less training equals more casualties upon deployment."  Banach Dec. at ¶ 2.   Obviously greater numbers of casualties is not in the public interest and will not advance the Army's mission of protecting the public interest.  As Judge Mollway has stated "there is no heavier weight to balance than the loss of human life."  <u>Malama Makua v. Rumsfeld</u>, 2006 U.S. Dist LEXIS 3962, *33 (D.Hawaii February 2, 2006).

**V.   CONCLUSION**

For the foregoing reasons, Federal Defendants request that the Court issue an order on interim injunction relief permitting the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, a minor modification to existing training Range 11T, and the following five transformation related construction

projects in order to properly transform the 2nd Brigade and protect

our national security interests:

1.    QTR1 at Schofield Barracks
2.    SBCT Motor Pool at Schofield Barracks
3.    Urban Assault Course at Schofield Barracks
4.    Tactical Vehicle Wash Facility at Schofield Barracks East
       Range (an environmental protection measure)
5.    Multiple Deployment Facility at Wheeler Army Airfield,
       Hawaii.

Respectfully submitted this 14th day of November 2006,

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
/s/ Thomas Helper
_____

HARRY YEE       (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General

BARRY A.  WEINER
JAMES D. GETTE
Trial Attorneys
General Litigation Section
Environment & Natural Resources
Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C.  20044-0663
Email: Barry.Weiner@usdoj.gov

```
                                    Telephone:     202-305-0469
                                    Fax:        202-305-0274
```

Of Counsel:
Robert M. Lewis
Senior Trial Attorney
Army Environmental Law Division
901 North Stuart Street, Suite 400
Arlington, VA 22203
Telephone:  (703) 696-1567
Facsimile:   (703) 696-2940

62

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

Served Electronically through CM/ECF:

David L. Henkin        dhenkin@earthjustice.org

Isaac H. Moriwake      imoriwake@earthjustice.org

Attorneys for Plaintiffs

DATED:  November 14, 2006, at Honolulu, Hawaii.


/s/ Jan Yoneda
_____

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
HARRY YEE     (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General
BARRY A. WEINER
JAMES D. GETTE
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0469
Facsimile:  (202) 305-0274
Email: Barry.Weiner@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| ILIO'ULAOKALANI COALITION, a Hawaii, nonprofit corporation; NA'IMI PONO, a Hawaii unincorporated association; and KIPUKA, a Hawaii unincorporated association, | ) CIVIL NO.04-00502 DAE BMK ) ) FEDERAL DEFENDANTS' ) MEMORANDUM ON THE SCOPE OF ) INTERIM INJUNCTIVE RELIEF ) IN ACCORDANCE WITH THE ) NINTH CIRCUIT'S REMAND ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| DONALD H. RUMSFELD, Secretary of United States Department of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army, | ) Hearing: ) ) Date:  November 20, 2006 ) Time:  9:45 a.m. ) Judge:  Hon. David A. Ezra |
| Defendants. | ) |

TABLE OF CONTENTS

TABLE OF AUTHORITIES

FEDERAL DEFENDANTS' MEMORANDUM ON THE SCOPE OF INTERIM INJUNCTIVE RELIEF IN ACCORDANCE WITH THE NINTH CIRCUIT'S REMAND

DECLARATION OF THOMAS HELPER; EXHIBITS "A" AND "B"

DECLARATION OF RONALD L. BORNE

DECLARATION OF LAURIE LUCKING; ATTACHMENTS "1" TO "31"

DECLARATION OF MAJOR GENERAL WILLIAM H. BRANDENBURG

DECLARATION OF COLONEL STEFAN J. BANACH

DECLARATION OF COLONEL ROBERT B. BROWN

DECLARATION OF MICHELLE MANSKER

DECLARATION OF MAJOR GENERAL DANA T. ATKINS

DECLARATION OF JAMES J. LOVELACE

DECLARATION OF LIEUTENANT GENERAL JOHN M. BROWN III

CERTIFICATE OF SERVICE

Federal Defendants, Donald H. Rumsfeld, Secretary of the United States Department of Defense; and Francis J. Harvey, Secretary of the United States Department of the Army, ("U.S. Army" or "Army"), by and through undersigned counsel, file this Emergency Motion for Decision on the Scope of Interim Injunctive Relief in Accordance with the Ninth Circuit's Remand.  For the reasons set forth below, the Army respectfully requests the Court to lift the temporary injunction entered in this action by the United States Court of Appeals for the Ninth Circuit, and replace it with a more limited interim injunction that allows the Army to proceed with critical transformation and training activities for the 2nd Brigade of the 25th Infantry Division (Light) as a Stryker Brigade Combat Team in Hawaii pending further proceedings in this Court to address what permanent injunction, if any, is warranted pending compliance with the National Environmental Policy Act ("NEPA").

## I.    INTRODUCTION

This action was remanded to this Court by the Ninth Circuit in an Order entered on October 27, 2006, issued a few weeks after the Ninth Circuit's Opinion concluding that the U.S. Army had violated the National Environmental Policy Act ("NEPA") by failing to consider locations outside of Hawaii for transforming the 2nd Brigade to a Stryker Brigade Combat Team.  See Opinion entered October 5, 2006 at 41 (2-1).  In its October 27th Order, as described in more detail below, the Ninth Circuit issued a limited remand to this Court for the sole purpose of determining on an expedited basis the appropriate scope of "interim injunctive relief" pending a decision by this Court on the scope of a permanent injunction.  Order of October 27, 2006, at 2-3 and Addendum to Order at 9 (2-1).  Since this matter is very time-sensitive, a fact recognized by the Ninth Circuit in directing

that the matter be resolved "expeditiously," Order at 3, the Army requests the Court to consider the scope of interim injunctive relief at its earliest opportunity.

The Ninth Circuit's October 27th Order responds to an emergency motion filed by Plaintiffs in the Ninth Circuit seeking "interim injunctive relief" pending a decision by this Court on the scope of permanent relief pursuant to the Ninth Circuit's Opinion on the merits. The Ninth Circuit did not grant the Plaintiffs the relief they sought, but instead issued a "temporary injunction" and "remanded to the district court to enter and determine the scope of an interim injunction." Addendum at 9.

The temporary injunction prohibits the Army "from implementing, executing, or proceeding with the following activities associated with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii: grading, grubbing, other ground disturbance, construction, land acquisition, project design, geotechnical testing, unexploded ordinance clearance, contract award, and Stryker Brigade Combat Team-specific training pending entry of an injunction by the district court." Order of Oct. 27 at 1-2. The Ninth Circuit imposed this temporary injunction "until the district court has entered an interim injunction" and accordingly remanded to this Court "for the purpose of determining the appropriate scope of an interim injunction . . . ." Id. at 2. In response to a dissent to the Order filed by Judge Bea, the Court of Appeals issued an Addendum to its Order that clarified that it had not issued the interim injunction requested by Plaintiffs but instead had "entered a temporary injunction pending the district court's expeditious resolution of the interim injunction." Addendum at 9.

3

As the Ninth Circuit acknowledged, it did not "[p]roperly
balanc[e] the parties' equities" in entering the temporary
injunction, a function the Ninth Circuit determined should be
performed instead by this Court.  Order at 3 ("Properly balancing the
parties' equities requires a fact-intensive inquiry best undertaken
by the district court").  Further, responding to the U.S. Army's
objection that an interim injunction would harm national security,
the Ninth Circuit acknowledged that "this matter is very
time-sensitive," and it consequently ordered "the district court [to]
proceed expeditiously" to adjudicate the interim injunction.  Id.
(emphasis added).  Finally, in the Addendum to its Order, the Ninth
Circuit took pains to clarify the temporal limitations of the
temporary injunction and its directions to this Court:

> Reading the dissent, one would think that we have issued a
> permanent injunction. We have not.  We have not even issued an
> interim injunction pending a ruling on a permanent injunction,
> which is what the Plaintiffs ask for.  Rather, we have entered a
> temporary injunction pending the district court's expeditious
> resolution of the interim injunction.  We have acknowledged that
> properly balancing the parties' equities is a fact-intensive
> inquiry best undertaken by the district court, and we have
> remanded to the district court to enter and determine the scope
> of an interim injunction.

Addendum at 9.

As set forth below, the Ninth Circuit's temporary injunction is
impairing the ability of the 2nd Brigade to accomplish its military
mission with a minimum of American combat related casualties, a
paramount national interest.  The temporary injunction should be
lifted immediately because the harm to the U.S. Army, and to the
public interest, from continuation of the injunction grossly
outweighs the negligible risk of harm to the Plaintiffs' interests

from lifting it.[1]

Further, the interim injunction contemplated by the Ninth Circuit should be narrowly tailored to allow certain critical elements of the 2d Brigade transformation and training to proceed pending further proceedings concerning a potential permanent injunction pending NEPA compliance.  In its October 27 remand Order, the Ninth Circuit directed the district court to consider "which Stryker Brigade Combat Team transformation-related activities in Hawaii are time critical and which activities can proceed without causing irreparable environmental and cultural harm."  Id. at 3.

The Army has identified five (5) of the twenty-eight (28) Stryker related projects and one minor modification to an existing training range (6 projects in total) that are the most time-sensitive and critical to proceed in order to ensure that the 2nd Brigade of the 25th Infantry Division Light ("2nd Brigade") can properly transform into a Stryker Brigade Combat Team ("SBCT")and be ready for deployment by November 2007.  The continuation of Stryker training and these six critical transformation related activities will permit the 2nd Brigade to properly transform and be available to defend our nation with the most effective military technology and weapons systems in a manner that does not cause irreparable harm to cultural sites or natural resources.

This Court previously held that the harm Plaintiffs alleged to cultural and natural resources was speculative and could not justify issuance of injunctive relief.  See Court's November 5, 2004 Order at 15-16.  That same conclusion is even more appropriate today.  There

---

[1] The U.S. Army will await issuance of the mandate before seeking a hearing before this Court to address what permanent injunction, if any, is warranted pending compliance with NEPA.

are no endangered or threatened species in the six critical project
areas.  See Declaration of Michelle Mansker at ¶4.  Furthermore, the
significant measures the Army has undertaken to protect cultural
resources have proven to be effective in protecting cultural
resources during the transformation process.  See Declaration of Dr.
Laurie Lucking "Lucking Dec")at ¶¶4-10, and attachment 1 to Lucking
Dec at ¶¶7, 12-19.  Plaintiffs' claim that some unknown burial site
might be impacted in the future is nothing more than pure
speculation, and does not demonstrate irreparable harm as is needed
to substantiate an injunction on the equipping and training of the
2nd Brigade and the six critical Stryker-related projects and
training.

As this Court previously recognized, the harm to the Army and
its effort on the Global War on Terrorism from an injunction are both
"demonstrative and severe."  See Court's November 5, 2004 Order at
17.  There is no question that "delaying or disrupting the conversion
of the 2nd Brigade to a SBCT 5 will significantly impact the sequence
of the Army transformation and reduce the overall effectiveness of
Army forces currently fighting the Global War on Terrorism."  Id. at
15, 18.  Above all, to enjoin the transformation of the 2nd Brigade
would result in soldiers that are not properly trained on the most
effective and protective defense systems, thereby compromising the
safety and effectiveness of these soldiers in combat.

The high likelihood of harm to the U.S. Army, and to the public
interest, from continuation of the temporary injunction would grossly
outweigh the negligible risk of harm to the Plaintiffs' interests
from lifting it.  Consequently, the temporary injunction should be
lifted and it should be replaced by a more narrowly tailored interim
injunction pending further proceedings in this Court to address what

permanent injunction, if any, is warranted pending NEPA compliance. The severe and demonstrative impact to our soldiers and our Nation from the temporary injunction must be avoided by allowing a limited number of projects and training to go forward immediately because they are necessary to accomplish the transformation of the 2nd Brigade and can be implemented in a manner that reduces to a discountable level the risk of harm to cultural and natural resources.  Consequently, the Army requests the Court to narrowly tailor the interim injunction so that it allows the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, and the following six transformation related projects:

    (1)  Completion of the Qualification Training Range One ("QTR1");
    (2)  Completion of 2/25 SBCT Motor Park and Maintenance Area ("SBCT Motor Pool");
    (3)  Completion of the Urban Assault Course ("UAC");
    (4)  Completion of the Tactical Vehicle Wash Facility ("TVWF");
    (5)  Completion of the Multiple Deployment Facility ("MDF"); and
    (6)  Minor modification to existing training range 11T on the Pohakuloa Training Area ("PTA").

## II.  FACTUAL BACKGROUND

To avoid needless repetition and inconvenience to the Court, Federal Defendants hereby incorporate by reference the Factual Background sections previously presented to the Court in their Cross-Motion for Summary Judgment dated February 4, 2005, and in their opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004.  <u>See</u> Federal Defendants' Memorandum in support of their Cross-Motion for Summary Judgment dated February 4, 2005 at 4-16 and Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004 at 1-10. This briefing provides the Court with the factual background underlying the Army's decision and need to transform the 2nd Brigade to a SBCT.  The critical information needed to resolve the scope of

an interim injunction and determine "which Stryker Brigade Combat Team transformation-related activities in Hawaii are time critical and which activities can proceed without causing irreparable environmental and cultural harm" is contained in this memorandum and the following declarations:

 (1) Declaration of Ronald L. Borne ("Borne Dec.") dated November 13, 2006;

 (2) Declaration of Laurie Lucking ("Lucking Dec.") dated November 13, 2006 with Attachment 1, Declaration of Laurie Lucking dated October 22, 2006 and Attachments 2-31 (photographs and maps of critical project areas);

 (3) Declaration of William H. Brandenburg ("Brandenburg Dec.") dated November 13, 2006;

 (4) Declaration of Stefan J. Banach ("Banach Dec.") dated November 8, 2006;

 (5) Declaration of Robert B. Brown ("Brown Dec.") dated November 7, 2006;

 (6) Declaration of Michelle Mansker ("Mansker Dec.") dated November 11, 2006;

 (7) Declaration of Dana T. Atkins ("Atkins Dec.") dated November 7, 2006;

 (8) Declaration of James J. Lovelace ("Lovelace Dec.") dated November 10, 2006; and

 (9) Declaration of John M. Brown III ("Brown III Dec.") dated November 9, 2006.

These declarations identify the critical transformation projects that are needed to transform the 2nd Brigade and ensure that it is properly trained and available for deployment in a timely manner. These declarations further confirm that the Army has undertaken significant protective measures to ensure that Stryker-related training and construction of these critical projects can be completed in a manner that is protective of cultural sites and natural resources. Finally, these declarations explain why these projects and Stryker-related training are time-sensitive and critical to our Nation's defense and ensuring that our soldiers are properly trained with the most effective and technologically advanced military defense equipment.

In addition, the course of events that led up to the 2d

8

Brigade's current posture of being 12 months into an approximately two year training cycle is particularly important when considering the appropriate scope of interim injunctive relief.  On August 17, 2004, Plaintiffs filed a complaint in the Hawaii district court alleging that the Army violated NEPA by failing to consider reasonable alternatives, including relocation to the continental United States. On November 5, 2004, this Court denied Plaintiffs' motion for a preliminary injunction.  Even then, before transformation of the 2d Brigade was in full swing, the Court realized that national security concerns were "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism."  See Court's November 5, 2004 Order at 17-18.

On April 25, 2005, this Court granted the United States' motion for summary judgment.  The Court entered final judgment on April 29, 2005 and denied Plaintiffs' motion for an injunction pending appeal on May 19, 2005. The Plaintiffs then moved for an injunction pending appeal in the Ninth Circuit, which similarly denied the injunction. On October 5, 2006, the Ninth Circuit reversed the district court and remanded for the Army to prepare a Supplemental Environmental Impact Statement ("SEIS") examining the alternative of relocation of the 2d Brigade to a facility outside of Hawaii.

Between the denial of the first motion for preliminary injunction in this case and the Ninth Circuit's October 5, 2006, decision, the Army proceeded with transforming the 2d Brigade. As a result, the 2d Brigade is 12 months into the transformation process.

9

It has completed 60% of its training and almost 70% of its new equipment fielding. Brandenburg Dec. at ¶4. The 2d Brigade is scheduled to become a fully manned, trained, and equipped Stryker Brigade Combat Team (SBCT), ready for deployment, by November 2007. The 2d Brigade can no longer simply train as a light-infantry brigade, and therefore any delay in Stryker training will result in a combat ineffective unit. Thus, "to stop transformation now, even for a matter of weeks, would deny the 2d Brigade Commander the power and ability to complete transformation and training to fulfill his assigned operational missions." Lovelace Dec. at ¶8. The Army cannot afford to delay the transformation and readiness of a single brigade, including the 2nd Brigade.  Lovelace Dec. at ¶3. "If 2nd Brigade is not available to deploy when required as SBCT 5, then every other brigade in the Army would have to deploy sooner. This accelerated deployment would further reduce unit training time, significantly increase the risk of American casualties, and decrease unit mission effectiveness in combat-for every brigade in the Army." Id.  The national security concerns that the district court found compelling in November of 2004 thus carry even more weight two years later and one full year into transforming the 2d Brigade.

Knowing that the 2nd Brigade cannot go back to an ineffective light infantry brigade and must continue with transformation, the Army has carefully considered the 28 Stryker-related projects and identified the most time-sensitive and critical to our national security and the safety and effectiveness of our soldiers.  As reflected in the administrative record and accompanying declarations, the Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to cultural and natural resources from continued training and completion of these six

specific projects.  This Court previously recognized the lengths to which the Army had gone to ensure that cultural and natural resources are protected during the transformation process, <u>see</u> Court's November 5, 2004 Order at 15-16, and nothing has occurred during the appeal process that would alter that previous determination.

For the reasons discussed below and in the accompanying declarations, it is requested that the temporary injunction be lifted and that the interim injunction that replaces it allow the Army to proceed with the six specific Stryker related projects and provision of the requisite equipment and training in order to ensure that the 2nd Brigade is properly trained and available for deployment as a SBCT by November 2007.

## III.  STANDARD FOR ISSUANCE OF AN INJUNCTION

Violations of environmental statutes do not mandate issuance of an injunction.  "NEPA creates no exception to the traditional principles that govern injunctive remedies." <u>National Audubon Society v. Department of Navy</u>, 422 F.3d 174, 201 (4th Cir. 2005).  Thus, to qualify for injunctive relief, the moving party must first show it will suffer some tangible irreparable injury absent an injunction. <u>See</u> <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982); <u>Amoco Production Company v. Village of Gambell</u>, 480 U.S. 531, 542 (1987). There is no presumption of irreparable injury in environmental cases. <u>Romero-Barcelo</u>, 456 U.S. at 312; <u>Amoco Production Co.</u>, 480 U.S. at 542; <u>see</u> <u>also</u> <u>Forest Conservation Council v. U.S. Forest Service</u>, 66 F.3d 1489, 1496 (9th Cir. 1995).

