PHONE (808) 594-1888



FAX (808) 594-1865

**STATE OF HAWAI'I**
**OFFICE OF HAWAIIAN AFFAIRS**
711 KAPI'OLANI BOULEVARD, SUITE 500
HONOLULU, HAWAI'I 96813

October 5, 2006

Colonel Howard Killian
Garrison Commander
Department of the Army
Headquarters, U.S. Army Garrison
Schofield Barracks, HI 96857-5000

**Re:** **Specific Concerns Related to OHA Objections to Programmatic Agreement (PA) among the United States Army Garrison, Hawai`i, the Hawai`i State Historic Preservation Office and the Advisory Council on Historic Preservation for Section 106 Responsibilities for the Army Transformation of the 2nd Brigade, 25th Infantry Division (Light) to a Stryker Brigade Combat Team (SBCT).**

Dear Colonel Killian:

The purpose of this letter is to follow up on our September 26, 2006 meeting and to allow the Office of Hawaiian Affairs (OHA) to properly assess whether our numerous concerns regarding the implementation of the SBCT Programmatic Agreement are being adequately addressed prior to the commencement of any formal legal recourse. We would like to thank you for meeting with us and for the open and productive discussion.

This letter is directly addressing, through specific instances, the concerns raised by OHA in both our October 20, 2005 letter to Alan K.L. Goo, Director, Directorate of Public Works, Department of the Army for the Garrison Command, and our July 25, 2006 letter, addressed to you as the Garrison Commander. We have highlighted our specific questions below to better allow the Installation an opportunity to identify and address OHA's concerns.

### General Implementation of Programmatic Agreement

The subject PA, in recognition of the "*long time period and broad geographical extent of the projects*" to convert the selected unit to an SCBT, set forth procedures for the proper "*identification, evaluation, treatment, and management*" of historic properties. OHA signed this PA with reservations on March 4, 2004.

# EXHIBIT 6

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 2

In the July 29, 2003 letter to Native Hawaiian organizations, then Garrison Commander Colonel
David L. Anderson initiated consultation for the "proposed transformation undertaking in
compliance with Section 106 of the National Historic Preservation Act." There were two very
important statements in this initial consultation letter that OHA considers as guiding policy with
regard to the good faith implementation of the PA:

1. *The Army is also very serious in its intent to ensure that its transformation
   projects do not significantly impinge on the rights of Native Hawaiians to conduct
   their traditional cultural practices;*

2. *The Army contends that the PA, when signed by all parties, will ensure that
   significant cultural resources will be preserved and protected during the Army's
   proposed undertaking to transform to an SBCT in Hawai`i.*

Furthermore, as noted by the Advisory Council on Historic Preservation (ACHP) in their letter
dated July 25, 2006, the core constitution of the PA consists of the following elements:

- *The PA was developed in accordance with Section 800.14 of the ACHP
  regulations to allow the Army to meet its responsibilities under Section 106;*
- *In signing the PA, the U.S. Army Garrison Hawai`i committed to carry out a
  program of activities to ensure the SBCT undertaking took into account effects on
  historic properties;*
- *Critical to the success of the PA was an ongoing commitment by the Army to work
  closely with Native Hawaiian organizations, families, and individuals that may
  ascribe religious and cultural importance to historic properties which may be
  effected by the SBCT undertakings;*
- *In PA Stipulation III, in recognition of the significance and respect properties of
  traditional religious and cultural importance, including burials and landscapes,
  play in the lives of Native Hawaiians, the Army committed to the selection of a
  Cultural Monitor;*
- *The Cultural Monitor was to be provided timely notification of all site-specific
  projects and access;*
- *By enabling the Cultural Monitor to serve as an independent observer, the Army
  could provide additional assurances to Native Hawaiians that properties of
  traditional religious and cultural importance are being properly treated.*

With these various statements and commitments in mind, and in light of the preliminary
observations of the ACHP as expressed, OHA would like to further explore the specifics of the
PA beginning with what OHA and other Native Hawaiian Organizations (NHO) consider to be a
paramount component of the PA's ability to protect the interests of the Native Hawaiian
community: the contemplated role of the Cultural Monitor.

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 3

### Implementation of Cultural Monitoring in SBCT

The idea of utilizing the services of a cultural monitor, in addition to the more widely accepted practice of utilizing the services of an archaeological monitor, is in OHA's opinion, an emerging and important trend in historic preservation efforts nationwide and even more aggressively within the State of Hawai`i. In fact, the trend in Hawai`i has been to move towards setting up guidelines, qualifications, training and certification processes for cultural monitors to provide a more uniform professional service and to assist in eventual codification of the practice.

Thus, the Native Hawaiian community appreciated that the SBCT Transformation PA set forth an important component of assurances to the Native Hawaiian community in the intended and contemplated role of the cultural monitor. Section III(3) of the PA established the following:

- *During construction activities that are likely to impact properties of traditional religious and cultural importance, the Cultural Monitor will be utilized to provide **additional assurances** to Native Hawaiians that properties of traditional religious and cultural importance are being properly treated.*

- *A Cultural Monitor will act as an **independent observer** who is both knowledgeable and sensitive to Native Hawaiian site management and who has the trust of members of his community.*

- *The Cultural monitor will work closely with archaeologists to provide **liaison with Native Hawaiians** when properties of traditional religious and cultural importance are discovered or inadvertently impacted, and assist in the identification and treatment of such sites (emphasis added).*

In looking at these three main components of the role of the Cultural Monitor as set forth in the PA, OHA finds three main issues around which the majority of our concerns center.

