SIERRA CLUB v. MARSH    497
Cite as 872 F.2d 497 (1st Cir. 1989)

SIERRA CLUB, et al.,
Plaintiffs, Appellants,

v.

John O. MARSH, Jr., et al.,
Defendants, Appellees.

No. 88-2049.

United States Court of Appeals,
First Circuit.

Heard Dec. 9, 1988.

Decided March 31, 1989.

Environmental organization and two of its members sought declaratory and injunctive relief from proposed development of marine dry cargo terminal on undeveloped island. The United States District Court for the District of Maine, Conrad K. Cyr, Chief Judge, 701 F.Supp. 886, held that finding of likely violation of National Environmental Policy Act, without more, did not raise presumption of irreparable injury or diminish need to determine likelihood of irreparable environmental harm and denied agency's motion to dismiss for lack of standing. On appeal, the Court of Appeals, Breyer, Circuit Judge, held that *Amoco Production Co. v. Village of Gambell* decision of United States Supreme Court did not overrule or significantly modify First Circuit's decision in *Commonwealth of Massachusetts v. Watt*, regarding harm required to obtain injunctive relief under NEPA.

Vacated and remanded.

Health and Environment ⊂⊃25.15(2)

*Amoco Production Co. v. Village of Gambell* decision of United States Supreme Court did not overrule or significantly modify *Commonwealth of Massachusetts v. Watt* decision of First Circuit, regarding harm required to obtain injunctive relief in suit under National Environmental Policy Act. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

Edward F. Lawson with whom Weston, Patrick, Willard & Redding, Boston, Mass., and Tybe A. Brett, Portland, Me., were on brief, for plaintiffs, appellants.

Lee P. Breckenridge, Chief, Environmental Protection Div., with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief, for Com. of Mass., amicus curiae.

Anthony C. Roth with whom John Quarles, Lisa M. Campbell, Morgan, Lewis & Bockius, Washington, D.C., and Thomas G. Reeves, Chief Counsel, Legal Div., Augusta, Me., were on brief, for defendant, appellee Maine Dept. of Transp.

David C. Shilton, Land and Natural Resources Div., Dept. of Justice, with whom Robert L. Klarquist, Daniel S. Goodman and Roger J. Marzulla, Asst. Atty. Gen., Washington, D.C., were on brief, for federal defendants, appellees John O. Marsh, Jr., et al.

Peter Shelley, Stephanie Pollack and Janet McGowan, Boston, Mass., on brief, for Conservation Law Foundation of New England, Inc., amicus curiae.

Before BOWNES, BREYER and SELYA, Circuit Judges.

BREYER, Circuit Judge.

In *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946 (1st Cir.1983), we said that the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* (1982 & Supp. IV 1986), seeks to create a particular bureaucratic decisionmaking process, a process whereby administrators make important decisions with an informed awareness of how the decision might significantly affect the environment. We wrote that, if any such decision is made without the information that NEPA seeks to put before the decisionmaker, the harm that NEPA seeks to prevent occurs. *Watt*, 716 F.2d at 952. And we held that courts are to take account of that kind of harm when they consider whether to enjoin governmental actions that plaintiffs claim violate NEPA. *Id.* at 952–53. We now consider whether the Supreme Court, in *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), over-

ruled this holding. We conclude that the Court did not overrule or significantly modify *Watt*, and we therefore remand this case to the district court, which ruled to the contrary.

## I. *Background*

This case involves the State of Maine's efforts to build a new six-berth marine dry cargo terminal at Searsport, one of the busiest ports in Maine. The Maine Department of Transportation ("MDOT") wants to build the terminal on Sears Island, a 940-acre, uninhabited, undeveloped piece of land directly opposite Mack Point, the site of a present two-berth terminal. (See Appendix A for a map.)

In a previous case, we noted that the Sears Island project would not only require Maine to dredge the channel, clear the island and build a causeway connecting the island to the mainland (for a highway and a railroad spur), but it would also lead to considerable secondary development on the island; hence NEPA required the Federal Highway Administration ("FHWA"), which would fund much of the project, to prepare an Environmental Impact Statement ("EIS"). *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir.1985) (*Sierra Club I*). See also *Sierra Club v. Secretary of Transportation*, 779 F.2d 776 (1st Cir.1985) (*Sierra Club II*) (holding that the physical mainland link was a "causeway," not a "bridge," and therefore that it required appropriate "causeway" permits).

