Case 1:04-cv-00502-DAE-BMK   Document 116-5   Filed 11/15/2006   Page 1 of 10

LAW, 1987 WL 18169]. Subsequently, petitioner raised the second and third claims in a proceeding in Supreme Court, Kings County, pursuant to section 440.10 of the Criminal Procedure Law (C.P.L.). Petitioner also raised the instant petition's fourth claim pursuant to C.P.L. § 440.20. On February 10, 1988, the Supreme Court denied both petitions.

The petition indicates that petitioner did not seek leave to appeal these decisions to the Appellate Division. New York law provides such an opportunity, C.P.L. §§ 450.-15(1), (2), and failure to seek leave to appeal renders these claims unexhausted. *See Klein v. Harris,* 667 F.2d 274, 282–83 (2d Cir.1981). Although petitioner's first claim has been exhausted, the presence of unexhausted claims requires dismissal of the entire petition. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

Petitioner may file and serve within sixty days of receipt of this order an amended petition presenting only his exhausted claim, or he may return to the state courts and try to exhaust whatever remedies may be available to him with respect to the three presently unexhausted claims.

Petition dismissed. So ordered.



STAND TOGETHER AGAINST NEIGHBORHOOD DECAY, INC., Donna Henes, Robert Hoffman, Robert Popham, William Price, Sarah Jenkins, Ryan Hilliard, and Arnold Fay, Plaintiffs,

v.

BOARD OF ESTIMATE OF the CITY OF NEW YORK, Edward I. Koch, as Mayor of the City of New York and Chairman of the Board of Estimate, Harrison J. Goldin, Andrew J. Stein, David N. Dinkins, Fernando Ferrer, Howard Golden, Claire Shulman and Ralph J. Lamberti, as Members of the Board of Estimate, New York City Planning Commission, Department of City Planning of the City of New York, Sylvia Deutsch, as Commissioner of the City Planning Commission and Director of the Department of City Planning, Department of Environmental Protection of the City of New York, Harvey W. Schultz, as Commissioner of the Department of Environmental Protection, New York City Public Development Corp., James P. Stuckey, as President of the Public Development Corp., Department of Housing Preservation & Development of the City of New York, Paul A. Crotty, as Commissioner of the Department of Housing Preservation and Development, Thomas C. Jorling, as Commissioner of the New York State Department of Environmental Conservation, United States Environmental Protection Agency, Lee M. Thomas, as Administrator of the Environmental Protection Agency, and Forest City Metrotech Associates, Defendants.

No. CV 87–2707.

United States District Court,
E.D. New York.

July 8, 1988.

Corporations and individuals sought to preliminarily enjoin city's application for order permitting condemnation of part of area slated for urban renewal. The Dis-

trict Court, Dearie, J., held that irreparable harm sufficient to support preliminarily enjoining proposed condemnation had not been shown on ground that injury resulting from violations of procedural requirements of National Environmental Policy Act would be irreparable if condemnation went forward or on ground that individuals whose businesses were on site to be condemned would be irreparably injured by loss of title to their property even if they were not deprived of possession and use of property.

Motion denied.

**1. Eminent Domain ⚖292**

Fact that proposed urban renewal project was allegedly in the public interest did not preclude parties seeking to preliminarily enjoin application for order to condemn small part of area slated for urban renewal from using "fair ground for litigation" to partially satisfy test for whether injunction should issue.

**2. Health and Environment ⚖25.15(3)**

Violation of the National Environmental Policy Act's environmental impact statement requirement is not, per se, irreparable harm, for purposes of attempt to obtain preliminary injunction. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**3. Health and Environment ⚖25.15(3)**

Irreparable injury sufficient to support preliminarily enjoining application for condemnation of portion of area slated for urban renewal did not exist on theory injury resulting from violations of procedural requirements of National Environmental Policy Act would be irreparable if condemnation went forward; city merely sought transfer of title for the property and represented it did not seek to take possession or to demolish any structure and would give counsel for corporation and persons seeking injunction as well as any persons objecting to relocation at least 60 days advance notice of any action to gain possession of properties, and power of court to reverse transfer of title was explicitly acknowledged. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**4. Eminent Domain ⚖292**

Irreparable injury supporting preliminarily enjoining condemnation of a portion of property slated for urban renewal had not been shown on ground individual members of corporation whose businesses were on site to be condemned would be irreparably injured by loss of title to their property, even if they were not deprived of possession and use of property; even if condemnation would frustrate plans to make further investments in or improvements on properties, as alleged by affiants, claims were economic to large extent, and economic damage did not justify preliminary injunctive relief, transfer of title could not be irreparable so long as court had authority to repair transfer of title, as it was conceded court did, threat of condemnation could not be removed until final adjudication on the merits, and lack of causal link between actual condemnation and alleged harm had accordingly not been shown.

