IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| 'ĪLIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NĀ 'IMI PONO, a Hawai'i unincorporated association; and KĪPUKA, a Hawai'i unincorporated association,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army,<br><br>Defendants. | Civil No. 04-00502 DAE BMK<br><br>DECLARATION OF KAMOA QUITEVIS; EXHIBITS "37"-"44;" CERTIFICATE OF SERVICE |

DECLARATION OF KAMOA QUITEVIS

I, KAMOA QUITEVIS, declare that if called as a witness in this action I could testify of my own personal knowledge as follows:

1. I am Native Hawaiian and was born and raised on the island of Oʻahu. My ʻohana and I have ancestral and cultural ties to the area traditionally known as Līhuʻe, which encompasses much of the land the U.S. Army would use and adversely impact in converting the 2nd Brigade to a Stryker Brigade Combat Team, including the land in and around the Schofield Barracks Military Reservation. I am a member of the Wahiawā Hawaiian Civic Club and of Kahunānā (families of the land), which is one of the Native Hawaiian organizations that has taken the lead in consulting with the Army regarding the cultural impacts of its Stryker plans. Based on my membership in the Wahiawā Hawaiian Civic Club and Kahunānā, the recommendations from the Native Hawaiian community, and my recognized connections to the land affected by the Army's Stryker activities, the Army has retained me as a "Cultural Monitor" under the Programmatic Agreement ("PA") it developed to comply with its legal obligations under the National Historic Preservation Act ("NHPA").

2. I am also a veteran. I served in the U.S. Navy for eight years and received an honorable discharge.

3. I have served since December 2004 as the Field Director of the Cultural Monitors. As Field Director, I have overseen all the Cultural Monitors and directed and coordinated all cultural monitoring of Stryker projects on Oʻahu.

2

The Cultural Monitors have all reported to me, and I have been responsible for organizing and submitting all their timesheets, logs, and reports. In this capacity, I have extensively traversed and inspected the areas affected by the Army's Stryker plans and have become familiar with these areas and the cultural resources discovered to date.

4.  I have reviewed the declaration submitted by Leimaile Quitevis, who is the Administrative Director of the Cultural Monitors on Oʻahu, and agree with the testimony in that declaration as consistent with my personal knowledge and informed opinion. I have also reviewed the declarations submitted by Army Cultural Resources Manager Laurie Lucking in this case, including the most recent declaration dated November 13, 2006. Although there is not enough time to refute all the inaccurate statements in this declaration, I wish to respond to several points and set the record straight regarding the Army's treatment of cultural resources.

5.  The Lucking declaration identifies six "absolutely essential" construction projects: (1) Tactical Vehicle Wash Facility ("TVWF"), (2) Motor Pool Complex ("MPC"), (3) Multiple Deployment Facility ("MDF"), (4) Qualifying Training Range One ("QTR1"), (5) Urban Assault Course ("UAC"), and (6) Range 11T at Pōhakuloa Training Area. The declaration then makes blanket statements like "[t]he cultural monitors did not identify any new cultural sites at the first five projects." These statements are misleading and incorrect. The Cultural Monitors found numerous undocumented cultural resources at QTR1,

3

including several sites (such as an apparent burial mound) on the plateau within several dozen feet of Target 3, a petroglyph less than 10 yards from Target 4, and a whole host of sites and site features in gulches lying directly in the firing lanes. All of these sites lie well within the "surface danger zones" threatened by live-fire training. The Cultural Monitors also found undocumented sites at the UAC, not far from the construction footprint and in areas that could be harmed by construction impacts including erosion. The Army archaeologists have not spent the time the Cultural Monitors have to inspect these areas, particularly the previously unsurveyed regions, so they simply may be personally unaware of the existence of these sites (even though the Cultural Monitors have repeatedly sought to inform them).

6.   The Army provided the Cultural Monitors no opportunity to inspect the TVWF or MPC, so there is telling whether Cultural Monitors would have found previously undiscovered cultural resources, as they did in the areas where they had such opportunities, such as at QTR1, the Battle Area Complex at Schofield Barracks ("BAX"), and the Combined Armed Collective Training Facility ("CACTF") in Kahuku. The statement that "[c]ultural monitors were invited to inspect [the TVWF] prior to construction and declined to examine the area" is false. The Army relegated the Cultural Monitors to "on call" status during construction, which in practice meant that no cultural monitoring occurred during the construction activities, contrary to the PA's requirements, since the Army never

4

"called." The Cultural Monitors had no opportunity to ensure the Army did not harm cultural resources, as it has in QTR1, the BAX and the CACTF.

