DAVID L. HENKIN          #6876
ISAAC H. MORIWAKE        #7141
EARTHJUSTICE
223 South King Street, Suite 400
Honolulu, Hawai‘i 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: dhenkin@earthjustice.org
Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| ‘ĪLIO‘ULAOKALANI COALITION, a Hawai‘i nonprofit corporation; NĀ ‘IMI PONO, a Hawai‘i unincorporated association; and KĪPUKA, a Hawai‘i unincorporated association,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army,<br><br>　　　　　Defendants. | Civil No. 04-00502 DAE BMK<br><br>PLAINTIFFS' SUPPLEMENTAL MEMORANDUM RE: INTERIM INJUNCTION; CERTIFICATE OF COMPLIANCE; DECLARATION OF WILLIAM J. AILĀ, JR.; EXHIBITS "45"-"47;" DECLARATION OF JOHN MICHAEL CASTILLO; EXHIBITS "48"-"56;" DECLARATION OF ANDREW P. HOOD; EXHIBITS "57"-"62;" SUPPLEMENTAL DECLARATION OF KAMOA QUITEVIS; EXHIBITS "63"-"65;" SUPPLEMENTAL DECLARATION OF DAVID L. HENKIN; EXHIBITS "66"-"93;" CERTIFICATE OF SERVICE<br><br>Hearing:<br><br>Date:　December 18, 2006<br>Time:　9:45 a.m.<br>Judge: Hon. David A. Ezra |

I.    INTRODUCTION

In considering the Army's request to modify the Ninth Circuit's blanket

injunction on Stryker-related activities, this Court must bear in mind it "cannot …

override Congress' policy choice, articulated in a statute, as to what behavior

should be prohibited."  United States v. Oakland Cannabis Buyers' Cooperative,

532 U.S. 483, 497 (2001).  This Court is not at liberty to "consider any and all

factors that might relate to the public interest or the convenience of the parties ... [,]

reject[ing] the balance that Congress has struck in a statute."  Id.  Rather, "[o]nce

Congress, exercising its delegated powers, has decided the order of priorities in a

given area, it is … for the courts to enforce them when enforcement is sought."  Id.

(quoting TVA v. Hill, 437 U.S. 153, 194 (1978)).

When it enacted the National Environmental Policy Act ("NEPA"),

Congress commanded that, "to the fullest extent possible[,] ... all agencies of the

Federal Government shall" prepare an environmental impact statement ("EIS") on

all "major Federal actions specifically affecting the quality of the human

environment."  42 U.S.C. § 4332(2)(C) (emphasis added); see also 40 C.F.R. §

1500.1(a) (noting section 102(2)'s "'action-forcing' provisions").[1]  Congress

---

[1] The conference report notes an initial proposed amendment that would
have "provided that 'nothing in the Act shall increase, decrease or change any
responsibility or authority of any Federal official or agency created by other

imposed this requirement to ensure all federal agencies, including the Army, would

"make decisions that are based on understanding of environmental consequences."

40 C.F.R. § 1500.1(c).  To accomplish this goal, NEPA requires, "before decisions

are made and before actions are taken," id. § 1500.1(b), that the Army disclose

"relevant environmental considerations that were given a 'hard look' by the

agency," including analysis of "choices or alternatives that might be pursued with

less environmental harm."  Lands Council v. Powell, 395 F.3d 1019, 1027 (9th Cir.

2005); see also 42 U.S.C. § 4332(2)(C)(ii), (E) (mandating alternatives analysis);

40 C.F.R. §§ 1502.1, 1502.14.  On October 5, 2006, the Ninth Circuit held the

Army failed to comply with this mandatory duty.

Until the Army complies with NEPA by issuing a new record of decision

("ROD") based on the supplemental alternatives analysis the Ninth Circuit ordered,

it may not take – and this Court may not authorize – any action concerning the

proposed conversion of the 2nd Brigade to a Stryker brigade that would:

---

provision of law.'"  H.R. Conf. Rep. No. 91-765 (1969), reprinted in 1969
U.S.C.C.A.N. 2767, 2770.  The conferees expressly deleted this provision,
substituting the "to the fullest extent possible" language.  The conference report
explained, "the purpose of the new language is to make it clear that each agency of
the Federal Government shall comply with the directives set out in [42 U.S.C. §
4332(2)] (A) through (H) unless the existing law applicable to such agency's
operations expressly prohibits or makes full compliance with one of the directives
impossible."  Id. (emphasis added).  The conferees stressed, "no agency shall
utilize an excessively narrow construction of its existing statutory authorizations to
avoid compliance."  Id.

(1)    Have an adverse environmental impact; or

(2)    Limit the choice of reasonable alternatives.

40 C.F.R. § 1506.1(a); see also National Audubon Soc'y v. Department of Navy,

422 F.3d 174, 201-02 (4th Cir. 2005); National Parks & Conservation Ass'n v.

Babbitt, 241 F.3d 722, 737 (9th Cir. 2001) ("NPCA") ("Where an EIS is required,

allowing a potentially environmentally damaging project to proceed prior to its

preparation runs contrary to the very purpose of the statute"); see generally Center

for Biological Diversity v. Pirie, 201 F. Supp. 2d 113, 120 (D.D.C. 2002), vacated

as moot, 2003 WL 179848 (D.C. Cir. Jan 23, 2003) (injunction against military

training only option that will ensure compliance with law).

    In responding to the limited discovery authorized at the November 20, 2006

status conference, defendants have defined, for the first time, the precise Stryker-

related training the Army seeks to carry out in Hawai'i prior to complying with

NEPA.  The Hawaiian Groups have carefully reviewed the Army's proposed

training, as well as gathered additional information about the Stryker-related

construction projects the Army seeks leave to pursue.  Based on the information

currently available to them, the Hawaiian Groups have concluded that some of the

Army's proposed activities could proceed prior to completion of the mandated

supplemental NEPA analysis without violating the prohibitions on taking actions

that would either (1) "[h]ave an adverse environmental impact" or (2) "[l]imit the choice of reasonable alternatives."  40 C.F.R. § 1506.1(a); <u>see</u> Part II, <u>infra</u>.  There are other activities that would violate the prohibition on adverse environmental impact absent limitation on those activities or prior implementation of mitigations not currently part of the Army's proposal.  With those limitations and/or mitigations in place, the Hawaiian Groups believe the activities could go forward without violating NEPA.  <u>See</u> Part III, <u>infra</u>.  Finally, there are some activities that would cause adverse environmental impacts that cannot be mitigated or would impermissibly limit alternatives by committing the Army to pursuing Stryker conversion in Hawaiʻi, and the Court should not allow these activities to proceed prior to full compliance with NEPA.  <u>See</u> Part IV, <u>infra</u>.  The Court can rest assured the Army can avoid any possible harm by pursuing the activities elsewhere.  <u>See</u> Part V, <u>infra</u>.

