DAVID L. HENKIN          #6876
ISAAC H. MORIWAKE        #7141
EARTHJUSTICE
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: dhenkin@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| 'ĪLIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NĀ 'IMI PONO, a Hawai'i unincorporated association; and KĪPUKA, a Hawai'i unincorporated association,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army,<br><br>Defendants. | Civil No. 04-00502 DAE BMK<br><br>DECLARATION OF WILLIAM AILĀ, JR.; EXHIBITS "45"- "47" |

## DECLARATION OF WILLIAM AILĀ, JR

I, WILLIAM AILĀ, JR., declare under penalty of perjury that:

1. I am a resident of Wai'anae, O'ahu. If called as a witness, I could and would testify competently to the matters set forth herein.

2. On October 18, 2001, I participated as a civilian observer of the first live-fire exercise at Mākua Military Reservation ("MMR") since September 1998, when a mortar round fired by U.S. Marines training at MMR landed outside the firebreak road, starting a blaze that burned about 800 acres.

3. As a life-long Wai'anae Coast resident and native Hawaiian with family and cultural ties to Mākua, I have always been concerned about the impacts of military training on the cultural and biological treasures found there. Following the disastrous September 1998 fire, I attended several public meetings called by the Army at which Army officials repeatedly assured me and other Wai'anae Coast residents that the same type of fire could never happen again, as the Army had taken all necessary precautions to ensure that, in the future, all mortar rounds would stay within the firebreak road.

4. On October 18, 2001, I watched from the Range Control observation tower as mortars were fired at MMR for the first time in more than three years. At around 7 a.m., just after the third mortar was fired, I saw a puff of smoke outside the impact area, just to the north of the south firebreak road, near "C-Ridge" (the ridge separating Mākua Valley from Kahanahāiki Valley, where the Marines

started the September 1998 fire). I immediately reported my observation to MMR's Range Control, since it appeared to me that the third mortar round had landed outside the firebreak road.

5. Initially, the Army vigorously denied that any of the mortar rounds had fallen outside of the firebreak road. However, after a Honolulu Star Bulletin reporter contacted the Army to follow up on the story, the Army sent an explosive ordnance disposal ("EOD") unit to try to locate the misfired round, apparently in an effort to disprove my account of what had happened. I was later told by personnel at MMR's Range Control that, after hours of looking for the mortar inside the firebreak road, the EOD unit finally looked for the round outside the firebreak road, where it was discovered.

6. On October 22, 2001, I participated in a site visit to the location where the mortar landed. Escorted by an Army EOD unit, I walked to the site of the mortar's impact, which was located more than 30 feet outside the firebreak road. Given that the road itself is at least 20 feet wide, that means that this mortar round landed more than 50 feet outside the outer limits of the impact area's buffer zone. The Army informed me that the location where the mortar landed was within the mortar's surface danger zone.

7. At the time of the October 22, 2001 site visit, the mortar's tailfin was still on the ground, in the center of the circle of grass flattened by the explosion.

2

The leader of the EOD unit gave me the mortar's tailfin, which I still have in my possession as a reminder of the inevitability – despite the Army's claims to the contrary – that, when the Army conducts live-fire training, mortar rounds and other munitions inevitably will fall outside the intended impact area.

8. On October 19, 2001, during the second day of the first live-fire training at MMR since 1998, I witnessed Army helicopters open fire with their .50-caliber machine guns on the wrong target. Instead of firing at the targets in the impact area, the helicopters fired at rubber-tire structures located in the area called "Objective Elk," which is across a large gully from the impact area. Numerous cultural sites are located in the Elk area, in the vicinity of the structures the helicopters shot up.

9. On April 8, 2004, I participated as a civilian observer of live-fire exercises the Marines conducted at MMR. These exercises were the first to use mortars since another disaster in July 2003, in which a "prescribed burn" spread out of control and burned at least 2,100 acres of MMR, destroying dozens of endangered plans and over 150 acres of critical habitat. The Marines conducted the exercises pursuant to the March 31, 2004 settlement ("2004 Settlement") of a case challenging the Army's failure to complete consultations under the Endangered Species Act before carrying out military training at MMR with a significant potential to start fires. I observed the Army's arguments to the Court

3

seeking to justify the resumption of live-fire exercises despite its ongoing consultation with the U.S. Fish and Wildlife Service regarding impacts to endangered species and critical habitat, during which the Army insisted that mortars posed no dangers because of numerous proposed precautions, including use of GPS-satellite technology, that were supposed to ensure the rounds landed on target.

10.     During the April 8, 2004 live-fire exercise, the Marines fired only a small number of mortar rounds because the "burn index" indicating the potential for fires was fluctuating around the "yellow" level at which the 2004 Settlement Agreement prohibited the use of mortars. I watched the entire exercise from the MMR observation tower with my binoculars. At around 10:30 a.m., the first several mortar rounds were fired. I heard multiple explosions and saw a cloud of smoke rise far short of the target area, in the Elk Objective. The smoke cloud was in the immediate vicinity of the cultural sites located there.

11.     Shortly thereafter, the Marines fired several more rounds. This time, I saw two puffs of smoke well beyond the target area, outside the south firebreak road, and in the same C-Ridge area where the Marines started the September 1998 fire. One puff appeared about halfway up the southern slope of C-Ridge. The other rose from the valley of Mākua Stream, which lies between C-Ridge and the target area. The Marines then stopped firing mortars for the rest of the day.

12. Attached hereto as Exhibits "45" to "47" are true and correct copies of still images from video footage taken from the MMR observation tower during the live-fire exercise I observed on April 8, 2005. These images accurately represent what I observed that day.

13. Exhibit "45" shows Elk Objective and the smoke cloud I saw when one or more mortar rounds hit that area. Exhibit "46" is a wider view that shows the impact area, where the mortars were supposed to land, and Elk Objective, where I saw the smoke cloud. The notations on the exhibit indicate where the cloud arose at Elk Objective, relative to the impact area. Exhibit "47" is an even wider view that shows the impact area, Elk Objective, and part of C-Ridge. The notations on this exhibit indicate the locations where I observed the misfired mortars hit Elk Objective, the Mākua Stream valley, and C-Ridge, relative to the impact area and firebreak road. The mortar impact on C-Ridge occurred beyond the camera's widest view; the arrow indicating its location thus points in the general direction of the area outside the camera's frame where I saw the explosion.

14. Like the incidents in October 2001, the events in April 2004 again disproved the Army's assurances of the safety of live-fire training and demonstrated the inevitability that live-fire training leads to mortar rounds and other munitions straying from their targets, threatening catastrophic fires and explosive damage to cultural sites.

5

I declare under penalty of perjury that I have read the foregoing declaration and know the contents thereof to be true of my own knowledge.

DATED at Honolulu, Hawai'i, December 14, 2006.

_____
WILLIAM AILĀ, JR.

'Īlio'ulaokalani Coalition, et al. v. Donald H. Rumsfeld, et al., Civil No. 04-00502 DAE BMK (D. Haw.); DECLARATION OF WILLIAM AILĀ, JR.