DAVID L. HENKIN         #6876
ISAAC H. MORIWAKE    #7141
EARTHJUSTICE
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: dhenkin@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| 'ĪLIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NĀ 'IMI PONO, a Hawai'i unincorporated association; and KĪPUKA, a Hawai'i unincorporated association,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army,<br><br>Defendants. | Civil No. 04-00502 DAE BMK<br><br>SUPPLEMENTAL DECLARATION OF KAMOA QUITEVIS; EXHIBITS "63" – "65" |

**SUPPLEMENTAL DECLARATION OF KAMOA QUITEVIS**

I, KAMOA QUITEVIS, declare under penalty of perjury that:

1. I previously submitted a declaration in this case on November 17, 2006. This declaration reiterates and supplements my previous testimony, as well as the testimony in the Declaration of Leimaile Quitevis filed on November 14, 2006, which is consistent with my personal knowledge.

2. From November 29 to December 1, 2006, I participated in site inspections to various areas where the Army seeks to conduct Stryker-related activities prior to complying with the Ninth Circuit's order to consider stationing locations outside of Hawai'i for its Stryker brigade. I have also reviewed various documents and answers to interrogatories the Army provided to plaintiffs regarding its proposed training. This limited discovery has raised additional concerns about the activities the Army proposes to conduct, which I describe in greater detail below.

3. On November 30, 2006, I participated in a site inspection of areas at Schofield Barracks East Range where the Army wants to train soldiers how to drive Stryker vehicles. As part of this driver training, Strykers would drive off the existing dirt road network and drive around off-road areas designated as "Go" areas on maps provided by the Army.

4. On December 1, 2006, I participated in a site inspection of areas within the Kahuku Training Area ("KTA") where the Army wants to conduct a

variety of maneuver exercises. As at East Range, these exercises would involve Strykers traveling off the existing road network into off-road "Go" areas.

5. At both East Range and KTA, it immediately became clear that none of the Army personnel accompanying us, who included individuals involved in management of those ranges, had any idea about which of the vaguely defined "Go" areas on the maps the Army sought to use for training. In addition, in the field, there was no way to determine with any precision where the "Go" areas were located. There were no boundary markers or any other demarcation of where Strykers would be permitted to go versus where they could not enter. Indeed, at KTA, our Army escorts often had difficulty figuring out where the "Go" areas were supposed to be, as some of the areas marked as "Go" on the maps included steep stream valleys where Strykers clearly could not maneuver.

6. Unless the Army delineates precisely the boundaries of the "Go" areas, allowing off-road maneuvers threatens to destroy cultural sites. For example, training area A1 at KTA contains large, ill-defined "Go" areas that extend toward the pali (mountainside), including places where the Army has identified numerous cultural sites, including a rock shelter (site 5536) and agricultural terraces and habitation sites (sites 5539 and 5540). Attached hereto as Exhibit 63 is a true and correct copy of a document from the administrative record entitled "Kahuku Training Area, Archaeological Sites In/Within 50 m of 'Go' Areas," which shows the locations of these sites. In addition to these known sites,

3

given the high concentration of cultural resources, it is likely that, as elsewhere, the Army's archaeologists have failed to identify and document additional cultural sites in the "Go" areas.

7. Also in KTA training area A1, I happened upon a cultural site with a temporary site identification tag less than 40 feet from the place we parked our vehicles to get out to inspect the "Go" areas on foot. I noticed the site because of my extensive familiarity and background regarding the form and likely location of cultural resources. There was, however, no barrier protecting the site or flagging indicating its presence. A soldier lacking my cultural knowledge could have easily driven over the site, without ever knowing it was there.

8. The absence of any clear demarcation of the limits of the "Go" areas and the Army's failure to identify and clearly mark the cultural sites located in, or immediately next to, those areas create a substantial risk that Strykers traveling off-road, including those that simply pull off the roads to park, will roll right over cultural sites, causing irreparable harm. Even where Strykers do not directly impact cultural sites, the proposed maneuver training could cause harm to cultural sites by causing soil erosion and runoff that can destabilize and damage the sites.

9. To avoid these harms, before any off-road maneuvers occur, the Army must clearly define the boundaries of the "Go" areas and ensure all the cultural resources within these boundaries are identified, flagged, and protected.

10. On November 30, 2006, I also inspected the Urban Assault Course ("UAC") and observed the Grenadier Range where the Army wants to conduct live-fire training with 40mm rounds. I have reviewed the SDZ map for such training and have seen undocumented and unprotected cultural sites within this SDZ, including apparent burial mounds and agricultural site features.

11. On December 1, 2006, I also participated in an inspection of Qualification Training Range 1 ("QTR1") at Schofield Barracks, a location with which I am very familiar from my years as a Cultural Monitor. During the site visit, I inspected several cultural sites mentioned in previous declarations.

