EDWARD H. KUBO, JR.  (2499)
United States Attorney
District of Hawaii
HARRY YEE  (3790)
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-3752
Email:  harry.yee@usdoj.gov
Attorneys for Defendants
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

'ILIO'ULAOKALANI COALITION, a  )  CIVIL NO. 04-00502 DAE BMK
Hawaii nonprofit corporation; )
NA 'IMI PONO, a Hawaii       )
unincorporated association;   )
and KIPUKA, a Hawaii         )
unincorporated association    )
                        )
          Plaintiffs,   )
   v.                  )
                        )
DONALD H. RUMSFELD, Secretary )
of Defense; and FRANCIS J.,  )
HARVEY, Secretary of the    )
United States Department     )  DATE:   November 18, 2006
of the Army,              )  TIME:  9:45 a.m.
          Defendants.   )  HONORABLE DAVID A. EZRA
_____  )

TABLE OF CONTENTS AND TABLE OF AUTHORITIES
DEFENDANTS' SUPPLEMENTAL BRIEF
ON THE SCOPE OF INTERIM INJUNCTIVE BRIEF
DECLARATION OF COL BANACH
DECLARATION OF RON BORNE
DECLARATION OF MG BRANDENBURG
DECLARATION OF LAWRENCE KAWASAKI
DECLARATION OF MICHELLE MANSKER
DECLARATION OF COL BROWN
DECLARATION OF JAMES GETTE
EXHIBITS "J" - "O"
CERTIFICATE OF SERVICE

**DEFENDANTS' SUPPLEMENTAL BRIEF**
**ON THE SCOPE OF INTERIM INJUNCTIVE RELIEF**

## I.    INTRODUCTION

In their Supplemental Memorandum filed at midnight this morning, Plaintiffs make the facile and remarkably dangerous argument that this Court has no choice but to enjoin "any action concerning the proposed conversion of the 2nd Brigade to a Stryker brigade that would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives." Plaintiffs' Supplemental Memorandum, etc. at 2-3.  Ignoring the law that obligates this Court to do equity – to balance the equities of the case, considering the public interest and the potential harms of granting or denying relief to each party, see, e.g. Amoco Production Company v. Village of Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) – and ignoring the fact that the injunction they seek threatens the safety of our men and women in uniform, Plaintiffs seek to impose impracticable limitations on aspects of the Army's proposed conversion, and to outright prohibit others, that Plaintiffs contend would have adverse environmental impacts or limit the choice of reasonable alternatives in the Army's future NEPA process.

Allowing Plaintiffs to set the limits and contours of specific training exercises of the military, as well as the use of specific weapon systems is both dangerous and inappropriate.

1

It is the military experts, not the Plaintiffs and not even the Court, who are charged with the responsibility to define the training that must be provided to the soldiers who will defend this country.

To the extent feasible in the short hours provided the Army to respond to Plaintiffs' brief, we have attempted herein to address certain aspects of Plaintiffs' particular assertions of harms and limitations that are overdrawn or one-sided.[1] However, we focus here on the overarching equities – three fundamental facts that must control the scope of the interim injunctive relief presently being considered by the Court when balancing the harms. First, and foremost, the country is at war. To prosecute

---

[1] At the status conference on December 8, 2006, Plaintiffs were granted six days – until 12:00 noon on December 14 – to file their supplemental brief on an interim injunction, while the Army was allowed only one day – until 12:00 noon the next day, December 15 – to file our response. In response to a subsequent *ex parte* request from Plaintiffs' counsel, Plaintiffs' time to file was enlarged by 12 hours – until 12:00 midnight on December 14 – while the Army's time for response was reduced by eight hours – by 4:00 p.m. on December 15. See Minute Order entered December 12, 2006. The Army has made extraordinary efforts to meet this deadline. Over a dozen Army staff and lawyers, including the declarants, assembled at 2:00 a.m. this morning to address how to respond to Plaintiffs' brief and begin preparing the materials filed with the Court today. However, despite these efforts, it has not been possible to prepare materials responding to all of Plaintiffs' specific assertions. Consequently, to afford the Army a meaningful opportunity to respond to Plaintiffs' filing, as required for due process, and to avoid prejudice to the Army that is both unnecessary and unfair, the Army reserves its right to seek leave of Court to provide the Court and Plaintiffs with limited supplemental materials at the outset of the hearing set for next Monday, December 18.

the war, the United States Army and the men and women who serve
in the Army deserve the best equipment and training available to
support our war effort.  The best the Army has is the Stryker
Brigade Combat Team ("SBCT").  Anything that delays the
deployment of the 2nd Brigade as a SBCT will severely and
irreparably harm the country by limiting the Army's ability to
support the Country's war effort; and will severely and
irreparably harm the men and women who are deployed to combat
without the support of the Stryker.  The declarations filed by
Defendants are replete with evidence of the harm that will befall
the Army and the men and women in uniform if the 2nd Brigade is
not permitted to complete its training as quickly as possible in
Hawaii.  This evidence is undisputed by Plaintiffs.

If the 2nd Brigade's conversion is delayed or interrupted,
another unit will be required to deploy in its place.  That unit
will not be a Stryker unit and will not have the protection
afforded by the Stryker.  As the Court noted at its prior status
conference, this harm alone dictates that the Army be permitted
to move forward with an extremely limited number of projects and
to train the 2nd Brigade to a level that will allow the Brigade
to be ready for deployment to Iraq by November of 2007.

Second, the Army is asking for only a small number of the 28
projects that will be necessary to sustain a Stryker Brigade in
Hawaii for the long term.  Indeed, the Army has asked to complete

3

and use only 6 of the 28 projects, one of which the Court has already cleared to move forward.  Because all of the 5 remaining projects will serve critical needs of the 25th Infantry Division and the other military components who already train in Hawaii – even if no SBCT is ultimately stationed here – the limited projects currently requested by the Army will not dictate the outcome of the Supplemental EIS.

Third, the training that the Army seeks to complete in Hawaii over the next 12 months is not unique.  The weapons systems and the maneuvering capability of the Stryker are not unique.  For example, the Stryker has no greater maneuvering capability than the long-time workhorse of the Army, the Jeep; and has less maneuvering capability than the M60A1 tanks that trained in Hawaii in the nineteen-eighties.  Since it will be training on the same ranges used by these predecessor Army vehicles, it will not be going into any terrain that has not already been the scene of decades of prior training.  What is unique about the Stryker is the intelligence that the Stryker brings to the battlefield, the protection that the Stryker affords soldiers, and the unparalleled accuracy of its weapons.  Indeed, it is sadly ironic that the current injunction prohibiting Stryker-specific training allows firing of the same weapons used on the Stryker if they are placed on tripods on the ground.  Yet, when placed on the Remote Weapons Station found on

the Stryker – which results in a substantially more accurate weapon because of the state of the art stabilization and sighting on the Stryker – the 2nd Brigade may not fire the weapons. Again, the evidence of the advantages afforded soldiers by the Stryker vehicle stand undisputed by Plaintiffs.

These facts must lead the Court to the conclusion that the limited projects and training sought by the Army at this time, must be approved.  As this Court has recognized, any harm to the men and women of our Army is the Court's first and paramount concern.  Thus, even if Plaintiffs could carry their burden of demonstrating irreparable environmental and cultural harm, the undisputed evidence that Defendants have offered of harm to the men and women of our Army must define the interim injunction entered by the Court at this time.

Moreover, the fact is that Plaintiffs have simply not carried their burden of demonstrating irreparable harm to either cultural or natural resources.  Ultimately the Court must conclude that the harms tip decidedly in favor of allowing the Army to complete its five remaining critical projects and allowing the 2nd Brigade to conduct the necessary training to deploy to Iraq as quickly as possible.  The public interest in this case supports the same conclusion.  Protection of the nation and providing our military the resources it needs during time of war are clearly and unequivocally in the public interest.

## II.  STANDARD FOR ISSUANCE OF AN INJUNCTION

Violations of environmental statutes do not mandate issuance of an injunction.  "NEPA creates no exception to the traditional principles that govern injunctive remedies." National Audubon Society v. Department of Navy, 422 F.3d 174, 201 (4th Cir. 2005). Thus, to qualify for injunctive relief, the moving party must first show it will suffer some tangible irreparable injury absent an injunction. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982); Amoco Production Company v. Village of Gambell, 480 U.S. 531, 542 (1987).  There is no presumption of irreparable injury in environmental cases.  Romero-Barcelo, 456 U.S. at 312; Amoco Production Co., 480 U.S. at 542; see also Forest Conservation Council v. U.S. Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995).

Further, where there are violations of environmental statutes, the court must balance the competing claims of injury and consider the effect on each party of granting or withholding the requested relief.  Amoco Production Company v. Village of Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).  The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances. Id.  The relative hardship to the parties is controlling.  Benda v. Grand Lodge of Int'l Ass'n of Machinists, 584 F.2d 308, 314, 315 (9th Cir. 1978). When a

federal court considers the propriety of injunctive relief, it must balance the equities of the case, considering the potential harms of granting or denying relief to each party, in an effort to "mold each decree to the necessities of the particular case." Romero-Barcelo, 456 U.S. at 312 (1982). The Court must also determine whether the balance of public interests is served by the requested injunction. Caribbean Marine Services v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).

