IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ILIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NA 'IMI PONO, a Hawaii unincorporated association; and KIPUKA, a Hawaii unincorporated association<br><br>Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD, Secretary of Defense; and LES BROWNLEE, Acting Secretary of the Untied States Department of the Army<br><br>Defendants. | CIVIL NO. 04-00502 DAE BMK<br><br>DECLARATION OF MAJOR GENERAL WILLIAM H. BRANDENBURG |

DECLARATION OF MAJOR GENERAL WILLIAM H. BRANDENBURG

1. This declaration supplements my declaration of November 13, 2006.

2. I am currently the Commanding General, 8th Theater Sustainment Command and Commanding General, United States Army Hawaii. I am responsible to ensure that 2nd Brigade, 25th Infantry Division (2/25) is trained to standard as a Stryker Brigade Combat Team (SBCT). I ensure that the Brigade has the time, facilities, personnel, equipment, and training resources in Hawaii to meet their initial operating capability by November 2007. There is no viable

1

alternative to 2/25 training in Hawaii that will ensure 2/25 will be available on time to meet the needs of Commander, United States Pacific Command and global commitments.

   3. I am a career Infantry Officer with over 33 years of service. I have commanded at the Company, Battalion and Brigade level during my service in the United States Army and have served as a Staff Officer at multiple echelons, ranging from Battalion through Geographic Combatant Command. Significant operations I have participated in include OPERATION IRAQI FREEDOM, where I served for a year as Deputy Commanding General, Multi-National Force - Iraq and Commanding General, Task Force 134. Prior to being stationed in Hawaii, I served as the Deputy Commanding General of I (US) Corps and Fort Lewis, Washington. In this role I was directly responsible for the establishment of the first two SBCTs in the Army inventory. Given my previous responsibilities at Fort Lewis and my current duties, I am intimately familiar with the training requirements and training resources in Hawaii required to deploy a Stryker Brigade to combat.

   4. The 2/25 SBCT is scheduled to be ready for deployment in November 2007. Under the current order by the U.S. Court of Appeals for the Ninth Circuit, the brigade

currently is not executing its training plan or integrating its new SBCT systems. The brigade was approximately 60% through its training as a SBCT when ordered to cease Stryker Specific training.

5. Due to the potential for this Court or the appellate court to continue the prohibition on 2/25 completing its Stryker specific training in Hawaii, I asked the Commander of 2/25 to look at options considering the possible outcomes of court rulings. The purpose was to identify in rough orders of magnitude the challenges that we might face and to begin the professional and intellectual understanding of the impact that the court rulings would have on training the Brigade to achieve initial operating capability (IOC) by November 2007. Additionally, we needed to gain insights should we need to prepare a formal proposal to the Department of the Army if a decision continues to enjoin necessary training in Hawaii. The Contingency Planning briefing that Colonel Banach prepared, which was provided as part of the discovery process, is not a formal proposal. Rather, it was meant to provide a large order of magnitude look at how training **might** be accomplished at an alternate location should 2/25 be precluded from continuing to transform and train in Hawaii.

6. I directed Colonel Banach to use Fort Lewis for his review for the following reasons: Four US installations have completed the appropriate environmental studies for Stryker: Fort Wainwright, Fort Polk, Fort Irwin and Fort Lewis. We believed that our only chance of possibly having adequate environmental analysis completed within the limited time available would require using one of those installations. Of those, Forts Polk and Irwin are both Combat Training Centers (CTC) that are continually in use performing Mission Rehearsal Exercises for every deploying brigade in the Army. These installations simply cannot support an additional brigade or elements of a brigade for an extended period without completely disrupting the final training and assessment sequences of every other brigade in the Army preparing for deployment. Therefore, I determined that it was totally infeasible to use the two CTCs for the review. Fort Wainwright is characterized by a harsh Arctic environment. Before 2/25 could train there, it would require extensive preparation of personnel and equipment for winter operations. It was apparent to me that 2/25 has neither the required winterization equipment nor the time to acquire it and complete the winterization process in time to meet IOC. Additionally, Fort Wainwright has limited training space available due to the 172nd SBCT

