IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

ILIO'ULAOKALANI COALITION, a ) CIVIL NO. 04-00502 DAE BMK
Hawai'i nonprofit corporation;)
NA 'IMI PONO, a Hawaii         ) DECLARATION OF
unincorporated association;    ) LAWRENCE T. KAWASAKI
and KIPUKA, a Hawaii           )
unincorporated association     )
                               )
            Plaintiffs,         )
                               )
     v.                         )
                               )
ROBERT GATES, Secretary of      )
Defense; and FRANCIS HARVEY;    )
Secretary of the United         )
States Department               )
of the Army                     )
                               )
            Defendants.         )
                               )
_____)

DECLARATION OF LAWRENCE T. KAWASAKI

     I, Lawrence T. Kawasaki, hereby declare that:

1.  I am a Program Manager with the U.S. Army Corps of

Engineers (USACE), Honolulu Engineer District, Hawaii.  I

have a Bachelor of Science degree in engineering and have

over 23 years of experience in facilities design and

construction.  My last four years has been with the

Honolulu Engineer District (HED).

2.   HED is the Design and Construction Agent for Army and

Air Force military construction (MILCON) projects in

Hawaii.  As the Stryker Brigade Combat Team (SBCT) Program

Manager at HED, I am responsible for the coordination and

execution of all HED projects associated with the

transformation of the 2nd Brigade, 25th Infantry Division

(Light), US Army Hawaii, to a SBCT.

3.  Military construction projects associated with the SBCT

must comply with the Code of Federal Regulations, Title 40,

Protection of Environment (40 CFR)and Section 402, Federal

Water Pollution Control Act, as amended by the Clean Water

Act of 1977.  Since the Environmental Protection Agency

delegated authority to the State of Hawaii to administer

its National Pollutant Discharge Elimination System (NPDES)

permit program in Hawaii, these projects must also comply

with Hawaii Administrative Rules, Title 11, Chapter 54,

Water Quality Standards, and Hawaii Administrative Rules,

Title 11, Chapter 55, Water Pollution Control.

4.  The State of Hawaii Department of Health (DOH) has

issued NPDES permits for each of the SBCT projects

currently under construction.  As part of the permit

process, site specific best management practices (BMPs)

were submitted and accepted by the DOH prior to

construction.  These BMPs are typical of the construction

BMPs used in Hawaii.  The Army strictly adheres to these

BMPs, which help to minimize soil erosion and adverse water

quality impacts from the project sites.  To date, SBCT

construction contractors have received no notices of

violation of their NPDES permits for unmanaged erosion or
adverse water quality impacts from the State of Hawaii.
Mr. Hood, the plaintiffs' hydrologist at no time states
anything to the contrary.

5.    The Army takes a proactive approach in managing its
NPDES program.  Army construction representatives together
with their construction contractors periodically inspect
the BMPs to ensure the BMPs continue to meet their desired
function.  If BMPs are not functioning well, the Army takes
immediate actions to improve and/or correct the problem.
Revised BMPs are also submitted to the State of Hawaii.
The Army has a designated Storm Water Program Manager who
provides oversight, consultation, and periodic inspections
of BMPs at the various construction sites.  The Army's
Storm Water Program Manager also invites the State of
Hawaii, Department of Health, Clean Water Branch to
accompany him on joint inspections of the project sites at
least once each year.

6.    Before discussing a few of the projects in detail, it
is important to understand how the Hawaii Administrative
Rules, Title 11, Chapter 55, Water Pollution Control
defines certain terms.  Section 11-55-01 indicates that
BMPs are schedules of activities, prohibitions or
designations of practices, maintenance procedures, and

3

other management practices to **prevent** or **reduce** the
pollution of state waters.  Appendix C, Guidelines for CWB-
NOI Form C, Paragraph 15.b. indicates that BMPs Plans
describe methods to **minimize** erosion of soil and discharge
of other pollutants into State waters and, after completion
of the construction activity, removal procedures for the
construction site BMPs.  Section 11-55-02 (b) General
Policy of Water Pollution Control states that any
industrial, public, or private project or development which
could be considered a new source of pollution or an
increased source of pollution shall, in its initial project
design and subsequent construction, provide the highest and
best degree of waste treatment **practicable** under existing
technology.

