1              IN UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3    ----------------------------------------

4    'ILIO'ULAOKALANI COALITION, a

5    Hawaii nonprofit corporation; NA 'IMI

6    PONO, a Hawaii unincorporated

7    association; and KIPUKA, a Hawaii

8    unincorporated association,

9              Plaintiffs,

10             vs.        Civil No. 04-00502 DAE BMK

11   DONALD H. RUMSFELD, Secretary of Defense;

12   and LES BROWNLEE, Acting Secretary of the

13   United States Department of the Army,

14             Defendants.

15   ----------------------------------------

16

17             DEPOSITION OF ANGELA EHIA-QUITEVIS

18

19   Taken on behalf of the Defendant at U.S. Attorney's

20   Office, PJKK Federal Building, 300 Ala Moana Blvd., Room

21   6-100, Honolulu, Hawaii 96813, commencing at 10:39 a.m.,

22   Wednesday, December 6, 2006, pursuant to Notice.

23

24   BEFORE:   BARBARA ACOBA, CSR No. 412, RPR

25             Notary Public, State of Hawaii

                                        EXHIBIT L

```
 1   BY MR. YEE:

 2       Q.   Mrs. Quitevis, have you formally retained

 3   Mr. Henkin as your attorney?

 4       A.   We discussed him representing me for this

 5   deposition.

 6       Q.   Okay.

 7       A.   And we confirmed that.

 8       Q.   And so you've asked him to represent you today

 9   as your attorney?

10       A.   Correct.

11       Q.   Are you paying Mr. Henkin for that service?

12       A.   No.

13       Q.   Have you signed an agreement to that affect?

14       A.   No, we had a verbal agreement.

15       Q.   Have you ever been qualified to testify as an

16   expert in Federal Court?

17       A.   Not to my knowledge.

18       Q.   Okay.  And what's your understanding as to the

19   expertise that you're going to be testifying to or that

20   you provided this declaration for?

21       A.   Simply because I know what I know and I'm a

22   living branch Lihue.  I'm from Lihue.  And also I know

23   that aina very well.  And also I have been a part of the

24   Stryker Brigade transformation since 2004, and during

25   that time I've acquired knowledge that most people don't
```

1    have about this process.

2        Q.    Let me ask the question differently:  What's

3    the field of expertise you feel qualified to testify as

4    an expert in?

5            MR. HENKIN:  Objection.  Asked and answered.

6    And to the extent it calls for a legal conclusion.

7    BY MR. YEE:

8        Q.    Can you answer my question?

9        A.    Can you repeat it, please.

10       Q.    What field of expertise do you feel you're

11   qualified to testify as an expert to?

12           MR. HENKIN:  Same objection.

13           THE WITNESS:  My field of expertise would be my

14   culture and the knowledge of the lands that are being

15   impacted by the Stryker Brigade transformation.

16   BY MR. YEE:

17       Q.    And with regards to that claim of expertise,

18   have you ever been qualified to testify in Federal

19   Court?

20           MR. HENKIN:  Asked and answered.

21           MR. YEE:  I think I asked her if she's been

22   qualified as an expert to testify in Federal Court.

23           MR. HENKIN:  I don't know the difference

24   between the two questions.  I'm not sure how she will.

25           MR. YEE:  I appreciate you limiting your

1    objections to the standard objections and not doing

2    speaking objections.  Your confusion about my questions

3    doesn't translate out to your client.  She can answer

4    the question or she can ask me to clarify.

5         MR. HENKIN:  Mr. Yee, you responded to my

6    objection by having a colloquy with me, to which I

7    responded.  If you want to just let me make my

8    objections and then turn to her and say please respond

9    if you can and we won't have colloquy on the record.

