# Declaration of Lawrence T. Kawasaki

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ILIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NA 'IMI PONO, a Hawaii unincorporated association; and KIPUKA, a Hawaii unincorporated association<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT GATES, Secretary of Defense; and FRANCIS HARVEY; Secretary of the United States Department of the Army<br><br>Defendants. | CIVIL NO. 04-00502 DAE BMK<br><br>SUPPLEMENTAL DECLARATION OF LAWRENCE T. KAWASAKI |

### DECLARATION OF LAWRENCE T. KAWASAKI

I, Lawrence T. Kawasaki, hereby declare that:

1. I previously submitted a declaration in this case on December 15, 2006 (mistakenly dated December 16, 2006). This declaration supplements my previous declaration, responding to Mr. Andrew P. Hood's supplemental declaration filed by the Plaintiffs on December 18, 2006.

2. Given the extremely short time to respond to Mr. Hood's supplemental declaration, I will limit my responses to the major issues that he addresses.

3. **Roads and Trails.** Mr. Hood indicates that eight months should have been more than enough time for the Army to

control soil and polluted runoff from the road network. Unfortunately, it is not nearly enough time to rehabilitate the roads/trails and install new BMP measures at all areas, considering the severity of the past storms that degraded East Range and the Kahuku Training Area. Mr. Hood provides no basis, other than his opinion on which to present this claim. As stated in my earlier declaration, the Army has an ongoing range maintenance program and will continue to prioritize the work addressing training needs as well as road and trail conditions that pose the greatest safety hazards and greatest threats to the environment.

4. Mr. Hood indicates that he observed three areas where roadside ditches drained directly into the stream. He offers Exhibit 58 in his supplemental declaration as an example. Yet, Exhibit 58 appears to have been taken in dry conditions, as it doesn't appear to be raining and running water doesn't appear to be flowing into the stream in the picture. With the severity of the storms that degraded East Range earlier, it is possible that the areas shown (like in Exhibit 58) could have failed at that time. However, many of the failures that I observed also had new BMPs in place closer to the roads, sloped to redirect the water into the vegetation, and away from the failed areas.

2

Mr. Hood does not appear to mention these BMPs in his declarations.

5. Mr. Hood indicates that he did not observe "kickouts" in the steeper areas of the roads. I observed numerous kickouts along the roads. One only needs to travel through the first mile of road at the entrance of the training area to start seeing the multiple kickouts in the steeper areas of the road.

6. Mr. Hood states, "Mr. Kawasaki's argument that I did not quantify the erosion previously caused by Stryker vehicles misses the point. If Stryker vehicles did not cause the erosion I observed, then the vastly more extensive Stryker training would cause even more harm and render the already failing BMPs even more inadequate". First Mr. Hood again does not provide data, estimates, or an analytical analysis to show the level of harm to the environment. Then Mr. Hood admits that he is not sure if the Stryker vehicles (who have been training in East Range for months), caused the erosion. Yet, in the very next statement, he claims that more extensive Stryker training would cause even more harm. He does not provide any substantive or quantifiable analysis on which to base his assertions.

3

7. Mr. Hood indicates that the earthen ditches should be lined and sediment-filtering structures should be installed in the ditches before they discharge into the streams. This could be a consideration if no other BMPs can be implemented to divert the flow away from the streams. Many of the ditches I observed had BMP measures in place where the flows were strategically redirected so the water flowed through vegetation before it entered the streams.

9. **Motor Pool.** Mr. Hood indicates that the Army representative at the site visit told him that the Army's BMPs were limited to the curb and gutter system. The Army representative at the site told me that his "curb and gutter" response was to Mr. Hood's question regarding the type of water collection system at the site. The Army representative never stated that the only BMP measures at the site were curb and gutters. Inlet filters and absorbent packs are not identified on the drawings, but are maintenance items that will be added once the asphalt is laid in the motor pool. Mr. Hood agreed that these should be installed.

