# Exhibit "P"

```
 1              IN UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF HAWAII

 3    ------------------------------------------

 4    'ILIO'ULAOKALANI COALITION, a

 5    Hawaii nonprofit corporation; NA 'IMI

 6    PONO, a Hawaii unincorporated

 7    association; and KIPUKA, a Hawaii

 8    unincorporated association,

 9              Plaintiffs,

10              vs.         Civil No. 04-00502 DAE BMK

11    DONALD H. RUMSFELD, Secretary of Defense;

12    and LES BROWNLEE, Acting Secretary of the

13    United States Department of the Army,

14              Defendants.

15    ------------------------------------------

16

17          DEPOSITION OF ANGELA EHIA-QUITEVIS

18

19    Taken on behalf of the Defendant at U.S. Attorney's

20    Office, PJKK Federal Building, 300 Ala Moana Blvd., Room

21    6-100, Honolulu, Hawaii 96813, commencing at 10:39 a.m.,

22    Wednesday, December 6, 2006, pursuant to Notice.

23

24    BEFORE:   BARBARA ACOBA, CSR No. 412, RPR

25              Notary Public, State of Hawaii

                                         EXHIBIT "P"
```

1  not taken a deposition before, I've asked her to ask for

2  documents if, you know, if she feels --

3          MR. YEE:  She's perfectly welcome to ask for

4  that if she hasn't seen it before.  If it helps to

5  refresh her recollection, I'm happy to provide it.

6          MR. HENKIN:  Thank you.

7          THE WITNESS:  Yes, I have.

8  BY MR. YEE:

9      Q.    And when was the last time you reviewed that

10  complaint?

11      A.    That's a very good question.  The first time or

12  the last time?

13      Q.    The most recent time you reviewed this

14  complaint.

15      A.    Sometime in October 2006.

16      Q.    Was that before the OHA meeting on October the

17  5th?

18      A.    No.

19      Q.    Was it after the OHA meeting on October 5th?

20      A.    A long -- awhile after.  It may not have been

21  in October.  It may have been in November.  October,

22  November, around there.

23      Q.    And you understand that simply because

24  Mr. Henkin's offered you as an expert, it doesn't mean

25  that you're qualified as an expert to testify in Federal

1    Court; do you understand that?

2           MR. HENKIN:  Objection.  Calls for a legal

3    conclusion.

4    BY MR. YEE:

5        Q.   You can answer the question if you understand

6    the question.

7        A.   I'm not sure what you mean.

8        Q.   The Federal rules of evidence have certain

9    requirements before you can be qualified as an expert

10   because experts offer opinion testimony, not factual

11   testimony.  Lay witnesses offer factual testimony.  And

12   opinion testimony is based on educational guesses

13   sometimes.  It's based on information gathered not by

14   yourself, but by others, which you render an opinion on.

15   And there are certain requirements in addition to that

16   that allow you to be qualified as an expert, and we're

17   going to be exploring that today.

18          MR. HENKIN:  If I may clarify for the record,

19   Mr. Yee, we're offering Mrs. Quitevis both as a fact and

20   as an expert witness.  Certain aspects of her testimony

21   are based on eyewitness and certain aspects of her

22   testimony are based on expert, just to clarify.

23          MR. YEE:  Actually, that doesn't clarify much,

24   because I have a very difficult time distinguishing what

25   are expert opinions in her declaration and what are not,

1  and so I'm gonna ask you on the record, Mr. Henkin, are

2  you gonna identify those portions of Mrs. Quitevis'

3  declaration as an expert opinion versus lay opinion?

4          MR. HENKIN:  I don't know what opportunity,

5  given the expedited nature of these proceedings, we're

6  gonna have to do that, but certainly you have an

7  opportunity to ask her under oath whether with respect

8  to various things she has personal knowledge or whether

9  it's based on information that she got from others.

10          MR. YEE:  And you don't have any plans at this

11  point in time to amend her declaration, do you, as a

12  result of the last couple days of depositions?  I think

13  it's become abundantly clear that certain information

14  contained in the declarations doesn't apply to the

15  proceedings that are scheduled for December 18th.

16          MR. HENKIN:  I think that this is a

17  conversation that's most appropriate to have between

18  attorneys off the record.  I'm not really sure why --

19  I'm not being deposed.

20          MR. YEE:  You're not being deposed.  All I'm

21  asking is if you plan to change her declaration, I won't

22  go through those sections of her declaration that will

23  be changed.

