IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| 'ĪLIO'ULAOKALANI COALITION, a Hawai'i nonprofit corporation; NĀ 'IMI PONO, a Hawai'i unincorporated association; and KĪPUKA, a Hawai'i unincorporated association, | ) ) ) ) ) ) ) | CV NO 04-00502 DAE BMK |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER SETTING INTERIM INJUNCTION

On December 18, 2006, the Court heard the parties' arguments regarding the scope of interim injunctive relief. David L. Henkin, Esq., appeared at the hearing on behalf of Plaintiffs; James Gette, Trial Attorney for the Environment and Natural Resources Division of the United States Department of Justice, and Harry Yee, Assistant United States Attorney, appeared at the hearing on behalf of Defendants ("Defendants" or "the Army"). After reviewing the evidence and the supporting and opposing memoranda, the Court enters interim

injunctive relief as detailed below.  This injunction will remain in place until either

Defendants have complied with the National Environmental Policy Act, or the

parties return to this Court with changed circumstances, whichever occurs sooner.

This time period is being set in accordance with the decisions of the United States

Court of Appeals of the Ninth Circuit rendered on October 5, 2006 and October 27,

2006, and the Addendum to the October 27, 2006 order.

<u>PROCEDURAL BACKGROUND</u>

On August 17, 2004, Plaintiffs filed a Complaint challenging

Defendants' decision to convert the 2nd Brigade of the 25th Infantry ("2/25") into a

Stryker Brigade in Hawai`i without considering using stationing locations outside

of Hawai`i.  Plaintiffs sought a preliminary injunction based upon Defendants'

alleged violation of the National Environmental Policy Act ("NEPA").  On

November 5, 2004, this Court issued an Order Denying Plaintiffs' Motion for

Preliminary Injunction.  On April 25, 2005, this Court issued an Order Denying

Plaintiffs' Motion for Summary Judgment and Granting Defendants' Cross Motion

for Summary Judgment.  Judgment was entered in favor of Defendants on April

29, 2005.

Plaintiffs filed an appeal on May 3, 2005.  On May 9, 2005, Plaintiffs

filed a motion for injunction pending appeal.  This Court denied Plaintiffs' motion

2

on May 19, 2005.  The Ninth Circuit also denied Plaintiffs' motion pending appeal, but expedited the hearing of the appeal.

On October 5, 2006, the Ninth Circuit affirmed in part and reversed in part this Court's summary judgment order.  The Ninth Circuit reversed the portion of this Court's order "that held that the Army considered all reasonable alternatives to transformation of the 2nd Brigade in Hawaii and remand[ed] to require it to prepare a supplemental [site-specific environmental impact statement] to consider all reasonable alternatives, most notably the potential for transforming the 2nd Brigade outside of Hawaii." `Ilio`Ulaokalani Coalition v. Rumsfeld, 464 F.3d 1083, 1087 (9th Cir. Haw. 2006).

According to Plaintiffs, Defendants continued with Stryker activities in Hawai`i, despite the Ninth Circuit's ruling.  Plaintiffs, thus, filed an emergency motion for temporary injunction in the Ninth Circuit.  On October 27, 2006, the Ninth Circuit granted Plaintiffs' motion and issued a temporary injunction enjoining Defendants from

> implementing, executing, or proceeding with the
> following activities associated with the transformation of
> the 2nd Brigade of the 25th Infantry Division (Light) to
> Striker Brigade Combat Team in Hawaii:  grading,
> grubbing, other ground disturbance, construction, land
> acquisition, project design, geotechnical testing,

> unexploded ordinance clearance, contract award, and
> Stryker Brigade Combat Team-specific training . . . .

(Defs.' Notice of Emergency Remand from the Court of Appeals at Ex. A.)  The

Ninth Circuit stated that its injunction would be in effect until this Court enters an

interim injunction pending Defendants' compliance with NEPA, as required by the

Ninth Circuit's October 5, 2006 opinion.  (Id.)  The Ninth Circuit instructed that

this Court proceed expeditiously and determine which Stryker Brigade Combat

Team ("SBCT") transformation-related activities are time-critical, and which can

proceed without causing irreparable cultural and environmental harm.  Due to

Judge Bea's lengthy dissent from the order, the Ninth Circuit majority issued an

Addendum to Order Granting Temporary Inunction and Remanding (the

"Addendum").  (Pls.' Mem. Re: Interim Inj. at Ex. 1.)

After a clarification order from the Ninth Circuit, this Court allowed

the parties, as they requested, to engage in limited and expedited discovery.  The

parties filed various briefs and declarations in November and supplemental briefs

in December 2006, after completing that discovery.

## STANDARD OF REVIEW

Plaintiffs have already been granted an interim injunction, it is now

this Court's duty to determine the appropriate scope of that interim injunction.  In

doing so, this Court must first consider whether plaintiffs can "demonstrate that there exists a significant threat of irreparable injury" to the Plaintiffs from the more limited actions that Defendants now seek to take. Oakland Tribune, Inc. v. Chronicle Pub Co., Inc., 762 F.2d 1374, 1376 (9th Cir. 1985). If so, "[i]n issuing an injunction, the court must balance the equities between the parties and give due regard to the public interest." High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 642 (9th Cir. 2004). "[A] court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Although particular regard should be given to the public interest . . . ." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987).

There is no automatic issuance of an injunction for a violation of NEPA. High Sierra Hikers Ass'n, 390 F.3d at 642. However, an "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable." Id. (quoting Amoco Prod. Co., 480 U.S. at 545). Thus, where there is a strong claim that NEPA has been violated, and environmental injury is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment." Id.

DISCUSSION

A.    Defendants' Request for a Limited Injunction

Defendants request that the Ninth Circuit's interim injunction be narrowed to allow them to proceed on a limited basis with new equipment fielding and training, training individual soldiers and units, and completion and use of six projects.  Of the 28 projects studied in the Evironmental Impact Statement ("EIS"), Defendants have specifically identified only six projects, which they argue are the most time-sensitive and need to be completed in order for 2/25 to complete its transformation to a SBCT and be prepared to be deployed.[1]  Defendants have requested that this Court narrow the broad injunction issued by the Ninth Circuit to allow the Army to proceed with:

(A) Limited New Equipment Fielding and Training;

(B) Soldier and Unit Level Training; and

(C) Construction and/or use of the following six projects:

(1) Use of the Qualification Training Range One ("QTR1");

---

[1] Defendants maintain that all 28 projects that were studies in the EIS are needed to establish facilities necessary to transform, maintain and sustain a Stryker Brigade in the long term.  Defendants, however, have sought to lift the injunction for only these six projects at this time since they are the most time critical and bear directly on soldier safety.  (See Defs.' Mem. on the Scope of Interim Inj. Relief at 22.)

(2) Completion and use of 2/25 SBCT Motor Park and Maintenance Area ("SBCT Motor Pool");

(3) Completion and use of the Urban Assault Course ("UAC");

(4) Completion and use of the Multiple Deployment Facility ("MDF");

(5) Modification to existing training range 11T on the Pohakuloa Training Area ("PTA"); and

(6) Use of the Tactical Vehicle Wash Facility.[2]

1.    New Equipment Fielding and Training

There are 18,000 pieces of new or reassigned equipment required for 2/25 to function as a SBCT, which includes 1,400 pieces of rolling stock, such as vehicles and trailers.  (11/13/06 Borne Decl. ¶ 4.)  2/25 needs 328 Strykers, 169 of which have already been received, and the remaining 157 are expected to arrive between December 2006 and April 30, 2007.

Training on the new equipment began in October 2005 and is scheduled to finish on June 29, 2007.  (Id.)  Training is designed to teach soldiers basic skills, with an emphasis on safety, in operating and maintaining the new vehicles and systems, such as upgraded weapons, communication systems, unmanned aerial vehicles, command and control vehicles, the ten Stryker variants,

---

[2]Plaintiffs do not oppose the use of this facility since it is already completed. (Pls.' Mem. Re: Interim Inj. at 26.)

tactical wheeled vehicles, and computer systems.  Individual Stryker vehicle training consists of driving, firing weapons, maintenance, and operating special equipment.  Each crew needs to practice for 44 hours of day and night driver training.  Driver training is conducted on existing roads, trials, and ranges on Schofield Barracks or at PTA.  Crews must operate and fire non-explosive training ammunition from a 105 mm gun as part of their training.  (Id.)  It is undisputed that this training is essential to transforming 2/25 to a SBCT, essential to soldier safety and time-critical.

### 2. Soldier and Unit Level Training

Individual soldiers must receive training on their specific military occupational and other combat skills.  (11/13/06 Borne Decl. ¶ 5.)  Soldiers must qualify on their individual weapons and assigned crew-served weapons every six months.  They also learn systems operations, maintenance, and equipment functions.

Soldiers must also train in increasingly larger units, starting with teams and squads and culminating in brigade exercises in California.  Unit training consists of tactical situation and field training exercises at squad, platoon, company, battalion, and brigade levels, and collective live-fire maneuver exercises at squad, platoon, and company levels.  (11/13/06 Brandenburg Decl. ¶ 5.)  These

training exercises are done with Stryker vehicles.  This training for 2/25 will be done at Schofield Barracks and PTA, in addition to Stryker Vehicle New Equipment Training, command and control systems training, basic and advanced medical training, marksmanship training, qualification of all weapons, and Stryker mounted gun system qualification.  (Id.)  As indicated above, it is undisputed that this training is necessary for 2/25's deployment to Iraq as a SBCT, and most importantly, for safety related purposes.  It is also undisputed that this training is time-critical.

