**FILED**

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

OCT 05 2006

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUL 2 4 2007

at ___ 1 o'clock and ___ 5 min. P M
SUE BEITIA, CLERK

'ĪLIO'ULAOKALANI COALITION, a
Hawaii nonprofit corporation; NĀ 'IMI
PONO, a Hawaii unincorporated
association; KĪPUKA, a Hawaii
unincorporated association,

Plaintiffs-Appellants,

v.

DONALD H. RUMSFELD, Secretary of
Defense; FRANCIS J. HARVEY, Dr.,
Secretary of the United Staes Department
of the Army,

Defendants-Appellees,

and

LES BROWNLEE, Acting Secretary of
the United States Department of the Army,

Defendant.

No. 05-15915

D.C. No. CV-04-00502-DAE - BMK

OPINION

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

Argued and Submitted December 6, 2005
San Francisco, California

Before: B. FLETCHER, THOMPSON, and BEA, Circuit Judges.

B. FLETCHER, Circuit Judge:

This appeal requires us to assess whether the Army complied with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4347 (2006), in planning its programs to modernize and streamline its forces, while simultaneously maintaining readiness. While the metamorphosis of the Army and the strategic planning accompanying this transformation is the business of the Army, not the courts, the Army's compliance with NEPA does involve us.

As part of its NEPA evaluation of the Army Transformation Campaign Plan, the Army completed a programmatic environmental impact statement ("PEIS"), in which it identified Hawaii as one of the selected sites for transformation. Subsequently, the Army undertook a site-specific environmental impact statement ("SEIS") to detail the impacts on the environment of the Army's expansion, land use, and activities associated with transforming the 2nd Brigade, now stationed on Oahu, Hawaii, into a Stryker Brigade Combat Team ("SBCT") in Hawaii. Plaintiffs, 'Ilio'ulaokalani Coalition, Nā 'Imi Pono, and Kīpuka ("Hawaiian Groups"), challenged the sufficiency of the Army's NEPA procedure, both at the

programmatic and site-specific levels, on two grounds, arguing that (1) the Army

failed to comply with NEPA's public notice requirements and (2) both the PEIS

and SEIS failed to consider reasonable alternatives.

The district court granted summary judgment to the Army, finding that its

public notice efforts were compliant with NEPA and that it sufficiently considered

reasonable alternatives to transforming the 2nd Brigade in Hawaii. We now

reverse the portion of the district court's decision that held that the Army

considered all reasonable alternatives to transformation of the 2nd Brigade in

Hawaii and remand to require it to prepare a supplemental SEIS to consider all

reasonable alternatives, most notably the potential for transforming the 2nd

Brigade outside of Hawaii.

## I. Background

### A. The Army's Planned Transformation

In 1999, the Secretary of the Army and the Chief of Staff of the Army

announced a major re-working of the United States Army. The objective of this

effort is the creation of a "more responsive, deployable, agile, versatile, lethal,

survivable, and sustainable" Army which is also strategically responsive and

3

nimble. Programmatic Record of Decision ("P-ROD") (Apr. 2002) at 1, AR 0009656. The Army describes the "ultimate force that would achieve the Army Vision" as the "Objective Force." Final Programmatic Environmental Impact Statement ("Final PEIS") (Feb. 2002) at 1-1, AR 0003864.

This thirty-year undertaking will have three phases (Initial Phase, Interim Capability Phase, and Objective Capability Phase) and three corresponding objectives (Initial Force, Interim Force, and Objective Force). P-ROD at 1-2, AR 0009656-57. The Initial Phase, which began in October 1999 and had been completed at the time of this appeal, had as its objective the creation of two Initial Brigade Combat Teams ("BCTs"). Two units, the 3rd Brigade, 2nd Infantry Division and the 1st Brigade, 25th Infantry Division, in Fort Lewis, Washington, were transformed to accomplish this objective. U.S. Army Public Affairs Office, Press Release, Army Announces Locations of Next Interim Brigade Combat Teams (July 12, 2001), AR 0003512. The purpose of this Initial Phase was to "validate an organizational and operational model for Interim BCTs [Brigade Combat Teams]" and to "develop[] the strategic, operational, and tactical doctrine for subsequent phases of transformation." Final PEIS at 2-5, AR 0003878. "These brigades . . . are being used to evaluate and refine the Operations and

Organization Concept for a brigade combat team (BCT) and to validate tactics, techniques, and procedures." P-ROD at 2, AR 0009657.

The Interim Capability Phase, aspects of which are at issue in the appeals before us, has as its objective "complet[ing] the fielding of five to eight Interim BCTs." The Interim Force would consist of "both Legacy Forces and transformed forces." Final PEIS at 2-5, AR 0003878. These BCTs will be capable of deploying anywhere in the world in four days. *Id.* at 1-1, AR 0003864. This phase will begin "with fielding of interim armored vehicles (IAVs) and will end when the last I[nterim ]BCT is fully manned, equipped, and trained to possess the capabilities described in the I[nterim ]BCT Operations and Organization Concept." P-ROD at 2, AR 0009657. The Objective Phase will complete the Army's transformation into the Objective Force described above. *Id.* at 1-2, AR 0009656-57.

Both cases decided today[1] address issues that arose as part of the Interim Capability Phase, namely the transformation of 2nd Brigade in Hawaii into an Interim or Stryker BCT. We present and view the facts in the light most favorable

---

[1]     The other case, *United States v. 1,402 Acres of Land, et al.*, No. 05-15858, concerns the Army's acquisition of land to serve its transformation of the 2nd Brigade. That case is disposed of in a separate memorandum disposition.

to Plaintiffs-Appellants Hawaiian Groups as this is an appeal from the grant of

summary judgment to appellees and denial of summary judgment to appellants.

*See Envtl. Coal. of Ojai v. Brown*, 72 F.3d 1411, 1414 (9th Cir. 1995).

### B. Programmatic Environmental Impact Statement

On December 15, 2000, the Army published in the *Federal Register* its

notice of intent ("NOI") to prepare a PEIS for its planned overhaul. 65 Fed. Reg.

