*Record of Decision*

majority of this ordnance is small arms rifle and machine gun ammunition used for the weapons qualification of Soldiers that would occur on designated live-fire training facilities.

The stationing of the 2/25th SBCT in Alaska would involve an increase in maneuver training at Fort Richardson and DTA. The 2/25th SBCT is projected to generate 104,898 MIMs compared to the 4/25th's projected 49,576 MIMs. This represents a 112 percent increase in anticipated maneuver impacts when comparing the 2/25th SBCT to the 4/25th. Qualitatively however, a greater percentage of vehicle mileage would be executed on roads and just off-road, in accordance with SBCT training doctrine and capabilities. Approximately 50 percent of the MIMs would be expended at Fort Richardson to support squad and platoon and limited company maneuvers. The remaining 50 percent of these MIMs would be executed by the 2/25th SBCT while performing maneuver-training tasks at DTA.

Alternative B requires the re-stationing of the 4/25th in Hawaii to vacate the garrison facilities and housing necessary to support the 2/25th SBCT. The 4/25th is currently assigned 567 fewer Soldiers than the 2/25th SBCT. The 4/25th consists of approximately 500 more Soldiers than the previous 2/25th ID (L) that was stationed in Hawaii prior to transformation. The 4/25th operates and trains using only light and medium vehicles as primary modes of transport. The stationing of the 4/25th in Hawaii would involve the same intensities and kinds of activities that would have taken place to support the 2/25th ID (L). Most vehicles, weapons systems, and equipment would be the same when comparing the 4/25th to the 2/25th SBCT prior to its transformation.

A few key differences exist, however. One of these differences is that the 4/25th possesses more unmanned aerial vehicle (UAV) units and its assigned equipment includes 19 UAVs. Moreover, the 4/25th is an airborne IBCT unit. This airborne capability of the 4/25th would be retained within U.S. Army Pacific (USARPAC) as part of the 4/25th re-stationing to SBMR. The requirements to conduct UAV training and airborne training will result in an increased use of airspace in Hawaii. Additional facilities to include jump towers, parachute rigging, storage facilities, and a heavy drop zone would be needed to support the airborne training of the 4/25th.

Given the reduced manning, vehicles, and equipment of the 4/25th compared to the 2/25th SBCT, there would be limited cantonment facilities required to meet the needs of the 4/25th's re-stationing to Hawaii. Critical facilities for the 4/25th, including office space, housing, and parking and maintenance space would be on hand. Overall, the unit would be adequately supported by those existing cantonment projects that have been completed or have been planned for completion in the near future and those facilities that would be vacated by the 2/25th SBCT. A new Parachute rigging and storage facility would be sited at an existing 30,000 square foot storage warehouse at WAAF that was originally constructed as part of the multiple deployment facility for the SBCT. Training projects presented in **Table 1** that are not SBCT-specific would be constructed and utilized by the 4/25th to support the unit's training requirements. In addition to these projects, a new infantry platoon battle course (IPBC) would be constructed in the footprint of the BAX at SBMR to support up to platoon level live-fire training requirements of the 4/25th. A combined arms live-fire exercise (CALFEX) capable range would be constructed in the footprint of the BAX at PTA to support up to company-level collective live-fire training events. The ranges standard design would be adjusted to meet training requirements given the terrain available to support its construction.

To support the Airborne training requirements of the 4/25th, two additional training infrastructure projects would need to be constructed and used by the 4/25th. These projects include jump towers needed to train airborne Soldiers on airborne training tasks. Five jump towers would be sited on the SRAA. Along with the jump towers, a drop zone of approximately 2,800 by 1,800 yards in dimension would need to be sited on the WPAA to support airborne paratrooper training jumps from C-130 aircraft.

*Record of Decision*

This facility would be partially sited on the footprint of a drop zone that has been used by the Army in the past to support training.

The 4/25th would be required to conduct semi-annual individual and crew-served weapons qualifications. The 4/25th would fire approximately 6.9 million rounds of munitions. Most of these rounds are used for individual weapons qualification and machine gun qualification, and most would be used on SBMR qualification ranges.

The 4/25th would conduct weapons qualification on new ranges not previously available to the 2/25th ID (L). Live fire activities would occur under Alternative B on ranges to include the QTRs, anti-armor live fire tracking range, and the IPBC to be constructed at SBMR. Additionally short range training ammunition (SRTA) training would occur at the CACTF at KTA.

