*Record of Decision*

Army's roadmap to accomplishing the goals set forth in the QDR and is the overarching planning document that guides Army Transformation. The QDR directed the Army to transform to a highly expeditionary force, or one that is capable of supporting itself in a combat environment without depending on continual supply and logistics support, while being highly mobile, deployable, and agile in response to decentralized contingencies and unconventional enemy operations. Additionally, the QDR directed the Army to integrate with the capabilities of our sister services to provide greater inter-operability and communication. The SBCT accomplishes the mission that the QDR envisioned-providing lethality, mobility, enhanced communications capability and greater interoperability from a self-supporting armored combat/combat service support platform requiring reduced logistical support requirements and greater protection on the battlefield.

The Stryker vehicle is the most advanced weapon system used by any country in the southeastern Pacific Rim. It therefore can provide a dominant force for contingency deployments. Although an SBCT cannot be deployed as rapidly as an IBCT, it can be deployed much more quickly than an HBCT.

PACOM conducts contingency planning to support the goals of the NSS and NDS to ensure the Army can fulfill its operational obligations to carry out the NMS in the Pacific Region of Interest. The rapid deployment capabilities of the SBCT currently represent the Army's most credible threat of projecting force in the Pacific region to shape the U.S.' strategic national security interests and therefore enable the Army to carry out its operational requirements. Deployment times for SBCTs from various spots in the United States to regions around the world appear similar. These deployment times, however, are based on a significant number of aircraft being available to transport the SBCT to its destination (GAO-03-801). In reality, there would probably be far fewer aircraft available and the same planes would have to make several trips. In this case, seemingly small differences in deployment times would multiply as the aircraft turned around to make additional trips. This is a much more realistic scenario and increases the value of forward stationing of the SBCT in Hawaii to support Pacific Rim contingencies. Furthermore, having SBCT units stationed in different locations permits the Army to rapidly and effectively deploy critical elements of multiple SBCT units at the same time. This alternative will also permit the Army to deploy a SBCT in the event that circumstances prevent the deployment of a SBCT from another location.

Stationing the 2/25th in Hawaii provides the Army with two distinct sets of deployment facilities strategically forward positioned at locations outside of the continental United States from which to deploy an SBCT to support national security requirements and operations in the Pacific Theater. Hawaii provides strategic flexibility, in conjunction with Alaska, for deploying forward positioned elements of an SBCT to support operations in the Pacific. This flexibility allows the military to deploy an SBCT to support contingencies even when the inclement weather or cold temperatures of Alaska's winter season prevent the air deployment of C-17 aircraft. The selection of Hawaii as the stationing location for the 2/25th will allow the Army the flexibility to deploy two SBCTs, or elements thereof simultaneously, if the Army is required to do so. This is especially true because both Hawaii and Alaska have C-17 aircraft permanently based at each location. During Alaska's extended winter season, SBCT vehicles must be winterized for cold weather operations, with special chains and lubricants that would not allow the unit's equipment to function properly if required to deploy to tropical climates of the South Pacific. Stationing an SBCT in Hawaii would require less pre-deployment preparation of vehicles, Soldiers, and equipment to countries in the Pacific with warmer climates. In addition, Hawaii is much closer to countries of the South Pacific, and the Army could respond much more rapidly than with troops stationed in either Alaska or Colorado if they were needed for peace support, stability, or wartime operations.

The stationing of an SBCT in Hawaii provides the Combatant Commander of U.S. forces in the Pacific with a unique capability to support military operations in the theater. The SBCT is highly de-

ployable and its armaments, firepower, and digital communications capabilities are superior to the equipment of nations in the Southeast Pacific. The 2/25th demonstrates the U.S. commitment to allies in the Southeast Pacific and provides key strategic deterrence presence that other stationing alternatives of this FEIS do not provide.