11

Further, where there are violations of environmental statutes, the court must balance the competing claims of injury and consider the effect on each party of granting or withholding the requested relief. <u>Amoco Production Company v. Village of Gambell</u>, 480 U.S. 531, 542 (1987); <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982). The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances. <u>Id</u>. The relative hardship to the parties is controlling. <u>Benda v. Grand Lodge of Int'l Ass'n of Machinists</u>, 584 F.2d 308, 314, 315 (9th Cir. 1978). When a federal court considers the propriety of injunctive relief, it must balance the equities of the case, considering the potential harms of granting or denying relief to each party, in an effort to "mould each decree to the necessities of the particular case." <u>Romero-Barcelo</u>, 456 U.S. at 312 (1982). The Court must also determine whether the balance of public interests is served by the requested injunction. <u>Caribbean Marine Services v. Baldridge</u>, 844 F.2d 668, 674 (9th Cir. 1988).

**IV. ARGUMENT**

While the Army remains committed to complying fully with NEPA,[2] equipment fielding, training activities and certain limited

---

[2]The Army has already taken initial actions to prepare the Supplemental EIS ordered by the Ninth Circuit. Brown III Dec. at ¶9.

12

construction activities that will directly facilitate the necessary training of the 2nd Brigade simply cannot be halted at this late date without doing irreparable harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security. In accordance with the Ninth Circuit's remand, the Army has identified six Stryker-related projects that are time-sensitive and critical to ensure the transformation of the 2nd Brigade to a SBCT. These construction projects as well as the associated Stryker-related training will not irreparably harm cultural or natural resources. Mansker Dec. at ¶4, Lucking Dec. at ¶¶4-10, Attachment 1 to Lucking Dec. at ¶¶7, 12-19. The Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to environmental and cultural resources from these actions and will continue to do so as it proceeds with training the 2nd Brigade. Id. The analysis this Court previously conducted on the impacts to the Army and this Nation's security that would result from an injunction is even more relevant today than it was in November 2004. This Court earlier found that the national security concerns implicated from preventing transformation are "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and

13

reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." <u>See</u> Court's November 5, 2004 Order at 17. The same conclusion should be reached here when considering interim injunctive relief because the harm to the Army and this nation's defense is highly likely and severe, while the harm claimed by the Plaintiffs is speculative in nature and unlikely due to the lack of cultural and natural resources in the six critical project areas and the extensive mitigation measures undertaken as part of the transformation process.

A.  **THE ARMY AND THE PUBLIC INTEREST WILL BE IRREPARABLY HARMED BY THE ISSUANCE OF A BLANKET INJUNCTION ON ALL STRYKER-RELATED PROJECTS AND TRAINING**

The Army has carefully crafted a solution that permits equipment fielding, training, and a limited number of Stryker-related construction projects to proceed while incorporating the protective measures outlined in the administrative record and accompanying declarations that will reduce any likelihood of harm to cultural and natural resources to a negligible level. As discussed below, unlike the potential for irreparable harm to cultural and natural resources, which is remote, the likelihood of severe harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security is high and, thus, the balance of harms tips decidedly in favor of the Army and the issuance of an interim injunction that permits transformation of

14

the 2nd Brigade to a SBCT.

   1.   **The irreparable harm that will be suffered
        by the Army and its soldiers from an injunction
        that prohibits the transformation of the
        2nd Brigade is demonstrative and severe**

There are currently four operational SBCTs. When the 2d Brigade is finished with its transformation, it will be the fifth.  At the time the Army announced its plans to begin transforming into a future force, its object was to create a "more responsive deployable, agile, versatile, lethal, survivable, and sustainable" Army. ARP[3] 9656. Combat evidence demonstrates that the Army has done just that with the operational SBCTs.

The primary component of an SBCT is the Stryker vehicle.  As Colonel (COL) Robert B. Brown, who commanded the 1st Brigade, 25th Infantry Division, Stryker Brigade Combat Team in Iraq, explains: "Having spent a year in combat fighting from a Stryker vehicle, I can emphatically state that it is my vehicle of choice for combat operations in today's environment."  Brown Dec. at ¶5. In short, the Stryker vehicle saves soldiers' lives.  As Brigade Commander, COL

_____

   [3] In this memorandum, Federal Defendants refer to documents from the Programmatic Environmental Impact Statement in the Administrative Record as "ARP" and document from the Site-Specific Environmental Impact Statement as "ARS" followed by the pertinent bates number for the referenced document.  The administrative record documents cited herein are attached to the Declaration of Thomas Helper, which has been filed simultaneously with this memorandum.

Brown obtained personal knowledge of the survival capabilities
provided by the Stryker vehicle in the form of approximately 137
Rocket Propelled Grenades (RPGs) and approximately 50 Suicide Vehicle
Born Improvised Explosive Devices striking direct hits to Stryker
vehicles under his command.  Id.  None of the RPGs penetrated a
Stryker vehicle due to its protection and speed.  Id.  The brigade
nevertheless ultimately lost 33 of its soldiers in combat.  According
to COL Brown, the Stryker vehicle was "essential to saving lives" and
"the losses would have been significantly higher if we had not been
able to fight configured as a [SBCT] or use the Stryker vehicle
during our training and deployment." Id.

       Colonel Brown is not alone in that assessment. Given its
performance in Iraq, the Army recognizes the importance of the SBCTs
and the Stryker vehicle to its mission. General George Casey, the
military commander of the Multi-National Force Iraq, requires SBCTs
and employs them in vital missions, recently assigning an SBCT to
"the priority mission to increase security in Baghdad and reduce the
level of sectarian violence and terror attack." Lovelace Dec. at ¶9.
In addition, General Casey "continues to submit formal requests for
forces to include [SBCTs] to Joint Forces Command as part of the
ongoing and continuous requirements in his theater of operations" and
he "will not accept a light infantry brigade as a substitute for the

SBCT requirement in Iraq." Id.  The SBCTs are vital, as "[n]o other unit provides the same capabilities urgently needed in Iraq."  Id. Congress also recognizes the SBCTs vital importance, as it has directed the Army to submit plans to field a seventh SBCT and appropriated additional funds for that purpose.

To provide the commanders in the field with another SBCT as soon as possible, the Army has scheduled the 2d Brigade to complete transformation into the fifth SBCT by November 2007 and then be available to deploy. Id. at ¶7. The training involved in creating a SBCT is an intensive process that takes approximately two years. SBCTs "are configured to fight differently than previous brigades . . . [which] requires more extensive training and preparation in the initial stages of the fielding." Brown Dec. at ¶3. To become the agile and adaptive soldier that SBCTs demand requires "extensive training in a variety of areas, such as leadership, adaptability, creative thinking, the use of digital information and advanced marksmanship techniques." Id.

The 2d Brigade is currently in month 12 of that almost two-year long process, and because it "no longer exists as a light infantry brigade" there is no turning back the clock. Bradenburg Dec. at ¶4; Banach Dec. at ¶6-7. Its weapons, vehicles, and communications are those required for a SBCT, and its soldiers have skills tailored to

17

those required for a SBCT. Id. at ¶8. Thousands of pieces of new

Stryker Brigade equipment have been issued and hundreds of pieces of

old equipment have been turned in. Brown III Dec. at ¶5; Banach Dec.

at ¶6. But the 2d Brigade cannot perform its vital function as an

SBCT if it cannot complete its training and new equipment fielding as

such.  An SBCT is "enormously complex" and "unlike any other

organization we have had in the history of our Army." Banach Dec. at

¶10.  That creates "a significant learning curve" before soldiers can

become combat ready.  Id.  Any delay makes the curve that much

steeper, and will ultimately result in a "combat ineffective unit."

Banach Dec. at ¶1.

Delaying the training and new equipment fielding involved in

transforming the 2d Brigade into a SBCT will therefore ultimately

deny the commanders in the field adequate combat and deterrent forces

by interrupting tightly integrated transformation and deployment

schedules. For example, Major General Dana T. Atkins, the Director of

Operations, United States Pacific Command, states that disrupting the

transformation of the 2d Brigade "would immediately and unacceptably

undermine the ability . . . to deter conflict and respond to crisis

situations throughout the Asia-Pacific region." Atkins Dec. at ¶1.

It will affect not only the Army's combat and deterrent missions, but

also its humanitarian mission in responding to the "frequent and

18

severe natural disasters, including super-typhoons, earthquakes, tsunamis, volcanic eruptions, and mudslides" in the Pacific Command's Area of Responsibility. Id. at ¶4. In addition, the 2d Brigade is "the only active brigade combat team assigned . . . in the Pacific that is not deployed to the Middle East. As such, it provides company and platoon sized contingency ready forces for PACOM responses to homeland security threats and provides units to participate in Theater Security Cooperation training and exercises with allied and neighboring armies." Brown III Dec. at ¶4.  No other Pacific Command "force provides the firepower, mobility, situational awareness, and information processing capabilities resident in a [SBCT]." Atkins Dec. at ¶6.

It is therefore critical that the 2d Brigade transform as planned to meet Pacific Command "mission requirements and response timeliness and to enhance the strategic flexibility of the United States within the theater." Id.  Disrupting training at this point would "cause immense harm to the US Army Pacific's capability to execute our mission to provide combat ready forces to the United States Pacific Command" and "add extreme difficulty to the brigade's already complex task of achieving combat readiness." Brown III Dec. at ¶8. Delaying the transformation of 2nd Brigade now, 12 months into transformation, will have an even greater domino effect than when

19

this Court heard Plaintiffs' first motion for an injunction pending appeal, weakening the Army's strategic posture to deter threats in the Pacific Region, breaking a transformation sequence that was carefully synchronized with projected requirements for combat operations in Iraq and Afghanistan, and disrupting the reallocation of resources to other units that are undergoing transformation. Brown III at ¶1,6.

In addition to disrupting the Army's overall ability to respond to threats around the world by throwing off a tightly integrated transformation and deployment schedule, any delay in training will also have a profound and direct impact on the soldiers of the 2d Brigade when they are deployed: *less training equals more casualties upon deployment.* Banach Dec. at ¶2. COL Stefan Banach, Commander of the 2d Brigade, understands the need for continuity in training plans. He led a U.S. Army Ranger combat parachute assault into Afghanistan on October 19, 2001, "as the spearhead for the Global War on Terrorism." Id. Those Rangers "were the best trained and most well led Soldiers in our Army" and "were fully resourced and . . . had full continuity in all aspects of our combat preparedness," yet this country "still lost five great Rangers and over thirty more Rangers were severely wounded." Id. In Colonel Banach's informed opinion, "any disruption of our current training plan will get many

20

more of our Soldiers killed and wounded in combat than if we were able to maintain continuity in our current training and transformation plan to a fully combat ready [SBCT]."  Id.; Bradenburg Dec. at ¶3. In other words, interrupting the training of the 2d Brigade as an SBCT "will have second and third order effects that will be measured in the blood of our Soldiers."[4] Id.

When weighed against the speculative environmental harms Plaintiffs have alleged, the disruption to the Army's mission and the harm to its soldiers and their families that an injunction would cause weigh heavily in favor of granting interim injunctive relief that would permit the Army to transform the 2nd Brigade into a SBCT.

>    **2.    _The Army has identified six specific projects in addition to training that are needed to prepare the 2d Brigade for combat deployment as a SBCT and are highly unlikely to cause environmental or cultural harm._**

Ronald L. Borne, the Director of Transformation for the 2d Brigade, has set forth the essential requirements that the Army must have to successfully complete the 2d Brigade's training as an SBCT before November 2007. Borne Dec. at ¶¶4-6.  To enjoin those activities will severely harm the Army. Thus, the Army submits that any interim injunction should permit the following activities, which

---

[4]Small detachments of 2d Brigade soldiers are already in combat in the Philippines and Iraq. Banach ¶ 9.

are critical to ensuring that the 2nd Brigade is properly transformed
into a SBCT and prepared for deployment and combat in hostile
environments:

•    New Equipment Fielding and New Equipment Training

•    Soldier and Unit Level Training

•    Construction and use of the five critical projects out of the 28
     studied in the EIS, and modification to an existing training
     range. These projects represent a fraction of the overall
     Stryker-related construction. They are:

     1.   QTR1 at Schofield Barracks
     2.   SBCT Motor Pool at Schofield Barracks
     3.   Urban Assault Course at Schofield Barracks
     4.   Tactical Vehicle Wash Facility at Schofield Barracks East
          Range (an environmental protection measure)
     5.   Multiple Deployment Facility at Wheeler Army Airfield,
          Hawaii
     6.   Minor modification to existing range 11T
     All of the Army's 28 construction projects in association with

the transformation are important[5], but these six are absolutely

_____

     [5] Plaintiffs have suggested that the delay in constructing
the Schofield BAX demonstrates that none of the Stryker-related
projects should be considered critical because this was one of
the 28 projects that Army previously claimed were necessary to
transform.  This criticism is misplaced.  The Army maintains that
all 28 projects are needed to establish facilities to transform,
maintain and sustain a Stryker brigade in the long term, but for
the limited duration of an interim injunction, the Army has
identified the six most critical projects that will permit the
2nd Brigade to transform in a timely manner and be ready for
deployment by November 2007.  Borne Dec. at ¶8.  The fact that
the Schofield BAX was delayed does not undermine the credibility
of the Army's assessment of what is needed for timely
transformation of the 2nd Brigade.  As Ronald Borne explained in

critical to ensuring that the 2nd Brigade is transformed into a SBCT and ready for deployment in November 2007. Borne Dec. at ¶6; Banach Dec. at ¶¶6,8; Brandenburg Dec. at ¶¶ 7, 10-12.[6]  Of these critical projects, two projects - QTR1 and Tactical Vehicle Wash Facility - are already completed. Borne Dec. at ¶6  The three remaining projects are being built over existing facilities and are close to 50% complete, thereby minimizing any environmental impact.  Borne Dec. at ¶6. The final project is a minor modification to an existing range 11T, which involves re-grading roads, improving berms, and moving certain targets, all with no adverse environmental impacts.  Id. at ¶4.  The Army has identified six critical projects that will have minimal impact to the environment, but must proceed in order to transform the 2nd Brigade to a SBCT.  Without these projects and training, the harm to the Army, its soldiers, and its effectiveness on the battlefield is inevitable.

The reasons these projects were deemed critical to the

---

his declaration, the project was delayed due to the unexpected discovery of a significant amount of unexploded ordnance (UXO) that took much longer than expected to clear, thus causing a delay in construction.  Id.  The Army should not be faulted for ensuring the safety of its soldiers, construction staff, and the general public.

[6]The reasons why these specific projects and Stryker-related training are critical to the transformation of the 2nd Brigade is discussed in detail in the declarations of Ronald Borne, Colonel Banach, and Major General William H. Brandenburg.

transformation of the 2nd Brigade are described in detail in Declaration of Ronald L. Borne.  Mr. Borne explains the critical nature of ensuring that QTR1 at Schofield Barracks is available for training. Borne Dec. at ¶6(b)(I).  This is a multi-purpose small arms and machine gun range that was built over the former site of other ranges and is designed to accommodate all individual and crew-served pistol, rifle, and machine gun qualification requirements.  Id.  This project is now complete and the weapons being used are not unique to a Stryker vehicle and will be in use regardless of the scope of any injunction issued in this case. Id. Furthermore, all ammunition used on this range is for training purposes and is not explosive in nature, thereby minimizing any alleged harm.  Id.  The QTR1 range is a critical facility for training the 2nd Brigade because without it, there is no range in Hawaii for a Stryker unit to become proficient with the weapons and communication systems associated with the Stryker vehicle.  Id.

The second critical project for the transformation of the 2nd Brigade is the SBCT Motor Pool at Schofield Barracks.  Borne Dec. at ¶6(b)(ii).  The SBCT Motor Pool is designed to provide a facility to park, store, and perform the requisite maintenance and repair on the more than 1,000 Stryker vehicles, trailers and wheel mounted systems that are assigned to a SBCT.  Id.  Without this facility, there is no

place on Oahu to store, maintain, and repair these vehicles and they would be left in fields, parking lots, and other open space areas. Id. This would create significant security issues and also increase the risk of environmental harm due to maintenance and fueling mishaps. Id.

The third critical project for the transformation of the 2nd Brigade is the Urban Assault Course ("UAC") at Schofield Barracks, which is more than 50% constructed. Id. at ¶6(b)(iii). The UAC is designed to provide a facility capable of training a SBCT unit on urban terrain combat, which is needed in hostile environments such as Baghdad, Iraq. Id. The UAC is a multi-purpose small arms and machine gun range designed to accommodate all urban area fire training requirements. Id. This training facility will be used by a SBCT in a similar manner to all other units in Hawaii, and will be limited to dismounted individual or small unit live fire training. Id. The UAC project is critical because without it, SBCT training units will not be able to satisfy current urban operation doctrine and training standards and, thus, will not be properly trained to engage the enemy in an urban environment such as exists in Iraq and Afghanistan. Id. This inability to complete urban warfare training will likely translate into higher casualties for the 2nd Brigade. Id.

25

The fourth critical project for transformation of the 2nd Brigade is the Tactical Vehicle Wash Facility at the Schofield Barracks East Range.  Borne Dec. at ¶6(b)(iv).  This facility was built to provide a facility for the 2nd Brigade and other units to remove soil, debris and alien seeds from vehicles, trailers and wheel mounted systems that are used in the East Range and the vicinity of Schofield Barracks.  Id.  This project is an environmental protective measure that permits the Army to prevent the spread of alien invasive species of weeds and other biological pests between the unique ecosystems constituting the Army training areas, as required by a U.S. Fish and Wildlife Biological Opinion.  Id.  The Tactical Vehicle Wash Facility was built over a former warehouse site and serves a significant and important role in ensuring invasive species, seeds, and pests are not transported throughout the facility.  Id.  This facility is now complete and in use by the 2nd Brigade and other military units in Hawaii to protect the environment. Id.  This facility is critical to enable the 2nd Brigade to conduct vehicle operations necessary to transform while minimizing any harm to the environment.  Id.

The final critical project for the transformation of the 2nd Brigade is the Multiple Deployment Facility ("MDF") at Wheeler Army

26

Airfield in Hawaii.  Borne Dec. at 6(b)(v).  This facility is
currently under construction and is being built over the Army's
former deployment  holding site, which cannot accommodate a SBCT.
The MDF is designed to allow units to pack, weigh, balance, and
inspect vehicles prior to transport by air or to a seaport for
debarkation.  Id.  Accurate weighing and center-of-gravity
determinations are crucial for safely loading aircraft and boats and
ensuring safety during transit.  Id.  Furthermore, the 2nd Brigade
once transformed to a SBCT must have the capacity to deploy within 96
hours notice and must have the flexibility to  deploy under various
load specifications.  Id.  This facility is critical to achieving
such a deployment capability.  Id.

In addition to these five construction projects, receiving and
training on the new equipment associated with Stryker vehicles,
including the new communications systems and new or upgraded weapons
systems, is essential to ensuring that these soldiers are properly
prepared to operate as a SBCT.  Borne Dec. at ¶¶4, 5.  This training
will occur on existing roads, trails and ranges on Schofield Barracks
or Pohakuloa Training Area ("PTA").  Id.  The weaponry associated with
the Stryker vehicle is similar to the weapons that have been used or
are currently in use at training facilities in Hawaii, and only non-

27

explosive ammunition will be used during training.  Id.; see Borne
Dec. at ¶¶4-5 for a more detailed description of the Stryker-related
training that is needed to transform the 2nd Brigade to a SBCT.[7]
Therefore, the Stryker-related training is not likely to cause any
additional impacts to cultural or natural resources.  The Stryker-
related training is consistent with military training that will occur
on similar weapons systems even if an injunction is issued.