### 1. "Additional Assurances"

*"Additional assurances to Native Hawaiians that properties of traditional religious and cultural importance are being properly treated."*

OHA maintains that the basic tenet of this provision is that the presence and substantive participation of a Cultural Monitor in the identification, evaluation and protective mitigation efforts of the SBCT project greatly assist in ameliorating the omnipresent concerns of the Native Hawaiian community regarding the loss and destruction of their material culture and historically and culturally important sites.

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 4

It appears from the record that Cultural Monitors did not substantively participate in any identification process or survey work to initially identify historic properties and when they did participate, they were either discouraged from identifying sites or were successful in identifying sites, both of which raise concerns regarding the adequacy of the archaeological inventory and reconnaissance work.

In 2005, it appears that the Installation, Army Corps of Engineers, and Garcia and Associates (GANDA) discouraged the cultural monitors from identifying possible sites in and around the Unexploded Ordinance (UXO) clearance activities by directly communicating to the Cultural Monitors, among other messages, that:

- The survey portion of the undertaking had already been completed;
- The cultural monitors should be limited to the construction footprint, not adjacent areas; and
- The cultural monitors should be monitoring UXO activities, not identifying sites.

While OHA understands that the intent of having cultural monitors in place was not to have unfettered access to all areas and all historic sites on base, irrespective of the needs of the SBCT project, it does appear that the monitors were discouraged from actively fulfilling an important portion of their role as expressed by the PA.

An important component of site identification and evaluation is examining and assessing a related complex of sites, even though extending beyond the immediate needs of the survey. This better adds to the integrity of the site boundary designation, the evaluation of the functions of a site, the significance as it relates to the criterion set forth in the NHPA, as well as the mitigation efforts in reducing adverse impacts.

The record shows that the Army's contractor, GANDA, truncated and bifurcated historic sites and complexes that extended beyond the area of the construction footprint, but apparently within the area of potential impact. According to the record, excavation and construction activities took place, such as on the QTR1 Fuel Break Road and in the Battle Area Complex (BAX) Unexploded Ordinance (UXO) Clearance project (both of which will be specifically addressed below) without the proper identification and evaluation of historic properties being conducted.

Of particular importance, it appears that all the sites found to date on the BAX have been almost categorically declared eligible for listing on the National Register of Historic Places. This raises concerns as to whether these sites are being adequately evaluated for significance pursuant to the PA with the substantive input of cultural monitors and Native Hawaiians. Many sites fit multiple criteria, and some applicable criterion may be better applied with the input of the cultural monitors and with Native Hawaiian participation.

The PA expressly states in Section II (A):

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 5

> *Consultation with Native Hawaiians concerning the identification of sites of traditional religious and cultural importance is recognition of their expertise in these areas.*

As the application of multiple criterion may be important in determining mitigation of adverse impacts, and whereas a suggested treatment of "data recovery" may be applied to a site which is deemed important for its information value only, clearly there are important sites from which data recovery would not be appropriate. Thus, it is crucial to involve the recognized "expertise" of Native Hawaiians in this effort.

The Native Hawaiian community may also play an important complimentary role in the identification of historic sites, including those often missed by traditional archaeological survey techniques. In August of 2006, the Installation noted, with regard to the discovery of culturally significant Hale`au`au Heiau in the target range:

> *Hale`au`au Heiau is not in the construction footprint. McCallister shows the heiau two kilometers east of its actual location. We have been searching for that heiau for ten years and only found it because of this project.*

OHA is of the understanding that Cultural Monitor Kamoa Quitevis was instrumental in the rediscovery of this important *heiau* despite the most well-intentioned archaeological survey efforts. This also raised serious concerns regarding the APE and what sites are or aren't in the "construction footprint." This holds true for the many important sites not of the physical magnitude of Hale`au`au, but certainly of the same cultural importance to the Native Hawaiian community.

**QUESTION: What methodology currently is being utilized in historic site identification and evaluation, and what is the role of cultural monitors and Native Hawaiians in the Army's identification and evaluation process?**

### 2. "Independent Observer"

*"A Cultural monitor will act as an independent observer..."*

OHA maintains that the basic tenet of this provision requires that the Cultural Monitor truly be independent in observations, recordation, communications and other critical aspects of project monitoring to ensure integrity in the entire monitoring process.

OHA understands that cultural monitoring is a new and emerging area in historic preservation, and the necessity to contract individuals and organizations in accordance with governmental requirements, but we are still troubled that the cultural monitors appear to be subordinate to the archaeological staff in most aspects. The PA described a more equal balance between the complimentary, but different, roles of the Cultural Monitor and Archaeological Monitor. The Installation, however, fostered the uncontemplated inequity early in the process.

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 6

Furthermore, the July 2006 Cultural Monitoring Plan seems to place the Cultural Monitors "under the direction of GANDA." This raises serious questions regarding the monitors' ability to truly act "independently", as the PA stipulated.