Subsequently, MDOT secured financial backing from the Federal Highway Administration and MDOT and FHWA together hired a consultant, prepared a Draft EIS, obtained public comments from both the public and governmental agencies, adopted a Final EIS, and decided to proceed with the Sears Island project. They then obtained the necessary permits from the U.S. Coast Guard and the U.S. Army Corps of Engineers, both of which adopted the findings of the Final EIS.

After MDOT and the FHWA received permits allowing them to proceed with the Sears Island project, the Sierra Club returned to federal court and began the present action. The Sierra Club, objecting to the Sears Island development (the option that the Draft EIS and the Final EIS favored), says that the Final EIS did not adequately evaluate the environmental effects of choosing the Sears Island site, nor did it adequately explore other alternatives (such as expanding the Mack Point terminal, or no new development at all) less harmful to the environment. Three federal "resource" agencies, the U.S. Environmental Protection Agency ("EPA") (which hired its own consultant to review this matter), the U.S. Fish and Wildlife Service ("FWS"), and the National Marine Fisheries Service ("NMFS"), agree with the Sierra Club's overall assessment.

In particular, the Sierra Club argued that the Final EIS did not respond adequately to the comments that it, and the resource agencies, had made on the Draft EIS. The Draft, for example, had given several reasons for preferring Sears Island to Mack Point: a six berth terminal means more jobs; there is room at Sears Island for six berths; there is room at Mack Point for only two berths; the cost of acquiring property at Mack Point is greater; the tax revenues would be greater from new development at Sears Island than from modifying Mack Point; and new berths at Mack Point would require more dredging and more tug boats than would Sears Island. The Sierra Club and the resource agencies had commented, in response, that the economy will demand no more than two berths through the year 2010 (so that six berths are not now necessary); the comparative costs and tax advantages favor Sears Island less than the Draft EIS suggested; no extra dredging or tug boats would be needed at Mack Point; and the environmental harms would be greater at Sears Island than they would be at Mack Point and greater than the Draft EIS estimated them to be. The Sierra Club argued in court that the Final EIS did not adequately deal with these and other comments. In particular, it said that the Final EIS exaggerated the economic need for the project (especially in light of an EPA consultant's report, which criticized the developers' consultant's methods and conclusions and

which found that only two berths would be necessary for a considerable time); that the Final EIS failed to consider important, less environmentally harmful alternatives (such as a terminal limited to two berths); and that it did not adequately consider secondary development. Furthermore, said the Sierra Club, the Final EIS did not take adequate account of new information discovered after it was published (such as the fact that the Sears Island terminal will require clearing 124 acres of wild land, not 50 acres as the Final EIS had estimated). The Sierra Club also claimed that neither the FHWA nor the Army evaluated the Final EIS properly before reaching their decisions. And the Sierra Club argued several technical failings, such as undisclosed potential conflicts of interest among consultants and improper incorporation of documents by reference.

The Sierra Club asked the district court to enjoin both the federal and state agencies from continuing to build the causeway or otherwise work upon the Sears Island project while the court considered the merits of its various, rather complex objections.

The federal district court denied the Sierra Club's request for a preliminary injunction. *Sierra Club v. Marsh,* 701 F.Supp. 886 (D.Me.1988). In doing so, the court referred to this Circuit's well-known four-part test for the issuance of a preliminary injunction: Will failure to issue the injunction cause the plaintiff "irreparable harm"? Does the "balance of harms" favor the plaintiff or defendant? Can plaintiff show a "likelihood of success" on the merits? Will granting the relief harm the public interest? *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). *See Sierra Club,* 701 F.Supp. at 894. But in answering these questions, and in particular in deciding whether there might be "irreparable harm" without the injunction, the district court stated that the Supreme Court case of *Village of Gambell, supra,* had "severely undercut" our holding in *Watt, see Sierra Club,* 701 F.Supp. at 895. It wrote that *Village of Gambell* "appears to preclude preliminary injunctive relief predicated on a likely NEPA violation *un-accompanied by a showing of irreparable environmental injury.*" *Id.* at 897 (emphasis added; footnote omitted). And, it made clear that by the words "irreparable environmental injury," it meant *physical harm to the environment that one could not repair at a later date* (if a plaintiff should later win on the merits). Thus, it said that the plaintiffs had "failed to make a showing of irreparable environmental injury" *because* they had not shown that *"removal of the causeway is either impracticable or that it would not restore the environmental status quo,"* id. at 898 (emphasis added). And, it added that the proposed dredging operations would not cause irreparable harm *because* restoration of the affected habitat was practicable. *Id.* at 898–99. The district court recognized that its view of what counts, potentially, as "irreparable harm" is inconsistent with *Watt. See id.* at 896–99; *id.* at 907. But it thought that *Village of Gambell* required this result.