---

Michael Gerrard, Berle, Kass & Case, New York City, for plaintiffs.

Eric Bregman, Sive, Paget & Riesel, P.C., New York City, for defendant Forest City Metrotech Associates.

Susan Shapiro, Asst. Corp. Counsel, for defendant New York City Bd. of Estimate and other municipal defendants.

Helene Goldberger, Asst. Atty. Gen., for defendant Thomas C. Jorling.

Robin Greenwald, Asst. U.S. Atty., for defendants U.S. E.P.A. and Lee M. Thomas.

MEMORANDUM OPINION

DEARIE, District Judge.

When the parties to this lawsuit look at the ten-block area osculatory to the Brooklyn Federal Courthouse's southeast corner, they see different sights and imagine different visions. The principal group of de-

fendants sees a run-down, blighted vicinage that ought to be replaced by a gleaming alabaster city of offices, shops and apartments. In plaintiffs' eyes, defendants' proposed development is dimmed by human tears induced by smog and the destruction of a vibrant community of homes and businesses.[1] Plaintiffs now ask the Court to prevent the defendants from taking a necessary though insufficient first step toward turning defendants' vision into reality.

## BACKGROUND

The essential facts are well established and not in dispute. This litigation focuses on a part of downtown Brooklyn bounded by Flatbush Avenue Extension, Jay Street, Tillary Street, and Willoughby Street. The area has long been slated for "urban renewal"; last year, the New York City Board of Estimate approved a proposal to develop a three-and-a-half million square foot mixed-use project called Metrotech on the site. Plaintiffs sue seventeen City agencies or officials that had a hand in planning or approving Metrotech, as well as the project's private developer, Forest City Metrotech Associates (collectively "municipal defendants" or "the City"),[2] alleging violations of numerous responsibilities imposed on the City by the Clean Air Act, Administrative Procedure Act, National Environmental Policy Act, and National Historic Preservation Act.[3]

On March 28, 1988, plaintiffs presented to the Court a public notice that the City would apply to Kings County Supreme Court, on April 7, 1988, for an order permitting the City to take a small part of the Metrotech site by eminent domain. Plaintiffs moved by order to show cause for a preliminary injunction enjoining the City from making such application. The parties then agreed that the City would take no action to condemn the subject properties until June 30, 1988, and the return date of plaintiffs' motion in this Court was adjourned by agreement to June 21, 1988. After hearing oral argument and carefully considering all the papers that have been filed in this action to date, the Court concluded that the injunction sought by plaintiffs should not issue because plaintiffs had failed to establish that the injunction was necessary to prevent irreparable harm. An order embodying that conclusion was signed on June 29, 1988. This opinion sets forth the reasoning behind the Court's decision and shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

## DISCUSSION

### A. Preliminary Injunction Standard

[1] The standard for preliminary injunction applications in the Second Circuit is well-established. An applicant for a preliminary injunction must show *both* "that it is likely to suffer possible irreparable harm if the requested relief is not granted" *and* "'either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.' *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir.1988) (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314–15 (2d Cir.1982)). The threat of irreparable harm must be "actual and imminent," *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 755 (2d Cir. 1977), and must be clearly shown regardless of which prong of the test of the merits the applicant seeks to invoke.[4] *Id.* at 750.

---

1. *See* Katherine Lee Bates, *America the Beautiful.*

2. The United States Environmental Protection Agency, its Administrator, and the New York State Commissioner of Environmental Conservation are also named as defendants. The motion for a preliminary injunction, however, does not involve these defendants and they have taken no position on the motion.