7. Attached hereto as Exhibits 37 and 38 are true and correct copies of photographs that I took during the initial assessment of the BAX the Army allowed the Cultural Monitors to conduct in August 2006, and that fairly and accurately depict what I saw when I took these pictures. The previous declaration of Leimaile Quitevis (¶¶ 10-22) contains a detailed description of the Cultural Monitors' recent surveys of the BAX, which confirmed hundreds of cultural resources undocumented by the Army contractors' previous surveys and numerous cultural resources damaged by ground-disturbing activities. The photographs provide some examples of the known damage the Cultural Monitors discovered. Exhibit 37 shows a kiʻi pohaku (petroglyph) I found lying in a excavation pit and scraped by heavy equipment. Exhibit 38 shows another similarly damaged petroglyph I found lying in a pile of spoils left near the perimeter of a construction area for a target emplacement. The disturbance and damage to these cultural resources and others resulted directly from the Army's failure to comply with the PA's provisions for protecting cultural resources prior to conducting destructive activities.

8. Based on what I have seen on several brief visits that were not at the Army's request and, thus, did not allow for any surveying, the TVWF area included not only a former warehouse area, but also unsurveyed forested land where cultural resources could have been present. I saw trees being cut down and

removed during one of my visits. The area is now paved over with concrete, so whatever cultural resources that did exist are now destroyed.

9. Similarly, the statement that no sites have been found "by the cultural or archaeological monitors during construction" of the MPC lacks any basis because the Cultural Monitors were not allowed to monitor that project. While conducting cultural monitoring at the nearby QTR2, I saw that MPC construction extended beyond the old agricultural areas into unsurveyed forested land, where cultural resources may have been present and could have been destroyed. The Army failure to survey these areas precludes us from ever knowing what has been lost.

10. The Lucking declaration reemphasizes the Army's narrow focus on the "construction footprint," while glossing over the reality that the impacts of live-fire training extend far beyond this limited footprint. Live-fire training at QTR1 began in August 2006, even before construction ended. Yet, the Army has not complied with its obligations under the Programmatic Agreement ("PA") to identify, evaluate, and mitigate harm to all cultural resources threatened by the live-fire training. The Army has no basis for claiming no harm will be caused by live-fire training when it has failed to comply with its stipulated process for determining and mitigating such harm.

11.     The Lucking declaration finally admits that areas "within the Surface Danger Zone of the QTR1 . . . have not been surveyed," as the Cultural Monitors have been insisting for months. The excuse given for this -- that "[t]he bulk of the un-surveyed areas are heavily vegetated gulches," which "have not been completely surveyed because of the presence of unexploded ordnance" -- is nonsense. The majority of these areas have little or no ground cover, and vegetation is usually limited to a tree canopy. More signficantly, unexploded ordnance did not prevent Army contract archaeologists from entering the gulches with Explosive Ordnance Disposal ("EOD") escorts during their previous surveys. Nor did it prevent the Army from allowing the Cultural Monitors, with EOD escorts, to inspect these areas in October 2006, after the Cultural Monitors objected for months to the lack of any inspection opportunities. The fact of the matter is that these inspections have alerted the Army to the multitudes of undocumented cultural sites lying in the surface danger zones of QTR1, yet the Army gave the Cultural Monitors only 15 days in October 2006 to survey these areas and is insisting on moving forward with live-fire training without complying with the PA's requirements, including protection of the sites against damage from live-fire training. Instead of fulfilling its repeated promises in the PA, EIS, and in court testimony to examine and develop proper mitigation measures for these cultural resources, the Army is simply trying to pretend that they do not exist.

12. The Lucking declaration also offers the unsupported conclusion that cultural sites in gulches are "unlikely to be affected" by "direct fire weapons." Through my years of involvement in the Army's Stryker activities, I know the weapons the Army uses for live-fire training. In observing recent live-fire training at QTR1 during my daily monitoring work, I was surprised to discover the Army was firing 40mm MK-19 grenade rounds, which the Army did not disclose in its analysis of impacts in its EIS. These high-velocity, rapid-fire rounds are fired at long distances in a lobbed trajectory, which readily enables the rounds to impact the insides of gulches.