During discovery, the Hawaiian Groups confirmed that none of the activities the Army seeks to conduct involves any use of the 24,000 acres on Hawaiʻi Island the Army recently purchased for $31.5 million from Parker Ranch ("the WPAA") and that, other than construction and use of the Schofield Barracks Motor Pool, the Army is not asking to carry out any activities in the 1,400 acres on Oʻahu acquired for $15.9 million from Campbell Estate ("the SRAA").  To avoid allowing the

Stryker conversion project in Hawai'i from gaining irreversible momentum, the

Court should undo the WPAA transaction in its entirety.  Moreover, the Court

should exercise its equitable discretion to undo the acquisition of the SRAA, at

least with respect to those acres that have not, to date, been disturbed by Stryker-

related activities.  See Part VI, infra.


II.    REQUESTED ACTIVITIES THAT AVAILABLE INFORMATION
       INDICATES WOULD NOT VIOLATE NEPA'S PROHIBITIONS

As the Court recognized at the November 20, 2006 status conference, the

limited discovery allowed to date has not given the Hawaiian Groups the

opportunity to determine conclusively whether any of the Stryker-related activities

the Army seeks to carry out prior to complying with NEPA would avoid adverse

impacts.[2]  By necessity, the analysis set forth below is based only on the

information currently available.  Should contrary information subsequently come

to light, the Hawaiian Groups reserve their right to seek appropriate modifications

to any order allowing Stryker-related activities to proceed prior to the Army's full

compliance with NEPA.  With those qualifications, the Hawaiian Groups believe

that, prior to issuance of a ROD based on a legally adequate EIS, the Army could

_____

[2] In determining whether there would be an adverse impact, the Hawaiian
Groups have focused on only incremental impacts associated with Stryker-related
activities, over and above any impacts that would otherwise result from routine,
non-Stryker activities, which the Court has instructed are part of the baseline.

carry out the following Stryker-related activities without violating the prohibitions set forth at 40 C.F.R. § 1506.1(a):

A.    Maneuver Training at Dillingham Training Area.

At Dillingham Training Area, the Army seeks to conduct non-live-fire maneuver exercises that would be limited to "existing roads, old airfield taxiways, aircraft parking areas or previously disturbed areas within the old Nike site." Exh. 66: Defs' 2nd Response at 9-10; see also Exh. 67: Defs' 1st Supplemental Response at 8-9 (describing training); Exh. 68: DTA map (proposed maneuvers limited to shaded orange areas). The Hawaiian Groups are currently unaware of any short-term impacts (i.e., impacts pending compliance with NEPA) associated with this training with these limitations in place.

B.    Training at Schofield Barracks' Kolekole Ranges.

The Army seeks leave to conduct a variety of training exercises at Ranges KR 3, 4, 5, and 6 at Schofield Barracks, including pre-Operational New Equipment Training, squad or section live-fire exercises ("LFXs"), platoon maneuver LFXs, platoon convoy LFXs, and gunnery exercises. These exercises are described in

detail in the Army's discovery responses.  See Exh. 69: Defs' Response at 11-17;

Defs' 2nd Response at 9; Exh. 70: KR 3-6 Training Briefing.[3]

While any military training, especially live-fire training, has the potential for

adverse impacts, the Hawaiian Groups are presently unaware of any short-term

impacts associated with the proposed training that are greater than impacts

associated with non-Stryker training.

C.      Construction of the Urban Assault Course.

Based on the Hawaiian Groups' site inspection, the Army appears to have

completed disturbance of the construction footprint of the Urban Assault Course

("UAC") at Schofield Barracks.  Completing the UAC's construction does not,

therefore, appear likely to cause further adverse impacts.  As discussed in Part

III.B, infra, any use of the UAC should be conditioned on the Army's compliance

with its obligations under the Programmatic Agreement ("PA") to identify and

protect all cultural sites within the surface danger zone ("SDZ") of weapons

proposed for use there.

---

[3] Notably, the Army does not allege any need to conduct company and
battalion maneuver and live-fire exercises in Hawai'i, since the 2nd Brigade will
have opportunities to conduct that training at the National Training Center
("NTC") in California.  11/13/06 Borne Dec. ¶5(b).

D.    Activities Described in Colonel Banach's Declaration.

In his November 8, 2006 declaration, the 2nd Brigade's commander, Colonel Stefan Banach, described several Stryker-related educational activities that would have no apparent adverse impacts:  classes associated with battle command and digital sustainment training, leader development courses, and combat medical training programs.  11/8/06 Banach Dec. ¶8(d), (f), (g).

III.    REQUESTED ACTIVITIES THAT REQUIRE MITIGATION OR LIMITATIONS TO AVOID ADVERSE IMPACTS OR LIMITATION OF ALTERNATIVES

Based on the information currently available, the Hawaiian Groups believe the following activities could lawfully proceed while the Army comes into compliance with NEPA, provided that the Court requires the Army to implement the specified mitigations or imposes the limitations on the activities detailed below:

A.    Training at Qualification Training Range 1.

Prior to building Qualification Training Range 1 ("QTR1") as part of Stryker conversion, the Army conducted small-arms, live-fire training at ranges in the McCarthy Flats ("MF") area of Schofield Barracks.  See 5/12/5 Borne Dec. ¶5. Ammunition historically fired at the MF ranges included 5.56mm, 7.62mm, and 9mm bullets.  Exh. 71: Oʻahu Biological Assessment at 263.  Since these types of

ammunition were fired at the MF ranges prior to QTR1's construction, the Hawaiian Groups are not currently aware of any incremental harm that would result from their use at QTR1.

The situation is quite different with respect to the Army's request to train at QTR1 with weapons firing .50-caliber rounds and 40mm grenades, neither of which previously had been used at the MF ranges.  Defs' Responses at 20-24.[4]  As discussed in cultural monitor Kamoa Quitevis's November 17, 2006 declaration, both types of ammunition can cause severe damage to cultural sites.  See Kamoa Quitevis Dec. ¶¶12-18 & Exhs. 39-44.  While Director of Transformation Ron Borne attacked Mr. Quitevis' statements in a declaration filed November 20, 2006, at deposition, Mr. Borne subsequently acknowledged that it was he, not Mr. Quitevis, who erred.  First, Mr. Borne conceded that, prior to submitting his declaration, he had failed to research the 40mm grenade rounds the 2nd Brigade used at QTR1 prior to the Ninth Circuit's injunction, and that, contrary to his previous sworn statement, it was Mr. Quitevis, not Mr. Borne, who had accurately described them.  Exh. 72: Borne Deposition at 123:13-125:6 & Exh. 10.

_____

[4] The use of MK-19s firing 40mm grenades at QTR1 was not only unexamined in the site-specific EIS ("SEIS"), see AR-S 51563, but was not subject to section 7 consultation under the Endangered Species Act ("ESA").  See O'ahu Biological Assessment at 248, 261-62 (no mention of use of MK-19 or 40mm rounds at QTR1).