12. I first inspected Site 210, which is a group of burials. Only a couple days after the Army began live-fire training at QTR1 in August 2006, I found a fragment of a 40mm grenade round on the site, as well as several other 40mm rounds on the slope in front of the site. On December 1st, I found several 40mm rounds on the slope. True and correct copies of photographs I took on December 1, 2006, accurately depicting the ordnance I found, are attached hereto as Exhibit 64. Based on my countless visits to and extensive work around this site, I am certain that none of the rounds I found in August and December 2006 were present prior to August 2006. Notably, these rounds appeared after the Army relocated Target 1 to take Site 210 out of the direct "line of fire," conclusively refuting the Army's claim that merely relocating Target 1 would protect Site 210 from misfired rounds. Despite the fact that Site 210 lies within the surface danger zone ("SDZ")

of 40mm rounds fired at QTR1, the Army has failed to put in place any site protective measures for the site.

13.   I then went to inspect cultural sites adjacent to Target 3, an ancient hearth just in front of the target and a likely burial mound located just beyond the target. Like Site 210, both sites lacked any protection from misfired rounds. When the vulnerable condition of the sites was pointed out to Army lawyer Mark Katkow, he responded that, until section 106 consultation regarding site protection was completed, the Army would not allow soldiers to fire at either Target 3 or 4. Nothing, however, prevents rounds intended for Targets 1 and 2 from hitting these sites, which lie within the SDZs for those targets.

14.   I then inspected a petroglyph rock and a nearby, as yet undocumented, site, both of which are located adjacent to Target 4. One of the rocks composing the undocumented site was flipped over, with its weather-worn side facing down, apparently the victim of a grading accident. Both sites were surrounded on three sides by orange plastic fencing, which presumably was intended to prevent heavy machinery from causing additional damage, but were otherwise completely unprotected.

15.   During the December 1, 2006 site inspection of QTR1, I saw an unmanned aerial vehicle ("UAV") in the air. I have seen UAVs in operation in connection with training numerous times during cultural monitoring.

16. In its answers to interrogatories, the Army claims that a photograph showing a gulch littered with many rounds of unexploded ordnance ("UXO") proves that further cultural surveys of the gulches at Schofield Barracks are impossible. I have reviewed the photograph, a true and correct copy of which is attached hereto as Exhibit 65, and am familiar with the scene it depicts. In fact, I was present with George McDonnell, one of the Army's archaeologists, when he took the picture. At the time, we were conducting the limited survey of sites in the Schofield Barracks Battle Area Complex ("BAX") that the Army allowed during several days in October 2006.

17. This photograph is significant for two reasons. First, it refutes the Army's claim that cultural sites located in gulches are protected from ordnance. Second, it contradicts the Army's repeated claims that UXO prevents surveys of the gulches. On the contrary, the Army's contract archaeologists and the Cultural Monitors have been allowed to survey gulches when accompanied by a UXO technician, and we were conducting such a survey when the photograph was taken.

18. In the course of discovery, the Army also appears to have taken the position that, merely because it is not seeking leave to construct the Schofield BAX, cultural resources located in that area would not be affected by the Stryker-related activities it currently proposes. This is inaccurate. Rounds fired from Kolekole Ranges ("KR") 3, 4, and 5 land in areas that are proposed to become the BAX, and these areas contain numerous documented and undocumented cultural

7

sites, including burials. In addition, much of QTR1, including Targets 3, 4, and 5, as well as the UAC, overlaps with the BAX, and these overlapping areas similarly contain documented and undocumented cultural sites, including burials. Furthermore, as the Army's SDZ diagrams confirm, live-fire training at QTR1, KR 3, 4, and 5, and the UAC all fire toward and into the BAX, and the impacts of such training extend well into the BAX. Thus, if allowed to proceed, the training the Army proposes would impact cultural resources located in the BAX.

19.   Moreover, the Army's mistreatment of cultural resources in the BAX, including the desecration of Hale'au'au Heiau, highlights its widespread violations of PA provisions intended to protect cultural resources. The Army's failures to identify, evaluate, and protect all cultural resources potentially affected by Stryker training before such training proceeds is not limited to the BAX, but is common to all areas where the Army currently proposes training. The Army's surveying efforts to date have focused on the immediate "construction footprint," and, even in those narrowly defined areas, have overlooked sites, including significant sites like the Hale'au'au Heiau complex. The Army has not made any real attempt to document the many unidentified sites lying outside the construction footprint that would be exposed to harm, if the proposed training were permitted to go forward.

20.   Significantly, the Army has not taken advantage of the lull in Stryker activities associated with the current injunction to carry out cultural surveys necessary to come into compliance with the PA's requirements for site

identification and evaluation. Instead, as of October 31, 2006, it laid off all Cultural Monitors.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge, information, and belief.

Dated at Wahiawā, Hawai'i, December 14, 2006.

_____
KAMOA QUITEVIS