**III. THE ARMY WILL BE HARMED IF THE 2ND BRIGADE IS DELAYED IN CONVERTING TO A SBCT**

Currently there are "no idle brigades in the active Army." Lovelace 11/10/06 Dec. ¶ 3. All brigades are either deployed to combat operations, are at home base training for their next deployment, or are positioned in strategic positions to deter conflicts. Id. Thus, delay to the training and preparation for deployment of any unit will severely harm the Army. This is doubly true when the unit has the enhanced capabilities that are present in an SBCT. Any delay to the preparation of the 2nd Brigade for deployment as a SBCT will harm the Army's ability to execute its missions in Iraq and Afghanistan, as well as its constant and continuing responsibility to protect the United States.

**A. The Army Cannot Afford to Lose an SBCT or Delay Its Deployment**

The 2nd Brigade (also known as the 5th SBCT) has been told to be ready to deploy to Iraq by November 1, 2007. Id., Dec. ¶ 7. Because of logistical issues related to movement of equipment, the troops will actually leave for Iraq a few months later. Any delay in the 2nd Brigade's ability to deploy to Iraq will mean that the Army will be unable to meet its need for forces in its theater of operation. Id., ¶ 11 ("delay [of the 2nd Brigade] would . . . hinder the ability of the Army to provide required forces to commanders in the field to execute their combat and contingency missions.").

If the 2nd Brigade cannot deploy as scheduled, some other brigade will need to be deployed in its place and will have to deploy more quickly than is currently programed. This will cause three very real and immediate harms to the Army. First, the accelerated deployment will result in less training time for the unit that is deployed in place of the 2nd Brigade. "If SBCT 5 is not available to deploy when required, then every other brigade in the Army would have to deploy sooner. This accelerated deployment would further reduce unit training time, significantly increase the risk of American casualties, and decrease unit mission effectiveness in combat – for every brigade in the Army." Id., ¶ 3. As the undisputed evidence and logic tell us, abbreviated, rushed, or disjointed training leads to higher casualties. Banach 11/8/06 Dec., ¶ 2. Thus, both the Army and

its soldiers will pay the greatest possible price – the loss of
lives – if another unit is forced to accelerate its deployment.
Second, the decreased training time, as well as the psychological
impact of being quickly deployed again, will also result in a
unit that is not as prepared for its mission as the 2nd Brigade
will be if allowed to complete its training on its current
schedule.  Third, the unit deployed in place of the 2nd Brigade
will not be a Styker brigade and will not have the benefit of the
protection, speed, and intelligence provided by the Stryker
vehicle.[2]  As Lieutenant General James J. Lovelace, the Army's
Deputy Chief of Staff for Operations and Planning, has stated:
"Non-SBCT units are not acceptable substitutes and there are not
enough SBCTs available for the specific combat and contingency
requirements of the Army."  Lovelace 11/10/06 Dec. ¶ 7.

    **B.    Without the 2nd Brigade as a Stryker unit, the
Army is harmed by the loss of speed, accuracy,
strength, and intelligence on the battlefield**

---

[2]The Army will also suffer a secondary additional harm if the 2nd
Brigade is not permitted to complete its training on its current
schedule.  The trainers and support personnel who are helping the
2nd Brigade transform to a SBCT will also be used to assist the
creation of the 7th SBCT after completing their work with the 2nd
Brigade.  Delays to the 2nd Brigades conversion will have the
ripple effect of also delaying the preparation of the 7th SBCT.
Lovelace 11/10/06 Dec. ¶ 11.  Since SBCTs are the most sought
after units in the Army today – because of their protection,
speed and intelligence – this secondary delay will also harm the
Army in its ability to protect the United States and execute its
current missions in Iraq and Afghanistan.

The Stryker is the best the Army has to offer.  <u>See</u> Banach 12/7/06 Dep. 87:16-24, attached as Exh. J.[3]  As compared to all other infantry vehicles, like Humvees, it is faster, has more accurate firing capabilities, provides increased fire power, and, most importantly, provides substantially enhanced battle field command and control.  When describing why Army Rangers already deployed to Iraq asked for and were given Strykers, Colonel Banach explains that it was "because of its survivability and its fire power and the complete connectivity in terms of situational awareness that this system brings.  It saves lives." <u>Id</u>. at 67:19-23; 88:22-89:1 ("Stryker Brigade is the most lethal, most capable, most advanced brigade we have in our Army.  It gives the Army a capability and the President of the United States a capability that no other unit in the Army provides right now.").  Colonel Banach's words are echoed by Colonel Robert Brown who has taken a Stryker brigade into combat in Iraq.  Based upon his experience, Colonel Brown has concluded that "the SBCT is significantly more informed, responsive, mobile, lethal and survivable than other combat brigades."  R. Brown 11/7/06 Dec. ¶ 4.

---

[3]"Operational tests, independent analysis and combat experience in Iraq have shown that transforming the 2nd Brigade to a SBCT will significantly increase its capability to conduct combat operations successfully with reduced American casualties.  A defense study concluded the SBCT is significantly more informed, responsive. mobile, lethal and survivable than a light infantry brigade like the 2nd Brigade." Lovelace 11/10/06 Dec. ¶ 5.

The Stryker allows soldiers to move and react with greater speed. The advanced computer and communication capabilities of the Stryker allow soldiers "to rapidly assess complex situations, react faster and apply more precision to the fight." <u>Id</u>. In addition, its ability to physically move at high speeds allows a Stryker to support operations in a much larger area.[4]

Because of the state of the art stability and sighting systems on the Stryker, the Stryker weapons are exceptionally accurate. <u>See</u> Sec. IV.A. <u>infra</u>; <u>see also</u> Banach 11/8/06 Dec. ¶ 7. In battle this accuracy matters for obvious reasons. More accurate weapons mean more effective elimination of the enemy. More effective elimination of the enemy means fewer wounded and killed soldiers. The improved accuracy also has the secondary benefit of protecting what our soldiers don't want to harm: innocent Iraqi civilians and cherished cultural sites both on the battlefield and in training. As Colonel Banach testified at deposition, "if I'm in Iraq and I have a terrorist next to a mosque, I shoot the terrorist with my .50 caliber. I don't shoot the mosque because of the enhanced gunnery capability [of the Stryker]." Exh. J at 58:8-12.

---

[4]General Lovelace reported a specific example where General Casey, the commanding General in Iraq, needed support some 300 miles from the location of an SBCT. "The SBCT moved within hours and successfully accomplished the mission, protecting Iraqi civilians and defeating the Mahdi Army. No other type of unit, especially a light infantry brigade, could have accomplished this mission with the same speed." Lovelace 11/10/06 Dec. ¶ 9.

The benefit of avoiding collateral damage in Iraq cannot be understated.  When collateral damage occurs, "[t]he result is you lose the hearts and minds when you blow up the entire building and kill everyone in the building instead of just the terrorists that are in the corner room you're trying to take."  Id. at 66:3-7.  The deployment of a non-Stryker unit to Iraq – as the result of delayed training of the 2nd Brigade – will harm the Army and the commanders in the field by depriving them of the precision the Styker can offer.

The Stryker, when combined with the Mobile Gun System (MGS), provides commanders in the field with a nimble, precise and intelligent piece of equipment that also brings increased fire power to the fight.  The Stryker brigades that previously deployed did not have this added capability because the MGS could simply not be manufactured in time.  Id. at 65:10-13.  As of today, the Army has concluded that the MGS is too important to be without.  Thus, even if they do not have enough MGS variants to equip each SBCT individually, units previously deployed to Iraq will leave their MGS variants in theater for the next arriving SBCT.  Banach 12/15/06 Dec. ¶ 30.

As Colonel Banach has explained, MGS capability is critical to allow a Stryker to be as effective in combat as it can be.  "I need the capability that the 105 millimeter cannon brings to be able to shoot a room off of a building and destroy that room

12

without destroying the rest of the building.  What Stryker
Brigades that have [previously] deployed to combat have had to do
is they've had to bring in larger munitions: 500-pound bombs off
of airplanes, attach helicopter munitions, okay, that are not as
accurate as the Mobile Gun System in a direct fire mode.  The
result is collateral damage." Id, 65:19-66:3.  Other Army
vehicles do not combine this increased fire power with the
agility, speed and intelligence of the Stryker.  Again, any delay
in the Army's ability to deploy the 2nd Brigade as a SBCT
equipped with the MGS would work extreme harm on Army commander's
in the field.  Second best, when you are at war, is simply not
acceptable.

      Finally, the Stryker provides soldiers with improved command
and control on the battlefield.  "Every Stryker vehicle has a
computer system that allows for unparalleled situational
awareness which is paramount to saving lives in combat.  The
Stryker vehicle has the capability to continuously monitor its
location, the rest of the friendly force unit locations, and can
monitor enemy positions once they are identified.  The digital
capabilities resident in the Stryker vehicles allow for the
processing of weather, targeting, and intelligence data; guiding
precision weapons; and communicating using abbreviated computer
codes, called bursts, that relay information in a fraction of the
time it would take a normal radio call found in the non-digital

13

units in our Army." Banach 11/8/06 Dec. ¶ 5. The result of the
intelligence offered by the Stryker is that soldiers are no
longer driving into enemy forces because locations of enemy
forces are transmitted from vehicle to vehicle almost
instantaneously as enemy positions are identified. Exh. J at
140:10-141:5.