redeploying in the very near future and beginning its reset and training for follow-on operations in support of the Global War on Terror. Thus, I eliminated Fort Wainwright from further review. By default, that left Fort Lewis to use for the review. I am personally very familiar with that installation's capabilities to support training. However, for what I asked COL Banach to do, this location was not the essential element. After detailed analysis, Fort Lewis may not be the best choice. In fact, Fort Lewis simply cannot accommodate 2/25's training needs. Fort Lewis is standing up the 7th SBCT, and the 17th Fires Brigade is relocating from Fort Sill. These units alone are adding nearly 7000 Soldiers to Fort Lewis and will require barracks facilities, motor pools and access to the training areas. Additionally, Ft Lewis was sized in facilities and training areas for two SBCTs--not three. The addition of 2/25, even though temporary will radically increase the demands on all facilities. Any discussion of the use of Fort Lewis must consider the total training and facility requirements and not just assume that SBCTs are the only units at Fort Lewis. Fort Lewis has increased the number of units because of BRAC and the relocation of units from overseas. Regardless of Fort Lewis's actual ability or inability to accommodate an additional unit's training

requirements, what we wanted to examine in the briefing was how long training at a different location might take and how it would impact the Brigade's readiness - not the details of each installation. Regardless of location, detailed coordination would be required to de-conflict the resources at any other location besides Hawaii. None of that coordination has begun nor will it occur until after the court has ruled. A court ruling that provides sufficient relief from the injunction would make all the coordination unnecessary. The effort to propose and plan an alternate location will be extensive. It will disrupt the ongoing mission planning for 2/25 in Hawaii, for the potential gaining installation, for the installation's higher command and the Army staff. Planning and coordinating a redeployment most likely will take weeks. For these reasons, we have not formally proposed any alternatives to the Department of the Army and, at this time, we would exceed our authority to begin any dialog with mainland installations.

7. The primary purpose of the briefing was to gain insight into the answer for the following question: Do we have the time to meet the required IOC date if we assume there is enough injunctive relief in Hawaii or could we move the training from Hawaii and still meet the required

availability date?  Having the SBCT is critical to the US Army maintaining the current pace of operations.  Beginning in the fall of 2007 and extending through the spring of 2008 is the active Army's most challenging period to meet the global force requirements.  Many brigades are likely to not have the desired one year at home station to reset and retrain before returning to combat.  Brigades across the Army are extremely stretched; this is why the ability to keep the Hawaii-based Stryker Brigade on track is essential.  Additionally, the SBCT is an optimal organization for ongoing combat operations.  A Stryker Brigade Combat Team is more capable than an Infantry Brigade Combat Team; therefore, availability in November 2007 is even more critical.

8.  The Brigade needs a certain number of days to execute training events, from individual to large units, to be able to stay on course to meet the November 2007 IOC.  The delay in training that has already occurred has substantially affected our capability to stay on course.  We have not crossed that line yet, but are very close.  We are mitigating the effects of the delay with adjustments to how we are training and by rescheduling Stryker-specific training to later in the training cycle.  However, this is already taking a toll on the overall quality of training

that 2/25 Soldiers are receiving. Minimum standards are not the objective. The objective is to provide 2/25's Soldiers and leaders with the best training possible in order to ensure mission success for the Brigade and fewer casualties. 3rd Brigade of the 25th Infantry Division has been deployed to Iraq for just over three months. They have sustained 12 Soldiers killed in action - a figure that is much higher than other Brigades during a similar time frame. 3rd Brigade's training was truncated in Hawaii because of delays in live fire range construction and the availability of live fire ranges for collective live fire training. While I cannot conclude with scientific certainty that the availability of these ranges was the cause, it is my professional judgment that it was as least a major contributing factor and it is clearly a consideration for ensuring 2nd Brigade has the right facilities in sufficient quantity and quality.

9. One of the lessons I brought to this command based on my experience in training the first and the second SBCTs at Fort Lewis is the requirement for the unit to do a significant amount of collective unit training - including live fire, maneuver and simulation - for the leaders and Soldiers to understand how the brigade fights. Because of the information dominance inherent in the SBCT's command

and control, leaders and Soldiers must learn through experience gained in practice (training) on how the organization fights from platoon to brigade level. With the first SBCT, we did not spend enough time doing this and at the very end had to add additional training to get the unit certified. We did not have the same issues with the next two SBCTs because we had learned and made the adjustments. For 2/25 SBCT, we must have the time to accomplish this revolutionary change to how we fight. Unlike the first SBCT, we do not have the luxury of time to add additional training if we get it wrong. We need to train right from the beginning.