7.   The SBCT Motor Pool.

a.   Concern has been expressed by the plaintiffs'
hydrologist that once this facility is paved and becomes
impervious, water will flow across it and flash into the
Waikele Stream, degrading the natural stream channels.  The
plaintiffs' hydrologist apparently did not know the extent
of the storm water control system at the Motor Pool planned
by the Army.  In addition to the curb and gutter system,
the Army plans to install inlet filters with absorbent
packs to trap sedimentation and pollutants. The design also

4

includes construction of three concrete dissipaters that
are designed to work in combination with exiting surge rock
at the down slope end of the project site.  Dissipaters are
storm water channels that are designed to decrease the
energy force in rushing water by blocking and splitting
large water volumes into several smaller flows through the
use of concrete baffles or walls staggered in the channel.
Surge rock, also called riprap, is quarry rock that is
placed in the flow path of the water, to further slow down
water flows and to act as primary filters upon exiting of a
water channel.  After leaving the riprap, the water flows
into a natural depression where it is slowed down again by
a berm at the far end of the project site.  On the other
side of the berm is a natural vegetated forest area which
extends approximately 2900 meters (9,500 feet) before it
reaches Waikele Stream.  This forested area will act as a
natural filter to trap additional sedimentation.  If
construction is allowed to proceed, consideration will also
be given to constructing speed bumps across the surface of
the motor pool, in conjunction with curb outlets, to
further slow and dissipate the sheet flow.

b.  The plaintiff's hydrologist also indicated that without
additional BMPs, there is a potential for more
environmental damage from the completed state (paving the

parking area) than the unfinished state (current condition with base course only). He goes on to say that the area is of a gentle grade and he did not see any locations where there might be concentrated flows to move the gravels off site. As noted above, there are other BMPs (dissipaters, inlet filters, and absorbent packs) at the site that he was unaware of. If the area is left unfinished, water will continue to sheet flow off the site. While there might not be a concentrated flow to move larger gravel in the base course, there is enough flow to move the fines (extremely small gravel) within the base course off the site. There is evidence of this already happening. Paving the area will allow the curb and gutter system (with filters and absorbent packs) to work as designed, lessening the possibility of sedimentation and pollutants leaving the site. As such, paving the area is far better for the environment than leaving the areas unpaved and allowing the rainfall to percolate into the ground as recommended by the hydrologist.

8.    Multiple Deployment Facility.

a.    The plaintiff's hydrologist indicated that there was a series of detention basins on the west side of the runway that didn't seem to be designed correctly. Later he admits that he wasn't sure because he wasn't able to dig through

the drawings.  Attachment One, Deposition of Andrew Hood,

page 18, lines 6-10.  The structure that he actually saw

was a detention basin which is designed correctly.  The

volume of water going into the basin will be much higher

than the volume leaving the basin.  Until the final

pavement is laid and the pavement is sloped to the drain

inlets, however, the detention basin is basically serving

as a sedimentation basin, trapping sediment before it flows

to the outlet.  Once the pavement is laid, the Army plans

to install a rolled fabric barrier (in addition to the

sandbags) in front of the 450mm pipe leaving the

sedimentation basin, thereby reducing the runoff velocity

further and filtering out sediment.  The Army is also

planning to provide floating boom(s) in the basin to filter

out pollutants.  Other BMPs discussed that might also be

implemented, should this system fail, are placing plastic

barriers or earthen berms across the bottom of the

detention basin to provide a lag in the water flow or

installation of inlet filters with absorbent packs to trap

sedimentation and pollutants.

b.   The Army is working on a separate project to protect

the cultural site, Maunauna from erosion.  While some of

the dirt stockpiled at the base of Maunauna came from the

MDF site, this project is no way associated with the

construction of the MDF.  The Army concurs that BMPs need to be implemented at the stockpile and will take the necessary actions to mitigate the situation.

c.   The other erosion problems identified by the plaintiff's hydrologist (1) head cut at the toe of the swale, (2) erosion at the outlet pipe of the detention basin, (3) improper use of the silt fence, and (4) high velocities in the swales were in the process of being improved when the injunction was issued on October 27, 2006. After a September 2006 rainfall which resulted in the head cut, a concrete block check dam was installed and the silt curtain barrier was restored.  The erosion of the outlet pipe also occurred at the same time. To resolve that issue, a silt curtain barrier was restored and an additional silt curtain was installed. Since these improvements were completed, no additional head cut at the toe of the swale or erosion at the outlet pipe was observed during rainfalls in October and November 2006.  The project designer was consulted and she recommended a long term solution to restore the swale to its preconstruction condition so that storm water sheet flow will resume its former pattern across and down the runway. The vegetation on the side of the runway will act as a natural filter for the sediment.  She also recommended that the silt curtains

8

near the outlet pipe be replaced with an earthen berm.  The
contract modification to do this work was being coordinated
when work on the project was enjoined.  The Army also plans
to add a gravel filled bag check dam fronting the silt
curtain to improve that BMP measure.

d.  The Army will continue to implement the necessary BMPs
at the MDF to prevent or minimize sedimentation and
pollutant runoff to flow into the stream.