10    But if you respond to me, I get to respond to you.

11    BY MR. YEE:

12         Q.    Do you understand the question, Mrs. Quitevis?

13         A.    Please clarify it for me.

14         Q.    Okay.  Have you ever been qualified as an

15    expert to testify in Federal Court with regards to

16    Hawaiian culture in the area of Lihue?

17         A.    I suppose not.

18         Q.    Okay.  Have you ever been --

19         A.    I don't understand what the legal definition

20    for that is.

21         Q.    It's actually a factual.  I mean, have you ever

22    entered into Federal Court, been sworn in as a

23    witness --

24         A.    You should have said that in the first place.

25    Okay.  No, I have never testified in Federal Court

1   before.

2       Q.    Okay.   You've never testified in any capacity

3   in Federal Court before?

4       A.    No.

5       Q.    As a lay witness?  As an expert witness?

6           MR. HENKIN:  Compound.  Asked and answered.

7   BY MR. YEE:

8       Q.    Do you understand the question?

9       A.    No and no.

10      Q.    Okay.

11      A.    Do my declarations count?

12      Q.    Do your declarations count?  Not at the point.

13      A.    Okay.

14      Q.    How about State court, have you ever qualified

15  to testify in State court as an expert with regards to

16  Hawaiian culture in the area of Lihue?

17      A.    No.  I have never testified in any court.

18      Q.    Have you ever testified before an

19  administrative body at the Federal level with regards to

20  your expertise in Hawaiian culture in the area of Lihue?

21      A.    A Federal body?

22      Q.    Federal administrative body.  An agency?  A

23  board?  A commission?

24      A.    I believe I may have, but I'm not sure if you

25  would consider them an administrative body.  I've

1    addressed the Department of Defense.

2        Q.    You what?

3        A.    The Department of Defense, their tribal

4    liaison.  And they had a team of people come down and

5    I've, yes, I've consulted for them, with them.  Would

6    that count?

7        Q.    When you say consult, why don't you just

8    describe for me a little bit, was it a meeting?  Was it

9    a discussion?  Did they hire you to do something?

10            MR. HENKIN:  Objection.  Compound.

11            THE WITNESS:  Which is your question?

12    BY MR. YEE:

13        Q.    I'm just trying to get to in what setting, in

14    what type of discussion was that you just described to

15    me the Department of Defense spoke to you.

16        A.    It was a meeting.

17        Q.    It was a meeting?

18        A.    Correct.

19        Q.    When was this meeting?

20        A.    August of 2006.

21        Q.    And as far as you can remember, is that the

22    only time you've given testimony to a Federal

23    administrative agency?

24        A.    I suppose so.

25        Q.    Mrs. Quitevis, I have to ask you these

1          MR. HENKIN:  I consider it to be invasive and

2     irrelevant.

3          MR. YEE:  Well, unless you can cite me a

4     statute that says I can't ask the question, I'm asking

5     the question.

6          MR. HENKIN:  I would like to know the reason.

7     BY MR. YEE:

8        Q.   Do you have any children, Mrs. Quitevis?

9          MR. HENKIN:  Allow limited inquiry into her

10    family.

11          THE WITNESS:  Do I have to wait for you two to

12    finish?

13          MR. YEE:  No.

14          THE WITNESS:  No.

15    BY MR. YEE:

16       Q.   And can you briefly run down your educational

17    background to me.

18       A.   Let's see.  Institutional -- western

19    institutional education?

20       Q.   Whatever you care to tell me, Mrs. Quitevis.

21    You know, I think it's all relevant.

22       A.   I have my GED in 1988.

23       Q.   And that's from the State of Hawaii?

24       A.   Yes.

25       Q.   And any other education after that?

1      A.    No, that's it.

2      Q.    Have you attended any training programs?  Any

3  vocational programs?  Any seminars which you can tell me

4  about?

5      A.    Mm-hmm.  I've -- let's see, where do I start?

6  I've been a part of halau since I was five years old.

7      Q.    Which halau is that?

8      A.    Halau Kula.  I have also been trained in that

9  na'au lafa'au from my kapuna, from my young age, and

10  then from other kahuna la'au lapa'au.  I am also a haku

11  ho'oponopono trained by Auntie Malie Craver.  I'm also a

12  haumana of Kumu John Keola Lake.  I have many kapuna in

13  my life who have added to who I am.  Kapuna role models,

14  Hawaiian practitioners, and I'm very much a student of

15  the land, of the aina.