11. Mr. Hood asserts that 34 acres of impervious parking area would cause high runoff volumes that, upon reaching the natural stream would degrade the channel, eroding stream banks and beds. Yet, he does not quantify or even

4

estimate how much degradation or erosion will occur. He also may have overlooked that the three dissipaters are designed to discharge water at different rates. This effectively reduces the overall volume of water being discharged at a time, spreading the flow out over time.

12. Mr. Hood provides a satellite image derived from Google Earth (Exhibit "B" of his Declaration) which depicts the close proximity of the Motor Pool to Waikele Stream. He further states that the concentrated runoff from the Motor Pool would discharge as close as 250 to 400 feet from Waikele Stream. While Waikele Stream may be as close as 250 to 400 feet from the Motor Pool, Mr. Hood does not appear to consider the topography in the area. The water will not necessary flow directly to the closest points along the stream. It will flow along the lowest areas of the forest until it gets to the stream. According the to designers of the Motor Pool project, they estimated that it will take approximately 2,900 meters (9,500 feet) before the water from the Motor Pool actually reaches Waikele Stream.

13. It should also be noted that the Army implements various steps to minimize the amount of pollutants that are introduced onto the pavement. The Army regularly maintains their vehicles, places drip pans under each vehicle when

5

they are parked, and provides quarterly environmental compliance inspections of all motor pools.

14. In summary, Mr. Hood did not appear to consider the concept of volume reduction through the use of multiple dissipaters nor did he appear to understand that topography dictates the direction of flow, not distance.  He concludes that the high runoff volumes will degrade the channel, eroding stream banks and beds, yet he offers no data, estimates or analytical analysis to support his assertions. As noted in my earlier declaration, the fines in the unpaved area will continue erode unless the area is paved. Paving the area is far better for the environment than leaving the areas unpaved and allowing rainfall to percolate into the ground as recommended by Mr. Hood.

15. **Multiple Deployment Facility**.  Mr. Hood mentions that the detention basin should be modified to handle the whole range of storm events.  The detention basin, is in fact designed to handle storm events from small storms to 100 year storms.  The sand bags placed in front of the outlet together with the rolled fabric barrier will help to detain the water, so sediments will settle and water will discharge from the outlet at controlled rates. This is already apparent as the detention basin is currently trapping sediment.  As stated in my earlier declaration,

6

the Army is also considering other BMP measures such as placing plastic barriers, creating an earthen berm, or providing inlet filters and absorbent packs.

16. Mr. Hood indicates that check dams and additional silt curtains are not designed to handle concentrated flows and it is widely accepted that check dams are not recommended to control gullying. As stated in my declaration, these were temporary measures that were implemented to immediately mitigate the problem. So far, in the months of October and November 2006, these measures have been successful in controlling further erosion and head cutting. Had the injunction not taken place, a more permanent fix would have been implemented, which Mr. Hood does not appear to object to.

17. In summary, Mr. Hood fails to quantify the harms the Multiple Deployment Facility will cause to the environment. Instead he focuses on how BMP measures can be improved in his supplemental declaration. The Army continues to inspect and improve its BMPs as required to prevent or reduce the pollution of state waters as required by the NPDES permit.

18. Overall, Mr. Hood does not appear to have substantive support for his assertions and he clearly did not quantify, provide analytical analysis or provide estimates of the

7

harms that the Roads and Trails, Motor Pool, and the Multiple Deployment Facility will have on the environment. The Army on the other hand, submitted site specific BMPs and received NPDES permits from the State of Hawaii, continues to be proactive in executing its NPDES program and implementing its BMPs at East Range and the Kahuku Training Area, and has yet to receive a notice of violation from the State of Hawaii. The Army has and will continue to work closely with the State of Hawaii and other agencies to ensure we prevent or minimize the erosion of soil and discharge of other pollutants into State waters.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on December _19_, 2006.

_____
LAWRENCE KAWASAKI