24          MR. HENKIN:  We haven't made a decision as to

25  what we're going to do as far as any future testimony by

1    have about this process.

2        Q.    Let me ask the question differently:  What's

3    the field of expertise you feel qualified to testify as

4    an expert in?

5            MR. HENKIN:  Objection.  Asked and answered.

6    And to the extent it calls for a legal conclusion.

7    BY MR. YEE:

8        Q.    Can you answer my question?

9        A.    Can you repeat it, please.

10       Q.    What field of expertise do you feel you're

11   qualified to testify as an expert to?

12           MR. HENKIN:  Same objection.

13           THE WITNESS:  My field of expertise would be my

14   culture and the knowledge of the lands that are being

15   impacted by the Stryker Brigade transformation.

16   BY MR. YEE:

17       Q.    And with regards to that claim of expertise,

18   have you ever been qualified to testify in Federal

19   Court?

20           MR. HENKIN:  Asked and answered.

21           MR. YEE:  I think I asked her if she's been

22   qualified as an expert to testify in Federal Court.

23           MR. HENKIN:  I don't know the difference

24   between the two questions.  I'm not sure how she will.

25           MR. YEE:  I appreciate you limiting your

1    objections to the standard objections and not doing

2    speaking objections.  Your confusion about my questions

3    doesn't translate out to your client.  She can answer

4    the question or she can ask me to clarify.

5              MR. HENKIN:  Mr. Yee, you responded to my

6    objection by having a colloquy with me, to which I

7    responded.  If you want to just let me make my

8    objections and then turn to her and say please respond

9    if you can and we won't have colloquy on the record.

10   But if you respond to me, I get to respond to you.

11   BY MR. YEE:

12       Q.   Do you understand the question, Mrs. Quitevis?

13       A.   Please clarify it for me.

14       Q.   Okay.  Have you ever been qualified as an

15   expert to testify in Federal Court with regards to

16   Hawaiian culture in the area of Lihue?

17       A.   I suppose not.

18       Q.   Okay.  Have you ever been --

19       A.   I don't understand what the legal definition

20   for that is.

21       Q.   It's actually a factual.  I mean, have you ever

22   entered into Federal Court, been sworn in as a

23   witness --

24       A.   You should have said that in the first place.

25   Okay.  No, I have never testified in Federal Court

1   before.

2        Q.   Okay.  You've never testified in any capacity

3   in Federal Court before?

4        A.   No.

5        Q.   As a lay witness?  As an expert witness?

6             MR. HENKIN:  Compound.  Asked and answered.

7   BY MR. YEE:

8        Q.   Do you understand the question?

9        A.   No and no.

10       Q.   Okay.

11       A.   Do my declarations count?

12       Q.   Do your declarations count?  Not at the point.

13       A.   Okay.

14       Q.   How about State court, have you ever qualified

15   to testify in State court as an expert with regards to

16   Hawaiian culture in the area of Lihue?

17       A.   No.  I have never testified in any court.

18       Q.   Have you ever testified before an

19   administrative body at the Federal level with regards to

20   your expertise in Hawaiian culture in the area of Lihue?

21       A.   A Federal body?

22       Q.   Federal administrative body.  An agency?  A

23   board?  A commission?

24       A.   I believe I may have, but I'm not sure if you

25   would consider them an administrative body.  I've

1    addressed the Department of Defense.

2        Q.    You what?

3        A.    The Department of Defense, their tribal

4    liaison.  And they had a team of people come down and

5    I've, yes, I've consulted for them, with them.  Would

6    that count?

7        Q.    When you say consult, why don't you just

8    describe for me a little bit, was it a meeting?  Was it

9    a discussion?  Did they hire you to do something?

10           MR. HENKIN:  Objection.  Compound.

11           THE WITNESS:  Which is your question?

12   BY MR. YEE:

13       Q.    I'm just trying to get to in what setting, in

14   what type of discussion was that you just described to

15   me the Department of Defense spoke to you.

16       A.    It was a meeting.

17       Q.    It was a meeting?

18       A.    Correct.

19       Q.    When was this meeting?

20       A.    August of 2006.

21       Q.    And as far as you can remember, is that the

22   only time you've given testimony to a Federal

23   administrative agency?