Plaintiffs are not aware of any short-term impacts that are greater than impacts from non-Stryker training associated with the non-live-fire maneuver exercises at the Dillingham Training Area that are limited to existing roads, old airfield taxiways, aircraft parking areas or previously disturbed areas within the old Nike site.  (Pls.' Supp. Mem. Re. Interim Inj. at 6.)  Likewise, Plaintiffs are not aware of any short-term impacts that are greater than impacts from non-Stryker training for a variety of training exercises at Ranges KR 3, 4, 5 and 6 at Schofield Barracks, including pre-Operation New Equipment Training, squad or section live-fire exercises, platoon maneuver live-fire exercises, platoon convoy live-fire exercises and gunnery exercises.  These training exercises are described in detail in Exhibits 69 and 70 of Plaintiffs' supplemental memorandum.  (Id. at 7.)

3.    Construction and Use of Projects

a.    Qualification Training Range 1

Defendants have designated QTR1 as the most important project.

QTR1 is located at Schofield Barracks.  (11/13/06 Borne Decl. ¶ 6i.)  QTR1 is a

multi-purpose, small arms and machine gun range used for soldiers to become

proficient and safe with their weapons.  Construction of QTR1 has been completed

and it is in use.  It was built as a range improvement project to accommodate all

individual and crew-served pistol, rifle, and machine gun qualification

requirements and tasks, which use the modern sighting systems.  QTR1 is the only

qualification range in Hawaii with these capabilities.  QTR1 was built over the

former site of qualifying ranges used by 2/25 and other units for many years.  (Id.)

Once every six months, soldiers are required to qualify with their

individual and crew-served weapons using the weapon's standard aiming sights,

special optical, laser, and thermal sights.  (Id.)  2/25 soldiers with assigned vehicles

must qualify with the weapons mounted on their stationary vehicles.  2/25 would

use QTR1, just like any other Army unit, for individual hand held or crew-served,

tripod-mounted marksmanship qualification.  The following weapons are used at

QTR1: small arms -- 9mm, 38 caliber and 45 caliber pistols; shotguns; the M-4

carbine; the M-16 rifle; the M-203 40 mm grenade launcher; the M-240 7.62 mm

machine gun; the M-249 5.56 mm squad automatic weapon; M-24 sniper rifle; M-2 .50 caliber machine gun; and the MK-19 40 mm machine gun. All ammunition is training, non-explosive ammunition. (Id.) Plaintiffs do not dispute that this training is essential and time-critical if 2/25 is going to be transformed to a SBCT.

       b.    <u>SBCT Motor Pool</u>

Defendants have designated the SBCT Motor Pool as the second most critical construction project. (11/13/06 Borne Decl. ¶ 6ii.) This project is also located at Schofield Barracks. It is designed to be a facility to park and to maintain over 1,000 vehicles, trailers, and wheel-mounted systems that are assigned to 2/25. This facility will be used by other units when 2/25 is absent. Construction of this project is more than 50 percent complete, and it is being built over former commercial agriculture lands in the South Range Acquisition Area.

Plaintiffs argue that this facility is not necessary and it is not a time-sensitive project because there is no need for speed in performing maintenance on vehicles returning from the National Training Center. Plaintiffs also assert that if there were a need to act quickly, the Army should establish temporary facilities at a fraction of the 44 million dollar cost to complete construction of the motor pool. Plaintiffs also assert that the Army should use

interim facilities, improve security at facilities it already has, or park vehicles on compacted gravel.

Defendants, however, presented evidence that the motor pool is time critical because the vehicles have to be at a high readiness standard to deploy to any theater. Specifically, when 2/25 returns from the National Training Center, its Stryker vehicles will have a very short window of time to receive final maintenance and repairs before needing to be loaded on ships headed for Kuwait and Iraq. (Pls.' Ex. 72 at 71.) Although, as Plaintiffs argue, some Stryker vehicles may be deployed directly from the National Training Center, Defendants provided evidence that the vast majority of the vehicles would return to Hawaii for maintenance. (Id. at 85; Pls.' Ex. 82 at 95.) Without this facility, vehicles would be stored in fields and open parking lots, which creates serious security concerns. Storage in open spaces makes maintenance more difficult, thereby impacting the readiness of the vehicles. (Id.) In addition, in January 2008, all present permanent motor pools, the SBCT motor pool, and all future temporary interim motor pools will be used for vehicle parking requirements and there will still be a 3,595 square yard shortfall of parking. (12/15/06 Borne Decl. ¶ 6.)

This Court independently finds that Defendants' testimony and evidence is more credible than Plaintiffs' suggested alternatives. In addition, this

12

Court notes that the Supreme Court has indicated in a variety of contexts, that this Court must give great deference to the military in their decisions as to which facilities and/or training are appropriate or necessary for them to best accomplish their mission.  See Gilligan v. Morgan, 413 U.S. 1, 10-11 (1973) (noting that "[t]he complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches," and thus should be left to the political branches directly responsible  to the electoral process, and not to the judiciary.)   Based on Defendants' credible evidence, this Court finds that Defendants have established that the SBCT Motor Pool is essential to transforming the 2/25 to a SBCT and is a time-critical project.

        c.    <u>Urban Assault Course</u>

        Defendants have determined that the UAC at Schofield Barracks is the third most important facility that needs to be completed and put into use. (11/13/06 Borne Decl. ¶ 6iii.)  It is currently more than 50 percent complete, and it is designed to provide a facility for 2/25 to train on foot in urban terrain combat, like that in Baghdad, where an operational SBCT unit is currently assigned.  The UAC is a range which would be built for multi-purpose, small arms and machine gun live-fire training requirements.  Soldiers would be able to practice drill

13

techniques of entering and clearing hostile forces from urban buildings, while

minimizing causalities to soldiers and civilian populations.  Experience in

personnel identification, fire discipline, teamwork, and ballistics effects can be

obtained only by training at the UAC.

The UAC is being built over the former site of the Military Operations

in Urban Terrain, Assault Course.  There is no other place in Hawaii that is

available for such training.  Since the UAC is replacing the former assault course,

it will be the training center for all Army and other military service units, not just

the 2/25.  (Id.)  Without the UAC, 2/25 will not be able to become proficient in the

type of terrain and conditions they will encounter in combat.  (Pls.' Ex. 69.)

Plaintiffs do not dispute the necessity for training at the UAC.

d.    Multiple Deployment Facility

The MDF is the next most important project that Defendants

identified.  (11/13/06 Borne Decl. ¶ 6v.)  This project is located at Wheeler Army

Airfield, and it is designed to provide a facility for 2/25 and other units to assemble

unit vehicle groups and convoys and conduct pre-deployment inspections.  This

facility will allow units to pack, weigh, balance, inspect, and otherwise prepare

vehicles and equipment prior to movement to air or seaport areas for debarkation

for deployments.  The MDF will allow the 2/25, as a SBCT, to deploy in 96 hours

or less.  The MDF is being built over and expands the former deployment holding

site.  (Id.)  The MDF will serve as the deployment platform for all Army units in

Hawaii, although it is being modified specifically for 2/25.

Plaintiffs assert that Defendants do not need the MDF because they

could use the interim deployment facility.  This Court disagrees.  Defendants

presented evidence that while an interim deployment facility exists, it was built to

support a light infantry unit, and not a vehicle centric-unit like the SBCT.  Thus, it

is too small to be used effectively and safely.  If only allowed to use the interim

facility, Defendants would have to stagger deployment, which translates into

delayed, piecemeal deployments, and would not allow the 2/25 to meet its 96 hour

or less deployment window.  (Id.)  This would seriously impact the safety of the

unit's soldiers.  Again, this Court finds Defendants evidence to be credible since

they are the experts in what is required for the Army to function effectively.

e.    Modification to Existing Training Range 11T

Defendants seek to make what they have considered to be a minor

modification to the long existing training range 11T on the Pohakuloa Training

Area.  (11/13/06 Borne Decl. ¶ 4.)  PTA is currently a helicopter gunnery, machine

gun, and anti-tank missile range.  PTA needs to be modified to support  use of the

mobile gun system, which is a Stryker with a 105 mm gun.  This same type of

weapon was used on the model M60 series tanks, which extensively used range 11T for training prior to 1990. Only non-explosive, solid metal alloy substitution training ammunition will be used during firing. The modifications to range 11T involve re-grading some roads, improving berms, and moving certain targets. (Id.)

Plaintiffs argue that this modification is not necessary because the mobile gun system is a new weapon that previous SBCT teams did not use and, thus, cannot be considered integral to converting 2/25 to a SBCT. (Pls.' Mem. Re: Interim Inj. at Ex. 27.) Even though the mobile gun system may be a new weapon system, Defendants have shown that it is necessary to complete training and will improve the capabilities of a SBCT. Indeed, the mobile gun system optimizes the Army's ability to fight and to survive in both an urban environment and on the battlefield. (12/15/06 Banach Decl. ¶ 31.) The mobile gun system has a smaller main weapon that is designed to achieve intended target destruction with a smaller chance for collateral civilian damage. (Id. at ¶ 32.) The other Stryker Brigades did not have a choice to deploy with the mobile gun system because the testing of the system was not complete and they could not be produced fast enough to meet deployment timelines. (Id. at ¶ 31.)