78476 (Dec. 15, 2000). At this point, the Initial Phase was already underway in

Fort Lewis, Washington. *Id.* The NOI described the alternatives that would be

considered in the PEIS:

> 1. No Action Alternative: Whereby the ATCP would not be implemented and needed changes to Army equipment, force structure and training practices would be separately analyzed on a piecemeal basis.
>
> 2. Action Alternative 1: Whereby the program for transformation of the Army to better meet present and future national security requirements and fulfill the Army Vision would be initiated in accordance with the ATCP including:
>
> a. A comparison of the likely environmental effects at candidate (alternative) sites for placement of the brigades planned for the Interim Force.
>
> b. Identification and analysis of the types of major actions contained in the ATCP leading to the Objective Force and their associated activities and consequential types and magnitude of effects.
>
> 3. Action Alternative 2: Whereby the ATCP would only be partially implemented because of budgetary or other constraints.

*Id.*

To further publicize the scoping period for the PEIS, the Army published a notice in USA TODAY on December 19, 2000. A large title reads, "PUBLIC NOTICE." In slightly smaller font is a subheading stating, "THE DEPARTMENT OF THE ARMY SEEKS PUBLIC INPUT FOR PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT FOR IMPLEMENTATION OF THE ARMY TRANSFORMATION CAMPAIGN PLAN." AR 0004167. Below that, in small type, the notice indicates that the Army is seeking public comment to determine the "appropriate scope of its Programmatic Environmental Impact Statement" and summarizes the alternatives to be considered as the "no-action" alternative, "full implementation of the TCP," and "partial implementation of the TCP." *Id.* That the Army provided notice of the pending PEIS in the *Federal Register* and in USA TODAY, not in the Hawaiian media, is not in dispute. The Army did not invite state and local agencies to participate in scoping for the PEIS. The Army noted internally that there was "[v]irtually no public response to 'scoping.'" Dep't of the Army Transformation Office, Public Involvement and Outreach for Army Transformation and the Transformation PEIS, slide presentation, AR 0004584.

7

Consistent with its practices during scoping, the Army published a Notice of Availability of the Draft PEIS for Implementation of Army Transformation in the *Federal Register*, 66 Fed. Reg. 54241 (Oct. 26, 2001), and in USA TODAY on October 31, 2001, making the Draft PEIS available for public comment. AR 0004593, 00010390-91. Again, the Army did not circulate the Draft PEIS to, and did not solicit comments from, state or local agencies. Neither did the Army provide written notice to national organizations or solicit comments from potentially interested individuals and communities. Plaintiffs did not comment on the Draft PEIS. According to Plaintiffs and confirmed by the Army's distribution list, no one in Hawaii sought copies of the Draft PEIS. Nationally, one member of the public submitted comments on the Draft PEIS. Pls.-Appellants' Opening Br. at 22-23. The Draft PEIS described how the transformation of certain brigades into Stryker Brigade Combat Teams ("SBCTs") would take place during the second phase, the Interim Capability Phase, of the Army's overhaul. The Draft PEIS identified the 2nd Brigade stationed in Hawaii as one of the units that would undergo transformation during the Interim Phase.[2] Draft Programmatic Environmental Impact Statement (Oct. 2001) ("Draft PEIS"), at 2-9, AR 0003597.

---

[2]     While the Army's formal announcement that the 2nd Brigade would be included in the Interim Phase came in July 2001, the 2nd Brigade had been selected, at least tentatively, before scoping for the PEIS began.

The *Federal Register* and USA TODAY announcements did not contain any

information that Hawaii would be affected by the planned transformation.  Pls.-

Appellants' Opening Br. at 22.

The Army's Final PEIS, issued in February 2002, considered the no action

alternative but, in summarizing its consideration of other alternatives, noted that

"maintenance of forces status quo would impair the Army's ability to maintain its

commitment to the Nation and fulfill the Army Vision."  Final PEIS at 2-9, AR

0003882.  The Final PEIS considered only two alternatives, the no-action

alternative and full implementation of the Army's Transformation Plan.  *Id.* at ES-

2, AR 0003847.  The Final PEIS determined that the preferred alternative is full

implementation of the proposed Army Transformation Plan.  The Final PEIS also

indicated that the Army expected to conduct transformation of existing units "in

place," rather than re-locating them.  *Id.* at 4-3, AR 0004000.  The 2nd Brigade

remained a target for Interim Phase transformation.  Fed. Appellees' Resp. Br. at

11.  The Army signed the Record of Decision ("ROD") for the PEIS, proceeding

with its preferred alternative and finalized designation of the 2nd Brigade for

conversion to an Interim BCT, contingent upon a site-specific EIS.  P-ROD at 1,

10, AR 0009656, 0009665.

The Army's own experts recognized the shortcomings of the PEIS and its
ROD not long after they were published.  The minutes of an internal June 2002
meeting preparing for the SEIS indicate that "the PEIS does not contain specific
language about why each of the five sites was selected."  After Action Report from
the Army Interim Force NEPA Process Coordination Meeting (June 4-5, 2002)
("After Action Report"), at 3, AR 0088102.  According to this document, the
Army "did know what the sites were and why they were selected, but didn't want
that detailed information to go into the PEIS."  *Id.*  Because the five sites for
Interim Phase transformation are in the ROD, "the main issue now is that the ROD
has no supporting analysis in the PEIS."  *Id.*  The Army's experts recognized this
as a "potential deficiency."  *Id.*  "In both Alaska and Hawaii, the question has
arisen as to why the Army picked these sites."  *Id.*

As to the alternatives considered by the PEIS, at a legal issues forum
documented in the minutes, in response to the question whether the SEIS should
look at other locations for the selected units, Army attorneys responded that the
PEIS foreclosed consideration of other locations:

> unless the local situation suggests that it may be impossible to train
> where they are now.  The PEIS leaves us short on alternatives.  The
> only alternatives we have are no action versus action.  The P&N
> [purpose and need] statements are crafted so tightly that we may be

restricting ourselves too much.  The PEIS only looked at one
alternative.

*Id.* at 5-6, AR 0088104-05.