The 4/25th would conduct approximately 50 percent of its maneuver training on the Island of Oahu and the other 50 percent on the Big Island of Hawaii. A majority of small unit maneuver training would occur on the Island of Oahu. Training would generally be conducted at the squad, platoon, and company level. Maneuver training at PTA would generally be conducted by larger units i.e. the battalion or brigade level.

The number of MIMs required to support the maneuver training of the 4/25th on an annual basis is 49,576. Given the existing shortfall of maneuver acreage being experienced in Hawaii, the 4/25th would need to utilize SRAA and WPAA to support maneuver-training requirements.

## 3.5 Alternative C

Alternative C includes the permanent home stationing of the 2/25th SBCT at Fort Carson, Colorado. The 2/25th SBCT would return to Fort Carson in early 2009 upon completion of its deployment. The 2/25th SBCT would conduct all activities needed to support the Proposed Action. Unit weapons qualifications, platoon training, equipment maintenance, and the housing and support of Soldiers and their Families would take place primarily at Fort Carson. Because of the limited availability of training land, unit maneuvers of the 2/25th SBCT above the platoon level would primarily occur at Pinon Canyon Maneuver Site (PCMS).

The stationing of the 2/25th SBCT at Fort Carson would result in a net increase of 663 Soldiers. Major differences between the equipment of the 2/25th SBCT and the 4/4th IBCT include approximately 317 Stryker vehicles and increased numbers of indirect fire systems, such as 18 155-mm cannons, 24 additional 120-mm mortars, and 27 additional 105 mm direct fire cannon systems mounted on the Stryker MGS.

In order to accommodate the stationing of the 2/25th SBCT in Colorado, the Army would construct two additional firing range facilities at Fort Carson, a multi-purpose machine gun range and an UAC. The 2/25th SBCT would use an existing Digital Multi-purpose Range Complex to satisfy collective live-fire training requirements of its units when the range was available.

Although a majority of the weapons systems and munitions would be the same when comparing munitions currently used by the 4/4th IBCT and the 2/25th SBCT under Alternative B, the level of live-fire training activity and number of rounds fired would increase at Fort Carson under this alternative. The 2/25th SBCT is authorized to fire just over 13 million rounds of training ammunition annually in comparison to the 4/4th IBCT's allocation to fire approximately 6.9 million rounds of training ammunition annually. A vast majority of this ordnance is small arms rifle and machine gun ammunition used for the weapons qualification of Soldiers. A majority of munitions expenditure would occur on designated live-fire training facilities at Fort Carson. Overall, munitions and live-fire training activi-

ties would increase minimally when analyzing the total training requirements of Fort Carson and the 5 BCTs that are scheduled to be stationed there in comparison with the increase in munitions use required to support the stationing of the SBCT.

The stationing of the 2/25th SBCT at Fort Carson would involve a slight increase in the overall amount of maneuver training that would occur at Fort Carson and PCMS following the implementation of Base Realignment and Closure Act (BRAC) legislation, Global Defense Posture Realignment (GDPR), and Army Growth and Realignment stationing decisions. To support doctrinal maneuver training requirements, a majority of training above the platoon level would have to occur at PCMS because of training land availability constraints present at Fort Carson. The Army projects an approximate 6 percent increase in the maneuver requirements for Fort Carson and PCMS as part of this alternative.

The 2/25th SBCT is projected to generate 104,898 MIMs compared to the 4/4th IBCTs annual training requirement of 49,576 MIMs. This represents an overall 111 percent increase in unit MIMs when directly comparing the maneuver requirements of the two units. Qualitatively, a greater percentage of vehicle mileage would be executed on roads and just off-road, in accordance with SBCT training doctrine and capabilities. Approximately 25 percent of the MIMs would be expended at Fort Carson to support squad and platoon maneuvers. The remaining 75 percent of these MIMs would be executed by the 2/25th SBCT while performing maneuver-training tasks at PCMS.

Several considerations need to be incorporated into the execution of maneuver training at Fort Carson and PCMS. The shortage of maneuver land available at PCMS is not an ideal solution for the 2/25 SBCT, but it is manageable. Examples of decisions that are made to address land constraints include reducing the size of the areas used for training (that is, maneuver boxes), reducing the duration of training exercises, alternating unit readiness by training less than all of the four BCTs, or a combination of these. As part of this alternative, the Fort Carson garrison commander would work with professional environmental staff and training land management staff to ensure the sustainment of the training land at Fort Carson and PCMS.