In addition to these reasons, Alternative A minimizes disruption to Soldiers and Families in Hawaii, Alaska, and Colorado that would be affected by the selection of Alternatives B or C. The Families of the 2/25th, 4/4th, and 4/25th are currently living in Hawaii, Colorado, and Alaska; respectively, and the selection of Alternative A allows these Families to remain in their current stationing locations.

The selection of Alternative A also allows the Army to provide better housing and quality of life infrastructure for the Soldiers and Families of the 2/25th. Furthermore, many of the Soldiers of the 2/25th have long-term reenlistment contracts in place to remain in Hawaii and Alternative A ensures the Army would be able to honor these commitments to its Soldiers. Many of these Soldiers have military occupational specialties that are specifically tied to the Stryker system. If there were no SBCT in Hawaii, they would be assigned elsewhere.

As discussed in detail in Chapter 2 of the FEIS and outlined above, the advantages of stationing the 2/25th in Hawaii outweigh the limited advantages of stationing the 2/25th in Alaska or Colorado and have led to my selection of Alternative A.

## 6.0 PUBLIC INVOLVEMENT

The public's participation has been carefully considered throughout this NEPA process. The Army has provided several opportunities for the public to participate and has considered the public's comments in reaching this decision. These include issuing in the *Federal Register* a Notice of Intent (NOI) to prepare an EIS, a public scoping process, a 45-day public review period for the DEIS, and publication of the FEIS, accompanied by a 30-day waiting period before a final decision was made and a ROD issued.

Following publication in the *Federal Register* of the NOI on January 4, 2007, public notices were published in the major newspapers on the Islands of Hawaii and Oahu announcing the times and locations of five public scoping meetings to solicit input and to obtain comments on the scope and desired content of the EIS. Public notices were also published in Colorado, Alaska, Washington, and Kentucky announcing the times and locations of nine public scoping meetings in these four states. The 45-day scoping period began on January 4, 2007 and ended on February 20, 2007. Fourteen scoping meetings were held between January 29 and February 16, 2007. For residents and groups in Hawaii, public scoping meetings were held in Waianae, Honolulu, Haleiwa, Waikoloa, and Hilo. For residents and groups in Colorado, public meetings were held in Colorado Springs, Trinidad, and La Junta. For residents and groups in Alaska, public meetings were held in Anchorage and Delta Junction. For residents and groups in Kentucky, public meetings were held in Shepherdsville and Radcliff. Finally, for residents and groups in Washington, public meetings were held in Lakewood and Yakima. A total of 284 people signed in at the 14 meetings.

At the public scoping meetings, 69 individuals and persons representing organizations provided oral comments via court reporters and video camera for the Army's consideration. The Army also received written comments from 199 individuals and organizations in the form of e-mails, facsimiles, individual letters, and form letters. The Army compiled a scoping report, identifying and assessing the issues brought forth through the scoping process. The major concerns and issues expressed during the scoping process that were determined to be within the scope of the EIS are as follows:

### Hawaii

- Not enough resources (land area, water, housing, etc.) exist on Hawaii to support more troops.
- Contamination of air, soil, and water, especially depleted uranium (DU) concerns.
- Monitoring of air, soil, and water.
- Impacts to cultural sites.
- Impacts to natural resources, including sensitive geologic areas.
- Need to assess cumulative impacts of all military activities in Hawaii.
- Identification and impacts of actions on true landowners and tenants.
- Alternatives where armored units already train were not fully considered (Forts Hood, Bliss, Benning, and Stewart), also why not Korean peninsula?
- Better to put SBCT close to major airfields that are larger than those on Hawaii. Proximity to airlift is more relevant than geographic location.
- Increase in wildfire risk.
- Expansion of Hawaiian facilities with the potential of inadequate training in the future when communities develop to the property line.
- Traffic and noise impacts.
- Mainland locations have more area and are more distant from communities.

### Alaska

- The Memorandum of Agreement (MOA) between US Army Alaska (USARAK) and Delta Junction needs to be considered.