The Army considers all Stryker-related projects to be important
and necessary to complete the transformation process, but it has
identified six of these projects that are absolutely critical to
ensuring that the 2nd Brigade can transform into a SBCT and properly
trained on the new communications and weapons systems before this
unit deploys in November 2007.  This transformation is critical to
this Nation's security interests and, as discussed below, it will be

---

[7] The 2nd Brigade also will be using a Mobile Gun System,
which employs a 105 millimeter (mm) gun. During training
exercises, non-explosive training ammunition will be used.  Borne
Dec. at ¶4.  The range upon which this training will occur, Range
11T, is currently a helicopter gunnery, machine gun, and anti-
tank missile range.  Id.  In the past, this range was used by
Model M60 tanks that were equipped with the same type of weapon
systems as the Mobile Gun Systems, a 105 mm gun. Minor
modifications that will not impact the environment, including
improving roads and berms, and installing new targets will be
made to accommodate this training.  Borne Dec. at ¶4.  This
training is critical to ensuring our soldiers are properly
trained on the weapons systems they will use as a SBCT.
Furthermore, any alleged damage from use of the MGS will be
minimal because the Army will not be using explosive ammunition.
Id.

done in a manner that is protective of the environment and will not result in an appreciable risk of harm to cultural or natural resources. As such, it is requested that the Court narrowly tailor an interim injunction to permit these critical projects to proceed along with the Stryker-related training discussed above.[8]

> **3.    *There are no viable alternatives to finishing the training of the 2d Brigade as a SBCT at a location outside Hawaii and maintaining this unit as a light infantry brigade is improvident.***

Plaintiffs have suggested an alternative to transforming the 2nd Brigade in Hawaii that would involve transporting the entire unit to another location either in the contiguous United States or Alaska. In the alternative, Plaintiffs have suggested that the 2nd Brigade simply continue to train and operate as a light infantry brigade. Either suggestion is not a viable alternative, and would result in significant harm to the Army and the public interest.

First, there is no feasible alternative for the 2d Brigade to finish its training as an SBCT outside Hawaii while staying on

---

[8]The Army can complete these critical construction projects and train the 2d Brigade for combat deployment while still maintaining the ability to take an objective look at whether to ultimately station the 2d Brigade in Hawaii, in compliance with NEPA and this Court's order. As Borne states in his declaration, these projects can be and are used by other Army units on Hawaii, Borne Dec. at ¶¶1,7, and thus their existence does not preclude the Army from restationing the 2d Brigade. See, infra, discussion under Point Heading IV(A)(4).

schedule to meet mission requirements. There is simply "no brigade-size excess capacity for Army housing, training areas and installation facilities available in the United States." Lovelace Dec. at ¶12; Brandenburg Dec. at ¶15. SBCT 3 will return to Alaska before the 2nd Brigade could complete its training; facilities in Alaska cannot accommodate that overlap. Lovelace Dec. at ¶10. There would be similar overlap with the impending activation of SBCT 7 at Fort Lewis in Washington. Id. Training at another location would also require transporting all personnel, equipment, and vehicles to that installation by air, which would require 80% of the Air Force's transport capacity and would consume 40 out of 270 available training days. AR 51334-36. Given the extensive transportation delays, and the years in advance in which the Army plans these actions, the 2d Brigade would not be able to meet its November 2007 availability date if training was to be completed outside Hawaii. Lovelace Dec. at ¶13.

In addition to the logistical problems of moving the 2d Brigade to complete its training, moving the 2d Brigade out of Hawaii would also "reduce the Army's posture to deter conflict and meet treaty obligations in the Pacific region including the Republic of Korea." Lovelace Dec. at ¶8. By remaining in Hawaii, the 2d Brigade is "strategically positioned to deploy to the four critical areas

identified in the National Defense Strategy: Northeast Asia, the East Asian littoral, Southwest Asia, and the Middle East." Id.  Thus, Admiral William J. Fallon, the combatant commander of the United States Pacific Command, "requires 2d Brigade to transform in Hawaii on time to meet mission requirements assigned by the Secretary of Defense." Id.

Finally, if soldiers were trained in Alaska or at Fort Lewis, their families would have to be left behind in Hawaii, because housing in Alaska and Fort Lewis is already occupied.  "This would require the soldiers and families of the 2nd Brigade, who have already endured a year-long deployment in Iraq . . . to endure additional months of separation during transformation" that would immediately be followed by another year-long deployment in Iraq. Lovelace Dec. at ¶12. It is not just a matter of convenience for those families, or for the Army.  Unexpected separation preceding a year-long deployment "adversely affect command authority, good order and discipline by creating morale and family problems that will undermine individual soldier's mental discipline and erode unit effectiveness." Id.; Brown III Dec. at ¶6. Separation creates distraction, and "distracted soldiers imperil themselves and others." Lovelace Dec. at ¶10.

31

In past motions, Plaintiffs have suggested that the 2nd Brigade would be as effective as a SBCT if it continued to operate as a light infantry brigade. The Army, however, has the expertise to determine what is in the nation's best interest as far as national defense is concerned, and it has determined that training as a light infantry brigade is both impractical and unwise. The 2d Brigade simply is not a light infantry brigade anymore and the Army does not operate light infantry units. Brandenburg Dec. at ¶4; Banach Dec. at ¶6. "It has different and improved capabilities that are now part of a fully integrated set of state of the art systems that provides our Nation with a new and overwhelming combat capability." Banach Dec. at ¶7. The new weapons systems and technology require each unit to transform and be trained on more advanced equipment and technology that is designed to provide a more effective and safer combat unit.  As detailed in Colonel Banach's declaration not only would it be impossible to go back to being a light infantry brigade, "to do so at this point would be illogical given the existing enhanced weapons accuracy, communications capability and protection for our soldiers that we can achieve now with our Strykers." Id.

It is also vital to train the 2d Brigade as an SBCT because "if events in the world require 2d Brigade to deploy tomorrow, or

32

whenever, it will do so with all available Strykers." Id.   The
soldiers must train on the equipment they will take into battle. And
they must do so "everyday in order to fight effectively when . . .
deployed to combat."  Id.   The bottom line is this: "There is no
going back to legacy procedures and or previous less capable unit
designs." Id.   The 2d Brigade no longer exists as a light infantry
brigade, the equipment has changed, the training has changed, and the
new system provides the Army with more effective capabilities while
also providing for greater protection of our soldiers.

It is clear that 2nd Brigade's transformation is critical to
national security, and should not be enjoined.  The brigade needs its
equipment and specific facilities to ensure that it can properly
transform to a SBCT.  National security and foreign policy
considerations such as those implicated here are sufficient to find
that any injunction should allow transformation of the 2nd Brigade,
even in the face of a NEPA violation.  See Committee for Nuclear
Responsibility Inc. et al., v. Seaborg, 463 F.2d 796, 798 (D.C. Cir
1971).

In contrast to Plaintiffs' impractical proposals, the Army has
carefully crafted a solution that permits the Army to proceed with
equipment fielding, training and a limited number of construction

projects that will not cause a significant risk of harm to natural or cultural resources. Two of these projects are already completed and the remaining three projects, other than the minor modification of Range 11T, are close to 50 percent complete. As for the Stryker-related training, the Army has already completed close to 70 percent of the requisite training to transform the 2nd Brigade to a SBCT. Rather than transport the 2nd Brigade to another location outside Hawaii as Plaintiffs have suggested, the only viable alternative to ensure that the 2nd Brigade is transformed and available for deployment in November 2007 is to permit the transformation of this unit in Hawaii under the limited conditions set forth above.

> **4.  The Army should be permitted to proceed with the critical SBCT projects because each has independent utility and their completion will not restrict the Army's ability to analyze reasonable alternatives in a SEIS.**

Not only would a broad interim injunction be inequitable, for the reasons discussed above, it would also be unnecessary to preserve a meaningful NEPA process. Federal Defendants anticipate that Plaintiffs may argue that the completion of the five critical projects and modification of Range 11T at PTA would undermine the Army's ability to meaningfully analyze reasonable alternatives in a supplemental NEPA analysis. To the extent Plaintiffs make this

34

argument, it is without merit.

Courts have held that action on a project may proceed, notwithstanding a NEPA violation, where such action would neither "have an adverse environmental impact" nor "limit the choice of reasonable alternatives" within the meaning of 40 C.F.R. § 1506.1(a). For example, in North Carolina v. City of Virginia Beach, 951 F.2d 596, 598 (4th Cir. 1991), the Fourth Circuit reversed a district court's refusal to modify its injunction which prohibited the City of Virginia Beach from undertaking steps to build an 85-mile pipeline from Lake Gaston to satisfy the City' s potable water needs.  The project required a FERC permit, and FERC had neither issued its permit nor conducted its NEPA review.  Id. at 600.  In reversing, the court of appeals recognized that action on a project should not go forward pending NEPA compliance to the extent doing so would so influence the agency s ultimate decision on the project as to effectively limit the choice of reasonable alternatives available to the federal decisionmakers in the NEPA process.  Id. at 601-02.  The court ruled, however, that the injunction should have been narrowly tailored to allow the limited construction that the City wanted to do because such work would not "unduly influence" FERC's consideration of alternatives.  Id. at 602; see also South Carolina Dept. of

35

Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 99-101 (4th Cir.
1989) (holding that action need not be enjoined pending NEPA
compliance notwithstanding the plaintiff's contention that allowing
the action to proceed would prejudice the federal agency's
consideration of alternatives in the NEPA process).  The court's
conclusion is consistent with the Council on Environmental Quality's
("CEQ") regulations which provide that until an agency completes the
NEPA process and issues a ROD, it is only prohibited from taking
action concerning a proposal that would have an adverse environmental
impact or limit the choice of reasonable alternatives.  40 C.F.R. §
1506.1(a).

     In this case, work on these critical projects and training will
not impact whether the Army decides where and how to complete the
transformation process.  Borne Dec. at ¶7.  While these projects are
vital to the 2nd Brigade's training and transformation, none are
unique to the Stryker transformation process and can be used by other
military units in Hawaii even if transformation is enjoined.  Id. at
¶¶6,7.  As explained by Ronald Borne, Director of Transformation for
the U.S. Army Garrison Hawaii, "[t]hese projects will also be used by
other military units stationed in Hawaii. Because these projects can,
and will, support activities unrelated to Stryker transformation,

their completion and/or use will not affect the ultimate decision on where 2/25 will be permanently stationed." Id. at ¶1. For example, construction on QTR1, a multi-purpose, small arms and machine gun range, and the Tactical Vehicle Wash Facility, a facility used to minimize the spread of invasive plant species and biological pests, has been completed and these facilities are in use by other Army units in Hawaii. Id. at ¶6. Thus, as Ronald Borne states in his declaration, the critical projects have independent utility and their existence does not preclude the Army from taking an objective look at whether to ultimately station the 2d Brigade in Hawaii, after compliance with NEPA under the Ninth Circuit's order. Id. at ¶¶1,6-8. Under such a scenario, and in accordance with the case law cited above, the Court should permit the Army to proceed with the limited number of projects that are needed to transform the 2nd Brigade.

The same result is reached with respect to the other prong of the CEQ regulation, which prohibits a federal agency from taking action that would have an adverse environmental impact pending NEPA compliance. See 40 C.F.R. § 1506.1(a)(1). In South Carolina Dept. of Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 100-01 (4th Cir. 1989), the district court granted plaintiffs motion for a preliminary injunction to prevent the Army Corps of Engineers from installing

37

pumped storage facilities prior to completion of an environmental impact statement that adequately considered the environmental impacts of operating the pumps.  The Fourth Circuit recognized that injunctive relief must be "tailored to restrain no more than what is reasonably required to accomplish its ends and no "broader than necessary to protect against the environmental risk." Id. at 100 (internal quotation marks and citations omitted).  Noting that "[t]he Corps ha[d] already spent a majority of the funds allocated for the project, and [that] Plaintiffs conceded at oral argument that installation alone of the already purchased pumped storage generators will cause no environmental damage," the Court of Appeals concluded that "restraining the installation of the generators is not reasonably required to protect the environment" and "vacate[d] that part of the injunction which prohibits the Corps from installing the pumped storage generators at the Dam." Id. at 100.

As more fully set forth in section IV.A.2, above, and section IV.B, below, the critical projects and training the Army seeks to complete pending further proceedings on a permanent injunction present negligible risk of significant harm to cultural or environmental resources.  Accordingly, it is not necessary to enjoin these activities to promote NEPA's purposes.

38

In the end, there is no danger of these limited construction projects and the related Stryker training rendering the NEPA compliance "an empty exercise," as Plaintiffs fear or, in the parlance of NEPA, "limit[ing] the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(2).  These projects are complete or close to completion, they have independent utility, and their future use is not conditioned on completion of the transformation process. Inasmuch as their use does not preclude the Army from giving meaningful consideration to other reasonable alternatives in an SEIS, these critical projects and related training should be allowed to proceed. See National Audubon Society, 422 F.3d at 201 ("[A] NEPA injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.' Violation of NEPA is not always cause to enjoin all agency activity while the agency completes the required environmental analysis.") (citation omitted).

B.    PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF
      THE COURT ISSUES A LIMITED INJUNCTION PERMITTING
      TRANSFORMATION OF THE 2ND BRIGADE

As this Court previously recognized in denying Plaintiffs' prior requests for injunctive relief, Plaintiffs' claims are speculative in nature and the Army has gone to great lengths to ensure that impacts to cultural sites and natural resources are either eliminated or

mitigated.  See Court's Order dated November 5, 2004 at 15-16. Today, Plaintiffs' assertions of harm fare worse than they did two years ago.

The administrative record demonstrates that the Army took the requisite hard look at the environmental impacts associated with the transformation process in its programmatic and site-specific EISs. See ARP 009656-666; ARS 0010308-329; 0024083-86; 0024260-73; 0024294-98; 0024616-24; 0051514-522; 0051523-529; 0051703-736; 0051737-759; 0052224-666; and 0052267-298.  The Army specifically analyzed the potential impacts associated with transformation and concluded, as did the Fish and Wildlife Service in its Biological Opinion, that the significant measures undertaken ensure that any risk to cultural and natural resources is minimized.  See ARS 0024083-86; 0024260-73; 0024294-98; 0024616-24.

Plaintiffs in this action have never questioned the Army's NEPA analysis on potential impacts nor have they claimed that this analysis violates NEPA.  In fact, neither the district court nor the Ninth Circuit identified any defects in the Army's impacts analysis. The analysis contained in the Army's NEPA documents on impacts to cultural and natural resources has not been invalidated and fully complies with the statutory requirements under NEPA.

40

Plaintiffs cannot demonstrate that they are likely to suffer irreparable harm from the limited activities the Army here seeks leave to pursue.  First, there are no endangered or threatened species in the critical project areas.  See Mansker Dec. at ¶4. Second, the Army has undertaken significant measures to protect cultural resources and, to date, these measures have proven to be effective in protecting cultural resources during the transformation process.  See Lucking Dec. at ¶¶2-11, Attachment 1 to Lucking Dec. at ¶¶7, 12-19.  With respect to cultural resources, there are none in four of the five project areas and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1. Lucking Dec. at ¶¶4-10. As for the modification to Range 11T, this project has not begun and the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences.  Id.  In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade.  Finally, Plaintiffs have raised concerns about the cultural site identified as Mauna'una, but, as Dr. Lucking explains, this site is located on a bluff and not within 200 yards of any of the critical

41

project areas. Lucking Dec. at ¶8.

Since Plaintiffs cannot demonstrate that cultural sites or natural resources are likely to be irreparably harmed by the completion of the six designated projects and Stryker-related training, the Court should fashion an injunction that permits these projects and training to continue in order to ensure that the 2nd Brigade is properly transformed and ready for deployment by November 2007.

### 1.    *Plaintiffs cannot demonstrate irreparable harm to cultural resources*

Plaintiffs have argued that the transformation of the 2nd Brigade will cause irreparable injury to unknown cultural resources. But, as this Court has previously recognized, Plaintiffs' claims of irreparable harm are too speculative and overlook the Army's knowledge of cultural resources in construction areas and the extensive steps it has taken to avoid and mitigate impacts to cultural areas.  Lucking Dec. at ¶¶ 2-10, Attachment 1 to Lucking Dec. at ¶¶2, 7-16, 19; <u>see</u> <u>also</u> Court's Order dated November 5, 2004 at 15-16.

Dr. Laurie Lucking, the Army Cultural Resources Manager, explains in her declaration that the Army acknowledged in the SEIS that transforming the 2nd Brigade might have significant impacts on

42

cultural resources because it realized that destroying even one
cultural site would be significant to Native Hawaiians. Attachment 1
to Lucking Dec. at ¶4. In addition, Areas of Traditional Importance,
which may not be protected under the National Historic Preservation
Act, may be impacted. Id. at ¶4. When it published the SEIS,
project designs had not progressed far enough to determine cultural
impacts with certainty, and the Army cannot guarantee that no
cultural sites will be impacted. However, the Army's goal is to
prevent impacts, and its efforts to date have proven successful. Id.
at ¶¶13,14.

Dr. Lucking explains in detail the Army's ongoing surveying and
monitoring of project sites.[9] Most of the areas surveyed to date
have revealed no cultural sites. Id. at ¶11. In the few instances
when the Army has discovered cultural sites, it has altered the
projects to avoid those sites entirely. Id. at ¶¶13, 14. To date,
there is no indication that unexploded ordnance clearance or
pre-construction environmental and geotechnical testing have damaged
any cultural resources. Id. at ¶¶11,16. Archeological and cultural

---

[9]Many of the measures Dr. Lucking describes are included in
the Programmatic Agreement the Army entered into with the
Advisory Council on Historic Preservation, the Hawaii State
Preservation Office, and the Office of Hawaiian Affairs to meet
its obligations under the National Historic Preservation Act.
Lucking Decl. ¶3.

monitoring will continue throughout the construction process to ensure that any cultural resources that may be discovered are properly protected.  Id. at ¶7.

Plaintiffs' selective criticism of the Army's mitigation measures in past briefing has failed to acknowledge the full scope of those efforts. Before the Army ever gets to the point of "data recovery" or "reburial," it will survey construction areas, flag eligible archaeological sites for avoidance, and design projects to avoid impacting those sites wherever possible.  ARS 52067; Attachment 1 to Lucking Dec. at ¶¶10,13,14.  Plaintiffs have argued that data recovery alone is insufficient to protect cultural resources. However, data recovery is not the only method of mitigation, as Plaintiffs would lead the Court to believe; in fact, it is the last line of defense. Id. Following Plaintiffs' logic, no earth-moving would be permitted in Hawaii since any such activity could lead to accidental discovery of archaeological sites, human remains, or cultural items. See also Judge Bea's dissent in Ninth Circuit's October 27, 2006 Order.  The Army is making every effort as it goes forward to avoid harming cultural resources by consulting with Native Hawaiian organizations, families and individuals, surveying project areas, amending project designs to avoid cultural sites, using lineal

44

descendants from project areas as cultural monitors to identify and suggest protection for sites, and using archaeologists and cultural monitors to oversee all earthmoving activities.  Id. at ¶¶2,5-11,13-14.