**QUESTION: What, if anything, is being done to address the stipulated independence of the Cultural Monitors?**

In September of 2004, and despite a requirement in the PA that "all excavations" will be monitored by an "archaeologist and a Cultural Monitor in accordance with Stipulation III.D", it appears that the Installation recognized that it was not in compliance with this PA requirement. The Installation sought after-the-fact Garrison Commander approval to allow archaeological monitoring of earth disturbing activities within the UXO exclusion zone on the QTR and BAX clearance project.

**QUESTION: Why did excavations begin without archaeological and cultural monitors, and why did the Installation, when realizing that it was not in compliance with the PA, not include Cultural Monitors in the after-the-fact request for access?**

The record shows that Cultural Monitors, initially required to be at the opening and closing meetings of the work day, were working ten-hour days, but only compensated for eight. Daily Hawaiian cultural protocols regarding the opening and closing activities as well as mandatory meeting attendance were initially unfunded by GANDA, and ultimately, the Installation. We believe that this aspect of our concern appears to have been resolved. However, we continue to be disturbed that the Cultural Monitors were not given administrative time and pay to allow them to effectively write up their notes, memoranda and other important observations after working a full day in the field.

In October of 2005, the Installation, after consulting with Valerie Hauser of the Advisory Council on Historic Preservation *"agreed that GANDA should be paying"* the Cultural Monitors for *"their write up time for their reports."* Unfortunately, what should have occurred in 2004, and was acknowledged in 2005, wasn't even addressed until June of 2006 when new contracts were contemplated which would help ensure:

- *Site information is accurate;*
- *Provide time for Cultural Monitors to liaison with the Native Hawaiian community;*
- *Provide time for Cultural Monitors to develop long term site protection measures; and*
- *Provide time for Cultural Monitors to write up their field notes and prepare a final report.*

**QUESTION: Why did it take almost two years to address this crucial aspect of the role of Cultural Monitors as expressed by the PA?**

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 7

### 3. "Liaison with Native Hawaiians"

*"The Cultural monitor will work closely with archaeologists to provide liaison with Native Hawaiians..."*

OHA maintains that the basic precept of this provision is that the Cultural Monitors were intended by the PA to provide meaningful liaison work with the Native Hawaiian community to include individuals, '*ohana* and other NHOs such as OHA. Again, it appears that this important role of the Cultural Monitor as contemplated by the PA was severely shortchanged and has fueled the current controversy.

This liaison work would have also greatly enhanced the reportedly dismal responses the Installation received in its routine requests for consultation with the Native Hawaiian community. It also greatly impacted OHA's ability to effectively comment on proposed actions given our important reliance on the cultural monitors out in the field every day.

In response to OHA's concerns regarding the inability of the Cultural Monitors to effectively liaison with the Native Hawaiian community, as expressed in OHA's July 24, 2006 letter to DPW Director Alan Goo, the Installation responded to OHA that:

*We never intended to pay the cultural monitors for their liaison work.*

OHA finds this position wholly unacceptable given the importance of this component of the Cultural Monitors' responsibilities as described in the PA.

**QUESTION: Can the Army explain this rationale, given our position that the ability of the Cultural Monitor to effectively liaison with the Native Hawaiian community has greatly contributed to, as well as exacerbated, the current controversy?**

### Cultural Resource Coordinator Staffing and Resource Issues

OHA has concerns that given the expansive effects of the SBCT projects and aggressive implementation timeline, the sector of the Garrison Command charged with properly consulting with the Native Hawaiian community and otherwise addressing and responding to numerous historic preservation and cultural concerns, on many projects, does not appear to currently have the capacity to adequately perform these important tasks.

As noted by the ACHP in their letter of July 25, 2006, there is no record of the requisite 2005 annual report being produced or submitted. The 2006 report is also due. These reports are critical in allowing the signatories to effectively assess the efficacy of the PA.

As provided for in the PA document:

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 8

> *VI. Administrative Stipulations*
>
> > *B. Reporting and Annual Review*
> >
> > > *(1) The Installation will provide all signatory and concurring parties with an annual report on or before July 1 of each year summarizing activities carried out under the terms of this PA.*

The type of information to be included in the annual report includes:

- *List of projects and program activities that summarize proposed project determinations of effect to historic properties;*
- *Summary of mitigation or treatment measures implemented to address the effects of undertakings;*
- *Summary of consultation activities and the views of the SHPO and interested parties where appropriate;*
- *Summary of Determinations of Eligibility to the National Register of Historic Places.*

Additional information to be included in the annual report are:

- *Cultural Resource Inventory Reports, Archaeological Monitoring Plans, Preservation or Mitigation Treatment Plans, Data Recovery Plans, and or histories or ethnographic studies;*

In reviewing the type of information that was supposed to be included in the annual report and provided to the signatories, it is clear that this information would have allowed some of the current controversy to be resolved incrementally and earlier in the process.