The Sierra Club has appealed. It argues that the district court's view of *Village of Gambell* is wrong; that that case does not "undermine" *Watt;* and it adds that the district court, had it followed *Watt,* might have come to a different conclusion about whether to issue a preliminary injunction. After reexamining *Watt* and *Village of Gambell,* we agree with the Sierra Club's view of the law.

II. *Watt*

The simplest way to explain what we held in *Watt* is to quote here the relevant section of the opinion. In that case the plaintiffs argued that the federal government had not published a proper EIS before auctioning rights to drill for oil off Georges Bank. The district court had granted a preliminary injunction. The government, on appeal, claimed that plaintiffs would not suffer "irreparable harm" because the lease sale did not entitle lease buyers to drill for oil immediately; rather, the lease buyers would have had to obtain further governmental permissions before even beginning to explore. In rejecting this argument, we wrote the following:

The government's argument, however, ignores an important feature of NEPA. NEPA is not designed to prevent all possible harm to the environment; it foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons. Rather, NEPA is designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account. Thus, *when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered.* NEPA in this sense differs from substantive environmental statutes, such as the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. The Federal Water Pollution Control Act focuses upon the "integrity of the Nation's Waters, not the permit process," *Weinberger v. Romero–Barcelo*, 456 U.S. [305] at 314, 102 S.Ct. [1798] at 1804 [72 L.Ed.2d 91 (1982)]. NEPA does the converse. Moreover, to set aside the agency's action at a later date will not necessarily undo the harm. The agency as well as private parties may well have become committed to the previously chosen course of action, and new information—a new EIS—may bring about a *new* decision, but it is that much less likely to bring about a *different* one. It is far easier to influence an initial choice than to change a mind already made up.

It is appropriate for the courts to recognize this type of injury in a NEPA case, for it reflects the very theory upon which NEPA is based—a theory aimed at presenting governmental decision-makers with relevant environmental data *before* they commit themselves to a course of action. This is not to say that a likely NEPA violation automatically calls for an injunction; the *balance* of harms may point the other way. *Cf. Weinberger v. Romero–Barcelo, supra* (a violation of the Federal Water Pollution Control Act does not automatically warrant an injunction). It is simply to say that a plaintiff seeking an injunction cannot be stopped at the *threshold* by pointing to additional steps between the governmental decision and environmental harm.

In the present case plaintiffs would suffer harm if they were denied an injunction, if the lease sale took place, and if the court *then* held that a supplemental EIS was required. In that event, the successful oil companies would have committed time and effort to planning the development of the blocks they had leased, and the Department of the Interior and the relevant state agencies would have begun to make plans based upon the leased tracts. Each of these events represents a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues. Once large bureaucracies are committed to a course of action, it is difficult to change that course—even if new, or more thorough, NEPA statements are prepared and the agency is told to "redecide." It is this type of harm that plaintiffs seek to avoid, and it is the presence of this type of harm that courts have said can merit an injunction in an appropriate case.

*Watt*, 716 F.2d at 952–53 (some citations omitted) (extended emphasis in first paragraph added).

Upon rereading this language, we would add one further word of explanation. We did not (and would not) characterize the harm described as a "procedural" harm, as if it were a harm to *procedure* (as the district court apparently considered it, *see Sierra Club*, 701 F.Supp. at 907 ("harm to the NEPA process itself")). Rather, the harm at stake is a harm to the *environment*, but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. NEPA's object is to minimize that risk, the risk of uninformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed

project than a barely started project. In *Watt* we simply held that the district court should take account of the potentially irreparable nature of this decisionmaking risk to the environment when considering a request for preliminary injunction. And other courts seem to agree. *See Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1156–58 (9th Cir.1988); *State of Wisconsin v. Weinberger*, 745 F.2d 412, 426–27 (7th Cir.1984); *id.* at 432–33 (Cudahy, J., concurring in part and dissenting in part); *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir.1975); *Friends of the Earth v. Hall*, 693 F.Supp. 904, 913, 949 (W.D.Wash.1988); *Stand Together Against Neighborhood Decay, Inc. v. Board of Estimate of the City of New York*, 690 F.Supp. 1192, 1196 (E.D.N.Y.1988) ("*STAND*"); *Save Our Dunes v. Pegues*, 642 F.Supp. 393, 404 (M.D.Ala.1985), *rev'd on other grounds*, 834 F.2d 984 (11th Cir.1987).