3. The statutes invoked in the complaint may be found, respectively, at 42 U.S.C. § 7401 *et seq.*, 5 U.S.C. § 701 *et seq.*, 42 U.S.C. § 4321 *et seq.*, and 16 U.S.C. § 470 *et seq.*

4. The Court is unimpressed with municipal defendants' argument that because Metrotech is in the "public interest," plaintiffs may not avail themselves of the "fair ground for litigation" prong of the test. The City misapplies *Union*

The test requires that the harm be irreparable because the applicant seeking to preserve the status quo must show a genuine need to preserve the status quo; injury that can later be remedied by an award of money damages is insufficient to justify a preliminary injunction. *Luce v. Edelstein,* 802 F.2d 49, 57–58 (2d Cir.1986); *Northern Cal. Power Agency v. Grace Geothermal Corp.,* 469 U.S. 1306, 105 S.Ct. 459, 83 L.Ed.2d 388 (Rehnquist, Circuit Justice 1984) (all injunctive relief requires showing of absence of adequate remedy at law). Similarly, a party is not entitled to a preliminary injunction if the harm caused by the action sought to be enjoined can later be rectified by a *post hoc* exercise of the Court's equitable powers. *New York v. Kleppe,* 429 U.S. 1307, 1312–13, 97 S.Ct. 4, 6–7, 50 L.Ed.2d 38 (Marshall, Circuit Justice 1976). These prudential requirements ensure that the injunctive power of the Court is wielded with appropriate caution, and only in cases that truly require its use.

B. The Action Plaintiffs Seek To Enjoin

Plaintiffs are not now confronted with imminent demolition of structures on the Metrotech site nor with imminent construction of the Metrotech project. The action plaintiffs seek to enjoin is the condemnation of about half a block, on which defendants plan to build a nine-story office building to house the Securities Industry Automation Corp. (SIAC). This is a relatively small fraction of the Metrotech site. *See* March 28, 1988 Order to Show Cause; Ex. D to Order to Show Cause; Ratner Aff. of May 17, 1988, ¶¶ 17–19. The threshold inquiry on plaintiff's motion for a preliminary injunction, therefore, is whether plaintiffs are likely to suffer any irreparable harm as a result of the June 30 eminent domain action absent an injunction.

The municipal defendants, including the project developer, have made numerous representations and commitments to the Court in their effort to persuade the Court that this is not a case in which bulldozers stand at the ready with engines idling, awaiting only the "Go" signal of formal transfer of title. For example, the City emphasizes that it seeks only to take title to the subject properties, not to take possession or to demolish any structure. Memorandum of Law of Municipal Defts. and Forest City Metrotech Assocs. in Opp. to Pltfs.' Motion for Preliminary Injunction [hereinafter "Memo in Opp."] at 19–20. "The municipal defendants and Forest City will give plaintiffs' counsel and any person subject to relocation at least sixty (60) days advance notice of any action to gain possession of the properties." Ratner Aff. of May 17, 1988, ¶ 6. Moreover, municipal defendants explicitly acknowledge the power of this Court to reverse the transfer of title, regardless of the provisions of New York Eminent Domain Procedure Law, if this Court later rules in plaintiffs' favor and finds such equitable relief justified. Ratner Aff. of May 17, 1988 ¶ 6; Memo in Opp. at 29–30; Reply Memorandum of Law of Municipal Defts. and Forest City Metro-

---

*Carbide Agric. Prods. Co. v. Costle,* 632 F.2d 1014, 1018 (2d Cir.1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981). In *Union Carbide,* pesticide manufacturers, alleging the purely private harm of disclosure of trade secrets, sought to enjoin implementation of a disclosure requirement that had been enacted by Congress. The Court held that in such circumstances "more than a 'fair ground for litigation' must be shown before the action will be stopped in its tracks by court order." *Id.* Here, defendants argue that Metrotech is in the public interest because the U.S. Department of Housing and Urban Development has agreed to provide congressionally-authorized Urban Development Action Grant funds for the development. Reply Memo in Opp. at 5–6.