13. Indeed, in inspections immediately following recent live-fire training at QTR1, I found several blue training rounds in Haleʻauʻau Gulch, which lies in the firing lanes of QTR1 targets, and which contains many undocumented sites, including burial mounds. Moreover, contrary to the statement in the Lucking declaration that "[n]one of this practice training ordnance has ever been found on Site 210 since QTR1 has been operational," I found a part of a training round in the burial mounds site the Army calls Site 210. This site was originally directly in the line of fire of one of the QTR1 targets. The Army moved the target, but the site still lies between two targets, within the surface danger zone of live-fire training, as the ordnance found at the site demonstrates. This ordnance in these cultural sites was not present during earlier inspections and appeared after only three days of live-fire training. Again, the Army archaeologists are not on site constantly like

8

the Cultural Monitors have been, so the archaeologists simply may not be aware of these incidents.

14.   Moreover, the Army has not been using the chalk-filled practice rounds mentioned in the Lucking declaration. Rather, the Army has been firing two other types of practice rounds. One is solid aluminum, and the other contains an explosive spotting charge that bursts on contact to discharge a cloud of smoke. This explosive charge can cause serious injury and requires disposal by an EOD expert. I know the Army has not been using the chalk-filled practice round because I have found no trace of such rounds in my inspections, including the characteristic orange chalk dispersed by these rounds.

15.   Attached hereto as Exhibits 39 to 43 are true and correct copies of photographs that I took during my inspections in August 2006, soon after live-fire training exercises at QTR1 began, and that fairly and accurately depict what I saw when I took the photographs. Exhibit 39 shows the two types of blue training rounds fired at QTR1. The round on the bottom is the solid aluminum type; the round on the top is the explosive type, with the metal backing of the round burst open. Exhibit 40 shows a pile of rounds fired at QTR1. The metal cylinders in the photograph are the metal counterweights contained inside the explosive round, which have been blown out of the aluminum shell.

16. Exhibit 41 shows the metal counterweight of the explosive round I found in the middle of Site 210, in direct contradiction to the statement that no rounds have been found in Site 210.

17. Exhibits 42 and 43 shows a temporary target the Army recently erected in QTR1, which has already been mutilated by 40mm fire. These targets consist of a large quarter- to half-inch steel plates. Fragments of the blue training rounds lie scattered around the target, and the impacts and explosive charges have severely dented and bent the steel plate. Following the recent training, I have seen other such targets with holes the size of 40mm rounds punched through them.

18. Attached hereto as Exhibit 44 is a true and correct copy of a photograph that I took in October 2006 after recent training in KR3 range in the BAX with 50 caliber machine guns, which I submit to show the kind of damage that can be done by live-fire training to the stone components of cultural sites. The photograph shows how the 50 caliber bullets chipped, cracked, and split solid rock. The 40mm rounds are larger and heavier and can inflict much more damage.

19. The Lucking declaration claims that Range 11T has been surveyed for cultural resources, which apparently revealed archaeological sites that forced the Army to change the layout and surface danger zones of the range. The Army's track record in other project areas casts in serious doubt the conclusory statement that "there will be no adverse effects to cultural resources with the use of Range 11T as a range for the [Stryker Mobile Gun System] with these changes."

20. The Lucking declaration claims the Army has not engaged in any data recovery, but resorts to other mitigation measures. In fact, the Army has not been able to reach issues of data recovery or any other mitigation measures because it has not even complied with the PA's initial requirements of identifying and evaluating the cultural resources threatened with harm. Mitigation is meaningless once the Army has already damaged and destroyed cultural resources, which has already occurred in numerous known incidents and will inevitably occur if the Army proceeds. Given the Army's failures to comply with the PA, and the undisputed existence of numerous undocumented and unprotected cultural resources lying in the areas threatened by Army activities, harm to cultural resources will undeniably occur if the Army is allowed to push ahead with Stryker activities, including live-fire training.

I declare under penalty of perjury that I have read the foregoing declaration and know the contents thereof to be true of my own knowledge.

Dated at Honolulu, Hawai'i, November 17, 2006.

_____
KAMOA QUITEVIS