Moreover, Mr. Borne acknowledged his prior claim that 40mm rounds would have less impact than bullets on cultural sites was groundless, since it ignored basic rules of physics.  Id. at 127:20-130:4.  While the velocity of a 40mm round fired from a MK-19 may be 65% that of a 9mm pistol round, the weight of the solid aluminum round is over 30 times greater, resulting in the 40mm projectile hitting cultural sites with over 20 times the force.  See id. at 130:9-14 & Exh. 11; Exh. 73: IET Soldier's Handbook at 6-30, 6-64 (muzzle velocity of M9 is 1,230 feet/second, while MK-19's is 798); Exh. 74: ARDEC Briefing at 5 (M385A1 projectile weighs 245 grams); Exh. 75: TM 43-0001-27 at 12-5 (M882 projectile weighs 112 grains (7.25 grams)).[5]  The photographs attached to Mr. Quitevis' initial declaration vividly illustrate the elevated threat to cultural sites should the Army be allowed to use new weapon systems at QTR1.  See Exhs. 42-44.

The Court should reject the Army's claims it can keep cultural sites safe from harm if allowed to train with .50-caliber rounds and 40mm grenades at QTR1.  While, the Army has asserted in court submissions that its "measures to protect cultural resources … have proven to be effective in protecting cultural

---

[5] The same holds true for rounds with much higher velocities than the 9mm pistol's.  For example, while an M16's bullet has four times the velocity of a MK-19's projectile's, the latter's weight is over 65 times greater, resulting in the MK-19 projectile hitting sites with over 15 times the force.  See IET Soldier's Handbook at 6-12 (M16's muzzle velocity is 3,100 feet/second); TM 43-0001-27 at 10-3 (M193 projectile weighs 56 grains (3.63 grams)).

resources during the transformation process," it has been more candid in out-of-court consultations under the National Historic Preservation Act ("NHPA").  Defs' 11/14/06 Memorandum at 41.  In letters to the State Historic Preservation Officer, the Army has admitted that Stryker-related unexploded ordnance ("UXO") clearance and grading activities had, among other things, broken, scarred and/or moved from their original locations at least three petroglyph boulders and damaged a fourth cultural site.  See Exh. 76: 9/7/06 Section 106 Letter; Exh. 77: 9/19/06 Section 106 Letter; see also 11/14/06 Leimaile Quitevis Dec. ¶18.  Any one of these incidents constitutes significant, permanent injury to cultural resources, which the Army refuses to recognize.

The SDZ maps for QTR1 confirm that .50-caliber rounds and 40mm grenades would blanket known cultural resources if the Army were allowed to conduct proposed training.  See Borne Exhs. 14 & 15.  While the Army tries to downplay the threat, relying on Mr. Borne's statement that an "SDZ is based on a 1 in 10 thousand chance of a round falling off the target but within this zone of danger," at deposition, Mr. Borne clarified that the 1 in 10,000 risk is limited to the narrow ricochet zone on the extreme edges of the SDZ.  11/20/06 Borne Dec. ¶7;

11

see also Borne Deposition at 134:1-136:6 & Exh. 12.[6]  For the rest of the SDZ, Mr.

Borne explained "that's where they expect rounds that didn't hit the target to land,"

resulting in "a high probability [that] those rounds will end up in that area."  Borne

Deposition at 136:17-20; see also id. at 137:11-23.

The threat to cultural sites in the SDZs at QTR1 is not, as the Army would

have it, speculative.  While the Army moved Target 1 at QTR1 so that Site 210 – a

multiple burial site the Army concedes is "significant" – is no longer in the direct

line-of-fire, the site remains within the SDZ of 40mm rounds fired at QTR1.  Exh.

78: 10/24/06 Section 106 Letter at 1.  That the Army's declaration of the site as a

"no fire zone" has done nothing to protect it was evident during the site inspection

on December 1, 2006, when cultural monitor Kamoa Quitevis found 40mm rounds

littering the slope immediately below the graves.  Kamoa Quitevis Supplemental

Dec. ¶12 & Exh. 64.  The absence of physical barriers protecting the site leaves it

vulnerable to damage and desecration from misfired rounds, which the Office of

Hawaiian Affairs ("OHA") has emphasized constitutes grievous cultural harm,

---

[6] Since the Army proposes to fire over 140,000 .50-caliber rounds annually
at QTR1, even a 1-in-10,000 risk adds up to a real danger from even ricochets
hitting cultural sites.  See Oʻahu Biological Assessment at 262.

"[g]iven the spiritual and religious significance of these burials." Exh. 91: 11/22/06 OHA Letter at 1.[7]

The Army's proposed training would threaten numerous other cultural sites at QTR1. Inspection on December 1 revealed that an ancient hearth and burial site immediately adjacent to Target 3, as well as a petroglyph rock and another, currently unevaluated cultural site adjacent to Target 4, lie completely unprotected, vulnerable to any stray round. Kamoa Quitevis Supplemental Dec. ¶¶13-14. The Army's assertion it would not allow shooting at these targets until site protection is in place misses the point; as long as the sites lie within the SDZs of rounds fired at other targets, they are at risk. Id. at ¶13.

In addition to the aforementioned sites, numerous currently undocumented and unprotected sites are found in the SDZs, including those located during the abbreviated survey of the Schofield Barracks Battle Area Complex ("BAX") in October 2006. 11/14/06 Leimaile Quitevis Dec. ¶¶21-22.[8] While the Army would

---

[7] Experience has shown that, despite the Army's assurances, rounds fired during training often fall far from the mark, threatening cultural sites. See generally Ailā Dec.; Exh. 79: Dodge Dec.; Exh. 80: 4/12/04 Army Memorandum; Exh. 81: Defs' 1st Supplemental Responses in Mālama Mākua v. Rumsfeld at 5-7. It is training, after all.

[8] In the course of discovery, the Army has argued that, merely because it is not seeking leave to construct the Schofield BAX, cultural resources located in that area would not be affected by the proposed Stryker-related activities. This is inaccurate. Much of QTR1, including Targets 3, 4, and 5, overlaps with the BAX,

have the Court believe these areas cannot be surveyed due to safety concerns, both

Army archaeologists and cultural monitors have been allowed to enter these

gulches when accompanied by an unexploded ordnance technician. Kamoa

Quitevis Supplemental Dec. ¶¶16-17.

At a minimum, unless and until the Court receives written concurrence from

the parties to the PA that the Army has fully complied with its obligations to

identify and evaluate all cultural properties within the SDZs of .50-caliber rounds

or 40mm grenades at QTR1 and to develop and implement appropriate site

protection in consultation with the parties to the PA and Native Hawaiians, the

injunction on firing such ammunition at QTR1 must stay in place to prevent

violations of NEPA's prohibition on adverse impacts. See AR-S 53073-77.[9] In the

meantime, the 2nd Brigade can carry out much of the proposed gunnery practice in

---

and these overlapping areas contain both documented and undocumented cultural
sites, including burials. Kamoa Quitevis Supplemental Dec. ¶18. Furthermore, as
the Army's SDZ diagrams confirm, rounds fired during live-fire training at QTR1
land in the BAX. See, e.g., Borne Exhs. 14-15. Thus, if allowed to proceed, the
proposed training would impact cultural resources in the BAX.