### C. Re-Positioning the 2nd Brigade Will Not Aid in The Timely Deployment of SBCT's to Support Military Operations in Iraq and Afghanistan

The Deputy Commanding General ("DCG"), US Army Pacific
Command ordered his staff to do an assessment of what would be
involved if the 2nd Brigade could not conduct the necessary
training in Hawaii to complete its transformation to a SBCT. In
examining alternatives, a basic predicate was whether the other
locations had completed environmental impact assessments of
Stryker training. Without these assessments, Stryker training
would not be appropriate in the alternative locations.
Brandenburg 12/15/06 Dec. at ¶6. Only four installations had
completed any form of NEPA analysis for the positioning of a
SBCT: Fort Wainwright, Alaska, The National Training Center
("NTC") at Fort Irwin California, The Joint Readiness Training
Center ("JRTC") at Fort Polk, Louisiana, and Fort Lewis,
Washington. Id.

Two of these locations, NTC and JRTC were clearly not
available because they serve as the final rehearsal facilities

for all combat brigades prior deployment.  <u>Id</u>.  Inserting the 2nd

Brigade into these installations for basic, long-term training

programs would disrupt the training and deployment cycles of the

entire Army.  Fort Wainwright was also clearly not an option for

two reasons.  First the 172 SBCT was returning from Iraq, leaving

insufficient room for both units.  Second, the time consuming

requirement to winterize equipment prior to deployment to Alaska

would prevent the 2nd Brigade from meeting its Initial

Operational Capability date of November 2007.  <u>Id</u>.

The DCG then directed the Commander of the 2nd Brigade to

assess the impacts of training at Fort Lewis.  This course of

action, along with that of reverting to an Infantry BCT, as well

as training in Hawaii were assessed.  Exhibit K Contingency Plan

("ConPlan") at pg. 2.  The assessment concluded that this re-

positioning could only occur if sufficient assets to move the

unit were available, if Fort Lewis could place the 2nd Brigade in

a priority position over all of the other units at Fort Lewis for

training resources, if there was available logistical support to

effectuate the re-positions, and if sufficient training assets

actually exist at Fort Lewis.  <u>Id</u>, pg 5.  These assumptions,

however, are unrealistic.  There simply is no room at Fort Lewis

because two SBCTs are currently stationed there and a third, SBCT

7, is scheduled to activate this Spring.  Lovelace 11/10/06 Dec.

¶¶ 11-12; <u>see also</u> Banach 12/15/06 Dec. ¶ 10.  The only way to

accommodate the 2nd Brigade would be to bump back the activation of SBCT 7. In essence, sacrificing the availability of one SBCT for another. Lovelace 11/10/06 Dec. ¶11. Even assuming this adjustment of SBCT 7 could be accomplished, the commanding officer of the 2nd Brigade, in consultation with the leadership of the US Army Pacific Command, determined that pre-deployment re-positioning of the brigade away from their families would severely harm the brigade's effectiveness and cohesiveness, and ultimately lead to more casualties once the Brigade was deployed. Banach 12/15/06 Dec. ¶ 13.

## IV. THE MEN AND WOMEN OF OUR ARMY WILL SUFFER INCREASED CASUALTIES IF THE 2ND BRIGADE IN NOT PERMITTED TO CONVERT TO A SBCT IN HAWAII NOW

The 2nd Brigade is the only brigade in the 25th Infantry Division that has met it reenlistment goals for the last two years. The reason for this distinction: if Army soldiers have to go to war, they want to go with the protection provided by a Stryker. Exh. J at 194:14-18; 73:1-16. Leaders and soldiers in the Army are well aware of the protection that has been provided to soldiers by the Stryker's that have already been deployed to combat in Iraq. As explained by Colonel Robert Brown, who commanded a Stryker brigade in combat in Iraq:

> The Stryker vehicle saved many of my soldier's lives due to its speed, protection, digital capability and design. As the brigade commander, I have personal knowledge that approximately 137 Rocket Propelled Grenades (RPGs) directly hit Stryker vehicles

16

> during our deployment.  None of the RPGS
> penetrated a Stryker vehicle due to the
> Stryker's protection and speed.
> Additionally, the brigade had approximately
> 50 Suicide Vehicle Born Improvised Explosive
> Devices (SVBIED) directly hit Stryker
> vehicles.  The protection afforded by the
> Stryker vehicle, despite the massive
> explosions and lethality from these suicide
> bombs, was essential to saving lives.

R. Brown 11/7/06 Dec. ¶ 5; see also soldier testimonials, R.

Brown 12/15/06 Dec. Attachment 1.  Simply put, if the 2nd Brigade

or some other unit is forced to deploy to Iraq in early 2008

without the support of the Stryker, the soldiers in the unit that

is deployed will suffer more casualties and more wounded.  Any

failure to provide timely, complete, and state-of-the-art

training that will allow Stryker brigades to deploy to Iraq as

soon as possible, will work severe harm on soldiers sent in place

of delayed Styker brigades.

   **A.   Strykers Afford Soldiers Protection and
         Capabilities that Are Unsurpassed**

   When referring to the Stryker, Colonel Banach has said "It's

the best vehicle we've made in the Army.  Unbelievable protection

for our soldiers.  [It] saves lives."  Exh. J at 44:1-3.  The

sentiment has been echoed by both Colonel Brown (see quote above)

and General Lovelace, the chief of Army planning and operations.

See Lovelace 11/10/06 Dec. ¶ 9.  ("The increased survivability

offered by Stryker vehicles protect our soldiers against enemy

snipers and roadside bombs.").  The sentiment has also been

echoed by soldiers who have taken Strykers into conflict, have been attacked, and have been saved by the Stryker. <u>See</u> soldier testimonials, R. Brown 12/15/06 Dec. Attachment 1.

The benefits of the Stryker are multi-faceted: speed, stealthiness, mobility, state of the art information systems, enhanced protection for soldiers and gunners, accurate weapons systems, and ease of maintenance. R. Brown 12/15/06 Dec. ¶¶ 3-9. A primary protection provided by the Stryker results from the fact that the vehicle can be driven and its weapon systems can be fully operated from inside the vehicle. Exh. J at 138:9-14. Colonel Brown recognized during his experience in Iraq that soldiers found the Stryker to be a vehicle that saved lives. R. Brown 12/15/06 Dec. Attachment 1.

**B. Re-Positioning or Splitting the 2nd Brigade to Complete Training Will Break the Unit, Its Leaders, and Its Soldiers**

Plaintiffs suggest that repositioning the 2nd Brigade to complete its training is nothing more than a "regrettable inconvenience." Pls' Mem at 33 n. 20. Plaintiffs, however, have offered no evidence regarding the harm that would be caused by repositioning. Indeed, they have offered nothing at all in support of their bald assertion. The evidence presented by those in the Army with the expertise and responsibility to prepare our

soldiers for war is completely to the contrary.[5]  As Colonel
Banach, the man who will lead the 2nd Brigade into battle, has
said, the notions of repositioning the 2nd Brigade to complete
its transformation or of splitting the Brigade to complete its
training are "bankrupt idea[s]" that will severely harm the men
and women that make up the 2nd Brigade.  Banach 12/15/06 Dec. ¶
10.

First, the time spent moving the 2nd Brigade piece-meal or
whole to a new location would eat up precious training time that
is absolutely critical to prepare the 2nd Brigade for deployment.
Second, extending deployment away from home station and family
will destroy the fabric of the unit and will ultimately lead to
higher casualties and more injuries.  Third, the leadership of
the 2nd Brigade would be "challenged to the breaking point" if
the brigade must deploy, in whole or in part, to a new location
to complete its training and then immediately re-deploy to war.

---

[5]Indeed, this is an area where the Court should give great
deference to the experts and the governmental branch that is
charged with the responsibility to prepare for and execute war.
See Jaffee v. United States, 663 F.2d 1226, 1237 (3rd Cir. 1981)
("The complex, subtle, and professional decisions as to
composition, training, equipping, and control of a military force
are essentially professional judgments."); Hamdi v. Rumsfeld, 124
S.Ct. 2633, 2647 (2004) (citing Department of the Navy v. Egan,
484 U.S. 518, 530 (1988) ("Without doubt, our Constitution
recognizes that core strategic matters of warmaking belong in the
hands of those who are best positioned and most politically
accountable for making them.") .

The 2nd Brigade has very limited time between now and
November 1, 2007 to become fully prepared to go to war. Moving
the Brigade to some new location to train will take a large bite
out of that already limited training time. Even assuming there
is an alternative location where the 2nd Brigade can train – a
notion that is far from clear – moving nearly 4,000 soldiers and
their equipment is not a task that can be done overnight. At a
minimum, it will take several weeks to reposition the unit, which
represents the loss of precious training time. Brandenburg
12/15/06 Dec. ¶ 6.[6] As Colonel Banach has said, "time is our
currency and we are burning it every day that we are not training
with our Stryker vehicles and we are increasing the risk to our
soldiers in combat." Banach 12/15/06 Dec. ¶ 3; see also Exh. J
at 18:22-19:5, 43:19-44:1.

Loss of training time means less effective soldiers and less
effective soldiers mean greater casualties in war.[7] Banach

---

[6]In addition, if squeezed into an already overextended Army
complex somewhere on the mainland, the 2nd Brigade will be
afforded much more limited range and training facility time, than
would be available at Schofield Barracks and the PTA.
Brandenburg 12/15/06 Dec. ¶ 6. This will result in the loss of
additional training time and increase the potential for a delay
in the deployment of the 2nd Brigade as an SBCT.

[7]Plaintiffs suggest that the 2nd Brigade can train with simulated
training devices such as the laser training simulator called
MILES or on the Stryker's embedded trainer. Pls Supp Mem at 14-
15. Simulated training, however, is not alternative to prepare a
soldier for war. MILES training, for example, is a "degraded
[training] mode" that is a lower level building block that does
not get soldiers fully trained for war. Banach 12/7/06 Dep.