10. We also needed to look at the available time if we went to another location on the mainland. Factors we discussed included availability of live fire ranges and maneuver areas as well as simulations. In no case is any Army installation idle. Units are competing for training resources to get ready for deployments to combat. These units are not just Infantry Brigades, but units of all types - Engineer, Military Police, Medical, Supply, Signal and Maintenance. All of these units compete for the same limited resources. Army installations by design have units assigned to them based on the ability of the installation to support the units for training. An additional large

unit will place other units at risk and will increase the time it takes to get the training accomplished (i.e., "thru put") because of the numbers required to use the facilities increases. While much of the training 2/25 must conduct in preparation for deployment is not unique to an SBCT, the Stryker-specific training is absolutely critical to this process. All units have 40 warrior tasks that range from individual marksmanship to cultural training done in situational training exercises. Each unit has crew served weapons qualification, both mounted and dismounted. All have collective live fire exercises. This training must be done with the equipment that unit will take to war - in this case, the Stryker fighting vehicle. While the ranges and maneuver areas may not change, the training scenario for the different types of units does change. Movement of the 2/25 SBCT or part(s) of the Brigade, at a minimum, increases the thru put challenges at any other location. However, in Hawaii, we would not have the thru put challenge if the Court permits us to use the ranges and training areas we have requested because the majority of the 25th Infantry division is currently deployed.

11. The review also began to give insights into the magnitude of the task to adjust the training location and the complexity of the coordination required. Additionally,

the review provided indications of the scale of the effort required to offer viable options to the Department of the Army. Detailed coordination would be required after a thorough review of possible locations to ensure ranges, maneuver area and simulations were readily available without significant impact on other units at a chosen training location. Availability of the necessary support facilities, motor pools and barracks for Soldiers would need to be examined closely. Detailed examination is needed for available logistical support to deliver fuel and ammunition and to provide echelon above brigade maintenance and medical care. The briefing only highlights the work that would need to be accomplished; it does not reflect answers to the many issues raised or assumption used. In each case, clearly these become new requirements for a new location and are a capability that is already present in Hawaii.

12. As part of the review, and as supported in other declarations, we were able to confirm some of the impacts of training away from Hawaii. The most significant conclusion is training away from Hawaii would not be as effective. The impacts are numerous. Additional extended family separation is not a regrettable inconvenience but a significant morale factor when a unit is faced with a long

deployment to combat. The separation can affect retention of our volunteer force and can cause the Soldier to loose focus during training. The leadership of the Brigade will have a score of additional tasks to accomplish if the training is done outside of Hawaii. They will find their time to focus on the task to transform and train for combat being diluted by the additional requirement to plan major unit movements that take time to prepare and execute. Split based training prevents the sharing of critical lessons learned and reduces the ability to conduct unit collective training at Battalion and Brigade level. Split based training also places additional demands on the leadership's time. The result will be fatigued leaders before they deploy to combat. Split based training also hinders building the necessary teamwork required to function as an effective fighting unit. These factors would combine to result in a significantly less effective unit and would almost certainly result in more Soldier casualties.

13. Another important consideration was that current contingency operations performed by the units in the Brigade in the Pacific area of operations would cease. The Brigade's conducting split based training in another geographic location without all of its equipment in a

single location would substantially delay a response to any contingencies in the Pacific. Part of the Brigade would be farther away, complicating and extending the time to deploy the unit.

14. When it reaches its IOC, 2/25 will become only the fifth fully operational SBCT. SBCTs, as noted above, are unique units with capabilities that are not replicated in either Armor or Infantry BCTs. Therefore, a unit other than an SBCT cannot simply be substituted for 2/25 in the deployment schedule. Even if this were possible, it would require either extending a brigade in Iraq or Afghanistan, or reducing the training and reset time for a brigade in the United States. Either choice would have profoundly detrimental impacts on those Soldiers and their families, as well as unit readiness. Use of the Reserve Component (RC) forces is even less feasible than substituting an active brigade for 2/25. There are no operational RC SBCTs. It would take 18 months to mobilize, train, deploy, and return an RC brigade. Finally, because they are part-time Soldiers, current laws and Defense Department policy limit when RC units may be involuntarily mobilized.

15. The option to relocate training to a mainland installation is extremely complex. The limited review only confirmed how much work would be required to propose to the

Department of the Army an alternate location for training if the Court rules in favor of the plaintiffs. We also confirmed that staying in Hawaii with sufficient resources and latitude to train is clearly better for the Brigade's readiness and the well-being of the leaders, Soldiers and their families.

   I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

   Executed on December 15, 2006.


_____          15 DEC 06
MAJOR GENERAL WILLIAM H. BRANDENBURG          DATE