10.  Roads and Trails.

a.  The Army has an ongoing range maintenance program to
improve its roads and to implement BMPs to minimize
erosion.  The Army prioritizes this work based on training
requirements, safety and impacts to the environment.
Unfortunately, during the winter of 2005-2006, Hawaii in
general, and the island of Oahu in specific, received
multiple rain storms over a 40 day period.  Reports noted
that this was one of the wettest times ever recorded.  The
saturation of the ground together with a weather pattern
that approximately equivalent to a 50 year storm, severely
degraded the East Range and Kahuku Training Areas.  The
Army submitted range assessments for Federal Disaster Funds
and Congress allocated $997,000 dollars to rehabilitate the
range.  The Army prioritized the work, with the highest
priority given to safety and to correcting the areas where

9

major contributing sources of sediment could enter water

bodies.  The work to repair these areas are still ongoing,

The plaintiffs' hydrologist is judging the Army's ability

to maintain its BMPs at a time when the area just suffered

a severe and unusual weather condition.

b.  Beginning in April 2006, in preparation for Stryker

training, a plan was implemented to rehabilitate 10 miles

of the most used roads and trails at East Range.  The plan

and actual work was again prioritized to address road and

trail conditions that posed a safety hazard and road or

trail conditions that posed the greatest threat to the

environment due to sedimentation. See Attachment Two

Erosion Control Projects.  This is an iterative process.

Plans and funds continue to be programmed annually to

maintain and improve the BMPs and quality of the access

roads and trails at East Range and the Kahuku Training

Area.  To help evaluate and prioritize the work at these

areas, the Army is using guidance from three sources:

Environmental Protection Agency publication 841-B-97-009,

July 1997, Techniques for Tracking, Evaluating, and

Reporting the Implementation of Non-Point Source Control

Measures, U.S. Forest Service Northeast Regional BMP

Protocols, and the Range and Training Lands Assessment

Range Assessment Protocols.

10

c. The plaintiff's hydrologist expressed concerns with inset ditches along the road that were actively downcut and he could see signs of recent sediment scouring and transport.  Some transport of sediment in the swales at the edge of the roads is to be expected and is acceptable as long as the sediment does not enter the streams.  The Army purposely cut paths into the vegetation along the roads to allow the water and sediment to flow there.  In most areas the ground was slightly elevated toward the end of the path so the water had a stopping point.  The vegetation in many of the areas acted as a natural filter for sediment.  This was done at several intervals along both sides of the roads, increasing on downslope sections.  The increase in intervals on downslope sections of the roads reduced the velocity and volume of water traveling down the road.  This also reduced the amount of sediment transported and prevented the roads from flooding and/or failing at the bottom. The plaintiff's hydrologist indicated that, "BMPs that could capture sediments generated from those sites and store them onsite so they're not conveyed through the system and into the stream courses and stuff, would be effective BMPs."  This is exactly what the Army has done with the numerous downcut areas into the vegetation, which is an acceptable BMP.

d.   Regarding the observations of the Plaintiffs'
hydrologist, they are based on a limited visit to (two
days), and limited knowledge of the projects. Attachment
One, page 13, lines 24-25; page 14, lines 1-25. He could
not distinguish between impacts from Stryker vehicles and
other wheeled vehicles.  Instead, he assumed that some
unquantified level of impacts associated with wheeled
vehicles were caused by Stryker vehicles.  Id., at page 15,
lines 21-24.  He notes generic forms of soil disturbance,
but does not note any evidence of the migration of this
soil into riparian area buffers or into water bodies. Id.,
at lines 12-17.

e.   While the hydrologist opines that Stryker training
increase over land flow leading to increased surficial
erosion that would be transported down stream, he does not
discuss the degree of this erosion or the level of impacts.
He simply states it will occur.  See e.g. Id., at page 25,
lines 15-25.  Additionally, he states that he thinks BMPs
are not commensurate with the expected level of road use,
but admits he does not know the actual level of use.  Id.,
at page 30, line 14.  The hydrologist notes that it is
"nearly impossible" not to cause erosion from vehicle use.
Id., at page 33, lines 11-16.  Plaintiffs' hydrologist in
no way quantifies any of the impacts he observes at any

12

location.  He simply points to generic issues associated

with any unimproved road system or construction project.

Finally, plaintiffs' hydrologist notes that customization

of the present BMPS and the addition of others would solve

the sediment problems he associates with Stryker training.

Id., at 18-23.  As noted above, this is what the Army is

doing in its iterative process of prioritizing and

addressing erosion issues at East Range and Kahukus.

11.  In summary, the Army coordinated with the State of

Hawaii and obtained the necessary NPDES permits for all

SBCT construction projects.  The Army continues to be

proactive in executing its NPDES program and its BMPs at

East Range and the Kahuku Training Area.  Finally, the Army

will continue to work closely with the State of Hawaii and

other agencies to ensure we prevent or minimize the erosion

of soil and discharge of other pollutants into State

waters.

I declare under penalty of perjury that the foregoing is

true and correct to the best of my knowledge, information,

and belief.

Executed on December 16, 2006.

LAWRENCE KAWASAKI

13