16      Q.    Is that everything?

17      A.    Let's see.  I've been a student all my life, so

18  to name everyone who taught me, every workshop I've been

19  to is kind of hard, so that's all that comes to mind

20  now.

21      Q.    Not to tax you on this, but is it more than 10?

22  Is it less than 50?

23      A.    People or workshops?

24      Q.    Workshops, seminars, trainings.

25      A.    Let's see.  I was chosen as one of 12 people

1    who were chosen from the Pacific to be part of -- the

2    acronym for this group is APAWLI, A-P-A-W-L-I, and it

3    means Asian Pacific American Women's Leadership

4    Institute, and as a fellowship as part of that program.

5    It's an ongoing workshop.

6        Q.    When were you chosen for that?

7        A.    In 2000 -- possibly 2002.  Or 2000, I really

8    can't be sure.  I've been a part of many mentorships,

9    many programs.  I'm really not sure how to answer this

10    fully so you can understand.

11        Q.    I actually know that organization.

12        A.    Yeah.  Morvena Kashkael was running that.

13    She's from -- yeah.  So I was a part of that.  So you

14    can maybe ask her.  Or I'm pretty sure it was 2002, but

15    I'm not sure.

16        Q.    And you said it's an ongoing?

17        A.    It was for that time.

18        Q.    And can you describe for me what your work

19    history is?

20        A.    Yes.  I -- let's see.  I've been the aholoa

21    on-site coordinator for Halau Lokahi, which is a Native

22    Hawaiian charter school.  I've also been --

23        Q.    I don't mean to interrupt, but it would help to

24    get dates.

25        A.    I knew you were going to say that.

1     Q.    I'm sorry.

2     A.    No problem.  2000.  Prior to that I was the --

3  let me see.  Okay.  Yeah.  So in 2000, the Halau Lokahi

4  on-site coordinator.  After that I became the -- one of

5  the coordinators for Na Lei Na'auao Native Hawaiian

6  Charter School.  I was also the coordinator for the

7  Villalua Native Educators Initiative Program, Villanua

8  Native.  It has a really long name.  Native Hawaiian

9  something professional development program.

10    Q.    And this was after 2000?

11    A.    Yes.  And at that point and all throughout that

12  time, I traveled throughout all the different islands

13  and helped to coordinate programs just to spear point.

14  So I was able to work with a lot of cultural practical

15  teachers and kapuna to help build the programs within

16  the different communities.

17          And from there, I believe it's after that that

18  I became involved with this initiative.

19    Q.    Okay.  And that's your entire work history

20  since you received your GED?

21    A.    Oh, no.  You want me to go that far back?

22    Q.    Yeah.

23    A.    Okay.  I received my GED in '88.  In '89, I

24  traveled to Egypt, Morocco, Tanzania, around the world

25  dancing hula.

1    Q.    With your halau?

2    A.    No.

3    Q.    With who?

4    A.    That was with Gypsy Norton at that point.

5    Q.    Was that an organization?

6    A.    No, she's an agent.

7    Q.    And you did that professionally?  You danced

8    hula professionally?

9    A.    Yes.

10    Q.    And was it with a production, show or...

11    A.    Yeah.

12    Q.    And what was the name of the production?

13    A.    Something like -- I think it was the Aloha

14    Show, I believe.  But I had done that for 10 years, for

15    a long time, traveled around, and during that time I

16    would also hold workshops in various areas and bring

17    awareness of the Hawaiian culture and some of the

18    important aspects of our culture.  I danced for, yeah, I

19    would say that was until 19 -- and with different

20    groups, 1995.  At that point, I was at -- I danced at

21    Disneyworld in Florida.

22    Q.    Were you employed by Disney?

23    A.    Disney, yes.  And then also Tokyo Disneyland,

24    and that was in '95.  Okay.  We're at '95 now.  And then

25    at that point got married.