24       A.    I suppose so.

25       Q.    Mrs. Quitevis, I have to ask you these

1          MR. HENKIN:  I consider it to be invasive and

2      irrelevant.

3          MR. YEE:  Well, unless you can cite me a

4      statute that says I can't ask the question, I'm asking

5      the question.

6          MR. HENKIN:  I would like to know the reason.

7      BY MR. YEE:

8      Q.  Do you have any children, Mrs. Quitevis?

9          MR. HENKIN:  Allow limited inquiry into her

10     family.

11         THE WITNESS:  Do I have to wait for you two to

12     finish?

13         MR. YEE:  No.

14         THE WITNESS:  No.

15     BY MR. YEE:

16     Q.  And can you briefly run down your educational

17     background to me.

18     A.  Let's see.  Institutional -- western

19     institutional education?

20     Q.  Whatever you care to tell me, Mrs. Quitevis.

21     You know, I think it's all relevant.

22     A.  I have my GED in 1988.

23     Q.  And that's from the State of Hawaii?

24     A.  Yes.

25     Q.  And any other education after that?

1      A.    No, that's it.

2      Q.    Have you attended any training programs?  Any

3  vocational programs?  Any seminars which you can tell me

4  about?

5      A.    Mm-hmm.  I've -- let's see, where do I start?

6  I've been a part of halau since I was five years old.

7      Q.    Which halau is that?

8      A.    Halau Kula.  I have also been trained in that

9  na'au lafa'au from my kapuna, from my young age, and

10  then from other kahuna la'au lapa'au.  I am also a haku

11  ho'oponopono trained by Auntie Malie Craver.  I'm also a

12  haumana of Kumu John Keola Lake.  I have many kapuna in

13  my life who have added to who I am.  Kapuna role models,

14  Hawaiian practitioners, and I'm very much a student of

15  the land, of the aina.

16      Q.    Is that everything?

17      A.    Let's see.  I've been a student all my life, so

18  to name everyone who taught me, every workshop I've been

19  to is kind of hard, so that's all that comes to mind

20  now.

21      Q.    Not to tax you on this, but is it more than 10?

22  Is it less than 50?

23      A.    People or workshops?

24      Q.    Workshops, seminars, trainings.

25      A.    Let's see.  I was chosen as one of 12 people

22

1    who were chosen from the Pacific to be part of -- the
2    acronym for this group is APAWLI, A-P-A-W-L-I, and it
3    means Asian Pacific American Women's Leadership
4    Institute, and as a fellowship as part of that program.
5    It's an ongoing workshop.
6        Q.    When were you chosen for that?
7        A.    In 2000 -- possibly 2002.  Or 2000, I really
8    can't be sure.  I've been a part of many mentorships,
9    many programs.  I'm really not sure how to answer this
10   fully so you can understand.
11       Q.    I actually know that organization.
12       A.    Yeah.  Morvena Kashkael was running that.
13   She's from -- yeah.  So I was a part of that.  So you
14   can maybe ask her.  Or I'm pretty sure it was 2002, but
15   I'm not sure.
16       Q.    And you said it's an ongoing?
17       A.    It was for that time.
18       Q.    And can you describe for me what your work
19   history is?
20       A.    Yes.  I -- let's see.  I've been the aholoa
21   on-site coordinator for Halau Lokahi, which is a Native
22   Hawaiian charter school.  I've also been --
23       Q.    I don't mean to interrupt, but it would help to
24   get dates.
25       A.    I knew you were going to say that.

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

1      Q.    I'm sorry.

2      A.    No problem.  2000.  Prior to that I was the --

3   let me see.  Okay.  Yeah.  So in 2000, the Halau Lokahi

4   on-site coordinator.  After that I became the -- one of

5   the coordinators for Na Lei Na'auao Native Hawaiian

6   Charter School.  I was also the coordinator for the

7   Villalua Native Educators Initiative Program, Villanua

8   Native.  It has a really long name.  Native Hawaiian

9   something professional development program.

10     Q.    And this was after 2000?

11     A.    Yes.  And at that point and all throughout that

12  time, I traveled throughout all the different islands

13  and helped to coordinate programs just to spear point.

14  So I was able to work with a lot of cultural practical

15  teachers and kapuna to help build the programs within

16  the different communities.

17          And from there, I believe it's after that that

18  I became involved with this initiative.

19     Q.    Okay.  And that's your entire work history

20  since you received your GED?