Thus, as the Army has shown that the mobile gun system will improve the functionality of 2/25 as a SBCT, and as the Army is the expert in this field, this

16

Court finds that their evidence is credible that training with this weapon is essential to complete transformation of 2/25 to a SBCT. It is also true that because of its improved accuracy and smaller main weapons the potential for environmental damage is reduced.

B.     Harm to Defendants if the Injunction Is Not Narrowed

The President of the United States, with the support of Congress, approved transforming all of the brigade combat teams to a modular organizational design, which creates brigades that are more effective, flexible, lethal, survivable, sustainable, and have better battle command and intelligence capabilities. (Lovelace Decl. ¶ 4.) Almost half of the Army's brigades have been completely transformed. Once the transformation is complete, no light infantry brigade, like 2/25's previous configuration, will remain. (Lovelace Decl. ¶ 4.)

2/25 began its transformation process from a Light Infantry Division to a SBCT in October 2005, and it is now more than one year into the two-year transformation process. (11/13/06 Borne Decl. ¶ 3.) The SBCT has the ability to assess complex situations, act faster, change missions easier, move quickly, and attack more precisely. (Lovelace Decl. ¶ 5.) The SBCT is more deployable and sustainable than a heavily armored brigade, but more lethal, mobile, and survivable than a light infantry brigade. (Lovelace Decl. ¶ 4.) Thus, a SBCT increases the

Army's ability to conduct combat operations successfully and reduces American casualties. (Id.) Indeed, former Brigade Commander Colonel Robert Brown testified that the Stryker vehicle and SBCT format of fighting saved many of his soldier's lives. (Brown Decl. ¶ 5 (noting that due to its speed and protection, none of the 137 rocket propelled grenades that hit the Stryker vehicle penetrated it, and it enabled many of his soldiers to survive direct hit suicide bombs; he believes that the loss of soldiers would have been significantly higher if they had not been able to fight as a SBCT or to use a Stryker vehicle).) Lieutenant General James Lovelace testified that the Stryker vehicle protects soldiers against enemy snipers and roadside bombs. (Lovelace Decl. ¶ 9.) The increased survivability, speed, mobility, and lethality of a SBCT allow the unit to conduct operations in an area that normally would require three brigades. (Id.)

Because the Army is currently fully engaged in combat operations in Iraq and Afghanistan, Defendants cannot afford to delay the readiness of a single brigade, including 2/25. (Lovelace Decl. ¶ 3.) There are only 42 active brigades in the Army, none of which are idle. (Id.) Due to the magnitude of this nation's current commitment, the Army is already deploying brigades at an accelerated

pace.[3] (Id.) In addition, there are only four fully transformed SBCTs in the Army, once ready, 2/25 would be the fifth SBCT. Because brigades across the Army are already stretched, it is essential to keep the 2/25 on track and not to delay its deployment. (12/15/06 Brandenburg Decl. ¶ 7.)

The Army has a closely integrated transformation and deployment schedule, which is planned years in advance and timed to achieve the right mix and the right number of forces to conduct operations in the field and to serve as a deterrent force in critical regions. (Lovelace Decl. ¶ 10.) A delay of the readiness of 2/25 would cause a ripple effect. (Id.) If 2/25 is not ready to be deployed as a SBCT by November 1, 2007, its scheduled deployment date, then every other brigade would have to deploy sooner. (Id. ¶ 3; 11/13/06 Borne Decl. ¶ 3.) According to the Army, any disruption to its tightly integrated transformation and deployment schedule would cause delay and less training for soldiers, leading to higher incidents of injuries and death in combat. (11/8/06 Banach Decl. ¶ 2.) For example, the 3rd Brigade has had 12 soldiers killed in action in just over three months, which is much higher than other brigades in the same time frame.

---

[3]The Army has a policy goal of providing two years of training at the home station for every one year of deployment. However, the Army is currently operating at a pace of deployment of one year deployed for only one year of training at home station, a full year faster than its policy goal. (Lovelace Decl. ¶ 3.)

(12/15/06 Brandenburg Decl. ¶ 8.) Major General Brandenburg believes that the 3rd Brigade has suffered more deaths because their training was truncated. (Id.) Thus, accelerated deployment would further reduce training time, which in turn decreases unit mission effectiveness in combat, and increases the risk of American casualties. (Lovelace Decl. ¶ 3.)

In addition, delaying transformation of 2/25 will have significant adverse impacts, such as reducing the Army's posture to deter war and to meet strategic commitments in the Pacific. (Lovelace Decl. ¶ 8; Atkins Decl. ¶ 1.) 2/25 provides contingency ready forces to United States Pacific Command responses to homeland security threats. (Brown III Decl. 4.) Specifically, the Army's ability to provide commanders in the field with ready forces to deter conflict and to meet treaty obligations in the Pacific region, including the Republic of Korea, would be diminished. (Lovelace Decl. ¶ 8.) In addition, it would affect humanitarian missions in responding to natural disasters. (Atkins Decl. ¶ 4.)

In sum, a delay of 2/25's readiness for deployment would reduce the number of SBCT units available and reduce the overall effectiveness of the Army's forces, leading to less training of soldiers and unnecessary loss of American soldiers' lives.

1.    <u>Possible Alternatives</u>

Plaintiffs assert that rather than transforming 2/25 to a SBCT, 2/25 could continue to train and to operate as a light infantry brigade.  Defendants argue that this is not a viable alternative since 2/25 is more than half way through the transformation process, SBCT's are desperately needed in Iraq, and all light infantry brigades will be transformed eventually.  This Court agrees.  Defendants have shown that a SBCT is more effective at saving soldiers' lives than the light infantry brigade formation.  Thus, denying 2/25 the transformation training needed, and requiring them to deploy to Iraq as a light infantry brigade would unnecessarily put at risk the lives the soldiers of the 2/25 and other soldiers' lives.  Indeed, the light infantry brigade fighting formation requires many more soldiers to cover an area that can be manned by only one SBCT.  This serious risk to American lives could be significantly mitigated if the 2/25 were deployed as a SBCT.

Plaintiffs also suggest that the transformation of 2/25 could occur outside Hawaii at either Fort Wainwright in Alaska, Fort Lewis in Washington, the

National Training Center, or Fort Polk, Louisiana, any of which support

Stryker-specific training[4].

Defendants argue that it is not possible for 2/25 to train outside of

Hawaii without incurring a significant delay of its deployment schedule.

Specifically, Defendants state that due to the increase in the number of active

component brigades stationed in the United States, "there is no brigade-size excess

capacity for army housing, training areas and installation facilities available in the

United States." (Lovelace Decl. ¶ 12.)  There is no idle Army installation as all

Army units, such as Infantry Brigades, Engineer, Military Police, etc., are in

competition for training resources to prepare for deployments. (12/15/06

Brandenburg Decl. ¶ 10.)  For example, the National Training Center and Fort

Polk, Louisiana are not available because they are continually in use for final

rehearsal exercises for all combat brigades prior to deployment. (12/15/06

Brandenburg Decl. ¶ 6.)  Thus, it is impossible for these facilities to be used for

extended training for 2/25 without disrupting the final training and assessment of

---

[4]Plaintiffs also assert that 2/25 could complete training at other facilities that host armored units.  Defendants, however, have presented evidence that these other facilities have not completed environmental impact assessments for Stryker training, and thus are not viable alternatives. (12/15/06 Brandenburg Decl. ¶ 6.)

every other brigade in the Army that is preparing for deployment. (Id.) Plaintiffs have not presented any evidence to the contrary.

Fort Wainwright in Alaska is also not a viable alternative because 2/25 does not have the required winterization equipment, nor the time to acquire it and to complete the winterization process to meet its initial operating capability. (12/15/06 Brandenburg Decl. ¶ 6.) In addition, SBCT 3 will return from Iraq to Alaska before 2/25 will complete its transformation, and there are not sufficient housing, training areas, and facilities to accommodate the overlap. (Lovelace Decl. ¶ 12.) Similarly, Fort Lewis, Washington, cannot accommodate an overlap with 2/25 because of the impending activation of SBCT 7 and the relocation of the 17th Fires Brigade to Fort Lewis. Plaintiff does not present specific evidence to rebut Defendants' conclusions.

Even if there were alternative locations available, moving the 2/25 would cause significant delay in the readiness of 2/25 as a SBCT. Training an infantry to become a SBCT involves vast resources, and the conversion is planned and prepared years in advance. A brigade cannot be easily diverted, especially twelve months into the SBCT training. Indeed, moving the 2/25 involves moving approximately 4,000 soldiers, 2,000 wheeled pieces of equipment, and thousands of dependants. (12/15/06 Banach Decl. ¶ 10.) Leaders would have to take time

23

away from training soldiers for combat to focus on planning a major unit movement.  (12/15/06 Brandenburg Decl. ¶ 12.)  Thus, moving 2/25 would add several more months to the deployment timeline for 2/25 as a SBCT.  (12/15/06 Banach Decl. ¶ 11.)