In response to questions of whether it is "reasonable for the public to ask

why on the siting issue," attorneys responded:  "Yes; the ROD makes a decision

that is not based on any analysis.  Installations need a position paper on why the

sites were picked, so that we have an administrative record of the decision that can

be referenced." *Id.* at 6, AR 0088105.  When asked about whether the

programmatic ROD can be fixed, attorneys responded:  "The only alternatives are

to have HQDA [Headquarters] bear the burden or have the installations bear it.

Installations will probably have to drive on." *Id.*

### C. Site-Specific Environmental Impact Statement

The Army then undertook a SEIS for the 2nd Brigade's transformation in

Hawaii, starting scoping by notifying and inviting comment from a breadth of

Hawaiian organizations, including civic organizations, veteran groups, retired

military officials, state and city government officials, members of Congress, and

neighborhood boards.  The Army also reached out to groups representing low-

income, minority and Native Hawaiian constituencies.  Final Site-Specific

Environmental Impact Statement, Transformation of the 2nd Brigade, 25th

11

Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii (May 2004) ("Final SEIS"), at 1-8, 1-9, AR 0051279-80. After the publication of the NOI in the Federal Register, the Army published notices in all major newspapers in Oahu and Hawaii on April 8, 2002, announcing scoping meetings. The Army held seven scoping meetings between April 16 and 30, 2002, five on Oahu and two on the island of Hawaii. The meetings on Hawaii are not at issue here. At the scoping meetings on Oahu, 100 oral comments were received from individuals and organizations. The Army also received written comments from 199 individuals and organizations, 21 comments through its website, 7 comments by telephone, and 77 comments at additional information meetings requested by organizations. Final SEIS at 1-9, AR 0051280.

The SEIS considered three alternatives, the no-action alternative, the reduced land acquisition alternative, and the proposed action. Record of Decision, Transformation of the 2nd Brigade, 25th Infantry Division (Light) to a Stryker Brigade Combat Team in Hawaii (July 2004) ("S-ROD"), at 7-8, AR 0010317-18. The proposed action consists of converting the 2nd Brigade into a SBCT on Oahu. The reduced land acquisition alternative is identical to the proposed action, except for decreased land acquisition at the South Range Acquisition Area ("SRAA"). *Id.* at 8, AR 0010318. In response to public questions as to why alternatives outside

of Hawaii were not considered, the Army responded that the decision to transform

the 2nd Brigade in place had been made in the PEIS. The Final SEIS issued on

May 28, 2004; the ROD followed on July 7, 2004 and recommitted to

transforming the 2nd Brigade in Hawaii.

## D. Procedural History

Plaintiffs-Appellants challenged the Army's SEIS. On October 12, 2004,

the district court entered the parties' stipulated agreement that the Army would not

proceed with conversion of the 2nd Brigade until after the district court ruled on

Plaintiffs' motion for a preliminary injunction. The district court denied that

motion on November 5, 2004. Pls.-Appellants' Opening Br. at 12. Plaintiffs then

amended their complaint to challenge the Army's notice and comment efforts for

the PEIS on January 4, 2005. On cross motions for summary judgment, the district

court denied Plaintiffs' motion and granted Defendants' motion. Judgment was

entered for the Army on April 29, 2005. Plaintiffs timely appealed the district

court's grant of summary judgment. This court denied Plaintiffs' motion for an

injunction pending this appeal and expedited briefing and our hearing of this

appeal. *Id.* at 13.

## II. Waiver

The district court held that Plaintiffs were barred from arguing the insufficiency of the alternatives considered in the PEIS because they had not submitted comments to the Army during the PEIS process. *'Īlio 'ulaokalani Coalition v. Rumsfeld*, 369 F. Supp. 2d 1246, 1253 (D. Haw. 2005). The district court found that "[w]ithout the benefit of such comments, the Army did not have the opportunity to respond with an explanation or address Plaintiffs' concerns at the proper point in the process." *Id.* The district court rested its holding on *Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004), and *Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991). *See id.* The district court held that the Army's publication of the Notice of Availability ("NOA") of the draft PEIS in the Federal Register "informed the public that it was soliciting input on its proposal to transform, and that the Army-wide transformation would include Hawaii."[3] *Id.* "Absent exceptional circumstances," stated the district court, "Plaintiffs' allegations cannot now serve as a basis to overturn the Army's decision." *Id.*

---

[3]        The district court cites *Gov't of Guam v. United States*, 744 F.2d 699, 701 (9th Cir. 1984), for the principle that publication in the Federal Register constitutes formal notice. *See id.* While this may generally prove true, its applicability is highly questionable in a case where another statute, in this case NEPA, provides specific, additional notice requirements and where Plaintiffs allege that those notice requirements were not met.

14

Following the rationale of *Havasupai Tribe*, the court found no exceptional circumstances.

In applying the *Vermont Yankee* doctrine, we find clear distinctions from *Havasupai Tribe* and *Public Citizen*. In *Vermont Yankee*, Plaintiffs challenged the Atomic Agency Commission's decision to grant an operating license to a nuclear power plant. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Defense Council*, 435 U.S. 519 (1978). During the public comment process, plaintiffs submitted comments on the draft EIS but did not participate in subsequent fact-finding hearings as to the content of their comments concerning energy conservation. The Supreme Court held that it is "incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Id.* at 553. In *Havasupai Tribe*, where this court applied the *Vermont Yankee* doctrine, the plaintiff failed to raise its claims during the public comment period, despite the fact that its comments were specifically solicited. 943 F.2d at 33. A similar factual situation arose in *Public Citizen*. Although the plaintiff organization submitted comments, those comments did not urge the agency to consider the alternatives that it later raised in its claim that the EIS was insufficient. *Public Citizen*, 541 U.S. at 764-65.