As part of this alternative, the modular 4/4th IBCT would exchange places with the 2/25th SBCT to be permanently stationed in Hawaii. It should be noted that the 4/4th IBCT does not share the Airborne designation or airborne training or facilities requirements of the 4/25th.

As detailed previously the 4/4th IBCT is assigned 663 fewer Soldiers than the SBCT. In addition, the IBCT operates and trains using only light and medium vehicles as primary modes of transport and does not possess 105 mm direct fire cannon systems or the increased artillery of the SBCT. Most vehicles, weapons systems, and equipment would be the same when comparing the 4/4th IBCT to the 2/25th prior to its transformation. One of the few differences in equipment is the 16 UAVs that the modular IBCT possesses.

The stationing of the 4/4th IBCT in Hawaii would require the completion of those transformation construction projects in Table 1 that were not specific to the needs of the Stryker unit, but are required to implement Army transformation. In addition to non-Stryker specific projects, the 4/4th IBCT would require the construction of an additional IPBC in the footprint of the BAX at SBMR to support IBCT collective live fire training events. A CALFEX capable range would be constructed in the footprint of the BAX at PTA to support up to company-level collective live-fire training events. The ranges standard design would be adjusted to meet training requirements given the terrain available to support its construction.

The 4/4th IBCT would be required to conduct semi-annual individual and crew-served weapons qualifications. The 4/4th IBCT would fire approximately 6.9 million rounds of munitions. Most of these rounds are used for individual weapons qualification and machine gun qualification and most would be used on SBMR qualification ranges.

The 4/4th IBCT would conduct weapons qualification on new ranges in Hawaii. Live fire activities would occur under Alternative C on ranges to include the QTRs, anti-armor live fire tracking range, and the IPBC to be constructed at SBMR. Additionally SRTA training would occur at the CACTF at KTA.

The 4/4th IBCT would conduct approximately 50 percent of its maneuver training on the Island of Oahu and the other 50 percent on the Big Island of Hawaii. A majority of small unit maneuver training would occur on the Island of Oahu. Training would generally be conducted at the squad, platoon, and company level. Maneuver training at PTA would generally be conducted by larger units i.e. the battalion or brigade level. The total increase in frequency of maneuver area training resulting from the stationing of the modular 4/4th in comparison to the 2/25th ID (L) would represent a less than 10 percent increase for all USAG-HI training areas.

The number of MIMs required to support the 4/4th IBCT would be 49,576. Given the existing shortfall of maneuver acreage being experienced in Hawaii, the 4/4th IBCT would need to utilize SRAA and WPAA to support maneuver-training requirements.

## 3.6 Alternative D

The No Action Alternative is the environmentally preferred alternative. The No Action Alternative shows the scenario of what would occur if the agency were not to carry out the Proposed Action and serves as a benchmark or baseline of the existing condition against which the predicted effects of the Proposed Action and alternatives can be evaluated. The No Action Alternative is to return the 2/25th SBCT to its original structure as a non-modular infantry brigade in Hawaii as it existed prior to its transformation. The No Action Alternative would not involve any unit stationing moves and would not include any actions to transform the structure of the 2/25th to an SBCT.

The No Action Alternative assumes the 2/25th SBCT would revert to the structure and equipment of the 2/25th ID (L) as it existed in 2004 without changes resulting from modularity. The brigade would train in the same manner and on the same facilities as the 2/25th ID (L) had conducted training in 2004. For land and facilities, it is important to have a real baseline against which to compare the impacts of the Proposed Action, however. Therefore, the baseline for facilities includes the actual conditions as they existed at the time of this analysis, including land ownership. This is further discussed below.

The No Action Alternative does not meet the objectives of Army Transformation or the stated Purpose and Need of this EIS because it would create a brigade that could not be properly trained, deployed, supported, and integrated into Army operations. Implementation of the No Action Alternative is not feasible. The Army is well into the process of organization-wide transformation. The Army no longer fields non-modular BCT configurations, such as the original structure of the 2/25th ID (L), and it would be impossible to support the unit logistically as it existed in 2004.