### Colorado

- Monitoring impacts to the restricted PCMS.
- Impacts to soil and grassland.
- Effects to historic aspects of the Santa Fe Trail.
- Natural resource and archeological resource concerns.

The comments and concerns of the public and agencies were used to determine the focus of analysis and selection of alternatives. A summary of the comments received during the scoping process is included in the project record, organized by location, meeting date, and subject.

In addition, following publication of the DEIS, the Army held multiple meetings in Hawaii, Alaska, and Colorado following an extended 100-day public comment period that started on July 20th and closed on October 30, 2007. Comments received from these meetings have been presented to Senior Army Leadership to provide additional information to decision makers and they have been used to help shape discussion presented in this FEIS.

In addition to comments collected at the public meetings, 228 comments were received by mail, facsimile, and e-mail. Of that total, 212 pertained to the Proposed Action in Hawaii, 11 pertained to the

Proposed Action in Colorado, two were not location specific, and three were from Federal agencies commenting on the project as a whole.

Comments on the DEIS are summarized below.

### Hawaii:

- Opposition to the military occupying more land.
- Spread of DU off contaminated ranges via water and dust; Health effects of DU; Decontamination of overseas equipment.
- The Army has not cleaned up contamination of the Hawaiian Islands from past activities.
- Insufficient land area to support expansion of Army training.
- Negative impacts to the tourist industry.
- The DEIS does not address the United Nation's Declaration on the Rights of Indigenous Peoples.
- Concerns that funding will be available for mitigation.
- SBCT training will increase dust and noise impacts off-post.
- The Army is occupying land on Oahu and Hawaii Island illegally.
- Project will destroy known and unknown cultural resources.
- Religious access to resources has been cultural restricted and will be further restricted.
- Concerns of the Army's ability to identify cultural resources.
- The project will increase the cost of living, strain public services and schools, and increase competition for housing and jobs.
- Army use of the Superferry in Hawaii.
- Use of Strykers in Makua Valley.
- Basing the 2/25th SBCT in Hawaii would have more significant effects than either the Alaska or Colorado alternatives.
- Impacts to subsistence were not considered in Hawaii.
- Impacts to the large number of threatened, endangered, and sensitive species.
- The project will spread non-native invasive species.
- Impacts to surface and groundwater quality and quantity.
- Use of areas of cultural and religious importance for military training.
- Increase risk of wildfire.

### Alaska:

- Ensure cumulative effects of the Army's Eagle River Flats Proposal and Alternative B are accurately captured.

### Colorado:

- Stationing of the 2/25th SBCT at Fort Carson will increase social problems in Colorado Springs and adjoining communities, such as transience and violence.

*Record of Decision*

- The project will justify future expansion of the PCMS.
- PCMS encompasses undisturbed, pristine natural areas with important ecological, archaeological, and historical values that must be protected.
- Training activities at PCMS will impact air quality.
- Archaeological, historic, and paleontological resources at the PCMS.
- Effects to Native Americans. Eleven federally recognized tribes have some cultural affiliation with the PCMS region.
- Effects on the rural communities surrounding PCMS.
- Impacts to the fragile grassland ecosystem.

## 7.0 ENVIRONMENTAL CONSEQUENCES

The tables below provide a comparative summary of the potential impacts of implementing each alternative for the permanent stationing of the 2/25th SBCT. The tables exhibit the composite impact (direct and indirect impacts and cumulative impacts) for each Valued Environmental Component (VEC) resulting from implementation of each alternative.

The composite impact incorporates the impacts from four activity groups that were analyzed (Cantonment Construction, Range Construction, Live-Fire Training, and Maneuver Training) occurring in all specific areas that would be affected in Hawaii, Alaska, and Colorado. To summarize these impacts comparatively, the highest impact level to each VEC that would be realized from any of the four activity groups in any of the impacted areas is used as the single impact rating for each alternative. Likewise, for the No Action alternative (Alternative D), the composite impact rating incorporates the impacts that would occur in all three locations (Hawaii, Alaska, Colorado) under the No Action alternative.