In the past, Plaintiffs have misstated the record when they've suggested that construction of several projects will occur in "archaeological sensitivity areas."  The SEIS identifies all archaeological sites at each sub-installation of which the Army was then aware.  See, e.g., ARS 52056-65.  However, the SEIS explains that individual project areas within those sub-installations "will be designed to avoid all eligible and unevaluated archaeological sites, to the full extent practicable."  ARS 52067. The Army has consistently redesigned projects to avoid cultural sites, Attachment 1 to Lucking Dec. at ¶¶ 2,10,13,14, and will continue to do so.

The Army developed a Cultural Monitoring Program, which enlists the assistance of persons who are knowledgeable about Native Hawaiian activities, to insure maximum protection for cultural sites and artifacts.  Id. at ¶7.  Currently, the Program includes 30 cultural monitors, all of whom are Native Hawaiians, who are permitted to go anywhere in the project area that is accessible to contractors and archaeologists.  Id.  Information reported by the monitors is given

45

to the archaeologists and the Army, as well as to interested members of the community for additional comment.  Id. at ¶8.  Dr. Lucking describes the other efforts the Army has undertaken, successfully, to avoid disturbing cultural resources in the project areas. Plaintiffs have complained that cultural monitors have been prevented from exercising meaningful oversight, but any restrictions have been safety related. Id. at ¶15.  Moreover, these complaints do not involve projects that are among the six critical projects that the Army wishes to continue during the interim injunction.  For example, due to the large amounts of unexploded ordnance at the Schofield BAX (not one of the six critical projects), the monitors initially were required to remain 200 feet away from all intrusive activities. Id. That was increased to 650 feet when chemical weapons were discovered on site. Id. Once earth disturbing activities were completed, however, the monitors were allowed down-range to examine those areas. Id. These restrictions, which were only in place at the Schofield Barracks BAX, were lifted several months ago after consultation with the cultural monitors, who, as a result, became part of the Schofield BAX UXO clearance team.

Any claim that construction will lead inevitably to the disinterment and destruction of Native Hawaiian burials is likewise

speculative and ignores the mitigation measures the Army has employed
to ensure that such harm will not occur.  Attachment 1 to Lucking
Dec. at ¶¶10,19.  The Army has taken every precaution to avoid
effects on Native Hawaiian burials, including extensive surveying
and, as noted above, hiring cultural monitors who are lineal
descendants of people native to the various project areas and who are
also knowledgeable about burial areas.  Id. at ¶¶7, 15,19.  When the
Army identified possible burial sites at the South Range Acquisition
Area, it marked the area "off-limits," and will do the same if it
identifies other burial sites in the future.  Id. at ¶19.  The
success of these measures is reflected in the identification and
protection of possible burial sites at the South Range Acquisition
Area (not one of the six critical projects) in July 2003.  Id. If
additional burial areas are identified, similar precautions will be
undertaken to protect them.  Id.  Thus, other than mere speculation,
Plaintiffs cannot demonstrate that harm to Native Hawaiian burials is
inevitable and irreparable.

   With respect to the six critical projects, the extensive
mitigation measures outlined above have worked with the two completed
projects and are working effectively with the three projects that are
currently under construction.  Lucking Dec. at 4-10; Attachment 1 to

47

Lucking Dec. at ¶7.  In fact, the Army's mitigation measures have revealed that there have been no cultural resources and historic properties identified in four of the five critical project areas, and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.  For example, in QTR1, which is an existing military range that is in use by non-Stryker units, a cultural site was identified and mitigation measures were undertaken to protect this site.  Id. at 9.  To date, this site has not been harmed.  Id.  As for the minor modification to Range 11T, this project has not begun, but the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences.  Id.

In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade.  Furthermore, there is a cultural site known as Mauna'una that Plaintiffs have identified as an area of concerns.  As Dr. Lucking explains, the Army is well aware of this site and has confirmed that it is more than 200 yards from any critical project area. Lucking Dec. at ¶8.  Mauna'una is located on a eroding slope and rather than harm this resource, the Army is

48

stockpiling soil from the Multiple Deployment Facility with hope that this soil can be used to stabilize the erosion around this site.  Id. Based on the foregoing and as explained in Dr. Lucking's declaration, Plaintiffs cannot establish that there is a likelihood of harm to cultural resources from the completion of the six critical Stryker projects and related training.

Finally, Plaintiffs have complained that the use of the MK-19 grenade launcher is likely to cause irreparable harm to cultural resources. But as Dr. Lucking explains in her declaration, the Army does not use, and does not intend to use, high explosive rounds for training with the MK-19. Instead, the MK-19 "weapons are using practice munitions that do not have a high explosive charge." Attachment 1 to Lucking Dec. at ¶17. Those practice rounds do not pose a threat of irreparable harm to cultural resources.  Id.

As this Court has already recognized, the Army has undertaken extensive measures to ensure that cultural sites and ATIs are identified and protected to fullest extent practicable.  See Court's Order dated November 5, 2004 at 15. Given these protective measures as outlined above, it is not surprising that there is no evidence that cultural resources have been irreparably harmed. Attachment 1 to Lucking Dec. at ¶¶7, 12-19.  Nor is it likely that this will occur.

49

Therefore, Plaintiffs cannot demonstrate irreparable harm to cultural

resources and the Court should issue an interim injunction that

permits the Army to proceed with the five critical Stryker projects

and Stryker training.  See Cummings v. Connell, 316 F.3d 886, 897

(9th Cir. 2003) (where there was no "cognizable danger" demonstrated

by plaintiffs, the court could not grant injunctive relief).[10]

### 2. Plaintiffs cannot demonstrate irreparable harm to natural resources

Plaintiffs cannot demonstrate that there will be  irreparable

---

[10]In the past, Plaintiffs have erroneously asserted that the
Army conceded its actions will irreparably harm cultural and
natural resources.  Plaintiffs' assertion, and much of their
irreparable harm argument, has been based on the Army's site-
specific EIS.  However, Plaintiffs' reliance on the Army's SEIS
to carry their burden is misplaced.  The EIS's characterization
of the likelihood of impacts as "significant" reflects the Army's
solicitude for Plaintiffs' cultural interests; the Army
recognizes that the loss of even one cultural site would be
significant.  However, Plaintiffs overlook that the EIS predicts
the impacts that might result from the proposed action as a
whole, not, as is the issue here, from a limited subset of
critical Stryker projects and training.  The SEIS does not
indicate that harm is likely or severe as a result of the
critical Stryker projects and training at issue here.  To the
contrary, as this Court earlier recognized, the Army developed
extensive measures to avoid and mitigate any impacts to these
resources. See Court's November 5, 2004 Opinion at 15-16.  In
fact, four of the project areas have no known cultural resources
and protective measures have proven successful in identifying and
protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.
The same protective measures will be undertaken before the
modification of Range 11T.  Thus, in light of the historic
success of the Army's protective measures, it is even more
apparent today than it was when the Court earlier ruled that
significant harm to cultural and natural resources from the
critical projects and training is not likely.

harm to natural resources in the critical project areas or as a result of Stryker-related training. First, there are no endangered or threatened species in the six critical project areas.  Mansker Dec. at ¶¶4, 17.  In fact, the only site within the current or planned construction projects that contains listed species or its habitat is at the PTA BAX. Id.  This, however, is not one of the  critical projects. Borne Dec. at ¶4-6. Thus, there is no current activity with respect to the six critical projects or training that impacts a listed species or its habitat, nor will there be, and even for the PTA BAX (not one of the six critical projects), the Army will build a 21,000 acre fenced area to exclude non-native ungulates. Mansker Dec. at ¶4. The conservation measures employed at the site will "result in a net benefit to the species in the long run." Id. at ¶7.

Second, the Fish and Wildlife Service issued two biological opinions concluding that the 2d Brigade transformation is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy critical habitat.  ARS 24264, 24616. This Court defers to the "special expertise of the FWS" in making such determinations.  See Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 523 (9th Cir. 1998); see also Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1456 (9th

51

Cir. 1992).  The Service's scientific judgment refutes Plaintiffs'
allegation that the Army will irreparably harm listed species absent
an injunction.  Significantly, Plaintiffs have not challenged these
biological opinions under the Endangered Species Act.

The Biological Opinions outline the actions the Army has taken
to protect critical habitat and listed species in the project area.
ARS 24264-73, 24616-24.  With these protective measures in place, the
Fish and Wildlife Service concluded that the proposed action is not
likely to jeopardize the continued existence of any species or
adversely modify critical habitat.  ARS 24264, 24616.  With regard to
the Hawaiian hoary bat, the Service concluded that "adverse impacts .
. . will be minimized and offset by fencing, ungulate removal, and
wildfire threat abatement."  ARS 24261.  Monitoring of bat habitat
will enable the agencies to assess the effectiveness of and adjust
these mitigation measures, as well as "provide valuable scientific
data that would contribute to the recovery of the Hawaiian hoary
bat."  ARS 24263.  The Army will also construct fence units, remove
ungulates, and plant listed plant species to increase their
distribution and abundance, and will take appropriate action to
protect palila habitat.  ARS 24264-65.  The Fish and Wildlife Service
concluded that minimization and mitigation measures would offset

adverse impacts to palila habitat.  ARS 24247.

Natural Resource Manager Michelle Mansker described in her declaration the Army's extensive efforts to protect listed species and their habitat.  Among other things, the Army has implemented an Integrated Wildfire Management Plan ("IWFMP") to reduce the frequency, size, and severity of any fire.  Mansker Dec. at ¶6.  The IWFMP includes a Fire Danger Rating System that restricts specific activities during high-risk periods and standard operating procedures for each installation that outline responsibilities, fire prevention measures, staffing levels, and requisite equipment needed, including helicopter support during all live fire training.  Id.  The Fish and Wildlife Service noted the significance of the IWFMP in protecting critical habitats and species in its no-jeopardy determination.  Id.; ARS 24265. Plaintiffs have not demonstrated that the proposed transformation, and most particularly the six critical construction projects, will irreparably harm the Hawaiian hoary bat or any other species or habitat in the proposed transformation area.

In the end, Plaintiffs simply cannot that demonstrate that there will be irreparable harm to natural resources in the six critical project areas or as a result of Stryker-related training.  There are no listed species found near or within any of the critical

53

construction projects.  Mansker Dec. at ¶4. Moreover, the Army has
undertaken significant protective measures to ensure protection of
natural resources during any training, including mitigation pursuant
to the Wildfire Management Plan, and Integrated Natural Resources
Management Plan. Id. at ¶7.  Such measures have proven successful and
were relied on by the U.S. Fish and Wildlife Service in issuing its
biological opinion that Stryker training and related construction
will not jeopardize threatened or endangered species.  Id. at ¶7-8.

Based on the foregoing and the no-jeopardy determination of the
Fish and Wildlife Service, Plaintiffs cannot demonstrate that any of
the proposed critical construction projects or related training will
irreparably harm any species or habitat in the proposed
transformation area.

### C.  THE BALANCE OF HARMS TIPS DECIDEDLY IN THE ARMY'S FAVOR

In considering the propriety of issuing an injunction, the court
must balance the relative harm each party may sustain. Caribbean
Marine Services v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  In
the instant case, the immediate and significant harm to the safety of
American soldiers and our country's national security far outweighs
the speculative claims of possible harm to cultural and natural
resources alleged by Plaintiffs.  The scale tips even more decidedly

in the Army's favor when the Court considers the narrow tailoring requested by the Army for the interim injunction.

Given the limited relief sought by the Army, Plaintiff simply cannot show any likelihood of harm, let alone a level of harm that outweighs the substantial harm faced by American soldiers and the Army. First, there are no cultural resources in four of the critical project areas sought by the Army, and, in the fifth, QTR1, the mitigation measures undertaken have proven successful in protecting the identified cultural resources. Lucking Dec. at ¶¶4-11; see also Attachment 1 to Lucking Dec. at ¶¶7, 9-12. These same successful mitigation measures will be undertaken before work begins on the minor modification to existing training range 11T. Id. Second, as for natural resources, there are no threatened or endangered species in the critical project areas, and mitigation measures, as concluded by the Fish and Wildlife Service in its Biological Opinions, have effectively protected species in other areas throughout the Army installation. Mansker Dec. at ¶4.

In contrast to Plaintiffs' speculative assertions of irreparable harm, the harm to our soldiers and to national security that would result from issuance of an injunction prohibiting the six critical projects and Stryker training would be severe. See State of

Wisconsin v. Weinberger, 745 F.2d 412, 428 (7th Cir. 1984) ("the district court abused its discretion by failing to consider the degree to which the NEPA interest would, in fact, be served by an injunction, the efficacy of other forms of relief, and the harm to national defense interests that would result"). SBCTs provide improved battle command capabilities and defense systems that increase our soldiers effectiveness in combat and protect them to a much greater extent than current military defense systems. Brown Dec. at ¶5. According to Colonel Brown who has first hand experience in Iraq, the Stryker vehicle was "essential to saving lives" and "the losses would have been significantly higher if we had not been able to fight configured as a [SBCT] or use the Stryker vehicle during our training and deployment." Id.

In addition, delaying or disrupting the conversion of the 2nd Brigade to a SBCT will significantly impact the sequence of Army transformation, reduce the number of highly effective SBCT units in the field of battle, and reduce the overall effectiveness of Army forces fighting the Global War on Terrorism. See Court's November 5, 2004 Order at 17-18.

The Army has carefully crafted a solution that does not involve all 28 Stryker related projects, but rather requires five critical

56

projects and a minor modification to one existing range to be completed immediately to ensure the transformation is completed and the 2nd Brigade is ready to deploy in November 2007.  These projects, with the exception to the minor modification to Range 11T, are either completed or more than 50% complete, and the related Stryker training is nearly 70% complete. To enjoin the transformation at this time would result in creating an ineffective brigade that has not been transformed and cannot be deployed.  Borne Dec. at ¶8.

The balance of harms in this matter clearly tips in favor of permitting the Army to proceed with the transformation of the 2nd Brigade, thereby, protecting our soldiers, improving our combat ability, and serving this Nation's security interests.  The Supreme Court recently reiterated that the role of the judiciary in reviewing military decisions is constrained.  "Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." Hamdi v. Rumsfeld, 124 S.Ct. 2633, 2647 (2004) (citing Department of the Navy v. Egan, 484 U.S. 518, 530 (1988).

As the facts in this memorandum demonstrate, and as this Court previously recognized, enjoining the 2nd Brigade from transforming to

57

a SBCT would result in real and significant harm to the Army, its soldiers, and the war on terror.  <u>See</u> Court's November 5, 2004 Order at 17-18.  Therefore, the Army requests that the Court not disrupt the Army's efforts to provide the best support possible to soldiers in combat and the best security possible to our nation when the record shows that the Army has effectively implemented efforts to eliminate or minimize harm to cultural and natural resources.

> **D.    AN INJUNCTION PREVENTING THE TRANSFORMATION OF THE 2ND BRIGADE TO A SBCT WOULD BE CONTRARY TO THE PUBLIC INTEREST**

As the Ninth Circuit has said, the trial court "must always consider whether the public interest would be advanced or impaired by issuance of an injunction in any action in which the public interest is affected."  <u>Carribean Marine Services Co., Inc. v. Baldridge</u>, 844 F.2d 668, 674 (citations omitted).  Indeed, if the public interest weighs strongly against an injunction, the relief must be denied "even though irreparable injury may otherwise result to plaintiff. . . ."  <u>Weinberger v. Romero-Barcelo, et al.</u>, 456 U.S. 305, 312 (<i>citing</i> <u>Yakus v. United States</u>, 321 U.S. 414, 440 (1944)).

The Army vigorously denies that Plaintiffs would suffer any harm absent an injunction in this case, let alone immediate and irreparable harm.  But, even if such harm were likely, the public

interest would dictate that no injunction issue in this case. Clearly, the defense of the United States is one of, if not the, most important of public interests.  Moreover, it is unquestionable that preparing our soldiers by providing them with the most advanced training and supplying them with the most advanced equipment serves not only the individual soldier's best interest, but the best interest of the public as well.  Put simply, where an injunction would harm the military's ability to provide for the national defense, it "would have a large negative effect on public interest." Water Keeper Alliance v. Department of Defense, 152 F.Supp.2d 155, 163 (D.P.R. 2001).

The overwhelming weight of the evidence before the Court demonstrates that enjoining the transformation of the 2nd Brigade will harm national security.  First, delay in transforming the 2nd Brigade will result in faster deployment of other Army units to combat operations in Iraq and elsewhere.  Such "accelerated deployment would further reduce unit training time, significantly increase the risk of American casualties and decrease unit mission effectiveness in combat . . . ."  Lovelace Dec. at ¶ 8.

Second, transformation delay would substantially interfere with the Army's ability to meet its obligation to protect the United

States' interests in the Pacific region.  As the "only active brigade combat team" in the Pacific that is not currently deployed, the ability of the unit to react expeditiously and provide the advanced capabilities attendant to a SBCT, would "cause immense harm to the US Army Pacific's capability to execute our mission. . . ."  Brown III Dec. at ¶ 8.

Finally, delay in the training of the soldiers of the 2nd Brigade will diminish the ability of our soldiers to carry out there mission of protecting the United States.  "Less training equals more casualties upon deployment."  Banach Dec. at ¶ 2.  Obviously greater numbers of casualties is not in the public interest and will not advance the Army's mission of protecting the public interest.  As Judge Mollway has stated "there is no heavier weight to balance than the loss of human life."  Malama Makua v. Rumsfeld, 2006 U.S. Dist LEXIS 3962, *33 (D.Hawaii February 2, 2006).

## V.    CONCLUSION

For the foregoing reasons, Federal Defendants request that the Court issue an order on interim injunction relief permitting the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, a minor modification to existing training Range 11T, and the following five transformation related construction

projects in order to properly transform the 2nd Brigade and protect

our national security interests:

1.  QTR1 at Schofield Barracks
2.  SBCT Motor Pool at Schofield Barracks
3.  Urban Assault Course at Schofield Barracks
4.  Tactical Vehicle Wash Facility at Schofield Barracks East
    Range (an environmental protection measure)
5.  Multiple Deployment Facility at Wheeler Army Airfield,
    Hawaii.

Respectfully submitted this 14th day of November 2006,

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
/s/ Thomas Helper
_____

HARRY YEE       (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General

BARRY A.  WEINER
JAMES D. GETTE
Trial Attorneys
General Litigation Section
Environment & Natural Resources
Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C.  20044-0663
Email: Barry.Weiner@usdoj.gov

```
                                  Telephone:     202-305-0469
                                  Fax:        202-305-0274

Of Counsel:
Robert M. Lewis
Senior Trial Attorney
Army Environmental Law Division
901 North Stuart Street, Suite 400
Arlington, VA 22203
Telephone:  (703) 696-1567
Facsimile:   (703) 696-2940
```

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

Served Electronically through CM/ECF:

David L. Henkin      dhenkin@earthjustice.org

Isaac H. Moriwake    imoriwake@earthjustice.org

Attorneys for Plaintiffs

DATED:  November 14, 2006, at Honolulu, Hawaii.