**QUESTION: What, if anything, has been done to secure or allocate more resources for the Installation's Cultural Resource Coordinator as required by the PA (II, A, (2))?**

### Construction vs. UXO Clearance

The ability of the Cultural Monitors to effectively perform their duties and fulfill their responsibilities and obligations to the Native Hawaiian community has been directly hampered by apparent semantic classification of various ground disturbing activities. According to the Cultural Monitors, the Installation has insisted that the activities conducted by Zapata Engineering (ZAPATA) are just a continuation of UXO clearance, yet the activity occurring consisted of construction for the SBCT, an activity which was not officially scheduled to occur until November 1, 2006.

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 9

Some of the supporting and corroborating information with regard to this specific allegation, include, but is not limited to:

- *ZAPATA representatives communicating to others that the activities they were performing were not UXO clearance;*

- *Some of the target areas ZAPATA was contracted to work on appear to have been previously cleared of ordinance and already accepted by the Army Corps of Engineers Quality Control and Quality Assurance, raising the issue of whether this is construction related;*

- *At a September 26, 2006 UXO meeting, the Army's Engineer for the Transformation issued the request that ZAPATA complete excavations for Targets V-31, T-14 and D-9 on the KR5 Impact Range and further proposed that after the planned burn, Cultural Monitors would have one day to survey the area before construction commenced; and*

- *Despite traditional UXO clearance consisting of remote detection of anomalies, manual excavation of each questionable item and, finally, removal or demolition, it appears that since June 22, 2006, ZAPATA has been utilizing heavy equipment to cut, grade and excavate course roads, service roads and target footings.*

Apparently, the following activities have been classified as part of UXO clearance, not construction, pursuant to the SBCT Undertaking:

- *Cutting, grading and excavating course roads;*
- *Cutting, grading and excavating service roads;*
- *Excavating utility trenches;*
- *General grading and compacting;*
- *Constructing road swales; and*
- *Conducting UXO clearance with backhoes, excavators and D6 bulldozers.*

**QUESTION: Please explain the aforementioned apparent conflict between traditional UXO clearance methods and this construction method.**

Apparently, the UXO Clearance process has been utilized to conduct actual construction for the SBCT Transformation Project without actually calling it construction, which would have involved sections of the PA that call for the identification and evaluation of historic properties and implementation of site protection plans prior to the commencement of construction.

UXO clearance provides its own unique hurdles to overcome with regard to exclusion zones and the ability of an archaeological monitor or cultural monitor to effectively monitor the activity. At

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 10

Schofield and also reported at Kahuku, during UXO clearance, the Army would identify ordinance, detonate it in place, bring the cultural monitor over to view the hole, and then take the monitor back outside of the exclusion zone.

Not having an UXO escort available greatly limited the ability of the archaeological and cultural monitors to access areas of concern. It is OHA's understanding that the cultural monitors initially made the push to be deemed essential in 2004 due to having to conduct monitoring activities 2,500 feet away in the exclusion zone. As a result of this effort, both the Cultural Monitor and the Archaeological Monitor were deemed essential and thus allowed to effectively do their jobs. Then in 2006, the Cultural Monitors had to fight for this designation all over again.

The first contract with ZAPATA included full time UXO Escorts for the Cultural Monitors, but the second contract, which was purportedly a continuation of the first contract and established around June of this year, provided no UXO Escort for either archaeological or cultural monitors.

Reportedly when the Cultural Monitors raised the issue of the lack of a site protection plan being in place prior to construction activities occurring, the Installation's position was that ZAPATA was working under a continuation of the previous UXO clearance contract, yet the Cultural Monitors were working under GANDA's BAX Construction Contract. GANDA representatives actually stated that the activity was construction, yet the Installation maintained that the activity was UXO clearance.

**QUESTION: Have construction activities occurred prior to the scheduled November 1, 2006 anticipated commencement date of SBCT Transformation construction?**

### Cultural Monitor Concerns in Narrative Format

The aforementioned concerns can best be summed up in examples of the breakdown in procedure. Following, we will provide examples of concerns relayed to OHA and others by the Cultural Monitors in various written communications.

### "Non-Intrusive Maintenance Activities"

A Cultural Monitor, concerned by the appearance of construction starting on the BAX without buffers in place, no archaeological or cultural monitoring, and no site protection plan in place, contacted GANDA, ZAPATA and Installation representatives to relay his concerns.

*ZAPATA personnel represented that they were not going to do any intrusive work, but merely cut the grass and put in survey points. On Saturday, June 24, 2006, another Cultural Monitor tried to gain access to the work but was informed that*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 11

> he didn't have an UXO Monitor so he couldn't gain access to the work, which
> included bulldozing.
>
> On Monday, a Cultural Monitor was driven out to the area by GANDA
> representatives and was unable to adequately assess the extent of the bulldozing
> and any damage during his approximately 15 minute site visit. It later appeared
> that ZAPATA ·bulldozed a majority of the anticipated construction footprint over
> that weekend.
>
> This large area, mostly unsurveyed, was found to contain at least five stones with
> petroglyphs, four of them having been impacted by the work. Another area was
> found to have had a large alignment of stones which were all pushed over and
> this is also the area where skeletal remains were exposed for close to a month,
> fortunately believed to be non-human at this point.