### III. *Village of Gambell*

*Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), involved a statute called the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3101 *et seq.* (1982 & Supp. IV 1986) (and scattered sections elsewhere). Section 810 of ANILCA, 16 U.S.C. § 3120, protects lands that native Alaskans use for hunting, fishing, and other "subsistence" purposes. First, the statute says that before making a decision affecting the "use, occupancy, or disposition" of "public lands," the head of a federal agency must "evaluate the effect" of the decision on "subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate" intrusion on subsistence uses. ANILCA § 810(a), 16 U.S.C. § 3120(a). This "subsistence evaluation" requirement mirrors NEPA's requirement of the preparation of an "environmental assessment" or an EIS before a major federal action is undertaken. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1313 n. 11, 1317–22 (9th Cir.1988). Second (and critical for present purposes), ANILCA § 810(a) also requires that before determining to alter land use in a way that would "significantly restrict subsistence uses," the federal agency must give notice, hold a hearing, and

> determine[ ] that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use ..., and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

16 U.S.C. § 3120(a).

In *Village of Gambell*, several Alaskan native villages tried to enjoin a proposed sale of Outer Continental Shelf ("OCS") oil leases on the ground that the Secretary of the Interior had not complied with ANILCA's procedures; he had not considered "alternatives" to leasing land that had "subsistence" uses (for he thought that ANILCA did not apply to the Outer Continental Shelf). The federal district court, although it agreed ANILCA applied to the OCS, decided that no preliminary injunction was warranted. The Ninth Circuit reversed on the ground that irreparable injury "is *presumed*" when an agency fails to evaluate environmental impacts "thoroughly." *People of Village of Gambell v. Hodel*, 774 F.2d 1414, 1423 (9th Cir.1985) (emphasis added; citation omitted).

The Supreme Court reversed the Ninth Circuit. It held that the law creates no such "presumption," and that courts should apply "traditional equitable principles" when deciding whether to issue a preliminary injunction. 480 U.S. at 545, 107 S.Ct. at 1404. The Court insisted that

> "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.... 'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.'"

480 U.S. at 542, 107 S.Ct. at 1403 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d

91 (1982) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946))).

Focusing on the "language and structure [and] legislative history" of the statute at issue, 480 U.S. at 543, 107 S.Ct. at 1403, the Court pointed out that the "purpose of ANILCA § 810 is to protect Alaskan subsistence resources from unnecessary destruction," *id.* at 544, 107 S.Ct. at 1403, and said that "the Ninth Circuit erroneously focused on the statutory procedure rather than on the underlying substantive policy the process was designed to effect—preservation of subsistence resources." *Id.* (The Court went on to hold that ANILCA did not apply to the OCS and that therefore the entire question of equitable relief under ANILCA was beside the point. 480 U.S. at 546–55, 107 S.Ct. at 1405–1409.)

As we read *Village of Gambell*, we see one important difference between that case and this one, and one important similarity.

(a) The difference concerns the statutes. Both NEPA and ANILCA are "procedural" statutes in the sense that both set forth procedures that decisionmakers must follow before taking an action that might harm the environment (or "subsistence uses"). But NEPA is a *purely* procedural statute in a sense that ANILCA is not. NEPA demands that a decisionmaker consider all significant environmental impacts before choosing a course of action; the decisionmaker is compelled to follow NEPA's evaluative process before acting. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) (NEPA's "mandate ... is essentially procedural"); *Aberdeen & Rockfish R.R. v. SCRAP*, 422 U.S. 289, 319, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975) (agency's obligation under NEPA is "procedural"); *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1382 (9th Cir.1986); *City of Angoon v. Hodel*, 803 F.2d 1016, 1020 (9th Cir.1986), *cert. denied*, — U.S. —, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987); *Olmsted Citizens for a Better Community v. United States*, 793 F.2d 201, 204 (8th Cir.1986); *South East Lake View Neighbors v. Department of Housing and Urban Development*, 685 F.2d 1027, 1038–39 (7th Cir.1982). But NEPA does not tell the decisionmaker what course of action he must choose. "On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980) (per curiam). As long as the decisionmaker has fully considered the environmental impacts of the proposed action, NEPA does not stop him from then deciding to cause environmental damage. *See State of Wisconsin*, 745 F.2d at 426 ("the statute recognizes that agencies may decide to subordinate environmental values to other social values"); *Watt*, 716 F.2d at 952 (NEPA "foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons").