Putting aside the Janus-like quality of this argument when juxtaposed with the City's repeated assertion that HUD has made no final commitment of UDAG funds to the project, *see, e.g.,* Memorandum of Law in Support of Municipal Defts.' Motion to Dismiss at 55–57, the City's argument is utterly unpersuasive. UDAG funds are congressionally authorized, but agencies have been known, even with the best of intentions, to exceed their lawful authority. Plaintiffs argue that HUD's approval of funding for Metrotech violates the strong public policies expressed in the Clean Air Act, National Environmental Policy Act, and National Historic Preservation Act. Both sides in this lawsuit have a legitimate claim to represent the "public" interest, as well as the private interests of the present and would-be future occupants of the Metrotech site.



tech Assocs. in Opposition to Pltfs.' Motion for Preliminary Injunction [hereinafter Reply Memo in Opp.] at 14–19.

The Court relies heavily on the City's commitments to these legal positions and intentions in its analysis of the irreparable harm issue. The Court could not reach its conclusion, that plaintiffs have failed to demonstrate a likelihood of actual and imminent irreparable harm, were it not convinced that the City does not intend immediate eviction, dispossession, or demolition on the Metrotech site, and that the City acknowledges the Court's authority to mandate reconveyance of the properties taken if that relief appears appropriate in the future.[5]

### C. Plaintiffs' Claims of Irreparable Harm

Plaintiffs make two claims of irreparable injury that will result if the condemnation proceeds. First, they assert that the injury resulting from violations of the procedural requirements of the National Environmental Policy Act (NEPA) will be irreparable if the condemnation goes forward. Second, they urge that the individual STAND members whose businesses are on the site to be condemned will be injured irreparably by the loss of title to their property, even if they are not deprived of possession and use of the property. Neither of these claims is a sufficient showing of irreparable harm in support of plaintiffs' motion for a preliminary injunction.

#### 1. Environmental Process Harms

NEPA requires completion of an adequate study of the environmental impact of any major federal action significantly affecting the quality of the human environment, before the action is undertaken. Plaintiffs correctly point out that NEPA compliance would be a hollow gesture if an insufficiently reviewed project were allowed to continue to completion during the pendency of an ultimately successful challenge to the aadequacy of an environmental impact statement (EIS). An EIS prepared in such circumstances would be at best a searching analysis of the pros and cons of a *fait accompli* and at worst a meaningless exercise in rationalization. It certainly could not "insure a fully informed and well-considered decision," *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), after the decision had already been made and implemented. Numerous courts, therefore, have enjoined a variety of federal actions pending determination of challenges to the sufficiency of EISs. *E.g., Steubing v. Brinegar*, 511 F.2d 489 (2d Cir.1975); *Environmental Defense Fund v. Tennessee Valley Auth.*, 468 F.2d 1164 (6th Cir.1972); *see Kleppe, supra*, 429 U.S. at 1312 n. 2, 97 S.Ct. at 7 n. 2 (citing cases); *Action for Rational Transit v. West Side Highway Project*, 536 F.Supp. 1225 (S.D.N.Y.1982) ("*ART II*") (injunction issued pending further administrative proceedings upon finding a NEPA violation), *aff'd in pertinent part and rev'd in part sub nom. Sierra Club v. United States Army Corps of Engineers*, 701 F.2d 1011 (2d Cir.1983); *see also Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (environmental injury often irreparable).

[2] However, a violation of NEPA's EIS requirement is not *per se* irreparable harm. *New York v. Nuclear Regulatory Comm'n, supra*, 550 F.2d at 753. When courts have granted injunctions in NEPA cases, they have generally enjoined actions that would immediately have caused the very environmental effects that were alleged to be inadequately studied, such as bridge construction (*Steubing*), dam construction (*Environmental Defense Fund*), or landfilling operations (*ART II*). The instant case is different, the City defendants assert, because transferring title for the SIAC site to the City does not of itself change land use patterns or create any of the environmental evils that plaintiffs allege were glossed over in the Metrotech EIS.

---

5. Of course, this is not to suggest that the City has waived any objection to the substantive correctness of a decision to grant such relief, if and when the Court makes that decision.