[9] Regardless of how the Court rules following the December 18 hearing,
almost no Stryker-related training will take place before the beginning of January,
as the entire 2nd Brigade (with the exception of key leaders) will be on vacation.
Exh. 82: Banach Deposition at 41:5-42:14 & Exh. 1 at 2. The Army could – and
should – use that time to come into compliance with the PA. Currently, it has laid
off all its cultural monitors, precluding compliance with its obligations under the
PA. Kamoa Quitevis Supplemental Dec. ¶20.

compliance with Army training doctrine by using either the Multiple Integrated Laser Engagement System ("MILES") or the Stryker vehicle's embedded trainer, neither of which threatens adverse impacts. Banach Deposition at 143:13-15, 146:12-24, 152:5-17 & Exh. 3 at 9-10, 27-28.

B.     Use of the Urban Assault Course.

Proposed training at the UAC would significantly increase the number of 40mm grenade rounds fired relative to usage at the MOUT Assault Course it replaces. See Oʻahu Biological Assessment at 259; Defs' Responses at 25-30; Defs' 2nd Response at 15. As described above, these additional rounds pose substantial threats to any cultural sites lying within the SDZ. See Borne Exh. 16. Accordingly, to avoid adverse impacts, use of the UAC should be conditioned on written concurrence from all parties to the PA that the Army has ensured all sites within the SDZs have been identified, evaluated and protected. See Kamoa Quitevis Supplemental Dec. ¶10 (undocumented sites adjacent to UAC). Since construction of the UAC will not be complete until sometime in the latter part of the summer of 2007, the Army has adequate time to comply with its obligations under the PA. See Borne Deposition at 110:2-112:16.

C.    <u>Maneuver Exercises at East Range and KTA.</u>

The Army seeks leave to carry out non-live-fire maneuver exercises with Stryker vehicles at both Schofield Barracks East Range and Kahuku Training Area ("KTA").  At East Range, the Army proposes to conduct drivers training on pre-existing dirt roads, as well as in three off-road locations.  <u>See</u> Defs' 1st Supplemental Response at 9; Borne Deposition at 19:2-24:23 & Exh. 2.  At KTA, the Army would like to conduct various maneuver exercises, which would go off-road in portions of training areas A1, B2, and C1.  <u>See</u> Defs' 1st Supplemental Response at 4-9; Borne Deposition at 26:5-27:18 & Exhs. 3A & 3B.

1.    <i>Impacts from Soil Loss and Water Pollution.</i>

To evaluate the Army's request, the Hawaiian Groups retained Andrew Hood, a hydrologist with expertise in surface and groundwater hydrology, water resources engineering, fluvial geomorphology, and erosion control.  <u>See</u> Hood Dec. ¶¶1-4 & Exh. 57.  Following site visits on November 30 and December 1, 2006, Mr. Hood concluded that, "due to the absence of adequate [best management practices ("BMPs")], allowing the Army to proceed with Stryker maneuvers and drivers training on the roads and off-road maneuver areas at KTA and East Range would cause environmental damage above and beyond that associated with non-Stryker exercises, due to both irreparable soil loss and the discharge of polluted

stormwater to streams that discharge into receiving water bodies that already exceed acceptable levels of turbidity." Id. at ¶7. Specifically, the on-site inspections revealed the absence of any meaningful BMPs on the road network at KTA, while the few BMPs observed on roads at East Range were either improperly installed, inadequately sized, or inadequate in number to prevent erosion and polluted runoff from flowing into streams. Id. at ¶10. The proposed off-road maneuver areas had no mitigation measures in place whatsoever. Id. at ¶11.

If allowed to proceed, the substantial increase in use associated with maneuver training and drivers training with Stryker vehicles would greatly increase and accelerate erosion by removing protective ground cover which would increase soil vulnerability to detachment and increase overland flows. Id. at ¶12. Mr. Hood concurred with the SEIS's conclusions that Stryker training would degrade land at East Range and KTA from its current borderline mild/moderate condition to severe. Id.; see also Exh. 83: AR-S 53305, 53307.

The increased erosion from proposed Stryker training at East Range and KTA would cause significant harm in the form of soil loss that, for all practical purposes, is irreparable, since the tons of lost soil could be replaced only in

geologic time.  Hood Dec. ¶13.  In its SEIS, the Army acknowledged that these impacts would be "significant."  AR-S 51696, 52016.

In addition, Stryker maneuver training at East Range and KTA would generate sediment-polluted runoff that would harm water quality in the streams flowing through these ranges and the water bodies receiving these flows.  Hood Dec. ¶13.  In East Range, Stryker-generated pollution would flow through the stream courses into either Waikele Stream or Kaiaka Bay, both of which are listed as impaired waters for turbidity under the federal Clean Water Act § 303(d), with Kaiaka Bay also listed as impaired for suspended solids.  At KTA, polluted runoff would reach Kawela Bay, which is listed on Hawai'i's 303(d) list as impaired for turbidity.

The aforementioned environmental degradation could be avoided only if, prior to conducting Stryker maneuvers, the Army first addresses the current lack of adequate BMPs for the roads and off-road maneuver areas at East Range and KTA. Id. at ¶14.  In the limited time allowed for discovery, the Hawaiian Groups did not have the opportunity to develop a comprehensive erosion control plan for these ranges.  However, it is feasible to develop such a plan, which, if implemented, could avoid the most significant of the environmental harm that would otherwise result from Stryker training.

18

To avoid violating NEPA's limitations on activities pending compliance with Congress's commands, no Stryker maneuver training at East Range or KTA should be allowed until the Army implements adequate BMPs at those ranges.[10] Moreover, to ensure BMPs are properly installed and sized, as well as adequate in number, to control erosion and runoff, the Court should not simply instruct the Army to construct adequate BMPs prior to carrying out proposed maneuver training.  See Hood Dec. ¶10.  Rather, it should order the Army to submit for review and approval a comprehensive erosion control plan and, following approval, provide for independent inspection of the plan's implementation.

> 2.    Impacts to Cultural Resources.

The Army's proposed maneuver training also threatens irreparable harm to cultural resources.  During the site visits to East Range and KTA, none of the Army personnel, which included individuals involved in management of those ranges, were able to identify which of the vaguely defined off-road maneuver areas – denominated on the Army's maps as "Go" areas – the Army sought to use for training.  Kamoa Quitevis Supplemental Dec. ¶5.  In addition, in the field, there was no way to determine with any precision where these "Go" areas were located,

---

[10] The same limitation should apply to any use by Strykers of roads at East Range associated with vehicle maintenance.  See Banach Deposition at 45:5-50:6.

as there were no boundary markers or any other demarcation of where Strykers would, and would not, be permitted to go.  Indeed, at KTA, the Army escorts often had difficulty figuring out where the "Go" areas were supposed to be, as some of the areas marked as "Go" on the maps included steep stream valleys where Strykers clearly could not maneuver.

Unless the Army delineates precisely the boundaries of the "Go" areas, allowing off-road maneuvers threatens to destroy cultural sites.  For example, training area A1 at KTA contains large, ill-defined "Go" areas that extend toward the pali (mountainside), including places where the Army has identified numerous cultural sites, including a rock shelter (site 5536) and agricultural terraces and habitation sites (sites 5539 and 5540).  Compare Borne Exhs. 3A & 3B with Exh. 63 (showing locations of archaeological sites at KTA in or within 50 meters of "Go" areas); see also AR-S 27981.  In addition to these known sites, given the high concentration of cultural resources, it is likely that, as elsewhere, the Army's archaeologists have failed to identify and document additional cultural sites in the "Go" areas.