20

11/8/06 Dec. ¶ 2 ("disruption of our current training plan will
get many more of our Soldiers killed and wounded in combat than
if we were able to maintain continuity in our current training
and transformation plan to a fully combat ready Stryker Brigade
Combat Team").[8]  The potential for increased death and injury
must be the paramount consideration of the Court.  Given this
harm, nothing short of allowing the 2nd Brigade to complete its
training expeditiously in Hawaii – using the limited number of
facilities identified by the Army as exceptions to what will
otherwise be a broad interim injunction – is appropriate.

In addition to the loss of precious training time,
deployment of the men and women of the 2nd Brigade to train on
the mainland for the next twelve months, followed immediately by
a year or longer deployment to Iraq, would result in a stressed,
tired and combat ineffective unit that will suffer greater
casualties.  Soldiers and their families "live under the constant
strain of knowing that [they] will deploy at some point to
combat.  The stress is enormous and must be addressed and managed
to ensure combat readiness of the force."  Banach 12/15/06 Dec.

_____

133:24-134:24.  As Colonel Banach testified at deposition,
"There's no gas, in the soldier's face.  There's no sand in his
eyes.  You don't get the sight, sounds, and smells of the
battlefield by using [simulators]." Exh. J at 137:13-23; 145:4-
13.

[8]"Failure to train to standard prior to deploying to combat
directly results in less effective unites, degraded operations,
and higher soldier casualties."  Brandenburg 11/13/06 Dec. ¶ 3.

¶ 11.    Increased deployment time will result in numerous social and behavioral issues for soldiers and their families[9] that will ultimately undermine the entire fabric and effectiveness of the unit.  As the leader who knows his soldiers and their families best has stated:

> The possibility of having to train the 2/25th SBCT on the mainland is an absolutely incomprehensible course of action to contemplate given the brigades' current transformational timeline.  Having this SBCT train on the mainland would create a degree of uncertainty and chaos that no one would want in a time of peace let alone a time of war.  Being forced to train on the mainland would place enormous stress on our Army families and the lack of predictability for the soldiers and their families given the short notice that our unit would get to execute a course of action such as this would be demoralizing and catastrophic for the brigade.  The 2/25 SBCT would be completely disjointed given that we would have units on the mainland, Oahu and PTA all trying to train for war with a complete lack of unity of command and unity of effort that are so important in our profession.  As a result, the brigade would have units that are less trained and less prepared to deploy.  All of this will result in higher casualty rates for the 2/25th SBCT in combat.  Additionally, the intangible aspects of preparing a brigade for combat would be severely eroded throughout the unit in terms or team building, cohesion and sharing lessons learned.  The idea of training on the mainland is a recipe for disaster and would ensure that the 2/25th SBCT would not meet its' current transformational and deployment requirements.

Banach 12/15/06 Dec.¶ 13; see also Exh J at 192:2-194:18.

---

[9]"[W]e're an Army of families.  Fifty-eight percent of my brigade is married.  When we start talking to soldiers about you're going to be Stryker [t]hen you're not going to be Stryker, that adds a level of – an increased level of tension that we quite frankly don't need.  This is the impact that I've seen." Exh. J at 73:17-74:5.

The chaos and exhaustion resulting from a deployment of some or all of the 2nd Brigade to the mainland for training will similarly degrade the leadership of the brigade. Adding additional complexity to the training process will put stress on the leadership and tire them more quickly. It should be recognized that many of these leaders have returned recently from previous deployments to Iraq or Afghanistan. To tire the leadership even more will harm the men and women of the 2nd Brigade. "When you have tired leaders, they make bad decision, and they get soldiers killed." Exh J at 35:6-11.

## C. The Second Best Training and Equipment Proposed By Plaintiffs Are Not Acceptable Alternatives

Plaintiffs have made numerous suggestions for limiting portions of the training and facilities the Army has requested based upon speculative allegations of harm to cultural sites or the environment from training activities that are already occurring in Hawaii or are not unique to a Stryker brigade. The harm from these limitations, however, will fall on the men and women of the armed forces who need all of this training to become fully prepared to go to war. As Colonel Banach has stated, soldiers need to train in all possible scenarios and complete numerous repetitions so that when the unexpected happens in battle, the soldier reacts with the appropriate instincts and actions. Banach 12/15/06 Dec. ¶ 5.

Plaintiffs do not dispute that soldiers need all of the training that has been identified by the Army. Moreover, they do not dispute that failure to receive this training will lead to more deaths and more wounded soldiers if the 2nd Brigade deploys to Iraq without the opportunity to complete its training. Despite this fact, Plaintiffs nonetheless argue that the soldiers of the 2nd Brigade should be precluded from the training that is necessary to deploy to Iraq. The Army, however, has requested only the facilities and training opportunities that it <u>must</u> have to prepare this brigade for combat. Any exceptions will harm the Army's ability to deploy the 2nd Brigade to Iraq as scheduled.

Plaintiffs would also like to limit the Army and its soldiers from deploying one of the Stryker weapons systems. They have suggested that just because Army didn't have the Mobile Gun System ("MGS") ready before it sent prior SBCTs to combat, there is no harm in sending the 2nd Brigade to combat without the MGS. This factually unsupported assertion, however, is contradicted by the evidence. The question is not whether prior units deployed without the MGS, but whether this Brigade would be harmed by being forced to deploy without it. There are, as Colonel Banach has testified, strong reasons to equip the 2nd Brigade with the MGS. The support provided by a heavy gun, like the 105 millimeter gun on the MGS, allows soldiers to clear key areas with precision. Exh J at 63:19-67:18; <u>see</u> <u>also</u> Banach 12/15/06

Dec. ¶ 31.  To send the 2nd Brigade to combat when this weapon is now available would clearly visit harm upon the men and women of the 2nd Brigade.  It would be like sending a brigade to combat with only rifles when machine guns are available.

Moreover, the 2nd Brigade must be given the opportunity to train on how to use the MGS.  This requires minor construction at an existing range that was used well into the Eighties to shoot the same caliber weapon from a tank.  Banach 12/15/06 Dec. ¶ 34. In short, without "Range 11T, this brigade will be at significant risk should we be deployed to combat either in Iraq or some other location without the capability that the Mobile Gun System brings to us."  Exh. J at 63:19-23.

## V.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF THE COURT ISSUES A LIMITED INJUNCTION PERMITTING TRANSFORMATION OF THE 2ND BRIGADE

As this Court previously recognized in denying Plaintiffs' prior requests for injunctive relief, Plaintiffs' claims are speculative in nature and the Army has gone to great lengths to ensure that impacts to cultural sites and natural resources are either eliminated or mitigated.  See Court's Order dated November 5, 2004 at 15-16.  Today, after the Court permitted Plaintiffs to engage in extensive discovery involving three days of site visits to the five critical remaining transformation projects and the various locations where Stryker training will occur, extensive depositions, and the introduction of new witness testimony,

25

Plaintiffs' assertions of harm fare no better than they did two years ago.

As set forth at length in Defendants' opening memorandum, see Defs' Br. dated November 14, 2006 at 39-54, Plaintiffs cannot demonstrate that they are likely to suffer irreparable harm from the limited activities the Army here seeks leave to pursue. First, there are no endangered or threatened species in the critical construction project areas. See Mansker 11/11/06 Dec. ¶4. Second, the Army has undertaken significant measures to protect cultural resources and, to date, these measures have proven to be effective in protecting cultural resources during the transformation process. See Lucking 11/13/06 Dec. at ¶¶2-11, Attachment 1 to Lucking 11/13/06 Dec. at ¶¶7, 12-19. With respect to cultural resources, there are none in four of the five project areas and mitigation measures have proven successful in identifying and protecting cultural resources at QTR 1. Lucking 11/13/06 Dec. at ¶¶4-10. As for the modification to Range 11T, this project has not begun, but the mitigation measure of avoidance has been implemented after completion of cultural resource surveys. Id.

In their supplemental brief, Plaintiffs fail to demonstrate any impacts to cultural sites as a result of the critical projects and Stryker-related training. Instead, Plaintiffs merely speculate as to potential harms without providing any

26

proof that such harms are likely or that the Army's mitigation measures, which have proven successful, would not minimize any alleged harm.   Therefore, the Court should fashion an injunction that permits the five critical projects and Stryker-related training to continue in order to ensure that the 2nd Brigade is properly transformed and ready for deployment by November 2007.

**A.    The Precision and Intelligence of the Stryker Will Actually Decrease the Potential for Harm to Environmental and Cultural Resources**

Plaintiffs' speculate that the use of the weapon systems associated with Stryker units may increase the risk of impacts in training areas.   However, this allegation is not supported by the record before this Court.   In fact, the opposite is true.   The weapon systems associated with a Stryker Brigade provide the most technically advanced weapons firing capabilities and will do less damage to the surrounding environment because of this improved technology.   Banach 11/08/06 Dec. at 19.

With respect to the harm alleged by Plaintiffs as a result of the introduction of the Stryker vehicle to the Army's training facilities in Hawaii, it is important to note that none of the training that will be done by the 2nd Brigade as an SBCT in Hawaii is unique.   Neither the weapons systems employed by the Stryker nor the areas where it will train are new.   Banach 12/15/06 Dec. ¶¶ 24 & 28.   Indeed, "[t]he uniqueness of the Stryker Brigade does not lie in its associated weapons systems

27

[or its limited off-road maneuverability] but rather in the Stryker's ability to provide enhanced situational awareness for command and control through computerized systems located in the vehicle, increased protection to Soldiers in the vehicle, and the increased speed of movement." Brandenburg Dec. I, ¶ 9.