1      Q.    What year was that?

2      A.    1995.  And from there, we moved to San Diego

3   and were there for two years, at which point I got

4   offered opportunities to dance there, but it's kind of

5   mickey mouse, funny to say after you worked at Disney,

6   but the shows are very high caliber and most of -- it's

7   very important to me that our culture is put forward the

8   right way, and so I didn't take up with any of the shows

9   in San Diego and got -- and then after that, we moved

10  home.

11         Oh, I don't think this is relevant, but I tried

12  it because I was trying to get ma'a to the area I was

13  living, I didn't know it was telemarketing, but it was

14  for this place called Seluda Hispanos, selling

15  advertising.  I did kinda good, but I -- but no.  So we

16  moved home.

17     Q.    That was before you left San Diego?

18     A.    Yeah.  That was before.  Tried it for a few

19  months.  And then came home.  Oh, I took some classes

20  while I was up there.

21     Q.    In San Diego?

22     A.    Yeah.  Some -- back to the other question, I

23  forgot, some creative writing classes and I coordinated

24  some of the workshops up there for creative writing.

25     Q.    Was that adult education?  Community college?

1    College?

2        A.    This one, I don't think I could even -- it

3    was -- they had high caliber writers, creative writers

4    from all over who was doing the classes, but it wasn't

5    necessarily a college, it was just a place you could

6    take workshops on creative writing, where different

7    indigenous people, different Native Americans would come

8    in, people from South American and Hawaii, some

9    Polynesians.

10       Q.    This was in San Diego?

11       A.    Yeah.

12       Q.    Was there a name for this organization?

13       A.    Creative Workshop.  I don't know.  It's

14   something like that.  And I also took some computer

15   classes while I was up there.  That was adult education

16   class.  Then we came home.  When I came home, I was in

17   the entertainment industry for awhile.  I promoted

18   concerts.

19       Q.    Did you work for somebody doing that?

20       A.    Yes.

21       Q.    Who was that?

22       A.    Crucial Running Entertainment.  Crucial Running

23   Entertainment.  A lot of the big reggae concerts now.

24   And prior to that I also --

25       Q.    What type of concerts?

1       A.    Reggea.

2       Q.    Oh.

3       A.    And I also worked with My TV Jams, which is

4    working with youth and what's going on in the community,

5    creating partnerships with the schools and programs.

6    And during that time I was also doing -- that's when I

7    did a lot of training and --

8       Q.    You provided training or you received training?

9       A.    Both, provided and received.  Started a

10   program, an incentive program for children from the

11   pilot charter schools who did good.  They would come and

12   do service learning and help do different things.  As an

13   incentive if they did good in school, they could come

14   and work and do things like that.

15      Q.    What type of work?

16      A.    Would the children do?

17      Q.    Yeah.

18      A.    Let's see.  Some of the things we did so we

19   could work it into their curriculum was if there were --

20   you know, as part of also their creative writing

21   component.  So what they would have to do is if they

22   wanted to come to work at the show, first they would

23   have to earn it and they'd have to write.  They'd have

24   to do research on the artist who was coming down and

25   why -- choose one of their songs and explain what that

1    meant to them and explore the song completely.  And if

2    they did that and had good attendance, then I would

3    create an opportunity for them to come and they would

4    help to host the people who would come on the concert

5    day.  We would kahea them in with the proper oli from

6    whatever aina the concert was being held, and they would

7    help to set up the hospitality room and clean up at the

8    end.  And then write a paper on what was their

9    experience, you know.