21     A.    Oh, no.  You want me to go that far back?

22     Q.    Yeah.

23     A.    Okay.  I received my GED in '88.  In '89, I

24  traveled to Egypt, Morocco, Tanzania, around the world

25  dancing hula.

1     Q.    With your halau?

2     A.    No.

3     Q.    With who?

4     A.    That was with Gypsy Norton at that point.

5     Q.    Was that an organization?

6     A.    No, she's an agent.

7     Q.    And you did that professionally?  You danced

8  hula professionally?

9     A.    Yes.

10    Q.    And was it with a production, show or...

11    A.    Yeah.

12    Q.    And what was the name of the production?

13    A.    Something like -- I think it was the Aloha

14 Show, I believe.  But I had done that for 10 years, for

15 a long time, traveled around, and during that time I

16 would also hold workshops in various areas and bring

17 awareness of the Hawaiian culture and some of the

18 important aspects of our culture.  I danced for, yeah, I

19 would say that was until 19 -- and with different

20 groups, 1995.  At that point, I was at -- I danced at

21 Disneyworld in Florida.

22    Q.    Were you employed by Disney?

23    A.    Disney, yes.  And then also Tokyo Disneyland,

24 and that was in '95.  Okay.  We're at '95 now.  And then

25 at that point got married.

1      Q.    What year was that?

2      A.    1995.  And from there, we moved to San Diego

3   and were there for two years, at which point I got

4   offered opportunities to dance there, but it's kind of

5   mickey mouse, funny to say after you worked at Disney,

6   but the shows are very high caliber and most of -- it's

7   very important to me that our culture is put forward the

8   right way, and so I didn't take up with any of the shows

9   in San Diego and got -- and then after that, we moved

10  home.

11         Oh, I don't think this is relevant, but I tried

12  it because I was trying to get ma'a to the area I was

13  living, I didn't know it was telemarketing, but it was

14  for this place called Seluda Hispanos, selling

15  advertising.  I did kinda good, but I -- but no.  So we

16  moved home.

17     Q.    That was before you left San Diego?

18     A.    Yeah.  That was before.  Tried it for a few

19  months.  And then came home.  Oh, I took some classes

20  while I was up there.

21     Q.    In San Diego?

22     A.    Yeah.  Some -- back to the other question, I

23  forgot, some creative writing classes and I coordinated

24  some of the workshops up there for creative writing.

25     Q.    Was that adult education?  Community college?

1    College?

2        A.    This one, I don't think I could even -- it

3    was -- they had high caliber writers, creative writers

4    from all over who was doing the classes, but it wasn't

5    necessarily a college, it was just a place you could

6    take workshops on creative writing, where different

7    indigenous people, different Native Americans would come

8    in, people from South American and Hawaii, some

9    Polynesians.

10       Q.    This was in San Diego?

11       A.    Yeah.

12       Q.    Was there a name for this organization?

13       A.    Creative Workshop.  I don't know.  It's

14   something like that.  And I also took some computer

15   classes while I was up there.  That was adult education

16   class.  Then we came home.  When I came home, I was in

17   the entertainment industry for awhile.  I promoted

18   concerts.

19       Q.    Did you work for somebody doing that?

20       A.    Yes.

21       Q.    Who was that?

22       A.    Crucial Running Entertainment.  Crucial Running

23   Entertainment.  A lot of the big reggae concerts now.

24   And prior to that I also --

25       Q.    What type of concerts?

1        A.      Reggea.

2        Q.      Oh.

3        A.      And I also worked with My TV Jams, which is

4    working with youth and what's going on in the community,

5    creating partnerships with the schools and programs.

6    And during that time I was also doing -- that's when I

7    did a lot of training and --

8        Q.      You provided training or you received training?

9        A.      Both, provided and received.  Started a

10   program, an incentive program for children from the

11   pilot charter schools who did good.  They would come and

12   do service learning and help do different things.  As an

13   incentive if they did good in school, they could come

14   and work and do things like that.