Moreover, moving soldiers alone, without their dependants, would impose tremendous hardship on the soldiers and their families because they would have to endure additional months of separation, which would be followed by a twelve month deployment in Iraq.  (12/15/06 Banach Decl. ¶ 11.)  This lengthened separation affects command authority, good order, and discipline due to distracted soldiers and low morale.  (Lovelace Decl. ¶ 12; 12/15/06 Brandenburg Decl. ¶ 12.)  Specifically, the Army notes that "increased deployment timelines precipitate a number of negative social externalities," including increases in domestic violence, drug use, suicides, suicide attempts, divorces, alcoholism, and child abuse. (12/15/06 Banach Decl. ¶ 11.)

Additionally, splitting 2/25 for training is not a viable alternative, as soldiers would lose the ability to conduct collective training, lose the ability to share critical lessons learned, and there would be no unity of command and effort, causing the 2/25 to become disjointed.  (12/15/06 Banach Decl. ¶ 13.) Defendants also assert that 1,000 soldiers re-enlisted in the Army on the condition

that they will serve in the SBCT in Hawaii and if 2/25 cannot complete its

transformation, the Army would have to reassign those soldiers to another unit,

which violates their enlistment contracts.  Finally, Defendants state that even if

2/25 trained outside of Hawaii, it would not affect the need to complete and to use

the construction projects since each project can and will be used by other Army

units in Hawaii.  (11/13/06 Borne Decl. ¶ 6.)

        Based on the overwhelming evidence that Defendants presented on

this issue, this Court finds that Defendants have established that moving 2/25

outside of Hawaii in the short term covered by this Oder to complete its

transformation training prior to its deployment to Iraq is not feasible and that it

would lead to significant danger to 2/25 soldiers who would risk deployment

without critical training.

C.    <u>Harm to Plaintiffs if Injunction Is Narrowed to Allow Defendants to Proceed
as Requested</u>

        The Ninth Circuit has found that Plaintiffs have shown irreparable

environmental and cultural harm by the very fact that NEPA was violated because

of the Army's failure to adequately consider reasonable alternatives.  (Addendum at

3-4.)  However, the Ninth Circuit remanded this case for this Court to determine

which time-critical Stryker-related activities could proceed without causing

25

incremental irreparable harm.  Plaintiffs have reviewed the limited activities that Defendants seek to proceed with and state that some of the proposed activities do not violate NEPA's provisions, other activities require mitigation in order to go forward, and they argue that a few activities cannot proceed without violating NEPA.

Specifically, Plaintiffs state that maneuver training at Dillingham Training Area, training at Schofield Barracks' Kolekole Ranges, construction of the Urban Assault Course, and educational activities described in Colonel Banach's November 8, 2006 Declaration do not violate NEPA's prohibitions.  Unless mitigation measures are taken to avoid adverse impacts, Plaintiffs object to the following activities:  training with 40mm grenades and .50 caliber rounds at Qualification Training Range 1; training with 40mm grenade rounds at the Urban Assault Course; maneuver exercises at Schofield Barracks East Range and Kahuku Training area; construction and use of the Multiple Deployment Facility; live-fire training at Ranges 1 and 10 at Pohakuloa Training Area; and training with mortars at PTA.  Plaintiffs state that mobile gun system training and associated construction at Range 11T, maneuver live-fire exercises at PTA Range 8, use of unmanned ariel vehicles, and construction and use of the SBCT Motor Pool cannot proceed.  Plaintiffs assert that these various activities will cause harm to cultural

sites and/or degrade the environment due to wildfires or pollutants and stormwater runoff entering nearby streams.

1.    Risk of Wildfire

   a.    Training at PTA Ranges 1 and 10, Training with Mortars at PTA, Maneuver Live-Fire Exercises at PTA Range 8, and Use of Unmanned Aerial Vehicles

Plaintiffs claim that the proposed training with tracer ammunition at Ranges 1 and 10 of PTA, training with mortars, maneuver live-fire training at Range 8, and use of unmanned aerial vehicles would increase the incidence of fires, which could destroy endangered species and native ecosystems.

The evidence shows that the proposed Stryker related training would increase the number of tracer rounds and mortars fired on an annual basis.  (Pls.' Ex. 52 at 61, 63, 66.)  The evidence also shows that tracers and illumination and white phosphorus motor rounds do have a fire ignition potential.  (Pls.' Ex. 52 at 13; Ex. 53 at 16-17 (noting that of all fires "started on or burning onto PTA, by far the most common cause is tracer ammunition.").)  Plaintiffs assert that incidence of fires would increase based upon these additional rounds being fired and because fire-promoting fountain grass is present at Range 10.  (Castillo Decl. ¶ 21.) Plaintiffs assert that the proposed training at Range 8, coupled with the spread of fountain grass, increases the risk of fire because it creates a larger area potentially

27

affected by the ammunition. (Castillo Decl. ¶ 24.) Plaintiffs further claim that the unmanned aerial vehicles have higher accident rate than traditional, manned aircraft and when they crash, they can ignite wildfires. (Pls.' Ex. 89.)

Defendants state Plaintiffs' contention that training at these ranges will result in irreparable harm through wildfires is not supported by the record. This Court agrees. First, the projected net difference in the amount of ammunition used was based on training for an entire year, yet 2/25 will be training in Hawaii prior to deployment in Iraq only until August 2007. Thus, there is no certain evidence that the amount of ammunition fired actually will increase. Accordingly, Plaintiffs cannot establish incremental harm in the short term.

Second, the Biological Opinions issued by the U.S. Fish and Wildlife Service ("FWS") found that implementation of transformation to a SBCT "is not likely to jeopardize the continued existence of any species covered in the biological opinion or adversely modify or destroy palila critical habitat [or Oahu elepaio critical habitat]." (Defs.' Ex. 2 at 24264 and 24616.) Plaintiffs do not challenge this finding.

Third, the testimony by Plaintiffs' expert, Castillo, that fountain grass at PTA is extensive and would fuel a wildfire, is hotly contested. Castillo, himself noted that most of PTA is lava rock. (Defs.' Ex. M at 78.) In addition, Castillo

previously found that the majority of PTA is comprised of lands dominated by barren lava or lava possessing discontinuous and open vegetation, which generally "do not have fuel loads sufficient to carry fire and are suitable to use as natural firebreaks."  (12/15/06 Mansker Decl. ¶ 10 and attachment 5.)  Castillo pointed out that his previous findings were based upon an old study of the area.  Nevertheless, Defendants presented evidence that this statement still describes the current condition of the area.  Indeed, Defendants expert, Mansker, stated in her declaration that the current natural separation between the areas containing heavy fuel loads (i.e. the impact area) and the endangered species habitat help to ensure that small fires that start within the impact area do not spread to the listed species habitat.  (12/15/06 Mansker Decl. ¶ 11.)  Masker also stated that "much of the barren lava separates endangered species habitat in the western and eastern portion of PTA from impact areas."  (12/18/06 Mansker Decl. ¶ 9.)  Furthermore, Mansker stated that contrary to Castillo's opinion that certain areas are covered with fountain grass, she observed that the area is dominated by native plants due to the Army's efforts to manage fountain grass. (12/18/06 Mansker Decl. ¶ 6.)  In addition, areas that Castillo identified as being covered by fountain grass are in fact areas with widely spaced intermittent clumps of fountain grass that do not constitute a wildfire threat.  (12/18/06 Mansker Decl. ¶ 7.)  Finally, the Army has

undertaken measures to eliminate fountain grass, and it has been successful in reducing the overall concentration of fountain grass. (12/15/06 Mansker Decl. ¶ 17.) Based upon this current condition of the area, Mansker opines that a catastrophic fire is unlikely to result from Stryker-related training at PTA. (12/18/06 Mansker Decl. ¶ 9.) This Court finds Mansker to be the more credible witness on the issue of potential wildfire in the area based upon her more intimate knowledge of the current condition of the area. (12/18/06 Mansker Decl. ¶ 9.) Therefore, the increased potential of fire is not a foregone conclusion, and it is speculative at best.

Fourth, the Army has taken significant measures to ensure that any risk to critical habitats or species is minimized through its Integrated Wildland Fire Management Plan ("IWFMP"), which contains policies and standard operating procedures for fire prevention measures, staffing levels, and equipment needed. (11/11/06 Mansker Decl. ¶ 6.) Plaintiffs argue that even if the IWFMP was fully funded and implemented, which history has shown is generally not the case, the IWFMP is too narrow in scope because the fire fighting personnel and equipment resources are inadequate to prevent catastrophic wildfires. (Castillo Decl. ¶¶ 26-29.) The FWS, however, reviewed the IWFMP and based its no jeopardy finding in part upon the fire prevention and minimization measures provided for in

the IWFMP.  (Defs.' Ex. 2 at 24265.)  Plaintiffs have not challenged the

non-jeopardy findings by the FWS.  This Court will not replace the FWS' opinion

on the adequacy of the IWFMP to protect endangered species or critical habitat

with its own opinion, as the FWS is the expert in making such determinations.  See

Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143

F.3d 515, 523 (9th Cir. 1998) (holding that the court "must defer to the special

expertise of the FWS in drafting [reasonable and prudent alternatives] that will

sufficiently protect endangered species").