This court has drawn a distinction between situations in which NEPA plaintiffs submitted comments that did not alert the agency to their concerns or failed to participate when the agency looked into their concerns and situations in which plaintiffs allege procedural violations of NEPA. *See Kunaknana v. Clark*, 742 F.2d 1145, 1148 (9th Cir. 1984) ("The rationale of *Vermont Yankee* has been applied in those instances in which an interested party suggests that certain factors be included in the agency analysis but later refuses the agency's request for assistance in exploring that party's contentions."). This court has declined to adopt "a broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision." *Id.*

In *Northwestern Environmental Defense Center v. Bonneville Power Administration*, 117 F.3d 1520, 1535 (9th Cir. 1997), we explicitly distinguished between claims based on procedural violations and situations like *Vermont Yankee* and *Havasupai Tribe* that "involved the failure to raise a specific factual contention regarding the substantive content of an EIS during the NEPA public comment process." Although the *Bonneville Power* case dealt with the Northwest Power Act, that act is analogous to NEPA in that it "governs the public comment process." *Id.*

Although we do not overrule the district court's denial of summary

judgment to Appellants on their claim that the Army did not satisfy NEPA's notice

requirements,[4] such a holding is not necessary to underlie our determination that

Plaintiffs have not waived their opportunity to challenge the range of alternatives

considered in the PEIS. *Kunaknana*, 742 F.2d at 1148. The Supreme Court in

*Public Citizen* reminds us of the rule that the primary responsibility for NEPA

compliance is with the agency: "the agency bears the primary responsibility to

ensure that it complies with NEPA, and an EA's or EIS' flaws might be so obvious

that there is no need for a commentator to point them out specifically in order to

preserve its ability to challenge a proposed action." 541 U.S. at 765 (internal

citation omitted). Our court's holding in *Friends of Clearwater v. Dombeck*, 222

F.3d 552 (9th Cir. 2000), sheds light on how to interpret this "so obvious"

standard. In that case, we held that an EIS was inadequate where the agency had

independent knowledge of the issues that concerned Plaintiffs. *Id.* at 558-59. The

record in this case is replete with evidence that the Army recognized the specific

shortfall of the PEIS raised by Plaintiffs here: the failure to support the

determination to transform the 2nd Brigade in place. *See* Dep't of the Army Envtl.

---

[4]     That is not to say that the Army was wise in deciding to avoid
notification of potentially interested Hawaiian entities.

Law Div., Internal Army Comments on the Preliminary Draft PEIS for Army Transformation (May 7, 2001) ("Comments on Draft PEIS"), at 1-6 (Comments of Paul Martin, NEPA Compliance Coordinator for the Army's Envtl. Ctr., Comments of Timothy Julius, Office of the Dir. of Envtl. Programs), AR 0004465-66, 0004476-79; Email from Scott Farley, AR 0004486-88; After Action Report at 1-6, AR 0088100-05. The Army had independent knowledge of the very issue that concerns Plaintiffs in this case, such that "there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Public Citizen*, 541 U.S. at 765. Plaintiffs have not waived their right to challenge the sufficiency of the Army's consideration of reasonable alternatives.

### III. Consideration of Reasonable Alternatives under NEPA

Strategic planning and the Army's metamorphosis are the Army's business, not the courts'. What involves us, however, is NEPA's requirement that the Army prepare an EIS to examine what effects any plans will have on the environment (the extreme example would be a plan for nuclear testing that would require extensive analysis). Here, the Army assumes that it has an obligation to comply with NEPA. That is not at issue. At issue is whether its compliance was adequate.

18

## A. NEPA

The National Environmental Policy Act of 1969, commonly known as NEPA, "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2006). The regulations implementing NEPA have developed procedures to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

Congress passed NEPA "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005). "NEPA requires that a federal agency consider every significant aspect of the environmental impact of a proposed action . . . [and] inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (internal quotation marks and citations omitted). "[T]o accomplish this, NEPA

imposes procedural requirements designed to force agencies to take a 'hard look'
at environmental consequences." *Id.* NEPA does not, however, mandate any
substantive outcome. *Lands Council*, 395 F.3d at 1026. Under NEPA, all federal
agencies, including the Army, must prepare an environmental impact statement
("EIS") for all "major Federal actions significantly affecting the quality of the
human environment." 42 U.S.C. § 4332(2)(C). That EIS "shall provide full and
fair discussion of significant environmental impacts and shall inform
decisionmakers and the public of the reasonable alternatives which would avoid or
minimize adverse impacts or enhance the quality of the human environment." 40
C.F.R. § 1502.1.

## B. Standard of Review

We review *de novo* the district court's summary judgment in appellees'
favor. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir.
2004). In so doing, we must view the evidence in the light most favorable to
Appellants and determine whether there are any genuine issues of material fact
and whether the district court correctly applied the substantive law. *Envtl. Coal.
of Ojai*, 72 F.3d at 1414. An agency decision may be set aside if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5
U.S.C. § 706(2)(A).

In reviewing the sufficiency of an EIS, we employ "a rule of reason"
standard of review "that inquires whether an EIS contains a reasonably thorough
discussion of the significant aspects of the probable environmental consequences."
*Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (internal quotation marks and
citation omitted). This "rule of reason" standard is not materially different from
arbitrary and capricious review. *Lands Council*, 395 F.3d at 1026 n.5. "We make
a pragmatic judgment whether the [Environmental Impact Statement's] form,
content and preparation foster both informed decision-making and informed public
participation." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d
1142, 1150-51 (9th Cir. 1997) (citing *Block*, 690 F.2d at 761) (internal quotation
marks omitted). To discharge our duty, we must be satisfied that the agency has
taken a "hard look" at the environmental consequences of a decision. *Id.* at 1151.

## C. The Army's NEPA Process

The Army adopted a "tiered" approach to its compliance with NEPA,
preparing a programmatic EIS followed by a site-specific EIS. NEPA regulations

encourage agencies to "tier" their environmental impact statements in some

situations. *See* 40 C.F.R. § 1502.20.

> "Tiering" refers to the coverage of general matters in broader
> environmental impact statements (such as national program or policy
> statements) with subsequent narrower statements or environmental
> analyses (such as regional or basinwide program statements or
> ultimately site-specific statements) incorporating by reference the
> general discussions and concentrating solely on the issues specific to
> statement subsequently prepared.