The No Action Alternative assumes that USAG-HI, Fort Richardson and DTA, and Fort Carson and PCMS have facilities that are currently in existence. Projects proposed in the 2004 Transformation FEIS that are complete or are in their final stages of completion and whose availability for use is asumed as part of the baseline condition for this analysis include:

1) UAC (SBMR)

2) Motor Pool and Maintenance Facilities (SBMR)

3) Tactical Vehicle Wash Facility (SBMR- East Range)

4) QTR 1 (SBMR)

5) Multiple Deployment Facility

6) Upgrade of Firing Range 11T (PTA)

7) Fixed Tactical Internet (SBMR and PTA)

In addition, several training projects from the 2004 FEIS have been completed or are partially complete though their use is currently enjoined. The baseline conditions used for analysis and comparison of alternatives in this document include these current existing conditions. The No Action baseline includes the following projects from the 2004 FEIS that have begun or are nearing completion to the extent that construction has occurred:

1) QTR 2 (SRAA) – 80 percent construction complete

2) BAX (SBMR) – UXO clearance mostly complete

3) Installation Information Infrastructure (PTA) – partially complete

The No Action Alternative does not include the completion of these projects or their use.

The No Action Alternative also assumes Army ownership of the Keamuku Parcel and SRAA because acquisition of these areas is complete. The No Action Alternative does not include use of these areas except to the extent that the SBMR motor pool and QTR 2 have already been sited and constructed in SRAA. The No Action Alternative includes the use of the Motor Pool. It does not include the use of QTR 2.

At the other installations in Alaska and Colorado, existing facilities, BRAC, GDPR, and construction plans for Army transformation are used for the baseline assessment of construction impacts for the continued stationing of the $4/25^{th}$ and the $4/4^{th}$ IBCT.

The Soldiers and Families of the $2/25^{th}$ ID (L) would not require any additional construction in the cantonment area of SBMR to support the No Action Alternative. There is adequate housing, office space, combat vehicle parking, and other key cantonment facilities that are on hand to meet the requirements of the $2/25^{th}$ ID (L) in addition to the other units at SBMR.

The No Action Alternative would not require construction of additional training infrastructure in Hawaii to support the training of the $2/25^{th}$ ID (L). Furthermore, no additional training infrastructure would need to be constructed to support the $4/25^{th}$ in Alaska or the $4/4^{th}$ IBCT in Colorado outside of those projects that have already been planned as part of BRAC, GDPR, or transformation, for which impacts have already been analyzed.

The No Action Alternative includes the live-fire training activities at facilities currently in existence and being used by the $4/4^{th}$ IBCT, $4/25^{th}$ and that would be available for use by the $2/25^{th}$ ID (L). Munitions fired to meet the training strategies of the $2/25^{th}$ ID (L) would be used. The respective brigades in Hawaii ($2/25^{th}$ ID (L)), Alaska ($4/25^{th}$) and Colorado ($4/4^{th}$ IBCT) would qualify using the appropriate weapons qualifications standards for live-fire to complete doctrinal live-fire training re-

quirements. The No Action Alternative assumes that the 2/25th ID (L) would train in the same manner and on the same facilities as they had prior to their transformation.

The live-fire training activities include the use of approximately 7 million rounds of training ammunition per year for each of the modular IBCTs. The 2/25th ID (L) had a requirement to fire about 7 million rounds of ammunition per year. Table 2–9 from the 2004 Transformation EIS depicts the amount of ammunition authorized to be fired to meet the training requirements of units in the garrison to include the 2/25th ID (L). Slightly less than half of the approximately 15 million rounds of ammunition depicted in this table were needed to support the 2/25th ID (L). As part of the No Action alternative, live-fire training activities to the appropriate doctrinal standards would take place on existing training range facilities.

The No Action Alternative includes the maneuver training activities required to maintain the operational training readiness of the 2/25th ID (L) in Hawaii, the 4/25th in Alaska, and the 4/4th in Colorado. Under the No Action Alternative, the respective units would conduct maneuver training at the crew/squad, platoon, company, battalion, and BCT levels. The 2/25th ID (L) would only use lands that were available for maneuver training in 2004.

## 3.7 Alternatives Considered but Not Studied in Detail

A) **Permanently Home Station the SBCT at Fort Lewis, Washington** – Under this alternative, the Army would permanently home station the 2/25th at Fort Lewis upon completion of its deployment in early 2009. This alternative was screened out of the Army's decision-making process for further consideration for several reasons that were articulated in the screening criteria section of the FEIS. Because of the receipt of a considerable number of public comments inquiring as to the suitability of Fort Lewis as a potential stationing location further elaboration and details are provided in this Record of Decision.