As noted in Section 5.2.5.4 of the FEIS and in response to public comments, the Army will continue to provide Native Hawaiians with access to traditional religious and cultural properties, in accordance with the American Indian Religious Freedom Act (AIRFA) and executive order 13007, on a case-by-case basis. This access program would be expanded to include SRAA and WPAA. The SBCT Programmatic Agreement (PA) also indicates that the installation will generally look favorably on affording access to historic sites to Native Hawaiians, subject to military operational requirements, security conditions, and other pertinent circumstances, such as safety.

### Summary of Direct and Indirect Impacts to each VEC by Alternative

| VEC | A - Hawaii | B - Alaska: Impacts in Alaska | B - Alaska: Impacts in Hawaii | C - Colorado: Impacts in Colorado | C - Colorado: Impacts in Hawaii | D - No Action |
|---|---|---|---|---|---|---|
| Soil Erosion | ⊗ | ⊘ | ⊘ | ⊗ | ⊘ | ⊘ |
| Water Resources | ⊘ | ⊙ | ⊘ | ⊙ | ⊘ | ⊘ |
| Wildfire Management | ⊗ | ⊗ | ⊗ | ⊗ | ⊗ | ⊗ |
| Cultural Resources | ⊗ | ⊗ | ⊗ | ⊗ | ⊗ | ⊘ |
| Land Use and Recreation | ⊘ | ⊙ | ⊙ | ⊘ | ⊙ | ⊙ |
| Traffic and Transportation | ⊙ | ⊙ | ⊙ | ⊘ | ⊙ | ⊘ |
| Socioeconomics | ⊘ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ |
| Hazardous Materials/ Hazardous Waste | ⊘ | ⊘ | ⊙ | ⊘ | ⊙ | ⊙ |
| Wetlands | ○ | ⊘ | ○ | ○ | ○ | ⊙ |
| Vegetation | ⊙ | ⊘ | ⊙ | ⊘ | ⊙ | ⊙ |
| Noxious Weeds | ⊘ | ⊙ | ⊘ | ⊙ | ⊘ | ⊘ |
| Threatened and Endangered Species | ⊗ | ⊙ | ⊗ | ⊘ | ⊗ | ⊘ |
| Wildlife and Habitats | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ |
| Air Quality | ⊗ | ⊙ | ⊘ | ⊗ | ⊘ | ⊙ |
| Noise | ⊗ | ⊙ | ⊗ | ⊙ | ⊗ | ⊗ |
| Airspace | ⊙ | ⊙ | ⊘ | ⊙ | ⊙ | ⊙ |
| Energy Demand and Generation | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ |
| Facilities | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ |
| Subsistence | N/A | ⊙ | N/A | N/A | N/A | ⊙ |

⊗ = Significant
⊘ = Significant but mitigable to less than significant
⊙ = Less than Significant
○ = No Impact
+ = Beneficial Impact
N/A = Not Applicable

In addition to these direct and indirect effects that the Army assessed for stationing of the 2/25th under different alternatives, it also conducted an assessment of cumulative impacts when looking at this proposed action in terms of past, present and reasonably foreseeable proposals in the region. The impact assessment below incorporates the impacts when viewed in the context of proposals and actions which have already occurred or which may take place in the future.