/s/ Jan Yoneda
_____

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
HARRY YEE      (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General
BARRY A. WEINER
JAMES D. GETTE
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0469
Facsimile:  (202) 305-0274
Email: Barry.Weiner@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| ILIO‘ULAOKALANI COALITION, a Hawaii, nonprofit corporation; NA‘IMI PONO, a Hawaii unincorporated association; and KIPUKA, a Hawaii unincorporated association, | CIVIL NO.04-00502 DAE BMK |
| | FEDERAL DEFENDANTS' MEMORANDUM ON THE SCOPE OF INTERIM INJUNCTIVE RELIEF IN ACCORDANCE WITH THE NINTH CIRCUIT'S REMAND |
| Plaintiffs, | |
| v. | |
| DONALD H. RUMSFELD, Secretary of United States Department of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army, | Hearing: |
| | Date:   November 20, 2006 |
| | Time:   9:45 a.m. |
| Defendants. | Judge:  Hon. David A. Ezra |

TABLE OF CONTENTS

TABLE OF AUTHORITIES

FEDERAL DEFENDANTS' MEMORANDUM ON THE SCOPE OF INTERIM
INJUNCTIVE RELIEF IN ACCORDANCE WITH THE NINTH CIRCUIT'S REMAND

DECLARATION OF THOMAS HELPER; EXHIBITS "A" AND "B"

DECLARATION OF RONALD L. BORNE

DECLARATION OF LAURIE LUCKING; ATTACHMENTS "1" TO "31"

DECLARATION OF MAJOR GENERAL WILLIAM H. BRANDENBURG

DECLARATION OF COLONEL STEFAN J. BANACH

DECLARATION OF COLONEL ROBERT B. BROWN

DECLARATION OF MICHELLE MANSKER

DECLARATION OF MAJOR GENERAL DANA T. ATKINS

DECLARATION OF JAMES J. LOVELACE

DECLARATION OF LIEUTENANT GENERAL JOHN M. BROWN III

CERTIFICATE OF SERVICE

Federal Defendants, Donald H. Rumsfeld, Secretary of the United States Department of Defense; and Francis J. Harvey, Secretary of the United States Department of the Army, ("U.S. Army" or "Army"), by and through undersigned counsel, file this Emergency Motion for Decision on the Scope of Interim Injunctive Relief in Accordance with the Ninth Circuit's Remand.  For the reasons set forth below, the Army respectfully requests the Court to lift the temporary injunction entered in this action by the United States Court of Appeals for the Ninth Circuit, and replace it with a more limited interim injunction that allows the Army to proceed with critical transformation and training activities for the 2nd Brigade of the 25th Infantry Division (Light) as a Stryker Brigade Combat Team in Hawaii pending further proceedings in this Court to address what permanent injunction, if any, is warranted pending compliance with the National Environmental Policy Act ("NEPA").

## I.    INTRODUCTION

This action was remanded to this Court by the Ninth Circuit in an Order entered on October 27, 2006, issued a few weeks after the Ninth Circuit's Opinion concluding that the U.S. Army had violated the National Environmental Policy Act ("NEPA") by failing to consider locations outside of Hawaii for transforming the 2nd Brigade to a Stryker Brigade Combat Team.  See Opinion entered October 5, 2006 at 41 (2-1).  In its October 27th Order, as described in more detail below, the Ninth Circuit issued a limited remand to this Court for the sole purpose of determining on an expedited basis the appropriate scope of "interim injunctive relief" pending a decision by this Court on the scope of a permanent injunction.  Order of October 27, 2006, at 2-3 and Addendum to Order at 9 (2-1).  Since this matter is very time-sensitive, a fact recognized by the Ninth Circuit in directing

2

that the matter be resolved "expeditiously," Order at 3, the Army requests the Court to consider the scope of interim injunctive relief at its earliest opportunity.

The Ninth Circuit's October 27th Order responds to an emergency motion filed by Plaintiffs in the Ninth Circuit seeking "interim injunctive relief" pending a decision by this Court on the scope of permanent relief pursuant to the Ninth Circuit's Opinion on the merits. The Ninth Circuit did not grant the Plaintiffs the relief they sought, but instead issued a "temporary injunction" and "remanded to the district court to enter and determine the scope of an interim injunction." Addendum at 9.

The temporary injunction prohibits the Army "from implementing, executing, or proceeding with the following activities associated with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii: grading, grubbing, other ground disturbance, construction, land acquisition, project design, geotechnical testing, unexploded ordinance clearance, contract award, and Stryker Brigade Combat Team-specific training pending entry of an injunction by the district court." Order of Oct. 27 at 1-2. The Ninth Circuit imposed this temporary injunction "until the district court has entered an interim injunction" and accordingly remanded to this Court "for the purpose of determining the appropriate scope of an interim injunction . . . ." Id. at 2. In response to a dissent to the Order filed by Judge Bea, the Court of Appeals issued an Addendum to its Order that clarified that it had not issued the interim injunction requested by Plaintiffs but instead had "entered a temporary injunction pending the district court's expeditious resolution of the interim injunction." Addendum at 9.

3

As the Ninth Circuit acknowledged, it did not "[p]roperly balanc[e] the parties' equities" in entering the temporary injunction, a function the Ninth Circuit determined should be performed instead by this Court.  Order at 3 ("Properly balancing the parties' equities requires a fact-intensive inquiry best undertaken by the district court").  Further, responding to the U.S. Army's objection that an interim injunction would harm national security, the Ninth Circuit acknowledged that "this matter is very time-sensitive," and it consequently ordered "the district court [to] proceed expeditiously" to adjudicate the interim injunction.  Id. (emphasis added).  Finally, in the Addendum to its Order, the Ninth Circuit took pains to clarify the temporal limitations of the temporary injunction and its directions to this Court:

> Reading the dissent, one would think that we have issued a permanent injunction. We have not.  We have not even issued an interim injunction pending a ruling on a permanent injunction, which is what the Plaintiffs ask for.  Rather, we have entered a temporary injunction pending the district court's expeditious resolution of the interim injunction.  We have acknowledged that properly balancing the parties' equities is a fact-intensive inquiry best undertaken by the district court, and we have remanded to the district court to enter and determine the scope of an interim injunction.

Addendum at 9.

As set forth below, the Ninth Circuit's temporary injunction is impairing the ability of the 2nd Brigade to accomplish its military mission with a minimum of American combat related casualties, a paramount national interest.  The temporary injunction should be lifted immediately because the harm to the U.S. Army, and to the public interest, from continuation of the injunction grossly outweighs the negligible risk of harm to the Plaintiffs' interests

from lifting it.[1]

Further, the interim injunction contemplated by the Ninth Circuit should be narrowly tailored to allow certain critical elements of the 2d Brigade transformation and training to proceed pending further proceedings concerning a potential permanent injunction pending NEPA compliance. In its October 27 remand Order, the Ninth Circuit directed the district court to consider "which Stryker Brigade Combat Team transformation-related activities in Hawaii are time critical and which activities can proceed without causing irreparable environmental and cultural harm." Id. at 3.

The Army has identified five (5) of the twenty-eight (28) Stryker related projects and one minor modification to an existing training range (6 projects in total) that are the most time-sensitive and critical to proceed in order to ensure that the 2nd Brigade of the 25th Infantry Division Light ("2nd Brigade") can properly transform into a Stryker Brigade Combat Team ("SBCT")and be ready for deployment by November 2007. The continuation of Stryker training and these six critical transformation related activities will permit the 2nd Brigade to properly transform and be available to defend our nation with the most effective military technology and weapons systems in a manner that does not cause irreparable harm to cultural sites or natural resources.

This Court previously held that the harm Plaintiffs alleged to cultural and natural resources was speculative and could not justify issuance of injunctive relief. See Court's November 5, 2004 Order at 15-16. That same conclusion is even more appropriate today. There

---

[1] The U.S. Army will await issuance of the mandate before seeking a hearing before this Court to address what permanent injunction, if any, is warranted pending compliance with NEPA.

are no endangered or threatened species in the six critical project
areas.  <u>See</u> Declaration of Michelle Mansker at ¶4.  Furthermore, the
significant measures the Army has undertaken to protect cultural
resources have proven to be effective in protecting cultural
resources during the transformation process.  <u>See</u> Declaration of Dr.
Laurie Lucking "Lucking Dec")at ¶¶4-10, and attachment 1 to Lucking
Dec at ¶¶7, 12-19.  Plaintiffs' claim that some unknown burial site
might be impacted in the future is nothing more than pure
speculation, and does not demonstrate irreparable harm as is needed
to substantiate an injunction on the equipping and training of the
2nd Brigade and the six critical Stryker-related projects and
training.

     As this Court previously recognized, the harm to the Army and
its effort on the Global War on Terrorism from an injunction are both
"demonstrative and severe."  <u>See</u> Court's November 5, 2004 Order at
17.  There is no question that "delaying or disrupting the conversion
of the 2nd Brigade to a SBCT 5 will significantly impact the sequence
of the Army transformation and reduce the overall effectiveness of
Army forces currently fighting the Global War on Terrorism."  <u>Id</u>. at
15, 18.  Above all, to enjoin the transformation of the 2nd Brigade
would result in soldiers that are not properly trained on the most
effective and protective defense systems, thereby compromising the
safety and effectiveness of these soldiers in combat.

     The high <u>likelihood</u> of harm to the U.S. Army, and to the public
interest, from continuation of the temporary injunction would grossly
outweigh the negligible <u>risk</u> of harm to the Plaintiffs' interests
from lifting it.  Consequently, the temporary injunction should be
lifted and it should be replaced by a more narrowly tailored interim
injunction pending further proceedings in this Court to address what

permanent injunction, if any, is warranted pending NEPA compliance. The severe and demonstrative impact to our soldiers and our Nation from the temporary injunction must be avoided by allowing a limited number of projects and training to go forward immediately because they are necessary to accomplish the transformation of the 2nd Brigade and can be implemented in a manner that reduces to a discountable level the risk of harm to cultural and natural resources.  Consequently, the Army requests the Court to narrowly tailor the interim injunction so that it allows the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, and the following six transformation related projects:

    (1)  Completion of the Qualification Training Range One ("QTR1");
    (2)  Completion of 2/25 SBCT Motor Park and Maintenance Area ("SBCT Motor Pool");
    (3)  Completion of the Urban Assault Course ("UAC");
    (4)  Completion of the Tactical Vehicle Wash Facility ("TVWF");
    (5)  Completion of the Multiple Deployment Facility ("MDF"); and
    (6)  Minor modification to existing training range 11T on the Pohakuloa Training Area ("PTA").

## II.   FACTUAL BACKGROUND

To avoid needless repetition and inconvenience to the Court, Federal Defendants hereby incorporate by reference the Factual Background sections previously presented to the Court in their Cross-Motion for Summary Judgment dated February 4, 2005, and in their opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004.  See Federal Defendants' Memorandum in support of their Cross-Motion for Summary Judgment dated February 4, 2005 at 4-16 and Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction dated October 18, 2004 at 1-10. This briefing provides the Court with the factual background underlying the Army's decision and need to transform the 2nd Brigade to a SBCT.  The critical information needed to resolve the scope of

an interim injunction and determine "which Stryker Brigade Combat
Team transformation-related activities in Hawaii are time critical
and which activities can proceed without causing irreparable
environmental and cultural harm" is contained in this memorandum and
the following declarations:

  (1)  Declaration of Ronald L. Borne ("Borne Dec.") dated
       November 13, 2006;
  (2)  Declaration of Laurie Lucking ("Lucking Dec.") dated
       November 13, 2006 with Attachment 1, Declaration of Laurie
       Lucking dated October 22, 2006 and Attachments 2-31
       (photographs and maps of critical project areas);
  (3)  Declaration of William H. Brandenburg ("Brandenburg Dec.")
       dated November 13, 2006;
  (4)  Declaration of Stefan J. Banach ("Banach Dec.") dated
       November 8, 2006;
  (5)  Declaration of Robert B. Brown ("Brown Dec.") dated
       November 7, 2006;
  (6)  Declaration of Michelle Mansker ("Mansker Dec.") dated
       November 11, 2006;
  (7)  Declaration of Dana T. Atkins ("Atkins Dec.") dated
       November 7, 2006;
  (8)  Declaration of James J. Lovelace ("Lovelace Dec.") dated
       November 10, 2006; and
  (9)  Declaration of John M. Brown III ("Brown III Dec.") dated
       November 9, 2006.

These declarations identify the critical transformation projects
that are needed to transform the 2nd Brigade and ensure that it is
properly trained and available for deployment in a timely manner.
These declarations further confirm that the Army has undertaken
significant protective measures to ensure that Stryker-related
training and construction of these critical projects can be completed
in a manner that is protective of cultural sites and natural
resources.  Finally, these declarations explain why these projects
and Stryker-related training are time-sensitive and critical to our
Nation's defense and ensuring that our soldiers are properly trained
with the most effective and technologically advanced military defense
equipment.

In addition, the course of events that led up to the 2d

8

Brigade's current posture of being 12 months into an approximately two year training cycle is particularly important when considering the appropriate scope of interim injunctive relief.  On August 17, 2004, Plaintiffs filed a complaint in the Hawaii district court alleging that the Army violated NEPA by failing to consider reasonable alternatives, including relocation to the continental United States. On November 5, 2004, this Court denied Plaintiffs' motion for a preliminary injunction.  Even then, before transformation of the 2d Brigade was in full swing, the Court realized that national security concerns were "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism."  See Court's November 5, 2004 Order at 17–18.

On April 25, 2005, this Court granted the United States' motion for summary judgment.  The Court entered final judgment on April 29, 2005 and denied Plaintiffs' motion for an injunction pending appeal on May 19, 2005. The Plaintiffs then moved for an injunction pending appeal in the Ninth Circuit, which similarly denied the injunction. On October 5, 2006, the Ninth Circuit reversed the district court and remanded for the Army to prepare a Supplemental Environmental Impact Statement ("SEIS") examining the alternative of relocation of the 2d Brigade to a facility outside of Hawaii.

Between the denial of the first motion for preliminary injunction in this case and the Ninth Circuit's October 5, 2006, decision, the Army proceeded with transforming the 2d Brigade. As a result, the 2d Brigade is 12 months into the transformation process.

It has completed 60% of its training and almost 70% of its new equipment fielding. Brandenburg Dec. at ¶4. The 2d Brigade is scheduled to become a fully manned, trained, and equipped Stryker Brigade Combat Team (SBCT), ready for deployment, by November 2007. The 2d Brigade can no longer simply train as a light-infantry brigade, and therefore any delay in Stryker training will result in a combat ineffective unit. Thus, "to stop transformation now, even for a matter of weeks, would deny the 2d Brigade Commander the power and ability to complete transformation and training to fulfill his assigned operational missions." Lovelace Dec. at ¶8. The Army cannot afford to delay the transformation and readiness of a single brigade, including the 2nd Brigade.  Lovelace Dec. at ¶3. "If 2nd Brigade is not available to deploy when required as SBCT 5, then every other brigade in the Army would have to deploy sooner. This accelerated deployment would further reduce unit training time, significantly increase the risk of American casualties, and decrease unit mission effectiveness in combat-for every brigade in the Army." Id.  The national security concerns that the district court found compelling in November of 2004 thus carry even more weight two years later and one full year into transforming the 2d Brigade.

Knowing that the 2nd Brigade cannot go back to an ineffective light infantry brigade and must continue with transformation, the Army has carefully considered the 28 Stryker-related projects and identified the most time-sensitive and critical to our national security and the safety and effectiveness of our soldiers.  As reflected in the administrative record and accompanying declarations, the Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to cultural and natural resources from continued training and completion of these six

10

specific projects.  This Court previously recognized the lengths to which the Army had gone to ensure that cultural and natural resources are protected during the transformation process, <u>see</u> Court's November 5, 2004 Order at 15-16, and nothing has occurred during the appeal process that would alter that previous determination.

For the reasons discussed below and in the accompanying declarations, it is requested that the temporary injunction be lifted and that the interim injunction that replaces it allow the Army to proceed with the six specific Stryker related projects and provision of the requisite equipment and training in order to ensure that the 2nd Brigade is properly trained and available for deployment as a SBCT by November 2007.

## III. STANDARD FOR ISSUANCE OF AN INJUNCTION

Violations of environmental statutes do not mandate issuance of an injunction.  "NEPA creates no exception to the traditional principles that govern injunctive remedies." <u>National Audubon Society v. Department of Navy</u>, 422 F.3d 174, 201 (4th Cir. 2005).  Thus, to qualify for injunctive relief, the moving party must first show it will suffer some tangible irreparable injury absent an injunction. <u>See</u> <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982); <u>Amoco Production Company v. Village of Gambell</u>, 480 U.S. 531, 542 (1987). There is no presumption of irreparable injury in environmental cases. <u>Romero-Barcelo</u>, 456 U.S. at 312; <u>Amoco Production Co.</u>, 480 U.S. at 542; <u>see</u> <u>also</u> <u>Forest Conservation Council v. U.S. Forest Service</u>, 66 F.3d 1489, 1496 (9th Cir. 1995).

Further, where there are violations of environmental statutes, the court must balance the competing claims of injury and consider the effect on each party of granting or withholding the requested relief. <u>Amoco Production Company v. Village of Gambell</u>, 480 U.S. 531, 542 (1987); <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982). The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances. <u>Id</u>. The relative hardship to the parties is controlling. <u>Benda v. Grand Lodge of Int'l Ass'n of Machinists</u>, 584 F.2d 308, 314, 315 (9th Cir. 1978). When a federal court considers the propriety of injunctive relief, it must balance the equities of the case, considering the potential harms of granting or denying relief to each party, in an effort to "mould each decree to the necessities of the particular case." <u>Romero-Barcelo</u>, 456 U.S. at 312 (1982). The Court must also determine whether the balance of public interests is served by the requested injunction. <u>Caribbean Marine Services v. Baldridge</u>, 844 F.2d 668, 674 (9th Cir. 1988).

**IV. ARGUMENT**

While the Army remains committed to complying fully with NEPA,[2] equipment fielding, training activities and certain limited

---

[2]The Army has already taken initial actions to prepare the Supplemental EIS ordered by the Ninth Circuit. Brown III Dec. at ¶9.