The Cultural Monitor later writes:

> On July 22, 2006, construction/UXO clearance commenced with cultural
> monitoring, a Site Protection Plan or Site Protective Measures in place. During
> this period, unchecked ground disturbing activities took place. We later
> discovered that several wahi kapu were impacted due to this action. Four ki'i
> pohaku were impacted and iwi were unearthed and exposed for at least a month.
> Two of these ki'i pohaku are located within the footprints of targets V13 and T6
> where excavations are not yet complete.

Clearly, if the exposed and disturbed skeletal remains had been human, this would have been
wholly unacceptable. As it stands, it is unclear as to the extent of damage to surface features
caused by the bulldozer method of "cutting grass." It is also unclear what sub-surface features
and cultural deposits, including human burial sites, may be in increased danger of disturbance,
given the apparent destruction of their surface markers.

Another accounting of the concerns of the Cultural Monitors was relayed as follows:

> On Friday, June 23, 2006, Cultural and Archaeological Field Directors attended
> a meeting for BAX Construction/UXO Clearance, where they were ensured that
> no intrusive work would take place until Monday, June 26th by Mike Winningham.
> In reality, intrusive activities which includes grading, grubbing and UXO
> clearance for roads and target emplacements for BAX Construction/UXO
> Clearance, started on June 24th without monitoring or a Site Protection Plan or
> Protective Measures in place.
>
> On Sunday, June 25th, a Cultural Monitor arrived at the project area to receive
> the Safety Briefing. He was informed that they were cutting grass and he

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 12

> *requested access in an effort to monitor and assess intrusive activities. Contractor refused his request because he didn't have an UXO Escort.*

> *Monday, June 26th, the Cultural Monitor and Archaeological Monitor requested to review the work conducted over the weekend. They were afforded a 15 minute drive through the area of impact. At which point they discovered that bulldozing had taken place in several areas both inside and outside of the construction footprint. Intensive intrusive work had occurred moving substantial amounts of earth. Some of the areas that were cleared are located in close proximity of documented sites. At this time, we cannot be certain something hasn't already been impacted. Cultural Monitors informed Project Manager and Senior UXO Officer that they were awaiting the next available opportunity to monitor the intrusive work of the day but we were never allowed back out on the range for the remainder of the day.*

> *Tuesday, June 27th, the Cultural Monitor and Archaeological Monitor requested access to monitor intrusive activities numerous times throughout the day. In the eight hour work day, they were allowed two 15 minute periods to observe intrusive work.*

**QUESTION: As OHA finds this series of events wholly unacceptable, please explain how this occurred and what, if anything, has been done to prevent it from occurring again?**

### "Jeep Road Incident"

A cultural monitor wrote:

> *Range Maintenance bulldozed road areas within the area of proposed construction, such as the KR Impact area, when an old jeep road, which began in P8, was vastly widened beyond its original alignment. This unmonitored activity adversely impacted a wide area with many undocumented sites in the area, including large stones believed to be associated with astronomical navigation and the navigational heiau known as Kumakali`i, as well as near what was later identified to be a possible burial site. All this occurred without either archaeological or cultural monitoring, who knows what was destroyed.*

Section V(B)(2) of the SCBT Transformation PA allows the following exemption:

> *Previously paved areas such as roads, parking areas, and paths may be maintained and repaved and/or resurfaced provided that heavy equipment is restricted to use in previously disturbed areas.*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 13

Unfortunately, this doesn't appear to be the case with the "Jeep Road" since the alignment was not only vastly expanded but also new alignments were created. Furthermore, when an NHO representative requested to enter dispute resolution on this issue, he was informed that he couldn't because he wasn't a signatory to the PA. Lastly, after all of this, the road was again revisited and widened further also without any monitoring.

A similar incident occurred recently as reported by a Cultural Monitor:

> *A large unnamed road was expanded under the guise of "reclaiming an old road." This road, approximately 50 to 60 feet across was expanded into new areas specifically for Stryker training. The expansion included the filling in of a streambed, and adding a culvert in an area with documented sites, all without any archaeological or cultural monitoring. It remains unclear what sites, if any, were destroyed.*

A Cultural Monitor expressed his concerns in writing in November of 2005:

> *First we had range control building huge roads for the SBCT project without monitoring. They claimed they were only doing range maintenance. Now ZAPATA has started trenching for the construction portion of the project without monitoring. As I understood it, all earth disturbing activities for the SBCT require monitoring as stated in the Programmatic Agreement.*

**QUESTION: Please explain how the aforementioned incidents occurred and what, if anything, has been done to ensure that similar events do not occur again?**

**"Hale`au`au Heiau Incident"**

A Cultural Monitor wrote:

> *A new schedule severely limiting the cultural monitors was implemented on July 22, 2006, stemming from a meeting in which the cultural monitors did not participate. This new schedule allowed the Cultural Monitors only three short opportunities to inspect work which occurred during the entire 12 hour work day. The three inspection opportunities are dictated by ZAPATA Engineering and given the transportation issues to and from the site, could be as little as 15 actual minutes on site and inspecting the spoils of the previous work. On this day, we were allowed 23 minutes to inspect work which occurred in the previous six hours. At this time, we discovered that UXO Team #2 had bulldozed across a site buffer that was put into place as a protective measure for Sites 200 and 215 (Hale`au`au Heiau). Numerous boulders and cobbles were pushed over the fence knocking it down in several places. The debris was pushed only a few meters away from the slope where the highly sensitive Hale`au`au Heiau is located. The*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 14