ANILCA, on the other hand, contains a "substantive" standard as well. Should an agency head choose a course of action that, for example, takes from subsistence uses more than the "minimal amount of public lands" necessary for the alternative public purposes (or should he fail to take "reasonable steps ... to minimize adverse impacts upon subsistence uses"), ANILCA requires him to change the action. This is plain from the second part of ANILCA § 810(a), 16 U.S.C. § 3120(a), quoted *supra* p. 501 and quoted in full by the Supreme Court in *Village of Gambell*, 480 U.S. at 535 n. 2, 107 S.Ct. at 1399 n. 2. An agency head could not, consistent with the text of ANILCA § 810(a), fully consider the impacts of a proposed action and then undertake it in spite of its non-minimal adverse impacts on subsistence uses; yet the agency head could do an exactly comparable thing under NEPA. ANILCA, in other words, not only requires decisionmakers to follow certain procedures, but it also curtails the range of their permissible choices.

This difference is important, for the kinds of "harms" that are relevant, and that may be "irreparable," will be different according to each statute's structure and

purpose. *See Village of Gambell,* 480 U.S. at 543 n. 9, 107 S.Ct. at 1403 n. 9 ("'purpose and language'" of each statute is critical in determining the scope of equitable discretion afforded (quoting *Romero-Barcelo,* 456 U.S. at 314, 102 S.Ct. at 1804)); *Watt,* 716 F.2d at 952 (distinguishing the Clean Water Act, which was construed in *Romero-Barcelo,* from NEPA). *Accord Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1156–58 (9th Cir.1988); *National Wildlife Federation v. Burford,* 835 F.2d 305, 337 (D.C.Cir.1987) (Williams, J., concurring and dissenting); *Sierra Club v. Marsh,* 816 F.2d 1376, 1384 (9th Cir. 1987).

Insofar as a procedural failure leads to an improper choice, a court, *under ANILCA but not under NEPA,* may require the decisionmaker to choose a new action; and this fact may make the ANILCA failure *"reparable* harm." Suppose, for example, an administrator decides to build a causeway without first preparing and considering NEPA's EIS. A district court, when considering a request for a preliminary injunction, must realize the important fact of administrative life that we described in *Watt:* as time goes on, it will become ever more difficult to undo an improper decision (a decision that, in the presence of adequate environmental information, might have come out differently). The relevant agencies and the relevant interest groups (suppliers, workers, potential customers, local officials, neighborhoods) may become ever more committed to the action initially chosen. They may become ever more reluctant to spend the ever greater amounts of time, energy and money that would be needed to undo the earlier action and to embark upon a new and different course of action. And the court, under NEPA, normally can do no more than require the agency to produce and consider a proper EIS. It cannot force the agency to choose a new course of action. Given the realities, the farther along the initially chosen path the agency has trod, the more likely it becomes that any later effort to bring about a new choice, simply by asking the agency administrator to read some new document, will prove an exercise in futility.

Now suppose an administrator decides to build an identical causeway on Alaskan "subsistence" lands without first evaluating and considering the impacts and alternatives as required by the first part of ANILCA § 810(a). Here too, as in the case of NEPA, the further construction advances, the harder it may be to convince the agency and relevant interest groups to change direction. But in the case of ANILCA, unlike NEPA, if (for example) the initial decision unreasonably harms subsistence uses, the second part of § 810(a) will *require* the agency to change direction: to alter the project, to use different lands, or to take additional impact-minimizing steps. For that reason, the injury that ever-growing bureaucratic commitment to a project can work may prove to be "irreparable harm" in a NEPA case in a sense not present in an ANILCA case. Moreover, that is why, despite the many additional bureaucratic steps that the agency would have had to take between (1) an initial lease decision and (2) the physical effect, failure to follow statutory procedures could have caused "irreparable harm" in *Watt* (NEPA) yet not in *Village of Gambell* (ANILCA) (nor in *Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, a case that involved the substantive Clean Water Act and that was relied upon by the Supreme Court in *Village of Gambell*).