[3] While the Court finds municipal defendants' repeated assertion that condemnation is "environmentally neutral," Memo in Opp. at 15; Reply Memo in Opp. at 8, a bit too glib, their essential point is well taken. Evicting current occupants of the Metrotech site could, and beginning demolition and construction activities almost certainly would, cause irreversible environmental impacts that might rise to the level of irreparable injury needed to support issuance of a preliminary injunction. The City's simple taking of title, however, in light of the City's representations—particularly its concession that what the condemnation proceeding will do, this Court can undo—does not immediately alter the environment, and plaintiffs have not shown a sufficient likelihood of irreparable environmental injury resulting from the condemnation itself.

Neither plaintiffs' submissions nor the Court's research has disclosed any persuasive authority in support of a finding of irreparable environmental harm flowing from a condemnation *qua* condemnation. In *Northern Cal. Power Agency, supra,* Justice Rehnquist refused to stay a preliminary injunction entered by a district court against a state eminent domain proceeding. The property to be taken in that case, however, was a leasehold interest, and the loss of title was tantamount to loss of possession; loss of possession in turn would cause the irreparable injury. 469 U.S. at 1806-07, 105 S.Ct. at 459-60. In *United States v. 18.2 Acres of Land,* 442 F.Supp. 800 (E.D.Cal.1977), the federal government sought to condemn an easement over a private road. The taking of the easement would necessarily have created the public access to which the property owner objected on NEPA grounds; the court enjoined the condemnation.[6] In both *18.2 Acres* and *Northern California Power* the acquisition of ownership could not be separated from creation of the environmental harm. That is not the case for the Metrotech condemnation.

In *Monarch Chem. Works, Inc. v. Exon,* 452 F.Supp. 493 (D.Neb.1978), *preliminary injunction vacated and permanent relief denied,* 466 F.Supp. 639 (D.Neb.), *aff'd,* 604 F.2d 1083 (8th Cir.1979), the Court concluded without explanation that "the condemnation of its land would result in irreparable harm to the plaintiff," *id.* at 502, and preliminarily enjoined condemnation, even though all of the claimed injuries were results of construction on the land and not of the loss of ownership, *id.* at 498-99. Nearly as cryptic is the two-paragraph opinion in *Thompson v. Fugate,* 452 F.2d 57 (4th Cir.1971) (per curiam). In *Thompson,* Virginia planned to condemn a historic site, in order to complete a circumferential highway, before a determination by the Secretary of Transportation that no prudent and feasible alternative route existed. The district court enjoined highway construction on, but not acquisition of, the site. The appeals court, citing an unpublished stay order by one of its judges, reversed the denial of an injunction against condemnation.[7] This Court finds *Monarch Chemical* and *Thompson* unpersuasive.

By contrast, the court in *City of Oak Creek v. Milwaukee Metro. Sewerage*

---

6. The *18.2 Acres* court noted that "a condemnation action, by its very nature, is a decision to put land to a certain public use, which may have a significant effect on the environment." *Id.* at 807. This conclusion sweeps too broadly. Condemnation may represent irrevocable commitment to a public use, but condemnation does not define the public use nor the environmental review that may continue after title to the property is acquired. In the case at bar, for instance, if office construction on the land to be condemned is later enjoined as violative of federal law, the City might be able to use all or part of the site as a park.

7. A plausible explanation of *Thompson* is that the state and federal governments were obviously committed to completing the highway in question, and the court may have felt that nothing could sway the government from its path once it had possession of the preferred route—particularly when the judgment as to whether other routes were "prudent" and "feasible" might be directly affected by expenditure of the condemnation funds. If this is indeed the reasoning used by the Fourth Circuit, it is inapposite here: the scope of the Metrotech project is in no way predetermined by acquisition of the SIAC site, and may well change if a Court-ordered EIS later reveals more significant environmental impacts than did the present EIS.



*Dist.*, 576 F.Supp. 482 (E.D.Wis.1983), sharply distinguished the environmental effects of land acquisition from those of land use. Defendants in *Oak Creek* sought to condemn land for use as a solid waste landfill. Plaintiffs objected, *inter alia*, that NEPA required completion of an EIS before the site could be lawfully acquired. The court, in ruling that this claim had no likelihood of success on the merits, rejected plaintiffs' argument that

> if the Sewerage District continues to make expenditures for the acquisition of site LF-022, then it will be presented with a fait accompli when it finally decides whether to begin construction of a landfill facility at the Oak Creek location....