The absence of any clear demarcation of the limits of the "Go" areas and the Army's failure to identify and clearly mark the cultural sites located in, or immediately next to, those areas create a substantial risk that Strykers traveling off-

road, including those that simply pull off the roads to park, will roll right over

cultural sites, causing irreparable harm.  Kamoa Quitevis Supplemental Dec. ¶¶6-8;

see also AR-S 27981, 51526.  Even where Strykers do not directly harm cultural

sites, the proposed maneuver training could do so by causing soil erosion and

runoff that can destabilize and damage the sites.  AR-S 51757, 52067.  To avoid

these harms, before any off-road maneuvers occur, the Army must clearly define

the boundaries of the "Go" areas and ensure all the cultural resources within these

boundaries are identified, flagged, and protected.

D.    Construction and Use of the Multiple Deployment Facility.

The Army seeks permission to complete construction of, and subsequently

use, the Multiple Deployment Facility ("MDF").  While questions remain whether

the MDF is truly "critical," given the existence of an interim deployment facility,

they conclude, the information currently available indicates the project could

proceed without violating NEPA if the Court requires adequate stormwater BMPs

and prohibits the Army from installing any heavy vehicle scales.

The Hawaiian Groups' inspection of the MDF revealed the few stormwater

BMPs present were improperly installed and visibly failing.  Hood Dec. ¶21.  For

example, a series of what were supposed to be sediment detention basins along the

west side of the facility were improperly designed to perform their intended

21

function of slowing down flows and capturing sediments and other pollutants. Before any use of the MDF is authorized, these detention basins must be modified and made functional. Otherwise, pollutants generated by deploying vehicles, ammunition, and soldiers will flow unhindered though the outflow into the adjacent stream. In addition, the Army must cease stockpiling excess dirt from the MDF at the foot of the scarp to the immediate east of the facility, unless and until it installs adequate BMPs to prevent the stockpile from eroding down into the natural drainage, polluting the stream that runs by the MDF. Id. ¶24.[11]

To ensure the objectivity of the Army's consideration of alternate stationing locations, the Court should prohibit the Army from spending over $1.1 million to install heavy vehicle scales, which would be needed only if the Army ultimately decides to station the Stryker brigade in Hawai'i. See Exh. 84: 12/6/06 Katkow Email at 2-3; 11/13/06 Borne Dec. ¶6(b)(v) (scales needed for "vehicle centric-unit like the SBCT"). Prior to complying with NEPA, the Army could still deploy the 2nd Brigade from the MDF using improvised scales, which would not cause any demonstrable harm. 11/13/06 Borne Dec. ¶6(b)(v). Particularly since the absence of permanent heavy vehicle scales from the MDF would not imperil soldiers' lives,

---

[11] While the Army claims it intended this stockpiling of dirt to protect a cultural site – Maunauna – threatened by the cliff's erosion, given the height of the scarp, stockpiling the relatively small amount of spoils from the MDF does nothing to protect the site. Id.

there is no justification for allowing the Army to commit further to Stryker

conversion in Hawai'i.[12]

      E.    <u>Training at PTA Ranges 1 and 10.</u>

As part of proposed training at Pōhakuloa Training Area ("PTA"), the Army

seeks leave to conduct live-fire training at Ranges 1 and 10 that would dramatically

increase the number of tracer rounds fired.  Defs' Response at 13, 16-17; Exh. 52:

Hawai'i Island Biological Assessment at 61, 63 (number of tracers would increase

by over 4,700).  The Army's own analyses establish that tracers have a "high" fire

ignition potential; indeed, they are the leading cause of fires at PTA.  Exh. 53:

Analysis of Fire History and Management Concerns at PTA at 16-17.[13]  By

increasing the number of tracers fired at Ranges 1 and 10 (and, thus, the abundance

of ignition sources), the proposed training would increase the incidence of fires,

any one of which could destroy endangered species and unique native ecosystems.

---

[12] Notably, in his declaration, Mr. Borne had claimed that, to protect soldiers, the Army needed to install munitions loading pads designed specifically for Strykers.  <u>Id.</u>  This claim has proved inaccurate.  During discovery, the Army confirmed that new munitions pads had been deleted from the MDF's plans, as the existing pads would be adequate.  Katkow Email at 3.

[13] Of course, just because a type of ammunition has a "low" fire ignition potential does not mean biological resources are safe.  <u>See, e.g.,</u> Exh. 85: 4/4/03 Review of Draft Biological Assessment (noting 310-acre fire at Kawailoa Training Area from blank ammunition, which is "treated as a low fire risk").

Castillo Dec. ¶21; see also id. at ¶19 (noting large pockets of fire-promoting fountain grass at Range 10).

Even if the Army's Integrated Wildland Fire Management Plan ("IWFMP") were fully funded and implemented (by no means a given), it could not ensure against catastrophic harm to listed species and PTA's unique ecosystems, since both existing and proposed measures to manage and reduce wildfire risk are too narrow in scope and inadequate in scale to succeed. Id. at ¶¶12, 26-29.[14] Because of the vulnerability to fire of PTA's ecosystems, as well as the inevitability of human error, the U.S. Fish and Wildlife Service ("FWS") concluded in its Biological Opinion that, "full control of fires [at PTA] is not possible, even with precautions and restrictions in place," and "the fire risk, as stated in the Transformation Biological Assessment, is underestimated and the Service believes the risks to all species and habitats is higher than the Army has indicated." AR-S 24197. To avoid adverse impacts above the baseline associated with training normally conducted at PTA, use of tracers at Ranges 1 and 10 must be limited to pre-Stryker quantities.

---

[14] FWS has identified habitat at PTA as essential for the conservation of ten federally listed plant species, as well as the endangered palila. 67 Fed. Reg. 36,968, 37,061 (May 28, 2002); AR-S 52248.

F.    <u>Training with Mortars at PTA.</u>

As with tracers, the Army's proposal to increase the number of mortars fired at PTA by nearly 4,800 – and particularly the increase by nearly 1,200 in the number of illumination and white phosphorus rounds, which have a "high" fire ignition potential – substantially increases threats to federally listed species and rare native habitat.  Defs' Response at 17; Hawai'i Island Biological Assessment at 13, 66.  In evaluating the effects of Stryker conversion, FWS singled out the increase in the use of mortar ammunition as "increasing the risk of fire in the areas where endangered plant species occur."  AR-S 24474.  To avoid violating NEPA, the Army should be required to limit its use of mortars to pre-Stryker levels.  120mm mortars, which were not previously used at PTA, should be completely prohibited.  <u>See</u> Hawai'i Island Biological Assessment at 66; AR-S 51326 (noting "addition of … the 120mm mortar" to the current force).