The only distinction with respect to the weapon systems is that they will now be fired while mounted on the Stryker, which will, in fact, add improved stabilization and sighting systems that actually make the weapons more accurate than the firing methods that are currently in use by other Brigades at Schofield Barracks and PTA.[10]  Moreover, the only distinction regarding maneuvering the Stryker – as compared to other vehicles that have been and continue to be maneuvered at Schofield and PTA – is that

_____

[10]Under the current Ninth Circuit injunction, the use of many of the weapons used by the 2nd Brigade is prohibited when mounted in the more accurate position on the Stryker.  But, firing them on the same ranges where the Stryker would fire them in the less accurate ground-mounted position is allowed, because it is the same historical method used by other Brigades who are and have for years been firing dismounted at Schofield and PTA.  Exh J at 58:14-59:7 ("With the court ruling, I've been allowed to fire .50 caliber and MK-19s off of a tripod ground-mounted.  Well, you take a .50 caliber on a tripod and you put it at Pohakuloa, okay, and you fire that weapon system on that tripod on lava, that gun moves around, and who knows where those rounds are going to land . . . .  We are providing a solution to that particular problem because when you fire those same weapon systems with enhance optics, [with] near complete stabilization, all right, the round goes where it's intended to go.  There isn't a vibration and a changing of the muzzle up and down or left or right. . . ."); see also Banach 12/15/06 Dec., ¶ 24.

the Stryker has enhanced intelligence that will allow the Stryker to avoid any sensitive cultural or environmental sites.

Plaintiffs have offered no evidence to contradict these facts.  Instead, they offer vague and unsubstantiated claims for harm to cultural and environmental sites.  The Court must engage in a balancing of harms in this case.  Because Plaintiffs' assertions are vague and do not demonstrate concrete harm to any cultural or environmental sites, the harms must weigh in favor of soldiers who will be unable to train, even while the country remains at war.  For example, on QTR-1, Plaintiffs allege that cultural sites will be harmed by the Army's use of the range. The evidence, however, is to the contrary.  First, Plaintiffs must admit that no cultural or environmental sites are in the line of fire on QTR-1.  Second, Plaintiffs do not dispute that no fire zones have been applied to the one confirmed site on QTR-1. Third, other units will be using QTR-1 for training using the exact same weapons that the SBCT will use on the range.  Fourth, the Stryker accuracy will protect any resources more fully than non-Stryker firing of the weapons.

With respect to the weapon systems used by Styker, the basic design and caliber of the ammunition is not new.  As Colonel Banach, the commander of the 2nd Brigade has said, "[t]hese staple weapons have been used at Schofield Barracks and the PTA

for the last 60 years." Banach 12/15/06 Dec. ¶27.[11] Moreover, the use of the primary weapon systems used by the Stryker – the M2 caliber 50 machine gun and the MK-19 grenade launcher – are more accurate when fired from the Stryker vehicle as opposed to firing them ground mounted. <u>Id</u>, ¶ 24. The improved accuracy of the weapons fired from the Stryker are outgrowths of the improved stability and improved sighting provided by the Stryker.

For example, when the standard weapon systems – the M2 caliber 50 machine gun and the MK-19 grenade launcher – are mounted on the Stryker, they are attached to the Stryker's remote weapons station ("RWS"). "The remote weapons station is an advanced very, very accurate weapons system configuration that allows soldiers that have the RWS system to fire from inside the vehicle." Exh. J at 138:9-14. On the Stryker, "precision firing is accomplished by what is known as Vector Stabilization. The RWS has gyroscopic sensors to detect the rate, amount, and direction of movement and applies an offset to the RWS ensuring a high probability of successful target engagement." Banach 12/15/06 Dec., ¶25. When the same weapons are fired from positions on the ground, as they currently are and have been for

---

[11]<u>See</u> <u>also</u>, Brandenburg Dec. I, ¶ 1 ("[T]he Stryker Brigade is equipped with weapons that are standard and common in all Army units and that have been in use at Schofield Barracks and Pohakuloa Training Area (PTA) for over 20 years. In some cases the weapons have been in use for over 50 years. Weapons and the caliber of the ammunition are not Stryker-unique.").

many years, at Schofield Barracks or PTA they are not aided by this advanced stability system.  Indeed, the already stabilized RWS will be upgraded in the next five months and will provide even greater stability and accuracy.  Exh. J at 138:15-139:3.

The Stryker also provides increased accuracy because of its sighting capabilities.  The Stryker has a laser designator that is known as the "storm system" (Exh. J At 138:21-139:1) and "also uses a Thermal Imaging Module to detect targets at night"(Banach 12/15/06 Dec., ¶25.  In short, weapons fired from the Stryker have improved accuracy because it "has the capability to integrate sensors in order to ascertain the precise location of the target." Brandenburg Dec. I, ¶ 9.

The improved accuracy of Stryker fired weapons as compared to the current firing posture, will actually improve the protection of any cultural and environmental sites at Schofield Barracks and PTA.  The improved protection is provided both by the accuracy of Stryker-fired weapons as well as the fact that fewer training rounds will need to be fired because of the accuracy of when fired from the Stryker.  Exh. J at  188:14-20 ("[the Stryker's] precision platform [     ] take less rounds to hit the target.  Therefore, you're going to shoot less ammunition . . . .  Not only are you going to shoot less ammunition, you're pretty much guaranteed that every round you fire is going to go exactly where you want it to go, which is huge."); see also Exh.

31

J. at 56:22-23; 62:25-63:9.   In short "[t]he RWS, when upgraded, contains all of the technology and equipment necessary to provide fully stabilized and pinpoint firing accuracy, which will assist in safeguarding cultural and other sensitive locations at Schofield Barracks and PTA."  Banach 12/15/06 Dec., ¶25.[12]

Similarly, the Stryker is nothing new to Schofield Barracks or PTA in terms of the maneuverability training that will be conducted by the 2nd Brigade.  The Stryker has the same ability to maneuver as the standard Army Jeep.  Exh. J at 126: 20-127:3. Soldiers will do maneuver training with the Stryker at Kahuku Training Area and the East Range.  Both of these training facilities have hosted and continue to host training by vehicles, such as Jeeps and Humvees, that can and do go everywhere the Stryker has the ability to go.  Banach 12/15/06 Dec., ¶28. Indeed, in many of the training areas used by Stryker, the Army has historically trained on tracked vehicles, which have the potential to do much greater damage.  Id.

---

[12]The more powerful weapon system to be used by an extremely limited number of Stryker's in Hawaii, the Mobile Gun System ("MGS"), is also nothing new at Schofield and PTA.  The only change is that it has been enhanced with improve stabilization. Banach 12/7/06 Dep. 65:2-9 ("The 105 millimeter gun that we're putting on the Mobile Gun System is one or two generations above the 105 millimeter gun that used to be fired here at Schofield Barracks and on Range 11T at the Pohakuloa Training Area back in the eighties.  Very little difference.  Same caliber.  The enhancements are in the stabilization in the gun system in terms of its ability to process fire missions.").

The Stryker will not be breaking new ground and it will not be driving willy nilly through the vegetation at either the Kahuku Training Area or the East Range.  The vehicle is limited in its capabilities to areas that have historically and continue to be used by other Army vehicles. Exh. J at 126:21-127:4 ("[W]e know where the driving courses are around East Range.  We stay on the roads, and we don't take our Strykers [when we track through dense vegetation].  And quite honestly, we can't take our Strykers by design.  The Stryker basically has the same terrain-negotiating capabilities . . . as a quarter-ton Jeep had.  So I mean, there are limitations to where we can take the vehicle anyway.  We just simply can't go there.").

In addition, both the Stryker and the SBCT offer enhancements that will allow the Army to protect any sensitive sites, in ways they have not been protected in the past.  First, as an SBCT, the 2nd Brigade has added "more disciplined stewardship" of the environment.  Banach 12/15/06 Dec., ¶ 26.  "Each company-size unit . . . has a school-trained Environmental Compliance Officer who supervises weekly and quarterly training requirements specific to environmental laws and procedures."  Id. The Stryker vehicle itself will act to protect sensitive sites. The computer systems on the Stryker can and will be programmed with the GPS locations of any sensitive site.  Thus, the soldiers operating the vehicles will be provided with visual mapping of

the locations as they drive and will receive audible warnings as
the vehicle approaches any off limits area.  Exh. J at 60:25-
61:17.  These substantial improvements will act to protect
cultural and environmentally sensitive areas in ways that
historical Army training at Schofield Barracks and PTA could not
provide.

**B.    Plaintiffs Cannot Demonstrate that Irreparable
        Harm to Natural Resources will Result from the
        Limited Construction Projects and Training Needed
        to Transform the 2nd Brigade into a Stryker Unit**

The extensive administrative record in this case and,
specifically the Biological Opinions issued by the U.S. Fish and
Wildlife Service for the proposed transformation, do not support
plaintiffs' contention that continued transformation will result
in irreparable harm to natural resources.  <u>See</u> SEIS 0024083-86;
SEIS 0024260-73; SEIS 0024294-98; SEIS 0024616-24.[13]  To the
contrary, the Fish and Wildlife Service analyzed significant
information from the project and issued two non-jeopardy
biological opinions in which the Service concluded that
"implementation of the proposed action discussed herein is not
likely to jeopardize the continued existence of any species
covered in this biological opinion or adversely modify or destroy

---

[13] References to the administrative record are abbreviated either
as "PEIS" for the programmatic record or "SEIS" for the site-
specific record, followed by the pertinent Bates-stamped page
number.

palila critical habitat (or Oahu elepaio critical habitat)."
SEIS 0024264 and 0024616.