10    Q.    So was music and writing?

11    A.    Yeah, music and writing.

12    Q.    And how long did that position last?

13    A.    For awhile, I believe until 2000 -- it may have

14    went a little -- I was doing a lot at one point between

15    2000 and 2001.  Oh, and I was also a Hawaiian studies

16    kumu in Mililani Elementary School.  And from there, the

17    Hawaiian charter schools just stole my heart, so I went

18    from that into the charter school movement.

19    Q.    And when you previously described it, you

20    started out as a site coordinator, correct?

21    A.    Correct.  I forget this.  Before I went to

22    Halau Lokahi, I was with Kalamaku, which was a pilot

23    program in Hau'ula.  So I left all my paying jobs to go

24    to the nonpaying job because I felt I could effect

25    change and really make a lot of difference in the lives

1    of the children.

2        Q.    And the position you took there was what?

3        A.    Administrative assistant.

4        Q.    And who was the kumu hula?

5        A.    Makaio -- I believe his first name is Kenneth

6    Makaio Hee.  Same last name as you.

7        Q.    And as site coordinator when you first started

8    out with the charter schools, I don't want you to go

9    through the whole thing again, but is it safe to say you

10   took some of those skills you had in doing trainings and

11   you transferred those skills over to that position?

12       MR. HENKIN:  Objection.  Vague.

13       THE WITNESS:  Yeah, can you clarify like

14   trainings.

15   BY MR. YEE:

16       Q.    Did you do trainings?  Because what it sounded

17   to me like was you were doing -- helping people set up

18   different programs, so you were doing training to help

19   them set up programs.

20       MR. HENKIN:  Objection.  Vague.

21   BY MR. YEE:

22       Q.    Well, then tell me what you did as site

23   coordinator.

24       A.    Yeah.  Maybe that's the thing.  An aholoa

25   on-site coordinator, aholoa means the long line, and so

1    what I was is the coordinator of the gifted and talented

2    program.  So as part of my kuleana, it was our belief

3    that all children are gifted and talented and for being

4    the aholoa on-site coordinator, it was my kuleana to

5    find out what that gift and talents were.  So what I set

6    up in that position was a community resource component

7    where different people from the community, as well as

8    organizations, Polynesian Voyaging Society, Bishop

9    Museum, and cultural resource people as well as

10   people -- it's hard.  It's just a program to help kids

11   have different experiences so that they can find out

12   what their gift and talent is.

13        Q.    So was it safe to say that you were the

14   teacher?

15        A.    No, it would not be.

16        Q.    Okay.

17        A.    I was the coordinator.

18        Q.    On a regular basis you're the one who

19   interacted with the children, though?

20        A.    Oh, very much so.  And I did teach the oli when

21   the kumu wasn't there.  The chanting.

22        Q.    And hula?

23        A.    No.

24        Q.    You're not a kumu hula?

25        A.    No.

1       A.    Because for one, I don't know that nothing's

2  happening out there.    There is some training happening.

3  Range maintenance also does a lot of things out there.

4  Army range maintenance that may harm our sites.

5       Q.    Have you observed training --

6             MR. HENKIN:    Mr. Yee, let her finish answering

7  the question, please.

8             MR. YEE:    I'm not gonna go and allow a

9  narrative answer, Mr. Henkin.    If I can focus in on the

10  details that I'm looking for in a deposition, I will.

11  So keep your objections to a minimum.

12  BY MR. YEE:

13       Q.    Have you observed training out at the BAX?

14             MR. HENKIN:    Objection.    Vague.

15             THE WITNESS:    Can you clarify.

16  BY MR. YEE:

17       Q.    Have you observed training out at the BAX since

18  October 27th of this year?

19             MR. HENKIN:    Same objection.

20             THE WITNESS:    There is training going out

21  there, not that it's Stryker related maybe.    I'm not

22  sure.    No, actually strike all of that.    My answer is

23  no, I haven't.

24  BY MR. YEE:

25       Q.    And have you observed range maintenance at the

 1    Mr. Henkin has been in deposition and site visits and

 2    working nonstop, so my apologies for raising my voice.