15       Q.      What type of work?

16       A.      Would the children do?

17       Q.      Yeah.

18       A.      Let's see.  Some of the things we did so we

19   could work it into their curriculum was if there were --

20   you know, as part of also their creative writing

21   component.  So what they would have to do is if they

22   wanted to come to work at the show, first they would

23   have to earn it and they'd have to write.  They'd have

24   to do research on the artist who was coming down and

25   why -- choose one of their songs and explain what that

1    meant to them and explore the song completely.  And if

2    they did that and had good attendance, then I would

3    create an opportunity for them to come and they would

4    help to host the people who would come on the concert

5    day.  We would kahea them in with the proper oli from

6    whatever aina the concert was being held, and they would

7    help to set up the hospitality room and clean up at the

8    end.  And then write a paper on what was their

9    experience, you know.

10        Q.    So was music and writing?

11        A.    Yeah, music and writing.

12        Q.    And how long did that position last?

13        A.    For awhile, I believe until 2000 -- it may have

14   went a little -- I was doing a lot at one point between

15   2000 and 2001.  Oh, and I was also a Hawaiian studies

16   kumu in Mililani Elementary School.  And from there, the

17   Hawaiian charter schools just stole my heart, so I went

18   from that into the charter school movement.

19        Q.    And when you previously described it, you

20   started out as a site coordinator, correct?

21        A.    Correct.  I forget this.  Before I went to

22   Halau Lokahi, I was with Kalamaku, which was a pilot

23   program in Hau'ula.  So I left all my paying jobs to go

24   to the nonpaying job because I felt I could effect

25   change and really make a lot of difference in the lives

1    of the children.

2        Q.    And the position you took there was what?

3        A.    Administrative assistant.

4        Q.    And who was the kumu hula?

5        A.    Makaio -- I believe his first name is Kenneth

6    Makaio Hee.  Same last name as you.

7        Q.    And as site coordinator when you first started

8    out with the charter schools, I don't want you to go

9    through the whole thing again, but is it safe to say you

10    took some of those skills you had in doing trainings and

11    you transferred those skills over to that position?

12            MR. HENKIN:  Objection.  Vague.

13            THE WITNESS:  Yeah, can you clarify like

14    trainings.

15    BY MR. YEE:

16        Q.    Did you do trainings?  Because what it sounded

17    to me like was you were doing -- helping people set up

18    different programs, so you were doing training to help

19    them set up programs.

20            MR. HENKIN:  Objection.  Vague.

21    BY MR. YEE:

22        Q.    Well, then tell me what you did as site

23    coordinator.

24        A.    Yeah.  Maybe that's the thing.  An aholoa

25    on-site coordinator, aholoa means the long line, and so

1    what I was is the coordinator of the gifted and talented

2    program.  So as part of my kuleana, it was our belief

3    that all children are gifted and talented and for being

4    the aholoa on-site coordinator, it was my kuleana to

5    find out what that gift and talents were.  So what I set

6    up in that position was a community resource component

7    where different people from the community, as well as

8    organizations, Polynesian Voyaging Society, Bishop

9    Museum, and cultural resource people as well as

10   people -- it's hard.  It's just a program to help kids

11   have different experiences so that they can find out

12   what their gift and talent is.

13        Q.   So was it safe to say that you were the

14   teacher?

15        A.   No, it would not be.

16        Q.   Okay.

17        A.   I was the coordinator.

18        Q.   On a regular basis you're the one who

19   interacted with the children, though?

20        A.   Oh, very much so.  And I did teach the oli when

21   the kumu wasn't there.  The chanting.

22        Q.   And hula?

23        A.   No.

24        Q.   You're not a kumu hula?

25        A.   No.

1        Q.    Can you describe for me what your family ties
2    are to the Lihue area.   Is your maiden name Quitevis?
3        A.    No.   That's my married name.
4        Q.    What's your maiden name?
5        A.    Ehia.
6        Q.    Can you describe for me what your -- the Ehia
7    family's ties are to the Lihue area?
8        A.    It would be my Kalioku side, from my mother.
9    It's a direct link to Lihue kokonilako.
10       Q.    And can you describe for me how many
11   generations have lived in the area?
12       A.    That's very difficult.   Go back to the time...
13   I would say back before the 1500s, maybe even before
14   that.   It's difficult to say.
15       Q.    In that area your family has ties?
16       A.    To many areas, but yes, to that -- specifically
17   to that area.
18       Q.    And in your experience, how many times have you
19   requested access to Schofield Barracks to exercise your
20   cultural heritage?
21       A.    That's a good question.   I just have to count.
22       Q.    And let me make it more specific, before you
23   were hired as a cultural monitor.
24       A.    Oh, that makes it easier.   Prior to then, none.
25   We didn't know who to call.