       Therefore, Plaintiffs cannot establish incremental irreparable harm

from training at PTA Ranges 1 and 10, training with Mortars, maneuver live-fire

exercises at PTA Range 8, and use of Unmanned Aerial Vehicles.  However,

because the no jeopardy finding was based in part on the implementation of the

IWFMP, this Court hereby orders the Army to fund fully and to implement the

IWFMP.

       2.    Soil Erosion and Stormwater Runoff

       Plaintiffs assert that the construction and/or use of the SBCT Motor

Pool and the Multiple Deployment Facility, and that training at East Range and

Kahuku Training Area ("KTA"), without adequate best management practices

("BMPs"), will cause soil erosion and stormwater runoff, polluting the nearby streams and downstream waters to which they flow.

Defendants argue that these construction projects, along with all others, are covered by National Pollution Discharge Elimination System ("NPDES") permits that were submitted to and approved by the State of Hawaii, Department of Health.  (12/16/06 Kawasaki Decl. ¶ 4.)  The Army submitted site specific BMPs as part of the permit process (prior to construction).  BMPs are schedules of activities, prohibitions or designations of practices, maintenance procedures, and other management practices to prevent or to reduce the pollution of State waters.  (Id. ¶ 6.)  BMP plans describe methods to minimize erosion of soil and discharge of other pollutants into State waters and, after completion of construction, removal procedures for the construction site.  The BMPs used by the Army are typical of construction BMPs used in Hawaii, and their purpose is to help minimize soil erosion and adverse water quality impacts from the project sites.  (Id. at ¶ 4.)  The Army periodically inspects the BMPs and if they are not functioning well, the Army takes measures to improve or to correct the problem.  (Id. at ¶ 5.)  The construction contractors have not received any notices of violation of the NPDES  permits for unmanaged erosion or adverse water quality impacts.  (Id. at ¶ 4.)

32

a.    SBCT Motor Pool

With respect to the Motor Pool, Plaintiffs assert that creating 34 acres of hardened parking area would increase stormwater runoff into the neighboring stream channels.  (Hood Decl. ¶¶ 15-16.)  Plaintiffs also assert that the use of the Motor Pool by more than 1,000 vehicles likely would produce pollutants such as dirt, mud, oil, grease, and tire wear, which stormwater would wash into the streams and the downstream waters into which they flow.  (Hood Decl. ¶ 17.)  Defendants do not contest that stormwater runoff and pollutants running into nearby streams would increase to some degree due to construction and use of the Motor Pool.  Thus, this Court finds that Plaintiffs have established incremental harm from the proposed construction and use of the Motor Pool.

Nonetheless, contrary to Plaintiffs' arguments that construction and use of the Motor Pool cannot proceed under any conditions, this Court finds that this harm could be prevented by the implementation of adequate Best Management Practices.  Plaintiffs' claim that the Army's construction plans do not have adequate BMPs to compensate for this alleged rapid discharge of high volumes of water.  (Hood Decl. ¶¶ 15-17.)  Defendants claim that the construction plans call for curb and gutter systems, in addition to inlet filters with absorbent packs.  (12/19/06 Kawasaki Decl. ¶ 9.)  In his supplemental declaration, Plaintiffs' expert,

33

Hood, agreed that inlet filters with absorbent packs should be installed to handle

the impacts of the completion of the Motor Pool.  (12/18/06 Hood Decl. ¶ 10.)

Defendants also assert that three dissipaters and surge rock or riprap

and a berm will slow down water flows.  Hood argues that although these measures

would reduce the velocity at the discharge outlets, they would not reduce the

volume of flows rushing into the streams or address the problem of non-source

pollutants being transported in high-volume flows.  (12/18/06 Hood Decl. ¶ 11.)

Defendants' expert, Kawasaki, states that Hood did not take into account the fact

that the dissipaters are designed to discharge water at different rates, which

effectively reduce the overall volume of water being discharged at a time,

spreading the flow out over time.  (12/19/06 Kawasaki Decl. ¶ 11.)  In addition, the

Army implements steps to minimize the amount of pollutants that are introduced

onto the pavement, such as regular maintenance of vehicles, and using drip pans

under each vehicle.  Finally, Kawasaki states that although the Waikele Stream

may be as close as 250 to 400 feet from the Motor Pool, the water will not

necessarily flow directly to the closest points along the stream, but it will flow

along the lowest areas of the forest until it gets to the stream.  This Court finds

Kawasaki's testimony to be more credible than Hood's testimony because

Kawasaki is far more familiar with the construction plans, and Hood did not

address the fact that the dissipaters are designed to discharge water at different rates, or that the Army will perform regular maintenance of vehicles, and use drip pans under each vehicle, and take other mitigation measures.

Since the Army has stated that construction plans call for curb and gutter systems, in addition to inlet filters with absorbent packs, which Hood states are necessary, this Court hereby orders that Defendants may proceed with construction and use of the SBCT Motor Pool, but that Defendants must implement filters and absorbent packs, the three dissipaters and surge rock or riprap and berm discussed by Kawasaki, in addition to any and all other BMPs called for in the construction plans. Defendants must periodically report to this Court on their progress, as scheduled through consultation with the parties.

      b.   <u>Maneuver Exercises at Schofield Barracks East Range and Kahuku Training Area</u>

Plaintiffs assert that conducting driver training on existing dirt roads, and three off-road locations at East Range and off-road maneuver exercises at training areas A1, B2 and C1 at KTA would lead to irreparable soil loss and discharge of polluted stormwater into streams due to the lack of adequate BMPs. (Hood Decl. ¶¶ 7-8, 12-13.) Specifically, Plaintiffs claim that there are no meaningful Best Management Practices on the road network at KTA, there were no

mitigation measures in place for off-road maneuver areas at East Range, and the few BMPs on the road at East Range allegedly were installed improperly, inadequately sized or inadequate in number to do an adequate job of preventing erosion and polluted runoff from entering into streams. (Id. at ¶¶ 10-13.) Plaintiffs claim that the increase in use associated with maneuver and driver training with Stryker vehicles would accelerate and increase erosion by removing the protective ground cover. Plaintiffs claim that the environmental degradations could be avoided if the Army addresses the lack of adequate BMPs in the specified areas and request that a comprehensive erosion plan be designed.

Defendants point out that Plaintiffs' assertions of harm are based upon assumptions that the impacts Hood viewed were from Stryker vehicles, as opposed to other wheeled vehicles, and that Plaintiffs have not quantified the level of impacts. (12/16/06 Kawasaki Decl. ¶ 10d.) However, Defendants do not deny that the use of these areas will increase with Stryker vehicle training, and it is common sense that increased use of the roads and off-road areas will lead to increased surface erosion. This Court, thus, finds that Plaintiffs have established incremental harm from Stryker related training at East Range and KTA. This Court does not find it necessary for Plaintiffs to establish the amount of incremental harm, only that incremental harm will occur.

36

However, this Court does not agree that all the BMPs in place along the roads are insufficient and failing.  Indeed, as Defendants point out, Hood's opinion that the B6MPs in place are failing is based on a visit of the areas conducted only several months after the highly unusual severe rainstorms that Hawaii experienced in the winter of 2005-2006.  (12/16/06 Kawasaki Decl.¶ 10a.) Congress has allocated to the Army $997,000 and the Army is continuing to repair the areas that pose the greatest threat to the environment due to sedimentation and to fix conditions that pose potential safety hazards.  (Id. ¶ 10b.)

Furthermore, the Army has implemented BMPs, known as "kickouts," along the roads.  Kickouts are paths cut into the vegetation at several intervals along the roads to allow the water and the sediment to flow there.  (Id. at ¶ 10c; 12/18/06 Hood Decl. ¶ 6.)  In most areas, the ground is slightly elevated toward the end of the path so the water has a stopping point, and the vegetation acts as a natural filter for sediment.  (12/16/06 Kawasaki Decl. ¶ 10c.)  The number of kickouts have been increased on downslope sections.  Although Hood states that he only observed kickouts in flat areas, Kawasaki responded that he has observed numerous kickouts along the roads in the steeper areas.  (12/19/06 Kawasaki Decl. ¶ 5.)  This Court finds Kawasaki's declaration more credible since he is the SBCT

Program Manager, and, thus, is more familiar with the area, whereas Hood's observations were made based on a limited visit of the areas.

Kawasaki, however, did not directly address Hood's concerns that most of the sloped areas made construction of kickouts physically impossible because the surrounding land lay at a higher elevation than the road. Hood also states that he observed three locations in East Range where roadside ditches drained directly into streams. (12/18/06 Hood Decl. ¶ 5.) Kawasaki responded that it is possible that the areas Hood observed may have recently failed due to the severity of the previous winter storms. (12/19/06 Kawasaki Decl. ¶ 4.) Kawasaki, however, did not deny that these areas of direct drainage existed. Kawasaki also stated that many of the failures he observed had new BMPs in place, directing water away from the failed areas. (Id.) Kawasaki, however, did not specifically state that new BMPs were in place in the three areas where Hood noted the ditches drained directly into the streams. Neither did Defendants address Plaintiffs' concerns that BMPs were non-existent in the proposed off-road training areas at East Range and KTA.