*Id.* § 1508.28.

Tiering is "encouraged . . . to eliminate repetitive discussions of the same

issues and to focus on the actual issues ripe for decision at each level of

environmental review." *Id.* § 1502.20. Here, where the agency is moving from "a

program, plan, or policy environmental impact statement to . . . a site-specific

statement or analysis," *id.* § 1508.28(a), tiering is appropriate.

In the context of national forest management, we defined the programmatic

stage as the level "at which the [agency] develops alternative management

scenarios responsive to public concerns, analyzes the costs, benefits and

consequences of each alternative in an environmental impact statement ("EIS"),

and adopts an amendable forest plan to guide management of multiple use

resources." *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 923 n.2 (9th Cir.

1999). Following the programmatic stage is the "implementation stage during which individual site specific projects, consistent with the forest plan, are proposed and assessed." *Id.* A programmatic EIS must provide "sufficient detail to foster informed decision-making," but an agency need not fully evaluate site-specific impacts "until a critical decision has been made to act on site development." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003) (quoting *N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890-91 (9th Cir. 1992) (quotation marks omitted)).

The Army's PEIS reached a deeper level of specificity than is usual in that it named several specific units that will transform in the Interim Phase and indicated that such transformation will take place "on-site." Although the PEIS names the 2nd Brigade in Hawaii as one of these units set for transformation on-site, it does not undertake any analysis of the environmental impacts associated with that transformation. Following its PEIS, which designated the 2nd Brigade in Hawaii as one the units to be transformed and committed to on-site transformation, the Army undertook a SEIS for the Hawaii transformation of that unit. Based on the PEIS's determination that transformation of the 2nd Brigade was to take place in Hawaii on Oahu, the SEIS considered three alternatives, all of which involved transformation of the 2nd Brigade in Hawaii on Oahu – the proposed action, a

reduced-land-acquisition alternative, and a no-action alternative. Appellants argue

that the Army's tiered NEPA analysis failed to consider reasonable alternatives,

particularly the transformation of the 2nd Brigade outside of Hawaii.

### D. Where the Army Went Wrong

> An EIS must describe and analyze alternatives to the proposed action.
> Indeed, the alternatives analysis section is the heart of the
> environmental impact statement. The agency must look at every
> reasonable alternative within the range dictated by the nature and
> scope of the proposal. The existence of reasonable but unexamined
> alternatives renders an EIS inadequate.

*Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998)

(internal citations and quotation marks omitted); *see* 40 C.F.R. § 1502.14 (stating

that consideration of alternatives is the "heart of the environmental impact

statement."); *Methow Valley Citizens Council v. Regional Forrester*, 833 F.2d

810, 815 (9th Cir. 1987) (noting that "an environmental impact statement must

consider every reasonable alternative" and that "the range of alternatives must be

sufficient to permit a reasoned choice."), *rev'd on other grounds*, 490 U.S. 332

(1989), *aff'd on remand*, 879 F.2d 705 (9th Cir. 1989).

1. The PEIS:  Selecting the 2nd Brigade

We first consider whether the Army should have undertaken analysis of the impacts of transforming the 2nd Brigade in Hawaii in the PEIS. *California v. Block*, 690 F.2d 753 (9th Cir. 1982), sets the foundation for our review of the PEIS's consideration of alternatives. It guides the determination of when site-specific analysis must occur where there is a programmatic EIS:

> The detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action. The standards normally applied to assess an EIS require further refinement when a largely programmatic EIS is reviewed. The critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur. NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process. This requirement is tempered, though, by the statutory command that we focus upon a proposal's parameters as the agency defines them. The requirement is further tempered by the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences. When a programmatic EIS has already been prepared, we have held that site-specific impacts need not be fully evaluated until a "critical decision" has been made to act on site development. This threshold is reached when, as a practical matter, the agency proposes to make an "irreversible and irretrievable commitment of the availability of resources" to a project at a particular site.

*Id.* at 761 (internal citations omitted).

The agency's challenge and ours is to find the right balance between the efficiency benefits of tiering, described in 40 C.F.R. § 1502.20, deference to the

agency's definition of the purpose and need of the proposed action, and the recognition that the PEIS constrains future decision-making and must therefore analyze alternatives in sufficient detail to prevent foreclosure of options with insufficient consideration. *Id.* at 762-63.

Appellants argue that the PEIS made the decision to commit resources to a particular site – the transformation of the 2nd Brigade in Hawaii. The Army counters that it did not commit to transform the 2nd Brigade until the issuance of the SEIS ROD, and that even though the PEIS identified the 2nd Brigade as targeted for transformation during the Interim Phase, the Army reserved judgment until completion of the SEIS. Fed. Appellees' Resp. Br. at 32. The comments of the Army's own experts indicate otherwise.

The minutes of a June 2002 post-PEIS, pre-SEIS Army planning meeting indicate that the Army's own experts recognized that the decision to commit resources to transformation of the 2nd Brigade in place was made during the PEIS and therefore that site-specific analysis should have been undertaken in the PEIS. The conclusions articulated in the PEIS ROD as to in-place transformation of the 2nd Brigade had little support in the document and no analysis of alternative sites, requiring the SEIS to provide analysis supporting a decision made in the PEIS.

Paul Martin, of the U.S. Army Environmental Center, commented on the draft

PEIS:

> Interim Force considerations are ripe for reasonably detailed analysis.
> . . . Interim Force development is an imminent proposal requiring a
> near term decision and commitment of Army resources that will have
> on the ground impacts within the next five to eight years. . . .
> Paragraph screams that the Army plans to make a Major [sic] resource
> allocation decision on the Interim Force without consideration of
> alternatives.

Comments on Draft PEIS at 4, AR 0004465.

In addition, the SEIS explicitly ruled out consideration of alternatives that

stationed the 2nd Brigade outside of Hawaii on the grounds that this would be

inconsistent with the PEIS.  Once the PEIS was issued, there was no longer a

question of whether the 2nd Brigade would transform in Hawaii, only a matter of

how.