Fort Lewis is currently home to two of the Army's seven SBCTs, with a third in the process of standing up there. Fort Lewis was the first location to test and train an SBCT, and it possesses most of the training facilities needed to accommodate the training requirements of the SBCTs currently stationed there. The addition of a fourth SBCT, however, would not be possible by early 2009. Fort Lewis lacks the necessary garrison facilities, training infrastructure, and the Soldier and Family quality of life accommodations needed to support a fourth SBCT.

As articulated in section 2.4 of the FEIS, construction of new facilities would take 3-5 years to plan, fund, design, and build. The only locations that are able to provide for a majority of SBCT facilities required to support the 2/25th are those that can exchange an existing BCT. The exchange of a BCT frees up a majority of the training and garrison facilities required by the SBCT while preserving the Army's force structure. Fort Lewis does not have a BCT, other than the SBCTs currently stationed there, to exchange back to Hawaii to ensure the 2/25th SBCT will have the necessary garrison infrastructure.

In addition to this primary reason, there are several other secondary reasons why Fort Lewis is not suitable for the stationing of the 2/25th SBCT. Fort Lewis will be at its maximum capacity in supporting the three SBCTs to be permanently stationed there. Accommodating the full requirements of an additional SBCT would require an additional 192 acres of space within the cantonment area, temporarily discounting the fact that facilities could not be constructed in time to meet the needs of the Proposed Action. To accomplish the necessary facilities construction, Fort Lewis would be required to demolish an existing housing area, as there is no unused buildable space in the cantonment area. Fort Lewis is currently experiencing a 1,100-unit shortfall in family hous-

*Record of Decision*

ing and the surrounding community is critically short on housing availability to meet these needs. An additional SBCT would increase the requirement for married and family housing by approximately 2,000 units while reducing the housing currently available. That demand would place considerable stress on the ability of Soldiers and Families to find suitable available housing. This would in turn degrade quality of life for all of the units at Fort Lewis to unacceptable levels.

Training infrastructure availability at Fort Lewis would also become an issue with the addition of a fourth SBCT. Many of the existing training ranges and facilities would not have the scheduling capacity to support an additional SBCT. The Army conducted initial analysis into what would be required to accommodate the training infrastructure requirements of the $2/25^{th}$, on top of those requirements of units already stationed there. Although USAG-HI, Fort Carson, and Fort Richardson have a majority of the training range infrastructure and scheduling capacity required to support the $2/25^{th}$, Fort Lewis would require seven additional training ranges to meet its requirements. This shortfall in training range capacity would not allow the $2/25^{th}$ and other units at Fort Lewis to meet their training requirements as required by Army Doctrine. Range shortfalls brought on by the permanent stationing of the $2/25^{th}$ would include Rifle Marksmanship Zero Range, Sniper Qualification Range, the Multi-purpose Machine Gun Range (MPMG), the Multi-purpose Training Range (MPTR), BAX, ISBC, and an UAC.

Finally, in order to meet the Army's rapid deployment intent to deploy a Stryker anywhere in the world in 96 hours there must be some geographic dispersion of Stryker units. Stacking four Stryker units at one location would tie up deployment facilities allowing only one SBCT to deploy at a time. This lack of geographic distribution and limitation on the capability of deployment facilities would not be an optimal situation for supporting the strategic needs of the Army.

B) **Permanently Station the SBCT at an Installation in Exchange for a Heavy Brigade Combat Team (HBCT)** – Under this alternative, the Army would permanently station the SBCT at an installation such as Forts Bliss and Hood in Texas, or Stewart in Georgia and return a HBCT to Hawaii. While this alternative would preserve the force structure and number of BCTs in the Army and provide for most of the necessary facilities, it is not tenable from either training or sustainability perspectives. The separate training sites of Hawaii are not ideal for conducting HBCT maneuvers and training exercises. Logistically, transporting tanks and heavy armored vehicles between sites could only be done at considerable cost and time to the Army and at the expense of available training time for the unit and Soldiers. Transportation networks would have to be reengineered to accommodate larger and heavier equipment transportation vehicles to ensure public safety during transportation of the HBCTs oversized vehicles. In addition, several of the training areas are not conducive to cross-country HBCT training because of topographical constraints. This would increase the concentration of HBCT training in select areas that would limit its availability to meet continued training maneuver requirements.