The FEIS takes into account past, present and reasonably foreseeable future actions. On 7 January 2008, the Army published the ROD for an EIS for Army Growth and Force Structure Realignment. That decision did not cover Alaska or Hawaii. Final decisions for unit stationing in Hawaii and Alaska will not be made for some time until costs and environmental impacts of the decision are understood. Stationing numbers will continue to fluctuate as the assessment of stationing needs is refined. On 13 March 2008, the Army published a Notice of Intent (NOI) for a supplement to the

*Record of Decision*

Growth EIS, designed to look at changes to support operations in the Pacific Theatre including Alaska and Hawaii. This EIS will examine the potential growth to support the entire Pacific Theatre and, as noted in the NOI, will include analysis of different stationing scenarios which may include installations in the Continental U.S., not just Hawaii. My staff is responsible for determining the numbers of Soldiers that will ultimately be proposed for stationing under this supplemental EIS. When we have made final determinations of the growth required to support operations in the Pacific Theater the Supplemental Programmatic EIS for Army growth will identify and analyze the cumulative impacts of both itself and past, present, and reasonably foreseeable future actions (to include this Stryker Stationing EIS.

### Summary of Cumulative Impacts to Each VEC for Each Alternative

| VEC | A – Hawaii | B - Alaska | C – Colorado | D – No Action |
|---|---|---|---|---|
| Soil Erosion | ⊗ | ⊘ | ⊗ | ○ |
| Water Resources | ⊘ | ⊘ | ⊘ | ○ |
| Wildfire Management | ⊗ | ⊗ | ⊗ | ○ |
| Cultural Resources | ⊗ | ⊗ | ⊗ | ○ |
| Land Use and Recreation | ⊗ | ⊙ | ⊙ | ○ |
| Traffic and Transportation | ⊙ | ⊙ | ⊙ | ○ |
| Socioeconomics | ⊘ | ⊙ | ⊙ | ○ |
| Hazardous Materials and Hazardous Waste | ⊗ | ⊘ | ⊙ | ○ |
| Wetlands | ○ | ⊘ | ○ | ○ |
| Vegetation | ⊙ | ⊙ | ⊘ | ○ |
| Noxious Weeds | ⊗ | ○ | ⊘ | ○ |
| Threatened and Endangered Species | ⊗ | ⊙ | ⊘ | ○ |
| General Wildlife and Habitat | ⊙ | ⊙ | ⊘ | ○ |
| Air Quality | ⊗ | ⊙ | ⊗ | ○ |
| Noise | ⊗ | ⊘ | ⊙ | ○ |
| Airspace | ⊙ | ⊙ | ○ | ○ |
| Energy | ⊙ | ⊙ | ⊙ | ○ |
| Facilities | ⊙ | ⊙ | ⊙ | ○ |
| Subsistence | N/A | ⊙ | N/A | ○ |

⊗ = Significant  
⊘ = Significant but mitigable to less than significant  
⊙ = Less than Significant  
○ = No Impact  
+ = Beneficial Impact  
N/A = Not Applicable

*Record of Decision*

## 8.0 FEIS UPDATE

In addition to the resources discussed in the FEIS, the Army has sighted the nene (*Branta sandvicensis*), a native Hawaiian goose, within the WPAA. The nene maintains separate breeding and feeding areas in Hawaii. To date the species is known to occur on the Big Island of Hawaii, Maui, Molokai, Lanai, and Kauai. It is a ground nesting species that has been identified at PTA in the past during flights over the training area. In late January 2008, Army natural resource personnel sighted a pair of nene while conducting a reconnaissance near the site for a dip tank project, one of the Integrated Wildfire Management Plan (IWFMP) projects in the WPAA. The nene were spotted approximately 1 kilometer from the project. A second pair of nene was observed in the same general area, but slightly farther from the project site, a few days later. The first pair of nene may have attempted to start a nest but no eggs were observed. When personnel revisited the site approximately five days later, the nene were no longer found at the site. No nest was observed as being associated with the second pair of nene observed. PTA personnel observed another single nene in the vicinity of the site on February 20, 2008. No nene have been observed in the area since the February 20th sighting.