12

construction activities that will directly facilitate the necessary training of the 2nd Brigade simply cannot be halted at this late date without doing irreparable harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security. In accordance with the Ninth Circuit's remand, the Army has identified six Stryker-related projects that are time-sensitive and critical to ensure the transformation of the 2nd Brigade to a SBCT. These construction projects as well as the associated Stryker-related training will not irreparably harm cultural or natural resources. Mansker Dec. at ¶4, Lucking Dec. at ¶¶4-10, Attachment 1 to Lucking Dec. at ¶¶7, 12-19. The Army has undertaken significant protective measures to reduce to a discountable level the risk of harm to environmental and cultural resources from these actions and will continue to do so as it proceeds with training the 2nd Brigade. Id. The analysis this Court previously conducted on the impacts to the Army and this Nation's security that would result from an injunction is even more relevant today than it was in November 2004. This Court earlier found that the national security concerns implicated from preventing transformation are "an issue of paramount importance that tips the balance of hardships decidedly in favor of" the Army because "[d]elaying or disrupting the conversion of the 2nd Brigade to SBCT 5 will significantly impact the sequence of Army transformation and

13

reduce the overall effectiveness of Army forces currently fighting the Global War on Terrorism." See Court's November 5, 2004 Order at 17. The same conclusion should be reached here when considering interim injunctive relief because the harm to the Army and this nation's defense is highly likely and severe, while the harm claimed by the Plaintiffs is speculative in nature and unlikely due to the lack of cultural and natural resources in the six critical project areas and the extensive mitigation measures undertaken as part of the transformation process.

A.  **THE ARMY AND THE PUBLIC INTEREST WILL BE IRREPARABLY HARMED BY THE ISSUANCE OF A BLANKET INJUNCTION ON ALL STRYKER-RELATED PROJECTS AND TRAINING**

The Army has carefully crafted a solution that permits equipment fielding, training, and a limited number of Stryker-related construction projects to proceed while incorporating the protective measures outlined in the administrative record and accompanying declarations that will reduce any likelihood of harm to cultural and natural resources to a negligible level. As discussed below, unlike the potential for irreparable harm to cultural and natural resources, which is remote, the likelihood of severe harm to the Army, the soldiers of the 2nd Brigade, and this Nation's security is high and, thus, the balance of harms tips decidedly in favor of the Army and the issuance of an interim injunction that permits transformation of

14

the 2nd Brigade to a SBCT.

> **1.   The irreparable harm that will be suffered
> by the Army and its soldiers from an injunction
> that prohibits the transformation of the
> 2nd Brigade is demonstrative and severe**

There are currently four operational SBCTs. When the 2d Brigade is finished with its transformation, it will be the fifth.  At the time the Army announced its plans to begin transforming into a future force, its object was to create a "more responsive deployable, agile, versatile, lethal, survivable, and sustainable" Army. ARP[3] 9656. Combat evidence demonstrates that the Army has done just that with the operational SBCTs.

The primary component of an SBCT is the Stryker vehicle.  As Colonel (COL) Robert B. Brown, who commanded the 1st Brigade, 25th Infantry Division, Stryker Brigade Combat Team in Iraq, explains: "Having spent a year in combat fighting from a Stryker vehicle, I can emphatically state that it is my vehicle of choice for combat operations in today's environment."  Brown Dec. at ¶5. In short, the Stryker vehicle saves soldiers' lives.  As Brigade Commander, COL

---

[3] In this memorandum, Federal Defendants refer to documents from the Programmatic Environmental Impact Statement in the Administrative Record as "ARP" and document from the Site-Specific Environmental Impact Statement as "ARS" followed by the pertinent bates number for the referenced document.  The administrative record documents cited herein are attached to the Declaration of Thomas Helper, which has been filed simultaneously with this memorandum.

Brown obtained personal knowledge of the survival capabilities
provided by the Stryker vehicle in the form of approximately 137
Rocket Propelled Grenades (RPGs) and approximately 50 Suicide Vehicle
Born Improvised Explosive Devices striking direct hits to Stryker
vehicles under his command.  Id.  None of the RPGs penetrated a
Stryker vehicle due to its protection and speed.  Id.  The brigade
nevertheless ultimately lost 33 of its soldiers in combat.  According
to COL Brown, the Stryker vehicle was "essential to saving lives" and
"the losses would have been significantly higher if we had not been
able to fight configured as a [SBCT] or use the Stryker vehicle
during our training and deployment." Id.

    Colonel Brown is not alone in that assessment. Given its
performance in Iraq, the Army recognizes the importance of the SBCTs
and the Stryker vehicle to its mission. General George Casey, the
military commander of the Multi-National Force Iraq, requires SBCTs
and employs them in vital missions, recently assigning an SBCT to
"the priority mission to increase security in Baghdad and reduce the
level of sectarian violence and terror attack." Lovelace Dec. at ¶9.
In addition, General Casey "continues to submit formal requests for
forces to include [SBCTs] to Joint Forces Command as part of the
ongoing and continuous requirements in his theater of operations" and
he "will not accept a light infantry brigade as a substitute for the

16

SBCT requirement in Iraq." Id.  The SBCTs are vital, as "[n]o other unit provides the same capabilities urgently needed in Iraq."  Id. Congress also recognizes the SBCTs vital importance, as it has directed the Army to submit plans to field a seventh SBCT and appropriated additional funds for that purpose.

To provide the commanders in the field with another SBCT as soon as possible, the Army has scheduled the 2d Brigade to complete transformation into the fifth SBCT by November 2007 and then be available to deploy. Id. at ¶7. The training involved in creating a SBCT is an intensive process that takes approximately two years. SBCTs "are configured to fight differently than previous brigades . . . [which] requires more extensive training and preparation in the initial stages of the fielding." Brown Dec. at ¶3. To become the agile and adaptive soldier that SBCTs demand requires "extensive training in a variety of areas, such as leadership, adaptability, creative thinking, the use of digital information and advanced marksmanship techniques." Id.

The 2d Brigade is currently in month 12 of that almost two-year long process, and because it "no longer exists as a light infantry brigade" there is no turning back the clock. Bradenburg Dec. at ¶4; Banach Dec. at ¶6-7. Its weapons, vehicles, and communications are those required for a SBCT, and its soldiers have skills tailored to

17

those required for a SBCT. Id. at ¶8. Thousands of pieces of new
Stryker Brigade equipment have been issued and hundreds of pieces of
old equipment have been turned in. Brown III Dec. at ¶5; Banach Dec.
at ¶6. But the 2d Brigade cannot perform its vital function as an
SBCT if it cannot complete its training and new equipment fielding as
such.  An SBCT is "enormously complex" and "unlike any other
organization we have had in the history of our Army." Banach Dec. at
¶10.  That creates "a significant learning curve" before soldiers can
become combat ready.  Id.  Any delay makes the curve that much
steeper, and will ultimately result in a "combat ineffective unit."
Banach Dec. at ¶1.

Delaying the training and new equipment fielding involved in
transforming the 2d Brigade into a SBCT will therefore ultimately
deny the commanders in the field adequate combat and deterrent forces
by interrupting tightly integrated transformation and deployment
schedules. For example, Major General Dana T. Atkins, the Director of
Operations, United States Pacific Command, states that disrupting the
transformation of the 2d Brigade "would immediately and unacceptably
undermine the ability . . . to deter conflict and respond to crisis
situations throughout the Asia-Pacific region." Atkins Dec. at ¶1.
It will affect not only the Army's combat and deterrent missions, but
also its humanitarian mission in responding to the "frequent and

18

severe natural disasters, including super-typhoons, earthquakes, tsunamis, volcanic eruptions, and mudslides" in the Pacific Command's Area of Responsibility. Id. at ¶4. In addition, the 2d Brigade is "the only active brigade combat team assigned . . . in the Pacific that is not deployed to the Middle East. As such, it provides company and platoon sized contingency ready forces for PACOM responses to homeland security threats and provides units to participate in Theater Security Cooperation training and exercises with allied and neighboring armies." Brown III Dec. at ¶4.  No other Pacific Command "force provides the firepower, mobility, situational awareness, and information processing capabilities resident in a [SBCT]." Atkins Dec. at ¶6.

It is therefore critical that the 2d Brigade transform as planned to meet Pacific Command "mission requirements and response timeliness and to enhance the strategic flexibility of the United States within the theater." Id.  Disrupting training at this point would "cause immense harm to the US Army Pacific's capability to execute our mission to provide combat ready forces to the United States Pacific Command" and "add extreme difficulty to the brigade's already complex task of achieving combat readiness." Brown III Dec. at ¶8. Delaying the transformation of 2nd Brigade now, 12 months into transformation, will have an even greater domino effect than when

19

this Court heard Plaintiffs' first motion for an injunction pending appeal, weakening the Army's strategic posture to deter threats in the Pacific Region, breaking a transformation sequence that was carefully synchronized with projected requirements for combat operations in Iraq and Afghanistan, and disrupting the reallocation of resources to other units that are undergoing transformation. Brown III at ¶1,6.

In addition to disrupting the Army's overall ability to respond to threats around the world by throwing off a tightly integrated transformation and deployment schedule, any delay in training will also have a profound and direct impact on the soldiers of the 2d Brigade when they are deployed: *less training equals more casualties upon deployment.* Banach Dec. at ¶2. COL Stefan Banach, Commander of the 2d Brigade, understands the need for continuity in training plans. He led a U.S. Army Ranger combat parachute assault into Afghanistan on October 19, 2001, "as the spearhead for the Global War on Terrorism." Id. Those Rangers "were the best trained and most well led Soldiers in our Army" and "were fully resourced and . . . had full continuity in all aspects of our combat preparedness," yet this country "still lost five great Rangers and over thirty more Rangers were severely wounded." Id. In Colonel Banach's informed opinion, "any disruption of our current training plan will get many

more of our Soldiers killed and wounded in combat than if we were

able to maintain continuity in our current training and

transformation plan to a fully combat ready [SBCT]."  Id.; Bradenburg

Dec. at ¶3. In other words, interrupting the training of the 2d

Brigade as an SBCT "will have second and third order effects that

will be measured in the blood of our Soldiers."[4] Id.

When weighed against the speculative environmental harms

Plaintiffs have alleged, the disruption to the Army's mission and the

harm to its soldiers and their families that an injunction would

cause weigh heavily in favor of granting interim injunctive relief

that would permit the Army to transform the 2nd Brigade into a SBCT.

> **2.    *The Army has identified six specific projects in addition to training that are needed to prepare the 2d Brigade for combat deployment as a SBCT and are highly unlikely to cause environmental or cultural harm.***

Ronald L. Borne, the Director of Transformation for the 2d

Brigade, has set forth the essential requirements that the Army must

have to successfully complete the 2d Brigade's training as an SBCT

before November 2007. Borne Dec. at ¶¶4-6.  To enjoin those

activities will severely harm the Army. Thus, the Army submits that

any interim injunction should permit the following activities, which

---

[4]Small detachments of 2d Brigade soldiers are already in
combat in the Philippines and Iraq. Banach ¶ 9.

are critical to ensuring that the 2nd Brigade is properly transformed

into a SBCT and prepared for deployment and combat in hostile

environments:

• New Equipment Fielding and New Equipment Training

• Soldier and Unit Level Training

• Construction and use of the five critical projects out of the 28

  studied in the EIS, and modification to an existing training

  range. These projects represent a fraction of the overall

  Stryker-related construction. They are:

  1. QTR1 at Schofield Barracks
  2. SBCT Motor Pool at Schofield Barracks
  3. Urban Assault Course at Schofield Barracks
  4. Tactical Vehicle Wash Facility at Schofield Barracks East
     Range (an environmental protection measure)
  5. Multiple Deployment Facility at Wheeler Army Airfield,
     Hawaii
  6. Minor modification to existing range 11T
  All of the Army's 28 construction projects in association with

the transformation are important[5], but these six are absolutely

_____

[5] Plaintiffs have suggested that the delay in constructing
the Schofield BAX demonstrates that none of the Stryker-related
projects should be considered critical because this was one of
the 28 projects that Army previously claimed were necessary to
transform.  This criticism is misplaced.  The Army maintains that
all 28 projects are needed to establish facilities to transform,
maintain and sustain a Stryker brigade in the long term, but for
the limited duration of an interim injunction, the Army has
identified the six most critical projects that will permit the
2nd Brigade to transform in a timely manner and be ready for
deployment by November 2007.  Borne Dec. at ¶8.  The fact that
the Schofield BAX was delayed does not undermine the credibility
of the Army's assessment of what is needed for timely
transformation of the 2nd Brigade.  As Ronald Borne explained in

critical to ensuring that the 2nd Brigade is transformed into a SBCT and ready for deployment in November 2007. Borne Dec. at ¶6; Banach Dec. at ¶¶6,8; Brandenburg Dec. at ¶¶ 7, 10-12.[6]  Of these critical projects, two projects - QTR1 and Tactical Vehicle Wash Facility - are already completed. Borne Dec. at ¶6  The three remaining projects are being built over existing facilities and are close to 50% complete, thereby minimizing any environmental impact.  Borne Dec. at ¶6. The final project is a minor modification to an existing range 11T, which involves re-grading roads, improving berms, and moving certain targets, all with no adverse environmental impacts.  Id. at ¶4.   The Army has identified six critical projects that will have minimal impact to the environment, but must proceed in order to transform the 2nd Brigade to a SBCT.  Without these projects and training, the harm to the Army, its soldiers, and its effectiveness on the battlefield is inevitable.

The reasons these projects were deemed critical to the

---

his declaration, the project was delayed due to the unexpected discovery of a significant amount of unexploded ordnance (UXO) that took much longer than expected to clear, thus causing a delay in construction.  Id.  The Army should not be faulted for ensuring the safety of its soldiers, construction staff, and the general public.

[6]The reasons why these specific projects and Stryker-related training are critical to the transformation of the 2nd Brigade is discussed in detail in the declarations of Ronald Borne, Colonel Banach, and Major General William H. Brandenburg.

transformation of the 2nd Brigade are described in detail in Declaration of Ronald L. Borne.  Mr. Borne explains the critical nature of ensuring that QTR1 at Schofield Barracks is available for training. Borne Dec. at ¶6(b)(I).  This is a multi-purpose small arms and machine gun range that was built over the former site of other ranges and is designed to accommodate all individual and crew-served pistol, rifle, and machine gun qualification requirements.  <u>Id</u>.  This project is now complete and the weapons being used are not unique to a Stryker vehicle and will be in use regardless of the scope of any injunction issued in this case. <u>Id</u>. Furthermore, all ammunition used on this range is for training purposes and is not explosive in nature, thereby minimizing any alleged harm.  <u>Id</u>.  The QTR1 range is a critical facility for training the 2nd Brigade because without it, there is no range in Hawaii for a Stryker unit to become proficient with the weapons and communication systems associated with the Stryker vehicle.  <u>Id</u>.

The second critical project for the transformation of the 2nd Brigade is the SBCT Motor Pool at Schofield Barracks.  Borne Dec. at ¶6(b)(ii).  The SBCT Motor Pool is designed to provide a facility to park, store, and perform the requisite maintenance and repair on the more than 1,000 Stryker vehicles, trailers and wheel mounted systems that are assigned to a SBCT.  <u>Id</u>.  Without this facility, there is no

24

place on Oahu to store, maintain, and repair these vehicles and they would be left in fields, parking lots, and other open space areas. Id. This would create significant security issues and also increase the risk of environmental harm due to maintenance and fueling mishaps. Id.

The third critical project for the transformation of the 2nd Brigade is the Urban Assault Course ("UAC") at Schofield Barracks, which is more than 50% constructed. Id. at ¶6(b)(iii). The UAC is designed to provide a facility capable of training a SBCT unit on urban terrain combat, which is needed in hostile environments such as Baghdad, Iraq. Id. The UAC is a multi-purpose small arms and machine gun range designed to accommodate all urban area fire training requirements. Id. This training facility will be used by a SBCT in a similar manner to all other units in Hawaii, and will be limited to dismounted individual or small unit live fire training. Id. The UAC project is critical because without it, SBCT training units will not be able to satisfy current urban operation doctrine and training standards and, thus, will not be properly trained to engage the enemy in an urban environment such as exists in Iraq and Afghanistan. Id. This inability to complete urban warfare training will likely translate into higher casualties for the 2nd Brigade. Id.

25

The fourth critical project for transformation of the 2nd Brigade is the Tactical Vehicle Wash Facility at the Schofield Barracks East Range.  Borne Dec. at ¶6(b)(iv).  This facility was built to provide a facility for the 2nd Brigade and other units to remove soil, debris and alien seeds from vehicles, trailers and wheel mounted systems that are used in the East Range and the vicinity of Schofield Barracks.  Id.  This project is an environmental protective measure that permits the Army to prevent the spread of alien invasive species of weeds and other biological pests between the unique ecosystems constituting the Army training areas, as required by a U.S. Fish and Wildlife Biological Opinion.  Id.  The Tactical Vehicle Wash Facility was built over a former warehouse site and serves a significant and important role in ensuring invasive species, seeds, and pests are not transported throughout the facility.  Id.  This facility is now complete and in use by the 2nd Brigade and other military units in Hawaii to protect the environment. Id.  This facility is critical to enable the 2nd Brigade to conduct vehicle operations necessary to transform while minimizing any harm to the environment.  Id.

The final critical project for the transformation of the 2nd Brigade is the Multiple Deployment Facility ("MDF") at Wheeler Army

26

Airfield in Hawaii.  Borne Dec. at 6(b)(v).  This facility is currently under construction and is being built over the Army's former deployment  holding site, which cannot accommodate a SBCT. The MDF is designed to allow units to pack, weigh, balance, and inspect vehicles prior to transport by air or to a seaport for debarkation.  Id.  Accurate weighing and center-of-gravity determinations are crucial for safely loading aircraft and boats and ensuring safety during transit.  Id.  Furthermore, the 2nd Brigade once transformed to a SBCT must have the capacity to deploy within 96 hours notice and must have the flexibility to  deploy under various load specifications.  Id.  This facility is critical to achieving such a deployment capability.  Id.

In addition to these five construction projects, receiving and training on the new equipment associated with Stryker vehicles, including the new communications systems and new or upgraded weapons systems, is essential to ensuring that these soldiers are properly prepared to operate as a SBCT.  Borne Dec. at ¶¶4, 5.  This training will occur on existing roads, trails and ranges on Schofield Barracks or Pohakuloa Training Area ("PTA").  Id.  The weaponry associated with the Stryker vehicle is similar to the weapons that have been used or are currently in use at training facilities in Hawaii, and only non-

27

explosive ammunition will be used during training.  Id.; see Borne Dec. at ¶¶4-5 for a more detailed description of the Stryker-related training that is needed to transform the 2nd Brigade to a SBCT.[7] Therefore, the Stryker-related training is not likely to cause any additional impacts to cultural or natural resources.  The Stryker-related training is consistent with military training that will occur on similar weapons systems even if an injunction is issued.

The Army considers all Stryker-related projects to be important and necessary to complete the transformation process, but it has identified six of these projects that are absolutely critical to ensuring that the 2nd Brigade can transform into a SBCT and properly trained on the new communications and weapons systems before this unit deploys in November 2007.  This transformation is critical to this Nation's security interests and, as discussed below, it will be

_____

[7] The 2nd Brigade also will be using a Mobile Gun System, which employs a 105 millimeter (mm) gun. During training exercises, non-explosive training ammunition will be used.  Borne Dec. at ¶4.  The range upon which this training will occur, Range 11T, is currently a helicopter gunnery, machine gun, and anti-tank missile range.  Id.  In the past, this range was used by Model M60 tanks that were equipped with the same type of weapon systems as the Mobile Gun Systems, a 105 mm gun. Minor modifications that will not impact the environment, including improving roads and berms, and installing new targets will be made to accommodate this training.  Borne Dec. at ¶4.  This training is critical to ensuring our soldiers are properly trained on the weapons systems they will use as a SBCT. Furthermore, any alleged damage from use of the MGS will be minimal because the Army will not be using explosive ammunition. Id.