> *site buffer that was implemented by the Army Department of Public Works only encompassed known surface features. The probability of unrecognizable surface features and buried subsurface features is extremely high given the close proximity to the heiau. If Cultural Monitors were allowed to monitor all earth disturbing activities as required by the SBCT Transformation PA, then this incident would have been avoided.*

**QUESTION: How did the breach of Hale`au`au Heiau buffer occur and what, if anything, has been done to ensure that it doesn't occur again?**

Specific concerns expressed after this incident were outlined by Cultural Monitors as follows:

- *Construction commenced June 24, 2006 before a Site Protection Plan was completed. To my knowledge, only a draft plan exists at this time*
- *Construction also started with out any site protective measures in place and the protective measures outlined in the draft Site Protection Plan have still not been completely implemented;*
- *There was no consultation with Kahunana, Aha Kukaniloko, Koa Mana or OHA regarding the Proposed Site Protection Plan. This incident emphasizes the fact that the proposed protective measures are inadequate;*
- *Intrusive activities for this project have occurred outside of the proposed construction footprint. The site protection plan is created to protect sites within the vicinity of the construction footprint. If earth disturbance occurs outside of the construction footprint, then negative impacts to Traditional Cultural Properties are inevitable;*
- *Cultural Monitors have not been allowed adequate access to monitor the earth disturbing activities for this construction project. This is in direct conflict with the SBCT Transformation Programmatic Agreement.*

**QUESTION: What, if anything, has been done to ensure that these concerns are adequately addressed?**

Further concerns regarding the protective measures in place for Hale`au`au Heiau and its treatment expressed by Cultural Monitors are as follows:

> *Target areas V23, V20 and the M2 Mover: The closest of which is located approximately 100 feet from Heiau Hale`au`au. All of these targets are located on the edge of the plateau that make up the complex of Hale`au`au which extends throughout the entire Hale`au`au gulch. The placement of these targets without monitoring has already commenced and has resulted in the breach of protective measures. The cultural landscape of Hale`au`au has been permanently altered by heavy equipment, unearthing and destroying several large pohaku, which without*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 15

> *a doubt are infused with mana of this wahi kapu. If these targets are allowed to be placed here, several types of munitions will be directly aimed at the Heiau and its related site features.*

> *All of the archaeological surveys that were conducted without input from the Native Hawaiian community failed to identify Hale`au`au and at least 70% of the other wahi pana and wahi kapu that exist within the area of potential impact from transformation and training of the Stryker Brigade Combat Team. Now that Kahunana (The Families of the Land) have relocated Hale`au`au, it is repulsive to know that the Army's intention is to make it a focal point for impact during training by placing several targets directly in front of it.*

**QUESTION: How will the protective measures outlined for this important heiau serve to protect its integrity given the placement of targets near the site?**

### "QTR 1 Fuel Break Road Incident"

A Cultural Monitor wrote, concerning the Fuel Break Road expansion on the QTR1:

> *Construction commenced on this road without a completion of the identification and evaluation of historic properties. Department of Public Works (DPW) walked a path through heavy vegetation along what they assumed was an old jeep road. They never completed walking within the proposed route and made no effort to identify possible historic properties within the vicinity of the proposed alignment. If a Cultural Monitor had not noticed the intrusive activity and started monitoring operations, Range Maintenance would have continued making the road without even following a pre-surveyed approved route and without consideration for Historic Preservation laws. Range workers openly stated that they "would have found their own route" if the Cultural Monitors had not been there.*

> *No site protection plan or measures were in place prior to the start of this intrusive activity. The Section 106 consultation letter was sent out approximately a week and a half after the road construction had already commenced. It also appears that no cultural monitoring was scheduled for this project. When the Cultural Monitor discovered that they were working out there, we informed DPW and GANDA of the activity and of our intent to monitor it. We were later told that we couldn't monitor this activity because it was not part of the Scope of Work for the QTR 1, even though it is a requirement for the operation of this particular Range.*

> *In addition, it appears that the Installation is still proposing to widen this road up to 30 feet in some areas, even though Cultural Monitors have identified many*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 16

> *sites that fall within close proximity of the road and only a very small portion of the proposed work has been assessed.*

In July of 2006, a Cultural Monitor wrote:

> *The attempt to fast track the QTR1 Fuel Break Road project despite all of the violations that have occurred since the start of this project is the cause of great concern. It seems that there is intent to ignore the thirty day consultation process once again. On July 17th the Fuel Break Road Re-Consultation letter was signed and dated and sent via email. We received notice on July 18th of intentions to resume construction on the 19th. There is no time here for meaningful consultation. We have not been allowed time to dispute or concur with DPW's findings and reports regarding the QTR1 Fuel Break Road. Families of the land have not been given the opportunity to survey the area that was cleared for the proposed connector road.*

> *The Fuel Break Road is being constructed as a requirement for the operation of the SBCT QTR1, yet on numerous occasions, various DPW representatives have stated that this project is not part of the SBCT transformation. We would like to get some clarity on this issue.*

**QUESTIONS: What are the circumstances surrounding the construction of the Fuel Break Road without any monitoring? Please clarify whether the project is or is not part of the SBCT Transformation Project.**