(b) The similarity between *Village of Gambell* and *Watt* concerns *Village of Gambell*'s basic holding. The Court in *Village of Gambell* held that traditional standards of equity govern a preliminary injunction decision under ANILCA § 810(a). It found nothing in ANILCA's history suggesting that Congress intended "to depart from established principles" in respect to preliminary injunctions, to establish any "presumption" favoring an injunction, or to "restrict" in any way a court's ability to exercise the "full scope" of its equity jurisdiction. 480 U.S. at 542–45, 107 S.Ct. at 1402–04. Similarly, in *Watt,* we created no special "presumption" in favor of injunctions. We applied only "traditional" equity standards. We simply pointed to the fact that Congress, in enacting

NEPA, explicitly took note of one way in which governments can harm the environment (through inadequately informed decisionmaking); and we said that courts should take account of this harm and its potentially "irreparable" nature. (Indeed we added: "This is not to say that a likely NEPA violation automatically calls for an injunction; the *balance* of harms may point the other way." *Watt*, 716 F.2d at 952 (emphasis in original).)

To repeat, the harm at stake in a NEPA violation *is* a harm to the *environment*, not merely to a legalistic "procedure," nor, for that matter, merely to psychological well-being. *Cf. Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774, 103 S.Ct. 1556, 1561, 75 L.Ed.2d 534 (1983) (harms under NEPA must involve "a change in the physical environment"). The way that harm arises may well have to do with the psychology of decisionmakers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built. But the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation. The difficulty of stopping a bureaucratic steam roller, once started, still seems to us, after reading *Village of Gambell*, a perfectly proper factor for a district court to take into account in assessing that risk, on a motion for a preliminary injunction. And, it does not surprise us that, since *Village of Gambell*, other courts have reached the same conclusion. *See Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1156–58 (9th Cir.1988); *Sierra Club v. United States Forest Service*, 843 F.2d 1190 (9th Cir.1988); *Save the Yaak Committee v. Block*, 840 F.2d 714, 722 (9th Cir.1988); *Friends of the Earth v. Hall*, 693 F.Supp. 904, 912–13, 949 (W.D.Wash. 1988).

### IV. *Remand*

The appellees argue that, even if the district court did not correctly determine "irreparable harm," we should affirm the decision, on the ground that, if the district court had taken account of the risks and harms we have just discussed, it still would not have changed its result. *See Sierra Club*, 701 F.Supp. at 907. We cannot say that this is necessarily so. The district court explicitly found that any "harm" would prove reparable (not "irreparable") on the ground that removal of the causeway would "substantially restore the environmental status quo," and "removal" was "practicable." *Id.* at 898. To rest the determination solely on this ground is to overlook the increased likelihood that residents, workers, businesses, as well as government agencies, may, for example, all become ever more attached to the causeway and to the island development as the project nears completion. They may prove ever more willing to put up with any concomitant environmental harm. Indeed, insofar as a completed access route brings new businesses or residents to Sears Island, one might expect to see a new, vocal interest group anxious to prevent any return to a Mack Point, mainland port project, and willing to put political and economic pressure upon government agencies to maintain a physical link between the island and the mainland. (And, of course, from a purely physical perspective, to build a causeway and then tear it down would mean, among other things, destroying and reseeding clam beds not once but twice.) Such considerations are *part* of what we believe courts should take into account when determining harms for NEPA purposes. Whether these factors in this case, in respect to this preliminary injunction, are, or are not important, whether they do, or do not, make a significant difference, all are matters for the district court to decide. We say only that the record does not permit us to say that to advance such considerations here is fanciful, or that they *could not* have made a difference.

The appellees point to two passages in the district court's decision denying a stay pending appeal, which they think show that the district court will not change its mind on reconsideration (and therefore that reconsideration would be a waste of time). The first says:

Even assuming that harm to the NEPA process remains an appropriate consider-

ation under *Amoco* [v. *Village of Gambell*], and that the alleged NEPA violations did occur, the court is unpersuaded that any such NEPA violations tip the equitable balance the other way absent irreparable harm to the environment. 701 F.Supp. at 907. A similar statement appears toward the bottom of that page, 701 F.Supp. at 907 (discussing "harm to the NEPA process itself" versus "concomitant environmental harm"). Appellees believe these passages show that the court would have come to the same conclusion even had it followed *Watt*. The language in these passages, however, suggests to us that the district court did not see the relation between a NEPA violation and environmental harm as we see it, and as we have tried to explain it here and in *Watt*. The court refers to "harm to the NEPA process" and "harm to the environment" as though they were separate categories; but they are not. *See supra* pp. 500–501, 504. The passages, at least, are sufficiently ambiguous to merit the district court's reconsideration of whether or not a preliminary injunction is warranted. We neither take nor intimate any view as to the result of such reconsideration; that is for the court below.

*The determination of the district court not to issue the preliminary injunction is vacated and this case is remanded for further proceedings consistent with this opinion.*