*Id.* at 488. Because the agencies involved intended to complete an EIS before design and construction grants were awarded for the landfill, the court held, a NEPA claim against condemnation could not succeed:

> Plaintiffs rely on cases in which actual construction of a proposed project was begun. The site acquisition expenses involved here are a far cry from those incurred in the construction of a proposed facility. *It is the landfill itself, not the land acquisition, that causes the major environmental impact*, and when a proposed action is rejected, expenditures on land are not wasted in the sense that construction expenses are wasted.

*Id.* at 490 (emphasis added). This Court agrees with *Oak Creek's* evaluation of the relative harmlessness of land acquisition vis-à-vis ultimate project construction.[8] The case may arise in which exercise of the eminent domain power is so closely linked to the ultimate public use that land acquisition sets in motion an irresistible force of environmental degradation. In the instant case, however, the Court's equitable powers, the time lag between land acquisition and significant environmental change, and the notice commitment made by the municipal defendants all ensure that the environment can be protected if such protection becomes necessary. The state court condemnation proceeding creates no necessity for such protection.

The Second Circuit has endorsed this type of line-drawing between stages of projects that cause irreparable environmental harm and stages that do not. In *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978), the Court of Appeals vacated an injunction granted by the district court despite the existence of troubling inadequacies in the EIS. Because "the multistage project is environmentally divisible," *id.* at 1391, the appeals court reasoned that the project was not destined to cause "irreversible damage from the outset," but could "satisfy environmental objections as it progresses," *id.* at 1390, rendering injunctive relief inappropriate.

Judge Griesa considered the "environmental divisibility" of condemnation and ultimate land use in the Westway case. As noted above, in *ART II* Judge Griesa enjoined any landfill activities for Westway construction. Earlier, however, he had refused to prohibit the state from taking title to the stretch of Hudson River that was intended to receive the fill.[9] *Action for Rational Transit v. West Side Highway Project*, 517 F.Supp. 1342 (S.D.N.Y.1981).

---

8. By quoting this language from *Oak Creek*, which was directed to the merits of the NEPA claim in that case and not to the irreparable harm requirement, the Court does not mean to intimate any view of the merits of the claims made in plaintiffs' amended complaint.

9. *United States v. 162.20 Acres of Land*, 639 F.2d 299 (5th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981), exhibits similar logic. Landowners attempted to assert violations of the NEPA-like review requirements of the National Historic Preservation Act (NHPA) as a defense in a condemnation proceeding. Reasoning that a declaration of taking did not commit the agency to destroy the taken historic property without appropriate review, the court refused to allow use of NHPA as a "shield" in a condemnation suit. *Id.* at 304–05. The court noted, however, that NHPA could be used as a sword to prevent the government, now landowner, from putting the historic property to its intended use until the statute was complied with. *Id.*; *see United States v. 162.20 Acres of Land*, 733 F.2d 377, 379–80 (same case after remand).

Judge Griesa felt, and this Court agrees, that allowing condemnation to go forward would in no way "prevent the granting of full [equitable] relief to ... plaintiffs if they should prevail on the merits ... prior to the commencement of actual construction." *Id.* at 1344.

Plaintiffs protest that Judge Griesa had only open water and fish to worry about, while this Court has before it claims of irreparable harm to standing structures and their occupants. This contention carries us from the general allegation of environmental process harms to the specific claims of irreparable injury to individual STAND members.

### 2. Injury to Site Residents

[4] Plaintiffs argue that those who own property on the Metrotech site will be injured irreparably by loss of title to their real estate, even if eviction, demolition and project construction do not follow. To prove this argument they submit the affidavits of Walter Chin, Wai Wai Pun and Carl Zerbo, all of whom own property in the half-block that is the subject of the June 30 court proceeding. The life stories told in these affidavits, often quite moving, differ in detail but share a consistent theme when it comes to the Metrotech development.

In brief, the affiants all own commercial property that is scheduled to be condemned, and all have made significant investments of time, effort and money in their businesses on the site, with varying degrees of success. All have plans to make further investments in or improvements on their properties. All aver that condemnation would frustrate those plans, by making them pointless or by making them impossible to finance, or both.