IV.    ACTIVITIES THAT CANNOT PROCEED WITHOUT VIOLATING NEPA'S PROHIBITIONS

Due to unavoidable, adverse environmental impacts and/or because proceeding with the actions would skew the Army's consideration of stationing alternatives, the following activities cannot proceed without violating 40 C.F.R. § 1506.1(a)'s limitations.

25

A.    Mobile Gun System Training at Range 11T and Associated
      Construction.

In order to train a variant of the Stryker vehicle known as the Mobile Gun

System ("MGS"), the Army seeks to build a temporary facility at PTA's Range

11T.  11/13/06 Borne Dec. ¶4.  Range construction would involve installing

twenty-nine stationary infantry targets, eight stationary armored targets, and two

moving armored targets.  Exh. 86: IPR for Range 11T Upgrades.   In addition, a

D9 bulldozer would "scrape and move lava from the surrounding area of the …

moving armor target berms," pushing 13,000 cubic yards of crushed lava to protect

the targets from the MGS's 105mm rounds.  Borne Exh. 19 at 6.  Following range

construction, the Army would conduct live-fire training with the MGS.   Defs'

Response at 17; Borne Deposition at 164:3-168:4 & Exh. 18 (Tables I-VIII would

be fired at PTA).

Both constructing the temporary facility and live-fire training would threaten

irreparable harm to cultural resources.  The range construction, including

bulldozing 13,000 cubic yards of "softened" lava would occur in an area almost

entirely occupied by a pre-contact Hawaiian excavated pit complex (Site 23621),

which is "considered potentially eligible for listing in the National Register of

Historic Places." AR-S 66173; see also AR-S 66054, 66062.[15] Since the dimensions of this vast complex are "[u]nknown" due to the Army's failure to complete surveys of the SDZ for proposed training at Range 11T, the Army's assurances the site would be spared by bulldozing and target emplacement are baseless. AR-S 66062; see also Borne Exh. 19 at 7. Instead, as the SEIS concedes, construction at Range 11T – which is located within the BAX footprint – could cause "site destruction or damage," a "significant" impact. AR-S 52293.

The proposed MGS training would likewise threaten cultural sites. The REC acknowledges the Army was unable to adjust the SDZs to avoid all known cultural sites. Borne Exh. 19 at 6 ("Surface Danger Area for this range overlays a number of cultural resources in the impact area"), 7 (noting complete avoidance not possible); see also Exh. 87: Map showing cultural resources in Range 11T SDZs. Since sites are immediately behind and adjacent to MGS targets, assuring the protection of cultural resources like Sites 23621 and 23626 would be impossible. AR-S 52293 (live-fire at PTA "could damage [cultural] resources from direct impacts of munitions"); see, e.g., Borne Deposition at 170:3-172:22 &

---

[15] The map included with the Army's Record of Environmental Consideration ("REC") shows the location of a "pahoehoe excavation" – one of this site's recorded features – immediately behind the 180m moving target berm, with a "cave site" (presumably Site 23626) nearby. Borne Exh. 19 at 10.

Exh. 19 at 42, 44 (MGS firing canister round would blanket SDZ with

projectiles).[16]

Firing thousands of 105mm rounds at Range 11T would also increase the

potential for ammunition to miss targeted areas, increasing areas where impacts –

including catastrophic wildfires – are likely to occur.  Castillo Dec. ¶22; see also

AR-S 24474 (MGS's "direct gunnery" increases threats to endangered plants).[17]

One need only compare the map of areas of high fire vulnerability at PTA with the

enormous SDZ for proposed training at Range 11T to realize the significant threat

of catastrophic wildfires posed by MGS training.  Compare Hawai'i Island

Biological Assessment at Fig. 17 with Exh. 54: Map showing biological resources

in Range 11T SDZs.[18]

The only way to avoid adverse environmental impacts beyond those of non-

Stryker training at PTA is to prohibit use of the MGS and modifications of Range

_____

[16] While the Army could reduce the training-related threats by conducting
most of the MGS exercises with blanks, the culminating qualification event (Table
VIII) must be fired with live rounds.  See Borne Exh. 18 at 8-9, 16, 20.

[17] The mere fact that, decades ago, tanks firing 105mm rounds used Range
11T does not, as the Army alleges, disprove claims the MGS's use of Range 11T
would threaten substantial harm to biological resources at PTA.  Castillo Dec.
¶¶31-32.

[18] Even when MGS training did not itself ignite fires at PTA, it would
increase fire threats by breaking down currently barren lava, creating favorable
habitat for fire-inducing fountain grass to spread.  Castillo Dec. ¶25.

11T.  Even were section 1506.1(a)'s prohibition not absolute, the Army has failed to prove the MGS is an essential element of a functioning Stryker brigade.  The MGS is an experimental weapon system undergoing its first field trials.  Banach Deposition at 79:14-80:20, 160:7-17.  The Army may well conclude the MGS is not yet ready for general fielding, and the 2nd Brigade would not receive any prior to deployment.  By the time the Army knows the MGS's fate, the damage to cultural sites from Range 11T construction would already be done.

Furthermore, the Army has failed to establish the 2nd Brigade could not function effectively as a Stryker unit without the MGS.  None of the Stryker brigades deployed to date, whose performance the Army lauds, had MGSs, and all were able to perform their missions successfully.  More tellingly, of the seven Stryker brigades currently in the Army's deployment schedule, four – including brigades already functioning as Stryker units – are not slated to receive MGSs until after their next deployment.  Id. at 76:3-17, 82:9-85:10 & Exh. 2.  The Army simply cannot claim the 2nd Brigade cannot function in combat without the MGS if these other brigades can.  Finally, since the limiting factor on the MGS's fielding is the ability of the "industrial base" to produce them, if the 2nd Brigade cannot train with MGSs in Hawai'i (and cannot find alternate locations to train), it simply means another Stryker brigade will get its complement of MGSs sooner.  Id. at

76:11-77:21.[19]  There would be no net change in the forces available for the Army

to deploy, obviating any possible harm to national security.

        B.     <u>Maneuver Live-Fire Exercises at PTA Range 8.</u>

      The Army seeks to alter training at Range 8 from its current use – soldiers

firing at targets from static firing points immediately adjacent to the Redleg Trail,

the main road along the eastern side of PTA – to maneuver live-fire training with

Stryker vehicles.  Castillo Dec. ¶24.  Under the Army's proposal, Strykers would

travel downrange and laterally along the target maintenance roads, firing at targets

as they go.  Defs' Response at 13, 16-17; Defs' 2nd Response at 9.  Such training

would pose significant risks to endangered species and native habitat far beyond

those associated with pre-Stryker activities.

      Even if Stryker vehicles did not crush any of the threatened *Silene*

*hawaiiense* that are found along the maintenance roads, the proposed training

would increase the area affected by the range's use, including nearby areas to the

sides of the range that previously were not in the line of fire.  Castillo Dec. ¶24.

The proposed Stryker training would also create a larger ignition zone surrounding

Range 8.  Coupled with the continued fountain grass spread throughout this region,

---

[19] The Army has failed to make any inquiries to see if the 2nd Brigade could
train with the MGS elsewhere.  <u>Id.</u> at 234:3-13.

the potential for training-related fires at Range 8 – one of the most fire-prone ranges at PTA – would increase markedly.  Id. at ¶¶21, 24.