As reflected in the Fish and Wildlife Service's Biological
Opinions, and as described at length in the Defendants' opening
memorandum, see Defs' Br. at 50-54, the Army has undertaken
significant measures to ensure that any risk to critical habitats
or species is minimized. Mansker 11/11/06 Decl. at ¶¶4-13; SEIS
0024260-73; SEIS 0024616-24. Plaintiffs argue that there is a
serious threat of fire from SBCT training that could destroy the
habitat of threatened and endangered species in the project area,
but they fail to recognize the extensive measures undertaken to
minimize any such harm. Pltfs' Br. at 23-25, 30. The Army has
implemented an Integrated Wildlife Management Plan ("IWFMP") in
an effort to reduce the frequency, size, and severity of any
fire. Mansker 11/11/06 Dec., at ¶6. The IWFMP contains plans,
policies, methods and standard operating procedures for each
installation that outline responsibilities, fire prevention
measures, staffing levels, and requisite equipment needed,
including helicopter support during all live fire training. Id.
The Fish and Wildlife Service noted the significance of the IWFMP
in protecting critical habitats and species in its no-jeopardy
determination. Id., SEIS 0024265.

The Army also has undertaken significant conservation
measures in order to protect critical species and their habitats

during the proposed transformation and subsequent SBCT training. Mansker 11/11/06 Dec. at ¶¶5-12; SEIS 0024264-71. For example, Plaintiffs speculate that plant species may be irreparably harmed by the proposed transformation. Pltfs' Br. at 23-25, 30. However, the Fish and Wildlife Service concluded that the efforts by the Army, including the development of the IWFMP and "the removal and control of non-native ungulates in fence units will contribute toward the restoration of damaged vegetation, and will enhance the survival and regeneration of treeland roosting habitat for bats." SEIS 0024262. In fact, these measures have proven successful and eight of the eleven rare plant species on the Army installation have significantly increased in number as a result of these measures. Declaration of Michelle Mansker 12/15/06 at ¶¶ 22, 23, 24, 24 & 25.

Based on the foregoing and the no-jeopardy determination of the Fish and Wildlife Service, Plaintiffs cannot demonstrate that the proposed transformation will irreparably harm any species or habitat in the proposed transformation area.

       **1.   Plaintiffs' Speculative Claims of Harm from Wildfires are Contradicted by the Record, two Biological Opinions, and the Success of the Army's Mitigation Measures in Protecting and Increasing the Number of Threatened and Endangered Species**

In their supplemental memorandum, Plaintiffs introduce an opinion from J. Michael Castillo, a private Forest Management Consultant, that the use of training ranges for Stryker-specific

36

training will likely increase the risk wildfires at the Pohakuloa
Training Area ("PTA") and surrounding lands.  Declaration of J.
Michael Castillo ("Castillo 12/13/06 Dec.") at 11.  However, Mr.
Castillo's opinion is directly contradicted by the Fish and
Wildlife Service's 2003 Biological Opinion that noted the
significance of the Army's extensive Integrated Wildlife
Management Plan ("IWFMP") in protecting critical habitats and
species in its no-jeopardy determination.  Declaration of
Michelle Mansker, Mansker 11/11/06 Dec. at ¶6; SEIS 24265.  The
IWFMP includes a Fire Danger Rating System that restricts
specific activities during high-risk periods and standard
operating procedures for each installation that outlines
responsibilities, fire prevention measures, staffing levels, and
requisite equipment needed, including helicopter support during
live fire training.  Id.  These protective measures were cited by
the Fish and Wildlife Service as being significant in minimizing
or eliminating potential impacts from wildfires and contradict
the finding's made by Plaintiffs' witness.

Not only do the findings of the Fish and Wildlife Service
undermine Mr. Castillo's speculative claims, but his own prior
research at PTA and deposition testimony also contradict his
recent assertions.[14]  Castillo Dep. 12/11/06, 73:21-25, attached

_____

[14]Mr. Castillo's current opinions directly conflict with his
draft declaration in which he concludes that the Army played a
significant role in maintaining "the largest and most contiguous
native-dominated forest and shrubland" in the upland environment

as Exh. M.  In 1997, Mr. Castillo served as a researcher for the Center for Environmental Management of Military Lands ("CEMML"), which concluded that PTA consisted of "mostly barren lava." Mansker 12/15/06 Dec., at ¶¶ 8 & 10; Castillo Dec. at ¶7.  This conclusion was subsequently affirmed by Mr. Castillo during his recent deposition: "As you know, most of the installation is rock, a lot of it is pahoehoe."  Exh. M at  78:21-22.  It is well known that sparsely vegetated lava is not conducive to fire and, thus, a wildfire is unlikely to occur at a majority of the installation at PTA.  Mansker 12/15/06 Dec. at ¶10.  Furthermore, a significant wildfire is not likely to result from Stryker-related training at PTA because much of the barren lava runs through the central impact area[15], separating the important endangered species habitat in the western and eastern portions of PTA from the impact area.  Id. at ¶11.  This natural separation between the impact area and the endangered species habitat helps ensure that any potential fire within the impact area does not

---

of PTA.  See Attachment 4 at ¶16 to Mansker 12/15/06 Dec.  Mr. Castillo explained that this high quality habitat remains because "military training has protected it from other more destructive land uses such as cattle production." Id.

[15]The central impact area is the designated location where training munitions land and constitutes the area that overlaps with the Surface Danger Zone ("SDZ") for each of the munitions used at PTA.  Mansker 12/15/06 Dec. at ¶9.  PTA consists of approximately 108,801 acres of which 47% or 50,700 acres comprise the central impact area.  Id.

38

spread to or impact listed species habitat. Id. Finally, in the 1997 CEMML study in which Mr. Castillo assisted, the final report concluded that the rare species at PTA mainly occupy "remote areas with little or no chance of being disturbed by military training." Id. at 15.

The most significant threat to federally listed species at PTA is not wildfire as Mr. Castillo now concludes, but rather, as the Fish and Wildlife Service has identified, the threat from ungulates (non native sheep, goats, and pigs). Masker 12/15/06 Dec. at ¶12. In its 2003 Biological Opinion, the Fish and Wildlife Service concluded that ungulates pose the greatest threat to 12 of the 15 listed species at PTA and identifies fencing and removal of ungulates as the most critical conservation method to protect those species. Id. Even the 1997 CEMML study concluded that ungulates "have a significant influence on the health, vigor, reproduction and survival of many of the rare species" found at PTA. Id. The CEMML study identified six listed plant species that have suffered either loss of individuals or loss of entire populations from ungulates. Id. In addition to the extensive measures undertaken in the IWFMP to protect species from wildfires, the Army recognizes the significant threat posed by ungulates to native species at PTA and will be fencing off over 30,000 acres, or the 57,000 total acres, of habitat located outside the impact area at PTA.

Mansker 12/15/06 Dec. at ¶ 13.  With the main threat to the
majority of listed species at PTA removed, the habitat and listed
species should recover.  <u>Id</u>.  The Army also intends to remove
invasive plant species from the fenced areas to allow the native
plants to revegetate and will re-introduce additional numbers of
the listed species into these fenced areas.  <u>Id</u>.  Based on the
foregoing measures, the Fish and Wildlife Service concluded that
Stryker training will not jeopardize threatened or endangered
species and, in fact, will result in a net benefit to the species
in the long run.  Mansker 12/15/06 Dec. at ¶7.

Mr. Castillo makes some additional observations in his
declaration that are inaccurate and undermined by the record, the
findings of the Fish and Wildlife Service, and the conclusions
reached by the Army's Natural Resource Manager, Michelle Mansker.
First, Mr. Castillo states that "fountain grass is continuing
unabated" and he uses this erroneous assumption as the basis for
many of his conclusions.  Castillo Dec. at ¶4.  This opinion,
however, is belied by the record before this Court, specifically
Figure 7, Fuel Management, in the 2003 PTA Biological Opinion,
which documents that the Army has undertaken measures to
eliminate fountain grass and other invasive plant species in
critical habitat areas.  Mansker 12/15/06 Dec. at ¶17. In fact,
the Army employs a staff of four full time employees whose sole
responsibility is to control invasive plant species on the

installation.  Id.  Over time, the Army's efforts have been
successful in reducing the overall concentration of fountain
grass, specifically in and around endangered species habitat.
Id.  This measure to eliminate the concentration of invasive
plant species that may fuel a wildfire coupled with the lava
flows that separate the impact areas from the listed species
habitats help to minimize the possibility that a fire will start
in the impact area and spread to listed species habitat.  Id.