 3    I would like to state my objection.

 4         Objection to the extent it calls for a legal

 5    conclusion.  Also, you haven't provided the witness with

 6    a copy of Section 106 when she has requested it.

 7         MR. YEE:  And I will provide her a copy of 106,

 8    but she's claimed certain knowledge as to 106.

 9    BY MR. YEE:

10    Q.   So my question is:  Do you have an

11    understanding whether or not a trained archaeologist has

12    more responsibility under Section 106 than somebody

13    who's hired as an advisor under the term cultural

14    monitor?

15         MR. HENKIN:  Same objection.

16         THE WITNESS:  Before I answer that question, I

17    would like to take a look at Section 106.

18    BY MR. YEE:

19    Q.   Okay.  Do you know if anywhere in Section 106

20    the term cultural monitor is used?

21         MR. HENKIN:  Same objection.

22         THE WITNESS:  I would need to look at Section

23    106.

24    BY MR. YEE:

25    Q.   Are you a trained archaeologist?

 1          MR. HENKIN:  Asked and answered.

 2          THE WITNESS:  I've already answered, no, I'm

 3  not.

 4  BY MR. YEE:

 5      Q.   Do you have any training in archaeology at all?

 6      A.   No.  I'm not hired as an archaeologist.

 7      Q.   Okay.  And in terms of identification of

 8  cultural sites, what's your training?

 9      A.   My training is the land and exploring the land

10  and drawing on ho'okahi, different kapuna, different

11  people, my husband.  The land has a lot to show us.

12      Q.   And on those various trips, did you go to sites

13  that were already identified?

14          MR. HENKIN:  Objection.  Compound.

15          THE WITNESS:  I've been to area where there

16  were sites that were not previously identified and

17  identified.

18  BY MR. YEE:

19      Q.   And as part of that trip where there were sites

20  that weren't identified, were you the one who identified

21  them as cultural sites?

22          MR. HENKIN:  Objection.  Compound and vague.

23          MR. YEE:  I'm being as specific as the witness

24  is being.

25          THE WITNESS:  When we go mauka or when we go on

```
 1    ho'okahi, we don't look for what you call sites.  That's

 2    the terminology we use when we doing this work.  We look

 3    for our wahi kapuna.  We feel the aina and, yes, many of

 4    times.

 5    BY MR. YEE:

 6        Q.    You're the one who identified the cultural

 7    site?

 8        A.    Our wahi kapuna, yes.

 9        Q.    And how did you do that?

10        A.    Can you clarify, what do you mean?

11        Q.    Well, you're the one saying I can identify

12    cultural sites.  I want to know how you're able to do

13    that.

14        A.    You just look.  And if it's there, it's there.

15    And if it's not there, that's all you need to do is open

16    your eyes and look.

17        Q.    What's the difference between a cultural site

18    and a natural occurring phenomenon, say a group of

19    stones is shaken up in the last earthquake and it forms

20    a certain pattern, how can you distinguish between that

21    and a cultural site?

22            MR. HENKIN:  Objection.  Lack of foundation.

23    Assumes facts not in evidence.

24            THE WITNESS:  First I would say, what makes you

25    think something that occurred naturally isn't a cultural
```

1  site?  There may be a pohaku that's water warn and to an

2  archaeologist it doesn't mean a thing and to a kanaka

3  maoli it can have a completely different meaning and I

4  cannot give you any across-the-board answers because

5  each place is unique unto itself.  And if you're trying

6  to compare an archaeologist and what experience they

7  have to my experience on the aina, all I could say to

8  that is methodology alone is not enough to say from an

9  archaeological point of the view that this may or may

10  not be a site, if they have no understanding of the aina

11  or what is important to us.

12  BY MR. YEE:

13      Q.   Well, again, going back to the purpose of the

14  Programmatic Agreement, are naturally occurring

15  structures and phenomenon, can they be qualified as

16  historic sites for the national registry?

17          MR. HENKIN:  Objection to the extent it calls

18  for a legal conclusion.