1    fulfill anything, we have to identify, and I think it's

2    just a play on words.  And we had this mix up in the

3    beginning with the Army because they thought something

4    was a survey.  We were throughout all of our -- yeah.

5    Survey was one of those words that I guess we gotta

6    agree on a definition or know what that is.

7        Q.    Well, it's not a play on words.  Do you know

8    what survey is?

9        A.    Do you?  I thought I knew.  I believe a survey

10   to be an inspection or identification of the site.  To

11   go out and inspect an area to identify.  There may be

12   all different kinds of surveys.

13       Q.    Are you a trained archaeologist?

14       A.    No.

15       Q.    Under 106, does an archaeologist have more

16   responsibility than somebody who's hired as a cultural

17   monitor, as an advisor?

18            MR. HENKIN:  Objection to the extent it --

19            MR. YEE:  She's claimed her knowledge.

20            MR. HENKIN:  Let me state my objection.

21            MR. YEE:  Can you lower your voice, please.

22   There's no need to yell.  I'm sitting across the table

23   from you.  Let the record reflect Mr. Henkin is losing

24   control, raising his voice for no reason whatsoever.

25            MR. HENKIN:  The record can reflect that

1    Mr. Henkin has been in deposition and site visits and

2    working nonstop, so my apologies for raising my voice.

3    I would like to state my objection.

4            Objection to the extent it calls for a legal

5    conclusion.  Also, you haven't provided the witness with

6    a copy of Section 106 when she has requested it.

7            MR. YEE:  And I will provide her a copy of 106,

8    but she's claimed certain knowledge as to 106.

9    BY MR. YEE:

10       Q.    So my question is:  Do you have an

11   understanding whether or not a trained archaeologist has

12   more responsibility under Section 106 than somebody

13   who's hired as an advisor under the term cultural

14   monitor?

15           MR. HENKIN:  Same objection.

16           THE WITNESS:  Before I answer that question, I

17   would like to take a look at Section 106.

18   BY MR. YEE:

19       Q.    Okay.  Do you know if anywhere in Section 106

20   the term cultural monitor is used?

21           MR. HENKIN:  Same objection.

22           THE WITNESS:  I would need to look at Section

23   106.

24   BY MR. YEE:

25       Q.    Are you a trained archaeologist?

1            MR. HENKIN:  Asked and answered.

2            THE WITNESS:  I've already answered, no, I'm

3    not.

4    BY MR. YEE:

5        Q.    Do you have any training in archaeology at all?

6        A.    No.  I'm not hired as an archaeologist.

7        Q.    Okay.  And in terms of identification of

8    cultural sites, what's your training?

9        A.    My training is the land and exploring the land

10   and drawing on ho'okahi, different kapuna, different

11   people, my husband.  The land has a lot to show us.

12       Q.    And on those various trips, did you go to sites

13   that were already identified?

14           MR. HENKIN:  Objection.  Compound.

15           THE WITNESS:  I've been to area where there

16   were sites that were not previously identified and

17   identified.

18   BY MR. YEE:

19       Q.    And as part of that trip where there were sites

20   that weren't identified, were you the one who identified

21   them as cultural sites?

22           MR. HENKIN:  Objection.  Compound and vague.

23           MR. YEE:  I'm being as specific as the witness

24   is being.

25           THE WITNESS:  When we go mauka or when we go on

1    ho'okahi, we don't look for what you call sites.  That's

2    the terminology we use when we doing this work.  We look

3    for our wahi kapuna.  We feel the aina and, yes, many of

4    times.

5    BY MR. YEE:

6        Q.    You're the one who identified the cultural

7    site?

8        A.    Our wahi kapuna, yes.

9        Q.    And how did you do that?

10       A.    Can you clarify, what do you mean?

11       Q.    Well, you're the one saying I can identify

12   cultural sites.  I want to know how you're able to do

13   that.

14       A.    You just look.  And if it's there, it's there.

15   And if it's not there, that's all you need to do is open

16   your eyes and look.

17       Q.    What's the difference between a cultural site

18   and a natural occurring phenomenon, say a group of

19   stones is shaken up in the last earthquake and it forms

20   a certain pattern, how can you distinguish between that

21   and a cultural site?