Based on the evidence discussed above, this Court hereby orders that Defendants must begin to implement BMPs in the following areas: the downslope areas where they are needed but where it is impossible to construct kickouts; the

38

three locations at East Range where Hood noted roadside ditches were draining

directly into streams; and in the off-road areas where Stryker training will occur.

Defendants must provide periodic progress reports to this Court, in a schedule to

be determined in consultation with the parties.  In addition, this Court orders

Defendants to continue their ongoing range maintenance program to improve its

roads and to implement BMPs to minimize erosion at East Range and KTA.

This Court is not ordering Defendants to design a comprehensive

erosion control plan prior to engaging in any training, however, because it believes

that such an undertaking would significantly delay the start of training at these

ranges and cause the harm described above to the 2/25 soldiers.  The Army, must,

however, immediately begin implementation of the mitigation measures indicated

above.

c.    Multiple Deployment Facility

Plaintiffs claim that use of the MDF might result in stormwater runoff

and pollutants entering the nearby stream.  Plaintiffs state that the sediment

detention basins along the west side of the MDF were designed improperly and

must be modified to slow down flows and capture sediment and pollutants.  (Hood

Decl. ¶ 11.)  Allegedly, the invert of the basin was at nearly the same level as the

outlet.  As such, water would easily flow through without having the lag time

39

needed to filter sediments and pollutants.  (Id.)  Without modification, pollutants

generated by deploying vehicles would flow into the nearby stream.

Defendants do not deny that best management practices are necessary

for the Army to be able to use the MDF without causing harm to the environment

from sediment and/or pollutants entering the nearby stream.  However, this Court

finds that Plaintiffs' claim that the sediment detention basins BMPs need to be

redesigned is unsupported by the record since when discussing the alleged visible

failing of the basins, Hood stated that "I'm assuming, in a sense that that's what

those were, but I haven't been able to dig through the documents to look at all the

CAD drawings . . . ."  (Hood Depo. at 18.)  Therefore, Hood's opinion that basins

were improperly designed and could not handle smaller storm events is

unsupported as he is not fully familiar with the design.  (12/18/06 Hood Decl. ¶

14.)

Hood also stated that other BMPs that the Army proposes to use will

not be effective.  Specifically, Hood states that rolled fabric barriers have little

effect on outlet velocities, silt curtains are not designed to handle concentrated

flows, and that "it is now widely accepted that check dams are not recommended to

control gullying and erosion."  (12/18/06 Hood Decl. ¶¶ 15-16.)  In a responsive

declaration, however, Kawasaki states that silt curtains and check dams were

temporary measures, which have been successful in controlling further erosions

and head cutting, and that had the broad injunction not been issued by the Ninth

Circuit, a more permanent fix would have been implemented.  (12/19/06 Kawasaki

Decl. ¶ 16.)  Kawasaki has also stated that the Army intends to use sandbags, in

addition to the rolled fabric barrier, in front of the 450 mm pipe leaving the

sedimentation basin, and floating booms in the basin, which will further reduce the

runoff velocity and filter out sediment.  (12/16/06 Kawasaki Decl. ¶ 8; 12/19/06

Kawasaki Decl. ¶ 15.) The Army may also place plastic barriers or earthen berms

across the bottom of the detention basin to provide a lag in the water flow or

install inlet filters with absorbent packs to trap sediment.  (Id.)  Hood did not

address whether the use of the sandbags, floating booms, or barriers or earthen

berms would make the BMPs more effective, as asserted by Kawasaki.  Hood did,

however, agree that inlet filters with absorbent packs should be installed.

(12/18/06 Hood Decl. ¶ 10.)

Plaintiffs also assert that the Army must stop stockpiling excess dirt at

the foot of the scarp to the immediate west of the facility until it installs adequate

BMPs to prevent the pile from eroding down into the natural drainage and

polluting the stream.  "The Army concurs that BMPs need to be implemented at the

stockpile and will take the necessary actions to mitigate the situation." (12/16/06 Kawasaki Decl. ¶ 8b.)

This Court finds that the Army's plans to take additional best management practices is an implied recognition that the sediment basins by themselves are insufficient to prevent pollutants and sediments from entering the stream. Therefore, the harm that Plaintiffs allege is not speculative. This Court finds that Plaintiffs have established incremental irreparable harm that could occur with respect to use of the MDF if proper BMPs are not in place to prevent or to reduce stormwater runoff. Because the Army has implemented some temporary BMPs, which are effective, and plans to implement a permanent fix, this Court hereby orders Defendants to implement all necessary BMPs to prevent or to reduce pollution of State waters as required by the NPDES permit.[5] This Court also orders Defendants to continually inspect and improve the BMPs. In addition, since the Army agreed that BMPs are needed at the stockpile and stated that it will take action to mitigate the situation, Defendants are prohibited from stockpiling excess dirt from the MDF at the foot of the scarp to the immediate east of the facility,

---

[5]This Court will not order the Army specifically to redesign the sediment basins, as requested by Plaintiffs, since Hood's opinion was unsupported in that regard and since Kawasaki stated that the basins were designed to handle storm events from small storms to 100 year storms. (12/19/06 Kawasaki Decl. ¶ 15.)

42

unless and until it installs adequate BMPs to prevent the stockpile from eroding down into the natural drainage. This Court finds that this ruling strikes an appropriate balance of the hardships because the Army has acknowledged that it must implement adequate BMPs, without argument that being required to do so will cause delay of the deployment of 2/25 as a SBCT.

Plaintiffs next request that Defendants be prohibited from installing heavy vehicle scales. Plaintiffs assert that such scales are not necessary, and that the Army should be prohibited from spending money on installing them so that it can remain objective when considering where to station the Stryker Brigade. However, Plaintiffs did not assert any specific harm that would be caused from the installation of such scales. Furthermore, as discussed above, the Army has stated that such scales are necessary since they are more accurate, and improvising other scales raises safety concerns, and would cost much more money than the amount needed to finish the heavy vehicle scales. (11/13/06 Borne Decl. ¶ 6bv; 12/15/06 Borne Decl. ¶ 5.) Moreover, given the amount of money already spent on completed and semi-completed construction projects, this Court does not believe that the additional funds needed to install the heavy vehicle scales would make the Army less objective when determining whether the Stryker Brigade must be relocated.

3.    Possible Harm to Cultural Sites

a.    Qualification Training Range 1

With respect to QTR1, Plaintiffs are not aware of any incremental harm that would result from using the following ammunition at the McCarthy Flats area of Schofield Barracks since such ammunition was previously fired: 5.56 mm, 7.62mm, and 9mm bullets.  However, Plaintiffs assert that weapons that fire .50 caliber rounds and 40mm grenades (such as the MK-19) were not previously used at QTR1 and were not examined in the site-specific EIS or in the Programmatic Biological Assessment.  (Pls.' Ex. 2 at 51563 and Ex. 71; L. Captives Decl. ¶ 24.) Plaintiffs argue that weapons that fire 40mm rounds can cause severe damage to cultural sites, since that ammunition is heavier than that of a pistol bullet, and, thus, results in a greater force upon impact.  (Pls.' Ex. 72 at 127-30.)

The cultural monitors have found 40mm practice rounds in Hale`au`au Gulch, where many undocumented cultural sites are located.  (L. Quitevis Decl. ¶ 24.)  The cultural monitors have also found sizable wall and platform complexes, stone structures, agricultural systems, petroglyph rock, an ancient hearth and burial sites adjacent to targets in QTR1.  (Id. at ¶ 27; 12/14/06 K. Quitevis Decl. ¶¶ 13-14.)  Although at least one or some of the practice targets were moved and/or are no longer allowed to be used, such as Target 1, so that cultural sites, such as

44

site 210, would not be in the direct line of fire, cultural monitors still found several

40 mm rounds on the slope in front of a cultural site.  (K. Quitevis Decl. ¶ 12; Pls.'

Ex. 78.) Plaintiffs assert that an ancient hearth and a likely burial mound are

adjacent to Target 3 and that although soldiers are not allowed to fire at either

Targets 3 or 4, those cultural sites lie within the Surface Danger Zones ("SDZ") for

Targets 1 and 2, and thus may be hit.  (12/14/06 K. Quitevis Decl. ¶ 13.)  Plaintiffs

did not present any evidence that.50 caliber rounds were found in documented or

undocumented cultural sites.  Neither did Plaintiffs present evidence that .50

caliber rounds could cause more damage than other ammunition.

Despite Plaintiffs' arguments, Defendants have provided persuasive

evidence that the weapons and the caliber of ammunition used at QTR1 are not

new or Stryker unique.  (11/13/06 Brandenburg Decl. ¶ 1; 12/15/06 Banach Decl.