Appellees also argue that all Army units are scheduled to transform under

the thirty-year plan and therefore that the 2nd Brigade is no different from any

other Brigade in terms of the Army's decision to transform in-place.  Fed.

Appellees' Resp. Br. at 35.  The problem with this argument is that the 2nd

Brigade is scheduled to transform much sooner than most other Brigades – the

site-specific plans for the 2nd Brigade are more crystallized than those for the brigades that will not undergo transformation until the Final Phase.

The Army's own experts realized that the Army made site-specific decisions in the PEIS without analysis of their impacts or consideration of reasonable alternatives, as required by NEPA. Despite this, the Army argues that it was appropriate to defer analysis until the SEIS, using the principles of "tiering" as its crutch. The Army settled on transformation of the 2nd Brigade in Hawaii in the PEIS; however, it reached this decision with no analysis of the environmental impacts or of reasonable alternatives to such a transformation. While there is nothing per se improper about reaching these decisions at the programmatic stage, it is improper to do so without undertaking the analysis required by NEPA when those decisions are made.

2. The SEIS

Without having considered alternatives to transformation of the 2nd Brigade in Hawaii in the PEIS, the Army had an obligation to consider such alternatives in the SEIS. The Army argues that the scope of reasonable alternatives to be considered in the SEIS was bound or limited by the PEIS's

decision to transform in Hawaii as articulated in the SEIS purpose and need statement.

The way the Army would have it, it was neither required to examine alternatives to transformation in Hawaii in the PEIS (because the site-specific threshold had not yet been crossed) nor in the SEIS (because on-site transformation of the 2nd Brigade was mandated by the PEIS as articulated in the SEIS purpose and need statement). The Army can't have it both ways. Either it needed to explain in the PEIS its decision to transform the 2nd Brigade in Hawaii and consider reasonable alternatives in the PEIS or it needed to explain that decision in the SEIS, but the Army cannot simultaneously argue that the decision had been made in the PEIS and that it had not. Somewhere, the Army must undertake site-specific analysis, including consideration of reasonable alternatives.

3. Reasonable Alternatives

The scope of reasonable alternatives that an agency must consider is shaped by the purpose and need statement articulated by that agency. The Army must consider all reasonable alternatives within the purpose and need it has defined. *See Nw. Coalition for Alternatives to Pesticides (NCAP) v. Lyng*, 844 F.2d 588, 592 (9th Cir. 1988) ("[I]t is the scope of the program that influences any

29

determination of what alternatives are viable and reasonable."). Appellants ask us

to find that the Army defined the purpose and need statement in the SEIS too

narrowly.[5] We do not see that as the problem. What is missing is the

consideration of alternate ways to accomplish its stated mission. The Army states

its mission as follows: "to enable the Army to achieve the force characteristics

articulated in the Army Vision in the most timely and efficient manner possible

and without compromising readiness and responsiveness. . . . Transformation is

---

[5]     Appellants rely on the principle that while an agency has the
discretion to define the purpose and need of a project, it may not "define its
objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea*, 123 F.3d
at 1155. Appellants note internal Army commentary before the SEIS was
undertaken in support of their argument that the Army defined its objectives too
narrowly in the PEIS. "The PEIS leaves us short on alternatives. The only
alternatives we have are no action versus action. The P&N statements are crafted
so tightly that we may be restricting ourselves too much." After Action Report at
5-6, AR 00088104-05. Paul Martin indicates that the framing of the
transformation "has foreclosed any rational consideration of alternatives, . . . to
meet the stated purpose and need." Comments on Draft PEIS at 1, AR 0004478.
Timothy Julius commented that the "EIS is woefully inadequate: The alternatives
are meaningless. Where is the 'analysis' of installations as initiated in the NOI? . .
. The decision provides no starting point or analysis that would be useful to
installations. Based on this document, the Army is forcing the installations to
individually justify transformation." AR 0004485. In addition to describing how
the Army's framing provides no real alternatives for consideration, Julius'
comments also drive home the fact that the Army's approach here was backwards:
rather than making its site decisions with full information about the impacts of
choosing those sites, the Army made its site decisions and asked the installations
to justify those decisions in their site-specific EISs.
    These comments, as we see them, simply highlight the Army's failure to
consider reasonable alternatives in either the PEIS or the SEIS.

needed to address the changing circumstances of the 21st Century." Final PEIS at 1-2, AR 0003865. It then leaps to the assumption that transformation in Hawaii or no action are the only alternatives. This is where the impermissible "narrowing" takes place. The Army violated NEPA by not considering alternatives that include transformation of the 2nd Brigade outside of Hawaii.[6]

The issue we consider is whether transformation of the 2nd Brigade *outside* of Hawaii is a reasonable alternative in the context of the Army's purpose and need: "to enable the Army to achieve the force characteristics articulated in the Army Vision in the most timely and efficient manner possible and without compromising readiness and responsiveness." *Id.* This purpose "is not, *by its own terms*, tied to a specific parcel of land," *Methow Valley*, 833 F.2d at 815, indicating that transformation outside of Hawaii is a reasonable alternative. Our sister circuit has held that "[w]hen the proposed action [here the transformation of the 2nd Brigade] is an integral part of a coordinated plan to deal with a broad

---

[6]     The Army argues that the PEIS limits its framing of the SEIS's purpose and need to transforming the 2nd Brigade in Hawaii. This argument assumes that the Army made this very decision in the PEIS (i.e., transformation of the 2nd Brigade in Hawaii) in a manner consistent with its obligations under NEPA. We reject this assumption and find that the Army erred by making unsupported site-specific determinations. The Army's reliance on "tiering" is unhelpful to its claims.

problem, the range of alternatives that must be evaluated is broadened." *City of Alexandria v. Slater*, 198 F.3d 862, 868 (D.C. Cir. 1999) (quoting *Natural Res. Defense Council v. Morton*, 458 F.2d 827, 835 (D.C. Cir. 1972)) (quotation marks omitted). Between the purpose articulated in the PEIS and that articulated in the SEIS, the Army made the decision to require transformation of the 2nd Brigade in Hawaii. This decision was never explained or justified and foreclosed alternatives that could have been consistent with the Army's stated mission.