C) **Permanently Station the SBCT at Fort Bliss or Fort Stewart Exchanging a Grow the Army IBCT back to Hawaii** – In December 2007, the Army announced a decision to establish six new IBCTs in the U.S., provided Congressional approval and funding. The first new brigades to be added will be at Fort Stewart and Fort Bliss. The IBCT at Fort Stewart will gradually replace an existing HBCT and will not be able to begin establishing itself until 2010; it will not be able to reach full strength until 2011. This is because facilities will only slowly become available. At Fort Bliss, the new IBCTs' facilities will be constructed from scratch. It will not be able to reach full strength until permanently constructed facilities are available at the beginning of 2011. The SBCT, currently a fully manned and equipped unit, would not be able to return to either of these locations in 2009 upon completion of its deployment. Because of the lack of cantonment infra-

structure needed to support the daily operations and maintenance of the SBCT, these locations have been eliminated from further consideration by the Army as alternatives for further analysis.

D) **Permanently Station the SBCT at a National Guard or Reserve Installation** – Under this alternative the Army would station the 2/25th SBCT at an Army National Guard (ARNG) or Reserve installation. ARNG and Reserve installations are designed to accommodate the needs of National Guard and Reserve Army units and Soldiers. The 2/25th SBCT is an Active Duty unit with requirements for garrison operations, deployment, training, and permanent housing and quality of life facilities for Soldiers and their Families. These requirements, and the facilities needed to support them are considerably different for Active versus Reserve component forces.

As discussed in Chapter 2 of the FEIS, the Army is in the process of conducting significant modernization of its training range infrastructure (FEIS 2-3). Because of resource limitations, only a select few ARNG and reserve mobilization sites have undergone significant range modernization that could support the training requirements of an active duty SBCT. These installations, such as Camp Shelby and Fort Dix, are fully engaged in training and mobilizing Soldiers for on-going operations. Furthermore, these mobilization facilities provide only basic temporary housing and dining facilities for reservists to conduct pre-deployment training. These facilities are designed to different standards and do not meet Active Duty stationing requirements for permanently stationed Soldiers and their families.

Although the 56th BCT did transform to an SBCT in Pennsylvania, this ARNG SBCT does not require permanent housing, garrison support, utilities, or the full range of facilities required to support the Soldiers and Families of an active duty BCT, such as the 2/25th. Any conversion of an ARNG or Reserve facility would require hundreds of millions of dollars in infrastructure expenditure and five to ten years to complete to meet the full measure of permanent facilities required for the 2/25th SBCT. Because this set of alternatives is not capable of meeting the permanent stationing for the 2/25th SBCT, it has not been carried forward for detailed analysis.

E) **Permanently Home Station the SBCT with an Overseas Host Nation** – Under this alternative, the Army would permanently station the 2/25th SBCT at an overseas installation on foreign soil. National security and defense policy has prescribed through the NDS, QDR, and other documents that the U.S. will rely on the rapid projection and deployment of units from within the U.S. In this way, the U.S. can fully control the availability and readiness of its units without having to rely on host nation support. In accordance with this defense policy guidance, the Army is in the process of bringing 44,500 Soldiers home from overseas stationing locations in Europe and Korea. The Army will not be stationing any additional combat brigades overseas. Stationing the 2/25th at a foreign overseas location is not in accordance with security and defense policy directives and decisions of the NDS and QDR. The consideration of overseas stationing locations is therefore not included in this document.

F) **Acquire Land to Support the Training Requirements of the SBCT** – Under this alternative, the Army would acquire land at Fort Knox, Fort Drum, Fort Riley, or Fort Polk to mitigate land shortfalls to meet the training needs of the SBCT. The military land acquisition process is a lengthy process that is very similar to military construction. To complete the process would take a minimum of five to ten years. A military land acquisition project must first be approved and funding must be appropriated. In addition, the Department of Defense (DoD) must approve a waiver of its policy that places a moratorium on major land acquisition. Environmental surveys and studies must be completed before any real estate transaction may begin. The entire process would take too long to meet the permanent stationing needs and requirements of the 2/25th SBCT. In addition to the time constraints of the process, there are land availability constraints. Discount-

ing the fact that the land acquisition process takes too long to support the maneuver training needs of the 2/25th, lack of available land would preclude land acquisition as a viable solution to meet the training space needs of the 2/25th SBCT. Because of these limitations, the Army did not consider land acquisition at installations such as Fort Knox, Fort Polk, Fort Drum, and Fort Riley a viable alternative to carry forward for analysis.