The Army notified the U.S. Fish and Wildlife Service (USFWS) of the nene sightings and ceased activity on the dip tank project. Subsequent coordination with the USFWS determined that work could take place in the area if natural resource staff are present at the construction site to record observations of the species. If nene are present in the immediate area of the construction site, construction will cease until the nene leave the area. The Army is in the process of preparing a Biological Assessment to initiate formal Section 7 consultations under the Endangered Species Act (ESA) to address use of the WPAA in light of this development. The Army anticipates that it will complete consultation by September/October 2008.

On 19 March 2008, Dr. James Morrow testified before the Hawaii legislature on the risk associated with depleted uranium, focusing on PTA. His testimony concluded with a determination that the depleted uranium at PTA did not represent a significant effect on air quality or risk associated with radiation.

This new information was taken into consideration as part of this decision, and the Army intends to carry out its responsibilities under the ESA.

## 9.0 MITIGATION MEASURES

Mitigation actions are expected to reduce, avoid, or compensate for most adverse effects. Subject to the availability of funds, the Army shall take all necessary steps to implement the mitigation and monitoring measures referenced in the 2004 ROD, which are incorporated by reference into this ROD. These mitigation measures, including regulatory and administrative requirements, will help substantially reduce significant impacts to affected resources, and will provide a substantial benefit to the affected resources. The 2004 ROD does not include those measures that are considered standard operating procedures and best management practices, which will be integrated into and implemented as part of the proposed projects.

Several new mitigation measures were identified during the 2007 impact analysis and are included in the 2008 FEIS. All mitigation measures identified in the 2008 FEIS are adopted. These measures include:

- *Land use and Recreation Additional Mitigation 1:* Access controls will be developed and implemented to ensure the safety of all personnel; and warning signs would be posted on the boundary to prevent unauthorized use/trespass. (FEIS page 5–31).

- *Biological Resources Additional Mitigation 2:* The Army will prevent any weeds brought in from becoming established by rigorously monitoring using transects and roadside surveys and eradicating new weeds using the most effective means known specific to each of the invasive species.

  - The Army will provide education regarding cleaning vehicles and field gear. These education materials will be USFWS-approved. (FEIS page 5-48)
  - The Army will wash vehicles in wash rack facilities prior to returning from the training areas, to minimize the spread of weeds (e.g., fountain grass). (FEIS page 5-49)
  - The Army will train and require Soldiers to clean their gear and vehicles when first arriving in Hawaii and prior to moving from installation to installation, as well as when moving from island to island. (FEIS page 5-49)

All regulatory requirements will be implemented in their entirety. Implementation and monitoring plans discussed in the mitigation table ES-22 of the 2004 EIS will be developed and implemented within 365 days of the ROD signing, unless otherwise identified. All implementation plans shall define the goal and objective of the plan and shall include status report due dates, monitoring timeframes and thresholds, and contingency measures to ensure the plan meets these defined goals and objectives. The mitigation enforcement and effectiveness-monitoring program will be consistent with the guidance at 32 CFR Part 651, Appendix C.

The mitigation and monitoring measures adopted in this ROD reflect all practicable means to avoid or minimize environmental harm. Combined with existing environmental stewardship measures, full implementation of the measures will aid in avoiding, minimizing, reducing, or rectifying adverse effects over time to land use and recreation, visual resources, air quality, noise, traffic, water resources, geology, soils and seismicity, biological resources, cultural resources, human health and safety, and socioeconomic and environmental justice.

## 10.0 POINT OF CONTACT

If you have any questions or wish to obtain additional copies of this document, please contact: Public Affairs Office, U.S. Army Environmental Command, Building E4460, 5179 Hoadley Road, Attention: IMAE-PA, Aberdeen Proving Ground, MD 21010-5401, telephone: 410-436-2556, facsimile: 410-436-1693, email: publiccomments@aec.apgea.army.mil.

*[signature]*  //April 2008

LTG James D. Thurman                Date

James D. Thurman

Lieutenant General, U.S. Army

Deputy Chief of Staff, G-3/5/7