28

done in a manner that is protective of the environment and will not result in an appreciable risk of harm to cultural or natural resources.  As such, it is requested that the Court narrowly tailor an interim injunction to permit these critical projects to proceed along with the Stryker-related training discussed above.[8]

> **3.**     **There are no viable alternatives to finishing the training of the 2d Brigade as a SBCT at a location outside Hawaii and maintaining this unit as a light infantry brigade is improvident.**

Plaintiffs have suggested an alternative to transforming the 2nd Brigade in Hawaii that would involve transporting the entire unit to another location either in the contiguous United States or Alaska. In the alternative, Plaintiffs have suggested that the 2nd Brigade simply continue to train and operate as a light infantry brigade. Either suggestion is not a viable alternative, and would result in significant harm to the Army and the public interest.

First, there is no feasible alternative for the 2d Brigade to finish its training as an SBCT outside Hawaii while staying on

---

[8]The Army can complete these critical construction projects and train the 2d Brigade for combat deployment while still maintaining the ability to take an objective look at whether to ultimately station the 2d Brigade in Hawaii, in compliance with NEPA and this Court's order. As Borne states in his declaration, these projects can be and are used by other Army units on Hawaii, Borne Dec. at ¶¶1,7, and thus their existence does not preclude the Army from restationing the 2d Brigade. See, infra, discussion under Point Heading IV(A)(4).

29

schedule to meet mission requirements. There is simply "no brigade-size excess capacity for Army housing, training areas and installation facilities available in the United States." Lovelace Dec. at ¶12; Brandenburg Dec. at ¶15.  SBCT 3 will return to Alaska before the 2nd Brigade could complete its training; facilities in Alaska cannot accommodate that overlap. Lovelace Dec. at ¶10. There would be similar overlap with the impending activation of SBCT 7 at Fort Lewis in Washington. Id.  Training at another location would also require transporting all personnel, equipment, and vehicles to that installation by air, which would require 80% of the Air Force's transport capacity and would consume 40 out of 270 available training days.  AR 51334-36.  Given the extensive transportation delays, and the years in advance in which the Army plans these actions, the 2d Brigade would not be able to meet its November 2007 availability date if training was to be completed outside Hawaii. Lovelace Dec. at ¶13.

In addition to the logistical problems of moving the 2d Brigade to complete its training, moving the 2d Brigade out of Hawaii would also "reduce the Army's posture to deter conflict and meet treaty obligations in the Pacific region including the Republic of Korea." Lovelace Dec. at ¶8. By remaining in Hawaii, the 2d Brigade is "strategically positioned to deploy to the four critical areas

identified in the National Defense Strategy: Northeast Asia, the East Asian littoral, Southwest Asia, and the Middle East." Id.  Thus, Admiral William J. Fallon, the combatant commander of the United States Pacific Command, "requires 2d Brigade to transform in Hawaii on time to meet mission requirements assigned by the Secretary of Defense." Id.

Finally, if soldiers were trained in Alaska or at Fort Lewis, their families would have to be left behind in Hawaii, because housing in Alaska and Fort Lewis is already occupied.  "This would require the soldiers and families of the 2nd Brigade, who have already endured a year-long deployment in Iraq . . . to endure additional months of separation during transformation" that would immediately be followed by another year-long deployment in Iraq. Lovelace Dec. at ¶12. It is not just a matter of convenience for those families, or for the Army.  Unexpected separation preceding a year-long deployment "adversely affect command authority, good order and discipline by creating morale and family problems that will undermine individual soldier's mental discipline and erode unit effectiveness." Id.; Brown III Dec. at ¶6. Separation creates distraction, and "distracted soldiers imperil themselves and others." Lovelace Dec. at ¶10.

31

In past motions, Plaintiffs have suggested that the 2nd Brigade would be as effective as a SBCT if it continued to operate as a light infantry brigade. The Army, however, has the expertise to determine what is in the nation's best interest as far as national defense is concerned, and it has determined that training as a light infantry brigade is both impractical and unwise. The 2d Brigade simply is not a light infantry brigade anymore and the Army does not operate light infantry units. Brandenburg Dec. at ¶4; Banach Dec. at ¶6. "It has different and improved capabilities that are now part of a fully integrated set of state of the art systems that provides our Nation with a new and overwhelming combat capability." Banach Dec. at ¶7. The new weapons systems and technology require each unit to transform and be trained on more advanced equipment and technology that is designed to provide a more effective and safer combat unit.  As detailed in Colonel Banach's declaration not only would it be impossible to go back to being a light infantry brigade, "to do so at this point would be illogical given the existing enhanced weapons accuracy, communications capability and protection for our soldiers that we can achieve now with our Strykers." Id.

It is also vital to train the 2d Brigade as an SBCT because "if events in the world require 2d Brigade to deploy tomorrow, or

whenever, it will do so with all available Strykers." Id.  The
soldiers must train on the equipment they will take into battle. And
they must do so "everyday in order to fight effectively when . . .
deployed to combat." Id.  The bottom line is this: "There is no
going back to legacy procedures and or previous less capable unit
designs." Id.  The 2d Brigade no longer exists as a light infantry
brigade, the equipment has changed, the training has changed, and the
new system provides the Army with more effective capabilities while
also providing for greater protection of our soldiers.

It is clear that 2nd Brigade's transformation is critical to
national security, and should not be enjoined.  The brigade needs its
equipment and specific facilities to ensure that it can properly
transform to a SBCT.  National security and foreign policy
considerations such as those implicated here are sufficient to find
that any injunction should allow transformation of the 2nd Brigade,
even in the face of a NEPA violation.  See Committee for Nuclear
Responsibility Inc. et al., v. Seaborg, 463 F.2d 796, 798 (D.C. Cir
1971).

In contrast to Plaintiffs' impractical proposals, the Army has
carefully crafted a solution that permits the Army to proceed with
equipment fielding, training and a limited number of construction

33

projects that will not cause a significant risk of harm to natural or cultural resources.  Two of these projects are already completed and the remaining three projects, other than the minor modification of Range 11T, are close to 50 percent complete.  As for the Stryker-related training, the Army has already completed close to 70 percent of the requisite training to transform the 2nd Brigade to a SBCT. Rather than transport the 2nd Brigade to another location outside Hawaii as Plaintiffs have suggested, the only viable alternative to ensure that the 2nd Brigade is transformed and available for deployment in November 2007 is to permit the transformation of this unit in Hawaii under the limited conditions set forth above.

**4.    The Army should be permitted to proceed with the critical SBCT projects because each has independent utility and their completion will not restrict the Army's ability to analyze reasonable alternatives in a SEIS.**

Not only would a broad interim injunction be inequitable, for the reasons discussed above, it would also be unnecessary to preserve a meaningful NEPA process.  Federal Defendants anticipate that Plaintiffs may argue that the completion of the five critical projects and modification of Range 11T at PTA would undermine the Army's ability to meaningfully analyze reasonable alternatives in a supplemental NEPA analysis.  To the extent Plaintiffs make this

34

argument, it is without merit.

Courts have held that action on a project may proceed, notwithstanding a NEPA violation, where such action would neither "have an adverse environmental impact" nor "limit the choice of reasonable alternatives" within the meaning of 40 C.F.R. § 1506.1(a). For example, in North Carolina v. City of Virginia Beach, 951 F.2d 596, 598 (4th Cir. 1991), the Fourth Circuit reversed a district court's refusal to modify its injunction which prohibited the City of Virginia Beach from undertaking steps to build an 85-mile pipeline from Lake Gaston to satisfy the City' s potable water needs.  The project required a FERC permit, and FERC had neither issued its permit nor conducted its NEPA review.  Id. at 600.  In reversing, the court of appeals recognized that action on a project should not go forward pending NEPA compliance to the extent doing so would so influence the agency s ultimate decision on the project as to effectively limit the choice of reasonable alternatives available to the federal decisionmakers in the NEPA process.  Id. at 601-02.  The court ruled, however, that the injunction should have been narrowly tailored to allow the limited construction that the City wanted to do because such work would not "unduly influence" FERC's consideration of alternatives.  Id. at 602; see also South Carolina Dept. of

Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 99-101 (4th Cir. 1989) (holding that action need not be enjoined pending NEPA compliance notwithstanding the plaintiff's contention that allowing the action to proceed would prejudice the federal agency's consideration of alternatives in the NEPA process).  The court's conclusion is consistent with the Council on Environmental Quality's ("CEQ") regulations which provide that until an agency completes the NEPA process and issues a ROD, it is only prohibited from taking action concerning a proposal that would have an adverse environmental impact or limit the choice of reasonable alternatives.  40 C.F.R. § 1506.1(a).

In this case, work on these critical projects and training will not impact whether the Army decides where and how to complete the transformation process.  Borne Dec. at ¶7.  While these projects are vital to the 2nd Brigade's training and transformation, none are unique to the Stryker transformation process and can be used by other military units in Hawaii even if transformation is enjoined.  Id. at ¶¶6,7.  As explained by Ronald Borne, Director of Transformation for the U.S. Army Garrison Hawaii, "[t]hese projects will also be used by other military units stationed in Hawaii. Because these projects can, and will, support activities unrelated to Stryker transformation,

36

their completion and/or use will not affect the ultimate decision on where 2/25 will be permanently stationed." Id. at ¶1. For example, construction on QTR1, a multi-purpose, small arms and machine gun range, and the Tactical Vehicle Wash Facility, a facility used to minimize the spread of invasive plant species and biological pests, has been completed and these facilities are in use by other Army units in Hawaii. Id. at ¶6. Thus, as Ronald Borne states in his declaration, the critical projects have independent utility and their existence does not preclude the Army from taking an objective look at whether to ultimately station the 2d Brigade in Hawaii, after compliance with NEPA under the Ninth Circuit's order. Id. at ¶¶1,6-8. Under such a scenario, and in accordance with the case law cited above, the Court should permit the Army to proceed with the limited number of projects that are needed to transform the 2nd Brigade.

The same result is reached with respect to the other prong of the CEQ regulation, which prohibits a federal agency from taking action that would have an adverse environmental impact pending NEPA compliance. See 40 C.F.R. § 1506.1(a)(1). In South Carolina Dept. of Wildlife & Marine Resources v. Marsh, 866 F.2d 97, 100-01 (4th Cir. 1989), the district court granted plaintiffs motion for a preliminary injunction to prevent the Army Corps of Engineers from installing

pumped storage facilities prior to completion of an environmental impact statement that adequately considered the environmental impacts of operating the pumps.  The Fourth Circuit recognized that injunctive relief must be "tailored to restrain no more than what is reasonably required to accomplish its ends and no "broader than necessary to protect against the environmental risk." Id. at 100 (internal quotation marks and citations omitted).  Noting that "[t]he Corps ha[d] already spent a majority of the funds allocated for the project, and [that] Plaintiffs conceded at oral argument that installation alone of the already purchased pumped storage generators will cause no environmental damage," the Court of Appeals concluded that "restraining the installation of the generators is not reasonably required to protect the environment" and "vacate[d] that part of the injunction which prohibits the Corps from installing the pumped storage generators at the Dam." Id. at 100.

As more fully set forth in section IV.A.2, above, and section IV.B, below, the critical projects and training the Army seeks to complete pending further proceedings on a permanent injunction present negligible risk of significant harm to cultural or environmental resources.  Accordingly, it is not necessary to enjoin these activities to promote NEPA's purposes.

38

In the end, there is no danger of these limited construction projects and the related Stryker training rendering the NEPA compliance "an empty exercise," as Plaintiffs fear or, in the parlance of NEPA, "limit[ing] the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(2).  These projects are complete or close to completion, they have independent utility, and their future use is not conditioned on completion of the transformation process. Inasmuch as their use does not preclude the Army from giving meaningful consideration to other reasonable alternatives in an SEIS, these critical projects and related training should be allowed to proceed. See National Audubon Society, 422 F.3d at 201 ("[A] NEPA injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.' Violation of NEPA is not always cause to enjoin all agency activity while the agency completes the required environmental analysis.") (citation omitted).

**B.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF THE COURT ISSUES A LIMITED INJUNCTION PERMITTING TRANSFORMATION OF THE 2ND BRIGADE**

As this Court previously recognized in denying Plaintiffs' prior requests for injunctive relief, Plaintiffs' claims are speculative in nature and the Army has gone to great lengths to ensure that impacts to cultural sites and natural resources are either eliminated or

39

mitigated.  See Court's Order dated November 5, 2004 at 15-16.
Today, Plaintiffs' assertions of harm fare worse than they did two
years ago.

The administrative record demonstrates that the Army took the
requisite hard look at the environmental impacts associated with the
transformation process in its programmatic and site-specific EISs.
See ARP 009656-666; ARS 0010308-329; 0024083-86; 0024260-73; 0024294-
98; 0024616-24; 0051514-522; 0051523-529; 0051703-736; 0051737-759;
0052224-666; and 0052267-298.  The Army specifically analyzed the
potential impacts associated with transformation and concluded, as
did the Fish and Wildlife Service in its Biological Opinion, that the
significant measures undertaken ensure that any risk to cultural and
natural resources is minimized.  See ARS 0024083-86; 0024260-73;
0024294-98; 0024616-24.

Plaintiffs in this action have never questioned the Army's NEPA
analysis on potential impacts nor have they claimed that this
analysis violates NEPA.  In fact, neither the district court nor the
Ninth Circuit identified any defects in the Army's impacts analysis.
The analysis contained in the Army's NEPA documents on impacts to
cultural and natural resources has not been invalidated and fully
complies with the statutory requirements under NEPA.

40

Plaintiffs cannot demonstrate that they are likely to suffer irreparable harm from the limited activities the Army here seeks leave to pursue.  First, there are no endangered or threatened species in the critical project areas.  <u>See</u> Mansker Dec. at ¶4. Second, the Army has undertaken significant measures to protect cultural resources and, to date, these measures have proven to be effective in protecting cultural resources during the transformation process.  <u>See</u> Lucking Dec. at ¶¶2-11, Attachment 1 to Lucking Dec. at ¶¶7, 12-19.  With respect to cultural resources, there are none in four of the five project areas and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1. Lucking Dec. at ¶¶4-10. As for the modification to Range 11T, this project has not begun and the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences.  <u>Id</u>.  In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade.  Finally, Plaintiffs have raised concerns about the cultural site identified as Mauna'una, but, as Dr. Lucking explains, this site is located on a bluff and not within 200 yards of any of the critical

41

project areas. Lucking Dec. at ¶8.

Since Plaintiffs cannot demonstrate that cultural sites or natural resources are likely to be irreparably harmed by the completion of the six designated projects and Stryker-related training, the Court should fashion an injunction that permits these projects and training to continue in order to ensure that the 2nd Brigade is properly transformed and ready for deployment by November 2007.

### 1. *Plaintiffs cannot demonstrate irreparable harm to cultural resources*

Plaintiffs have argued that the transformation of the 2nd Brigade will cause irreparable injury to unknown cultural resources. But, as this Court has previously recognized, Plaintiffs' claims of irreparable harm are too speculative and overlook the Army's knowledge of cultural resources in construction areas and the extensive steps it has taken to avoid and mitigate impacts to cultural areas. Lucking Dec. at ¶¶ 2-10, Attachment 1 to Lucking Dec. at ¶¶2, 7-16, 19; see also Court's Order dated November 5, 2004 at 15-16.

Dr. Laurie Lucking, the Army Cultural Resources Manager, explains in her declaration that the Army acknowledged in the SEIS that transforming the 2nd Brigade might have significant impacts on

42

cultural resources because it realized that destroying even one cultural site would be significant to Native Hawaiians. Attachment 1 to Lucking Dec. at ¶4. In addition, Areas of Traditional Importance, which may not be protected under the National Historic Preservation Act, may be impacted. Id. at ¶4. When it published the SEIS, project designs had not progressed far enough to determine cultural impacts with certainty, and the Army cannot guarantee that no cultural sites will be impacted. However, the Army's goal is to prevent impacts, and its efforts to date have proven successful. Id. at ¶¶13,14.

Dr. Lucking explains in detail the Army's ongoing surveying and monitoring of project sites.[9] Most of the areas surveyed to date have revealed no cultural sites. Id. at ¶11. In the few instances when the Army has discovered cultural sites, it has altered the projects to avoid those sites entirely. Id. at ¶¶13, 14. To date, there is no indication that unexploded ordnance clearance or pre-construction environmental and geotechnical testing have damaged any cultural resources. Id. at ¶¶11,16. Archeological and cultural

_____

[9]Many of the measures Dr. Lucking describes are included in the Programmatic Agreement the Army entered into with the Advisory Council on Historic Preservation, the Hawaii State Preservation Office, and the Office of Hawaiian Affairs to meet its obligations under the National Historic Preservation Act. Lucking Decl. ¶3.

43

monitoring will continue throughout the construction process to ensure that any cultural resources that may be discovered are properly protected.  Id. at ¶7.

Plaintiffs' selective criticism of the Army's mitigation measures in past briefing has failed to acknowledge the full scope of those efforts. Before the Army ever gets to the point of "data recovery" or "reburial," it will survey construction areas, flag eligible archaeological sites for avoidance, and design projects to avoid impacting those sites wherever possible.  ARS 52067; Attachment 1 to Lucking Dec. at ¶¶10,13,14.  Plaintiffs have argued that data recovery alone is insufficient to protect cultural resources. However, data recovery is not the only method of mitigation, as Plaintiffs would lead the Court to believe; in fact, it is the last line of defense. Id. Following Plaintiffs' logic, no earth-moving would be permitted in Hawaii since any such activity could lead to accidental discovery of archaeological sites, human remains, or cultural items. See also Judge Bea's dissent in Ninth Circuit's October 27, 2006 Order.  The Army is making every effort as it goes forward to avoid harming cultural resources by consulting with Native Hawaiian organizations, families and individuals, surveying project areas, amending project designs to avoid cultural sites, using lineal

44

descendants from project areas as cultural monitors to identify and suggest protection for sites, and using archaeologists and cultural monitors to oversee all earthmoving activities.  Id. at ¶¶2,5-11,13-14.

In the past, Plaintiffs have misstated the record when they've suggested that construction of several projects will occur in "archaeological sensitivity areas."  The SEIS identifies all archaeological sites at each sub-installation of which the Army was then aware.  See, e.g., ARS 52056-65.  However, the SEIS explains that individual project areas within those sub-installations "will be designed to avoid all eligible and unevaluated archaeological sites, to the full extent practicable."  ARS 52067. The Army has consistently redesigned projects to avoid cultural sites, Attachment 1 to Lucking Dec. at ¶¶ 2,10,13,14, and will continue to do so.