### "QTR1 Training Concerns"

> *It appears that training has commenced on QTR1 in August of 2006, prior to the completion of construction. It also appears that 40mm munitions are being fired at temporary targets placed on the QTR1 Range. These munitions are rapid fire projectiles that can inflict a considerable amount of damage to any historic property and this is occurring without a complete identification and evaluation of historic properties as well as no site protection plan in place.*

> *After identifying sites 169, 170 and 171 that descend down into Hale`au`au from the QTR1 Range, cultural monitors insisted that they should conduct a thorough survey of all surrounding areas that may be impacted during construction and training. There is a large complex of sites that monitors have seen while documenting the aforementioned sites.*

> *Cultural Monitors were told that no survey would be conducted within the surrounding gulches of QTR1 because any sites that may exist there would not be impacted by proposed munitions.*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 17

> *It appears that the Environmental Impact Study did not list 40mm as a munition that would be used on this range.*

> *After this training occurred, cultural monitors observed several 40mm rounds at the bottom of Hale`au`au gulch where we are aware of many undocumented sites. Site 210, burial mounds, are in between QTR1 targets one and two, and cultural monitors have already documented rounds that landed in the site.*

> *Despite the sensitivity of Site 210 and no site protective measures in place for this training, and despite the expressed concerns of cultural monitors, training continues in this area.*

**QUESTION: What are the protective measures in place for the use of 40mm munitions on documented and undocumented sites in the Area of Potential Effect on the QTR1 Range?**

### "Adequacy of Archaeological Survey"

With regard to the adequacy of archaeological surveys, a Cultural Monitor wrote:

> *The identification, evaluation and assessment of the proposed area of work in the BAX has never been completed. Archaeologists have done surveys in many of the areas but it doesn't appear that Native Hawaiians were ever involved with these surveys as required by the PA. During monitoring, numerous sites, site features and artifacts have been found by Cultural Monitors in areas that the archaeologists have already surveyed.*

> *The number of sites, site features and artifacts located during monitoring far exceed the amount of sites, site features and artifacts located during years of archaeological surveys.*

> *Sites identified only during cultural monitoring:*

> - *Site 6834 with six features;*
> - *Site 6835 with three features;*
> - *Site Complex 6841;*
> - *Site 6685 with two features;*
> - *Site 6845 with two features;*
> - *Site Complex 6832;*
> - *Site 6846;*
> - *Site 6844;*
> - *Site 6837;*
> - *Site 6839;*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 18

- *Site 6843;*
- *Site 6833;*
- *Site T200-T214;*
- *Site 5381 300 meter extension of Kukuiolono;*
- *Heiau Hale`au`au Complex.*

A Cultural Monitor wrote:

> *At this time, 211 sites and site complexes have been documented. Almost half of these sites were not identified during initial surveys by cultural resource management companies that occurred since 2003. All of these sites make up only 30% of the sites that exist within the area of impact according to our liberal estimates. Section IV of the PA states that "the identification, evaluation and assessment of historic properties will be completed prior to the implementation of any SCBT undertakings." At this point, the Army refuses to comply with this stipulation which has resulted in the desecration of numerous wahi pana and wahi kapu.*
>
> *Since the transformation project commenced, nearly 300 mea Hawai`i (artifacts) were found. Again, more than two-thirds were found by monitors and not during initial surveys. In the last month, since monitors were deemed essential personnel and allowed to monitor intrusive work, more than 60 artifacts have been recovered and protected and four more sites have been located within the immediate vicinity of construction. This emphasized the inadequacy of the initial surveys done without the participation of the families.*

**QUESTION: What is the Army's explanation for the increase in newly discovered historic properties identified during cultural monitoring, as it relates to the adequacy of the archaeological surveys? Does the Army believe that the identification, evaluation and assessment of historic properties is complete?**

### "BAX Trenching Incident"

In November of 2005, a Cultural Monitor wrote:

> *I found out yesterday that ZAPATA was doing trenching with a backhoe in the BAX expansion area. The trenches are about two feet deep, six feet wide and several meters long. This action is taking place without any cultural or archaeological monitoring. Our UXO Escort informed me that ZAPATA had been awarded a contract to do thousands of linear feet of utility trenching throughout the McCarthy flats in support of the SBCT project. David Byerly called Cassidy Debaker to inform her of this new development. Cassidy told him that it had been approved for them to start trenching and that the trenches would be no more than*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 19

*two feet deep and six feet wide. She also stated that the trenching should be monitored at the end of the day when ZAPATA is no longer intrusive.*

*This type of major intrusive work requires constant monitoring, not periodic spot checking before and after it has occurred. If any subsurface cultural properties, including burials are impacted during the process, we will not be aware of it until way after the fact. It was also my understanding that construction was not supposed to start until the archaeological survey and mitigation consultation was complete, as stated in the EIS 4.11 Cultural Resources, Regulatory and Administrative Mitigation 2:*