The municipal defendants respond to the Chin, Pun and Zerbo affidavits with a needless barrage of affiant-bashing. Memo in Opp. at 20-24; *see also* Reply Memo in Opp. at 11-14. They impugn the accuracy of plaintiffs' description of the effects that imminent condemnation has on investment in the neighborhood; they impugn the veracity of the affiants' avowed plans; they impugn the genuineness of plaintiffs' and affiants' stated concern for the environment and the public interest.[10] The Court does not formally find as facts all of the assertions in the Chin, Pun and Zerbo affidavits, although the Court perceives no reason to doubt the affiants' sincerity. However, an inquiry into the affiants' credibility is unnecessary, because even complete acceptance of the affidavits would not produce facts sufficient to justify the legal conclusion that these affiants will suffer irreparable harm if no injunction against condemnation is granted.

Plaintiffs' assertion of irreparable harm founders on a series of shoals. First, to a large extent the claims are economic. Suppose the condemnation of their properties really causes Chin not to expand his store, Pun not to open his restaurant, and Zerbo not to build his office building. Suppose further that plaintiffs ultimately prevail and the Court enjoins any further work on Metrotech. If at that time affiants retain possession of their properties, or regain title by order of this Court, they would be free to resume their deferred dreams at a cost of nothing more than lost profits and increased costs. Such economic damages do not justify preliminary injunctive relief. *See Luce v. Edelstein, supra.*

Second, the transfer of title cannot be "irreparable" so long as this Court has the power, quite literally, to repair it. The City concedes that if plaintiffs prevail on the merits the Court could fashion a remedy that would require the City to reconvey all condemned property. Because the Court retains that power, so long as in the mean-

---

10. This last jab elicited from plaintiffs' counsel the bemused comment that for Forest City to label Zerbo a land speculator was the "pot-calling-the-kettle-black." Plaintiffs' Reply Memorandum of Law in Support of Motion for Preliminary Injunction [hereinafter "Plaintiffs' Reply Memo"] at 9. All the name-calling is quite beside the point. Disputes that revolve around the fate of a neighborhood, a canyon, an old farm or any other important property inevitably implicate a host of interests to which the labels "public" and "private" adhere only uncomfortably. *See supra* note 3. Neither those who make way for projects nor those who build projects generally act for purely altruistic reasons.

time no one is displaced and no buildings are demolished, there is simply no reason for the Court to use its injunctive powers at this time.

This is why plaintiffs' attempt to distinguish the Westway cases fails. In a typical environmental case, the alleged harm is purely environmental and truly irreparable: once the river is filled and the bass are gone, as a rule, the river stays filled and the bass stay gone. The occurrence of the harm, however, typically depends not on who owns the ecosystem but on what is done to it: hence Judge Griesa's conclusion that the bass stay happy as long as the river stays wet. As plaintiffs point out, people, unlike fish, are directly affected by the locus of ownership. But title, unlike an extinguished species, can be returned whence it came by order of the Court. Thus plaintiffs are correct that condemnation may harm property owners where it would not harm environments, but defendants are correct that the harm to property owners may not be irreparable where harm to environments would be.

Plaintiffs argue that the effects condemnation would have on their representative affiants are symptomatic of a cloud that condemnation of even a small parcel would place over the entire neighborhood, bringing with it an exodus of investment and energy that would create an enduring and irremediable atmosphere of blight. Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction at 7–8; Plaintiffs' Reply Memo at 10–11. Plaintiffs have failed to produce proof adequate to establish this contention.[11] More fundamentally, even if there is some evidence that a cloud hovers over investment in properties on the Metrotech site, there is no proof that the planned taking of the SIAC site is responsible for that cloud.

It is undisputed that some form of urban renewal project has been planned for the Metrotech area for decades. See, e.g., Chin Aff. ¶ 10; Reply Memo in Opp. at 12. Municipal defendants argue persuasively that the mere knowledge that government has grand plans for a neighborhood (plans that inevitably seem to exclude many of the existing structures) is sufficient to deter people from investing in the vicinity. Indeed, as the City notes, the Zerbo affidavit, in paragraph nine, states that his "plans *have been* stalled by the *possibility* of condemnation" (emphasis added).