      C.    Use of Unmanned Aerial Vehicles.

During discovery, the Hawaiian Groups learned the Army continues to use unmanned aerial vehicles ("UAVs") in connection with the 2nd Brigade's training. Kamoa Quitevis Supplemental Dec. ¶15.  The use of UAVs, a new form of reconnaissance training associated with Stryker conversion, threatens significant harm to native habitat and listed species.  AR-S 51325-26.  The Army's own studies demonstrate that both mechanical failures and human error render UAVs extremely crash-prone, with over 150 mishaps for every 100,000 miles flown, an accident rate many times that of traditional, manned Army aircraft.  Exh. 88: Army Manned & Unmanned Accident Data (manned aircraft have only about 25 mishaps per 100,000 miles); Exh. 89: FLIGHT fax at 4.  When UAVs crash, they can burst into flames, igniting wildfires.  Exh. 90: FY 2004-2007 UAV post-crash fires.

The SEIS acknowledges that fires sparked by downed UAVs can cause significant adverse impacts to biological resources.  AR-S 51725-26.  Thus, use of UAVs must be enjoined pending the Army's compliance with NEPA.

D.   Construction and Operation of the Schofield Barracks Motor Pool.

The Army seeks approval to spend nearly $44 million to complete construction of the Schofield Barracks Motor Pool.  Exh. 5: 10/22/06 Kawasaki Dec. ¶6(c), (e)  The alleged need for this costly project is to speed repair of vehicles returning from NTC.  Borne Deposition at 71:3-72:1.  Completing the Motor Pool will also allegedly ensure adequate parking during the brief overlap between the 3rd Brigade's return from Iraq in July 2007 and the 2nd Brigade's deployment for NTC the following month.  See id. at 72:3-73:8; Banach Deposition at 98:16-99:10& Exh. 1 at 3.

The record does not, however, support the Army's claims.  The only vehicles definitely returning from NTC will not be deploying with the brigade in early 2008.  Rather, Stryker vehicles may well deploy directly from NTC, while non-Stryker vehicles returning to Hawai'i will not deploy with the brigade.  Borne Deposition at 85:1-24; Banach Deposition at 94:25-95:14.  Instead, the 2nd Brigade would pick up armored versions of non-Stryker vehicles in theater.  Banach Deposition at 95:15-18, 97:8-15.  There is, therefore, no demonstrated need for speed in performing maintenance on vehicles returning from NTC, and, even if there were, the Army could establish temporary maintenance facilities at a fraction of the cost of the Motor Pool, which would not be needed should the Army decide

to station its Stryker brigade elsewhere.  Borne Deposition at 91:2-12, 100:15-101:15; see also 11/8/06 Banach Dec. ¶6(b) (Stryker brigade has "five-fold increase in motor pool facilities and weapons and equipment storage requirements"); 11/13/06 Brandenburg Dec. ¶12 ("facility provides the space required for the SBCT").

As for the alleged, short-term parking shortage, the Army has not proved it could not make up for any shortfall via interim facilities or by providing better security at the facilities it already has.  Borne Deposition at 73:9-74:8, 97:9-16. Alternatively, if there were a pressing, short-term need for parking, the 2nd Brigade could simply park its vehicles on the compacted gravel.  Id. at 96:7-18; Hood Dec. ¶19.  Allowing the Army to spend tens of millions on the Motor Pool before it has made a lawful decision to bring a Stryker brigade to Hawai'i would improperly forge "a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues."  Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir. 1989) (quoting Commonwealth of Massachusetts v. Watt, 716 F.2d 946, 952 (1st Cir. 1983)) (Breyer, J.); see also Environmental Defense Fund v. Andrus, 596 F.2d 848, 853 (9th Cir. 1979) ("After major investment of both time and money, it is likely that more environmental harm will be tolerated").

33

Allowing the Army to complete the Motor Pool would also cause adverse environmental impacts. When completed, the Motor Pool would include approximately thirty-four acres of hardened parking areas. AR-S 52696. Creating this large, impervious surface would significantly increase stormwater runoff from the Motor Pool area, and the Army's construction plans lack adequate BMPs to compensate. Hood Dec. ¶15. The resulting rapid discharges of high volumes of water into the neighboring natural stream channels would cause severe degradation to stream ecosystems, including sediment pollution in the streams and the water bodies into which they flow. Id. ¶16.

Moreover, use of the Motor Pool by the more than 1,000 vehicles associated with the Stryker brigade would invariably produce pollutants such as dirt and mud, oil and grease, and tire wear, which would be mobilized and transported during rain events. Id. ¶17. Stormwater flows would wash this pollution directly into neighboring streams, contaminating them and the downstream waters into which they flow. These adverse impacts on water quality are inevitable, since the Army's construction plans – contrary to the standard practice for such projects – fail to provide any mechanism to capture and separate the pollutants from the stormwater flows. Id.

In contrast, leaving the facility in its current unfinished state would pose no significant erosion concerns.  Id. ¶18.  Most of the proposed parking areas are now graveled, which allows rainfall to percolate safely into the ground.  See Exh. 60.  Even where the proposed parking areas are still dirt, the generally gentle grade of the area does not lend the area to significant erosion, and inspection revealed no signs of such erosion.  Hood Dec. ¶18.  Moreover, the silt fences currently encircling the construction site should contain on-site any minor erosion that might result from stormwater flows in the area's current state.  Id.  Even if the Army were allowed to park vehicles in the Motor Pool area, it would be environmentally preferable to park them on the compacted soils and gravel of the unfinished Motor Pool, rather than on the hardened surfaces the Army proposes.  Id. ¶19.

To permit an objective analysis of where the Army should station the Stryker brigade and to prevent adverse environmental impacts, the Court should not allow the Motor Pool project to proceed.

## V.     THE 2ND BRIGADE CAN CONDUCT STRYKER-RELATED ACTIVITIES ELSEWHERE

Should the Army feel the need to conduct Stryker-related activities that cannot, consistent with NEPA, currently take place in Hawai'i, there are many

alternate locations available.[20]  The Army has identified at least four facilities that can support Stryker-specific training:  Fort Richardson/Fort Wainwright, Alaska; Fort Lewis, Washington State; the NTC; and Fort Polk, Louisiana.  Defs' 2nd Response at 48.  In addition, it has provided no valid reason why the 2nd Brigade could not conduct Stryker exercises at facilities that host armored units:  Fort Hood, Texas; Fort Bliss, Texas; Fort Carson, Colorado; Fort Riley, Kansas; and Fort Stewart, Georgia.  Borne Deposition at 177:3-181:16, 182:7-183:5.[21]  The Army cannot credibly claim the 2nd Brigade could not train at these facilities, since no efforts have been made to secure training opportunities.  Defs' 2nd Response at 50; see also Banach Deposition at 211:18-212:15.