    Mr. Castillo's assertion that the use of tracers as part of
the Stryker training will increase the potential for wildfires
(Castillo 12/13/06 Dec. at ¶20) also is not supported by the
record or the historical use of these training areas.  First, as
discussed earlier by Colonel Banach, the weapons systems
associated with Stryker training are more precise than
traditional military systems current in use at these ranges.
See, supra, section IV.A.  With the unprecedented accuracy of the
Stryker-related weapons systems, the risk of missing target areas
and causing harm to threatened or endangered species is greatly
reduced.  Id.  Furthermore, although historically tracers may
have caused the majority of fires, these fires have remained
small in size, mostly less than 1 acre, and, more importantly, no
such fire has impacted listed species.  Mansker 12/15/06 Dec. at
¶19.  In fact, as noted in the IWFMP, "much of the threat to
endangered species populations is a result of off-post

ignitions." Even Mr. Castillo acknowledges that the two "large fires" he is aware of in the area started outside the Army's military installation. Exh. M at 49:22-50:13. Since July 1990, over 8,000 acres have burned on Army property, and 7,700 of those acres were burned by non-military sources. Mansker 12/15/06 Dec. at ¶20. The largest of these fires started in 1994 on state lands below PTA and moved onto the installations western section, burning a significant portion of this area. Id. Given this past experience, the Army is currently constructing a large western firebreak separating state land from PTA. This firebreak is not to stop fires that start on the installation from military training, but to prevent the more likely off-site sources of a significant wildfire from progressing into the western area of PTA, which contains a large concentration of listed species. Id.

The Army's mitigation measures, including the use of firebreaks and the IWFMP, have proven successful and were relied on by the Fish and Wildlife Service in issuing its biological opinion that Stryker training and related construction will not jeopardize threatened or endangered species.[16]  Mansker 12/15/06

---

[16]  Contrary to Plaintiffs' speculative assertion that unmanned aerial vehicles are likely to cause harm to threatened or endangered species, see Pltfs' Br. at 31, the record demonstrates otherwise. The Raven and Shadow UAVs have logged 132,000 flying hours over the last three fiscal years. Defendants' Exhibit N, Flightfx, September 2006, page 8. Between these two systems, they have had only 5 post crash fires. See Plaintiffs' Exhibit 90, FY 2004-2007 UAV post-crash data. Three of these occurred in Iraq and only one post-crash fire occurred in each of the last two years. Id. This is another example where Plaintiffs'

Dec. at ¶7.  In fact, the Fish and Wildlife Service concluded
that these mitigation measures will result in a net benefit to
the species in the long run and that conclusion has been verified
in the years since the 2003 Biological Opinion was issued.  <u>Id</u>.;
<u>see also</u> Mansker 12/15/06 Dec. at ¶¶ 22-24.  A recent survey
submitted to the Army by CEMML in which Mr. Castillo conducted
some of the survey work, identifies a large increase in the
number of a rare plant species.  Mansker 12/15/06 Dec at ¶ 22.
Furthermore, since the completion of the Biological Opinion,
there has been a substantial increase in 8 of the 11 plant
species found at PTA.  <u>Id</u>. at ¶¶ 23-24.  In the end, Mr.
Castillo's opinion are not supported by the record, the Fish and
Wildlife's Biological Opinions, and the documented success of the
Army's mitigation measures in protecting and improving threatened
and endangered species in the training areas to be used by
Stryker brigade combat units.

>    **2.    The Army has Undertaken Significant Measures
>           to Ensure that Impacts from Erosion and
>           Stormwater Runoff are Minimized**

In their supplemental memorandum, Plaintiffs assert that the
Army's construction projects might result in erosion and
stormwater runoff that could impact the environment.  Pltfs' Br.
at 16-19.  However, this opinion fails to consider the numerous

---

allegations of potential harm are not supported by the record
before this Court.

measures undertaken by the Army to ensure that erosion from the critical projects is minimized or eliminated.

All of the construction projects associated with Stryker transformation are covered by National Pollution Discharge Elimination System (NPDES) permits that are submitted to and approved by the State of Hawaii Department of Health ("DOH"). Declaration of Lawrence T. Kawasaki ("Kawasaki 12/15/06 Dec") (December 15, 2006) at ¶4. These permits require the Army to implement Best Management Practices ("BMPs") to minimize any impacts resulting from soil erosion and avoid adverse impacts on water quality. Id. at ¶¶4,5. To date, the Army has not received a single notice of violation of its NPDES permit for erosion or adverse water quality impacts from the State of Hawaii. Id. at ¶4.

Plaintiffs' hydrologist, Mr. Hood, raises concerns about potential erosion from a number of projects without understanding the construction design or the measures undertaken by the Army to prevent erosion and adverse water quality impacts. Id. at ¶¶7-10. For example, Mr. Hood claims that once the SBCT Motor Pool is paved and becomes impervious, water will flow across it and into the Waikele stream, thus degrading the natural stream channels. However, Mr. Hood apparently does not know the extent of storm water and pollution control at the Motor Pool. In addition to the curb and gutter system, there are three

44

constructed concrete dissipaters that are designed to decrease the water flow and splitting the resulting water volume into three distribution points that reduce the possibility of erosion from stormwater runoff.  Filters and absorbents are also will be used  Id. at ¶7a, 7b.

Mr. Hood also did not understand the BMPs in place at the Multiple Deployment Facility (MDF).  For example, he indicated that there are a series of detention basins on the west side of the runway for the MDF that are not designed correctly, though he acknowledges not be being familiar with the design. Kawasaki Dec. at ¶8a.  In fact, the structure he actually saw was a detention basis that was properly designed and consistent with BMPs.  Id. This is the same BMP that Mr. Hood recommended for the Motor Pool and it is primarily used to slow down the flow of water.  Until the final pavement is laid and the payment is sloped to the drain inlets, the detention basin serves as a sedimentation basin, trapping sediment before it flows to a nearby outlet.  Id. at 9b Furthermore, before the injunction was issued, the Army was undertaking a design change to correct a stormwater runoff and erosion issue that resulted from heavy rainfall.  Id.  The Army identified this issue and consulted with the contractor on the appropriate remedial steps to undertake when the injunction was issued.  Id.

Finally, based on an admittedly limited basis of knowledge, Mr. Hood expressed concerns with stormwater runoff and erosion on roads and trails road from Stryker operations. He does so by observing impacts from unidentified wheeled vehicles and simply assuming some amount of impacts must be Stryker related. Kawasaki 12/15/06 Dec. at ¶10d. To address the problem he observes, Mr. Hood advocates using "BMPS that could capture sediments generated from those sites and store them onsite so they're not conveyed through the system and into the stream course." This is exactly the course of action undertaken by the Army to ensure stormwater runoff of sedimentation along these areas does not travel into local waterways. Kawasaki 12/15/06 Dec. At ¶10c. The Army purposely cut paths into the vegetation along the roads to allow the water and sediment to flow there. Id. In most areas, the ground was slightly elevated toward so the water had a stopping point and the vegetation acted as a natural filter to prevent the flow of sediment. Id. These measures reduced the velocity and volume of water traveling down the roadway as well as the sedimentation and incorporated BMPs to minimize any impacts from water runoff.

In the end, the Army coordinated with the State of Hawaii and obtained the necessary NPDES permits for all SBCT construction projects. The Army continues to be proactive in executing its NPDES program and ensuring BMPS are implemented.

46

Finally, as evidenced in the preceding discussion, the Army has undertaken significant measures to ensure that stormwater runoff and erosion do not adversely impact the waters surrounding these construction projects. As evidence of its commitment, it is significant that the Army has not received a single notice of violation of its NPDES permit for erosion or adverse water quality impacts from the State of Hawaii. <u>Id</u>. at ¶4. Plaintiffs' hydrologist, Mr. Hood, never concludes nor could he that irreparable harm will occur from Stryker training or the related critical projects. The Army has demonstrated its commitment to maintaining the BMPs in accordance with its NPDES permit to ensure no such harm will occur.

> **C.** **Plaintiffs Cannot Demonstrate Irreparable Harm to Cultural Resources will Result from the Limited Construction Projects and Training Needed to Transform the 2nd Brigade into a Stryker Unit**

Plaintiffs have argued that the transformation of the 2nd Brigade will cause irreparable injury to cultural resources. But, as this Court has previously recognized, Plaintiffs' claims of irreparable harm are too speculative and overlook the Army's knowledge of cultural resources in construction and training areas and the extensive steps it has taken to avoid and mitigate impacts to cultural areas. Declaration of Dr. Laurie Lucking (November 13, 2006) at ¶¶2-10, Attachment 1 to Lucking 11/13/06 Dec. at ¶¶2, 7-16, 19; <u>see</u> <u>also</u> Federal Defendants' initial memorandum dated November 14, 2006 at 39-50 and the Court's Order

dated November 5, 2004 at 15-16.  Dr. Laurie Lucking, the Army's
Cultural Resource Manager, has explained in detail in her prior
declaration the extensive measures the Army has undertaken to
ensure that cultural sites are identified and protected.  <u>See</u>
Lucking 11/13/06 Dec.; <u>see</u> <u>also</u> Federal Defendants' initial
memorandum dated November 14, 2006 at 39-50.  With respect to the
five remaining critical projects, the extensive mitigation
measures described by Dr. Lucking have proven effective.  Lucking
Dec. at ¶¶4-10.  The Army's mitigation measures have revealed
that there have been no cultural resources identified in four of
the five critical project areas, and mitigation measures have
proven successful in identifying and protecting cultural
resources at QTR1.  <u>Id</u>. As for the modification to Range 11T,
this project has not begun, but the mitigation measure of
avoidance has been implemented after completion of cultural
resource surveys. <u>Id</u>.