19          THE WITNESS:  Again, I have to tell you, or

20  maybe the first time I'll tell you, I cannot answer that

21  question because each site is individual unto itself.  I

22  cannot make a blanket statement and X everything out one

23  way or the other.  I cannot say no or yes on that.

24  BY MR. YEE:

25      Q.   Well, let's go back to the area in QTR1 that

1    Q.    Your answer to my question is yes?

2    A.    For majority of it, however, some of the mea

3    Hawaii, although it's in the BAX, it's kind of in the

4    QTR1 area.

5    Q.    And the mea Hawaii that you're referring to is

6    the cultural artifacts, correct?

7    A.    Yes.  Correct.  But majority of them I would

8    say, yes, the BAX.  It's just that one area on the top

9    where it's a WTA area and sometimes it's the BAX and

10   sometimes it's the QTR.  I believe right now it's the

11   QTR, but in the beginning of the project it's considered

12   to be part of the BAX.  That's the best way I can answer

13   that.  Sorry it's so confusing.

14   Q.    So let me ask the question again:  What

15   cultural artifacts did you personally observe in the

16   QTR1, because I think your previous statement was none?

17   A.    QTR1 or the BAX?

18   Q.    QTR1.

19   A.    For myself, I've seen -- I would say our

20   cultural monitor who worked out on the QTR1, we have

21   weekly meetings.  So like I stated earlier, I, myself,

22   didn't find the artifact.

23   Q.    And that's the question:  What have you

24   personally observed out at QTR1?

25   A.    In that area someone else found mea Hawaii.

1    asking questions, I'm going to have to refresh and refer

2    back to it.  Okay.

3        Q.    Okay.  The first violation that you allege of

4    the Programmatic Agreement --

5        A.    Are you still on...

6        Q.    On page 13.

7        A.    Correct.

8        Q.    And that refers to the BAX, correct?

9        A.    Correct.

10       Q.    And then the next violation you allege of the

11   Programmatic Agreement is in the middle of page 13,

12   correct?

13       A.    The second bullet?

14       Q.    Right.  Is that also in the BAX?

15       A.    Correct.  Yes.

16       Q.    And if you turn to page 14, the next bullet

17   which begins June 2006 --

18       A.    Yes.

19       Q.    -- is that also in the BAX?

20       A.    Correct.  Yes.

21       Q.    The skeletal remains that you mention in this

22   section --

23       A.    Yes.

24       Q.    -- were they ever identified as human remains?

25       A.    No, they were not.  We've never received a

1    report.

2        Q.    Have you ever heard from anybody that they were

3    not human remains?

4        A.    Yes.

5        Q.    And who told you that?

6        A.    I believe it was Kamoa.

7        Q.    Your husband?

8        A.    Correct.

9        Q.    And did they tell you what kind of remains they

10   were?

11       A.    Someone had come out and done a site visit.

12   And after that visit, we requested a report of the

13   outcome of everything so we know where it stood, and we

14   haven't received one until today.

15       Q.    Okay.  But your husband told you that they

16   weren't human remains, right?

17       A.    Yeah.

18            MR. HENKIN:  Objection.  Misstates testimony.

19   BY MR. YEE:

20       Q.    Did your husband tell you what kind of remains

21   they were?

22       A.    What he said was that the person who came out

23   gave an opinion that it's probably not human remains.

24       Q.    Did they say anything beyond that?

25       A.    That they were -- he used a specific word.

1    Another word for animal bones that I'm not familiar

2    with.

3        Q.    Did your husband ever tell you that they were

4    possibly cow bones?

5        A.    I think Laurie Lucking had stated something to

6    that later, far later on.  I'm not sure when, but yeah.

7    Yeah.  But the very first initial, they came out with a

8    scientific word I didn't understand.

9        Q.    Okay.  So you've had conversation with

10   Dr. Lucking also about these so-called skeletal remains,

11   right?