22            MR. HENKIN:  Objection.  Lack of foundation.

23   Assumes facts not in evidence.

24            THE WITNESS:  First I would say, what makes you

25   think something that occurred naturally isn't a cultural

1    site?  There may be a pohaku that's water warn and to an

2    archaeologist it doesn't mean a thing and to a kanaka

3    maoli it can have a completely different meaning and I

4    cannot give you any across-the-board answers because

5    each place is unique unto itself.  And if you're trying

6    to compare an archaeologist and what experience they

7    have to my experience on the aina, all I could say to

8    that is methodology alone is not enough to say from an

9    archaeological point of the view that this may or may

10   not be a site, if they have no understanding of the aina

11   or what is important to us.

12   BY MR. YEE:

13       Q.   Well, again, going back to the purpose of the

14   Programmatic Agreement, are naturally occurring

15   structures and phenomenon, can they be qualified as

16   historic sites for the national registry?

17          MR. HENKIN:  Objection to the extent it calls

18   for a legal conclusion.

19          THE WITNESS:  Again, I have to tell you, or

20   maybe the first time I'll tell you, I cannot answer that

21   question because each site is individual unto itself.  I

22   cannot make a blanket statement and X everything out one

23   way or the other.  I cannot say no or yes on that.

24   BY MR. YEE:

25       Q.   Well, let's go back to the area in QTR1 that

1       A.    Excuse me?

2       Q.    There's no specific reference to any area in

3  this paragraph, is there, QTR1 or BAX?

4       A.    No reference to any area?

5       Q.    Well, you can tell me if you're referring to

6  QTR1 or BAX.

7              MR. HENKIN:  Then why didn't you ask her that?

8              THE WITNESS:  Can you repeat the question,

9  please.

10 BY MR. YEE:

11      Q.    Are you referring to BAX in this section of

12 your declaration?

13      A.    Yes.

14      Q.    Okay.  On to paragraph 15.  This, again,

15 relates to the sites that are found in -- that you claim

16 were found in 14, correct, in paragraph 14, what you

17 called newly discovered sites?

18      A.    Correct.

19      Q.    If you go to page 12, paragraph 18.

20      A.    Okay.  Would you like me to --

21      Q.    Just read it to yourself.

22      A.    I think with this there's a lot of information

23 in that paragraph.

24      Q.    It goes all the way to page 17.

25      A.    Okay.  So even as I review it now as you're

1    asking questions, I'm going to have to refresh and refer

2    back to it.  Okay.

3         Q.   Okay.  The first violation that you allege of

4    the Programmatic Agreement --

5         A.   Are you still on...

6         Q.   On page 13.

7         A.   Correct.

8         Q.   And that refers to the BAX, correct?

9         A.   Correct.

10        Q.   And then the next violation you allege of the

11   Programmatic Agreement is in the middle of page 13,

12   correct?

13        A.   The second bullet?

14        Q.   Right.  Is that also in the BAX?

15        A.   Correct.  Yes.

16        Q.   And if you turn to page 14, the next bullet

17   which begins June 2006 --

18        A.   Yes.

19        Q.   -- is that also in the BAX?

20        A.   Correct.  Yes.

21        Q.   The skeletal remains that you mention in this

22   section --

23        A.   Yes.

24        Q.   -- were they ever identified as human remains?

25        A.   No, they were not.  We've never received a

1    report.

2       Q.    Have you ever heard from anybody that they were

3    not human remains?

4       A.    Yes.

5       Q.    And who told you that?

6       A.    I believe it was Kamoa.

7       Q.    Your husband?

8       A.    Correct.

9       Q.    And did they tell you what kind of remains they

10   were?

11      A.    Someone had come out and done a site visit.

12   And after that visit, we requested a report of the

13   outcome of everything so we know where it stood, and we

14   haven't received one until today.

15      Q.    Okay.  But your husband told you that they

16   weren't human remains, right?

17      A.    Yeah.

18          MR. HENKIN:  Objection.  Misstates testimony.

19   BY MR. YEE:

20      Q.    Did your husband tell you what kind of remains

21   they were?

22      A.    What he said was that the person who came out

23   gave an opinion that it's probably not human remains.

24      Q.    Did they say anything beyond that?

25      A.    That they were -- he used a specific word.

1    Another word for animal bones that I'm not familiar

2    with.

3         Q.    Did your husband ever tell you that they were

4    possibly cow bones?