¶¶ 20-22.)  Indeed, the .50 caliber machine guns and the M129 40 mm grenade

launchers have historically been used at Schofield Barracks by the Army.  The only

difference in the Stryker Brigade's use of the ammunition is that the firing

platforms that the Stryker uses to shoot the weapons have been improved to

provide greater accuracy.  (12/15/06 Banach Decl. ¶¶ 20-25.)  Weapons used at

QTR1 by 2/25 for Stryker training are more accurate than weapons used for regular

infantry training since they are mounted on the Stryker vehicle, making them more

stable, and they have a better line of sight.  Thus, the Stryker Brigade actually

requires less ammunition to be expended to complete training tasks compared to

the historical norms for the .50 caliber ammunition and the 40 mm ammunition

used by an infantry brigade.  (12/15/06 Banach Decl. ¶ 22.)  Accordingly, an

injunction prohibiting Stryker training with 40 mm or .50 caliber rounds would be

illogical and counter productive because the Army still will be allowed to train

with such ammunition when the weapons that fire such ammunition are positioned

on the ground, which is more hazardous to the environment than firing such

ammunition from the stabilized firing systems on the Stryker Vehicles.  (12/15/06

Banach Decl. ¶ 24.)

Because it is clear to this Court that the .50 caliber and 40 mm caliber

ammunition has historically been used at QTR1, and they will continue to be used

in non-Stryker training in this area, this Court finds that Plaintiffs have not

established that Stryker training will cause incremental irreparable harm.

Accordingly, Defendants may proceed with Stryker Brigade training at QTR1.

   b. <u>Urban Assault Course</u>

Plaintiffs state that completing construction of the UAC does not

appear likely to cause further adverse impacts.  Plaintiffs, however, assert that use

of the UAC should be conditioned upon the Army's compliance with its obligations

under the Programmatic Agreement to identify and to protect all cultural sites

within the SDZ of weapons proposed for use at the UAC.  The cultural monitors

stated that the UAC abuts large, unsurveyed areas where one undocumented site is

known to exist, and it overlaps in part with the Battle Area Complex, where the

monitors have found cultural sites and artifacts.  (L. Quitevis Decl. ¶¶ 11, 27.)  The

cultural monitors have also seen undocumented and unprotected cultural sites, such

as apparent burial mounds and agricultural site features within the SDZ.  (12/14/06

K. Quitevis Decl. ¶ 10.)  Plaintiffs assert that the proposed training at this site

would significantly increase the number of 40 mm grenade rounds fired relative to

the usage at the former assault course and thus would threaten cultural sites.  (Pls.'

Ex. 71 at 259 (noting that the projected net difference in 40 mm ammunition used

at the assault course with transformation is plus 513).)

At the hearing, however, Defendants pointed out that the projected net

difference in ammunition used was based on training for an entire year, yet 2/25

will only be training in Hawaii until August 2007.  Furthermore, the UAC is not

complete, and is estimated that it will not be complete until the summer of 2007.

(Pls.' Ex. 69 at 28; Ex. 72 at 112.)

Therefore, this Court finds that Plaintiffs' claim of incremental harm is

speculative.  There is no certain evidence that the number of 40 mm rounds fired at

UAC will increase due to Stryker training, especially considering 2/25 will have to leave Hawaii to complete training prior to the passage of twelve months. Accordingly, this Court will allow Defendants to complete construction of the UAC and to use the UAC for Stryker training in the limited fashion proposed.

    c.  <u>Maneuver Exercises at East Range and Kahuku Training Area</u>

    Plaintiffs claim that the Army's proposed maneuver training at East Range and KTA threaten irreparable harm to cultural resources because there are numerous cultural sites within these areas, but the Army has not determined with precision, areas to be used for off-road maneuver exercises.  Specifically, training area A1 at KTA contains cultural sites such as a rock shelter (site 5536) and agricultural terraces and habitation sites (sites 5539 and 5540).  (Pls.' Ex. 63; 12/14/06 K. Quitevis Decl. ¶ 6; Pls.' Ex. 3 at 27981.)  Plaintiffs assert that if the Army does not clearly define the boundaries of the off-road training areas, then soldiers could easily roll right over cultural sites.  Plaintiffs request that the Army be required to clearly define the boundaries of the off-road training areas before engaging in such maneuvers.

    Defendants state that the off-road areas are mapped with accurate coordinates for use in the Stryker vehicle, which uses Global Positioning onboard navigation system ("GPS") to identify and to warn of restricted areas.  (12/15/06

48

Borne Decl. ¶ 4.)  Defendants further state that the system broadcasts each vehicle's location to the lead vehicle, which maintains accountability and monitors whether subordinate vehicles are nearing off-limit areas.  Plaintiffs have not disputed the accuracy of the new GPS system.

This Court finds that Plaintiffs have not established that Stryker vehicles with GPS systems create threat of irreparable harm to cultural sites at training area A1 at KTA, or any other areas in KTA or at East Range, because, although the off-road boundaries are not flagged, they can be avoided by use of accurate maps along with the GPS system in the Stryker vehicle.  However, subordinate vehicles may easily stray into restricted areas since they do not have GPS systems and the lead vehicle may lose track of their exact location since their primary goal is training, and not avoidance of cultural sites.  Therefore, this Court hereby orders that the boundaries of the off-road areas at East Range and KTA that Stryker vehicles without GPS systems will use must be adequately flagged.  This Court believes that requiring flagging would not cause significant delay in transforming 2/25 to a SBCT because the Army has indicated that these areas are already accurately mapped.

     d.      <u>Modification of Range 11T and Mobile Gun System Training</u>

Plaintiffs assert that range modification, such as bulldozing 13,000 cubic yards of softened lava, would cause harm to a pre-contact Hawaiian excavated pit complex (Site 23621), which is potentially eligible for listing in the National Register of Historic Places. (Pls.' Ex. 83 at 66062, 66173.) Plaintiffs state that because the construction would occur in the area that the cultural site occupies, and the dimensions of the cultural site are unknown because surveys of the SDZ for proposed training at Range 11T have not been completed, the Army's assurances that the site will not be affected by bulldozing and target placement are baseless.

Defendants presented evidence that the construction footprint at Range 11T has in fact been surveyed. (11/13/06 Lucking Decl. ¶ 10; Pls.' Ex. 72 at Ex. 19 at 7 (noting that "Range 11T construction area is within the PTA BAX construction footprint and has been surveyed for cultural resources.").) The firing lanes and target areas have also been surveyed, unless unsafe to do so. (<u>Id.</u>; 11/13/06 Lucking Decl. ¶ 4.) The cultural resources manager found that construction activities will avoid all cultural sites in the area. (Pls.' Ex. 72 at Ex.

19 at 7.) Plaintiffs have not presented evidence to the contrary.[6] Since the

construction footprint and the target areas have been surveyed,[7] and since there is

no specific evidence of cultural sites being located in those discrete areas, this

Court finds that Plaintiffs have not shown irreparable harm that would be result

from proceeding with the proposed construction and target placement.

       Plaintiffs also claim that use of the mobile gun system would threaten

cultural sites because they lie in the SDZ for the weapon and the Cultural

Resources Manager found that complete avoidance of cultural sites was not

possible. (Pls.' Ex. 72 at Ex. 19 at 7.) Nonetheless, Defendants presented evidence

that the 105 mm gun, which is the weapon used by the mobile gun system, was

previously used at Range 11T by non-Stryker units. (11/13/06 Lucking Decl. ¶

10.) In addition, the firing lanes and the target areas for the weapon have been

---

    [6]Plaintiffs cite to the SEIS for their argument that bulldozing and target emplacement could cause site destruction or damage. (Pls.' Ex. 3 at 52293.) Although the SEIS states that "[p]otential impacts include site destruction or damage from construction of BAX/AALFTR facilities," it does not specifically address whether Site 23621 would be harmed by the proposed construction and target placement at Range 11T.

    [7]Lucking testified that firing lanes and target areas were surveyed, unless unsafe to do so. For present purposes, this Court assumes that the target areas that require construction for placement of targets were in fact surveyed, because if it was unsafe to survey such area, then it would also be unsafe to engage in construction.

surveyed (unless unsafe to do so), and the portions of the SDZ that have not been surveyed are part of the existing impact area at PTA. (Pls.' Ex. 72 at Ex. 19 at 7; 11/13/06 Lucking Decl. ¶ 4.) The SDZ has also been adjusted to avoid adverse impacts where possible, and where not possible, mitigation measures will be implemented. (Pls.' Ex. 72 at Ex. 19 at 7.)

Based on this evidence, this Court finds that Plaintiffs cannot establish incremental irreparable harm from training with the mobile gun system. That is so because the weapon used by the mobile gun system was previously used at this range, and portions of the impact area from this weapon are part of the existing impact area at PTA. However, since the targets for the mobile gun system are new and/or will be moved, and thus the SDZ will be adjusted, it is unclear to this Court whether the SDZ for the mobile gun system with the newly placed targets includes new impact areas where cultural sites are located. If so, then Plaintiffs could establish incremental harm, as there would be new areas of impact at cultural sites. Nevertheless, Defendants have stated that mitigation measures will be taken where cultural sites cannot be avoided.

Because it is Plaintiffs burden to establish irreparable harm and the record is unclear in that respect, this Court will not enjoin Defendants from training with the mobile gun system at Range 11T. However, since Defendants have stated

that mitigation measures will be taken to protect any known cultural sites that cannot be avoided, this Court hereby orders Defendants to fully fund and to implement all necessary mitigation measures to protect known cultural sites that are within the SDZ of the mobile gun system at Range 11T.  This Court also orders Defendants to report those measures to this Court on a scheduled basis, as determined in consultation with the parties.[8]  With respect to Site 23621 specifically, this Court orders that it not be disturbed in any manner, either by construction or by ammunition from the mobile gun system.