Furthermore, the record is unambiguous – compelling our finding that transformation of the 2nd Brigade outside of Hawaii was a reasonable alternative that the Army was required to consider under NEPA. First, the Army's own experts recognized that the failure to undertake this analysis in the PEIS created a problem under NEPA – an unsupported conclusion needing to be justified in the SEIS was a back-door path avoiding analysis. Second, the Army had already started transformation of other west-coast brigades, including two in Ft. Lewis, Washington, an alternative location where transformation of the 2nd Brigade could happen at potentially lower cost to the environment, and another brigade, the 2nd Calvary from Louisiana, which was moved for its transformation.

    a. Internal Acknowledgment of the Need to Consider Off-island Transformation

The record is replete with expressions of concern that the Army never explained its decision to not consider alternatives involving transforming the 2nd Brigade outside of Hawaii. Army personnel and Hawaiians both sought an answer to the question, "Why Hawaii?" *See* After Action Report at 1, 3, AR 0088100, 0088102. This concern about incomplete information underpinning the decision to transform in Hawaii was raised within the Army during the PEIS process and in preparation for the SEIS, and by the public during scoping for the site-specific EIS.

From the outset, Army staff expressed concern about the scope of the PEIS and its failure to explain siting decisions. *See supra* note 5 (reviewers noted in May 2001 that the framing of the transformation "foreclosed any rational consideration of alternatives, . . . to meet the stated purpose and need," AR 0004478, the PEIS was "woefully inadequate," "[t]he alternatives meaningless," and "the Army is forcing the installations to individually justify transformation," AR 0004485.).

The PEIS never responded to these concerns. Following the completion of the PEIS and in preparation for the SEIS, Army staff comments revealed that "[t]he PEIS leaves us short on alternatives. The only alternatives we have are no

action versus action. The P&N statements are crafted so tightly that we may be

restricting ourselves too much." After Action Report at 5-6, AR 0088104-05. The

minutes of that meeting read:

> A major issue that surfaced during group discussion was the fact that
> the PEIS does not contain specific language about why each of the
> five sites was selected. It would have been helpful to have it there so
> that each site could refer to the PEIS when queried about reasons for
> selection. . . . the main issue now is that the ROD has no supporting
> analysis in the PEIS.

*Id.* at 3, AR 0088102.

Lieutenant Colonel Kozlowski noted that it should be up to the Major Army

Commands to explain the siting decisions in their specific EISs – the Headquarters

of the Department of the Army ("HQDA") should have done that. He thought that

these questions should be answered by Headquarters outside of the PEIS in a

supplemental EIS. *Id.*

In a question and answer session at this meeting, in response to a question

asking whether it would be better for Army Headquarters to develop a unified

purpose and need statement for each location chosen to transform, Major Army

Command attorneys responded:

> The PEIS is what it is, as is the ROD. HQDA can't effectively
> supplement those documents, and that will be a potential weakness.

> However, *it does give installations the right to look at different*
> *training site alternatives.* LTC Kozlowski will take the issue to the
> G-3, who will probably put together a task force to correct *the*
> *mistake of not addressing location selections in the PEIS.*

*Id.* at 5, AR 0088104 (emphasis added).

In response to a questions about whether it is "reasonable for the public to

ask why on the siting issue," the same attorneys answered:

> Yes; the ROD makes a decision that is not based on any analysis.
> Installations need a position paper on why the sites were picked, so
> that we have an administrative record of the decision that can be
> referenced. . . . either HQDA has to revise the ROD to address the
> issue or installations will have to look at stationing alternatives. . . .
> The only alternatives are to have HQDA bear the burden or have the
> installations bear it. Installations will probably have to drive on.

*Id.* at 6, AR 0088105.

b. The Army's Rationale for Not Analyzing Alternatives

The Army now argues that the record demonstrates that transformation of

the 2nd Brigade in Hawaii is of strategic importance, that transformation in

Hawaii is critical for the training of soldiers in "conditions that would arise in

expected combat situations," and therefore that transforming outside of Hawaii is

not a reasonable alternative. Final SEIS at 1-4, AR 0051275. This argument is

undermined by the record. The SEIS purpose and need statement offers three

factors to explain why the 2nd Brigade was chosen to transform into a Stryker

Brigade: (1) location of the 2nd Brigade within the strategically important Pacific

Rim; (2) the terrain and conditions in Hawaii which most closely approximate

those likely to be found in the Pacific Rim; (3) proximity to major airbases and

seaports makes deployment easier. Unfortunately for the Army, however, the

SEIS does not support its own purpose and need statement, or a finding that

transformation of the 2nd Brigade in Hawaii is the only reasonable alternative.

This finding is undermined by evidence developed in the SEIS.

(1) Location in the Pacific Rim and Proximity to Airbases and Seaports

As the SEIS's Statement of Need points out, other locations in the United

States with proximity to the Pacific Rim have been designated for early

transformation: "There are two other SBCTs on the Pacific coast of the

continental United States (Alaska and Washington) to support deployment to the

critically important Pacific Rim . . . ." Final SEIS at 1-5, AR 0051576. Nothing in

the record distinguishes Hawaii from Alaska or Washington.

Transformation of brigades at Fort Lewis, Washington was part of the Initial

Phase of Army Transformation. The Army had already started transformation of

these other west-coast brigades, creating alternative locations where

36

transformation of the 2nd Brigade could happen at potentially less detriment to the

environment.  Furthermore, it is clear that the Army knew that it had the authority

to consider moving the 2nd Brigade to Washington or Alaska for transformation.

*See* Dep't of the Army, Strategic Envtl. Assessment for Army Transformation,

Initial Report (Nov. 17, 2000), at 30, AR 0005547 (listing "[r]e-stationing of

brigades to take advantage of training assets and opportunities" as a "type[] of

proposal[] that must be considered" in NEPA analysis.).  For example, the Army

moved another brigade, the 2nd Armored Cavalry Regiment from Louisiana to

Fort Lewis for its transformation into a Stryker Brigade Combat Team. *See* Press

Release, Joint Readiness Training Center and Fort Polk Public Affairs Office, Fort

Polk to Receive New Infantry Brigade Combat Team (July 23, 2004), AR

0009561.  Thus, the Army's argument that Hawaii is close to the Pacific Rim and

has access to seaports and airbases does not answer the question, "Why Hawaii?"