While it is true that the Army has proposed expanding Fort Polk, Louisiana and has received endorsement from Louisiana public officials, the process is just beginning. The expansion must be approved by the Department of Defense before any planning can begin (to include NEPA analysis). That approval has not occurred. The length of time this alternative would take is materially different from that required for the three action alternatives given full consideration. Limitations discussed as part of this alternative are fully applicable to Fort Polk and its suitability for stationing of the 2/25th SBCT.

G) **Permanently Headquarter the 2/25th in Hawaii but Conduct Stryker-specific Maneuver and Live-fire Training Events at Locations other than Hawaii** – Training locations could include training centers such as Fort Irwin, California and Fort Polk, Louisiana. This alternative would require very frequent movements of Soldiers and equipment. This would be both time-consuming and expensive. The deployment would also be very disruptive to Soldiers and their Families. Finally, alternative training areas are heavily used by other Army units, making it difficult to schedule the 2/25th requirements. For these reasons, this alternative does not meet the purpose and need for the Proposed Action. It was therefore not carried though for full evaluation as a reasonable alternative.

H) **Station the 2/25th in Hawaii Temporarily, and then Permanently Station the 2/25th SBCT in another Location when Facilities Construction is Completed** – The 2/25th has deployed to support current operations and is scheduled to complete its current deployment in early 2009. Under this alternative, the 2/25th would be stationed in Hawaii for several years until an additional set of SBCT facilities were constructed at an alternate location. As discussed as part of the Proposed Action, the 2/25th would need to be stationed in a location that provides for SBCT training and operational requirements upon its return from deployment. It would take approximately 3-5 years or more through the military construction process to appropriate funding to build additional SBCT facilities at another installation location. Even if programmed funding could be accelerated, it would take a minimum of 3-4 years to implement project construction and have facilities ready for the SBCT. This would leave the SBCT without adequate training facilities for an extended period of time. This would not allow the SBCT to prepare fully for operational deployments without deploying to other installations in the continental US to train, which adds increase stress on Soldiers and their Families.

The 2/25th was able to be deployed in 2007, but the conditions were less than optimal. Training facilities for the SBCT were not available and the unit had to make do with other facilities and conduct 20 days of additional training away from home station just prior to a 15-month deployment. While this had to be done to meet deployment schedules, this lack of ability to train the SBCT to training readiness standards at home station is not considered sustainable or feasible for the Soldiers and Families of the 2/25th SBCT. Army deployments have taxed and stressed Soldier and Family relationships Army wide.

To move ahead with construction of required training projects in Hawaii and then station the SBCT at another location would also be unacceptable. A second set of SBCT facilities would need to be built at another location to support the eventual permanent stationing of the SBCT. The construction of a duplicate set of SBCT facilities in Hawaii as well as a second set in another

*Record of Decision*

location would represent a waste of project funding on two sets of facilities. Given the inefficiencies inherent in such an alternative, it is not carried forward as a reasonable alternative for analysis in this document.

The BAX is specifically designed for SBCT training with appropriate instrumentation needed for such training. The BAX is larger than the facility that would be built for an IBCT. In addition, the BAX is almost twice as expensive. Building a BAX to support an IBCT would not make sense, both in terms of size and expense.

I) **Drop the 2-25th from the Army inventory and constitute the Army with one less SBCT-** Under this alternative, there would be only one Army BCT in Hawaii, the 3-25th IBCT. The current 2-25th SBCT would be disbanded once it completed its current combat mission. Its personnel would be sent elsewhere and its equipment placed in storage or distributed to other units. This alternative would reduce the Army's combat forces at a time when those forces are under considerable strain. This alternative would not meet the Army's force requirements to support global and regional security requirements. For these reasons, this alternative does not meet the purpose and need for the Proposed Action. It was therefore not carried though for full evaluation as a reasonable alternative.

## 4.0 DECISION

I have reviewed the FEIS for the Permanent Stationing of the 2/25th SBCT. On behalf of the Army, I have decided to proceed with all facets of Alternative A, which is to station the 2/25th SBCT permanently at SBMR while conducting the required training at military training sites in Hawaii. This alternative is summarized in the ROD and described fully in Chapter 2 of the FEIS. The FEIS assessed the potential environmental consequences of the alternatives on the biological, physical, and cultural environments. The FEIS is incorporated by reference.