The Army developed a Cultural Monitoring Program, which enlists the assistance of persons who are knowledgeable about Native Hawaiian activities, to insure maximum protection for cultural sites and artifacts.  Id. at ¶7.  Currently, the Program includes 30 cultural monitors, all of whom are Native Hawaiians, who are permitted to go anywhere in the project area that is accessible to contractors and archaeologists.  Id.  Information reported by the monitors is given

45

to the archaeologists and the Army, as well as to interested members of the community for additional comment.  Id. at ¶8.  Dr. Lucking describes the other efforts the Army has undertaken, successfully, to avoid disturbing cultural resources in the project areas. Plaintiffs have complained that cultural monitors have been prevented from exercising meaningful oversight, but any restrictions have been safety related. Id. at ¶15.  Moreover, these complaints do not involve projects that are among the six critical projects that the Army wishes to continue during the interim injunction.  For example, due to the large amounts of unexploded ordnance at the Schofield BAX (not one of the six critical projects), the monitors initially were required to remain 200 feet away from all intrusive activities. Id. That was increased to 650 feet when chemical weapons were discovered on site. Id. Once earth disturbing activities were completed, however, the monitors were allowed down-range to examine those areas. Id. These restrictions, which were only in place at the Schofield Barracks BAX, were lifted several months ago after consultation with the cultural monitors, who, as a result, became part of the Schofield BAX UXO clearance team.

Any claim that construction will lead inevitably to the disinterment and destruction of Native Hawaiian burials is likewise

speculative and ignores the mitigation measures the Army has employed to ensure that such harm will not occur.  Attachment 1 to Lucking Dec. at ¶¶10,19.  The Army has taken every precaution to avoid effects on Native Hawaiian burials, including extensive surveying and, as noted above, hiring cultural monitors who are lineal descendants of people native to the various project areas and who are also knowledgeable about burial areas.  Id. at ¶¶7, 15,19.  When the Army identified possible burial sites at the South Range Acquisition Area, it marked the area "off-limits," and will do the same if it identifies other burial sites in the future.  Id. at ¶19.  The success of these measures is reflected in the identification and protection of possible burial sites at the South Range Acquisition Area (not one of the six critical projects) in July 2003.  Id. If additional burial areas are identified, similar precautions will be undertaken to protect them.  Id.  Thus, other than mere speculation, Plaintiffs cannot demonstrate that harm to Native Hawaiian burials is inevitable and irreparable.

With respect to the six critical projects, the extensive mitigation measures outlined above have worked with the two completed projects and are working effectively with the three projects that are currently under construction.  Lucking Dec. at 4-10; Attachment 1 to

47

Lucking Dec. at ¶7.  In fact, the Army's mitigation measures have revealed that there have been no cultural resources and historic properties identified in four of the five critical project areas, and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.  For example, in QTR1, which is an existing military range that is in use by non-Stryker units, a cultural site was identified and mitigation measures were undertaken to protect this site.  Id. at 9.  To date, this site has not been harmed.  Id.  As for the minor modification to Range 11T, this project has not begun, but the mitigation measures, including cultural resource surveys, that have proven successful elsewhere will be undertaken before this project commences.  Id.

In past briefing, Plaintiffs have raised concerns about construction at the Schofield Battle Area Complex, but this is not one of the critical projects identified by the Army as needed for transformation of the 2nd Brigade.  Furthermore, there is a cultural site known as Mauna'una that Plaintiffs have identified as an area of concerns.  As Dr. Lucking explains, the Army is well aware of this site and has confirmed that it is more than 200 yards from any critical project area. Lucking Dec. at ¶8.  Mauna'una is located on a eroding slope and rather than harm this resource, the Army is

48

stockpiling soil from the Multiple Deployment Facility with hope that this soil can be used to stabilize the erosion around this site.  Id. Based on the foregoing and as explained in Dr. Lucking's declaration, Plaintiffs cannot establish that there is a likelihood of harm to cultural resources from the completion of the six critical Stryker projects and related training.

Finally, Plaintiffs have complained that the use of the MK-19 grenade launcher is likely to cause irreparable harm to cultural resources. But as Dr. Lucking explains in her declaration, the Army does not use, and does not intend to use, high explosive rounds for training with the MK-19. Instead, the MK-19 "weapons are using practice munitions that do not have a high explosive charge." Attachment 1 to Lucking Dec. at ¶17. Those practice rounds do not pose a threat of irreparable harm to cultural resources.  Id.

As this Court has already recognized, the Army has undertaken extensive measures to ensure that cultural sites and ATIs are identified and protected to fullest extent practicable.  See Court's Order dated November 5, 2004 at 15. Given these protective measures as outlined above, it is not surprising that there is no evidence that cultural resources have been irreparably harmed. Attachment 1 to Lucking Dec. at ¶¶7, 12-19.  Nor is it likely that this will occur.

49

Therefore, Plaintiffs cannot demonstrate irreparable harm to cultural

resources and the Court should issue an interim injunction that

permits the Army to proceed with the five critical Stryker projects

and Stryker training.  See Cummings v. Connell, 316 F.3d 886, 897

(9th Cir. 2003) (where there was no "cognizable danger" demonstrated

by plaintiffs, the court could not grant injunctive relief).[10]

### 2.  Plaintiffs cannot demonstrate irreparable harm to natural resources

Plaintiffs cannot demonstrate that there will be  irreparable

---

[10]In the past, Plaintiffs have erroneously asserted that the
Army conceded its actions will irreparably harm cultural and
natural resources.  Plaintiffs' assertion, and much of their
irreparable harm argument, has been based on the Army's site-
specific EIS.  However, Plaintiffs' reliance on the Army's SEIS
to carry their burden is misplaced.  The EIS's characterization
of the likelihood of impacts as "significant" reflects the Army's
solicitude for Plaintiffs' cultural interests; the Army
recognizes that the loss of even one cultural site would be
significant.  However, Plaintiffs overlook that the EIS predicts
the impacts that might result from the proposed action as a
whole, not, as is the issue here, from a limited subset of
critical Stryker projects and training.  The SEIS does not
indicate that harm is likely or severe as a result of the
critical Stryker projects and training at issue here.  To the
contrary, as this Court earlier recognized, the Army developed
extensive measures to avoid and mitigate any impacts to these
resources.  See Court's November 5, 2004 Opinion at 15-16.  In
fact, four of the project areas have no known cultural resources
and protective measures have proven successful in identifying and
protecting cultural resources at QTR 1.  Lucking Dec. at ¶¶4-10.
The same protective measures will be undertaken before the
modification of Range 11T.  Thus, in light of the historic
success of the Army's protective measures, it is even more
apparent today than it was when the Court earlier ruled that
significant harm to cultural and natural resources from the
critical projects and training is not likely.

harm to natural resources in the critical project areas or as a result of Stryker-related training. First, there are no endangered or threatened species in the six critical project areas. Mansker Dec. at ¶¶4, 17. In fact, the only site within the current or planned construction projects that contains listed species or its habitat is at the PTA BAX. Id. This, however, is not one of the critical projects. Borne Dec. at ¶4-6. Thus, there is no current activity with respect to the six critical projects or training that impacts a listed species or its habitat, nor will there be, and even for the PTA BAX (not one of the six critical projects), the Army will build a 21,000 acre fenced area to exclude non-native ungulates. Mansker Dec. at ¶4. The conservation measures employed at the site will "result in a net benefit to the species in the long run." Id. at ¶7.

Second, the Fish and Wildlife Service issued two biological opinions concluding that the 2d Brigade transformation is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy critical habitat. ARS 24264, 24616. This Court defers to the "special expertise of the FWS" in making such determinations. See Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 523 (9th Cir. 1998); see also Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1456 (9th

Cir. 1992).  The Service's scientific judgment refutes Plaintiffs'
allegation that the Army will irreparably harm listed species absent
an injunction.  Significantly, Plaintiffs have not challenged these
biological opinions under the Endangered Species Act.

The Biological Opinions outline the actions the Army has taken
to protect critical habitat and listed species in the project area.
ARS 24264-73, 24616-24.  With these protective measures in place, the
Fish and Wildlife Service concluded that the proposed action is not
likely to jeopardize the continued existence of any species or
adversely modify critical habitat.  ARS 24264, 24616.  With regard to
the Hawaiian hoary bat, the Service concluded that "adverse impacts .
. . will be minimized and offset by fencing, ungulate removal, and
wildfire threat abatement."  ARS 24261.  Monitoring of bat habitat
will enable the agencies to assess the effectiveness of and adjust
these mitigation measures, as well as "provide valuable scientific
data that would contribute to the recovery of the Hawaiian hoary
bat."  ARS 24263.  The Army will also construct fence units, remove
ungulates, and plant listed plant species to increase their
distribution and abundance, and will take appropriate action to
protect palila habitat.  ARS 24264-65.  The Fish and Wildlife Service
concluded that minimization and mitigation measures would offset

adverse impacts to palila habitat.  ARS 24247.

Natural Resource Manager Michelle Mansker described in her declaration the Army's extensive efforts to protect listed species and their habitat.  Among other things, the Army has implemented an Integrated Wildfire Management Plan ("IWFMP") to reduce the frequency, size, and severity of any fire.  Mansker Dec. at ¶6.  The IWFMP includes a Fire Danger Rating System that restricts specific activities during high-risk periods and standard operating procedures for each installation that outline responsibilities, fire prevention measures, staffing levels, and requisite equipment needed, including helicopter support during all live fire training.  Id.  The Fish and Wildlife Service noted the significance of the IWFMP in protecting critical habitats and species in its no-jeopardy determination.  Id.; ARS 24265. Plaintiffs have not demonstrated that the proposed transformation, and most particularly the six critical construction projects, will irreparably harm the Hawaiian hoary bat or any other species or habitat in the proposed transformation area.

In the end, Plaintiffs simply cannot that demonstrate that there will be irreparable harm to natural resources in the six critical project areas or as a result of Stryker-related training.  There are no listed species found near or within any of the critical

53

construction projects.  Mansker Dec. at ¶4. Moreover, the Army has undertaken significant protective measures to ensure protection of natural resources during any training, including mitigation pursuant to the Wildfire Management Plan, and Integrated Natural Resources Management Plan. Id. at ¶7.  Such measures have proven successful and were relied on by the U.S. Fish and Wildlife Service in issuing its biological opinion that Stryker training and related construction will not jeopardize threatened or endangered species.  Id. at ¶7-8.

Based on the foregoing and the no-jeopardy determination of the Fish and Wildlife Service, Plaintiffs cannot demonstrate that any of the proposed critical construction projects or related training will irreparably harm any species or habitat in the proposed transformation area.

### C.   THE BALANCE OF HARMS TIPS DECIDEDLY IN THE ARMY'S FAVOR

In considering the propriety of issuing an injunction, the court must balance the relative harm each party may sustain. Caribbean Marine Services v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  In the instant case, the immediate and significant harm to the safety of American soldiers and our country's national security far outweighs the speculative claims of possible harm to cultural and natural resources alleged by Plaintiffs.  The scale tips even more decidedly

in the Army's favor when the Court considers the narrow tailoring requested by the Army for the interim injunction.

Given the limited relief sought by the Army, Plaintiff simply cannot show any likelihood of harm, let alone a level of harm that outweighs the substantial harm faced by American soldiers and the Army. First, there are no cultural resources in four of the critical project areas sought by the Army, and, in the fifth, QTR1, the mitigation measures undertaken have proven successful in protecting the identified cultural resources. Lucking Dec. at ¶¶4-11; see also Attachment 1 to Lucking Dec. at ¶¶7, 9-12. These same successful mitigation measures will be undertaken before work begins on the minor modification to existing training range 11T. Id. Second, as for natural resources, there are no threatened or endangered species in the critical project areas, and mitigation measures, as concluded by the Fish and Wildlife Service in its Biological Opinions, have effectively protected species in other areas throughout the Army installation. Mansker Dec. at ¶4.

In contrast to Plaintiffs' speculative assertions of irreparable harm, the harm to our soldiers and to national security that would result from issuance of an injunction prohibiting the six critical projects and Stryker training would be severe. See State of

<u>Wisconsin v. Weinberger</u>, 745 F.2d 412, 428 (7th Cir. 1984) ("the district court abused its discretion by failing to consider the degree to which the NEPA interest would, in fact, be served by an injunction, the efficacy of other forms of relief, and the harm to national defense interests that would result"). SBCTs provide improved battle command capabilities and defense systems that increase our soldiers effectiveness in combat and protect them to a much greater extent than current military defense systems. Brown Dec. at ¶5. According to Colonel Brown who has first hand experience in Iraq, the Stryker vehicle was "essential to saving lives" and "the losses would have been significantly higher if we had not been able to fight configured as a [SBCT] or use the Stryker vehicle during our training and deployment." <u>Id</u>.

In addition, delaying or disrupting the conversion of the 2nd Brigade to a SBCT will significantly impact the sequence of Army transformation, reduce the number of highly effective SBCT units in the field of battle, and reduce the overall effectiveness of Army forces fighting the Global War on Terrorism. <u>See</u> Court's November 5, 2004 Order at 17-18.

The Army has carefully crafted a solution that does not involve all 28 Stryker related projects, but rather requires five critical

projects and a minor modification to one existing range to be completed immediately to ensure the transformation is completed and the 2nd Brigade is ready to deploy in November 2007.  These projects, with the exception to the minor modification to Range 11T, are either completed or more than 50% complete, and the related Stryker training is nearly 70% complete. To enjoin the transformation at this time would result in creating an ineffective brigade that has not been transformed and cannot be deployed.  Borne Dec. at ¶8.

The balance of harms in this matter clearly tips in favor of permitting the Army to proceed with the transformation of the 2nd Brigade, thereby, protecting our soldiers, improving our combat ability, and serving this Nation's security interests.  The Supreme Court recently reiterated that the role of the judiciary in reviewing military decisions is constrained.  "Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them."  Hamdi v. Rumsfeld, 124 S.Ct. 2633, 2647 (2004) (citing Department of the Navy v. Egan, 484 U.S. 518, 530 (1988).

As the facts in this memorandum demonstrate, and as this Court previously recognized, enjoining the 2nd Brigade from transforming to

57

a SBCT would result in real and significant harm to the Army, its soldiers, and the war on terror.  <u>See</u> Court's November 5, 2004 Order at 17-18.  Therefore, the Army requests that the Court not disrupt the Army's efforts to provide the best support possible to soldiers in combat and the best security possible to our nation when the record shows that the Army has effectively implemented efforts to eliminate or minimize harm to cultural and natural resources.

D.    **AN INJUNCTION PREVENTING THE TRANSFORMATION OF THE 2ND BRIGADE TO A SBCT WOULD BE CONTRARY TO THE PUBLIC INTEREST**

As the Ninth Circuit has said, the trial court "must always consider whether the public interest would be advanced or impaired by issuance of an injunction in any action in which the public interest is affected."  <u>Carribean Marine Services Co., Inc. v. Baldridge</u>, 844 F.2d 668, 674 (citations omitted).  Indeed, if the public interest weighs strongly against an injunction, the relief must be denied "even though irreparable injury may otherwise result to plaintiff. . . ."  <u>Weinberger v. Romero-Barcelo, et al.</u>, 456 U.S. 305, 312 (*citing* <u>Yakus v. United States</u>, 321 U.S. 414, 440 (1944)).

The Army vigorously denies that Plaintiffs would suffer any harm absent an injunction in this case, let alone immediate and irreparable harm.  But, even if such harm were likely, the public

interest would dictate that no injunction issue in this case.
Clearly, the defense of the United States is one of, if not <u>the</u>, most
important of public interests.  Moreover, it is unquestionable that
preparing our soldiers by providing them with the most advanced
training and supplying them with the most advanced equipment serves
not only the individual soldier's best interest, but the best
interest of the public as well.  Put simply, where an injunction
would harm the military's ability to provide for the national
defense, it "would have a large negative effect on public interest."
<u>Water Keeper Alliance v. Department of Defense</u>, 152 F.Supp.2d 155,
163 (D.P.R. 2001).

　　　The overwhelming weight of the evidence before the Court
demonstrates that enjoining the transformation of the 2nd Brigade
will harm national security.  First, delay in transforming the 2nd
Brigade will result in faster deployment of other Army units to
combat operations in Iraq and elsewhere.  Such "accelerated
deployment would further reduce unit training time, significantly
increase the risk of American casualties and decrease unit mission
effectiveness in combat . . . ."  Lovelace Dec. at ¶ 8.

　　　Second, transformation delay would substantially interfere with
the Army's ability to meet its obligation to protect the United

States' interests in the Pacific region.  As the "only active brigade combat team" in the Pacific that is not currently deployed, the ability of the unit to react expeditiously and provide the advanced capabilities attendant to a SBCT, would "cause immense harm to the US Army Pacific's capability to execute our mission. . . ."  Brown III Dec. at ¶ 8.

Finally, delay in the training of the soldiers of the 2nd Brigade will diminish the ability of our soldiers to carry out there mission of protecting the United States.  "Less training equals more casualties upon deployment."  Banach Dec. at ¶ 2.  Obviously greater numbers of casualties is not in the public interest and will not advance the Army's mission of protecting the public interest.  As Judge Mollway has stated "there is no heavier weight to balance than the loss of human life."  <u>Malama Makua v. Rumsfeld</u>, 2006 U.S. Dist LEXIS 3962, *33 (D.Hawaii February 2, 2006).

**V.    CONCLUSION**

For the foregoing reasons, Federal Defendants request that the Court issue an order on interim injunction relief permitting the Army to proceed with Stryker related training, provision of the requisite Stryker equipment, a minor modification to existing training Range 11T, and the following five transformation related construction

60

projects in order to properly transform the 2nd Brigade and protect

our national security interests:

1.  QTR1 at Schofield Barracks
2.  SBCT Motor Pool at Schofield Barracks
3.  Urban Assault Course at Schofield Barracks
4.  Tactical Vehicle Wash Facility at Schofield Barracks East Range (an environmental protection measure)
5.  Multiple Deployment Facility at Wheeler Army Airfield, Hawaii.

Respectfully submitted this 14th day of November 2006,

EDWARD H. KUBO, JR. (2499)
United States Attorney
District of Hawai`I
/s/ Thomas Helper
_____

HARRY YEE      (3790)
THOMAS HELPER  (5676)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawai`I  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email: harry.yee@usdoj.gov

SUE ELLEN WOODRIDGE
Assistant Attorney General

BARRY A.  WEINER
JAMES D. GETTE
Trial Attorneys
General Litigation Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C.  20044-0663
Email: Barry.Weiner@usdoj.gov

```
                                  Telephone:     202-305-0469
                                  Fax:        202-305-0274

Of Counsel:
Robert M. Lewis
Senior Trial Attorney
Army Environmental Law Division
901 North Stuart Street, Suite 400
Arlington, VA 22203
Telephone:  (703) 696-1567
Facsimile:   (703) 696-2940
```

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

Served Electronically through CM/ECF:

David L. Henkin       dhenkin@earthjustice.org

Isaac H. Moriwake     imoriwake@earthjustice.org

Attorneys for Plaintiffs

DATED:  November 14, 2006, at Honolulu, Hawaii.


/s/ Jan Yoneda
_____