> *Before construction, the Army will complete the evaluation of any archaeological sites within areas subject to range and facility construction. Sites determined to be eligible for the NRHP will be flagged for avoidance. The projects will be designed to avoid all eligible and unevaluated archaeological sites, to the full extent practicable. Geographical Information Systems (GIS) and Global Positioning System (GPS) information will be given to project designers and range control to ensure that any sites are considered in project design. If it is not possible to avoid archaeological sites, the Army will consult in accordance with the PA to determine the appropriate mitigation for the damage to the sites, such as data recovery or other mitigation measures. To address the accidental discovery of archaeological sites, human remains or cultural items, the Army has developed an inadvertent discovery plan (IDP) as part of the PA.*

*They will be trenching thousands of linear feet very near to known surface cultural properties. The probability of disturbing subsurface features is very high. There are several damaged surface features that are barely recognizable. These features have not been documented by the Archaeologists and therefore are not buffered. The probability that there will be subsurface cultural properties is high in these areas and constant monitoring is required. The numerous artifacts that have been found everywhere on the plains of McCarthy flats may be evidence of what remains below the surface in the project area.*

*Also there is a time restraint to consider, before ZAPATA goes intrusive in the morning and when they shut down at the end of the day. By the time we arrive at the completed grids from the day before, we have only about 10-15 minutes to complete our monitoring before UXO clearance begins. This is barely enough time for us to check regular intrusive work. There would literally be no time to also check the trenching. At the end of the day intrusive work stops at about 2:30 and the range has to be completely cleared at 3:00 for the Army to train. Even if*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006
Page 20

> *we are waiting just outside the exclusion zone, the time it would take to drive out to the trenching and then to be off the range by three would leave us only ten minutes to check a large amount of earth disturbance in highly sensitive areas. On top of that, if there is a demo shot scheduled for that day, they will clear the range even earlier.*

> *We were told that the trenching would be two feet wide and six feet deep but I now that many of the moving targets require trenching up to eight feet deep and hundreds of feet long.*

**QUESTION: What are the circumstances surrounding this apparently large intrusive activity occurring without monitoring?**

### "Site 5381: Kukuiolono"

This significant site is of particular concern to OHA. The Cultural Monitors wrote:

> *There are many inconsistencies in the Mitigation report for the proposed road through a section of site 5381 that has been issued to the concurring parties. First, the site description and the proposed mitigated impacts to the site are inaccurate. Also the function and cultural significance of this national treasure has not been explored in this report.*

- *The size of site 50-80-04-5381 is misrepresented in the site description. Site 50-80-04-5381 extends approximately 500 meters east to west. We have encircled this area with green on the revised map, Figure 1. The portion of Mohiakeha gulch that is west of this site is still un-surveyed and probably extends the site even farther, Figure 2. The eastern section of the gulch has scattered terracing that we have seen 1200 meters down stream.*
- *The map created on October 21, 2005 has not been reflected in the site description that only lists two features. The two features that are described are from the original site and do not include the area that will be impacted by the road construction. We have pointed out the area that this map depicts Feature 1a; from its legend you can see that this portion of the site is about 100 meters long.*
- *The maps are incomplete and do not include the site and all of its features in their entirety. Besides the terracing and irrigation modifications we have observed shrines, house platforms, burials, sustenance zones and other features of cultural significance.*
- *Where the road exits the gulch near feature 34 on the 10-21-05 map, there are some features including a mound of cobble that may be a burial at the tree line. This is not represented on any of the maps or site descriptions.*

Colonel Howard Killian, Garrison Commander
U.S. Army Garrison, Schofield Barracks
October 5, 2006 ·
Page 21

- *The site description lists Christmas berry as the only vegetation found within the site complex. This is another serious violation. Cultural Monitor field reports have documented the observation of native endemic plants like ohia lehua*
- *(Metrosideros polymorpha), mamaki (Pipturus albidus), uluhe fern (Dicranopteris linearis), loulu (Prichardia sp.), native indigenous plants including moa fern (Psilotum nudum), uhaloa (Waltheria indica), laukahi (Plantego sp.) and many Polynesian introduced plants like kukui (Candle nut), uhi (Yam), hau (Tree Hibiscus), lai (Ti leaf).*
- *Lack of recognition and input from known lineal descendants connected to these historic and sacred sites ( Site Complex 5381)*

**QUESTION: What are the circumstances surrounding the identification, evaluation and assessment of this particular site including planned protective measures?**

### Summary

The aforementioned concerns of OHA are not exhaustive, but they do represent our major concerns regarding the implementation of the SBCT Programmatic Agreement, focusing on the identification and evaluation of historic properties and the overall integration of the role of cultural monitors into the transformation project.

While OHA is sensitive to the needs of the Army with regard to training at Schofield, we are also cognizant of the historical and cultural importance of the Lihu'e area in Hawaiian history. There truly is no other place like it in the world. We look forward to your response and thank you for your attention to this time sensitive matter.

If you have any questions or concerns regarding our request, please contact Kai Markell, Lead Policy Advocate for Culture, at 594-1945 or kaim@oha.org. Once again, thank you for your patience during our review and assessment of this important matter.

'O wau iho nō,

Clyde W. Nāmu'o
Administrator

c.    OHA BOT
      Valerie Hauser, Advisory Council on Historic Preservation
      Peter Young, State Historic Preservation Officer



Schofield BAX Proposed Road Route Between 6561 and 5381