This argument is devastating to plaintiffs' claims of irreparable injury. The *threat* of condemnation is something this Court is powerless to remove, at least until a final adjudication on the merits, and perhaps not even then. The cloud hanging over the neighborhood can not be blown out to sea by a preliminary injunction. Plaintiffs have not demonstrated any incremental irreparable harm that will inure to them absent an injunction, nor have they demonstrated that the Court's injunction could in any way eliminate the harm that already exists. The lack of a causal link between the act sought to be enjoined and the irreparable harm alleged means that plaintiffs have failed to establish any genuine need to maintain the status quo and therefore have failed to meet the first part of the strict standard for obtaining preliminary injunctive relief.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction was denied for the reasons stated above. Because plaintiffs failed to make the requisite showing of irreparable harm, it was unnecessary for the Court to consider the second half of the preliminary injunction standard, either prong of which requires an assessment of the merits of plaintiffs' case. The merits are of course the subjects of the several motions to dismiss and the motion for partial summary judgment that are presently *sub judice*

---

11. The Court does, however, find plaintiffs' assertion considerably more plausible than municipal defendants' utterly unsupported theory that property owners throughout the Metrotech site are pouring money into their buildings in order to jack up the condemnation awards they will receive. Do owners really expect to get back, a few years from now, substantially more value than they put in?

Decisions on those motions are forthcoming.



UNITED STATES of America, Plaintiff,

v.

STATE OF NEW YORK; Mario M. Cuomo, Governor of the State of New York; New York; State Office of Mental Health, Richard C. Surles, Commissioner of the New York State Office of Mental Health; Patricia T. Oulton, Executive Director of the Buffalo Psychiatric Center, Defendants.

No. CIV-88-138C.

United States District Court,
W.D. New York.

July 13, 1988.

State officials moved to dismiss action brought by United States under the Civil Rights of Institutionalized Persons Act. The District Court, Curtin, Chief Judge, held that Attorney General's certification that prefiling requirements of the Act have been met may not be reviewed by the court.

Motion to dismiss denied.

Civil Rights ⚖13.9

Certification by the Attorney General that the prefiling requirements of the Civil Rights of Institutionalized Persons Act have been met before the filing of suit may not be reviewed by the court, even where it clearly appears that the Department of Justice has not made a serious effort to mediate or conciliate regarding remedies. Civil Rights of Institutionalized Persons Act, § 4(a)(2)(B), 42 U.S.C.A. § 1997b(a)(2)(B).

Roger P. Williams, U.S. Atty., Buffalo, N.Y. (Denise E. O'Donnell, of counsel), U.S. Department of Justice, Special Litigation Section, Civil Rights Div., Washington, D.C. (Verlin Hughes, David Deutsch, of counsel), for plaintiff.

Robert Abrams, Atty. Gen. of the State of N.Y., Buffalo, N.Y. (Douglas S. Cream, of counsel), for defendants.

CURTIN, Chief Judge.

Pending is the motion of defendants to dismiss this action pursuant to Federal Rules of Civil Procedure, Rule 12(b)(1) on the ground that plaintiff lacks standing to bring the action and has failed to comply with the jurisdictional prerequisites of 42 U.S.C. § 1997b(a)(2)(B).

The complaint alleges a violation of Civil Rights of the Institutionalized Persons Act [CRIPA]. Defendants move to dismiss on the ground that plaintiff has failed to satisfy certain procedural prerequisites before commencing Litigation under this Act. Specifically, defendants state the CRIPA requires the Attorney General of the United States under section 1997b(a)(2)(B) to require the State to correct the alleged condition through informal conferences and to voluntarily remedy unacceptable conditions before suit is brought.

The complaint, alleging a violation of 42 U.S.C. § 1997b, *et seq.*, CRIPA, alleges in general terms that the inpatients at the Buffalo Psychiatric Hospital [BPC] of the State of New York's Office of Mental Health are deprived of rights secured to them by the United States Constitution.

The facts underlying the motion are not in serious dispute and are set forth in detail in the motion brought by the Attorney General to dismiss. There, the correspondence between the State and Federal officials is set forth, as well as a record of meetings which were held between the representatives of the State and the Department of Justice [DOJ].

For the purpose of this motion, the essential facts may be summarized as fol-