---

[20] Significantly, even though the Army has insisted that training the 2nd Brigade as an infantry unit is out of the question, many of the brigade's soldiers have deployed in the past year to perform non-Stryker duties, including hundreds of soldiers who had no difficulty integrating into the 3rd Brigade, which is an Infantry Brigade Combat Team ("IBCT").  Banach Deposition at 11:10-14:25, 19:7-15.  Indeed, Army contingency plans include the option of training the 2nd Brigade as an IBCT.  Id. at 208:2-209:10, 217:9-25 & Exh. 5 at 11-13.

[21] The stated reason – that these facilities have not completed a NEPA document for Stryker training – ignores the lack of a valid EIS for the Stryker activities the Army seeks to conduct in Hawai'i.  Id. at 181:1-3.  Moreover, the Army has never bothered to determine whether Stryker training would have any greater impact than training with armored units, an unlikely proposition.  Id. at 178:12-19.  If not, there would be no need to prepare a supplemental NEPA document other than, perhaps, a brief Record of Environmental Consideration.

Had inquiries been made, the Army undoubtedly could have found alternate locations for Stryker training. See Banach Deposition at 91:4-92:6 (discussing flexibility in NTC scheduling to meet needs of deploying units).[22] Fort Lewis, which has facilities for three Stryker brigades, clearly has room for 2nd Brigade training. See Exh. 92: Fort Lewis Command Briefing at 11. With the 2nd Cavalry's recent transfer to Germany and the current deployment of the 2nd Division's 3rd Brigade, only one Stryker brigade – the 2nd Division's 4th Brigade – is currently at Fort Lewis. Id.; Exh. 33: 9/18/06 Army Press Release. The latter unit is scheduled to deploy in May 2007, a full month before the 3rd Brigade returns to Fort Lewis. Borne Exh. 21; Banach Exh. 2; Exh. 93: 11/17/06 Press Release. At no time between now and when the 2nd Brigade is expected to deploy in early 2008 will Fort Lewis have its full complement of Stryker brigades.

The Army's assertion that the formation of a seventh Stryker brigade at Fort Lewis would preclude the 2nd Brigade from training there ignores the lack of any overlap between the two units' training needs. As the Army has emphasized to the

---

[22] The Army estimates it would take only two weeks to restation the 2nd Brigade. Defs' 2nd Response at 53. Even if relocation were to delay the 2nd Brigade's conversion, there is no credible evidence such a minor delay would cause any material harm. Indeed, given the inevitable delays associated with litigation, it is unclear whether the 2nd Brigade would be able to meet its November 1, 2007 deadline to be deployable as a Stryker brigade, even absent any future restrictions on training in Hawai'i. Banach Deposition at 179:19-180:13.

Court, the 2nd Brigade is already more than a year into its Stryker conversion.

Borne Deposition at 187:17-189:10 & Exh. 21.  In contrast, the 7th Stryker brigade

will not even formally "stand up" until April 2007, more than three months from

now, and is not scheduled to begin training with Stryker vehicles until sometime in

October 2007, when the 2nd Brigade will already be at NTC.  Id. at 198:21-200:1 &

Exh. 21; Defs' 2nd Response at 60.  There is no evidence Fort Lewis could not

accommodate both units' training needs at the same time.  Indeed, the Army has

never seriously inquired whether any conflict actually exists.  Borne Deposition at

200:13-201:12.

  That is not to say the 2nd Brigade has not considered its options, should the

Army's NEPA violations preclude Stryker-related training in Hawai'i.  In a

briefing prepared just before the November 20, 2006 status conference, the 2nd

Brigade's commander, Colonel Banach, under instructions from Major General

Brandenburg, outlined several possible courses of action, including two that

involved restationing the 2nd Brigade to undergo Stryker conversion at Fort Lewis.

Banach Deposition at 195:5-196:23, 199:18-201:7, 207:5-208:24 & Exh. 5 at 2-9.

Both options – one with training at Fort Lewis beginning in November 2006 and

the other with training beginning in January 2007 – would achieve the 2nd

Brigade's conversion to a Stryker brigade on schedule, by November 2007.

The Army then made a conscious decision not to pursue the first course of action, which would have required a decision to be made by November 15, 2006, because it did not want to run the "[r]isk of forcing the Court's hand by demonstrating early action to move off Hawaii." Banach Exh. 5 at 21; see also id. ("Mitigate risk by waiting for 15 Dec"). Or, as Colonel Banach put it, "[w]e would have not ever had a chance to win the court case here in Hawai'i if we had taken that approach." Banach Deposition at 230:6-8. The second option for conducting all Stryker training in Hawai'i is still available.

VI.    THE COURT SHOULD SET A HEARING TO CONSIDER SETTING
       ASIDE THE ARMY'S ACQUISITIONS OF LAND FOR STRYKER
       CONVERSION IN HAWAI'I

In responding to discovery, the Army confirmed it has no present need to use any part of the WPAA. Borne Deposition at 29:15-30:4. Similarly, other than activities associated with the Motor Pool (to which the Hawaiian Groups object), the Army has not claimed any urgent need for Stryker activities in the SRAA. The Hawaiian Groups respectfully ask the Court to set a hearing to consider whether it should exercise its equitable discretion to set aside any aspect of these land acquisitions pending NEPA compliance. See, e.g., Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 804, 814-15 (9th Cir. 1999) (in NEPA case, court authorized to set aside agency's acquisition of over 32,000 acres); Desert

Citizens Against Pollution v. Bisson, 231 F.3d 1172, 1175, 1187-88 (9th Cir. 2000)

(setting aside agency's acquisition of over 2,600 acres).[23]


      DATED:   Honolulu, Hawai'i, December 14, 2006.

                     EARTHJUSTICE
                     David L. Henkin
                     Isaac H. Moriwake
                     223 South King Street, Suite 400
                     Honolulu, Hawai'i 96813

            By:   /s/ David L. Henkin
                     DAVID L. HENKIN
                     ISAAC H. MORIWAKE
                     Attorneys for Plaintiffs

---

[23] The Army's arguments to Magistrate Judge Kurren about the Quiet Title Act confuse the Hawaiian Groups' request to set aside the land purchases as an equitable matter with a challenge to the government's legal authority to acquire land.  In the Ninth Circuit, this Court's equitable discretion to set aside the government's acquisition of land once a NEPA violation is found is well-established.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| ʻĪLIOʻULAOKALANI COALITION, a Hawaiʻi nonprofit corporation; NĀ ʻIMI PONO, a Hawaiʻi unincorporated association; and KĪPUKA, a Hawaiʻi unincorporated association,<br><br>    Plaintiffs,<br><br>  v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army,<br><br>    Defendants. | CIVIL NO. 04-00502 DAE BMK<br><br>CERTIFICATE OF COMPLIANCE |

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.5(e), I certify that the foregoing brief is set in a proportionally spaced 14-point font (Hawaiian version of Times New Roman) and contains 8,980 words, exclusive of the caption and signature block. I have relied upon Microsoft Word to determine the word count.

DATED: Honolulu, Hawaiʻi, December 14, 2006.

        /s/ David L. Henkin
        DAVID L. HENKIN
        Attorney for Plaintiffs