    In past briefing, and during the recent two-week discovery
period, Plaintiffs and their witnesses have raised concerns about
construction and training impacting two cultural sites known as
Mauna'una and Hale'au'au Heiau that Plaintiffs have identified as
areas of concern.  As Dr. Lucking has explained, the Army is well
aware of these sites and protective measures have been
implemented to minimize any potential harm.  Lucking Dec. at ¶8.
Mauna'una is located on an eroding slope more than 200 yards from

48

any critical project area.  Id.  Rather than harm this resource,
the Army is stockpiling soil from the Multiple Deployment
Facility with the hope that this soil can be used to stabilize
the erosion around this site.[17]  Id.  As for the Haleʻauʻau site,
through its mitigation measures, the Army identified this site,
marked it with plastic construction fencing, and to this day,
there has not been damage to the site from any Army operation,
construction or training.  Id.

    Furthermore, as described in detail above at IV.A., the
training ranges and most of the weapons systems will be used at
the various Army facilities in question regardless of the scope
of an injunction issued by the Court.  The only issue is whether
these weapons systems will be mounted on Stryker vehicles, which
will, in fact, add improved stabilization and sighting systems
that actually make the weapons more accurate than the firing
methods that are currently in use by other Brigades at Schofield
Barracks, PTA, and QTR1.  Banach 12/15/06 Dec. at ¶ 19.  Thus,
the increased precision associated with the Stryker vehicles will
actually improve protection of cultural and environmental sites
and with the increased accuracy, fewer training rounds will be
needed.  Id.  Any claim that potential cultural resources in the

---

[17] Surprisingly, Plaintiffs seem to fault the Army for attempting
to protect the eroding slope near a cultural site that is not
within a critical project area or where training will occur.
Pltfs' Supp. Br. at 22, fn 11.

SDZs are more likely to be impacted by Stryker-specific training is therefore unfounded. See Pltfs' Supp. Br. at 12.  In the end, these substantial improvements in the accuracy and technology associated with Stryker-related training will act to protect cultural sites and environmentally sensitive areas in ways that historical Army training cannot provide.  Id.

Plaintiffs have not provided any evidence to contradict these conclusions.  Rather, Plaintiffs rely on speculation that harm may occur, which is insufficient to satisfy their burden of proof.  For example, Plaintiffs' witness, Lemaile Quitevis, claims that the Army has impacted cultural sites at QTR1 and mishandled skeletal remains.  However, when questioned on these assertions, she could not identify cultural sites in specific locations, including the critical project and training areas, and conceded that the bones in question were cow bones that have never been used in Hawaiian cultural practices. Quitevis 12/05/06 Dep. at 80:19-81:8; 85:1-89:10.  Another witness, Kamoa Quitevis, claims that the Army damaged a cultural site known as Haleʻauʻau site and this is indicative that the Army's mitigation measures are ineffective.  Kamoa Quitevis 12/14/06 Dec. at ¶19.  However, this assertion is incorrect and the record demonstrates that the Army identified the site, implemented protective measures and, to this day, there has not been damage to the site from any Army operation, construction or training.  Attachment 1 to Lucking

11/13/06 Dec. at ¶16.  Plaintiffs also speculate that construction activity at Range 11T will impact a cultural site, 23621, but this also is not true.  Pltfs' Supp. Br. at 26.  As Dr. Lucking has explained, the construction footprint of this project has been designed to avoid this and other sites.  Lucking 11/13/06 Dec. at 10.  Thus, there will be no adverse effects to cultural resources as a result of the construction or use of Range 11T.  Id.  Finally, Plaintiffs assert that the use of Targets 3 and 4 at QTR1 will result in impact to cultural sites. However, these targets have not been used and, before any such use, the Army will undertaken the precautionary measures outlined in Dr. Lucking's prior declaration, including consultation. Furthermore, specific mitigation measures will be implemented for any identified sites before these targets are used. Attachment 1 at ¶10, 19 to Lucking 11/13/06 Dec.  Finally, Plaintiffs incorrectly assert that the Office of Hawaiian Affairs ("OHA") concluded that the lack of a physical barrier around site 210 at QTR1 constitutes "grievous cultural harm."  Pltfs' Supp. Br. at 12.  This statement is false and misleading.  In its November 22, 2006 correspondence, OHA recommended that the Army more precisely define the no fire zone while incorporating the identified mitigation measures. See OHA's November 22, 2006 correspondence, Exhibit O to the Declaration of James Gette.  Under no uncertain terms did OHA conclude that the Army should implement a physical

51

barrier or the lack of such a measure was "grievous cultural harm." <u>Id</u>.

The foregoing examples are illustrative of the speculative and misleading nature of Plaintiffs' claims and demonstrate that Plaintiffs cannot establish that irreparable harm will result from Stryker-specific training and the limited construction projects. As this Court has already recognized, the Army has undertaken extensive measures to ensure that cultural sites are identified and protected to the fullest extent practicable. <u>See</u> Court's Order dated November 5, 2004 at 15. Given these protective measures as outlined above and described in earlier briefing, <u>see</u> Defs' 11/14/06 memorandum at 39-50, it is not surprising that there is no evidence that cultural resources have been irreparably harmed. <u>See</u> Attachment 1 to Lucking 11/13/06 Dec at ¶¶7, 12-1. Nor is it likely that this will occur. Therefore, Plaintiffs cannot demonstrate irreparable harm to cultural resources and the Court should issue an interim injunction that permits the Army to proceed with the five critical Stryker projects and Stryker training.

**VI.  PLAINTIFF'S MAY NOT "SET ASIDE" COMPLEGED LAND ACQUISITIONS**

Plaintiffs suggest that the Court at some future date set a hearing to consider Plaintiffs' attempt to "set aside" the completed acquisition of land that was accomplished through condemnation of approximately 1,400 acres of the Campbell Estate

and through voluntary purchase of 24,000 acres from the Parker
Ranch.  There is no basis or need for the Court to entertain
Plaintiffs' request now or in the future.  As Plaintiff is well
aware, the first transfer they seek to rescind – the condemnation
of the Campbell Property – occurred in an action in which they
intervened and in which both this Court and the Ninth Circuit
rejected their argument that the land acquisition should be set
aside.  See, United States v. 1,402 Acres of Land, No. 05-15858
(9th Cir. Oct. 5, 2006).[18]  Plaintiffs' attempt to collaterally
attack that decision before this Court is clearly improper and
should be denied.

     Plaintiffs' attempt to rescind the Parker Ranch acquisition
has no better legal underpinning and also must be denied.  While
a NEPA lawsuit, which is based on the APA, may under certain
limited circumstances be used to challenge the conveyance of land
out of federal ownership, it cannot be used to contest the United
States' existing ownership of land, such as the former Parker
Ranch land.[19]  Instead, the Quiet Title Act ("QTA"), 28 U.S.C. §

---

[18]Generally unpublished decisions of the Ninth Circuit lack
precedential value and may not be cited.  Cir. Rule 36-3(a)&(b).
Unpublished decisions, however, are treated as binding precedent
for purposes of the application of the doctrine of res judicata
and may, as here, be cited for that purpose.

[19]The cases cited by Plaintiff are inapposite.  Desert Citizens
Against Pollution v. Bisson, 231 F.3d 1172 (9th Cir. 2000) is not
a NEPA case and the statutory requirement at issue – valuing
property at its highest and best use – goes directly to the
legality of the land transfer, not an ancillary statute, such as
NEPA, which addresses only the use of the property not the

2409a, is the exclusive means by which the United States' ownership of land may be challenged. <u>Block v. North Dakota</u>, 461 U.S. 273, 286 (1983). The Quiet Title Act provides the exclusive means by which the United States' title to real property may be challenged. <u>Id</u>. Among other provisions, the QTA provides a strictly construed, limited waiver of sovereign immunity to assert title claims against the United States and specifically allows the United States to "retain such possession or control of the real property or of any part thereof as it may elect" so long as just compensation has been paid. <u>See</u> 28 U.S.C. § 2409a(b). Plaintiffs have not alleged jurisdiction under the QTA, could not properly assert a claim even if they did, and could not be granted the relief they seek (divesting the United States of title) because of the express terms of the QTA.

## VII. CONCLUSION

For the foregoing reasons, Federal Defendants request that the Court issue an order on interim injunctive relief permitting the Army to proceed with Stryker related training, provision of

---

acquisition itself.    In <u>Muckleshoot Indian Tribe v. U.S. Forest Service</u>, 177 F.3d 800 (9th Cir. 1999), the Court did not order that the United States be divested of property, rather it enjoined a private company who acquired property from the U.S. Forest Service from certain activities until the Forest Service met its obligations under NEPA.

the requisite Stryker equipment, and the completion of the five

critical construction projects.

    Dated:  December 15, 2006, Honolulu, Hawaii.

                                EDWARD H. KUBO, JR.
                                United States Attorney
                                District of Hawaii

                                /s/ Harry Yee

                                By_____
                                  HARRY YEE
                                Assistant U.S. Attorney

                                Attorney for Defendants
                                UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| 'ILIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NA 'IMI PONO, a Hawai'i unincorporated association; and KIPUKA, a Hawai'i unincorporated association, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army, )<br><br>Defendants. ) | CIVIL NO. 04-00502 DAE-BMK<br><br>CERTIFICATE OF SERVICE |

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

Served Electronically through CM/ECF:

David L. Henkin        dhenkin@earthjustice.org

Isaac H. Moriwake      imoriwake@earthjustice.org

Served by Hand-Delivery:

    David L. Henkin, Esq.
    Isaac H. Moriwake, Esq.
    Earthjustice
    223 South King Street, Suite 400
    Honolulu, Hawaii  96813

       Attorneys for Plaintiffs

DATED:  December 15, 2006, at Honolulu, Hawaii.


              /s/ Jan Yoneda
             _____

1