12       A.    With these, Kamoa took care of most of the

13   communications for that.

14       Q.    But you've also talked to Dr. Lucking about

15   that?

16       A.    I'm kind of iffy right now if I spoke to her or

17   he talked to her.  I talked to her on a lot of different

18   things, but regarding iwi, that is not my kuleana at

19   this time in my life.

20       Q.    I understand.  I'm just trying to find out if

21   you actually had a conversation or you found out about

22   the conversation where Dr. Lucking said these were cow

23   bones?

24            MR. HENKIN:  Objection.  Compound.

25            THE WITNESS:  I know of definitely, yes.  I

1   can't right now tell you exactly how and why, but yes, I

2   did hear cow.

3   BY MR. YEE:

4      Q.   Okay.  And you know that to have been

5   Dr. Lucking's conversation with somebody?

6      A.   Yes.  Sorry, it's so vague, but yes.

7      Q.   No.  No.  It's okay.  Do you have any reason to

8   disagree with Dr. Lucking?

9          MR. HENKIN:  Objection.  Foundation.

10        THE WITNESS:  On this particular incident, no.

11  BY MR. YEE:

12      Q.   Because I think you just said you don't feel

13  that you have expertise in iwi at this point.

14      A.   No, I did not say it's not my area of

15  expertise.  I said it is not my kuleana at this point in

16  my life.  And there's cultural purposes, my own beliefs

17  with that.  But when it comes to iwi, that is not my

18  kuleana at this point in life.

19      Q.   So you wouldn't be able to identify human

20  remains versus cow remains?

21         MR. HENKIN:  Objection.  Misstates testimony.

22         MR. YEE:  It's just a question.

23         THE WITNESS:  No, I would not.

24  BY MR. YEE:

25      Q.   Do you know if there was --

1       A.    Actually, can I clarify?

2       Q.    Sure.

3       A.    There's certain things that I think any of us

4   if we seen we would know if it's a cow or human, but

5   there's other little bones that you would need -- that I

6   would not know.  So if it was the head or, you know,

7   obvious parts, then yes, but other than that, no.

8       Q.    Are you aware of any Hawaiian cultural

9   practices that include the remains of a cow?

10      A.    No, I am not.  Not to my knowledge.

11      Q.    Thank you.  And so the next bullet on page 14,

12  you're talking about the opportunities you had to go

13  into various areas with the UXO teams, correct?

14      A.    What I'm talking about, and I'm so glad we're

15  there, what I'm talking about in this is our opportunity

16  to monitor excavations.

17      Q.    And so when you say "lasting mere minutes," do

18  you remember when the first opportunity was, the date of

19  that?

20      A.    This is in July.  I believe it was on

21  July 27th, Monday.

22      Q.    Of this year?

23      A.    2006.

24      Q.    And was it you and your husband, those are the

25  cultural monitors you're talking about?

1      A.    There were --

2      Q.    And again, just talking about the July.

3      A.    -- yeah, just July.  The different cultural

4  monitors would be Kamoa, Alii.  I would have to look at

5  the schedules to see if there was anyone else that was

6  rotating through the BAX, because at that point we had,

7  I believe, four or five ongoing projects.

8      Q.    Did it include you?

9      A.    Yes.  Yes.

10     Q.    Okay.  And you just said to the BAX, so this is

11 concerning the BAX?

12     A.    Yes.  Let me see.  This -- yeah.  Okay.  Go

13 ahead.

14     Q.    And so if you turn to page 15, the next bullet

15 which is close to the bottom of the page.

16     A.    Okay.

17     Q.    Did you personally observe the bulldozers

18 realigning and significantly widening the roads at QTR1?

19     A.    Yes.

20     Q.    And did you see any effect, impact, damage to a

21 cultural site as a result of that work at QTR1?

22     A.    No.  By the time I got there, a lot of the work

23 had already been done, so some damage could have

24 happened that I wasn't aware of.  However, one thing

25 that was very damaging, I believe I prevented damage