5         A.    I think Laurie Lucking had stated something to

6    that later, far later on.  I'm not sure when, but yeah.

7    Yeah.  But the very first initial, they came out with a

8    scientific word I didn't understand.

9         Q.    Okay.  So you've had conversation with

10   Dr. Lucking also about these so-called skeletal remains,

11   right?

12        A.    With these, Kamoa took care of most of the

13   communications for that.

14        Q.    But you've also talked to Dr. Lucking about

15   that?

16        A.    I'm kind of iffy right now if I spoke to her or

17   he talked to her.  I talked to her on a lot of different

18   things, but regarding iwi, that is not my kuleana at

19   this time in my life.

20        Q.    I understand.  I'm just trying to find out if

21   you actually had a conversation or you found out about

22   the conversation where Dr. Lucking said these were cow

23   bones?

24             MR. HENKIN:  Objection.  Compound.

25             THE WITNESS:  I know of definitely, yes.  I

1    can't right now tell you exactly how and why, but yes, I

2    did hear cow.

3    BY MR. YEE:

4        Q.    Okay.  And you know that to have been

5    Dr. Lucking's conversation with somebody?

6        A.    Yes.  Sorry, it's so vague, but yes.

7        Q.    No.  No.  It's okay.  Do you have any reason to

8    disagree with Dr. Lucking?

9            MR. HENKIN:  Objection.  Foundation.

10           THE WITNESS:  On this particular incident, no.

11   BY MR. YEE:

12       Q.    Because I think you just said you don't feel

13   that you have expertise in iwi at this point.

14       A.    No, I did not say it's not my area of

15   expertise.  I said it is not my kuleana at this point in

16   my life.  And there's cultural purposes, my own beliefs

17   with that.  But when it comes to iwi, that is not my

18   kuleana at this point in life.

19       Q.    So you wouldn't be able to identify human

20   remains versus cow remains?

21           MR. HENKIN:  Objection.  Misstates testimony.

22           MR. YEE:  It's just a question.

23           THE WITNESS:  No, I would not.

24   BY MR. YEE:

25       Q.    Do you know if there was --

```
 1        A.    Actually, can I clarify?

 2        Q.    Sure.

 3        A.    There's certain things that I think any of us

 4   if we seen we would know if it's a cow or human, but

 5   there's other little bones that you would need -- that I

 6   would not know.  So if it was the head or, you know,

 7   obvious parts, then yes, but other than that, no.

 8        Q.    Are you aware of any Hawaiian cultural

 9   practices that include the remains of a cow?

10        A.    No, I am not.  Not to my knowledge.

11        Q.    Thank you.  And so the next bullet on page 14,

12   you're talking about the opportunities you had to go

13   into various areas with the UXO teams, correct?

14        A.    What I'm talking about, and I'm so glad we're

15   there, what I'm talking about in this is our opportunity

16   to monitor excavations.

17        Q.    And so when you say "lasting mere minutes," do

18   you remember when the first opportunity was, the date of

19   that?

20        A.    This is in July.  I believe it was on

21   July 27th, Monday.

22        Q.    Of this year?

23        A.    2006.

24        Q.    And was it you and your husband, those are the

25   cultural monitors you're talking about?
```

1                        C E R T I F I C A T E

2     STATE OF HAWAII                    )

3     CITY AND COUNTY OF HONOLULU    )

4              I, BARBARA ACOBA, Certified Shorthand

5     Reporter and Notary Public, State of Hawaii, do

6     hereby certify:

7              That on Wednesday, December 6, 2006, 2006, at

8     10:39 a.m., appeared before me ANGELA EHIA-QUITEVIS, the

9     witness whose deposition is contained herein; that

10    prior to being examined he was by me duly sworn;

11             That the deposition was taken down by me

12    in machine shorthand and was thereafter reduced to

13    typewriting under my supervision; that the foregoing

14    represents, to the best of my ability, a true and

15    correct transcript of the proceedings had in the

16    foregoing matter.

17             I further certify that I am not an attorney

18    for any of the parties hereto, nor in any way concerned

19    with the cause.

20             Dated this 7th day of December, 2006,

21    in Honolulu, Hawaii.

22                        _____

23             BARBARA ACOBA, CSR NO. 412

24             Notary Public, State of Hawaii

25             My Commission Exp: 10-22-2008