D.     Balancing of the Harms and the Public Interest

        Plaintiffs argue that until Defendants comply with NEPA, this Court may not authorize any action concerning the conversion of 2/25 to a SBCT that would have an adverse environmental impact or limit the choice of reasonable alternatives.  Accordingly, Plaintiffs argue that this Court may only lift the Ninth Circuit's broad injunction in the limited ways that they propose.  Plaintiffs also assert that because Defendants violated NEPA, this Court is not at liberty to

---

        [8]Plaintiffs claim that it is impossible to protect cultural sites since sites could be subject to increased risk of fire and projectiles lying on top of them. However, this Court believes that Defendants may be able to mitigate damage for the short term by using mostly blanks (as suggested by Plaintiffs), and funding and implementing its Integrated Wildland Fire Management Plan, among other possibilities.

consider any and all factors that might relate to the public interest or the

convenience of the parties since, Congress has decided the order of priorities when

it enacted NEPA.

> Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. . . . when a court of equity exercises its discretion, it may not consider the advantages and disadvantages of nonenforcement of the statute, but only the advantages and disadvantages of employing the extraordinary remedy of injunction, over the other available methods of enforcement.  To the extent the district court considers the public interest and the conveniences of the parties, the court is limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement mechanisms.

United States v. Oakland Cannabis Buyers' Co-op., 532 U.S. 483, 497-98 (2001)

 (citations and internal quotations omitted).

> This Court believes that the injunction issued herein enforces the

policy choices articulated in NEPA and strikes the appropriate balance.  Indeed, if

the Ninth Circuit had determined that NEPA would not allow this Court to

consider the harm to Defendants, as argued by the Plaintiffs, it would not have

remanded this case back to this Court to determine which time-critical Stryker

activities could proceed.  Instead, the Ninth Circuit would have required this Court

to implement its blanket injunction, without any consideration as to whether some Stryker-related activities should be allowed to move forward.

Furthermore, the public interest lies on both sides of this dispute.  On the one hand, the public clearly has an overriding interest protecting its soldiers from injury or death with state-of-the-art equipment and training without any further delay.  Makua v. Rumsfeld, 163 F. Supp. 2d 1202, 1222 (D. Haw. 2001) ("the public has a substantial interest in the national well-being and security of the nation.").  On the other hand, "the public also has a significant interest in the protection of endangered species, cultural resources, Native Hawaiian rights, and the environment . . . ."  Id.

This Court has profound respect for the cultural history of Hawai`i and its unique environmental resources.  In the past, this Court has ruled against the government, enjoining it from moving forward with government projects, and in favor of Hawaiian groups and environmental groups because the evidence supported such a holding.  However, in this Court's view, there are few things that are more important than the lives of those men and women who serve in the armed forces.

As set forth above, Defendants have demonstrated that transforming the 2/25 to a SBCT without delay will in fact save the lives of the soldiers who are

55

currently serving this country in Iraq or will be doing so soon. Defendants have thus sought to move forward at this time with only 6 of 28 projects and training. Plaintiffs were not able to establish incremental irreparable harm with respect to each project or training. Where Plaintiffs were able to establish incremental harm, this Court ordered mitigating measures be undertaken so that harm could be avoided by implementation of protective measures.

It must be remembered that while Congress enacted NEPA, it also provided the funds for the implementation of the Stryker Brigade in Hawaii. Given the nature of the certain harm which will befall 2/25 soldiers if they are sent into combat without appropriate training against the potential of mitigated harm to the environment during this discrete period of time, this Court cannot believe that any composition of Congress would have intended or approved the cessation of all Stryker training under these circumstances.

For these reasons, this Court believes that the injunction set forth below, strikes the appropriate balance of allowing the 2/25 to move forward with transforming to a SBCT without delay, while at the same time protecting cultural and environmental resources from harm.[9]

_____

[9]Plaintiffs also request that this Court set a hearing to consider setting aside the Army's acquisitions of land. Plaintiffs claim that the Army has no present need to use any part of the 24,000 acres on Hawai`i island that it purchased from Parker

INJUNCTION

Defendants are hereby enjoined from implementing, executing, or proceeding with the following activities associated with the transformation of the 2nd Brigade of the 25th Infantry Division (Light) to Striker Brigade Combat Team in Hawaii: grading, grubbing, other ground disturbance, construction, land acquisition, project design, geotechnical testing, unexploded ordinance clearance, contract award, and Stryker Brigade Combat Team-specific training, except as follows, for the term of this interim injunction:

(1)    Defendants may engage in New Equipment Fielding and Training and Soldier and Unit Level Training, including, but not limited to: training at Qualification Training Range 1, training at the Urban Assault Course, training at Pohakuloa Training Area Ranges 1 and 10; training with Mortars; maneuver live-fire exercises at Pohakuloa Training Area Range 8; use of Unmanned Aerial Vehicles; training exercises at Ranges KR 3, 4, 5 and 6 at

---

Ranch, or the 1,400 acres it acquired from Campbell Estate, except for activities associated with the Motor Pool. Since Plaintiffs have stated that the Army has no present need to use the lands, other than for construction of the SBCT Motor Pool, which this Court has allowed to proceed, Plaintiffs cannot demonstrate any immediate incremental harm in the short term from the mere acquisition of these lands. Moreover, as this is only an interim injunction pending compliance with NEPA, Plaintiffs may return to this Court with this argument if the Army fails to comply with NEPA, or begins to use such land.

Schofield Barracks, including pre-Operation New Equipment Training, squad or section live-fire exercises, platoon maneuver live-fire exercises, platoon convoy live-fire exercises, and gunnery exercises, as described in detail in Exhibits 69 and 70 of the Plaintiffs' supplemental memorandum; non-live-fire maneuver exercises at the Dillingham Training Area that are limited to existing roads, old airfield taxiways, aircraft parking areas or previously disturbed areas within the old Nike site. However, Defendants must proceed to fully fund and to implement the Integrated Wildland Fire Management Plan;

(2) Defendants may use the Tactical Vehicle Wash Facility;

(3) Defendants may complete construction of the Urban Assault Course and engage in training at the Urban Assault Course, as set forth in paragraph (1);

(4) Defendants may proceed with construction and use of the SBCT Motor Pool. However, Defendants must implement filters and absorbent packs, the three dissipaters and surge rock or riprap and berm discussed by Kawasaki, in addition to any other Best Management Practices called for in the construction plans. Defendants must provide periodic progress reports to this Court, in a schedule to be determined in consultation with the parties.

58

(5) Defendants may engage in Stryker training in the East Range and at Kahuku Training Area.  However, Defendants must implement Best Management Practices in the following areas:  the downslope areas where it is needed but where it is impossible to construct kickouts; at the three locations at East Range where Hood noted roadside ditches were draining directly into streams; and in the off-road areas where Stryker training will occur.  Defendants shall provide periodic progress reports to this Court, in a schedule to be determined in consultation with the parties.  In addition, Defendants must continue their ongoing range maintenance program to improve its roads and to implement Best Management Practices to minimize erosion at East Range and Kahuku Training Area.  Defendants must also flag the boundaries of the off-road areas at East Range and Kahuku Training Area that Stryker vehicles without GPS systems will use.

(6) Defendants may complete construction of the Multiple Deployment Facility, including installing heavy vehicle scales.  Notwithstanding, Defendants must implement all necessary Best Management Practices to prevent or to reduce pollution of State waters as required by the NPDES permit.  In addition, Defendants must implement use of sandbags, in addition to the rolled fabric barrier, in front of the 450 mm pipe leaving the sedimentation basin, floating booms in the basin, and install inlet filters with absorbent packs.  Defendants must

59

continually inspect and improve the Best Management Practices.  Defendants are prohibited from stockpiling excess dirt from the Multiple Deployment Facility at the foot of the scarp to the immediate east of the facility, unless and until Defendants install adequate Best Management Practices to prevent the stockpile from eroding down into the natural drainage.

(7) Defendants may complete modification of Range 11T at Pohakuloa Training Area and engage in training with the mobile gun system at Range 11T.  Defendants must fully fund and implement all necessary mitigation measures to protect known cultural sites that are within the Surface Danger Zone of the mobile gun system at Range 11T.  Defendants shall report those measures to this Court on a scheduled basis, as determined in consultation with the parties. Defendants may not engage in any activities, construction, or training that would disturb Site 23621 in any manner.

Where the Court has required the Army to implement and construct Best Management Practices and/or to implement mitigation measures, training may commence immediately, so long as the Army promptly moves forward to begin implementation of this Court's mitigation requirements.  To require otherwise would in effect preclude the Army from achieving this time-critical training during

this relatively short period of time prior to the deployment of the Stryker units

overseas.

      IT IS SO ORDERED.

      DATED:  Honolulu, Hawaii, December 29, 2006.

_____
David Alan Ezra
United States District Judge

‘ĪLIO‘ULAOKALANI COALITION, et al. v. DONALD H. RUMSFELD, et al.,
CV NO 04-00502; ORDER SETTING INTERIM INJUNCTION