    (2)  The Importance of Hawaii's Terrain and Conditions

    The Army also argues that Hawaii's unique terrain and conditions mandate

transformation in Hawaii.  At oral argument and in subsequent supplemental

briefing, Appellees focused our attention on their argument that Hawaii's terrain is

unique in the United States and most closely approximates tropical terrain in the

Pacific Rim and elsewhere in the world. The Army cites a 1997 study on

Installation Training Capacity by Army Headquarters, which notes that "[t]raining

areas on Oahu, Hawaii are unique in the Army's training land inventory. They are

the only mountainous jungle setting." HQDA, Training Directorate, Office of the

Dep. Chief of Staff for Operations and Plans, Installation Training Capacity (ITC)

Phase 1 Study Report (Dec. 31, 1997), at 11, AR 0002886. These documents refer

to the Kawailoa Training Area ("KLOA") on Oahu.

KLOA consists of 23,348 acres on the western slope of the Ko'olau

Mountain Range, of which 5,310 acres are suitable for maneuver training

activities. Final SEIS at 7-14, 7-15, AR 0051956-57. "KLOA can support small

infantry unit maneuvers and helicopter. The remaining land is considered

unsuitable for maneuver training, but can support mountain and jungle warfare

training. In these areas, troop deployment is limited to single file, small unit

movement on ridgelines." *Id.* at 7-15, AR 00551957. Based on this statement in

the SEIS, Appellee argues that the Army's assertion that Hawaii offers unique

training areas for the 2nd Brigade once it has been transformed into a Stryker

Brigade is "fully consistent with the actual training terrain available."

While the Army may be correct that KLOA provides unique and important mountainous jungle terrain for a light infantry unit, the Army has failed to account for the fact that no Stryker training is proposed for KLOA. In fact, KLOA cannot support Stryker vehicles and is unsuitable for Stryker Brigade training. Stryker vehicles are eight-wheeled, 23-foot long, 9-foot wide, 20-ton combat vehicles. Final SEIS at 2-33, AR 0051318. While the actual vehicle employed by the SBCT "may vary from the current Stryker vehicles as the system is developed," it "overall will have the same characteristics as the current Stryker." *Id.* "Because of the limitations of the Stryker, most mounted movement takes places on roads or unrestricted terrain." *Id.* at 2-40, AR 0051325. The SEIS indicates that not a single acre of KLOA is maneuver-acreage for mounted Stryker training. Stryker vehicles would only be appropriate in KLOA along Drum Road in transit to other locations. *Id.* at 2-37, AR 0051322. Stryker training focuses on "[u]rban operations training" and will employ "new urban warfare facilities." *Id.* at 2-36, AR 0051321.

At the time that the Army noted the unique training that KLOA's mountainous jungle terrain would provide the Army, Stryker brigades did not yet exist. The SEIS indicates that, while that jungle terrain may be unique and important for light infantry brigades like the current 2nd Brigade, KLOA cannot

support Stryker vehicles, and no mounted training is envisioned or possible there. The fact that Oahu has jungle terrain does not alone justify the elimination of alternatives involving transformation of the 2nd Brigade outside of Hawaii.

Ultimately, the question raised by the Army's own experts during the PEIS process and following the publication of the ROD based on the PEIS, and by the public in the scoping process for SEIS – "Why Hawaii?" – was never answered. Transformation of the 2nd Brigade outside of Hawaii was a reasonable alternative that the Army was obligated under NEPA to consider. Its failure to do so renders the Army's EISs inadequate. *See Friends of Southeast's Future*, 153 F.3d at 1065.

**E. Remedy**

If we were to accede to the Army's assertion that its statement of purpose and need, including its site-selection, cannot be challenged, the concept of tiered EISs is meaningless. An agency could avoid consideration of reasonable alternatives by making a binding site-specific decision at the programmatic stage without analysis, deferring consideration of site-specific issues to a SEIS. Then at the SEIS stage, the agency simply could point back to the analysis-free decision at the programmatic stage, as the Army has done here, and find that the scope of its

site-specific analysis is constrained by the PEIS. The SEIS would merely operate to justify a decision made analysis-free at a previous stage.

The result: the Army never undertakes any analysis of alternatives to Hawaii. What is the cure? We conclude that the practical solution is to remand, requiring the preparation of a supplemental SEIS. There is no magic as to which EIS is the vehicle for site-specific analysis. It would have been perfectly appropriate for the PEIS to forgo any decision as to specific sites, leaving the analysis and recommendations to the SEIS. The Army's mistake here was to commit to the transformation of the 2nd Brigade in Hawaii without considering alternatives in either the PEIS or the SEIS.

We conclude that this can now be done most appropriately in a supplemental SEIS. As the Army's pre-SEIS, June 2002 meeting indicates, the failure of Army Headquarters to explain its decision at the programmatic phase requires each separate installation to consider a broader range of alternatives in its SEIS than would otherwise have been required. Therefore, we reverse and remand for supplemental analysis of alternative locations in a supplemental SEIS.

**AFFIRMED IN PART, REVERSED IN PART. REMANDED.**

A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

JUL 1 9 2007

Deputy Clerk

41

# COUNSEL

David L. Henkin, Earthjustice, Honolulu, Hawaii argued the case for Appellants 'Īlio'ulaokalani, Nā 'Imi Pono, and Kīpuka; Isaac H. Moriwake was on the briefs for Appellants.

Michael T. Gray, Department of Justice, Washington, D.C. argued the case for Appellees Donald H. Rumsfeld, Secretary of Defense and Francis J. Harvey, Secretary of the United States Department of the Army; Kelly A. Johnson, Acting Assistant Attorney General, John L. Smelzer, Department of Justice, and Barry A. Weiner, Department of Justice, were on the briefs for Appellees.