Under Alternative A, the Army will permanently home station the 2/25th SBCT in Hawaii upon completion of its current deployment to Southwest Asia. This alternative will include all of the activities needed to implement the Proposed Action, including the training, garrison operations, deployment, support of Soldier and Family quality of life, and other needs for meeting the requirements of the 2/25th SBCT. The 2/25th SBCT will be stationed at SBMR and will conduct garrison operations at this location. SBMR includes SBMP, SRAA, and SBER. Training will be conducted at a number of other training areas in Hawaii, including DMR, KTA, KLOA, and WAAF on Oahu. On the Island of Hawaii, the SBCT will train at PTA, Keamuku parcel also referred to in this document as WPAA, and BAAF. Training resources that will be used by the SBCT include an assortment of live-fire and non-live-fire maneuver training facilities, fixed-position live-fire training facilities, infantry and engineer demolition training facilities, grenade training facilities, and an urban assault course.

The EIS states categorically that use of MMR is not part of the proposed action. The SBCT can be fully trained in all its mission essential tasks without the use of MMR. For purposes of this stationing decision, MMR has been determined to be unavailable for the live fire training of the SBCT.

The use of MMR for live fire training is currently enjoined by a federal court pending completion of a separate EIS. Should this EIS result in a decision to resume live fire training at MMR, it would be possible that the SBCT could perform some dismounted live-fire training and convoy live-fire training there. I have therefore taken into account the information contained in the June 2005 Draft EIS (DEIS) for Military Training Activities at MMR as well as the June, 2007 Biological Opinion for that

action. I understand that it will be at least six months before an FEIS for that action is issued. The stationing decision for the 2/25th SBCT cannot wait for the MMR decision.

Another issue involving MMR needs clarification. Both alternatives B and C of this EIS state that for an IBCT coming to Hawaii, "a CALFEX capable range would be constructed in the footprint of the BAX at PTA to support up to company-level collective live-fire training events." It is important to understand that if there were two IBCTs stationed in Hawaii, there would be no reason to build the BAX at PTA. The statement in the EIS should not be misunderstood to mean that the PTA BAX location is the only place on PTA on which a CALFEX site could be located, or that stationing of the SBCT in Hawaii in any way forecloses possibility of a PTA alternative for the training proposed for MMR. To the contrary, I understand that the public has suggested a PTA alternative to MMR and that such an alternative (other than the BAX location) will be included in the FEIS for Military Training Activities at MMR. Stationing an SBCT in Hawaii does not make the resumption of live fire at MMR a foregone conclusion.

## 5.0 RATIONALE FOR THE DECISION

My decision to implement Alternative A is based on consideration of the analyses contained in the FEIS, comments provided during formal public comment and review periods, and an evaluation of the ability of each alternative to meet the Purpose and Need for the Proposed Action. Thus, I balanced the relative strengths and weaknesses of each alternative to meet the Army's need for the Proposed Action.

Based on my review of these components of the decision, I selected Alternative A for implementation. I selected Hawaii primarily because it is best able to meet the Army's strategic defense and national security needs in the Pacific theater. In making my decision, I was fully informed as to the limitations in Hawaii in terms of training ranges, maneuver land, and impacts to sensitive environmental and cultural resources. I also considered the conditions of training ranges and maneuver land at the alternate stationing locations.

In part, my decision was based on the fact that the U.S. is a nation with vital interests in the Pacific Rim and Southeast Asia. Both the NMS and the QDR provide decisions and directives to reorient and focus additional combat power in the Pacific Region. To support national security goals and objectives, the U.S. Pacific Command (PACOM) must be prepared to handle contingencies involving a number of potential conflict scenarios. Strategic concerns in the region include:

- The U.S. commitment to the defense of Taiwan
- The U.S. commitment to Japan and South Korea in containment of North Korean aggression
- The U.S. commitment to deterring North Korean nuclear advancement
- The U.S. commitment to deterring sanctuary for terrorist organizations and preventing the growth of safe harbor for terrorist organizations and growing insurgency in Indonesia, the Philippines, and other areas of growing unrest in Southeast Asia
- The U.S. commitment to allaying ethnic conflict in Indonesia
- The U.S. commitment to supporting democracy in Southeast Asia

One of the primary areas of need for the Proposed Action is to further Army Transformation as directed by the QDR and defense policies outlined above and in the FEIS. To implement the decisions in the QDR, the Army has developed the Army Campaign Plan (ACP). The ACP serves as the